```
 1          Q.      Did you come into the firm as a
 2   principal?
 3          A.      Yes.
 4          Q.      Do you have much experience, or do
 5   you have any experience in advising clients on
 6   life insurance policies?
 7          A.      I mean, not much.
 8          Q.      And you worked in a lot of trust and
 9   estate work, as you said?
10          A.      Yes.
11          Q.      Is it common that a life insurance
12   policy would be included in a trust or estate
13   plan?
14          A.      Somewhat.  Not always.  Less now
15   because of changes in the estate tax law.
16          Q.      Have you had clients in the past
17   reach out to you for advice on life insurance
18   policies?
19          A.      Yes.
20          Q.      And when that happens, do you
21   typically answer their questions?  Or do you find
22   them a third party attorney or someone else in
23   your office to better help them?
24          A.      I typically discuss it with somebody
25   else appropriate in our office.
```

EXHIBIT B

```
 1   documents, both electronically, and you also

 2   allowed the firm of Jacobson and I to come in and

 3   view your file in person?

 4          A.     Yes.

 5          Q.     And there were a number of documents

 6   that you copied for us out of the file and

 7   produced supplementary to us?

 8          A.     Yes.

 9                 MR. SLABY:  Just for the record,

10   there was a privilege log provided that --

11                 MR. BRODZIK:  And I'm going to mark

12   this as Exhibit C.

13                 (Whereupon, Exhibit C is marked for

14   identification.)

15   BY MR. BRODZIK:

16          Q.     This was a privilege log that was

17   provided to us in conjunction with us getting an

18   original production and then coming in the office

19   to review the file?

20          A.     (Nodding.)

21          Q.     Okay.  Based on the privilege log

22   that you have issued, is it your understanding

23   that none of the documents that you have produced

24   to us or that you have copied and then given to us

25   you are claiming privilege to?
```

EXHIBIT B

```
 1          A.      Yes.
 2          Q.      So the background of this suit, or
 3   the allegations in the pending petition, all
 4   essentially resolve around a life insurance policy
 5   that was taken out by Dr. Wiegand on his then
 6   wife, Jean Cameron Wiegand's life.  Are you
 7   familiar with that policy?
 8          A.      Somewhat.
 9          Q.      For the record, it is called a
10   Universal Life Accumulator Policy, Number
11   62791665.  Have you ever read this policy?
12          A.      I have read parts of it.
13          Q.      What parts of the policy do you
14   recall having read?
15          A.      Primarily, the first several pages
16   of the policy.
17          Q.      Is there a reason why you would read
18   the first several pages of the policy and not the
19   entirety of it?
20          A.      As I recall, the policy was -- it's
21   a very substantial number of pages.  It's not a
22   short document, and you know --
23          Q.      So you didn't feel like it was
24   necessary to read the entirety of it, or --
25          A.      My conversations with the clients
```

1    about my involvement with this policy are

2    privileged.  And this is starting to touch on

3    that, so I can't go any further.

4              MR. BRODZIK:  Can you certify that

5    question, please?

6              (Whereupon, the pending question is

7    certified at the request of Mr. Brodzik.)

8    BY MR. BRODZIK:

9        Q.    Did you assist in procuring this

10   policy?

11       A.    No.

12       Q.    Do you know who procured the policy?

13       A.    There was -- I believe it was an

14   insurance broker that the Wiegands worked with.  I

15   can't recall the name of the company.  And I think

16   it's defunct.  I'm fairly sure it's defunct,

17   because I understood that the broker had died

18   somewhere along the line.

19       Q.    Understood.  Are you familiar with

20   life accumulator life insurance policies?

21       A.    Not enough to talk about them.

22       Q.    So you don't know the difference

23   between -- or you can't describe the difference

24   between a life accumulator policy and a standard

25   term life insurance policy?

EXHIBIT B

1          **A.      I can't explain the difference.  I**

2    **know that there is a difference between a term**

3    **policy and most other kinds of whole life or term**

4    **life or accumulative policies.**

5          Q.      Do you recall what the life benefit

6    on Ms. Jean Wiegand was on this particular policy?

7          **A.      Not precisely.**

8          Q.      Do you recall what the initial

9    up-front premium was on this policy?

10         **A.      I can't accurately recall.  I have a**

11   **vague impression.**

12         Q.      What is your vague impression?

13         **A.      About $700,000.**

14         Q.      Are you aware that this particular

15   life insurance policy, this accumulator policy,

16   had a cash value?

17         **A.      Yes.**

18         Q.      Okay.  Are you aware that over time

19   the cash value of a policy or this particular

20   policy would diminish without the supplementation

21   of yearly premium?

22         **A.      That, once again, gets into a matter**

23   **of discussion with the clients.  And --**

24         Q.      Well, I'm asking for your personal

25   understanding of the policy, nothing you have

EXHIBIT B

1  can't proceed.

2  BY MR. BRODZIK:

3      Q.    So you have no opinion on when a

4  cash value should be exercised or when a client

5  should wait for a death benefit?

6      **A.    If I'm dealing with a client on that**

7  **question, as I said, I would refer them back to**

8  **their insurance agent or to someone in our office**

9  **to help review.**

10     Q.    Do you recall ever directing Edward

11 or Eugenia to speak with their insurance agent

12 about this policy?

13     **A.    I believe that is covered by**

14 **confidentiality.**

15         MR. BRODZIK:  I would like to

16 certify that question as well.

17         (Whereupon, the pending question is

18 certified at the request of Mr. Brodzik.)

19         (Whereupon, Exhibit G is marked for

20 identification.)

21 BY MR. BRODZIK:

22     Q.    This is a letter, dated October 23,

23 2002, to McCarter and Greenley, signed by Edward

24 and Eugenia Sprich, apparently requesting that

25 their representation be -- or McCarter and