IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
Eastern Division

| | | |
|---|---|---|
| EDWARD WIEGAND | ) | |
| and EUGENIA SPRICH, | ) | |
| TRUSTEES OF THE HERBERT C. | ) | |
| WIEGAND REVOCABLE TRUST, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 4:22-cv-00188 RWS |
| vs. | ) | |
| | ) | Jury Trial Demanded |
| NEW YORK LIFE INSURANCE | ) | |
| & ANNUITY CORPORATION and | ) | |
| NEW YORK LIFE INSURANCE CO., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO COMPEL DEPOSITION TESTIMONY OF JOANN DYROFF**

Defendants New York Life Insurance & Annuity Corporation and New York Life Insurance Company (together, "NY Life") move to compel Joann Dyroff, one of plaintiffs' lawyers, to testify about her communications with the plaintiffs.

NY Life makes several assertions in support of their motion. None have any merit. The motion should be denied.

1

## I.     Importance of attorney-client privilege under Missouri law.

The Missouri Supreme Court "has spoken clearly of the sanctity of the attorney-client privilege." *State ex rel. Peabody Coal Co. v. Clark*, 863 S.W.2d 604, 607 (Mo. banc 1993).

> The relationship and the continued existence of the giving of legal advice by persons accurately and effectively trained in the law is of greater societal value … than the admissibility of a given piece of evidence in a particular lawsuit. Contrary to the implied assertions of the evidence authorities, the heavens will not fall if all relevant and competent evidence cannot be admitted.

*Id.* (quoting *State ex rel. Great American Ins. Co. v. Smith*, 574 S.W.2d 379, 383 (Mo. banc 1978)). Confidentiality is essential if attorney-client relationships are to be fostered and effective. *Great American*, 574 S.W.2d at 383-84.

> Although the privilege may be waived, such waiver must be voluntary. For example, anticipatory waiver of the attorney-client privilege may occur where the client places the subject matter of the privileged communication in issue in the litigation.

*State ex rel. Behrendt v. Neill*, 337 S.W.3d 727, 729 (Mo. App. 2011) (citations and internal quotations omitted).

> Most commonly, waiver may be invoked where proof of the elements of a party's claim will neces-

2

> sarily entail proof of the contents of an attorney-
> client communication, such as a claim of reliance on
> legal advice as an element of a claim or defense.

*State ex rel. Chase Resorts v. Campbell*, 913 S.W.2d 832, 837 (Mo. App. 1995) (citations omitted).

## II.   The communications NY Life wishes to have Dyroff testify about were all attorney-client communications.

NY Life first asserts that Dyroff was not plaintiffs' lawyer at the time of the communications it seeks to discover — that Dyroff only provided "prior services," *Motion* at 1-2, or non-legal services to plaintiffs, *id.* at 3-4.

### A.   Dyroff was plaintiffs' lawyer at all relevant times.

How the supposed cessation of Dyroff's representation of plaintiffs would open up to discovery communications Dyroff had with plaintiffs at a time when NY Life admits she was representing them is never explained. NY Life's argument is in any case based on a false premise, the false premise that there was no attorney-client relationship in place when Dyroff had her key communications with plaintiffs.

Dyroff has been plaintiffs' lawyer throughout and is still plaintiffs' lawyer. Plaintiffs consulted with her and sought her advice when they learned that NY Life had breached its insurance contract and would not

3

pay the amount owed. Eugenia ("Gina") Sprich, one of the plaintiffs,
described in her deposition the continuing attorney-client relationship and
the plaintiffs' recent conversations with Dyroff, their lawyer:

> Q     Did you reach out to Ms. Joann Dyroff regard-
>       ing this policy after you learned that Jean
>       Cameron Walters had passed away?
>
> A     Yes, I did.
>
> Q     And what did she tell you?
>
> A     She went and got her files. There's — and
>       sent me copies that showed that Eddie and I
>       had signed the documents to have the name
>       and address changed. She said —
>
> Q     Did she provide — did Dyroff provide you
>       with a copy of the policy?
>
> A     No, not the policy.
>
> Q     Did you ask her for a copy of the policy?
>
> A     I don't — I don't think she thought she had it.
>
> Q     Have you seen the documents that she's pro-
>       duced in response to our subpoena in this
>       case?
>
> A     Yes.
>
> Q     Did you see that she had a copy of the policy
>       in her file?

4

> A       I did not know — she didn't, she did not know
>         that she had it when I spoke it her.
>
> Q       Okay. Did you ask her to check to see if she
>         had a copy of the policy?
>
> A       I think I asked her if she had it, and I, I don't
>         remember the exact conversation.

*Sprich Depo.* at 97-98.

Plaintiffs never terminated their attorney-client relationship with

Dyroff and her law firm:

> Q       Okay. Are you aware of any payments going
>         to Joann Dyroff's firm after 2004 for services
>         relative to the Herbert C. Wiegand Revocable
>         Trust?
>
> A       Not that I recall.
>
> Q       Would that suggest to you that Ms. Dyroff
>         and her firm didn't provide any legal services
>         for the trust after 2004?
>
> A       I, I don't recall. We didn't end the relationship
>         because we knew we had this thing coming
>         up, so we wanted to keep it open in case we
>         needed it.

*Sprich Depo.* at 110.

Once plaintiffs finally received information about the Policy from NY

Life, they consulted with Dyroff to get her advice on the matter:

Q      Okay. And who, who did you confer with in order to understand these annual statements as well as the policy?

A      I know I had talked to Joann [Dyroff] a couple times. She kind of helped me understand it.

      * * *

      Gina, you indicated that you had some communications with Ms. Dyroff after you received the policy and the annual statements from New York Life; is that correct?

A      Correct.

Q      How many such communications did you have with her on that subject?

A      Of this policy?

Q      Yeah. And the statements.

A      Not a whole lot.

Q      Well, can you estimate for me how many, how many — were they over the phone, were they by email, or were they in person? What kind of –-

A      They were mostly over the phone.

Q      Do you recall how many times you had communications with her, with Ms. Dyroff, after you received the policy and the annual statements from New York Life?

6

> A      I may have talked to her once or twice after-
>         wards, after I knew what I needed to do.

*Sprich Depo.* at 127, 129.

Thus it was plaintiffs' reasonable understanding that when they contacted Dyroff after learning that NY Life had terminated the life insurance policy, plaintiffs were contacting Dyroff as their lawyer, and that when plaintiffs talked to Dyroff, they were talking to their lawyer, with all that that implies about the confidentiality of their communications.

## B.   NY Life's contention that the communications it is seeking to discover were not attorney-client communications does not hold water.

NY Life's other theory is that the communications about which it seeks discovery were not attorney-client communications but more akin to "non-legal matters," like "the transfer of money." *Motion* at 3.

Specifically, NY Life "simply" wants to ask whether Dyroff "informed the Plaintiffs about the insurance policy as is her duty under the Missouri Rules of Professional Conduct." *Motion* at 4. NY Life also wants to ask Dyroff whether she was instructed by plaintiffs to receive on their behalf annual notices and other communication from NY Life, calling that activ-

ity turning Dyroff into "a mere conduit for the transfer of insurance documents." *Id.* at 4-5.

Frankly, plaintiff finds these contentions puzzling. How could a lawyer providing her client information as required by the Rules of Professional Conduct not be an attorney-client communication? Moreover, both Dyroff and Sprich testified in their depositions that Dyroff did not provide plaintiffs with any information about the Policy's terms or how the Policy worked. Dyroff testified:

> Q.   Okay. In 2003, did you understand that term about the policy?
>
> A.   Understand what term about the policy?
>
> Q.   That the policy had a cash value that would dissipate over time unless additional premium was added to the policy?
>
> A.   No.

*Dyrofff Depo.* at 22.

> Q.   Okay. And you've provided legal guidance in regards to the handling and maintenance of these types of policies?
>
> A.   On a very limited basis.
>
> Q.   Okay. And what basis would that be?

8

> A.    To consult with their insurance agent primarily.

*Dyroff Depo.* at 33.

> Q.    So you have no opinion on when a cash value should be exercised or when a client should wait for a death benefit?
>
> A.    If I'm dealing with a client on that question, as I said, I would refer them back to their insurance agent or to someone in our office to help review.

*Dyroff Depo.* at 57.

> Q.    What is your understanding of what the term "Guaranteed no-lapse date" of a policy means?
>
> MR. SLABY: Object to form.
>
> THE WITNESS: Beyond the words itself, I can't give you an explanation.
>
> Q.    Do you know what the "No-lapse" date means, generally speaking?
>
> A.    I can tell you what the words might mean in English, but not what it means to the insurance companies.

*Dyroff Depo.* at 60.

Gina Sprich's deposition testimony answered all of NY Life's relevant questions other than about her actual conversations with Joann Dyroff:

Q       When was the first time you were provided
        with a copy of the life insurance policy that is
        the subject of this lawsuit?

A       Only after I found out Jean Walters passed
        away.

Q       And when approximately was that?

A       That was last — over a year ago I think it
        was.

Q       So approximately what year?

A       2000 — what is it — '21 or '22. '21 I think.

Q       Prior to 2021, did anyone explain to you how
        this policy, namely the policy that's at issue in
        this lawsuit, operated?

A       No. Had no idea.

Q       Up until the time you got a copy of the policy
        in 2021 or 2022, was it your understanding
        that nothing needed to be done relative to this
        policy other than to wait until Jean Cameron
        Walters passed away?

A       That is correct. From Clinton Vance.

*Sprich Depo.* at 73-74.

        Sprich had met NY Life's agent Clinton Vance on two occasions. Once

was at the home where her father lived with his second wife, Jean

Cameron Walters. The second was at the viewing of her father before the

10

funeral. *Sprich Depo.* at 61-62. During a brief conversation at the viewing,

Vance disclosed the existence of the Policy to Sprich and told her what she

and her brother needed to do to collect on the Policy — which was nothing:

> Q    And at any time, did you discuss with
>       Mr. Vance the life insurance policy that's at
>       issue in this lawsuit?
>
> A    I only found out about it the day of the view-
>       ing.
>
> Q    Okay. And how did you find out about it?
>
> A    I was speaking to people in the viewing room.
>       And a guy tapped on my shoulder and it was
>       Mr. Clinton Vance and he asked me to follow
>       him. We went into a little office, and he told
>       me about that. That's the first I heard of it.
>
> Q    So at the viewing, that was at the wake after
>       your father's death?
>
> A    Yeah. The viewing, yeah, before the funeral.
>
> Q    Okay. And what, if anything — was there
>       anyone in the room other than you and
>       Mr. Vance?
>
> A    No.
>
> Q    What, if anything — what did Mr. Vance tell
>       you about the policy that's at issue in this
>       lawsuit?

> A    He told me that my dad had this other policy,
>      and it's on Jean's life. And he has paid all the
>      premiums and all the taxes on it. All you have
>      to do is sit back and wait for her to die. Then
>      it gets split among the kids. That's exactly,
>      pretty much exactly what he said to me.
>
> Q    Anything else?
>
> A    No.

*Sprich Depo.* at 62-63.

> Q    Did you or your brother ever ask Joann Dyroff
>      or anyone else to analyze the policy that's at
>      issue in this case to see whether or not any-
>      thing further needed to be done on this policy
>      after your dad passed away?
>
> A    No. When I was told everything was paid up
>      and all we had to do was sit and wait, I didn't
>      see there was any reason to ask anybody any-
>      thing. We weren't — we didn't have to do any-
>      thing. And I assumed everything was going to
>      be paid — that everything was okay.

*Sprich Depo.* at 100.

Thus, NY Life's contention that the conversations between Dyroff

and plaintiffs about which it seeks testimony were not attorney-client

conversations is baseless. And, NY Life already obtained testimony both

about Dyroff's lack of understanding about the Policy and the absence of

conversations between her and plaintiffs about how the Policy worked.

12

**III.   Plaintiffs never put their conversations with their lawyer, Joann Dyroff, at issue in this lawsuit.**

NY Life claims that there is no privilege in the conversations between plaintiffs and their lawyer Dyroff because plaintiffs purportedly put their communication at issue in filing this lawsuit.

NY Life never identifies any claim made in the complaint that puts these conversations at issue or otherwise waives the privilege. Notably, the claims in the complaint are focused squarely on NY Life's failure to mail the annual Policy notices, notwithstanding NY Life's contractual and legal obligation to mail the annual notices. Conversations, if any, between Dyroff and plaintiffs about the Policy are simply irrelevant to the claims. Plaintiffs do not allege advice of counsel. Plaintiffs do not allege any claim the proof (or defense) of which requires evidence of plaintiffs' conversations with their lawyer.

## CONCLUSION

NY Life's motion to compel should be denied.

13

Respectfully submitted,

JACOBSON PRESS P.C.

By:   /s/ Joe D. Jacobson
Joe D. Jacobson #33715
222 South Central Ave., Suite 550
Clayton, Missouri 63105
Tel: (314) 899-9789
Direct: (314) 899-9790
Fax: (314) 899-0282
Jacobson@ArchCityLawyers.com

Attorneys for plaintiffs Edward
Wiegand and Eugenia Sprich,
Trustees of the Herbert C. Wiegand
Revocable Trust

## CERTIFICATE OF SERVICE

The filing attorney certifies that on April 24, 2023, the foregoing and its attachments were filed electronically with the Clerk of the Court to be served by operation of the Court's electronic case filing system upon all participants in the Court's electronic case filing system.

14