```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MISSOURI
                      EASTERN DIVISION


EDWARD WIEGAND AND EUGENIA      )
SPRICH, TRUSTEES OF THE HERBERT )
C. WIEGAND REVOCABLE TRUST,     )
INDIVIDUALLY AND ON BEHALF OF   )
ALL OTHER SIMILARLY SITUATED,   )
                                )
Plaintiff,                      )
                                )
                                )
vs.                             )Case No. 4:22 CV 188 RWS
                                )
                                )
NEW YORK LIFE INSURANCE &       )
ANNUITY CORPORATION, ET AL.,    )
                                )
Defendants.                     )
```

VIDEOCONFERENCE DEPOSITION OF EUGENIA SPRICH

Taken on behalf of Defendants

April 7, 2023

JULIE HUNDELT, RPR, CCR, CSR
Missouri CCR No. 829
Illinois CSR No. 084-004789

```
 1         I N D E X   O F   E X A M I N A T I O N

 2    WITNESS:  EUGENIA SPRICH

 3         Examination By Mr. Ryan ........................6

 4

 5
           I N D E X   O F   E X H I B I T S
 6
      Exhibit No. 1 .......................................35
 7         Document:  First Amendment to the
           Amended and Restated Herbert C.
 8         Wiegand Revocable Trust

 9    Exhibit No. 2 .......................................52
           Document:  Assets of Herbert C.
10         Wiegand

11    Exhibit No. 3 .......................................67
           7/22/2003 Letter from Joann Dyroff
12         to Marylee Behlmann at Vance
           Financial Group
13
      Exhibit No. 4 .......................................81
14         Policy on Jean Wiegand, Policy No.
           62791665, Date of 6/1/2000
15
      Exhibit No. 5 ......................................108
16         2/17/2004 Fax Cover Sheet from Joann
           Dryoff to Vance Financial Group Re:
17         New York Life Insurance Policy
           62691665
18
      Exhibit No. 6 ......................................109
19         Itemized Document from Herbert C.
           Wiegand Revocable Trust Checking
20         Account

21    Exhibit No. 7 ......................................111
           New York Life Customer Advocacy
22         Department

23    Exhibit No. 8 ......................................115
           7/30/2002 Document:  Fax Cover Sheet
24         Vance Financial Group from Marylee
           Behlmann to McCarter and Greenley
25         Re: Jean Wiegand Policy No. 62791665
```

```
 1                         I N D E X
                          (continued)
 2      Exhibit No. 9 ......................................118
             Document on New York Life Letterhead
 3           Titled, "Policy Delivery Receipt for
             Insured Jean Wiegand, Policy No.
 4           62791665"

 5      Exhibit No. 10 .....................................121
             Group Exhibit, Series of Annual
 6           Policy Summaries from New York Life
             and Annuity Corporation from 2003
 7           through 2009

 8      Exhibit No. 11 .....................................135
             Group Exhibit, Series of Annual
 9           Policy Summaries from New York Life
             and Annuity Corporation from 2001
10           through 2002

11      Exhibit No. 12 .....................................141
             1/12/2004 Letter from Joann Dryoff
12           to Eugenia Sprich and Edward Wiegand

13      Exhibit No. 13 .....................................147
             Series of Annual Policy Summaries
14           from New York Life and Annuity
             Corporation from June 2009 through
15           June 2014

16      Exhibit No. 14 .....................................150
             6/23/2004 Letter from Jennifer
17           Williams, Customer Service Rep at
             New York Life to The Herbert C.
18           Wiegand Revocable Trust Dated
             4/15/1997
19

20

21     (All exhibits were retained by counsel for Defendants,
                         Daniel K. Ryan.)
22

23

24

25
```

```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
 2                        EASTERN DIVISION

 3

 4   EDWARD WIEGAND AND EUGENIA    )
     SPRICH, TRUSTEES OF THE HERBERT)
 5   C. WIEGAND REVOCABLE TRUST,   )
     INDIVIDUALLY AND ON BEHALF OF )
 6   ALL OTHER SIMILARLY SITUATED, )
                                   )
 7   Plaintiff,                    )
                                   )
 8                                 )
     vs.                           )Case No. 4:22 CV 188 RWS
 9                                 )
                                   )
10   NEW YORK LIFE INSURANCE &     )
     ANNUITY CORPORATION, ET AL.,  )
11                                 )
     Defendants.                   )
12

13            VIDEOCONFERENCE DEPOSITION OF EUGENIA SPRICH,

14   produced, sworn, and examined on behalf of the

15   Defendants, April 7, 2023, between the hours of

16   10:00 a.m. CST and 3:30 p.m. CST on that day, via Zoom,

17   before Julie Hundelt, a Registered Professional

18   Reporter, Certified Shorthand Reporter, and Certified

19   Court Reporter, within and for the State of Missouri.

20

21

22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2      APPEARING FOR THE PLAINTIFF:
        Joe Jacobson
 3      Jacobson Press, PC
        222 S. Central Ave., Suite 550
 4      Clayton, MO 63105
        (314) 899-9790
 5      Jacobson@ArchCityLawyers.com

 6      APPEARING FOR THE DEFENDANTS:
        Daniel K. Ryan
 7      Hinshaw & Culbertson LLP
        151 North Franklin Street, Suite 2500
 8      Chicago, IL  60606
        (312) 704-3248
 9      dryan@hinshawlaw.com

10      ALSO PRESENT:
        Edward Wiegand
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1            IT IS STIPULATED AND AGREED by and between
2    counsel for the Plaintiffs and counsel for the
3    Defendants that the deposition of EUGENIA SPRICH may be
4    taken in shorthand by Julie Hundelt, Registered
5    Professional Reporter, Certified Court Reporter, and
6    Certified Shorthand Reporter, and afterwards
7    transcribed into typewriting, and the signature of the
8    witness is reserved by agreement of counsel and the
9    witness.
10                PROCEEDINGS:  10:00 a.m. CST
11                         * * * * *
12                       EUGENIA SPRICH,
13   of lawful age, being produced, sworn, and examined on
14   the part of the Defendants, and after responding "I do"
15   to the oath administered by the court reporter, deposes
16   and says:
17                        EXAMINATION
18   QUESTIONS BY MR. RYAN:
19       Q    All right.  We've done it.  Technology is in
20   place here.
21            Would you please state your full name and
22   spell it for the record?
23       **A    It's Eugenia W. Sprich.  It's E-U-G-E-N-I-A,**
24   **middle initial W like William, Sprich, S-P-R-I-C-H.**
25       Q    All right. And we've got Ed, is it Wiegand

1    the connection goes. But I won't swear on it.
2    Q    Okay. Have you ever had any, have you ever
3    met Clinton Vance?
4    A    Yes.
5    Q    On how many occasions?
6    A    Two.
7    Q    When were those occasions?
8    A    One was at 9 Huntleigh Woods one time when I
9    was there. And the other time was at the visitation.
10    Q    And so the meeting with him at 9 Huntleigh
11    Woods in St. Louis, that was while your dad was still
12    alive?
13    A    Yes.
14    Q    And what was that, some sort of a social
15    event?
16    A    No, they needed him to sign papers while we
17    were there. And they brought them over.
18    Q    Did you have to sign papers at that time?
19    A    No. They were still finishing up my dad's
20    stuff.
21    Q    Okay.
22    A    They needed his signature.
23    Q    I see. And you just happened to be there?
24    A    Yes.
25    Q    Were those any documents related to the

```
 1    insurance policy at issue in this lawsuit?
 2         A    I have no idea.
 3         Q    Okay.
 4         A    I didn't see it, and it wasn't offered.
 5         Q    And at any time, did you discuss with
 6    Mr. Vance the life insurance policy that's at issue in
 7    this lawsuit?
 8         A    I only found out about it the day of the
 9    viewing.
10         Q    Okay.  And how did you find out about it?
11         A    I was speaking to people in the viewing
12    room.  And a guy tapped on my shoulder and it was
13    Mr. Clinton Vance and he asked me to follow him.  We
14    went into a little office, and he told me about that.
15    That's the first I heard of it.
16         Q    So at the viewing, that was at the wake
17    after your father's death?
18         A    Yeah.  The viewing, yeah, before the
19    funeral.
20         Q    Okay.  And what, if anything -- was there
21    anyone in the room other than you and Mr. Vance?
22         A    No.
23         Q    What, if anything -- what did Mr. Vance tell
24    you about the policy that's at issue in this lawsuit?
25         A    He told me that my dad had this other
```

1  **policy, and it's on Jean's life.  And he has paid all**
2  **the premiums and all the taxes on it.  All you have to**
3  **do is sit back and wait for her to die.  Then it gets**
4  **split among the kids.  That's exactly, pretty much**
5  **exactly what he said to me.**
6        Q    Anything else?
7        **A    No.**
8        Q    All right.  The next policy listed in
9   Exhibit 2 is a life policy 62772095 on Dr. Wiegand's
10  life.  Death benefit is $400,000.  CV on 9/8/01.
11  73,385.  ANN premiums are $35,000.
12            Do you see that?
13       **A    Yes.**
14       Q    Was that a term life insurance policy to
15  your knowledge?
16       **A    I don't know.**
17       Q    It reflects an amount of $400,000.  To your
18  knowledge, was this policy in effect at the time of
19  your father's death?
20       **A    It would appear to be by the date, value**
21  **date.**
22       Q    Okay.  And was it, was it a policy issued by
23  New York Life?
24       **A    I don't know that.**
25       Q    To your knowledge, was this policy -- did

```
 1        A    Correct.
 2        Q    That would be all, all seven children of
 3   your father?
 4        A    Yes.
 5        Q    At the time you signed this document in or
 6   about May 27, 2003, did you or Ms. Dyroff have the
 7   policy that is the subject of, of this transfer of
 8   ownership?
 9             MR. JACOBSON:  Object to the form of the
10   question.
11             I'm not sure what you mean by "had the
12   policy."  You mean had a copy of the policy?
13             MR. RYAN:  I'm not sure, Joe.
14        Q    (By Mr. Ryan) The copy -- did you have a
15   copy of the policy?
16        A    I don't think I did.
17        Q    Okay.  When was the first time --
18        A    Oh, this is, this is the one where, where --
19   no.  I did not get a copy of that.
20        Q    Okay.
21        A    Of the policy itself.
22        Q    When was the first time you were provided
23   with a copy of the life insurance policy that is the
24   subject of this lawsuit?
25        A    Only after I found out Jean Walters passed
```

```
 1   away.
 2        Q    And when approximately was that?
 3        A    That was last -- over a year ago I think it
 4   was.
 5        Q    So approximately what year?
 6        A    2000 -- what is it -- '21 or '22.  '21 I
 7   think.
 8        Q    Prior to 2021, did anyone explain to you how
 9   this policy, namely the policy that's at issue in this
10   lawsuit, operated?
11        A    No.  Had no idea.
12        Q    Up until the time you got a copy of the
13   policy in 2021 or 2022, was it your understanding that
14   nothing needed to be done relative to this policy
15   other than to wait until Jean Cameron Walters passed
16   away?
17        A    That is correct.  From Clinton Vance.
18        Q    Based on what Mr. Vance told you?
19        A    Yes.  That the policies were all paid up and
20   the taxes were all paid up.
21        Q    And that you didn't need to do anything
22   except wait until --
23        A    Correct.
24        Q    -- Jean Cameron --
25        A    Passed away.
```

1     **A    It was a couple weeks.  I don't remember how**
2  **long.  I'd have to look at it.**
3     Q    Okay.  During this time, were you discussing
4  with your brother Ed Wiegand anything about this
5  policy?
6     **A    What do you mean discussing?  We didn't know**
7  **the terms of the policy in between.**
8     Q    Yeah, I know.  But -- you're in the process
9  of trying to get more information regarding the
10 policy; right?
11    **A    Yeah.**
12    Q    Did you, did you, did you discuss anything
13 having to do with this policy with your brother Ed,
14 the co-trustee?
15    **A    Yes.**
16    Q    During this, during this period of time?
17    **A    Yes, I told him I was looking into it**
18 **because I talked to him.  He didn't have anything that**
19 **referred to it.**
20    Q    Okay.
21    **A    About the terms of it.**
22    Q    Did you reach out to Ms. Joann Dyroff
23 regarding this policy after you learned that Jean
24 Cameron Walters had passed away?
25    **A    Yes, I did.**

```
 1      Q    And what did she tell you?
 2      A    She went and got her files.  There's -- and
 3  sent me copies that showed that Eddie and I had signed
 4  the documents to have the name and address changed.
 5  She said --
 6      Q    Did she provide -- did Dyroff provide you
 7  with a copy of the policy?
 8      A    No, not the policy.
 9      Q    Did you ask her for a copy of the policy?
10      A    I don't -- I don't think she thought she had
11  it.
12      Q    Have you seen the documents that she's
13  produced in response to our subpoena in this case?
14      A    Yes.
15      Q    Did you see that she had a copy of the
16  policy in her file?
17      A    I did not know -- she didn't, she did not
18  know that she had it when I spoke it her.
19      Q    Okay.  Did you ask her to check to see if
20  she had a copy of the policy?
21      A    I think I asked her if she had it, and I, I
22  don't remember the exact conversation.
23      Q    Okay.  Let me ask you this, at any time
24  after your father's funeral and up until the time you
25  learned that Jean Cameron Walters had passed away, did
```

Case: 4:22-cv-00188-HEA Doc. #: 45-1 Filed: 04/24/23 Page: 14 of 19 PageID #: 686

Page 99

1  you have any conversations with Joann Dyroff or anyone
2  at her office regarding the life insurance policy
3  that's at issue in this lawsuit?
4      **A    Could you repeat that, please?**
5          MR. RYAN:  Miss Court Reporter, would you
6  repeat it, please.
7              (The requested portion of testimony was
8              read back by the court reporter.)
9          THE WITNESS:  From the time after my father
10 died, we just, we had those letters -- Eddie and I
11 signed those letters that she had sent on to Vance
12 that was forwarded to New York.  But other than that,
13 no.
14      Q    (By Mr. Ryan) All right.  So aside, except
15 for the documents transferring ownership of this
16 policy from the LLC to the Herbert C. Wiegand Trust,
17 you had no conversations with Joann Dyroff or her
18 office regarding this policy up until the time you
19 learned of the death of Jean Cameron Walters; is that
20 correct?
21      **A    Correct.  Correct.**
22      Q    During that same time period, did you or
23 your brother ask anyone, whether it be Ms. Dyroff's
24 office or New York Life, did you -- during those years
25 did you ask anyone for documents or information or

PohlmanUSA Court Reporting
(877) 421-0099    PohlmanUSA.com

```
 1    reports or statements regarding the policy that's at
 2    issue in this case?
 3         A    I did not.  I don't know if anybody else
 4    did, but I didn't because of the way it was presented
 5    to me by Clinton Vance -- there was nothing to be done
 6    but wait, everything was taken care of.
 7         Q    Did you or your brother ever ask Joann
 8    Dyroff or anyone else to analyze the policy that's at
 9    issue in this case to see whether or not anything
10    further needed to be done on this policy after your
11    dad passed away?
12         A    No.  When I was told everything was paid up
13    and all we had to do was sit and wait, I didn't see
14    there was any reason to ask anybody anything.  We
15    weren't -- we didn't have to do anything.  And I
16    assumed everything was going to be paid -- that
17    everything was okay.
18         Q    Other than the policy, the life insurance
19    policy that's at issue in this case, are you aware of
20    any other assets that are contained in the Herbert C.
21    Wiegand Revocable Trust?
22         A    I'm confused what you're asking.
23         Q    Sure.  I'll, I'll -- I need to stop sharing
24    here.
25              Other than possibly this life insurance
```

1  it? did I -- am I sharing it with you, Gina?
2  **A    Yeah, I can see it.  It's kind of small, but**
3  **I can see it.**
4     Q    Let me see if I can blow it up for you.  Do
5  you see it better now?
6  **A    Yes.**
7     Q    So at the top there's some legal expenses
8  for McCarter and Greenley.
9          Is this from the trust checking account?
10 **A    I, I don't recall.**
11    Q    Okay.  And where did the account statements
12 for this checking account go?  Did they go to you or
13 your brother Ed?
14 **A    Eddie has the, Eddie the checkbook.  Eddie**
15 **wrote the checks.**
16    Q    Okay.  Are you aware of any payments going
17 to Joann Dyroff's firm after 2004 for services
18 relative to the Herbert C. Wiegand Revocable Trust?
19 **A    Not that I recall.**
20    Q    Would that suggest to you that Ms. Dyroff
21 and her firm didn't provide any legal services for the
22 trust after 2004?
23 **A    I, I don't recall.  We didn't end the**
24 **relationship because we knew we had this thing coming**
25 **up, so we wanted to keep it open in case we needed it.**

1   **policies.**

2   Q   All right. And in order to understand the
3   statements, did you have to go back to the policy
4   itself?

5   **A   Yes.**

6   Q   Read that?

7   **A   Yes.**

8   Q   Okay. And who, who did you confer with in
9   order to understand these annual statements as well as
10  the policy?

11  **A   I know I had talked to Joann a couple times.**
12  **She kind of helped me understand it.**

13  Q   Okay. And what did Joann say to you
14  regarding the policy and the statements?

15          MR. JACOBSON:  I'm going to object.  I'm
16  going to object as to attorney-client communication.

17          THE WITNESS:  Yes.  Thank you.

18          MR. RYAN:  Well, Joe, I, I hear your
19  objection.  But the, the communications that we're
20  talking about here are at the heart of this
21  litigation.  And I think there's an exception --

22          Our position is that there's an exception to
23  the privilege given the nature of this dispute and the
24  communications between Dyroff and, and this witness,
25  so I believe I'm entitled to inquire about them.

```
 1            I'm not intending -- I don't have any belief
 2   that I'm going to convince you of that here today.
 3   I'm just, I'm just stating my position for the record,
 4   okay, and we'll take it up with the judge.
 5            That's not -- I'm not trying to be
 6   threatening or anything.  I just want you to
 7   understand that that's our position, and we may need
 8   to come back depending on the Court's ruling.  Okay?
 9            MR. JACOBSON:  I'll let you know my position
10   which is that you say it's the heart of the situation,
11   and communications between their clients and lawyers
12   are often at the heart of the situation.
13            The privilege is there.  The relationship
14   was never terminated.  And Ms. Dyroff at her
15   deposition refused to answer these questions as well
16   under attorney-client privilege.
17            MR. RYAN:  I understand.  Hey, listen, we
18   can have mutual respect on this.  Okay?  I'm not
19   trying to pick a fight here.  I just thought I'd get
20   my position on the record, as I think Jim Brodzik did
21   during Dyroff's deposition.  Okay.
22            So I'm going to ask some follow-up questions
23   without getting into the substance of her
24   communications with Joann Dyroff just to get a sense
25   of who, what, when, that sort of thing.  Okay?
```

1    Q    (By Mr. Ryan) Back on the record -- well, I
2    guess we've been on the record.
3         Gina, you indicated that you had some
4    communications with Ms. Dyroff after you received the
5    policy and the annual statements from New York Life;
6    is that correct?
7    **A    Correct.**
8    Q    How many such communications did you have
9    with her on that subject?
10   **A    Of this policy?**
11   Q    Yeah.  And the statements.
12   **A    Not a whole lot.**
13   Q    Well, can you estimate for me how many, how
14   many -- were they over the phone, were they by email,
15   or were they in person?  What kind of --
16   **A    They were mostly over the phone.**
17   Q    Do you recall how many times you had
18   communications with her, with Ms. Dyroff, after you
19   received the policy and the annual statements from New
20   York Life?
21   **A    I may have talked to her once or twice**
22   **afterwards, after I knew what I needed to do.**
23   Q    Did Ms. -- to your knowledge, did Ms. Dyroff
24   have any communications with New York Life?
25        MR. JACOBSON:  I'm going to object to that