IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
Eastern Division

| | |
|---|---|
| EDWARD WIEGAND and EUGENIA SPRICH, TRUSTEES OF THE HERBERT C. WIEGAND REVOCABLE TRUST,  )<br><br>Plaintiffs,  )<br><br>vs.  )<br><br>NEW YORK LIFE INSURANCE & ANNUITY CORPORATION and NEW YORK LIFE INSURANCE COMPANY,  )<br><br>Defendants.  ) | No.4:22-cv-00188-HEA<br><br>Jury Trial Demanded |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

COME NOW Defendants, NEW YORK LIFE INSURANCE & ANNUITY CORPORATION and NEW YORK LIFE INSURANCE COMPANY, by and through their attorneys, and for their Memorandum in Support of their Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 4.01(A), state as follows:

**INTRODUCTION AND FACTUAL BACKGROUND**

In 1999, Dr. Herbert Wiegand and Jean Wiegand (Walters) married. Deposition of Ed Wiegand, 53:17-25, (Exhibit 1). Dr. Wiegand was 82 years old and Ms. Wiegand was 80 at the time of the marriage. Ex. 1, Wiegand dep., 53:17-25. Dr. Wiegand and Ms. Wiegand each had multiple children from prior marriages but had no children together. Two of Dr. Wiegand's children, Edward Wiegand and Eugenia Sprich ("Plaintiffs"), are the Trustees of the Herbert C. Wiegand Revocable Trust (the "Trust"). On June 13, 2000, Dr. Wiegand purchased an accumulator universal life insurance policy ("the Policy") from New York Life ("Defendants") against the life of Ms. Wiegand with a face value (death benefit) of $1.4 million and a maturity date of June 12, 2020. See Policy, (Exhibit 2), NYL 648-

673; Doc. #4, Petition, ¶ 7. The Wiegands lived together at 9 Huntleigh Woods, St. Louis MO 63131 until his death in 2002, and hers in 2020. Ex. 1, Wiegand dep., 55:5-24.

In a universal life insurance policy like this one, the policyowner pays premiums, which keeps the Policy in force and may allow it to build a cash value. See deposition of New York Life Corporate Representative James Elliott, 16:10-22, (Exhibit 3). Every month, the policy's cash value fluctuates based on prevailing interest rates and the ongoing cost to maintain coverage under the Policy. Ex. 3, Elliott dep., 16:15-22. Coverage continues if the Policy's cash value exceeds the monthly cost to maintain the Policy. Ex. 3, Elliott dep., 16:15-22; 17:14-17. Here, the Policy was funded with a single, up-front premium payment of $750,000. Ex. 3, Elliott dep., 169:1-8. The up-front premium was guaranteed to provide coverage for at least five years, with the potential to last longer if the interest that accumulated exceeded its remaining cash value. Ex. 2, Policy, at NYL671. If the cash value decreased below the cost to maintain the Policy prior to the maturity date, the policyowner had options to pay additional premiums or surrender the Policy in exchange for a cash disbursement equal to the "cash surrender value" under Section 5.5 of the Policy. Ex. 2, Policy, NYL659; Ex. 3, Elliott dep., 78:14-80:25. The cash surrender value also fluctuated on a monthly basis subject to the remaining value of the premium, less charges or fees set forth in the Policy. Ex. 3, Elliott dep., 80:1-13. If the insured dies before the earlier of the maturity date or the lapse of the Policy, the policyowner is paid the death benefit. Ex. 2, Policy, NYL 659.

Dr. Wiegand died on July 16, 2002. Ex. 1, Wiegand dep., 29:7. Plaintiffs last interacted with their stepmother, the insured, Ms. Wiegand, "within a few days of [their] father's funeral." Ex. 1, Wiegand dep., 29:2-8.  They did not see or speak with Ms. Wiegand again for the remaining eighteen years of her life, did not attend her funeral, and had no contact with Ms. Wiegand's surviving family. Ex. 1, Wiegand dep., 29:2-8, 54:20-55:2, 58:3-15; Deposition of Eugenia Sprich, 79:5-14; 85:13-17, (Exhibit 4). After their father's death, Plaintiffs' only discussions regarding the Policy involved "how

2

long is [Ms. Wiegand] going to live before we get a payout from this policy" and the need to "just sit back and wait." Ex. 1, Wiegand dep., 28:1-19; Ex. 4, Sprich dep., 62:23-63:5. Plaintiffs had no knowledge of Ms. Wiegand's health condition or status from which they could have assessed whether to maintain or surrender the Policy. Ex. 1, Wiegand dep. 59:8-17; Ex. 4, Sprich dep., 151:13-21.

On July 22, 2003 – approximately a year after Dr. Wiegand's death – Plaintiffs engaged attorney Joann Dyroff to notify New York Life in a writing that they wished to transfer ownership of the Policy from the Wiegand Family LLC to the Trust and modify certain beneficiary information. See 7/22/03 letter, (Exhibit 5). New York Life acknowledged receipt in correspondence to Ms. Dyroff and recorded the change in ownership on August 19, 2003. See 8/19/03 correspondence, (Exhibit 6), NYL616. On January 12, 2004, Ms. Dyroff sent a letter to New York Life enclosing a "Service Form – Change Requests" document that was signed by the Trustees. See 1/12/04 letter, (Exhibit 7), DRYOFF 502. It stated in relevant part:

> We are enclosing the completed Service Form – Change Request for the life insurance policy owned by the Herbert C. Wiegand Revocable Trust, insuring the life of Jean C. Wiegand. As indicated in the document, the original policy has been lost and we are requesting the issuance of a new policy, showing the current owner as the Herbert C. Wiegand Irrevocable Trust.

In addition to the request for a new copy of the Policy, the Service Form included another term not mentioned in the letter: the Trust's address was listed as 165 N. Meramce (sic) Avenue, 6th Floor. Ex. 7. In a second letter to New York Life dated February 17, 2004, Ms. Dyroff advised the Policy incorrectly stated that it was owned by Mr. Wiegand, rather than the Trust in his name, but made no mention of the purported request to change the Trust's mailing address. See 2/17/04 letter, (Exhibit 8), DRYOFF92-95. In reply correspondence dated June 23, 2004, New York Life confirmed the owner of the policy was The Herbert C. Wiegand Revocable Trust. See 6/23/04 letter, (Exhibit 9), DRYOFF83-84. New York Life's letter contained the same Huntleigh Woods address for the policyowner. Ex. 9.

Neither Ms. Dyroff nor the Trustees advised New York Life that its June 23, 2004 correspondence was addressed incorrectly. Ex. 1, Wiegand dep., 70:2-13; Deposition of Joann Dyroff, 66:3-67:20, (Exhibit 10). Ms. Dyroff had no further contact with New York Life regarding the Policy on behalf of the Trust for 16 years, between June 23, 2004 and 2020. Ex 4, Sprich dep., 111:4-8; Ex. 10, Dyroff dep., 70:14-18, 72:9-18.

Trustee Wiegand testified that he was obligated "to handle all affairs as outlined in the Trust," which required him to review and understand any documents necessary to effectuate the Trust's provisions. Ex. 1, Wiegand dep., 35:11-36:6, 176:1-6. Nonetheless, he admitted he did not read the Policy, know how it functioned, or take steps to learn about the it from Ms. Dyroff or New York Life between 2004 and 2020. Ex. 1, Wiegand dep., 40:12-14; 147:18-148:19. Trustee Sprich testified that despite signing the 2004 Service Form, she did not read the request "word for word" to ensure she understood it, did not understand she was requesting that the Policy's mailing address and contact phone number be changed to Ms. Dyroff's office, and did not expect that future communications with New York Life should be made exclusively through Ms. Dyroff. Ex. 4, Sprich dep., 142:1-144:5.

In addition to an annual notice, New York Life offers policyowners multiple other ways to receive up-to-date information about their policies. Under Section 5 of the Policy, policyowners may request their policies' present cash value by phone or online. Ex. 3, Elliott dep., 210:2-25; Ex. 1, Wiegand dep., 82:1-16; 83:1-10. Plaintiffs never requested an updated calculation of the policy's cash value. Ex. 1, Wiegand dep., 83:6-10. Plaintiffs also never attempted to surrender the policy in exchange for its cash value. Ex. 1, Wiegand dep., 84:7-11.

New York Life sent annual correspondence regarding the policy's status to the Huntleigh Woods address each June until 2011. Annual Notices, 2003-2011, NYL 793-846, (Exhibit 11). The annual notices provided updates of the policy's remaining cash value, premium, anticipated changes in the policy's value in the coming year, and estimated when the policy was likely to expire if no further

4

premium payments were made. New York Life's correspondence was delivered successfully to the Huntleigh Woods address every year until 2011 where Ms. Wiegand resided. Ex. 3, Elliott dep., 209:9-17.

On June 3, 2011, the U.S. Postal Service returned and marked New York Life's annual Policy correspondence to the Huntleigh Woods address undeliverable. Ex. 3, Elliott dep., 53:24-54:7. When mail is returned as undeliverable, New York Life has an internal procedure to search for alternative contact information and if necessary, stop sending correspondence to addresses with unknown inhabitants. Here, a New York Life employee reviewed the file to see if the policyowner recently submitted a change of address within a month of the undelivered correspondence. Ex. 3, Elliott dep., 53:22-25; 55:7-13.[1] Finding no change of address was submitted in the preceding month, New York Life then searched Accurint, a background check and public records search vendor. Ex. 3, Elliott dep., 53:22-54:4. The Accurint search revealed no alternative contact information because the Policy was owned by the Trust rather than an individual. Ex. 3, Elliott dep., 54:5-7. New York Life does not have the ability to search for non-person entities such as trusts. Ex. 3, Elliott dep., 91:10-15.

On June 23, 2011, New York Life sent another letter to the Huntleigh Woods address advising of the prior failure of delivery, requesting a phone call to confirm New York Life's contact information was up-to-date, and stating if New York Life received no reply within 120 days, it would send no further correspondence to the Huntleigh Woods address so as to protect against disclosure of private information regarding the Policy. See 6/23/11 letter, (Exhibit 12), NYL 787; Ex. 3, Elliott dep. 56:18-57:1; 58:10-22. Receiving no reply to its first two letters, New York Life sent a final letter to the Huntleigh Woods address on October 21, 2011 stating it would send no further correspondence unless an authorized policyowner confirmed its validity. See 10/21/11 correspondence, (Exhibit 13), NYL

---

[1] New York Life does not attempt to send correspondence to addresses referenced in older documents because it considers that information "stale." Ex. 3, Elliott dep., 91:23-92:4.

788. No one responded to the October 21, 2011 letter, and so New York Life sent no further correspondence to the Huntleigh Woods address until the Policy was about to lapse in 2016. Ex. 3, Elliott dep., 94:21-96:5. Having only stale contact information, from 2012 through the Policy's expiration in 2016, the Policy continued and New York Life generated annual reports and archived them in its file. Ex. 3, Elliott dep., 90:21-91:4, 92:5-16.

The Policy's premium and accrued interest was eventually depleted in 2016. On June 13, 2016, New York Life sent a letter to the Huntleigh Woods address stating the policy would lapse without additional premium payments. See 6/13/16 letter, (Exhibit 14), NYL883-884. New York Life sent two final notifications of lapse on July 13 and August 15, 2016. See 7/13/16 letter, (Exhibit 15), NYL 885-886 and 8/15/16 letter, (Exhibit 16), NYL 887. New York Life kept the policy open until August 18, 2016 under a grace period funded in part by the remaining cash value of the Policy, at which point the remaining value of the premium was exhausted and coverage terminated. Ex. 3, Elliott dep., 77:15-20; 123:11-16.

Ms. Wiegand died in November of 2020, approximately five months after the policy's June 12, 2020 maturity date. She lived at the Huntleigh Woods address until her death. Ex. 4, Sprich dep. 113:22-24. In a letter to New York Life dated November 19, 2020, Plaintiff Eugenia Sprich asserted she was unaware the policy lapsed in 2016 or that the Huntleigh Woods mailing address was incorrect. She requested copies of the Policy, its transaction history, notices, correspondence, and policy cash values over time. See 11/19/20 letter from Sprich to NYL, (Exhibit 17), NYL 738-760. In a letter dated February 2, 2021, New York Life provided Plaintiffs with all annual notices from 2003-2016 and made an extracontractual offer to pay the cash surrender value of the policy at the time of its 2016 expiration: $25,095.26. See 2/2/21 letter, (Exhibit 18), NYL 789-881. On December 10, 2021, Plaintiffs rejected New York Life's offer and filed a Petition against New York Life in the Circuit Court of St. Louis County, Missouri. Doc. #4. The Petition alleged (1) Breach of Insurance Contract;

(2) Vexatious Refusal; (3) Conversion; and (4) Unjust Enrichment. Doc. #4. New York Life timely removed to this Court on February 15, 2022. Doc. #1.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013). The movant "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal marks omitted).

## ARGUMENT

### I. Plaintiffs cannot establish a breach of contract.

In Count I, Plaintiffs allege New York Life breached the Policy because it stopped mailing annual reports beginning in 2012. Doc. #4, Petition, ¶¶ 75-77. Plaintiffs assert that had they received an annual notice in 2012, they would have surrendered the policy in exchange for its cash surrender value of approximately $809,000. Doc. #4, Petition, ¶ 78. "A breach of contract action includes the following essential elements: (1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." *Braughton v. Esurance Ins. Co.*, 466 S.W.3d 1, 8 (Mo. App. W.D. 2015). As explained below, Plaintiffs cannot establish their own performance or damages. *Id.*

The Policy provided two relevant procedures by which beneficiaries could be paid: death of the insured or surrender of the Policy prior to lapse or maturity. Sections 1.1 and 5.5 of the Policy provide:

> 1.1  **Is a Life Insurance Benefit Payable Under this Policy?** We will pay the life insurance proceeds to the beneficiary promptly, when we have proof that the Insured died before the Maturity Date and while the life insurance under this policy was in effect, subject to the General Provisions section of this Policy.
>
> 5.5  **Can You Surrender This Policy For Its Cash Surrender Value?** At any time after this policy has cash value, and while the Insured is living, you may surrender it for its cash surrender value. The cash surrender value is equal to the cash value less any surrender charges which may apply, less any unpaid loan and accrued interest, subject to the provisions of Section One of this policy. A table of maximum surrender charges is shown on Policy Data page 2.1. The cash value and the surrender charges will be calculated as of the date on which we receive your signed request. All insurance will end on the date we receive your surrender request.
> Ex. 2.

Plaintiffs concede they never submitted a request to surrender the Policy; however, they claim they would have done so at the earliest opportunity under Section 5.5 had they been aware of the Policy's diminishing cash value.

### A. Defendants' failure to update the Trust's address did not breach the Policy because Plaintiffs knew Defendants did not update the address and remained silent.

Plaintiffs assert damages arise entirely out of New York Life's failure to update the Trust's address to Ms. Dyroff's office following their submission of the January 12, 2004 letter and Service Form. Plaintiffs' contentions are self-serving, inconsistent with the record, and overlook their own role in the address not being updated.

The terms for communication between New York Life and the policyowners were set forth under Section 8.15. Section 8.15 provides:

> 8.15  **Will You Be Updated Regarding The Status Of Your Policy?** Each policy year after the first, while this policy is in force and the Insured is living, we will send a written report to you within 30 days after the policy anniversary. It will show, as of that anniversary, the cash value, the cash surrender value and the amount of any unpaid loan and accrued interest. This report will also give you any other facts required by state law or regulation.

On January 12 and February 17, 2004, Plaintiffs sent correspondence to New York Life through Ms. Dyroff, both times referencing an ownership change to the Trust. See Ex. 7 and Ex. 8.

8

In the January 12 letter, Ms. Dyroff indicated the Trust was the new owner of the Policy and requested a new copy of the policy. The letter also enclosed the Service Form. Ex. 7.

The Service Form included a partially completed request to change the Policy owner's address, as the "TO" line of the Form contained Ms. Dyroff's office address, 165 N. Meramce (sic) Avenue, 6th Floor. Ex. 7, page 2. Ms. Dyroff's accompanying cover letter made no mention of a requested change of address, nor did the February 17, 2004 letter. Ex. 7 at 1; Ex. 8.

New York Life responded to Ms. Dyroff's correspondence on June 23, 2004. Ex. 9. At the top of the page, the Trust's owner and address were listed in all caps using the Huntleigh Woods address and the body of the letter made no mention of the Policy's mailing address. The letter closed with an invitation to contact New York Life with any questions at a toll-free telephone number. Plaintiffs made no further communications with New York Life regarding ownership or the proper address for the Policy from 2004 to 2020. Ex. 1, Wiegand dep., 70:2-13; Ex. 10, Dyroff dep., 66:3-67:20, 70:14-18, 72:9-18; Ex. 4, Sprich dep., 111:4-8.

"When a party is under a duty to speak, or when his failure to speak is inconsistent with honest dealings, and misleads another, then his silence may be deemed to be acquiescence." *Doran, Inc. v. James A. Green, Jr. & Co.*, 654 S.W.2d 106, 109 (Mo. App. W.D. 1983). "If an insurer is required to send premium due notices by custom, the insurer must continue to send notices to the address it has on file for the insured unless it is notified that the insured has changed address. However, the fact that the insured has changed his or her address does not affect the sufficiency of the notification, where the change is unknown to the insurer." *C.F.C.S. Invs., LP v. Transamerica Occidental Life Ins. Co.*, 2018 U.S. Dist. LEXIS 137657, *16 (E.D. Mo. Aug. 15, 2018) (citing 5 Couch on Ins. § 71:34 (3rd ed.)).

Here, New York Life's June 23, 2004 correspondence with Plaintiffs and Ms. Dyroff not only contained no mention of the requested address change, but also explicitly included a reference to the Huntleigh Woods address for the Policy. Ex. 9. After June 23, 2004, Plaintiffs and/or Ms. Dyroff

therefore knew – or had reason to know – New York Life was unaware of the address change and its mailing information on file remained at the Huntleigh Woods Address. Instead of informing New York Life that the Policy's listed address was not up-to-date, Plaintiffs and their attorney went silent for next 16 years until after Ms. Wiegand died. Ex. 5; Ex. 7; Ex. 8; 5 Couch on Insurance § 71:34, *supra*. If Plaintiffs did not agree with the information they knew New York Life had on file, they cannot now rely on their own misleading silence. *Doran, Inc.*, 654 S.W.2d at 109. As such, Plaintiffs cannot establish their own performance under the Policy as a matter of law. *Braughton*, 466 S.W.3d at 8.

### B. Plaintiffs have failed to establish damages and damages are purely speculative.

Plaintiffs seek $809,022.69, plus interest and costs. This amount is based on the theory that they would have surrendered the Policy in June 2012, but for Defendants' failure to send the annual statements to a different address. They allege they would have "cancelled" the Policy four years prior to lapse and received the cash value as it existed at that point in time. Petition, ¶ 78. Plaintiffs' allegations are wholly speculative and are insufficient to sustain the damages element of the breach of contract claim.

Plaintiffs' claim they would have surrendered the Policy at the height of its cash surrender value if New York Life changed the mailing address on file seven years prior rests on self-serving speculation. First, there is nothing in the record to suggest Plaintiffs would have surrendered the Policy at any particular point. Edward Wiegand was directly asked at deposition "had you received notices of this policy, that in 2012 you would have exercised the cash surrender value?" He responded "[n]o, I'm not saying that" Ex. 1, Wiegand dep., 159:15-19. Second, the Policy's cash surrender value changed on a month-to-month basis and was calculated as follows:

> The cash value on the policy date is determined by subtracting the Monthly Deduction Charge and the premium expense charge from the initial premium. The cash value on each Monthly Deduction Day after the issue date is determined as follows. First, from the cash value as of the prior Monthly Deduction Day, subtract any partial cash surrender value benefits paid, and any service or other charges made since that day. Add all premiums received since the prior Monthly Deduction Day less any premium

10

>expense charges. Add to this sum any interest credited for the prior month. Subtract the Monthly Deduction Charge.
>Ex. 2, § 5.2; Ex. 3, Elliott dep., 80:1-13.

In other words, the cash value at the inception of the Policy was $750,000. After each month, the cash value increased by the amount of interest the $750,000 earned and decreased by the monthly cost of maintaining the policy as defined in Policy sections 6.1 and 6.2. Ex. 2. For over a decade, the Policy earned more interest each month than the cost of continuing to insure Ms. Wiegand. As a result, the cash value of the Policy appreciated and was worth more than $800,000 in 2012. However, the monthly cost of insuring Ms. Wiegand increased as she aged and outpaced the interest the Policy earned until it lapsed in 2016 due to its cash value being exhausted. Ex. 3, Elliott dep, 118:14-17.

Damages in breach of contract require "actual facts that present a basis for a rational estimate of damages without resort to speculation." *Guidry v. Charter Communs., Inc.*, 269 S.W.3d 520, 533 (Mo. App. E.D. 2008). "This principle limits the reach of redress, on the breach of the contract, to the proximately caused or reasonably contemplated losses and excludes the problematical profits of future bargains." *Id.* Damage claims may not be based on "consequences which are contingent, speculative, or merely possible." *Delgado v. Mitchell*, 55 S.W.3d 508, 512 (Mo. App. S.D. 2001) (citing *First Nat'l Bank v. Kansas City S. Ry.*, 865 S.W.2d 719, 739 (Mo. App. W.D. 1993)).

Determining whether to exercise the option to surrender the Policy in exchange for the cash value at any point in time required a multi-faceted analysis. At minimum, one must understand how the Policy operates, the life expectancy of the insured, the health of the insured at each point in time and the extent to which the policyowner is willing to bet the insured will die before the policy lapses—which here would result in a death benefit payment of $1,400,000. Ex. 3, Elliott dep, 208:13-25.

Plaintiffs admit they took none of the above actions. They did not read and understand the terms of the Policy such that they would or could have meaningfully considered the costs and benefits of continuing versus surrendering it while it was active. Ex. 1, Wiegand dep., 59:8-17, 147:18-148:19;

11

Ex. 4, Sprich dep., 151:13-21. Plaintiffs also made no effort to interact with Ms. Wiegand or otherwise assess her physical condition or age at any point after 2002. Ex. 1,Wiegand dep., 59:8-17; Ex. 4, Sprich dep., 151:13-21. Rather, Plaintiffs decided to "sit back and wait" for the elderly Ms. Wiegand to die. Ms. Wiegand was 92 years old in 2012 and remained insured for $1.4 million until age 96 in 2016.

The speculative nature of Plaintiffs' damage claim is demonstrated by their admission that they chose the Policy's June 2012 cash surrender value as their damages for three reasons with no relevance to what Plaintiffs did or would have done. First, Plaintiffs chose the 2012 cash surrender value because they are barred by the statute of limitations from looking back further than 2012. When asked what damages he is claiming, Mr. Wiegand responded "[d]amages in the form of cash value limited by statute of limitations…You can only go back, I believe it's ten years, from the time you file a petition for damages." Ex. 1, Wiegand dep., 59:1-2;9-11. Second, and as noted above, Plaintiffs admitted they would not have exercised the cash surrender option in 2012. Ex. 1, Wiegand dep., 159:15-19.  Third, the Policy's cash surrender value in 2012 was at its peak for the limitations period. Accepting Plaintiffs' damage allegations, which rely solely on post hoc analysis of the Policy's value, allow Plaintiffs to choose the highest Policy value within the statute of limitations without any factual basis to suggest they would have actually cashed in the Policy at any particular point in time, if ever.

Given the above, Plaintiffs' reliance on hindsight to maximize the Policy's value in light of Ms. Wiegand surviving the Policy's lapse and maturity dates is inherently speculative. *Delgado v. Mitchell*, 55 S.W.3d at 512. Hindsight-driven speculation as a basis for liability or damages is not permitted. See, *e.g.*, *Mack v. Stryker Corp.*, 748 F.3d 845, 848 (8th Cir. 2014) (products liability); *Podraza v. Whiting*, 790 F.3d 828, 838 (8th Cir 2015) (intent in GAAP accounting violations); *Ladish v. Gordon*, 879 S.W.2d 623, 632 n. 3 (Mo. App. W.D. 1994) (medical negligence); *Liddell by Liddell v. Board of Educ.*, 126 F.3d 1049, 1058 (8th Cir. 1997).

12

In real time, the choice policyowners face is more complex than "surrender the Policy or get nothing". In 2012, surrendering the Policy would have forfeited four additional years of coverage on a woman in her nineties whose death would have paid out nearly double the cash surrender value. Plaintiffs' allegations they would have acted differently is untethered from their complete disassociation from Ms. Wiegand in 2002 and failure to monitor the value of the Policy at any point after 2004. As such, there are no "actual facts that present a basis for a rational estimate of damages without resort to speculation." *Guidry*, 269 S.W.3d at 533.

Tying damages to the Policy's maximum cash surrender value within the statute of limitations would relieve Plaintiffs of the obligation to establish the existence *and* extent of damages without resorting to speculation. *Delgado*, 55 S.W.3d at 512. Even if New York Life failed to update the Policy's mailing address – a failure Plaintiffs knew about and took no action to redress – nothing in the record suggests Plaintiffs' alleged damages were "proximately caused or reasonably contemplated" by the alleged breach. *Guidry*, 269 S.W.3d at 533. Plaintiffs could have contacted New York Life by phone, mail, or online at any point and learned any information they allege they needed to evaluate the Policy. Ex. 3, Elliott dep., 210:2-25. Plaintiffs' claim they would have forfeited a potential $1,4000,000 payout by surrendering the Policy at some point during Ms. Wiegand's nineties is pure speculation based on the hindsight knowledge that Ms. Wiegand outlived the Policy and reached her 100th birthday. The Court should therefore grant Defendants summary judgment on Plaintiffs' breach of contract claim.

**II. Plaintiffs cannot establish vexatious refusal.**

Plaintiffs allege "The Trust had a right to be paid the Cash Value of the Policy in June 2012, but was not paid because of the Insured's breach of the Policy."[2] Doc. #4, Petition, ¶84. They contend

---

[2] Defendants presume Plaintiffs intended to allege the "insurer" breached the Policy.

13

they made a demand for payment, which was denied without reasonable cause or excuse. Doc. #4, Petition, ¶¶ 85-87. Vexatious refusal claims are governed by Mo. Rev. Stat. § 375.420, which provides:

> In any action against any insurance company to recover the amount of any loss under a policy of … life, … if it appears from the evidence that such company has refused to pay such loss without reasonable cause or excuse, the court or jury may, in addition to the amount thereof and interest, allow the plaintiff damages not to exceed twenty percent of the first fifteen hundred dollars of the loss, and ten percent of the amount of the loss in excess of fifteen hundred dollars and a reasonable attorney's fee; and the court shall enter judgment for the aggregate sum found in the verdict.

Defendants do not dispute that Plaintiffs had the contractual right to surrender the Policy while it remained in force from 2000-2016. However, Plaintiffs concede they made no such demand during the life of the Policy. Ex. 1, Wiegand dep., 84:7-11. Trustee Sprich's November 19, 2020 letter to New York Life asserted (1) the Trustees were unaware the policy lapsed in 2016; (2) the Huntleigh Woods mailing address was incorrect; and (3) requested copies of the policy's statement and transaction history, notices and correspondence, and policy cash value at any time. Ex. 17. Notably absent from Trustee Sprich's letter, however, was any demand for payment. Ex. 17. In its February 2021 reply correspondence, New York Life made an extracontractual settlement offer equal to the cash surrender value of the Policy at the time of its expiration. Ex. 18. Plaintiffs rejected New York Life's offer and filed suit.

"To prove a claim of vexatious refusal, the insured must show the insurer's refusal to pay the claim was willful and without reasonable cause, as the facts would appear to a reasonable and prudent person." *Morris v. J.C. Penney Life Ins. Co.*, 895 S.W.2d 73, 76 (Mo. App. W.D. 1995). The elements of vexatious refusal are (1) absence of a reasonably litigable issue and (2) the insurer's vexatious and recalcitrant attitude in refusing the claim. *Id.* An adverse decision of the insurer alone is insufficient to support a vexatious refusal claim; the insurer may insist on a judicial determination of claims if there is an open question of fact or law determinative of liability. *Id.* "The purpose of section 375.420 is to

14

correct the evil of an arbitrary refusal for the sole purpose of delaying the plaintiff in the collection of the claim." *Id.*

Given that New York Life offered to pay Plaintiffs the Policy's final cash surrender value despite having no obligation to do so and having received no demand at that point, New York Life has not "refused" to pay or taken a vexatious position toward resolving this claim. New York Life's position is reasonably litigable: undersigned counsel is aware of no case holding the measure of damages for a life insurance company's failure to update a policyowner's address is the peak cash surrender value of the policy. New York Life also proactively responded to Plaintiffs' 2020 inquiry by offering a monetary disbursement, despite the policy having lapsed in 2016 *and* the insured, Ms. Wiegand, outliving the Policy's maturity date. That New York Life requests judicial determination of the value – if any – of Plaintiffs' claims instead of accepting demands in excess of the Policy's face value does not constitute "arbitrary refusal for the sole purpose of delaying the plaintiff in the collection of the claim." *Morris*, 895 S.W.2d at 76. The Court should therefore grant Defendants summary judgment on Plaintiffs' vexatious refusal claim.

**III-IV. The Court previously rejected Plaintiff's conversion and unjust enrichment claims.**

This Court's reasoning in its July 28, 2022 Order, Doc. #32 functioned as a dismissal with prejudice of Counts 3 and 4, although the Court did not explicitly state those Counts were dismissed. Out of an abundance of caution, Defendants hereby adopt and incorporate by reference the arguments in Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Leave to File First Amended Complaint, Doc. #28 and this Court's corresponding Order, Doc. #32 pursuant to Fed. R. Civ. P. 10(c) and state summary judgment is justified on the same grounds, if necessary.[3]

---

[3] Regarding the conversion Count, this Court stated, "there is no basis for a claim of conversion for Plaintiffs or any proposed class members." Order, Doc. #32, pp. 3. Regarding the unjust enrichment Count, this Court stated, "an equitable claim for unjust enrichment is not available. Neither Plaintiffs nor any proposed class members can assert a claim of unjust enrichment based on the express contracts of their universal life policies." Order, Doc. #32, pp. 3-4.

WHEREFORE, Defendants respectfully request that this Court grant their Motion for Summary Judgment, enter judgment in favor of Defendants and against Plaintiff, and for such other and further relief the Court deems just and proper.

        Respectfully submitted,

        HINSHAW & CULBERTSON LLP

By:   /s/ James M. Brodzik
      James M. Brodzik #66700
      Daniel K. Ryan #619661
      521 West Main Street, Suite 300
      Belleville, IL 62220
      Telephone: 618-277-2400
      Facsimile: 618-277-1144
      Email: JBrodzik@HinshawLaw.com
      Email: DRyan@HinshawLaw.com

      Attorneys for defendants New York Life Insurance & Annuity Corporation and New York Life Insurance Company

## CERTIFICATE OF SERVICE

The filing attorney certifies that on July 17, 2023, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic case filing system upon all participants in the Court's electronic case filing system.

        /s/ James M. Brodzik