IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
Eastern Division

| | | |
|---|---|---|
| EDWARD WIEGAND, *et al.*, etc., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 4:22-cv-00188 HEA |
| vs. | ) | |
| | ) | Jury Trial Demanded |
| NEW YORK LIFE INSURANCE | ) | |
| & ANNUITY CORPORATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' TRIAL BRIEF

Plaintiffs Edward Wiegand ("Ed") and Eugenia Sprich ("Gina")[1] (jointly, "Trustees") are the Trustees of the Herbert C. Wiegand Revocable Trust dated April 15, 1997 (the "Trust").

Plaintiffs' father, Dr. Herbert C. Wiegand, was the Trust's grantor.

Dr. Wiegand married his second wife, Jean Cameron Walters ("Jean"), in August 1999. Dr. Wiegand was 82 and Jean was 79 at the time.

---

[1]     For convenience, first names are used in this brief to identify the many members of the Wiegand family.

1

In June 2020, as part of his estate planning, Dr. Wiegand bought the subject life insurance policy ("Policy" or "insurance contract") from defendant New York Life Insurance & Annuity Corporation ("NYLIAC"), a wholly-owned subsidiary of defendant New York Life Insurance Company (jointly, "NY Life"). The Policy provided insurance coverage of $1.4 million on Jean's life for the benefit of Dr. Wiegand's children. Dr. Wiegand had seven children, all from his first marriage. The Policy also had a cash surrender value that varied over time per the terms of the Policy.

Dr. Wiegand died July 16, 2002. Dr. Wiegand had not kept his children informed about his finances or his estate planning. Trustees did not learn about the Policy until the day of Dr. Wiegand's funeral. At the viewing before the funeral, Dr. Wiegand's insurance agent, NY Life agent Clinton Vance, took Gina aside and told her about the Policy. At her deposition, Gina testified to her conversation with Vance:

> Q     What, if anything — what did Mr. Vance tell you about the policy that's at issue in this lawsuit?
>
> A     He told me that my dad had this other policy, and it's on Jean's life. And he has paid all the premiums and all the taxes on it. All you have to do is sit back and wait for her to die. Then it gets split among the kids. That's exactly, pretty much exactly what he said to me.

2

Later that day, at a restaurant-bar where friends and relatives gathered after Dr. Wiegand's funeral, Vance told Ed about the Policy. Ed testified about this conversation at his deposition:

> The only person I talked to about anything was
> Clinton Vance regarding this policy in question,
> and he basically said that all you have to do is sit
> back and wait for Jean to die to receive the money
> from this policy.

Vance's statements to Trustees did not accurately describe the Policy. The Policy was not, in fact, a simply insurance policy. It was not an insurance policy where one could just sit back and wait until the insured died and then receive the insurance proceeds.

Ed also had a conversation about the Policy with Dr. Wiegand's estate planning lawyer, Charles McCarter. Ed testified in his deposition:

> I will tell you this, Charles McCarter, in reference
> to the policy in question here, said it was a single
> payment premium life insurance policy, which I feel
> is very misleading at this point in time.

McCarter's statement was very misleading. Contrary to what he told Ed, the Policy was not a single payment or single premium insurance policy. To the contrary, the Policy required infusions of new cash through premium payments to avoid lapsing.

3

Vance's and McCarter's statements are admissible in evidence at trial. The statements will not be offered for the truth of the matter asserted, the hallmark of hearsay. (In fact, the statements were false.) The statements are admissible because they explain Trustees' state of mind and their conduct relating to the Policy. *Rodriguez v. Suzuki Motor Corp.*, 996 S.W.2d 47, 59 (Mo. 1999); *Coon v. American Compressed Steel, Inc.*, 207 S.W.3d 629, 635, 636 (Mo. App. 2006).

Dr. Wiegand's children became unhappy with McCarter as the estate's lawyer and hired lawyer Joanne Dyroff to finish the work. The estate had many components, of which the Policy was just one. Dyroff sent in NY Life's form to change the ownership of the Policy to the Trust. Later Dyroff sent in NY Life's form to change the Trust's mailing address to her law firm's address. It took Dyroff several efforts to get NY Life to change the ownership of the Policy. And although NY Life had everything it needed to process the Trust's address change, it never did so.

Dyroff did not know that NY Life had not changed the address for the Policy. Neither did the Trustees. Trustees did not receive any mailings from NY Life via Dyroff, but they were not concerned about it because, based on what Vance (and McCarter) had told them, they were not expec-

ting any communications. Based on what they were told about the Policy, Trustees understood that they only had to sit back and wait until Jean died to collect the Policy proceeds.

The Policy (Section 8.15) required NY Life to send annual written reports about the Policy to the owner (from 2004 on, the Trust) every June so long as the Policy was in force. Those annual reports showed key information about the Policy, including its cash surrender value — the amount the owner would receive if it surrendered the Policy — and the month-by-month changes to the Policy's cash surrender value over the prior 12 months. The reports also provided projections of when the Policy would lapse if additional premiums were not paid.

Elliott, NY Life's corporate representative, agreed that NY Life had a contractual obligation to mail the annual written reports to the Trust.

From 2004 and through the June 2011 annual written report, NY Life mailed the reports *to Jean's home address* and **not** to the address for the Trust that Dyroff had provided.

Plaintiffs did not receive any of the written reports.[2]

---

[2]     NY Life argues that Trustees had contributory or comparative fault for NY Life's failure to update the Trust's address and send the

In June 2011, a invoice mailed by NY Life to the old address was returned to NY Life as undeliverable. The envelope was stamped, "RETURN TO SENDER / NOT DELIVERABLE TO ADDRESSEE / UNABLE TO FORWARD."

According to defendants' corporate representative, James Elliott, when the letter was returned undeliverable, NY Life followed its usual procedures to locate a new address for the Policy's owner.

First, NY Life checked its files to see whether it has received a change of address form from the owner of the Policy within the last 30 days.

Second, NY Life checked with an address service to see if it could provide a new mailing address for the Trust.

---

written reports to the Trust. While factually without basis, even if there was a factual basis, such contributory fault would be immaterial to Trustees' breach of contract claim:

> [C]ontributory negligence is no defense to a breach of contract action. … [A] plaintiff's contributory negligence goes only to mitigation of damages. … The duty to mitigate damages, however, does not arise until the promisee learns that the contract has been breached.

*A.G. Edwards & Sons v. Drew*, 978 S.W.2d 386, 391 (Mo. App. 1998).

Elliott admitted that checking with the address service was an empty gesture because the service could only provide address updates for individuals, not trusts.

**When NY Life did not get a new mailing address through these two inquiries, it simply stopped sending the annual written reports**. Instead, from that point on NY Life generated annual written reports that went directly to NY Life's file archive. For example, the next annual written report, prepared for June 2012, states on its first page: "UNCLAIMED MAIL. APS ARCHIVED, BUT NOT MAILED." The subsequent annual written reports had the same notation.

**NY Life had the ability, however, to mail the June 2012 report (and the subsequent reports) to the correct address. All NY Life had to do was look in its own files to get the right address**. If NY Life had not used its self-imposed and absurd limitation of looking-back only 30 days, it would have found in its files for the Policy the completed address change form, in good form, providing the correct mailing address for the Trust. NY Life would also have found its correspondence with the estate's lawyer, Dyroff, showing her law firm's name, phone number, and mailing address, as well as the names and addresses of all of the Trust

7

beneficiaries. There was more than enough information in NY Life's file to enable NY Life to get a good address and comply with its contractual obligation to send the annual written reports to the Trust.

Trustees point to NY Life's failure to send them the June 2012 annual written report as the breach of insurance contract on which this lawsuit is based.

While NY Life's failure to send the June 2011 and earlier reports to the Trust were also breaches of the insurance contract, NY Life did actually mail reports in those years, albeit to the wrong address. Those mis-addressed mailings, however, were all made more than 10 years before this case was filed — and therefore if Trustee made claims based on those breaches of contract, the claims would be barred by the applicable statute of limitations. *See Section 516.110, RSMo.* ("Within ten years: (1) An action upon any writing … for the payment of money …").

**NY Life's failure to mail its report to the Trust in June 2012 is, however, within the 10-year statute of limitations**. It is also distinguished from the June 2011 and earlier breaches of contract in that *NY Life did not send its June 2012 report anywhere*. **Failure to mail is an even clearer breach of contract than mailing to an old address**.

8

The Policy provides, and Elliott the corporate representative admits, that the Trust could have surrendered the Policy for its cash surrender value at anytime while the Policy was in force and had a cash value. The Trust could have surrendered the Policy at anytime during 2012. The cash surrender value on any date was an amount that could be mathematically calculated.

The June 2012 written report — the report that NY Life never sent — showed the Policy's cash surrender value as of June 12, 2012 to be $809,022.60. The June 2012 written report also showed that the cash surrender value had dropped significantly since June 13, 2011, when it was $850,714.38, and that the value would continue to drop in the coming months if an additional premium payment was not made.

The June 2012 written report also included projections as to when the Policy would lapse and no longer be in effect. The projection stated that if no further premium payments were made, the Policy would lapse:

> 3. **June 2016**, assuming that you make **no further payments**, and that the **current** interest rate is credited and the **fees and charges** that are currently utilized continue to be deducted.

4. **Aug 2015**, assuming that you make **no further payments**, and that the **guaranteed** interest rate is credited and the maximum **fees and charges** that are guaranteed by the policy are deducted.

Trustees never had any of this important information available to them because NY Life never sent them the June 2012 report. This failure by NY Life was a breach of its contractual obligations under the Policy.

**If Trustees had received the information provided by the June 2012 written report, they would have promptly surrender the Policy and collected the cash surrender value**. Plaintiffs can testify to this notwithstanding defendants' contention that such testimony is speculative. "A witness may testify to the fact of what he did not know and how, if he had known that independently established fact, it would have affected his conduct or behavior." *U.S. v. Cuti*, 720 F.3d 453, 459 (2nd Cir. 2013); citing and following *U.S. v. Jennings*, 487 F.3d 564 (8th Cir. 2007); *see also U.S. v. Bistrup*, 449 F.3d 873, 881 (8th Cir. 2006); *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created").

10

Damages are liquidated. Damages equal the cash surrender value of the Policy as of the date it would have been surrendered. The cash surrender value of the Policy as of the date of the June 2012 report was $809,022.60. Defendants may argue that it would have taken Trustees several days, or even a couple of weeks, after receiving the June 2012 report before they could decide to surrender the Policy and complete the paperwork to effectuate the surrender. Assuming this is true, this is not a problem for Trustees' case. The June 2013 written report provides information from which the cash surrender value of the Policy can easily be calculated during the prior 12 months.

In the month from June 12, 2012 to July 13, 2012, the Policy cash surrender value changed as follows:

| | |
|---|---|
| June 12 value | $809,022.60 |
| June 13 insurance cost | ($8,273.07) |
| June 13 fees | ($8.00) |
| July 13 insurance cost | ($8,352.48) |
| July 13 fees | ($8.00) |
| July 13 interest earned | $2,653.36 |

11

So, if the Trustees surrendered the Policy during the one-month period from June 12 to July 12, 2012, the cash surrender value would have been $800,741.53. (If it took the Trustees another 30 days, up to and including August 12, 2012 in which to surrender the Policy, the cash surrender value would have been $795,034.41.)

Damages are liquidated in that they are stated plainly on the face of the June 2012 annual written report or are easily calculated from the figures for the prior year's monthly changes in cash surrender value appearing on the June 2013 report.

Because NY Life did not send the annual written reports to the Trust at the Trust's address, the Trustees did not know these important facts about the Policy. The Trustees were deprived of both (a) the information that would have informed them of their contractual right to surrender the Policy and (b) of the opportunity to consider whether to surrender the Policy. Without that information, and without that opportunity, Trustees did what NY Life's agent Clinton Vance told them to do: They sat and waited for Jean to die.

Jean died at the age of 100. Upon learning of her death, Gina contacted NY Life to claim the Policy proceeds on behalf of the Trust. After

Gina established her right to obtain the information, NY Life told Gina that the Policy had lapsed in August 2016 because of the nonpayment of premiums.

To say that Gina was surprised and upset would be an understatement. Gina sought additional information from NY Life in writing about what had happened. Three months later, in a February 2, 2021 letter, NY Life finally responded, telling her:

> On January 21, 2004 we received a request signed by Edward Wiegand and Eugenia Sprich as Co-Trustees to change the address to 165 N. Meramce Avenue, 6th Floor, St. Louis, MO 63105. **Due to an oversight on our part, the address change was not processed as requested. We apologize for this error** (emphasis added).

NY Life also provided a detailed explanation of the mechanics of the Policy, informing Trustees for the first time that this was not a fully-paid, single-premium life insurance policy. NY Life provided Gina with copies of the annual premium notices and annual written reports beginning from 2003 (when the Trust became the owner) and continuing through 2016 (when the Policy lapsed). Finally, NY Life made the Trustees a settlement offer that NY Life called "an extra contractual offer":

> Please note that upon our review, we are extending an extra contractual offer based on the circumstances that have occurred. …
>
> Since the policy is no longer active, and in view of the circumstances explained above. New York Life is willing to make an extra-contractual offer since the policy cannot be reinstated. We will pay the equivalent of the policy's cash surrender value of $25,095.26, representing the cash surrender value as of the 2016 Annual Policy Summary (APS) prior to the policy's expiration.

Following receipt of this derisory settlement offer, Trustees retained a lawyer to make a demand for payment of their loss under the Policy. The lawyer's demand letter, dated December 10, 2021, set out Trustees' understanding of the Policy and the relevant facts. While the demand had a couple of errors — most significantly, it used the figure on the June 2012 annual report of the June *2011* cash value ($850,714.38) rather than the lower cash surrender value figure for June 2012, the general gist of the demand was on point and clear. Trustees demanded that NY Life pay the Trust the cash surrender value of the Policy as of June 2012 plus 9.5 years of interest at 9% to cover the period from NY Life's June 2012 breach of contract to Trustees' December 2021 demand for payment.[3]

---

[3]    Trustees are now entitled to over 11 years of interest.

The demand letter also advised NY Life that if a lawsuit was needed to enforce the Trustees' claim for breach of contract, the Trustees would also make a claim against NY Life for vexatious refusal.

NY Life responded to the Trustees' demand letter, writing:

> In regard to the demand of monies above and beyond our offer, please know that had the trustees received billing notices prior to expiration, additional payments for the monthly Cost of Insurance (COI) charge and other fees would have been required to keep the policy in force until the insured's age 100. At the time of expiration, the monthly COI excluding other fees equaled $38,842.05. Hence, at the very minimum this is the amount that would have been required each month until year 2020.

NY Life's response was unreasonable and unresponsive. Trustees' demand did *not* assert that if they received the documents to which they were contractually entitled they would have kept the Policy in force by paying the premiums. **Trustees' demand asserted that if Trustees had received the required annual written reports, Trustees would have surrendered the Policy and taken the cash surrender value**. Contrary to NY Life's absurd analysis in its response letter, there would have been no premiums to pay to keep the Policy in force until Jean

reached age 100 because that is not what the Trustees would have done. Thus, NY Life's response to the demand letter was wholly non-responsive.

NY Life continued:

> We are still willing to make an extra-contractual offer to pay the equivalent of the policy's cash surrender value of $25,095.26, which represents the value as of the 2016 Annual Policy Summary (APS) before the policy expired.

NY Life's response to the demand letter, and its refusal to pay the June 2012 cash surrender value after acknowledging that NY Life's failure to send Trustees the June 2012 annual written report was its own fault, was vexatious. The vexatiousness of NY Life's response is highlighted by its failure to respond to the Trustees' actual contentions and concerns and by its repetition of its insultingly-low "extra-contractual offer." This offer of $25,095.26 equaled **about only 3%** of the June 2012 cash surrender value. Without interest. A 3% settlement offer was unreasonably low given that NY Life had already admitted that its breach of its contractual duty to sent the annual reports **was the result of NY Life's own error** — an error for which it gave its **empty, fake apology**.

This 3% letter, and the demand letter the preceded it, will both be admissible in evidence on Trustees' vexatious refusal claim:

16

> [S]ettlement offers and demands are admissible in
> a vexatious refusal to pay case if they are relevant
> to the reasonableness of an insurance company's
> conduct. …
>
> Frankly, **we find it difficult to imagine any
> evidence more relevant to the reasonableness
> element in a vexatious refusal to pay case
> than whether defendant insurance company
> made a settlement offer and, if so, for how
> much**. To exclude such evidence would force the
> jury to make its assessment of the company's
> conduct in a vacuum without "all the facts and
> circumstances in connection with the case."

*Qureshi v. American Family Mut. Ins. Co.*, 604 S.W.3d 721, 728-29 (Mo.
App. 2020) (emphasis added; citations omitted).

## CONCLUSION

Based on the undisputed and other easy-to-prove facts, and on the
well-established law applicable to this case, Trustees will be entitled to
judgments on their breach of contract claim against NY Life for an amount
in excess of $800,000 in actual damages, plus prejudgment interest, as
well as an award of a 10% penalty and attorney fees under the vexatious
refusal statute.

17

Respectfully submitted,

Jacobson Press P.C.

By:    /s/ Joe D. Jacobson
Joe D. Jacobson #33715
222 South Central Avenue, Suite 550
Clayton, MO 63105
Tel: (314) 899-9789
Direct: (314) 899-9790
Fax: (314) 899-0282
Email: Jacobson@ArchCityLawyers.com

Attorneys for plaintiffs Edward
Wiegand and Eugenia Sprich

## CERTIFICATE OF SERVICE

The filing attorney certifies that copies of this document were served on each counsel of record participating in the court's electronic case filing (ECF) system by filing this document through the ECF system on October 25, 2023.