IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
Eastern Division

| | | |
|---|---|---|
| EDWARD WIEGAND and EUGENIA SPRICH, TRUSTEES OF THE HERBERT C. WIEGAND REVOCABLE TRUST, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| | ) | No.4:22-cv-00188-HEA |
| vs. | ) ) | |
| | ) | Jury Trial Demanded |
| NEW YORK LIFE INSURANCE & ANNUITY CORPORATION and NEW YORK LIFE INSURANCE COMPANY, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' TRIAL BRIEF

COME NOW Defendants, NEW YORK LIFE INSURANCE & ANNUITY CORPORATION and NEW YORK LIFE INSURANCE COMPANY ("New York Life" or "Defendants"), by and through their attorneys, and for their Trial Brief state as follows:

## STATEMENT OF THE CASE

Edward Wiegand and Eugenia Sprich ("Plaintiffs") brought this Breach of Contract and Vexatious Refusal action in their capacities as Trustees of the Herbert C. Wiegand Revocable Trust. Their claims arise from an accumulator universal life insurance policy ("the Policy") their father, Dr. Herbert Wiegand, purchased on the life of his wife, Jean Wiegand (Walters), in June of 2000. Plaintiffs allege New York Life failed to update the Policy's mailing address at Plaintiffs' request after Dr. Wiegand's death in 2002. They contend this failure prevented them from receiving subsequent correspondence about the Policy and had they received said correspondence, they would have surrendered the Policy for its cash value. Instead, Plaintiffs received nothing because the Policy lapsed in 2016 while Ms. Wiegand was still living at age ninety-six.

New York Life anticipates Plaintiffs will (1) argue New York Life's failure to process the address change request constituted breach of contract, (2) claim Plaintiffs were unable to evaluate whether they should keep the Policy in effect or surrender it for a percentage of its face value because they did not receive New York Life's annual notices about the Policy, and (3) claim Plaintiffs would have surrendered the Policy in 2012 in exchange for its cash surrender value. New York Life further anticipates that should Plaintiffs prevail on their breach of contract claim, they will request statutory damages and attorneys' fees under Missouri's vexatious refusal statute, Mo. Rev. Stat. § 375.420.

New York Life will argue Plaintiffs cannot establish two essential elements of breach of contract. First, New York Life will argue Plaintiffs violated their own obligations under the Policy because although they knew or had reason to know New York Life did not process the address change request, they remained silent. Second, New York Life will argue Plaintiffs' damage claims are impermissibly speculative. To the extent Plaintiffs seek relief under the vexatious refusal statutes, New York Life will argue it is entitled to seek judicial determination of the reasonably litigable issues of fact and law pertaining to breach of contract and the measure of damages.

## FACTS

In 1999, Dr. Wiegand and Ms. Wiegand married at the ages of 82 and 80, respectively. Deposition of Edward Wiegand, 53:17-25, (Exhibit 1). Dr. Wiegand and Ms. Wiegand each had multiple children from prior marriages but had no children together. Plaintiffs are children of Dr. Wiegand and the Trustees of the Herbert C. Wiegand Revocable Trust (the "Trust"). On June 13, 2000, Dr. Wiegand purchased the Policy from New York Life against the life of Ms. Wiegand with a face value (death benefit) of $1.4 million and a maturity date of June 12, 2020. See Policy, (Exhibit 2), NYL 648-673; Doc. #4, Petition, ¶ 7. The Wiegands lived together at 9 Huntleigh Woods, St. Louis MO 63131 until his death in 2002, and hers in 2020.  Ex. 1, Wiegand dep., 55:5-24.

83487\314987710.v1

In a universal life insurance policy like this one, the policyowner pays premiums, which keeps the Policy in force and may allow it to build a cash value. See deposition of New York Life Corporate Representative James Elliott, 16:10-22, (Exhibit 3). Every month, the Policy's cash value fluctuates based on prevailing interest rates and the ongoing cost to maintain coverage under the Policy. Ex. 3, Elliott dep., 16:15-22. Coverage continues if the Policy's cash value exceeds the monthly cost to maintain the Policy. Ex. 3, Elliott dep., 16:15-22; 17:14-17. Here, the Policy was funded with a single, up-front premium payment of $750,000. Ex. 3, Elliott dep., 169:1-8. The up-front premium was guaranteed to provide coverage for at least eight years, with the potential to last longer if the interest that accumulated exceeded its remaining cash value. Ex. 2, Policy, at NYL671. If the cash value decreased below the cost to maintain the Policy prior to the maturity date, the policyowner had options to pay additional premiums or surrender the Policy in exchange for a cash disbursement equal to the "cash surrender value" under Section 5.5 of the Policy. Ex. 2, Policy, NYL659; Ex. 3, Elliott dep., 78:14-80:25. The cash surrender value also fluctuated on a monthly basis subject to the remaining value of the premium, less charges or fees set forth in the Policy. Ex. 3, Elliott dep., 80:1-13. If the insured dies before the earlier of the maturity date or the lapse of the Policy, the policyowner is paid the death benefit. Ex. 2, Policy, NYL 659. The Policy instructs the owner to "Read the Policy Carefully". Ex. 2, Policy, NYL 659.

Dr. Wiegand died on July 16, 2002. Ex. 1, Wiegand dep., 29:7. Plaintiffs last interacted with their stepmother, the insured, Ms. Wiegand, "within a few days of [their] father's funeral." Ex. 1, Wiegand dep., 29:2-8.  They did not see or speak with Ms. Wiegand again for the remaining eighteen years of her life, did not attend her funeral, and had no contact with Ms. Wiegand's surviving family. Ex. 1, Wiegand dep., 29:2-8, 54:20-55:2, 58:3-15; Deposition of Eugenia Sprich, 79:5-14; 85:13-17, (Exhibit 4). After Dr. Wiegand's death, Plaintiffs' only discussions regarding the Policy involved "how long is [Ms. Wiegand] going to live before we get a payout from this policy" and the need to "just sit

3

back and wait." Ex. 1, Wiegand dep., 28:1-19; Ex. 4, Sprich dep., 62:23-63:5. Plaintiffs had no knowledge and took no action to learn of Ms. Wiegand's health condition or status from which they could have assessed whether to maintain or surrender the Policy. Ex. 1, Wiegand dep. 59:8-17; Ex. 4, Sprich dep., 151:13-21.

On July 22, 2003 – approximately a year after Dr. Wiegand's death – Plaintiffs engaged attorney Joann Dyroff to notify New York Life in a writing that they wished to transfer ownership of the Policy from the Wiegand Family LLC to the Trust and modify certain beneficiary information. See 7/22/03 letter, (Exhibit 5). New York Life acknowledged receipt in correspondence to Ms. Dyroff and recorded the change in ownership on August 19, 2003. See 8/19/03 correspondence, (Exhibit 6), NYL616. On January 12, 2004, Ms. Dyroff sent a letter to New York Life enclosing a "Service Form – Change Requests" document that was signed by the Trustees. See 1/12/04 letter, (Exhibit 7), DRYOFF 502. It stated in relevant part:

> We are enclosing the completed Service Form – Change Request for the life insurance policy owned by the Herbert C. Wiegand Revocable Trust, insuring the life of Jean C. Wiegand. As indicated in the document, the original policy has been lost and we are requesting the issuance of a new policy, showing the current owner as the Herbert C. Wiegand Irrevocable Trust.

In addition to the request for a new copy of the Policy, the Service Form included another term not mentioned in the letter: the Trust's address was listed as 165 N. Meramce (sic) Avenue, 6th Floor. Ex. 7. In a second letter to New York Life dated February 17, 2004, Ms. Dyroff advised the Policy incorrectly stated that it was owned by Mr. Wiegand, rather than the Trust, but made no mention of the purported request to change the Trust's mailing address. See 2/17/04 letter, (Exhibit 8), DRYOFF92-95. In reply correspondence dated June 23, 2004, New York Life confirmed the Policy's owner was The Herbert C. Wiegand Revocable Trust. See 6/23/04 letter, (Exhibit 9), DRYOFF83-84. The letter's address block contained the same Huntleigh Woods address. Ex. 9.

Neither Ms. Dyroff nor the Trustees advised New York Life that its June 23, 2004 correspondence was addressed incorrectly. Ex. 1, Wiegand dep., 70:2-13; Deposition of Joann Dyroff, 66:3-67:20, (Exhibit 10). Ms. Dyroff had no further contact with New York Life regarding the Policy on behalf of the Trust for 16 years, between June 23, 2004 and 2020. Ex 4, Sprich dep., 111:4-8; Ex. 10, Dyroff dep., 70:14-18, 72:9-18.

Trustee Wiegand testified that he was obligated "to handle all affairs as outlined in the Trust," which required him to review and understand any documents necessary to effectuate the Trust's provisions. Ex. 1, Wiegand dep., 35:11-36:6, 176:1-6. Nonetheless, he admitted he did not read the Policy, know how it functioned, or take steps to learn about it from Ms. Dyroff or New York Life between 2004 and 2020. Ex. 1, Wiegand dep., 40:12-14; 147:18-148:19. Trustee Sprich testified that despite signing the 2004 Service Form, she did not read the request "word for word" to ensure she understood it, did not understand she was requesting that the Policy's mailing address and contact phone number be changed to Ms. Dyroff's office, and did not expect that future communications with New York Life should be made exclusively through Ms. Dyroff. Ex. 4, Sprich dep., 142:1-144:5.

Annual notices are not the only way for policyowners to learn about their policies. Policyowners may seek up-to-date information about their policies' present cash values by phone or online. Ex. 3, Elliott dep., 210:2-25; Ex. 1, Wiegand dep., 82:1-16; 83:1-10. Plaintiffs admitted they never requested an updated calculation of the Policy's cash value. Ex. 1, Wiegand dep., 83:6-10. Plaintiffs also never attempted to surrender the Policy in exchange for its cash value. Ex. 1, Wiegand dep., 84:7-11.

Every June from 2003-2011, New York Life sent correspondence about the Policy to the Huntleigh Woods address where Ms. Wiegand resided. Annual Notices, 2003-2011, NYL 793-846, (Exhibit 11). The annual notices provided updates of the Policy's remaining cash value, premium, anticipated changes in the Policy's value in the coming year, and estimated when the Policy was likely

5

to lapse if no further premium payments were made. New York Life's correspondence was delivered successfully to the Huntleigh Woods address every year until 2011. Ex. 3, Elliott dep., 209:9-17.

On June 3, 2011, the U.S. Postal Service returned and marked New York Life's annual Policy correspondence to the Huntleigh Woods address undeliverable. Ex. 3, Elliott dep., 53:24-54:7. When mail is returned as undeliverable, New York Life has an internal procedure to search for alternative contact information and if necessary, stop sending correspondence to addresses with unknown inhabitants. Here, a New York Life employee reviewed the file to see if the policyowner recently submitted a change of address within a month of the undelivered correspondence. Ex. 3, Elliott dep., 53:22-25; 55:7-13.[1] Finding no change of address was submitted in the preceding month, New York Life then searched Accurint, a background check and public records search vendor. Ex. 3, Elliott dep., 53:22-54:4. The Accurint search revealed no alternative contact information because the Policy was owned by the Trust rather than an individual. Ex. 3, Elliott dep., 54:5-7. New York Life does not have the ability to search for non-person entities such as trusts. Ex. 3, Elliott dep., 91:10-15.

On June 23, 2011, New York Life sent another letter to the Huntleigh Woods address advising of the prior failure of delivery, requesting a phone call to confirm New York Life's contact information was up-to-date, and stating if New York Life received no reply within 120 days, it would send no further correspondence to the Huntleigh Woods address so as to protect against disclosure of private information to unknown recipients. See 6/23/11 letter, (Exhibit 12), NYL 787; Ex. 3, Elliott dep. 56:18-57:1; 58:10-22. During this period, Jean Wiegand remained an occupant of the Huntleigh Woods home. Receiving no reply to its first two letters, New York Life sent a final letter to the Huntleigh Woods address on October 21, 2011 stating it would send no further correspondence unless an authorized policyowner confirmed the address. See 10/21/11 correspondence, (Exhibit 13), NYL

---

[1] New York Life does not attempt to send correspondence to addresses referenced in older documents because it considers that information "stale." Ex. 3, Elliott dep., 91:23-92:4.

83487\314987710.v1

788. No one responded to the October 21, 2011 letter, and so New York Life sent no further correspondence to the Huntleigh Woods address until the Policy was about to lapse in 2016. Ex. 3, Elliott dep., 94:21-96:5. From 2012 through the Policy's expiration in 2016, New York Life continued generating annual reports and archived them in its file. Ex. 3, Elliott dep., 90:21-91:4, 92:5-16.

The Policy's premium and accrued interest was eventually depleted in 2016. On June 13, 2016, New York Life sent a letter to the Huntleigh Woods address stating the Policy would lapse without additional premium payments. See 6/13/16 letter, (Exhibit 14), NYL883-884. New York Life sent two final notifications of lapse on July 13 and August 15, 2016. See 7/13/16 letter, (Exhibit 15), NYL 885-886 and 8/15/16 letter, (Exhibit 16), NYL 887. New York Life kept the Policy open until August 18, 2016 under a grace period funded in part by the remaining cash value of the Policy, at which point the remaining value of the premium was exhausted and coverage terminated. Ex. 3, Elliott dep., 77:15-20; 123:11-16. As noted above, Ms. Wiegand lived at the Huntleigh Woods address until her death. Ex. 4, Sprich dep. 113:22-24. She outlived the Policy's June 12, 2020 maturity date by approximately five months, passing away in November of 2020.

After learning of Ms. Wiegand's death, Ms. Sprich sent a letter to New York Life on or about November 19, 2020, asserting she was unaware the Policy lapsed in 2016 or that the Huntleigh Woods mailing address was incorrect. She requested copies of the Policy, its transaction history, notices, correspondence, and Policy cash values over time. See 11/19/20 letter from Sprich to NYL, (Exhibit 17), NYL 738-760. In a letter dated February 2, 2021, New York Life provided Plaintiffs with all annual notices from 2003-2016. See 2/2/21 letter, (Exhibit 18), NYL 789-881. On December 10, 2021, Plaintiffs filed a Petition in the Circuit Court of St. Louis County, Missouri. Doc. #4. The Petition alleged (1) Breach of Insurance Contract; (2) Vexatious Refusal; (3) Conversion; and (4) Unjust Enrichment. Doc. #4. New York Life timely removed to this Court on February 15, 2022. Doc. #1. Plaintiffs' Conversion and Unjust Enrichment counts have been dismissed. Doc. #32.

83487\314987710.v1

## ANTICIPATED FACTUAL AND LEGAL ISSUES

### I. Plaintiffs cannot establish breach of contract.

New York Life will argue Plaintiffs cannot meet all four "essential elements" of breach of contract under Missouri law: (1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." *Braughton v. Esurance Ins. Co.*, 466 S.W.3d 1, 8 (Mo. App. W.D. 2015). There is no dispute a contract existed through the Policy. New York Life anticipates Plaintiffs will argue New York Life breached the Policy when it overlooked an address change request Plaintiffs submitted in 2004 and consequently did not update the address in its file.

New York Life's argument is twofold. First, Plaintiffs cannot establish their own performance because they knew or had reason to know New York Life did not update its file, yet remained silent. Second, Plaintiffs' claim they were damaged by New York Life's omission is impermissibly speculative.

A. Plaintiffs' failure to communicate with New York Life negates their own performance.

Plaintiffs submitted multiple letters to New York Life through Ms. Dyroff requesting changes to various aspects of the Policy in 2003-2004. See Ex. 5, Ex. 7, and Ex. 8. In a letter dated January 12, 2004, Ms. Dyroff indicated the Trust was the Policy's new owner and requested a copy of the Policy. She also enclosed a change of address Service Form, though the letter made no mention of it. Ex. 7. In a second letter dated February 17, 2004, Ms. Dyroff again made no mention of the change of address Service Form she enclosed with Exhibit 7. Ex. 8.

New York Life responded to Ms. Dyroff's correspondence on June 23, 2004. Ex. 9. At the top of the page, New York Life listed the Policy's owner and address in all caps using the Huntleigh Woods address. Nowhere in the letter was Plaintiffs' Service Form mentioned. The letter closed with an invitation to contact New York Life with any questions at a toll-free telephone number. Ex. 9. Plaintiffs did not respond and directed no further communications to New York Life from 2004 to

2020. Ex. 1, Wiegand dep., 70:2-13; Ex. 10, Dyroff dep., 66:3-67:20, 70:14-18, 72:9-18; Ex. 4, Sprich dep., 111:4-8.

Because New York Life's correspondence continued using the Huntleigh Woods address and never acknowledged the Service Form, Plaintiffs were on notice that the address change was not effectuated. This is particularly true because New York Life affirmatively acknowledged Plaintiffs' other requests that it completed. See Ex. 6 and Ex. 9. Moreover, New York Life's June 23, 2004 letter – sent more than five months after Ms. Dyroff submitted the Service Form – prominently listed the Huntleigh Woods address in all caps at the top of the page. Ex. 9. If Plaintiffs disagreed with New York Life using the Huntleigh Woods address where their stepmother lived, they could have raised the issue at any time since 2004. Instead, they ceased contact.

"When a party is under a duty to speak, or when his failure to speak is inconsistent with honest dealings, and misleads another, then his silence may be deemed to be acquiescence." *Doran, Inc. v. James A. Green, Jr. & Co.*, 654 S.W.2d 106, 109 (Mo. App. W.D. 1983). "If an insurer is required to send premium due notices by custom, the insurer must continue to send notices to the address it has on file for the insured unless it is notified that the insured has changed address. However, the fact that the insured has changed his or her address does not affect the sufficiency of the notification, where the change is unknown to the insurer." *C.F.C.S. Invs., LP v. Transamerica Occidental Life Ins. Co.*, 2018 U.S. Dist. LEXIS 137657, *16 (E.D. Mo. Aug. 15, 2018) (citing 5 Couch on Ins. § 71:34 (3rd ed.)).

By the time Plaintiffs received Exhibit 9, it was clear the address change Service Form had not been processed. Instead of following up with New York Life, Plaintiffs went silent for the next sixteen years. Plaintiffs' failure to speak was out of step with their prior dealings with New York Life. From 2003-2004, Plaintiffs sent New York Life multiple requests to change various aspects of the Policy and did not hesitate to follow up as needed to correct any issues that were not fully resolved to their satisfaction. See, e.g., Ex. 5, Ex. 7, and Ex. 8.

As fiduciaries of the Trust, Plaintiffs conceded they failed in their duties to read and understand the Policy and failing that, to contact New York Life for information at any point after 2004. Ex. 1, Wiegand dep., 35:11-36:6; 82:1-16; 83:1-10; 176:1-6. Missouri law presumes parties to a contract had knowledge of its terms and recognizes a duty to read the contract. *Lopez v. GMT Auto Sales*, 656 S.W.3d 315, 321 (Mo. App. E.D. 2022). A party who is capable of reading and understanding a contract is charged with knowledge of its terms. *Farmland Indus. v. Bittner*, 920 S.W.2d 581, 584 (Mo. App. W.D. 1996) (citing *Sanger v. Yellow Cab Co.*, 486 S.W.2d 477 (Mo. banc 1972). Accordingly, Plaintiffs had a legal duty to read and understand the terms of an insurance policy to which they were parties and now seek to enforce. See, also *McCullohs Serv. Station v. Wilkes*, 359 S.E.2d 745, 747 (Ga. App. 1987) ("Appellants were under a legal duty to read the policy issued to them, and they failed to comply with that duty"); *Cincinnati Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 474 S.E.2d 78, 80 (Ga. App. 1996) (Dr. Muhanna had a legal duty to read his policy and therefore he is presumed to know the policy coverage) (internal citations omitted); *S. Guar. Ins. Co. v. Goddard*, 378 S.E.2d 130, 132 (Ga. App. 1989) (collecting cases). Moreover, Plaintiffs may not rely on the statements and representations of an insurance agent in lieu of actually reading the policy. See *Bull v. Allstate Ins. Co.*, No. 2:07-CV-1595, 2009 U.S. Dist. LEXIS 68923, at *30 (W.D. La. 2009) ("[Insured] had a legal duty to read, familiarize, and understand the terms of the policy regardless of any assurance Agent Fear gave them"); *Blackstone v. Chase Manhattan Mortg. Corp.*, No. 10-4604, 2012 U.S. Dist. LEXIS 32252, at *17-18 (E.D. La. 2012) (same). Failure to read the Policy is no excuse for an insured's misunderstanding of the Policy's terms. See *Zaremba Equip., Inc. v. Harco Nat'l Ins. Co.*, 761 N.W.2d 151, 160 (2008) ("It is well established that an insured is obligated to read his or her insurance policy and raise any questions about the coverage within a reasonable time after the policy is issued. Consistent with this obligation, if the insured has not read the policy, he or she is nevertheless charged with knowledge of the terms and conditions of the insurance policy").

In the context of this case and given they concede they did not read the Policy, Plaintiffs'
silence after June 23, 2004 negates the element of their own performance because it misled New York
Life into believing all requests had been fulfilled to Plaintiffs' satisfaction. *Doran, Inc.*, 654 S.W.2d at
109. This delay was avoidable and needlessly compounded an issue that would have been easy to fix
in 2004.

B. Plaintiffs' damage allegations are speculative.

It is undisputed that the damages Plaintiffs claim in this case are based on the theory that they
would have exercised the option to take the cash surrender value of the Policy in 2012 (four years
before it lapsed) had they received New York Life's annual correspondence. Put differently, they allege
they would have foregone the possibility of the insured, Ms. Wiegand, dying at some point in the four
years thereafter and thereby receiving the death benefit of $1.4 million. Because their claims about
what they purportedly would have done are wholly speculative, Plaintiffs cannot prove the damage
element of their cause of action. To date, Plaintiffs have offered no evidence to support the notion
that they would have surrendered the Policy in 2012 or at any other time. Rather, they admittedly
based their damage claim purely on hindsight and the fact they are barred by the statute of limitations
from alleging they would have surrendered the Policy even earlier.

New York Life anticipates that Plaintiffs will argue their damages are not speculative because
they never learned about the Policy's mechanics and believed they simply needed to wait for Ms.
Wiegand to die to collect on the Policy. An in-depth understanding of life insurance is not necessary
to understand why such a belief would be unreasonable, if not absurd. Given death is an eventuality,
a life insurance policy conditioned solely on the insured's death at any time would amount to a
guarantee of payment. Even if Plaintiffs believed life insurance is a no-strings guarantee of payment
at death, they could have easily corrected those misconceptions. Plaintiffs had access to the Policy no
later than February 17, 2004 and therefore had the ability to read the Policy, learn how it worked, and

contact New York Life if they had any questions. As Trustees, Plaintiffs failed in their fiduciary duty to take these steps. Plaintiffs had a duty to read the policy and failed to do so. Had they undertaken the simple task, they would have been immediately informed of the cash value surrender option as well as the fact that premiums could potentially be exhausted. Moreover, Plaintiffs' testimony they would have surrendered the policy is couched in uncertainty and speculation. Mr. Wiegand testified:

> If I would have known what I know now today, I may have chosen, with my sister, to opt for paying the surrender charge and just taken the money. Like I said, a bird in hand is worth more than two in the bush. And I had no idea how long she [the insured] was going to live. She seemed like a nice lady and all, but I had no information about her health.

Edward Wiegand dep., 162:19-25.

Damages in breach of contract require "actual facts that present a basis for a rational estimate of damages without resort to speculation." *Guidry v. Charter Communs., Inc.*, 269 S.W.3d 520, 533 (Mo. App. E.D. 2008). "This principle limits the reach of redress, on the breach of the contract, to the proximately caused or reasonably contemplated losses and excludes the problematical profits of future bargains." *Id.* Damage claims may not be based on "consequences which are contingent, speculative, or merely possible." *Delgado v. Mitchell*, 55 S.W.3d 508, 512 (Mo. App. S.D. 2001) (citing *First Nat'l Bank v. Kansas City S. Ry.*, 865 S.W.2d 719, 739 (Mo. App. W.D. 1993)). Hindsight-driven speculation as a basis for liability or damages is not permitted. See, *e.g.*, *Mack v. Stryker Corp.*, 748 F.3d 845, 848 (8th Cir. 2014) (products liability); *Podraza v. Whiting*, 790 F.3d 828, 838 (8th Cir 2015) (intent in GAAP accounting violations); *Ladish v. Gordon*, 879 S.W.2d 623, 632 n. 3 (Mo. App. W.D. 1994) (medical negligence); *Liddell by Liddell v. Board of Educ.*, 126 F.3d 1049, 1058 (8th Cir. 1997).

New York Life will argue Plaintiffs did not establish they *would* have surrendered the Policy at any particular point. Plaintiffs admittedly did not understand how the Policy operated, nor did they

weigh Ms. Wiegand's health and life expectancy against the possibility that she would die while the Policy was in effect and the $1.4 million death benefit would be paid. New York Life will emphasize Plaintiffs made no effort to monitor Ms. Wiegand's health over the final eighteen years of her life – an approach mirroring Plaintiffs' lack of attention to the Policy itself.

Plaintiffs already received the benefit of life insurance coverage worth $1.4 million from 2001-2016. For example, had Ms. Wiegand died at any point before June of 2016, Plaintiffs certainly would not now claim they would have surrendered the Policy in 2012 and forfeited four years of coverage on a woman in her nineties. Tying damages to the Policy's maximum cash surrender value within the statute of limitations would relieve Plaintiffs of the obligation to establish the existence *and* extent of damages without resorting to speculation. *Delgado*, 55 S.W.3d at 512. There are no "actual facts that present a basis for a rational estimate of damages without resort to speculation." *Guidry*, 269 S.W.3d at 533. Rather, Plaintiffs' damage allegations are purely outcome-driven by the knowledge that Ms. Wiegand outlived the Policy and reached her 100th birthday. Any claim to the contrary is untethered from Plaintiffs' complete disassociation from Ms. Wiegand in 2002 and failure to attempt to monitor the Policy's value at any point after 2004.

## II. Plaintiffs cannot establish Vexatious Refusal.

New York Life anticipates Plaintiffs will argue New York Life violated Mo. Rev. Stat. § 375.420 because it did not accept their demand for the Policy's 2012 cash surrender value and statutory interest accrued to date. Section 375.420 provides that if an insurer refuses to pay a claim "without reasonable cause or excuse," a plaintiff may be awarded damages up to twenty percent of the first $1,500 of the loss, ten percent of the loss in excess of $1,500, and attorneys' fees. "To prove a claim of vexatious refusal, the insured must show the insurer's refusal to pay the claim was willful and without reasonable cause, as the facts would appear to a reasonable and prudent person." *Morris v. J.C. Penney Life Ins. Co.*, 895 S.W.2d 73, 76 (Mo. App. W.D. 1995). The elements of vexatious refusal are

83487\314987710.v1

(1) absence of a reasonably litigable issue and (2) the insurer's vexatious and recalcitrant attitude in refusing the claim. *Id.* An adverse decision of the insurer alone is insufficient to support a vexatious refusal claim; the insurer may insist on a judicial determination of claims if there is an open question of fact or law determinative of liability. *Id.*

In sum, there are reasonably litigable issues about the viability of Plaintiffs' claims as well as the existence and extent of damages, as already demonstrated by this Court's dismissals of Plaintiffs' conversion and unjust enrichment claims. Further, New York Life's attitude in negotiating with Plaintiffs was not vexatious or recalcitrant, as demonstrated by its correspondence preceding this litigation. Finally, New York Life had the right to seek judicial determination of these issues regardless of the outcome of Plaintiffs' breach of contract claim. That New York Life did not acquiesce to Plaintiffs' demand for a sum bearing no relation to any reasonably contemplated losses does not mean New York Life behaved vexatiously in its handling of the claim. *Guidry*, 269 S.W.3d at 533.

## CONCLUSION

Plaintiffs' remaining breach of contract and vexatious refusal counts should be dismissed with prejudice for the reasons explained in New York Life's Motion for Summary Judgment. New York Life anticipates its case at trial will closely track the arguments raised in the Motion, should it not be granted.

Respectfully submitted,

HINSHAW & CULBERTSON LLP

By:    /s/  James M. Brodzik
        Daniel K. Ryan
        James M. Brodzik #66700
        521 West Main Street, Suite 300
        Belleville, IL 62220
        Telephone: 618-277-2400
        Facsimile: 618-277-1144
        Email: JBrodzik@HinshawLaw.com
        Email: DRyan@HinshawLaw.com

Attorneys for defendants New York Life Insurance &
Annuity Corporation and New York Life Insurance
Company

**CERTIFICATE OF SERVICE**

The filing attorney certifies that on October 30, 2023, the foregoing was filed electronically
with the Clerk of the Court to be served by operation of the Court's electronic case filing system upon
all participants in the Court's electronic case filing system.


_____/s/ James M. Brodzik_____