

# PohlmanUSA®

## Court Reporting and Litigation Services

---

Corporate Representative for New York Life Insurance

May 12, 2023

---

Edward Wiegand, et al.

vs.

New York Life Insurance & Annuity Corporation, et al.

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MISSOURI

EASTERN DIVISION

EDWARD WIEGAND AND EUGENIA )

SPRICH, TRUSTEES OF THE     )

HERBERT C. WIEGAND         )

REVOCABLE TRUST,           )

                           )

          PLAINTIFFS,      )

                           )

vs.                        ) Case No. 4:22-CV-00188RWS

                           ) JURY TRIAL DEMANDED

                           )

NEW YORK LIFE INSURANCE &  )

ANNUITY CORPORATION AND NEW)

YORK LIFE INSURANCE CO.,   )

                           )

          DEFENDANTS.      )

Page 4

```
1              EXHIBITS
2   Exhibit 21, October 21, 2011 letter   ........99
       (Bates NYL 00788)
3   Exhibit 22, Sprich Fax requesting documents .....101
       (Bates NYL00738-760)
4   Exhibit 23, Email chain (Bates NYL00912-913) ....102
    Exhibit 24, Email chain (Bates NYL00914-915) ....106
5   Exhibit 25, Email chain (Bates NYL00414-417) ....112
    Exhibit 26, Email chain (Bates BTK00916-918) ....118
6   Exhibit 27, Email chain (Bates NYL00919-920) ....120
    Exhibit 28, Undated internal memo    ........121
7      (Bates NYL00369)
    Exhibit 29, January 28, 2021 Reissued policy ....125
8      (Bates NYL921-971)
    Exhibit 30, February 2, 2021 letter   ........129
9      (Bates NYL00789-881)
    Exhibit 31, June 13, 2001 New York Life .........151
10     Insurance and Annuity Corporation
       Annual Policy Summary
11     (Bates NYL00470-541)
    Exhibit 32, Email (Bates NYL 00001-2) ........154
12  Exhibit 33, December 10, 2021 letter   ........155
       (Bates NYL00326-365)
13  Exhibit 34,  Miscellaneous Loss Form   ........157
       (Bates NYL417)
14  Exhibit 36, December 27, 2021 Letter   ........158
       (Bates NYL00418-427)
15  Exhibit 37, NYL Contact log    .......158
       (Bates NYL888-911)
16  Exhibit 39, Premium History     ........167
       (Bates NYL356)
17  Exhibit 40, Reissue of insurance policy  ........168
       (Bates NYL00648-673)
18  Exhibit 41, Second Amended Notice ...............9
19     Answer and Affirmative Defenses to
       Plaintiff's Petition
20     (Not marked as exhibit, but
       identified on page 179)
21
22     (Exhibits 35, 38 were not identified or
23  marked for this deposition.  Exhibits 1-34, 36, 37,
24  39, 40, 41 are attached to transcript.)
25
```

REMOTE DEPOSITION OF CORPORATE REPRESENTATIVE NEW YORK

LIFE INSURANCE & ANNUITY CORPORATION AND NEW YORK LIFE

INSURANCE COMPANY

JAMES ELLIOTT

TAKEN ON BEHALF OF THE PLAINTIFFS

MAY 12, 2023

Elizabeth A. Goodwin, RPR, IL-CSR, MO-CCR

CSR No. 084.004310

CCR No. 831

Page 3

```
1              INDEX OF EXAMINATION
2   QUESTIONS BY ATTORNEY JACOBSON ...................6
    QUESTIONS BY ATTORNEY RYAN ....................206
3   QUESTIONS BY ATTORNEY JACOBSON .................210
4       INDEX OF EXHIBITS
5   Exhibit 1, August 29, 2000 letter  ..............11
       (Bates NYL00615)
6   Exhibit 2,  July 22, 2003 letter .................24
    Exhibit 3,  August 19, 2003 letter  .............27
7      (Bates NYL00616)
    Exhibit 4,  November 18, 2003 fax  ..............28
8      (Bates DRYOFF00556)
    Exhibit 5,  Service Form - Change Requests .......30
9      (Bates NYL00367-368)
    Exhibit 6,  January 12, 2004 letter  .........32
10     (Bates DRYOFF 00502-504)
    Exhibit 7,  June 13, 2000 Policy #62731665 .......17
11     (Bates DRYOFF00121-147)
    Exhibit 8,  February 17, 2004 Facsimile Cover ...37
12     Sheet (Bates DRYOFF00092-95)
    Exhibit 9,  June 24, 2004 letter    ........39
13     (Bates DRYOFF00083-84)
    Exhibit 10, NYL permanent insurance   ........41
14     (Bates NYL00784)
    Exhibit 11, April 7, 2009 Letter, Agent Barr .....46
15     ceases relationship
       (Bates NYL00785)
16  Exhibit 12, April 7, 2009 Letter, Agent Vance ....47
       ceases relationship
17     (Bates NYL00786)
    Exhibit 13, Return of Sender, not deliverable ....49
18     envelope (Bates NYL00029)
    Exhibit 14, June 3, 2011 Invoice returned .........50
19     (Bates E. Wiegand NYL00736)
    Exhibit 15, INTERNAL WORK REQUEST     ........55
20     (Bates NYL00420-439)
    Exhibit 16, June 3, 2016 annual premium notice ...88
21     (Bates NYL 00464-466)
    Exhibit 17, June 13, 2016 letter    ........91
22     (Bates NYL00883-884)
    Exhibit 18, June 23, 2011 letter ................93
23     (BatesNYL00787)
    Exhibit 19, July 13, 2016 letter    .........95
24     (Bates NYL00885-886)
    Exhibit 20, August 15, 2016 letter (Bates ........97
25     NYL00887)
```

Page 5

```
1       IN THE UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF MISSOURI
2             EASTERN DIVISION
3
4   EDWARD WIEGAND AND EUGENIA )
     SPRICH, THRUSTEES OF THE   )
5   HERBERT C. WIEGAND         )
     REVOCABLE TRUST,          )
6                              )
        PLAINTIFFS,    )
7                              )
     vs.            )  Case No. 4:22-CV-00188RWS
8                   )  JURY TRIAL DEMANDED
     NEW YORK LIFE INSURANCE & )
9    ANNUITY CORPORATION AND NEW)
     YORK LIFE INSURANCE CO.,,  )
10                             )
        DEFENDANTS.    )
11
12      REMOTE DEPOSITION OF CORPORATE
13  REPRESENTATIVE OF DEFENDANTS, NEW YORK LIFE INSURANCE
14  & ANNUITY CORPORATION AND NEW YORK LIFE INSURANCE CO.,
15  JAMES ELLIOTT, produced, sworn, and examined on behalf
16  of Plaintiffs, May 12, 2023, between the hours of 9:30
17  (CST) in the forenoon and 5:45 (CST) in the
18  afternoon of that day, via Zoom, before Elizabeth A.
19  Goodwin, RPR, CSR NO. 084.004310, CCR No. 831.
20
21
22
23
24
25
```

Page 6

```
 1              A P P E A R A N C E S
 2    Attended Remotely:
           Joe Jacobson, Esq.
 3         Jacobson Press P.C.
           222 South Central Avenue, Suite 550
 4         St. Louis, MO 63105
           Jacobson@ArchCityLawyers.com
 5         represented Plaintiffs.
 6    Attended Remotely:
           Daniel K. Ryan, Esq.
 7         Hinshaw & Culbertson, LLP
           151 North Franklin Street, Suite 2500
 8         Chicago, IL 60606
           dryan@hinshawlaw.com
 9         represented Defendants.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1         IT IS HEREBY STIPULATED AND AGREED by and
 2    between counsel for the PLAINTIFFS and counsel for the
 3    DEFENDANTS, that this remote deposition may be taken
 4    in shorthand by Elizabeth A. Goodwin, a Registered
 5    Professional Reporter, Illinois Certified Shorthand
 6    Reporter, No. 084.004310, and Missouri Certified Court
 7    Reporter, No. 831, and afterwards transcribed into
 8    typewriting, and the signature of the witness is
 9    reserved by agreement of counsel and the witness.
10         COURT REPORTER:  Mr. Elliott, will you
11    please raise your right hand.
12                   0-0-0
13              JAMES ELLIOTT,
14    of lawful age, being produced, sworn, and examined on
15    the part of the Plaintiffs, and after responding "Yes"
16    to the oath administered by the court reporter,
17    deposes, and says:
18            * * * * * * * * * * * *
19            [EXAMINATION]
20    QUESTIONS BY ATTORNEY JACOBSON:
21         Q.  Good morning, Mr. Elliott.  My name is Joe
22    Jacobson.  I'm the lawyer for the Plaintiffs in this
23    case.  Today I'm going to be asking you a series of
24    questions.  I understand that you're here as the
25    corporate representative for New York Life Insurance
```

Page 8

```
 1    Company; is that correct?
 2         A.  Yes, that's correct.
 3         Q.  And also for New York Life Insurance &
 4    Annuity Corporation?
 5         A.  Yes, that's correct.
 6         Q.  All right.  I'd like to ask -- and I also
 7    understand that you may have some expert opinions that
 8    you may offer in this case.
 9         A.  I'm --
10         ATTORNEY RYAN:  No, I don't -- I'll -- I
11    don't -- where did you get that, Joe?
12         ATTORNEY JACOBSON:  From your Rule 26
13    Disclosure.
14         ATTORNEY RYAN:  All right.  Well, we'll
15    proceed and see where this goes.
16         ATTORNEY JACOBSON:  Okay.  I was going to
17    find out what opinions he's planning on offering.  If
18    he doesn't have any, that will make that very quick.
19         ATTORNEY RYAN:  Okay.
20         Q   (By Attorney Jacobson)  So, Mr. Elliott, can
21    you tell me a little bit about your background at New
22    York Life?
23         A.  I work in the customer service area.
24         Q.  You're audio is a little blurry, could
25    you --
```

Page 9

```
 1         A.  I work in the customer service area.  I'm
 2    one of the Corporate Vice Presidents.
 3         Q.  All right.  You're a Corporate Vice
 4    President.  Does that make you an officer of the
 5    company?
 6         A.  Yes.
 7         Q.  All right.  Can you tell me a little about
 8    your history with New York Life?
 9         When did you join?
10         When did you become an Officer?
11         A.  I've been with New York Life since 1988.  I
12    became an Officer, I believe, it was in 2011.
13         Q.  All right.  And how did you come to be
14    assigned to be the corporate rep in this case?
15         A.  I'm familiar with this type of policy, and I
16    was asked to do it.
17         Q.  All right.  Were you familiar with this
18    particular policy before the lawsuit was filed?
19         A.  No.  I had not worked on this policy.
20         Q.  All right.  So, this is something you first
21    became involved with after the lawsuit was filed?
22         A.  That's correct.
23         Q.  All right.  Do you frequently serve as a
24    corporate rep for New York Life in cases involving
25    these type of policies?
```

3  (Pages 6 to 9)

Page 10

```
 1       A.  I'm not really sure how you would describe
 2   "frequently."  I have been here -- I have done this
 3   for New York Life in the past, yes.
 4       Q.  Okay.  You should have a copy of our Second
 5   Amended Notice of Corporate Deposition.
 6       Do you have that?
 7       A.  I don't have it with me.
 8       Q.  If you open up the "Chat" function on
 9   your Zoom.  You will see in the Chat to everyone,
10   you'll see a document from me called Exhibit 41 Second
11   Amended Notice.
12            (Exhibit 41 was identified and marked.)
13            THE WITNESS:  I'm in the Meeting Chat.  Is
14   that not where I should be?
15            ATTORNEY JACOBSON:  So, here there is a -- I
16   guess they call it a Chat window.  Right?  If you look
17   in the lower right you'll see a series --
18            THE WITNESS:  When I look in the lower right
19   I see -- it says "to everyone," and then there is
20   nothing.
21            COURT REPORTER:  Mr. Jacobson, I don't think
22   the witness was on Zoom when the exhibit was uploaded.
23   The Chat will not show what has been uploaded before
24   you arrive to the meeting.  If you can upload it
25   again.
```

Page 11

```
 1            ATTORNEY JACOBSON:  Okay.  I will upload it
 2   again.  Let me know when it arrives.
 3            THE WITNESS:  I've got it.
 4       Q.  (By Attorney Jacobson) What I'm going to do
 5   today -- a lot of times on these video depositions,
 6   people, lawyers will share their screen, and they have
 7   a little document, and you have got to look at what
 8   I'm looking at.  It's only like a little window in the
 9   document.  What I'll be doing is I'll be sending the
10   Exhibits over the Chat so you can open them up on your
11   screen and you can look at it more freely and not be
12   constrained by what I show you.  Okay?
13       A.  Okay.
14       Q.  All right.  In this deposition, we do have a
15   court reporter who is taking down everything that we
16   say.  So, I will wait until you're done answering
17   before I ask my next question.  And I ask that you
18   wait until I'm done asking my question before
19   answering so we're not talking at the same time and
20   make it impossible for her.  Is that okay with you?
21       A.  That's okay with me, yes.
22       Q.  All right.  If at any point during this
23   deposition, you need to take break for any personal
24   reason, just let me know.  I'll be happy to break for
25   you.  I would just ask that you answer the question
```

Page 12

```
 1   that's then pending, if there is one pending, before
 2   we take the break.  Is that all right?
 3       A.  That's fine.
 4       Q.  All right.  Were you involved, by the way,
 5   in answering the Complaint in this lawsuit?
 6       Did you participate in doing that?
 7       A.  No.
 8       Q.  All right.  Are you familiar with the
 9   production of the documents in this case for New York
10   Life?
11       A.  I'm not sure what you mean by "production"
12   of documents.  I've seen documents.
13       Q.  Okay.  So, in this case, New York Life has
14   delivered in, I guess, four different tranches,
15   documents that are stamped in the lower right-hand
16   corner New York Life (NYL)  And then some number.
17       Are you familiar with those at all?
18       A.  I've seen documents.  I'm not sure which
19   particular one you're talking about, but I didn't know
20   anything about tranches of documents.
21       Q.  All right.  Let me send you a document so I
22   can -- it can be clear what I'm talking about.  I'm
23   just sending you a document now, which I have marked
24   as Exhibit 1.
25            (Exhibit 1 was identified and marked.)
```

Page 13

```
 1       Q  (By Attorney Jacobson) And it's an August 29,
 2   2000, letter from New York Life Insurance Annuity
 3   Corporation to Herbert Wiegand.
 4            ATTORNEY JACOBSON:  Do you see that on the
 5   Meeting Chat?
 6            THE WITNESS:  If you sent it, I don't see
 7   it.
 8            ATTORNEY JACOBSON:  Actually, there's a
 9   second step.  I had to click another button.
10       A.  Let me open this.  I can see the August 29.
11       Q.  (By Attorney Jacobson) Okay.  Why don't you
12   open it up on your screen.
13       A.  I've got it.
14       Q.  Okay.  So, you've got in front of you a
15   document I've marked as Exhibit 1 in your deposition.
16   It's a letter dated August 29, 2000, from New York
17   Life Insurance & Annuity Company.  Is there a
18   shorthand way you refer to that company?
19       A.  NYLIAC.
20       Q.  NYLIAC.  All right.  I'll try to remember to
21   say it that way.
22       Are you employed by NYLIAC?
23       A.  I work for New York Life Insurance.
24       Q.  Does NYLIAC have any employees of its own,
25   or does it do all of its operations through New York
```

4  (Pages 10 to 13)

Page 14

1  Life?
2      A.  I don't know the answer to that.
3      Q.  Okay.  So, this is a letter regarding the
4  insurance policy that we're here about today, which is
5  Policy # 62791665.
6      Do you see that Policy number on the letter?
7      A.  Yes.
8      Q.  Okay.  Is this a typical letter that is sent
9  to a customer at the initiation of the relationship
10 through a universal life insurance contract?
11     A.  Yes.
12     Q.  All right.  And so, the letter provides what
13 I guess would be considered basic information about
14 the contract; is that correct?
15     A.  It has a summary of about eight or nine
16 things in there, yes.
17     Q.  All right.  So the name of the Insured,
18 right?
19     A.  Yes.
20     Q.  Policy number?
21     A.  Yes.
22     Q.  The Policy plan and base amount?
23     A.  Yes.
24     Q.  All right.  Could you explain what a "NYLIAC
25 accumulator" is?

Page 15

1      A.  This is a type of policy.  NYLIAC is more
2  like an annuity corporation.  Accumulator is a type of
3  universal language insurance policy.
4      Q.  All right.  When you say -- is it anything
5  particular, a catchphrase about accumulator that
6  distinguishes it from other universal life insurance
7  policies?
8      A.  We've got different types of universal life
9  insurance policies, I'm not really sure what --(audio
10 distorted).
11     ATTORNEY JACOBSON:  Sir, I'm sorry to
12 interrupt you.  The audio quality is so bad, I can't
13 even understand what you are saying.  I can see the
14 court reporter is throwing her arms up in dismay.
15     THE WITNESS:  Can we take a break, and I
16 will see if I can get a headset?
17     ATTORNEY JACOBSON:  Yes.
18     COURT REPORTER:  I am off the record.
19     (Recess.)
20     COURT REPORTER:  Back on the record.
21     Q  (By Attorney Jacobson) Now we're back on the
22 record.
23     Can you explain how the NYLIAC accumulator
24 is different than other whole life policies?
25     A.  It's not a whole life policy.  It's a

Page 16

1  universal life policy.
2      Q.  Okay.
3      A.  I'm not really sure what differentiates it
4  between other ones.  We've got all different versions
5  of universal life policies.  I don't really know what
6  the difference between them is.  They're all basically
7  the same.
8      Q.  All right.  How is a universal life policy
9  differ from a whole life policy?
10     A.  A universal life policy is different than a
11 whole life policy.  In a whole life policy, your
12 premium is fixed, and the premium is due for the life
13 of the contract.  The Cash Value in a whole life
14 policy is based on tables within that contract.  It's
15 all tabular and fixed.  A universal life contract,
16 people pay money into it, it builds a Cash Value.
17 Each month we do a comparison of the monthly charges
18 that are due for that next month and the Cash Value.
19 If the Cash Value is enough to cover the monthly
20 charges until the next month, the coverage continues
21 for one more month.  And we continue to do that for
22 each month.
23     Q.  All right.  And is that something that's
24 common across the insurance industry, or is that a
25 specialty of New York Life?

Page 17

1      A.  I believe many companies offers universal
2  life policies.
3      Q.  All right.  Below that it talks about the
4  "plan premium frequency."  Do you see that?
5      A.  Yes.
6      Q.  And that's $750,000 annual; is that correct?
7      A.  That's correct.
8      Q.  Does that mean under this Policy it is
9  expected that the owner will pay a premium of $750,000
10 per year each and every year that this Policy is in
11 force?
12     A.  It's not expected.  That's what was planned.
13 On this type of Policy you can pay planned premiums,
14 no premiums, unplanned premiums.  All that's necessary
15 is that each month that we have enough Cash Value to
16 cover the next month's cost of insurance -- the next
17 month's deductions.
18     Q.  All right.  So, what do you -- what does
19 "planned" mean in that context then?
20     A.  It means that's what we would send bills
21 for.
22     Q.  Okay.  So you would send bills for $750,000
23 premium each year?
24     A.  That's correct.
25     Q.  Okay.  And the face value of the life

5  (Pages 14 to 17)

1    insurance policy is a $1,400,000, right?
2        A.  That's correct.
3        Q.  So, if one paid the initial premium of
4    $750,000, as was paid here, and then paid the initial
5    planned annual premium of $750,000, you would have, at
6    that point, paid $100,000 more than the life insurance
7    value of the insured value, correct?
8        A.  No.  This Policy also has within it a -- I'm
9    trying to think of the words here.  There's a corridor
10   percentage.  If the Cash Value becomes greater -- the
11   Cash Value times the corridor percentage becomes
12   greater than the face amount, that's what gets paid
13   out.  If the Cash Value times -- I'm not sure what it
14   was for the EJD.  It would be in the contract if you
15   want to get the contract, we can look at the corridor
16   table.
17       Q.  All right.  Sure.  Hold on one second.  Let
18   me find a Policy.  Okay.  I think that's the right
19   one.  That's Exhibit 7.
20          (Exhibit 7 was identified and marked.)
21       Q  (By Attorney Jacobson) I've just sent you
22   Exhibit 7.
23       A.  It's not -- there it is.  Okay.
24       Q.  Which appears to be the copy of the Policy
25   at issue.  It says the Insured's name Jean Wiegand has

1    a Policy # 62731 -- let me zoom in on that -- 665.  A
2    Policy of June 13th, 2000.
3          Do you see that?
4        A.  Yes.  I see Exhibit N.
5        Q.  At the top of Exhibit 7 --
6        A.  Exhibit 7 at the bottom, yes.
7        Q.  Exhibit N was a label that was placed on it
8    at a prior deposition.
9        A.  Okay.  So, this is Exhibit 7.
10       Q.  Yeah.  My Exhibits are all the yellow-boxed
11   ones.
12       A.  Okay.
13       Q.  Where do you go in this document to see this
14   corridor number you talked about?
15       A.  Take a look at page 4, Section 1.3.
16       Q.  Section 1.3.  Okay.  I have that Section
17   1.3.  What am I looking for, sir?
18       A.  What we're looking at is the percentage of
19   Cash Value.  So, the Cash Value times that percentage.
20   And for an 80-year-old or an 81-year-old, it would
21   have been 105% is greater than the face amount, that's
22   what the death benefit would become.
23       Q.  Okay.  So, the death benefit would be the
24   greater of the face amount and 105% of the Cash Value
25   for a person who is of age 75 through 90?

1        A.  Yes, through 90.  And it's "or," not "and."
2        Q.  Okay.  All right.  We'll come back to
3    Exhibit 7 later, I think.  So, we also have here on
4    this letter, it talks about the agents/
5    representatives.  It mentions Clinton Vance and Robert
6    Barr.
7          First of all, does New York Life distinguish
8    somehow between its agents and its representatives?
9        A.  I'm not sure why that's like that.  They
10   were agents at this time.
11       Q.  All right.  And what does New York Life
12   understand "agents" to mean at that time?
13       A.  I'm not an expert in the agency contract,
14   but we have them listed as agents on the policies.
15       Q.  All right.  If a person is a New York Life's
16   agent, are they able to bind New York Life through
17   coverage?
18          ATTORNEY RYAN:  Objection.  Calls for a
19   legal conclusion.  Calls for a legal opinion.  Form.
20       Q  (By Attorney Jacobson) You'll get -- from
21   time to time, you'll get objections.  Most of the
22   objections are designed to protect the record in the
23   case for later and does not -- do not block you from
24   giving an answer.  If your lawyer wants you to not
25   give the answer, he'll give you an instruction not to

1    answer.  That's up to him to decide what he's going to
2    do.  But if he objects, you can just wait for him to
3    finish and then go ahead and answer the question.  All
4    right?
5        A.  I can answer it?
6          I don't know the answer to that.
7        Q.  All right.  Does New York Life at that time
8    or -- well, first of all, has New York Life changed
9    the way it interacts or reacts to or empowers its
10   agents in the years that you've been with the company?
11          ATTORNEY RYAN:  Same objection.  Calls for a
12   legal opinion.
13       A.  Same answer.  I'm not an expert in the
14   agent's contract, I don't know.
15       Q  (By Attorney Jacobson) Not an agent's
16   contract.  Do you work at all with New York Life
17   agents in your business, your company?
18       A.  I interact with our agents quite frequently,
19   yes.
20       Q.  All right.  And do you use agents to
21   communicate with the insureds or the owners of the
22   policies?
23       A.  Yes, we do.
24       Q.  All right.  Is it, in fact, normally that
25   New York Life doesn't communicate directly with its

Page 22

1   customers but it expects the agents to do so for it?
2       A.  In almost every case we -- we communicate
3   with both.  Unless it's something where the agent has
4   asked us a direct question, we tell the agent back.
5   If we've made any changes, they go to the policy owner
6   directly as well.
7       Q.  Okay.  So if you make a change, it goes to
8   the agent, then the policyholder?
9       A.  Yes.
10      Q.  All right.  And if you're simply doing
11  communications, you get a message from the agent and
12  you respond to the agent?
13      A.  That's correct.
14      Q.  Okay.  And a customer can feel confident
15  that when they're communicating with one of New York
16  Life's agents, they are communicating with New York
17  Life; is that correct?
18          ATTORNEY RYAN:  Objection.  Form.  Calls for
19  speculation.
20      A.  Yeah, I can't tell you whether customers
21  feel confident or not.
22      Q  (By Attorney Jacobson) I'm asking whether
23  it's New York Life's intention that customers feel
24  confident that when they're communicating with New
25  York Life's agents that they're communicating with New

Page 23

1   York Life.
2           ATTORNEY RYAN:  Objection.  Form.
3       A.  I'm not really sure what our intention is
4   with that.  I don't -- I don't understand -- I don't
5   know the corporate intentions on that.
6       Q.  (By Attorney Jacobson) All right.  Let me ask
7   you this:  What did you do to prepare for your
8   deposition today?
9       A.  I reviewed some documents.
10      Q.  All right.  Did you look at the Second
11  Amended Notice of Rule 30(b) 6 Deposition that laid
12  out the topics that were going to be covered today?
13      A.  Yes, I did.
14      Q.  All right.  And did you understand that you
15  were here to testify on behalf of New York Life and
16  NYLIAC on these topics?
17      A.  Yes, I did.
18      Q.  And did you understand that if there was a
19  topic that you did not have knowledge about at that
20  point that you needed to research it internally so
21  that you could answer authoritatively on behalf of the
22  company?
23      A.  I understand how the agent's interact with
24  service.  I'm not an expert in everything to do with
25  the agency contract.

Page 24

1       Q.  My question was:  Did you understand that it
2   was your obligation as the representative, New York
3   Life and NYLIAC, for this deposition that if there was
4   a question or a topic area on this notice that you
5   didn't feel you had comprehensive knowledge of that
6   you needed to investigate it so that you could, in
7   fact, speak definitively on behalf of the company?
8           ATTORNEY RYAN:  Objection.  Calls for a
9   legal conclusion as to what the rules require or don't
10  require.
11      Q  (By Attorney Jacobson) Did you understand?
12      A.  I was not aware that I needed to understand
13  what the intention of New York Life was with regard to
14  whether our customers were -- who feel confident
15  dealing with us.
16      Q.  All right.  You're pointing to a specific
17  question.  I'm asking right now generally about your
18  approach to preparing for the deposition, which was:
19  Did you understand that you needed to investigate what
20  New York Life's positions were on things if you did
21  not already know on the topic that we're here?
22          ATTORNEY RYAN:  Same -- same objection.
23  Calls for a legal conclusion.  Form.  You may answer.
24      A.  Yeah -- I -- I've researched.  What I knew
25  in service, I've gone through our documents, our

Page 25

1   policies and procedures, but the agency relationship
2   with New York Life is something that I'm not an expert
3   on.
4       Q.  (By Attorney Jacobson) Okay.  We'll be going
5   through these various questions, and we'll see how
6   well you answer them, and, hopefully, you'll have
7   enough knowledge.
8           All right.  I'm done with Exhibit 1.
9           ATTORNEY RYAN:  Joe, are we going in any
10  particular order on these Exhibits?  They're numbered
11  kind of out of sequence, and I'm just kind of trying
12  to keep track here.
13          ATTORNEY JACOBSON:  Actually, I have them
14  numbered by date.  So, they're chronologically
15  numbered by date from the set of documents you
16  produced.
17          ATTORNEY RYAN:  That's fine.  I'm just
18  trying to keep track is all, thank you.
19          ATTORNEY JACOBSON:  You should be getting
20  copies of these as well.  And if you need, I can send
21  you a whole set of copies as well.
22      Q (By Attorney Jacobson) All right.  I've just
23  sent you a document that I've marked as Exhibit 2.
24          (Exhibit 2 was identified and marked.)
25      Q (By Attorney Jacobson) It is a letter dated

7  (Pages 22 to 25)

Page 26

1   July 22, 2003, to Marylee Behlmann at the Vance
2   Financial Group.  It comes from Joann Dyroff, who is
3   the lawyer for the Trust at that time.  It has
4   attached to it a Transfer Ownership Form, a Statement
5   Regarding Inter-Vivos Trust, a Statement of
6   Irrevocability, and a Change of Beneficiary Request.
7       Do you need to take a moment to read through
8   the document?
9       **A.  Yes, please.  (Reading document.)**
10  **I've reviewed it.**
11      Q.  Okay.  Have you seen all or part of this
12  document before in your review of the files?
13      **A.  Yes, I have.**
14      Q.  All right.  The first two pages, which are
15  the cover letter from the lawyer, there are no copies
16  of that letter in the New York Life files that were
17  produced to us.
18      Do you know whether New York Life received a
19  copy of that letter through its agents?
20      **A.  That I don't know.**
21      Q.  All right.  Do you know whether or not there
22  is a copy of that somewhere in New York Life's files?
23      **A.  That I don't know.**
24      Q.  Okay.  Did you see it in New York Life's
25  files?

Page 27

1       **A.  I've looked at a lot of files.  I don't**
2   **remember everything that I saw.**
3       Q.  Okay.  Do you remember seeing this?
4       **A.  I -- I don't -- this -- the Ownership Change**
5   **and the Change of Beneficiary Form, I do remember**
6   **seeing.  This letter here, it does not strike me as**
7   **something I remember seeing.**
8       Q.  Okay.  If you turn to the third page, which
9   is the Change in Ownership Form.
10      **A.  I'm looking at it.**
11      Q.  Okay.  New York Life has noted that the form
12  does not include an address for the owner.
13      Do you see that?
14      **A.  Yes.**
15      Q.  All right.  Is there -- are there any
16  policies at New York Life regarding contacting a
17  customer if a customer submits a form which appears to
18  be incomplete?
19      **A.  No.  If there was something that was**
20  **necessary to complete the change, the request wouldn't**
21  **be in good order, and we'd reach out to the customer.**
22  **We don't require a new address.**
23      Q.  Okay.  So, then you would say that this form
24  was considered to be in good form you said?
25      **A.  Yes.**

Page 28

1       Q.  And the Change of Beneficiary Request lists
2   a whole series of beneficiaries, correct?
3       **A.  Yes.**
4       Q.  And with each one, it has a name, address,
5   and a telephone number, or Social Security number.
6   Sorry.
7       **A.  I see Social Security numbers, yes.  I don't**
8   **see any phone numbers.**
9       Q.  Yeah.  And is this the type of document that
10  New York Life keeps in its files when it receives
11  them?
12      **A.  Yes.**
13      Q.  And, in fact, you saw the documents in the
14  files at New York Life?
15      **A.  Yes, I did.**
16      Q.  All right.  I've just sent you Exhibit 3.
17      (Exhibit 3 was identified and marked.)
18      Q  (By Attorney Jacobson) Do you have that
19  there?
20      **A.  It's opening, yes.  I'm looking at it now.**
21  **(Reviewing document) Okay.  I've reviewed it.**
22      Q.  Okay.  So, this is an August 19th,
23  2003 letter to "The Wiegand Family, LLC" at 9
24  Huntleigh Woods.
25      **A.  Yes.**

Page 29

1       Q.  All right.  And this is reflecting the
2   Change in Ownership in the Policy; is that correct?
3       **A.  That's correct.**
4       Q.  Is this a standard form of letter that New
5   York Life would send if there's a Change in Ownership?
6       **A.  Yes, it is.  We're confirming to the old**
7   **owner that we've changed the address as they**
8   **requested.**
9       Q.  All right.  You mailed the letter to both
10  the old owner and the new owner, or just the old
11  owner?
12      **A.  This letter goes to the old owner.**
13      Q.  Okay.  So, as of that date, August 19, 2003,
14  the ownership of the Policy had been changed on New
15  York Life's records; is that correct?
16      **A.  That is the date our records were updated,**
17  **yes.**
18      ATTORNEY JACOBSON:  Okay.  It takes a little
19  time to click around all of this stuff.  Sorry about
20  that.
21      THE WITNESS:  It's okay.
22      ATTORNEY JACOBSON:  I just sent you
23  Exhibit 4.
24      (Exhibit 4 was identified and marked.)
25      Q  (By Attorney Jacobson) Exhibit 4 is a fax

8  (Pages 26 to 29)

## Page 30

1    from the Vance Financial Group, Clinton Vance.
2    **A. I see it. Let me look at it.**
3    Q. Sure.
4    **A. (Reviewing document.) okay.**
5    Q. All right. Typically, do your agents copy
6    New York Life on their correspondence with the
7    customers?
8    **A. I don't know what they typically do.**
9    Q. In your experience, do you see messages,
10   copies of things from agents to the customers, or do
11   you not see those?
12   **A. I see them quite often. Why they send them,**
13   **I don't really know.**
14   Q. Do you know whether or not this is a
15   document that you reviewed when you were going through
16   New York Life's files?
17   **A. I -- it looks familiar, but if I saw it, I**
18   **didn't pay much attention to it.**
19   Q. Okay. So, the first paragraph of the
20   message is about the Change in Ownership, which we
21   just looked at the other letter about, correct? And
22   the second paragraph references liquidation of
23   security account.
24       Do you see that?
25   **A. Yes.**

## Page 31

1    Q. All right. It says: "The paperwork to
2    liquidate and security account never arrived to New
3    York Life. "
4        Do you see that?
5    **A. That's what it says.**
6    Q. Do you know anything about this at all?
7    **A. Not at all.**
8    Q. Okay. In review of your files, did you
9    notice that Mr. Wiegand had a fair number of different
10   accounts with New York Life, different policies,
11   annuities and all of that?
12       ATTORNEY RYAN: Objection. Outside of the
13   scope of the topics for which this witness has been
14   designated.
15   **A. I didn't review anything else but the**
16   **documents they gave me on this.**
17   Q (By Attorney Jacobson) Okay. I've just sent
18   you what I've marked as Exhibit 5 , which is a
19   "Service Form - Change Request." If you'll take a
20   minute to look at that.
21       (Exhibit 5 was identified and marked.)
22   **A. (Reviewing document.) I've got it, and I've**
23   **reviewed it.**
24   Q (By Attorney Jacobson) All right. Are you
25   familiar with this document?

## Page 32

1    **A. I've seen this document, yes.**
2    Q. All right. You've seen it in New York
3    Life's files?
4    **A. I -- yes, I've seen this in our files.**
5    Q. All right. And this is an address that
6    is -- the document that changed the address for the
7    Trust as owner of the Policy; is that correct?
8    **A. It's a request for two things: To change**
9    **the address, and to provide a duplicate policy.**
10   Q. Okay. So, changing the address. Did New
11   York Life ever take any steps to change the address to
12   the address listed on this form?
13   **A. This -- this Address Change Request was**
14   **overlooked. We processed the Duplicate Policy**
15   **Request.**
16   Q. Okay. So, when you say it was overlooked,
17   you mean that the address was not changed on your
18   records, correct?
19   **A. We did not change the address to this**
20   **address, that is correct.**
21   Q. All right. In fact, you never changed the
22   address on the Policy ever from the 9 Huntleigh Woods,
23   correct?
24   **A. I believe that's correct.**
25   Q. All right. Did New York Life ever attempt

## Page 33

1    to mail anything to the address listed here?
2    **A. No.**
3    Q. You said you created a duplicate policy?
4    **A. That is correct.**
5    Q. All right. And was the duplicate policy --
6    when was that produced?
7    **A. When this was submitted.**
8    Q. All right. Let me show you what I've marked
9    as Exhibit 6.
10       (Exhibit 6 was identified and marked.)
11       ATTORNEY RYAN: Are we done with this one,
12   Joe?
13       ATTORNEY JACOBSON: Yes.
14       ATTORNEY RYAN: Thank you.
15       THE WITNESS: Let me ask a question here.
16   As we move through these pages, I've got them all open
17   on my Adobe. Should I keep them all open? Are we
18   going to flip back and forth on these today?
19       ATTORNEY JACOBSON: I'm generally not going
20   to go back and forth. I'm marching through the
21   documents right now. I have questions about each of
22   them. Later, I may have a question, and I'll tell you
23   specifically about that.
24       THE WITNESS: Okay. I'll close all the
25   other ones, and I have the attachments if I need to

9  (Pages 30 to 33)

Page 34

1    reopen them.
2        ATTORNEY JACOBSON:  Yeah, your screen space
3    is valuable.
4        Q   (By Attorney Jacobson) Do you have Exhibit 6
5    there?
6        A.  Yes.
7        Q.  All right.  Is this a document you've seen
8    before?
9        A.  I've seen -- let me look at it.
10           (Reviewing document).  Yes, I've seen this
11    before.
12       Q.  This is indicating that the original Policy
13    has been lost, and they are requesting issuance of the
14    new Policy showing the current owner?
15       A.  That's right.  This is a request for the
16    duplicate Policy only.  They didn't ask us to change
17    the address on this transmittal letter.
18       Q.  You can close that one.  And I'm going to
19    send you Exhibit 7.  So Exhibit 7 is one we looked at
20    previously.
21       ATTORNEY RYAN:  Wait.  I don't have
22    Exhibit 7 yet.
23       THE WITNESS:  It's not come through.
24       ATTORNEY JACOBSON:  Hopefully, you have it
25    now.

Page 35

1        ATTORNEY RYAN:  Not yet.  Okay.  There we
2    go.
3        Q   (By Attorney Jacobson) That was the one we
4    looked at before that was Deposition Exhibit N.  All
5    right.  If you turn to the second page of this pdf.
6        A.  I'm looking at it.
7        Q.  You've got -- the left side is a blank page.
8    The right side is a very brief summary giving the
9    Insured's name, Policy number, Policy issue dates,
10    correct?
11       A.  Yes.
12       Q.  All right.  And it lists the owner as
13    Herbert C. Wiegand, right?
14       A.  Yeah.
15       Q.  And that was not the right owner at that
16    point in time, correct?
17       A.  At that time that would --
18       ATTORNEY RYAN:  Objection.  Falls outside of
19    the scope of the topic for which he's been designated.
20       A.  The owner on this Policy had been changed
21    before April 1st of 20- -- before January 29, 2004.
22       Q   (By Attorney Jacobson) I'm sorry.  I don't
23    understand your answer.
24       A.  You had asked if this was the correct owner,
25    is that correct?

Page 36

1        Q.  Yes.
2        A.  And I'm saying the owner had been changed.
3    This is not the correct owner.
4        Q.  All right.  The owner was a trust.  All
5    right.  If we go to page 13 of the pdf.
6        A.  I'm looking at it.
7        Q.  And that has two pages on it.  It has
8    page 16 and page 17 of the Policy, correct?
9        A.  Yes.
10       Q.  If you look on the right-hand side, page 13
11    at Section 8.15.  Do you see that?
12       A.  Yes.
13       Q.  All right.  And I'm going to read that and
14    make sure I've read it correctly.  All right.  "8.15:
15    Will You Be Updated Regarding The Status Of Your
16    Policy?  Each policy year after the first, while this
17    policy is in force and the insured is living, we will
18    send a written report to you within 30 days after the
19    policy anniversary.  It will show, as of that
20    anniversary, the Cash Value, the Cash Surrender Value,
21    and the amount of any unpaid accrued had interest.
22    This report will also give you any other facts
23    required by state law or regulation."
24           Did I read that correctly, sir?
25       A.  Yes, you did.

Page 37

1        Q.  Did New York Life understand this to be part
2    of their contract with the owner of the policy?
3        A.  Yes.
4        Q.  What do you know about any other facts
5    required by state law or regulation to be disclosed
6    annually to the owner of a universal life policy?
7        ATTORNEY RYAN:  Objection.  Calls for a
8    legal conclusion.
9           You may answer.
10       A.  I don't -- I don't know what might be
11    required by state law or state regulation.  Each state
12    has its own rules.
13       Q   (By Attorney Jacobson) Okay.  Let me get
14    page 16 if you go down to page 16 of this document.
15    There is a left hand page is blank.  The right-hand
16    page is an "Endorsement."  All right.
17       A.  Yes.
18       Q.  And the Endorsement states: "This policy is
19    issued in place of a previously issued policy with the
20    same policy number or in place of part of a previously
21    issued policy with the same policy number."
22           Did I read that correctly?
23       A.  Yes, you did.
24       Q.  It has the signature or mechanical
25    signature, I don't know which, of the President and

10  (Pages 34 to 37)

Page 38

1   Secretary of New York Life Insurance Annuity
2   Corporation?
3       A.   Yes.
4       Q.   Do you know whether they physically signed
5   these or whether it's a mechanical signature on their
6   behalf?
7       A.   It's a mechanical signature on their behalf.
8       Q.   All right.  And it's dated "New York,
9   January 29, 2004," correct?
10      A.   Yes.
11      Q.   And is this -- other than the change in The
12  owner and beneficiary in addition of this Enforcement,
13  is this Policy the same as the initial policy that was
14  issued back in 2000?
15      A.   Yes.
16      Q.   Okay.  I've just sent you Exhibit 8.
17           (Exhibit 8 was identified and marked.)
18      Q.   (By Attorney Jacobson) Do you have that now,
19  sir?
20      A.   Yes, I'm reviewing it now.  (Reviewing
21  document.)
22      Q.   Okay.
23      A.   Okay, I've reviewed it.
24      Q.   Okay.  So, this is a facsimile message dated
25  February 17, 2004.  And it has attached to it,

Page 39

1   basically, the first three pages of the Policy we just
2   looked at as Exhibit 7; is that correct?
3       A.   Yes.
4       Q.   And it's basically saying that the owner is
5   listed as the individual, Herbert Wiegand, rather than
6   his Revocable Trust.
7       A.   That correct.
8       Q.   And it's asking to have this corrected.
9       A.   Yes.
10      Q.   Do you know whether New York Life received
11  this fax?
12      A.   I believe we did.
13      Q.   Okay.  And did New York Life then take steps
14  to correct the Policy?
15      A.   Yes, we did.  I believe we sent a
16  confirmation letter.
17      Q.   All right.  Did you issue a new replacement
18  policy at that time?
19      A.   I'm not sure if we did or not.
20      Q.   There is not one in the files that New York
21  Life produced to us.  If New York Life had generated a
22  replacement policy at that time, would you have
23  expected to find it in your documents?
24      A.   I would have expected to find it there, yes.
25      Q.   Does the absence of it from your documents

Page 40

1   suggest that it was not produced at that time?
2       A.   It suggests that I don't -- it's not in our
3   files.  I don't -- I would say that we probably didn't
4   produce it at that time if it's not in the files.
5       Q.   Do you do a pretty good job of keeping your
6   files together at New York Life?
7       A.   Yes.
8       Q.   All right.  I've just sent you Exhibit 9.
9           (Exhibit 9 was identified.)
10      A.   (Reviewing document.) Okay.  I'm looking at
11  it.  I reviewed it.
12      Q.   (By Attorney Jacobson) Okay.  This is a
13  document you've seen before?
14      A.   Yes.
15      Q.   All right.  And first page is a fax from the
16  Vance Financial Group dated June 24, 2004, to JoAnn
17  Dyroff, the lawyer for the Trust.
18      A.   Yes.
19      Q.   And it says here comes the ownership and
20  beneficiary information regarding the Policy we've
21  been talking about, correct?
22      A.   That is correct.
23      Q.   Second page a letter from New York Life
24  addressed to the trust at the 9 Huntleigh Woods
25  address regarding this Policy?

Page 41

1       A.   Yes.
2       Q.   And it shows that the owner is now the
3   "Hebert C. Wiegand Revocable Trust?"
4       A.   That's what it says.
5       Q.   And "Hebert" is a misspelling typo of
6   Herbert; is that correct?
7       A.   Yes.
8       Q.   And then, references "Beneficiary:  See
9   attached change of beneficiary request," which is not
10  part of this exhibit; is that correct?
11      A.   Yes.
12      Q.   So, a typo notwithstanding that change has
13  now been, at least, reflected in the New York Life
14  records; is that correct?
15      A.   Yes.  And we've confirmed it back to the
16  Huntleigh Woods address.
17      Q.   Are you saying that this was mailed to the
18  Huntleigh Woods address as well?
19      A.   This should have gone to the Huntleigh Woods
20  address, as well as back to the attorney for the
21  Trust.
22      Q.   The attorney for the Trust via the Agent
23  Cliff Vance.
24      A.   Yes.
25      Q.   You should have Exhibit 10 coming in.

11  (Pages 38 to 41)

Page 42

1    (Exhibit 10 was identified and marked.)
2    **A.  (Reviewing document.)  I've got it.  I**
3    **reviewed it.**
4    Q  (By Attorney Jacobson)  Okay.  This is a
5    document in the New York Life files, as shown by the
6    stamp in the lower right-hand corner, is that correct?
7    **A.  Yes.**
8    Q.  And it's addressed to the Trust at the
9    Huntleigh address and is dated December 18, 2006,
10   correct?
11   **A.  Yes.**
12   Q.  It references the agent, the representative
13   as being Clinton Vance and Robert Barr, Jr.?
14   **A.  Yes.**
15   Q.  After Barr's name, there's some letters
16   L-U-T-C-F.  Do you know what that means?
17   **A.  It's a professional designation.  I believe**
18   **it's Life Underwriting Training Council Fellow or**
19   **something to that effect.**
20   Q.  Okay.  So, I'm going to read to you the
21   first paragraph of this letter after "Dear
22   Policyowner," and let me know whether I've read it
23   correctly, okay.  "Most assets that you acquire
24   depreciate in value the moment they become yours.  But
25   there is an important exception:  Permanent Life

Page 43

1    Insurance Company."
2    And "Permanent Life Insurance Company" is
3    underlined; is that correct?
4    **A.  Yes.**
5    Q.  "The longer you keep it and the older the
6    insured gets, the more valuable this asset becomes -
7    especially if his or her health changes."
8    Did I read that accurately, sir?
9    **A.  Yes, you did.**
10   Q.  All right.  Do you know what prompts the
11   sending of a letter like this to a customer?
12   Is this a routine thing?
13   Is this something that's prompted by some
14   special event?
15   **A.  I don't know what caused this letter to be**
16   **sent.**
17   Q.  Is this the type of letter you've seen
18   before in other UNIVERSAL Life Policy files?
19   **A.  I don't recognize this specific letter as**
20   **anything I've seen before.**
21   Q.  Do you know Melvin Feinberg, the Senior Vice
22   President, who signed it?
23   **A.  I have -- I have talked to Mr. Feinberg,**
24   **yes.  He's long retired.**
25   Q.  Long retired.  So, what does permanent life

Page 44

1    insurance mean to you?
2    **A.  Permanent life insurance means that it**
3    **doesn't cover you for just a specific term.  It**
4    **provides coverage permanently.**
5    Q.  All right.  Is that a term of art within the
6    insurance industry?
7    **A.  I'm not really sure what you mean by "term**
8    **of art."**
9    Q.  Okay.  So, I mean, we have -- we have words
10   that have sort of like generally accepted meaning.
11   Like term life, whole life.  Right?  Those have
12   generally accepted meanings within the industry; is
13   that correct?
14   **A.  Yes.**
15   Q.  All right.  And you indicated earlier that
16   universal life is also a term that's generally
17   understood?
18   **A.  Yes.**
19   Q.  So my question is:  Is permanent life
20   insurance a term that's generally understood within
21   the industry?
22   **A.  I don't know.  I -- in our context,**
23   **permanent is whole life insurance and universal life**
24   **insurance.  It doesn't end at a specific date.**
25   **Coverage continues permanently.**

Page 45

1    Q.  Permanently.  All right.  This says about
2    this Policy that the longer you keep it, the more
3    valuable it becomes, correct?
4    **A.  That's what it says.**
5    Q.  All right.  So that's not actually factually
6    correct, is it, sir?
7    ATTORNEY RYAN:  Objection.  Form.
8    Argumentative.
9    **A.  It really depends on how you value an asset.**
10   **This is life insurance.  I'd say that a $1.4-million**
11   **life insurance contract on a 90-year-old is more**
12   **valuable than one on an 80-year-old.**
13   Q  (By Attorney Jacobson) All right.  But if
14   this Policy has the diminishing Cash Value if you
15   don't make the planned premium payments of $750,000 a
16   year; correct?
17   ATTORNEY RYAN:  Objection.  Form.  Lack of
18   foundation.
19   **A.  The Cash Value can go up or down depending**
20   **on the monthly deductible charges, the premiums paid,**
21   **and the interest rate.**
22   Q.  (By Attorney Jacobson) And the monthly
23   deducted charges consists of two sets of charges.
24   Right?  There are fixed charges, and there's
25   also an insurance charge on the life of the insured,

12  (Pages 42 to 45)

Page 46

1  correct?
2      A.  There's a cost of insurance charge and a
3  monthly fee, a $6 fee, yes.
4      Q.  The $6 is small compared to the insurance
5  charge.  So, let's just look at the insurance charge.
6  Did the insurance charge go up, the monthly insurance
7  charge go up with each year of age of the insured?
8      A.  The charge goes up based on the amount at
9  risk.  If the Cash Value is going up more quickly than
10  the cost per thousand for the insurance at that age,
11  it can go down.  I didn't look and see what happened
12  on this particular Policy each month or each year as
13  the cost of insurance changed.  But, in general, as
14  you become older, the monthly -- the per-thousand cost
15  of insurance does increase, yes.
16      Q.  All right.  And so, you're saying you did
17  not look at this Policy to see how the relationship
18  between the monthly interest payments and the monthly
19  interest charges varied over time?
20      A.  I didn't do a review of the monthly
21  deduction of the Cash Values on a month-to-month basis
22  for the life of the Policy; I did not.
23      Q.  All right.  You are aware, however, that
24  this Policy eventually terminated when the Cash Value
25  became less than the amount of the monthly charge of

Page 47

1  insurance?
2      A.  Yes.
3      Q.  All right.  And I would suggest to you, I
4  would expect that given the initial $750,000 premium
5  that was paid, that at some point, the monthly charge
6  of insurance became significantly greater than the
7  monthly interest being earned on the Policy.  Is that
8  fair to say?
9      A.  I think that's fair to say, yes.
10      Q.  All right.  I have just sent you what I have
11  marked as Exhibit 11.
12          (Exhibit 11 was identified and marked.)
13      A.  I've got it.  (Reviewing document).  I've
14  reviewed it.
15      Q  (By Attorney Jacobson)  Okay.  Is this a form
16  letter that's sent by New York Life to customers when
17  an agent ceases their relationship with New York Life?
18      A.  Yes.  We send this when the agent is no
19  longer with New York Life.  It reasserts that we are
20  here for the customer and gives a phone number to
21  reach us.
22      Q.  So, on or about April 7, 2009, or slightly
23  before that, Mr. Robert Barr, Jr. ceased to be a New
24  York Life Agent?
25      A.  Before that, he ceased to be a New York Life

Page 48

1  Agent.  I don't know how soon before.
2      Q.  All right.  Is there a typical amount of
3  time after an agent leaves that New York Life sends
4  this notice to their customers?
5      A.  I'm not -- that's not something that I've
6  ever paid attention to the timing on.
7      Q.  Okay.  That's fair.  Do you have any
8  information about Mr. Barr's separation from New York
9  Life?
10          Is there a reason for it?
11      A.  No.
12      Q.  Okay.
13          THE WITNESS:  Could we take a break here?
14          ATTORNEY JACOBSON:  Absolutely.
15          COURT REPORTER:  I'm off the record.
16          (Recess.)
17          COURT REPORTER:  I'm ready to go back on the
18  record.
19          ATTORNEY JACOBSON:  Let's go back on the
20  record.
21          (Exhibit 12 was identified and marked.)
22      Q  (By Attorney Jacobson)  Mr. Elliott, I just
23  sent you what we've marked as June 12, which is a
24  June 9, 2009 letter, similar to the Exhibit 11, but
25  this one involves the departure of Mr. Cliff Vance

Page 49

1  from New York Life.
2          Do you see that?
3      A.  Give me a moment.  (Reviewing document).
4  Yes, I see that.  I've reviewed it.
5      Q  (By Attorney Jacobson)  So, this is two months
6  after the letter in which Mr. Barr left.
7          Do you know anything about Mr. Vance's
8  separation from New York Life?
9      A.  No.
10      Q.  All right.  Now that neither of the agents
11  who were working for the Wiegand family are there, is
12  it New York Life's -- do they ever -- do they appoint
13  a new agent to work with the insureds?
14          Do they take it in-house?
15          What's the typical process when all the
16  agents who are representing a customer are no longer
17  representing the insured?
18      A.  Our service center is ready to assist them
19  directly.  It says that in the letter as well.  It
20  gives a number to reach us.
21      Q.  All right.  The service center is like an
22  in-house --
23      A.  It's me.  It's where I am.
24      Q.  Where you are, okay.  So, you deal directly
25  with customers who are not interacting through an

13  (Pages 46 to 49)

Page 50

```
 1   agent?
 2       A. Also, who are interacting with agents.
 3       Q.  Okay.  And I don't recall if I asked this
 4   question or you answered this question.  So, I
 5   apologize if I repeat myself.
 6       Do you have any knowledge of Mr. Vance's
 7   separation from New York Life?
 8       A.  I do not.
 9       Q.  All right.  I've sent you what I have marked
10   as Exhibit 13.
11          (Exhibit 13 was identified and marked.)
12       Q  (By Attorney Jacobson) This is from New York
13   Life's files.  It's stamped as NYL00029.  Other copies
14   of it also appear in the documents that your lawyers
15   have produced to us.  This is a letter returning mail
16   to New York Life.
17       Do you see that?
18       A.  This is an envelope showing that the Post
19   Office returned the letter to us as undeliverable as
20   addressed and no forwarding address.
21       Q.  All right.  And this is the returning
22   correspondence that was sent to the Trust at the
23   Huntleigh address, right?
24       A.  At the Huntleigh address.
25       Q.  Okay.  So, that doesn't say it on this
```

Page 51

```
 1   particular one because it's the glossy-window envelope
 2   that had the address on the document side, correct?
 3       A.  That's correct.
 4       Q.  Do you know which document it was that was
 5   sent and returned?
 6       A.  It's stamped "Billing Notice Enclosed." I
 7   believe, when I looked at the other document, it
 8   included the June 2011 bill.
 9       Q.  All right.  Let me show you Exhibit 14 and
10   ask you if that's the June 11th bill to which you were
11   referring.
12          (Exhibit 14 was identified.)
13       A.  I've got it.  Let me review it.
14       Q  (By Attorney Jacobson) Absolutely.
15       A.  (Reviewing document.) Yes, this is the
16   notice I'm referring to.
17       Q.  All right.  Now, New York Life would
18   annually send a bill and also annually send an account
19   summary each year to the Huntleigh Woods address,
20   correct?
21       A.  That's correct.
22       Q.  Were they sent in separate envelopes?
23       A.  Yes.
24       Q.  Okay.
25       A.  At separate times.
```

Page 52

```
 1       Q.  At separate times, all right.  I wasn't
 2   clear on that, so I appreciate that.  So, this is the
 3   invoice.  It indicates the annual premium of $750,000.
 4   That being the amount due, correct?
 5       A.  Yes.
 6       Q.  And --
 7       A.  That being -- let me -- that being the
 8   planned premium.  It says "amount due," but that's
 9   also the planned premium.
10       Q.  Right.  And it says on there, there's an
11   asterisks on amount due saying:  "Please refer to an
12   "Important Message Regarding Premium Payments" on the
13   reverse side of this notice."
14       Do you see that?
15       A.  Yes.
16       Q.  Okay.  And it may be on the reverse side of
17   this notice, but this particular copy, which was New
18   York Life Document 736 and 737, the next page is
19   actually another copy of that return envelope.
20       Do you see that?
21       A.  Yes.
22       Q.  All right.  So, if I understand from the
23   fact that it's in your file, is it New York Life's
24   general practice to -- when a letter is returned to
25   make a copy of the return envelope and add it to the
```

Page 53

```
 1   file so you have that for your records?
 2       A.  Yes.
 3       Q.  And since there aren't any earlier ones,
 4   we'd have to assume that this would be the first time
 5   that a letter was sent to the 9 Huntleigh Woods
 6   address had been returned to New York Life?
 7       A.  This is the first record of anything being
 8   returned, yes.
 9       Q.  When New York Life gets a document returned
10   to it because of it being undeliverable without a
11   forwarding address, as happened in this case, is there
12   a procedure in process in place for New York Life to
13   try to locate the person to whom they were writing?
14       A.  We do have a policy --
15          ATTORNEY RYAN:  Just a second.  Ms. Court
16   reporter, can you read the question back?
17          (The court reporter read back the
18          requested portion of the transcript.)
19          ATTORNEY RYAN:  You may answer.
20       A.  Yes.  We have a procedure that we follow
21   when we got these back, yes.
22       Q  (By Attorney Jacobson) Can you tell me what
23   that procedure is?
24       A.  We check and see if we've received any
25   Change of Address notifications recently.  We look to
```

Page 54

1  see if the address has already been changed on the
2  record. We will also, when possible, search what we
3  call Accurint, which is a vendor that we use to look
4  up people.
5       In this case, the Trust is not a person, so
6  there's not -- a better address for them wouldn't be
7  published in Accurint.
8       Q.  Any other steps that you take in order to
9  try to see if you can locate the addressee who do not
10 receive the mail?
11      A.  At the time we received the mail, those are
12 the steps that we follow. That's our process.
13      Q.  All right. Does New York Life then not look
14 at its own file to see if it has alternative contact
15 information for the addressee?
16      A.  Like I said, we look for recent address
17 changes.
18      Q.  But other than recent address changes, do
19 you look at your file to see the alternative addresses
20 or alternative contact information, like a phone
21 number for the person?
22      A.  We look for address changes. We don't --
23 for the owner. We don't -- we don't look beyond that,
24 that's not our procedure.
25      Q.  All right. So you would not look to see

Page 55

1  whether, for example, you had a phone number for the
2  owner?
3       A.  If -- if it was on a recent address change
4  form, yes, we would see that, but we would also see
5  the recent address change. There were no recent
6  address changes on this file.
7       Q.  I understand that about recent. I'm not
8  talking -- now, setting aside recent address changes.
9  How far in the past would be considered recent?
10      Is that a month? A year? What is that?
11      A.  I don't know that we necessarily have recent
12 defined. I would -- my understanding of it would be
13 within the last month since the letter was prepared.
14      Q.  Okay. But my question is: In setting aside
15 recent changes, does New York Life ever look at a
16 file, a policy file more generally to see if there is
17 alternative contact information. For example, a phone
18 number, an email address, a lawyer, anything that
19 might be an alternative way of contacting the
20 customer, the owner if these other methods you
21 mentioned are fruitless?
22      A.  That's not our procedure.
23      Q.  Okay. And so, that wasn't done here?
24      A.  I don't know what we did, but our procedure
25 is that we wouldn't have done that.

Page 56

1       Q.  Okay. You will agree, however, that the
2  insurance policy is a valuable asset?
3           ATTORNEY RYAN: Objection. Argumentative.
4  Form.
5       A.  It depends.
6       Q.  (By Attorney Jacobson) All right. You should
7  be receiving what I've marked as Exhibits 15.
8       A.  (Reviewing document).
9           (Exhibit 15 was identified and marked.)
10      Q.  (By Attorney Jacobson) This is a set of pages
11 that were produced by New York Life. They are marked
12 in the lower right-hand corner as NYL429 through 439.
13 And I've marked them as Exhibit 15.
14      A.  I've got it. I'm looking at it. (Reviewing
15 document). I have reviewed it.
16      Q.  All right. Can you tell me what these pages
17 are?
18      A.  These are what we produced from our -- our
19 work flow system. It shows -- if you look there, it's
20 got the Policy number, the name -- in this case, it's
21 a folder number. The name of the Insured. And then,
22 we have comments. This is what was notated in our
23 Work Flow System. And on June 23, 2011, the person,
24 whoever belongs to this code here, was not able to
25 find a better address. They had an Unclaimed Mail

Page 57

1  Indicator, and they closed their file.
2       Q.  Okay. So, under this document or this set
3  of documents, they're all called Work Requests. Is
4  that a term that's used generally in New York Life for
5  this kind of work flow record?
6       A.  I'm not sure what that means. I don't know
7  whether that's something from the process where these
8  are produced for this sort of thing. Work Request is
9  not anything I'm familiar with.
10      Q.  Okay. So, listed under the Insured's name,
11 right, Jean Wiegand here, right? There's no listing
12 on the form by owner of policy.
13      Do you keep your records at New York Life by
14 the name of the insured only or is the owner's name
15 included in these work records at some point?
16      A.  For what we've got printed out here, it's
17 only the insured's name. But we definitely have
18 record of the owners as well. I'm not sure why this
19 formatted document -- again, this is not anything I
20 work with. This was the production for the purposes
21 of today.
22      Q.  Okay. None of these documents does the
23 Trust name appear, only Jean Wiegand.
24      A.  That's correct.
25      Q.  Okay. So, the entry for June 23 of 2011,

15  (Pages 54 to 57)

1  how he described it is that whoever did this work at
2  that time looked for a new address to be in the Policy
3  that you mentioned, couldn't find one, and indicated
4  that it's a Unclaimed Mail?
5      A.  That's correct.  We were not able to find a
6  better address.
7          Can I -- can I tell you what happens when
8  they put an Unclaimed Mail indicator on a file?
9      Q.  Absolutely, please.
10     A.  When we put an Unclaimed Mail indicator on
11 the policy, that prevents us from sending mail, the
12 regular mail that would be produced from this policy.
13 It also generates a letter to the old address letting
14 them know that the Post Office has returned mail, and
15 putting them on notice to reach out to us if that's
16 incorrect.  We follow that up 120-days later with a
17 similar letter.  So, those are -- whether those should
18 have been included in my answer about our process or
19 whether this here is a separate part of it, it's all
20 part of the Unclaimed Mail.  We have a procedure for
21 looking and finding a better address.  And when we
22 can't, then we put the Unclaimed Mail indicator on.
23     Q.  Okay.  So the Unclaimed Mail indicator then
24 results, if I understand correctly, in the following:
25 One that the normal correspondence that sends to the

1  address no longer sends, but a notice is sent to the
2  address alerting them to the fact that the mail had
3  been returned and a similar notice is sent out 120
4  days later.
5      A.  Correct.
6      Q.  Okay.  All right.  Then we go to the next
7  page of this document, page 2.  And there's a
8  different comment.  This is from June 28 of 2016.
9          Do you see that?
10     A.  I do.
11     Q.  All right.  And can you tell us what this is
12 informing us of?
13     A.  This is telling us that whoever "CKGREEN01"
14 is received a call from a third party.  A third party
15 is not the owner or agent about this Policy.
16     Q.  All right.  And that was a telephone call?
17     A.  Yes.
18     Q.  All right.  And there's no way of telling
19 from this particular form who that person might have
20 been who called; is that right?
21     A.  Not from this form.
22     Q.  And it says:  "POC Inquiry" under "Work
23 Type."  Do you know what that stands for?
24     A.  Point of call.
25     Q.  Okay.  Next page is a November 19, 2020,

1  entry.  It starts then, there's a couple of follow-up
2  entries.  Four entries in all.
3          Can you tell us what this is about?
4      A.  On November '20, this record was created.
5  I'm not sure what this was in November of '20.  This
6  person, whoever "T80KK2I" was, said that this was
7  Advanced, which means it's not something that they've
8  got the skill set to handle.  It was looked at again
9  by "RROBERSON" on December 21, '20, and she split the
10 client work -- "Client Support Work Object From Corr.
11 Request Added Trustee Roles," and then she completed
12 the file.
13     Q.  So, the thing you described that "RROBERSON"
14 did, what does that mean?  That they just split client
15 support work from correspondence request in adding
16 trustees roles?
17     A.  Splitting work, when a piece -- when a piece
18 of work comes in it gets assigned, in this case, as a
19 Correspondence Request.  In order to get these handled
20 by the right people, we've got the ability to split
21 these cases into different pieces.  She split off a
22 Client Support Work Object because she was adding
23 trustee roles.  We were adding trustees' information
24 in our client's information system.
25     Q.  So, would this reflect the contact by

1  Eugenia Sprich as a Trustee toward your client?
2      A.  That, I don't know.  I don't think so.
3      Q.  Okay.  All right.  The next page is the
4  beginning of -- I think it's a four-page set of notes.
5  And if I understand correctly, the earliest note is at
6  the end of the table; is that correct?
7      A.  That's right.  It's bottom up.
8      Q.  Okay.  And the Work Type is a holding
9  letter.  And what is that?
10     A.  When we have an active complaint file, we
11 periodically send holding letters to the complainant
12 letting them know that we're still working on their
13 request.
14     Q.  Okay.  And it says:  The "Detailed Status"
15 is policy info/status ULA-L."  Can you tell us what
16 that means?
17     A.  This is a request for the policy information
18 or the status of a universal life accumulator with a
19 level option, ULA-L.
20     Q.  Okay.  So, since this is in reverse
21 chronological order, let's go to the end of the table,
22 which is on page 7 of this Exhibit 15.  And working
23 our way from the bottom up, can you tell us what's
24 going on?
25     A.  This is that same piece of work that

16  (Pages 58 to 61)

Page 62

1  "RROBERSON" worked on the last occasion.  You can see
2  the first four boxes are the same.  Then she added
3  some -- the correspondence that was available in the
4  file.  She's made a -- made comments that the transfer
5  of ownership received in 2008 was processed and
6  requested.  There wasn't an address on the -- for the
7  trust provided on the form.  "The address of record
8  was used.  Confirmations were sent and we did not
9  receive a request to change the address.  We received
10  returned mail June15, 2011 and a Unclaimed Mail
11  indicator was effective June 23, 2011.  No further
12  premium notices or policy summaries were sent.  The
13  lapse and foreclosure letters from June August 2016
14  were sent."
15       And then, parenthetically, those are
16  contractually required that we sent to the last known
17  address, but they were not returned as undeliverable.
18       I mentioned Accurint when "RROBERSON" looked
19  up in Accurint she could see that Herbert, who was the
20  guarantor, the person named in the Trust, that he had
21  died then.
22       Q.  On June 16th, 2010?
23       A.  Right, that's what she noted.
24       Q.  Okay.
25       A.  Then she split this off as a complaint

Page 63

1  object to be handled by our Customer Advocacy Team.
2       Q.  All right.  That's the December 22, the
3  first December -- well, on page 6 of this document,
4  second row up from the bottom, right?
5       A.  Right.
6       ATTORNEY RYAN:  What's the Bates number on
7  that page, Joe?
8       ATTORNEY JACOBSON:  That is New York Life
9  434.
10       ATTORNEY RYAN:  Thank you.
11       Q  (By Attorney Jacobson) All right.  Moving
12  upward tell us what continued to happen.
13       A.  These are just some routing notes as this
14  thing worked its way to the Customer Advocacy Team to
15  be looked at.  And "MMURAWSKI" put this into a status
16  of business expert review.
17       Q.  What's that mean?
18       A.  That means we're going to have to send this
19  to a business expert to review it and assist the
20  Customer Advocacy Team if they're not able to address
21  it themselves.  Sometimes the customer advocacy people
22  are also business experts in that particular type of
23  work.  It's the part of the file where we're saying,
24  what do we got here, let's review this.
25       Q.  Okay.  And that's when is sent to

Page 64

1  "LDILLARD".
2       A.  She acknowledged that we had received this.
3  She called Eugenia, advised her we were looking into
4  her concerns and will send a written response and it
5  may be at least 10 business days before a response is
6  sent.  And it just looks like the rest of the
7  information she had was she thanked her and gave the
8  rest of the information.
9       We got new information at that time, it
10  looks like a couple -- it looks like we called her
11  back and got her address.  We now have an address for
12  Eugenia of 1001 Lisa Run Drive in Kernersville.
13       The next notation here is "update CTS."  CTS
14  is the Complaint Tracking System.  That's a corporate
15  database that tracks complaints not just from service,
16  but from anywhere.  It just reflects that we have this
17  file in our records here.  It was sent to Coordinator
18  Review, which is a step in the customer advocacy
19  process to just move this from different people.  She
20  sent this to "LSHESTINA," and then back to herself.
21  "LDILLARD" was working on this and pressed save on
22  file.
23       The reason you'll see these notations is it
24  saves.  The system will close after a certain period
25  of time if you haven't made a notation.  That's just

Page 65

1  to keep the file open so you don't lose your track in
2  it.
3       Q.  Okay.
4       A.  Then "LDILLARD" reached out to "ASCAFFIDI"
5  and asked for reinstatement requirements.
6       Q.  All right.  What does it mean by a
7  "reinstatement?"
8       A.  The Policy was expired.  And it looked like,
9  at this point, she was asking, what would we need to
10  put this Policy back in force?
11       Q.  Was that something from this it appears
12  Eugenia was asking for?  Or is this "LDILLARD's"
13  thoughts on how to pursue?
14       A.  I believe this is -- without reviewing,
15  Eugenia's request, we can do that if you like.  I
16  believe this is her thoughts on how, I believe, we
17  should be getting ready to respond.
18       Q.  Okay.  Then you move up.  We now have --
19  about the middle of that page, 11:22 a.m.
20       A.  Yeah.  "ASCAFFIDI" responded that there's
21  no way to get a quote.  It's too old.  Would have to
22  be approved by the product department to reinstate.
23  If they say OK we may be able to get you an amount.
24  "TL," that's shorthand for the universal life
25  department.  One of our products -- one of our

Page 66

1  universal life products is also Target Life. That's
2  what "ASCAFFIDI" meant here. I don't think they
3  realized at this time that this Policy was past the
4  period of time where it would have ended.
5      Q.  All right. Continue moving up as we go
6  through time.
7      A.  "RROBERSON" makes another comment that she
8  did review the file, and she sees there was an address
9  change in 2004. It was in the Contract Changes
10 Folder. Contract Changes is where the duplicate
11 policy was produced. According to TR, the change was
12 not processed.
13     "TR" is Transaction Register.
14     The change was not done; although, the
15 request was In Good Order. So, this is just -- she's
16 reflecting that we did not process the oversight due
17 to the -- we did not process the address change due to
18 an oversight.
19     Q.  Okay. What -- the next entry, 11:51, what
20 is that telling us?
21     A.  "ASCAFFIDI" is making a comment about --
22 further information about the reinstatement
23 department. She's saying she's not getting a quote.
24 I don't think that she realized at this time that the
25 Policy had reached its maturity age. That's why it's

Page 67

1  not providing a quote. Reach out to them, the
2  department, the product department, for manual
3  calculation if needed.
4      Q.  That would be the Target Life/Universal Life
5  Department?
6      A.  Yeah. Like I explained, this is a universal
7  life policy. One of our old products was target life.
8  "ASCAFFIDI" is just calling it by its old name.
9      Q.  And when it says "current coi," is that Cost
10 of Insurance?
11     A.  That is correct.
12     Q.  Okay. And what does "x2" mean?
13     A.  The required -- the requirement to put a
14 universal life policy back in force is two times the
15 cost of insurance.
16     Q.  So whatever the cost of insurance, if you
17 want to reinstate a policy, you have to pay twice that
18 amount?
19     A.  That's correct.
20     Q.  Okay. Understood. What's the next entry
21 mean?
22     A.  "ASCAFFIDI" went back in and noted the file
23 as it can't be reinstated. Here's where she notices
24 it's past the maturity age.
25     Q.  Which means that Jean is over 100?

Page 68

1      A.  All it means -- it means that she's over
2  100, but the Policy has a specific maturity date. It
3  was past that date, yes.
4      Q.  Okay. All right. Then there's an entry
5  that starts on the prior page and it ends on this
6  page. What is that one telling us?
7      A.  "LDILLARD" is noting that she sees the
8  address change in the Contract Change Folder. "DMS"
9  is our Document Management System. That's where we
10 moved our files, our old files, the paper files were
11 moved to the DMS. The request was In Good Order. It
12 is "pre AWF." "AWF" is the Work Flow System that
13 we're looking at now. These are comments from the
14 Work Flow System. That's what AWF is.
15     Q.  So it means that the Change of Address
16 Request is maybe four or five documents in this Work
17 Flow System that we're looking at here?
18     A.  That's correct. So, we only have the
19 document. We don't have any comments here. With this
20 here, we can see the comments of the people that are
21 working on them. Document Management System, we just
22 see the documents.
23     Q.  So, that way --
24     A.  She was --.
25     Q.  Because it's not in the Work Flow System,

Page 69

1  you don't know why the address was not updated or who
2  was the person at New York Life who was responsible
3  for handling it?
4      A.  That is correct.
5      Q.  Okay. What else?
6      A.  We don't know why it wasn't updated. We
7  received a 2011 billing notice back. It's the only
8  correspondence that had been returned. We put the
9  Unclaimed Mail in care on record. The person, CSR,
10 Customer Service Rep, that put the Unclaimed Mail
11 Indicator on record is no longer with us. But since
12 the address change is from 2004, there wouldn't be a
13 reason for the CSR to search back that far or look in
14 that folder.
15     Q.  Well, it says that the address request was
16 from 2004 in the incorrect folder. What does
17 "incorrect folder" mean here?
18     A.  I believe the "LDILLARD" is making an
19 assumption that this should just be strictly an
20 address change folder. This was one document and in
21 the Document Management System, things can only go in
22 one folder. The duplicate policy was the piece that
23 was processed, so it was in the Contract Change
24 Folder. That's where duplicate policies are
25 processed. I don't believe "LDILLARD" was here back

18  (Pages 66 to 69)

Page 70

1    in times before we had AWF.  So, I don't think she
2    recognized that there was not a way to put them in
3    multiple folders.
4        Q.  That there was no way to put them in
5    multiple folders, or you didn't put them in multiple
6    folders?
7        A.  There wasn't a way to put one piece of paper
8    in multiple folders short of making a photocopy and
9    sending two folders.
10        Q.  All right.  Because, at that point in time,
11    it was actual paper folders with papers and documents?
12        A.  The things that we're seeing in the Document
13    Management System were just the scanned images of the
14    mail, yes.
15        Q.  Okay.  So, now we're on the first page of
16    this particular request moving our way up on page New
17    York Life 432.  What's the full box there above what
18    we just talked about?
19        A.  She's updating the record that she's
20    reviewed this with the reinstatement team.  That this
21    is past the maturity.  The maturity age, she's saying,
22    was May 2020.  At that time, there would have been an
23    option to cancel the policy for its Cash Surrender
24    Value or continue it until the passing of the insured.
25    Any Cash Value, at that time, would have been paid to

Page 71

1    the named beneficiaries.  Upon maturity, there's no
2    more premium payments are allowed, and the cost of
3    insurance is no longer charged.  The Cash Value will
4    continue to be credited with insurance.
5        Q.  Okay.  Prior -- the next entry, I guess?
6        A.  On 12/30/20 "LDILLARD" went in and updated
7    the record from what she's read from the Trust
8    Amendment.  Eugenia Louise Regina Weigand Sprich and
9    Edward Leo Wiegand are trustees jointly, if they are
10    both willing -- living and willing and able to serve.
11    Otherwise, if one of them is not living or not willing
12    to act, then the other may -- may -- shall be the
13    trustee.
14        Q.  Okay.  And then the next one, something
15    about "Spawn Holding Letter," what does that mean?
16        A.  This created a new object as a Holding
17    Letter.  One of the things that we do to keep our
18    complaints moving along in the Customer Advocacy Team,
19    is the complaint record will continue.  But a Holding
20    Letter is a new Work Object.  When you send the
21    holding letter, you close that particular Work Object,
22    but the complaint file continues.
23        Q.  I see.  And then the last one at the top of
24    the table, what does that mean?
25        A.  She closed the Holding Letter Work Object.

Page 72

1    So the hold letter was not required.
2        Q.  All right.  No action closed.  No action
3    required.  Is that right?
4        A.  That's right.  In our Work Flow System, when
5    you close a case there's little shorthand actions that
6    you took.  In this case, because the Holding Letter
7    was not required, there was no action required.  So,
8    that's how she closed it.
9        Q.  Okay.  I appreciate that.  I would never
10    understand what that stuff meant without you going
11    through it with me.
12        A.  That's why I'm here.  I'm happy to help.
13        Q.  Let's go to the next Work Request, which is
14    on page 8 of Exhibit 15.  And that is New York Life
15    stamped 436.  This is one that goes through the end of
16    the document.  So, we can go through the last -- look
17    at that first page there so you can get yourself
18    oriented, and then we'll go to the end.
19        A.  Okay.  On 12/13/2011 we had a Work Object in
20    which created -- created the Work Object.  "CATKINS"
21    looked at the Work Object and moved it to Business
22    Expert Review and transferred the file from one of our
23    service centers to the other because the person he
24    wanted to work on it, they were assigned out of the
25    Cleveland Service Center.

Page 73

1        Q.  Okay.
2        A.  I don't know what was Dillard --
3    "LDILLARD'S" comment there.
4        Q.  On 12/14?
5        A.  Right.
6        Q.  It's probably some kind of attorney-client
7    communication, which you're allowed not to disclose to
8    us.
9            What happened after that set of redacted
10    comments?
11        A.  On 12/14, she added a document.  We went
12    back and updated CTS that we had received.  Remember,
13    CTS is the corporate Complete Tracking System that we
14    received to follow-up on on the prior case.  She sent
15    a draft to OGC, that's our Office of General Counsel.
16        Q.  Okay.
17        A.  There's a bunch of housekeeping things,
18    moving documents around, merging things, emailing
19    things.  We had a duplicate request on June -- on
20    December 16th she merged that into this file.
21        Q.  What does "duplicate request" mean?
22        A.  It means we got the same request more than
23    once.
24        Q.  Once by email.  Once by mail.
25        A.  More than likely.  December 21 she followed

19  (Pages 70 to 73)

Page 74

1    up with the Office of General Counsel, sent them an
2    email.
3        Q.  Okay.
4        A.  12/21 at 11:39, she added some documents.
5    Also, 10:56 added some documents to the file.
6        Q.  Okay.  Now, here we get to the 12/21 entry
7    at 12:09 p.m., which is much longer than all the other
8    entries we have.  So tell me what this is about.
9        A.  Let me take a minute to read this.
10       Q.  All right.
11       A.  (Reviewing document.) Okay.  So "LDILLARD"
12   sent this file to "CLGRAHAM," who is the Officer.
13   This is an Officer approval step it's in now.
14       Q.  Officer of what type?
15       A.  The same type of Officer as me.
16       Q.  Okay.  Is it a particular office that
17   they're in charge of?  Is this a lawyer officer?  A
18   business officer?
19       A.  She -- the "CLGRAHAM" is a Officer In
20   Service.
21       Q.  Okay.
22       A.  She explained what's going on with the case.
23   The follow-up from the trustees, contact an attorney
24   to suggest a counteroffer.  They're requesting more
25   than I offered.  It looks like this was -- this is a

Page 75

1    follow-up to the earlier one where we offered the
2    $25,000 amount.
3        Q.  Right.
4        A.  This explains where that amount came from.
5    It says, "What happened: Due to a service error the
6    policy lapsed.  The address was not changed as
7    requested, therefore the trustees did not receive the
8    premium and lapse notices, therefore the trustees did
9    not receive the premium and lapse notices.  Therefore
10   an extra-contractual offer has been made."
11       "What we learned:  The policy cannot be
12   reinstated as the policy matured at the insureds age
13   100 which occurred in May 2020.  At the tie of
14   maturity the options would have been to cancel the
15   policy for the value or continue it until the passing
16   of the insured at which time the Cash Value would be
17   payable instead of the face amount."
18       The resolution, what we're doing.  We're
19   restating our position, offering additional time to
20   accept the offer.  Explaining that the Policy had
21   been -- that had the policy been active from 2016 to
22   2020, the Cost of Insurance would have been required
23   to keep the Policy active until that time.  The
24   monthly base Cost of Insurance without additional fees
25   and charges was $38,842.  That was the last cost of

Page 76

1    insurance she saw.
2        Q.  All right.  So let me make sure.  So, at the
3    time that the Policy was terminated for failure to pay
4    the monthly insurance charge, the insured -- the
5    monthly insurance charge at that time was that $38,842
6    amount, correct?
7        A.  That was the Cost of Insurance that was due
8    on June 15, 2016, yes.
9        Q.  And that's the amount that was due each and
10   every month that year?
11       A.  No.  It would have changed each month.
12       Q.  It would have changed each month?
13       A.  Not much.  The big change happens on the
14   anniversary when we mark the insured one year older.
15   But each month the amount due is based on the amount
16   of risk, which is, in this case, the 1.4 million minus
17   whatever the Cash Value is in the policy.  So, if
18   they -- for example, if 38,000 was due, and they gave
19   us a 100,00 to cover for the few months, the next
20   couple of months amount of risks would have been
21   smaller than if they just gave us the 38,000.  But
22   materially, it's 38,800 a month.  I'm talking a
23   couple-hundred dollars up and down.
24       Q.  So approximately 38,000, 39,000?
25       A.  Right.  And it would have been more the next

Page 77

1    year.
2        Q.  Okay.  And at the time that the Cash Value
3    was short of the amount needed to pay the insurance
4    that Cash Value was the $25,095 as mentioned earlier?
5        A.  That's correct.  That's the -- that was the
6    Cash Value that was not sufficient to cover the
7    38,000 that was due.
8        Q.  All right.  And what happened to that cash
9    when it was not applied to the insurance price?
10       A.  Well, the final -- remember, I said there's
11   a month-by-month test to see if the insurance can
12   continue to the next month.  If 38,000 -- if we had
13   nothing there to cover the 38,000, it would have
14   continued the coverage until July 15.
15       Under its grace period, this policy has --
16   provides two additional months of coverage.  The
17   coverage on this Policy didn't end until August 18.
18   So that additional $25,000 that was in the Policy was
19   used to provide the grace period coverage, which was
20   for two months.
21       Q.  All right.  So, if I understand correctly,
22   the policy -- it wasn't enough there to pay for the
23   premium, but you keep the Policy alive for another two
24   months anyway and applied an insufficient cash balance
25   as -- to cover part of your cost of writing that

1  insurance?
2      A.  That's right.
3      Q.  Okay.  And now the -- owner of that
4  Policy had the right throughout the entire time the
5  Policy was in effect to terminate the Policy
6  themselves and receive the Cash Surrender Value, which
7  after a point in time surrender charges were no longer
8  going to be applied is equal to the Cash Value; is
9  that correct?
10         ATTORNEY RYAN:  Objection.  Form.  Calls for
11  speculation.  Object that insofar as it calls for a
12  legal conclusion.
13     A.  Yeah, I --
14     Q  (By Attorney Jacobson) Let me rephrase it.
15  Under this Policy, the owner of the Policy has a right
16  to end the Policy and take some cash, correct?
17         ATTORNEY RYAN:  Same objection.
18     A.  The Policy has a surrender provision in it.
19     Q  (By Attorney Jacobson) All right.  And that
20  surrender professor means that the owner can surrender
21  the Policy at any point and get whatever cash the
22  Policy terms provide, correct?
23     A.  We can look at some of the provisions in the
24  contract.
25     Q.  You don't know whether or not the Policy

1  allows the owner to surrender the Policy and get
2  whatever the cash the Policy terms provide?
3      A.  Well, we're talking about the Policy terms.
4  I mean, if we want -- I can tell you that the owners
5  can surrender the Policy, as explained in this random
6  provision in the contract, yes.
7      Q.  You should have No. 7 up there.  That was
8  the one we looked at before.
9      A.  I do.
10     Q.  All right.  Why don't we pull that up.  And
11  you direct me to where we should look to understand
12  the owner's ability to surrender the policy and how
13  they would -- how New York Life would calculate the
14  amount that they were entitled to receive.
15     A.  Okay.  Give me a moment to look through
16  this.
17     Q.  Absolutely.
18     A.  (Reviewing document.) It's on page 9 of the
19  pdf.  Page 9 of the policy section, it looks like,
20  8.5.  Can you surrender this policy for its Cash
21  Value.  And then we explained --
22     Q.  Oh, okay.  Let me enlarge it over here so we
23  can see it.  That's 5.5.
24     A.  Oh, is it -- yeah, 5.5.
25     Q.  Okay.  Could you read that Section 5.5?

1      A.  Yes.  "Can You Surrender This Policy For Its
2  Cash Surrender Value?  At any time after this policy
3  has Cash Value, and while the insured is living, you
4  may surrender it for its cash, Cash Surrender Value.
5  The Cash Surrender Value is equal to the Cash Value
6  less any surrender charges which may apply, less any
7  unpaid loan and accrued interest, subject to the
8  provisions of Section One of this policy.  A table of
9  maximum surrender charges is shown on Policy Data
10  page 2.1.  The Cash Value in the surrender charges
11  will be calculated as of the date on which we received
12  your signed request.  All insurance will end on the
13  date we receive your surrender request."
14     Q.  All right.  So, if I understand, and you
15  correct me if I'm wrong, New York Life says that you
16  may surrender the Policy for a Cash Surrender Value
17  assuming that it has a Cash Value.
18     A.  While it is in effect and if it has a value,
19  yes.
20     Q.  Okay.  And the Cash Surrender Value is equal
21  to the Cash Value less any surrender charges?
22     A.  And loan interest if there was a loan on it.
23     Q.  All right.  There was never any loan on this
24  Policy, correct?
25     A.  Right.

1      Q.  We'll leave the loan issue out.  All right.
2  And there's a table of the surrender charges, which is
3  at section -- at page 2.1, right?
4      A.  Yes.
5      Q.  Okay.  So let's go to 2.1.  Where is that?
6      A.  It's on page 4 of the pdf.
7      Q.  Okay.
8         ATTORNEY RYAN:  Can we get a Bates number
9  just so we're all clear on this, please?
10        ATTORNEY JACOBSON:  Sure.  The Bates number
11  is -- this is actually from Dryoff.  So, it's Bates
12  numbered DRYOFF124.
13        ATTORNEY RYAN:  Thank you.
14     Q  (By Attorney Jacobson) All right.  So we're
15  looking at DRYOFF124, which is page 4 of Exhibit 7.
16  And there's a table that was called "TABLE OF MAXIMUM
17  SURRENDER CHARGES."
18     A.  Yes.
19     Q.  And it says the "SURRENDER CHARGE PREMIUM"
20  was "$6,237.5," correct?
21     A.  In year '10.
22     Q.  In year '10?
23     A.  Policy year '10 was 6,237.50.
24     Q.  No, no, I'm looking after the Policy number,
25  it gives you the surrender charge premium.

Page 82

1    A.  Oh, I'm sorry, that's the surcharge maximum.
2    Q.  Right.
3    A.  Okay.  No.  Let me catch myself here.  The
4    surrender charge premium and the surrender charge are
5    two different things.
6    Q.  Oh, okay.  Tell me how they differ.
7    A.  When we apply premiums, when people send us
8    a premium on this Policy, premiums below the surrender
9    charge premium and above the surrender charge premium,
10   I believe, receive -- can receive different interest
11   rates on them.  Or not interest rates.  The word is
12   escaping me at the moment here.  I apologize, I can
13   think of the word, but it's not...
14   Q.  It will pop in your brain later.
15   A.  Expense charge.  There's an expense charge
16   when premiums are paid.  Below the surrender charge
17   premium and above the surrender charge premium have
18   two different expense charges applied to them.  That's
19   what that amount is.  So, the surrender charges
20   themselves are in the table.
21   Q.  Let me try to understand.  So, if they were
22   to make a payment of a premium on this Policy, let's
23   say they were to pay the planned premium of $750,000
24   in one year.  There would be some expense taken out of
25   that 750,000 before it was added to the Cash Value of

Page 83

1    that policy.
2    A.  That is correct.
3    Q.  And the amount of that expense would differ
4    as to whether the amount that was paid was above or
5    below the $62,375 amount?
6    A.  That's correct.
7    Q.  Okay.  I understand that now.  So, then the
8    surrender charges in the table -- and it has the
9    Policy Year 1 through 11.  It has Percentages Applied
10   beginning at 40% and dropping down to 0%.  And then,
11   has a surrender charge amount starting at $49,900 and
12   dropping down, ultimately, in year '11 to $0?
13   A.  Yes.
14   Q.  Could you explain to us what "Percentage
15   Applied" means in this table?
16   A.  If the contract was going to be surrendered
17   in year 1 or year 5 or year 9, this tells us the
18   amount of the percentage that we would deduct out as a
19   surrender charge.  If the policy was being surrendered
20   in year 9, we would have taken a 10% surrender charge.
21   That surrender charge is based on the surrender charge
22   premium.  There would have been a deduction from
23   the -- am I reading that correctly?  I may be -- this
24   is so small on this screen here, I'm having trouble.
25   Q.  You should be able to zoom in on the pdf.

Page 84

1    That's why I sent you a pdf so you can control your
2    own visual of it.
3    A.  Yeah, and I'm trying to figure out.  When I
4    hit the magnifying glass, it's turning it into
5    searching for words.  I'm trying to figure out where.
6    Q.  In the upper -- there should be a little
7    drop-down menu with a minus and a plus to the left of
8    it.
9    A.  Oh, okay, I got it.  There we go.  So, the
10   surrender charge in year 9 would be $12,475.
11   Q.  Okay.  And what does that 10% mean?
12   A.  Down here it says:  "The surrender charge is
13   calculated as a percentage of the lesser of the
14   cumulative premiums paid or two times the surrender
15   charge premium, as shown above in the percentage
16   applied column."
17   So, the surrender charge is -- the lesser of
18   what you paid in or two times, in this case, $62,000.
19   10% of that would be $12,475, hypothetically, in year
20   9.
21   Q.  Okay.  So make sure I understand what you
22   said.  So, to figure out what the surrender charge
23   would be, you take that surrender charge premium
24   there, the 62,375 --
25   A.  Right.

Page 85

1    Q.  -- you multiply by the percentage applied
2    per the table, right?  And then you multiply that
3    number by two, and that gives you the number in the
4    right-hand table.
5    A.  That's correct.  The surrender charge could
6    be less if you had paid in less than 62,000, or if you
7    had paid less than 124,000.  The lesser of the
8    cumulative premium paid or two times that amount.  In
9    this case, they paid 750,000.  So, we're over the
10   amount.  It's two times the surrender charge premium.
11   Q.  Okay.  So, if you paid a smaller initial
12   premium, your surrender charge could be higher because
13   it would be based on the surrender charge premium
14   number.  But if you had paid premiums in excess of
15   that amount, then it comes off of the premium you
16   actually paid?
17   A.  I think you got that backwards.
18   Q.  I got it backwards.
19   A.  If you pay a smaller amount, the surrender
20   charge would have been smaller.
21   Q.  Okay.  But once you get past year 11, year
22   11 and later, then there's no surrender charge at all?
23   A.  That's correct, no surrender charge.
24   Q.  Okay.  So after -- in year 11 and
25   thereafter, if you want to surrender this Policy, you

Page 86

1  would just get the Cash Value, correct?
2      A. Yes. You'd get the Cash Value as of the
3  date of the surrender.
4      Q. And there's no limit in this Policy as to on
5  what date you choose to surrender, is there?
6      A. Policy as to be in force.
7      Q. Has to be in force. But I'm saying as far
8  as a date is concerned, it's not as though you can
9  only surrender on an anniversary date, for example.
10     A. That's correct. You can surrender any time.
11     Q. So long as the policy is in force, you can
12  surrender at any time?
13     A. Right.
14     Q. Okay. And after year 10, beginning in year
15  11, you can do so and you won't have to pay a
16  surrender charge to do so?
17     A. That's correct.
18     Q. Okay. All right. I'm going back to
19  Exhibit 15 where we were before we switched back to
20  the policy. We had gone through the 12/21 note by
21  "LDILLARD" on page 9 of Exhibit 15, which was New York
22  Life 437.
23         Continuing in time, the next entry is email
24  sent. And then the next one is a "CLGRAHAM" entry.
25  What is that about?

Page 87

1      A. "CLGRAHAM" is the Officer who approved this.
2  And she is thanking an "LDILLARD." She's saying that
3  she supports the recommendation from the Office of
4  General Counsel to stand by the initial offer. But if
5  the client comes back again, we may want to have a
6  TL -- again, that's the internal shorthand for
7  universal life expert -- calculate the value as of
8  2020 to see if it was higher than the 2016 amount we
9  were offering. There is no need to complete a
10  miscellaneous loss form until we know the true amount
11  of funds we're writing off. See edits and okay to
12  send after updating.
13     Q. Okay. How would it be possible for the
14  Policy's value to be higher in 2020 than it was in
15  2016 if the Cash Value had been down to 25,000 and the
16  monthly insurance premiums were 38,000 and climbing?
17         ATTORNEY RYAN: Objection. Calls for
18  speculation. Objection. Form. Lack of foundation.
19     Q. (By Attorney Jacobson) You can answer.
20     A. It wouldn't be. "CLGRAHAM" is not a
21  universal life expert.
22     Q. All right. What else do we see here? So,
23  we have above that an email saying this "Spawn Holding
24  Letter Work Object". You explained earlier what that
25  means.

Page 88

1         Then a prior page, it says something,
2  "Begin Rendezvous comments."
3         What does that mean?
4         ATTORNEY RYAN: Wait. What page are we in
5  now?
6         ATTORNEY JACOBSON: We are now on page 8 of
7  the exhibit, New York Life 436.
8         ATTORNEY RYAN: Thank you.
9      A. Rendezvous is the opposite of a split. It's
10  when there's another Work Object out there, and you
11  just bring it back into the original Work Object.
12     Q. (By Attorney Jacobson) Okay. You can have a
13  Work Object, you split it so you have two different
14  people working on it. You rendezvous back into a
15  single object?
16     A. That's correct.
17     Q. Okay. What else do we note here? Moving
18  our way up.
19     A. Yeah. What was -- what was -- Rendezvous
20  was the hold Letter. She merged it back in. Is not
21  required because we're going to send our response.
22  The same day we sent our response, we mailed an email
23  of the response on 12/27. The file was closed. We
24  completed a file. We marked it under "service"
25  because that's the area where the complaint was

Page 89

1  focused on service.
2      Q. So, if I understand what you just said on
3  December 27th of 2021 you closed this file?
4      A. Yes.
5      Q. Does it indicate why the file would be
6  closed while there's an active complaint?
7      A. We sent out our response. We don't keep
8  files open if we're waiting on a response. We'll
9  reopen a file when a response comes in.
10     Q. I see. Okay. And that's it for Exhibit 15.
11         THE WITNESS: Before we get to the next one,
12  I'd like to go to the restroom again, please.
13         ATTORNEY JACOBSON: Absolutely. We can take
14  a break whenever you need to.
15         (Recess.)
16         COURT REPORTER: Ready to go back on the
17  record?
18         ATTORNEY JACOBSON: All right. Let's go
19  back on the record.
20     Q. (By Attorney Jacobson) All right. I'm going
21  to send you a document.
22         (Exhibit 16 was identified and marked.)
23     Q. (By Attorney Jacobson) I have just sent you a
24  document, Exhibit 16, which was stamped as New York
25  Life 464.

23  (Pages 86 to 89)

Page 90

1   A.  I got it.
2   Q.  It's an Annual Premium Notice for June of
3   2016.
4   A.  I'm reviewing it.  (Reviewing document.)  I
5   got it.
6   Q.  I'm only showing it to you because this is
7   the only one in the file that was produced that looks
8   like this with the color printing and the rest of
9   that.  Is this what the invoices typically look like,
10  this kind of coloring and formatting?
11  A.  Over time it's changed.  But this is what
12  this would have looked like had it been produced in
13  paper.
14  Q.  All right.  In the upper left-hand corner,
15  it has the line "Unclaimed Mail:  Letter archived, but
16  not mailed."
17      Do you see that?
18  A.  I do.
19  Q.  Okay.  Can you tell me what that means?
20  What that process is?
21  A.  We discussed earlier when the mail had been
22  returned by the Post Office that we placed a Unclaimed
23  Mail indicator on it.  This is noting that that was
24  still the mail status of this policy.  "Letter
25  archived by not mailed" means we still produce the

Page 91

1   letter.  Everything that took place normally in the
2   policy was continuing to take place as it did.  We
3   didn't mail it.  We kept a copy in our archives should
4   the owner request it later on.
5   Q.  Okay.  And once a file goes into the
6   Unclaimed Mail status, does New York Life ever, at any
7   point, periodically or otherwise, go and look to see
8   whether there's some way of finding an address or a
9   contact in order to contact their customer?
10  A.  At least once a year we check all of our
11  addresses against a database with our outside vendor,
12  but it's for people.  Trusts don't have addresses that
13  this database can check.  So, if there's a trust as
14  the owner, there's not a way we can check for a better
15  address.
16  Q.  All right.  Did you ever look at a file to
17  see if you have an identity of a trustee, that you
18  might be able to locate that trustee, that individual,
19  that person?
20  A.  We have a procedure that we followed when we
21  made this Unclaimed Mail indicator in the first place.
22  That's the procedure that we follow.
23  Q.  All right.  So, it does not include checking
24  the file for information about the trustee
25  individually so you might contact them?

Page 92

1   A.  That's correct.  But even -- if something
2   had come in -- if it was recent to the change, we
3   would see that, but anything besides that would have
4   been stale.
5   Q.  All right.  So, you're saying if after a
6   file went on to Unclaimed Mail status, if the
7   customer/owner has sent in a Change of Address Form,
8   for example, a fresh one, then you would have a new
9   address, and then you could start sending mail to that
10  address?
11  A.  That's correct.
12  Q.  All right.  But unless the customer contacts
13  you and said, hey, I haven't gotten any mail for a
14  while, here's my address.  You're not going to look at
15  the individuals beyond the name of the owner itself?
16  A.  That's correct.
17  Q.  All right.  I've just sent you what I've
18  marked as Exhibit 17.
19      (Exhibit 17 was identified and marked.)
20  Q (By Attorney Jacobson) It was a document that
21  was stamped New York Life 883 and dated June 13 of
22  2016.
23  A.  (Reviewing document).  I've got it.  Okay.
24  I've reviewed it.
25  Q.  Okay.  So, this is one of those lapse

Page 93

1   letters you mentioned, correct?
2   A.  That is correct.  This was the first lapse
3   letter we sent.
4   Q.  All right.  It's dated June 13 of 2016.
5   A.  Yes.
6   Q.  And it states:  To keep your coverage in
7   force, they should mail in the $72,027.31 along with
8   the attached Lapse Statement.
9   A.  That's correct.
10  Q.  And to do so no later than August 15th of
11  2016?
12  A.  Right.  That's the date when you were asking
13  where I got the 25,000, that's the date that we would
14  have continued to provide coverage until.
15  Q.  Okay.  And you did not receive a premium
16  upon sending this letter, correct?
17  A.  That's correct.
18  Q.  And you did not receive any type of contact
19  from the owner of the Policy?
20  A.  That is correct.
21  Q.  Did you receive any kind of contact from
22  anybody else regarding that letter?
23  A.  Not that I can recall at the moment.
24  Q.  Okay.  If something refreshes your
25  recollection or you change your answer, let me know.

24  (Pages 90 to 93)

1  Okay?
2     A.  Okay.
3     Q.  That was 17.
4        ATTORNEY JACOBSON:  Sorry for the little
5  pause between each exhibit.  Each one, I open it, have
6  to move it from the screen it goes on to so it's not
7  covering you so I can see it, and then I have to go to
8  the next thing and then scroll around to get to the
9  next document.  It gets to be a little annoying.
10        THE WITNESS:  That's fine.
11        ATTORNEY JACOBSON:  Exhibit 18 now, it
12  should be, right.  I sent 17 again, I'm sorry.
13        ATTORNEY RYAN:  Is this a different exhibit,
14  Joe?
15        ATTORNEY JACOBSON:  I'm sending a different
16  one Exhibit 18.  I sent the same one, 17 by accident.
17        ATTORNEY RYAN:  Okay.
18           (Exhibit 18 was identified and marked.)
19     Q.  (By Attorney Jacobson) Do you have that, sir?
20     A.  I've got it.
21     Q.  Okay.  This is a June 23, 2011 letter, New
22  York Life 787, addressed to the trust at the Huntleigh
23  Woods address, correct?
24     A.  Yes.
25     Q.  All right.  Now, what is this letter in the

1  process?
2     A.  This is the Unclaimed Mail letter I
3  described earlier.  We send this to the final address
4  letting them know that the Post Office had returned
5  mail.  We don't include any privacy guarded
6  information on here.  There's no Policy number on
7  here.  There's no Insured name on here.  This is just
8  the letter we sent to the last address saying, hey,
9  Post Office said that even though we were sending mail
10  here, it's not deliverable anymore.  Contact us.
11     Q.  All right.  It gives a hotline, toll-free
12  number they can call, correct?
13     A.  Right, yes.
14     Q.  And it says you have to complete some
15  security verification --
16     A.  Right.
17     Q.  -- to remove the block on mail for this
18  address.  By "block on mail," you mean the fact that
19  you're not sending things anymore to that address?
20     A.  What would happen is if they called and
21  passed the security verification, and said this is the
22  good address, we would remove the Unclaimed Mail
23  indicator and resume mailing.
24     Q.  All right.  If they called and said, this is
25  not a good address, what would you do?

1     A.  We would ask for the information about the
2  new address.
3     Q.  Okay.  And it advises that after 120 days a
4  "Final Notice Letter" will be sent.
5     A.  That's correct.
6     Q.  All right.  And that's what you mentioned
7  earlier in your testimony.
8        Do you know Daniel Sprenger, the person who
9  signed this letter?
10     A.  I do.  He's retired.
11     Q.  Was he in the same division as you?
12     A.  Yes.
13           (Exhibit 19 was identified and marked.)
14     Q  (By Attorney Jacobson) Okay.  I'm sending you
15  another letter relating to lapse warnings.  This is
16  marked as Exhibit 19.  It's stamped as New York Life
17  885, and it's dated July 13 of 2016.  It's about a
18  month after the prior letters.
19        Do you have that there?
20     A.  Yes, I've got it.  (Reviewing document.)
21  I've reviewed it.
22     Q.  Okay.  So, this is the second warning of
23  lapse, correct?
24     A.  Correct.
25     Q.  And it says there's the attached Lapse

1  Statement, and you can send that total amount no later
2  than August 15th of 2016.
3     A.  That's correct.
4     Q.  And if you look at that second page, that
5  amount is the same, $72,027.28, mentioned previously,
6  correct?
7     A.  That's correct.
8     Q.  And this is part of the typical process at
9  New York Life?
10     A.  That's correct.
11     Q.  All right.  Do you think that New York Life
12  has any fault or failing to review its files to find a
13  properly delivered Change of Address Form that had
14  been in the file for years?
15        ATTORNEY RYAN:  Objection.  Form.
16  Argumentative.  Calls for a legal conclusion.
17     A.  I'm not in a position where I can determine
18  any fault on that.
19     Q  (By Attorney Jacobson) All right.  You don't
20  think that New York Life did anything wrong there?
21        ATTORNEY RYAN:  Same objection.
22     A.  And again, I'm not in a position to give any
23  idea whether something was a fault or not.
24     Q  (By Attorney Jacobson) I've sent you what I
25  have marked as Exhibit 20, which is a New York Life

25  (Pages 94 to 97)

## Page 98

1  document 887. And it's an August 15, 2016 letter.
2      A.  I got it, let me review.
3          (Exhibit 20 was identified.)
4      A.  Reviewing document.) Okay I've reviewed it.
5      Q  (By Attorney Jacobson) All right. And this
6  is the notice that the Policy, in fact, has now
7  terminated; is that correct?
8      A.  That is correct.
9      Q.  All right. And the first paragraph says:
10 "There is no Cash Value or life insurance remaining
11 under this contract."
12     A.  The first sentence? Where did you see that?
13     Q.  The last sentence.
14     A.  The last sentence of the first paragraph,
15 yes.
16     Q.  As a matter of fact, there was no Cash Value
17 as far as New York Life's concerned at this point and
18 no life insurance coverage?
19     A.  That's right. The remaining Cash Value was
20 used to provide coverage from June 15 to August 15.
21     Q.  I see. Sandra Brennan who signed this, who
22 is that?
23     A.  Another Vice President, Corporate Vice
24 President in Service.
25     Q.  Same level as you?

## Page 99

1      A.  Yes.
2      Q.  All right. Is there a reason why the
3  letters are all signed by different Corporate Vice
4  Presidents? Where there's not any one particular
5  individual continuing on dealing with this particular
6  customer?
7      A.  It's really just a matter of what address --
8  what position people were in at the time that these
9  letters were last updated.
10     Q.  What do you mean "position they were in?"
11     A.  Well, Sandra Brennan may have been the
12 person that was signing these letters when this letter
13 was created. Dan Sprenger may have been the person
14 that was in the position of Service Officer when the
15 last letter was created. The letter itself doesn't
16 change depending on who signed it. It's just who you
17 put on there as a contact person.
18     Q.  All right. So, the person who is the
19 Service Officer signing letters change month-to-month,
20 as we see here?
21     A.  I didn't say month-to-month. I said people
22 move from one role to the next, and letters are
23 updated from time to time.
24     Q.  How many people, roughly, are at your level
25 of the company in your office?

## Page 100

1      A.  Well, we're not really set up in a
2  geographical sense, and we've got different levels of
3  service. So, it really would be hard to spell it out.
4      ATTORNEY RYAN:  Don't speculate,
5  Mr. Elliott.
6      A.  Yeah, I really don't have -- I don't have an
7  answer for you.
8      Q  (By Attorney Jacobson) Well, so are you,
9  like, let's say, in the order of like one of three
10 vice presidents in the service thing at this time, or
11 are you one of 300? I'm just trying to get an idea
12 for the order of magnitude.
13     A.  Order of magnitude, the first one is not
14 correct. It would be closer to the second one.
15     Q.  So not exact number, but there are 100 or
16 200 or 300 or 400 people at your level?
17     ATTORNEY RYAN:  Same objection. Form.
18 Speculation.
19     A.  There's certainly more than three. I
20 couldn't tell you what the amount is.
21     Q  (By Attorney Jacobson) I've just sent you
22 what I've marked as Exhibit 21, which was New York
23 Life 788. It's an October 21, 2011 letter again to
24 the Trust at the Huntleigh Woods address.
25         (Exhibit 21 was identified and marked.)

## Page 101

1      A.  I'm looking at it. (Reviewing document.)
2  I've reviewed it.
3      Q  (By Attorney Jacobson) Okay. So, this
4  describes itself as being the final letter with regard
5  to the mail at this address being undeliverable,
6  correct?
7      A.  That's correct.
8      Q.  And, in fact, from this point forward until
9  the contract expired and those letters that were
10 asking for additional premium at the end come up, this
11 is the last correspondence sent; is that correct?
12     A.  This is the last piece that we didn't
13 archive, yes.
14     Q.  And by "archive" you mean send directly to
15 archive without mailing?
16     A.  That's correct.
17     Q.  Okay. So that was in 2016. And the next
18 document I have for you is in 2020.
19     A.  Well, this was 2011.
20     Q.  Oh, that was the 2011 one. I'm sorry.
21     A.  This is the final letter that was in 2011.
22     Q.  I apologize. I looked at the wrong thing on
23 my directory thing here. So, again that was --
24     A.  Yeah, this was sent 120 days after that
25 first last letter.

26  (Pages 98 to 101)

Page 102

1    Q.  Well, that's the problem, I have the wrong
2  date on my file name.  Okay.  That's why it's in this
3  place as opposed to where it belonged.  Hang on one
4  second.  Okay.  I've just sent you what I've marked as
5  Exhibit 22.
6         (Exhibit 22 was identified and marked.)
7    Q  (By Attorney Jacobson) Exhibit 22 is a
8  23-page long document, starting with the stamp New
9  York Life 738 and ending with New York Life 760.
10   **A.  I've got it.**
11   Q.  Okay.  Take a moment to get yourself
12 familiar with it.
13   **A.  (Reviewing document).  Okay, I've reviewed**
14 **it.**
15   Q.  All right.  So this Exhibit 22 includes some
16 pages we've looked at previously in earlier context,
17 correct?
18   **A.  Yes.**
19   Q.  All right.  And this is a fax from Eugenia
20 Sprich to New York Life.  Obviously, it was received
21 by New York Life because it was in your files,
22 correct?
23   **A.  Yes.**
24   Q.  All right.  And she -- on the first page
25 she's asking -- you know, please call if you have any

Page 103

1  questions.  And if there are any of the documents with
2  this Policy to forward them to go with your response,
3  correct?
4    **A.  Yes.**
5    Q.  And she provides her phone number.  And this
6  will be the contact that matches what we saw in the
7  logs and what we saw in the Work Requests in
8  Exhibit 15, correct?
9    **A.  Let me go back to Exhibit 15.  (Reviewing**
10 **document).  Yes.  This is the one, starting on page 7**
11 **of Exhibit 15 is what we start talking about this one,**
12 **yes.**
13   Q.  Yeah, thank you.  I appreciate you tying it
14 to that.  The second page of this Exhibit 22 is a
15 letter from her, all right, detailing information she
16 says she now has and describing her contact with New
17 York Life.  And then, describing the documents that
18 she's attaching and the documents that she's
19 requesting, correct?
20   **A.  Yes.**
21   Q.  All right.  And this letter, sort of,
22 initiated a sequence of events over at New York Life
23 to try to respond to it in an appropriate way.
24   **A.  That's correct.**
25        (Exhibit 23 was identified and marked.)

Page 104

1    Q  (By Attorney Jacobson) I'm sending you what
2  I've marked as Exhibit 23.  It's a two-page document
3  beginning at New York Life page 912, and its some
4  emails.
5    THE WITNESS:  It has not come through yet.
6    ATTORNEY JACOBSON:  Oh, there's always this
7  extra little thing I need to click, and sometimes I
8  miss it.  I'm sorry.  I clicked it now.
9    THE WITNESS:  That's okay.  I just didn't
10 want to stare at a blank screen if you think it's
11 already been sent.
12   **A.  Okay.  (Reviewing document.)  I've reviewed**
13 **it.**
14   Q  (By Attorney Jacobson) Okay.  So, is this an
15 email component of the Automated Work Flow (AWF)
16 system, which sends documents to various people within
17 the New York Life system?
18   **A.  This was generated as part of the AWF.  You**
19 **can see it in the subject line.**
20   Q.  What does "IPS complaint/inquiry" mean?
21   **A.  IPS is an old name for our department,**
22 **Individual Policy Services.  It's just not been**
23 **updated to have a different name in our email system.**
24   Q.  Okay.  So, starting at the bottom and
25 working our way up, can you tell us just what's

Page 105

1  happening in this email chain so we can understand?
2    **A.  Yeah.  In this here, the Customer Advocacy**
3  **Team sent an email to Danielle Mantz about the**
4  **complaint.  This is an email letting her know that she**
5  **got this thing assigned to her.  She opened it.  Read**
6  **it.  And she went back to Ms. Dillard and said:  Can**
7  **you please route this to Mike Nalls or Justin Lucas?**
8  **Because she doesn't handle universal life contracts.**
9  **Lakeisha sends this to Mike Nalls asking him to review**
10 **the case, asking if it's possible to process a**
11 **surrender as of 2016 or if we would need to do a**
12 **miscellaneous loss.**
13       **Mike confirmed that he looked at it and said**
14 **that it wouldn't be able to be reinstated so the**
15 **surrender could be processed.  So the amount would**
16 **have to go out as a miscellaneous loss.**
17   **A.  He wasn't able to go into the complaint item**
18 **so he couldn't leave a comment.  He just responded**
19 **back to the Customer Advocacy Team person, Lakeisha.**
20   Q.  Okay.  So, looking at around the middle,
21 which is Lakeisha's email to Mike.  He says: "We are
22 making extra-contractual offer due to a service
23 opportunity."
24       What does that mean?
25   **A.  An "extra-contractual offer" is an offer of**

27  (Pages 102 to 105)

1    something that's not in the contract.  The contract
2    does not require that we make any payment on this at
3    all.  But we're looking to make an extra-contractual
4    offer through a service opportunity.
5        Q.  What does it mean by "a service
6    opportunity?"
7        A.  I'm not 100% sure what Ms. Dillard sent, but
8    I believe it's because of the oversight where we
9    didn't update the address.
10       Q.  Okay.  And what's a miscellaneous loss?
11       A.  Miscellaneous loss is when we process a
12   check without going through our usual administrative
13   system.  What they're really trying to do here is find
14   out can we process this with the normal path that we
15   would do with surrender, or do we have to do this
16   outside?  And Mike Nalls is confirming there's not any
17   way to do this through our normal process.  We have to
18   do it outside the normal process.
19       Q.  And a surrender as of 2016 would be, what?
20   The $25,000 that we talked about before?
21       Or some different number?
22       What's that referring to?
23       A.  Well, the offer as they put in the offers
24   was the Cash Value on June of 2016.
25       Q.  I have just sent you some more internal New

1    York Life emails.  This is marked as Exhibit 24.  It's
2    two pages.  First page is New York Life 914.
3            (Exhibit 24 was identified and marked.)
4        A.  I've got it.  (Reviewing document).  I've
5    reviewed it.
6        Q  (By Attorney Jacobson) Okay.  Now, is this --
7    I'm not talking about the specific content in this
8    email for the first question.  Is this the sort of
9    back and forth within New York Life when you're
10   dealing with a customer complaint or customer issue?
11       A.  It's -- that's what it is for this case.
12       Q.  Okay.  So, roughly halfway on the first
13   page, there's an email from Christopher Atkins to
14   Lakeisha Dillard and Calinda Stringer.  So, I'm trying
15   to understand.  So, we have some various statements.
16   We have some stuff in red.  We have -- what is this?
17   Can you explain to us what we're looking at here?
18       A.  What we're looking at here is an email from
19   Chris Atkins, who is the Manager of the Customer
20   Advocacy Team, to Calinda Stringer.  That's "CLGRAHAM"
21   is Ms. Stringer in the -- in the Work Flow comments,
22   that's her maiden name, Graham.
23       Q.  Okay.
24       A.  So, he sent her an email outlining what
25   they've put together so far on this case.  He sent it

1    to Ms. Stringer.  Ms. Stringer's reviewed it.  She's
2    just saying I conceptually agree with this offer, but
3    she's asking some questions, and that's what's in red.
4    So these are questions she's asking Chris and Lakeisha
5    in response to the summary that was sent to her.
6        Q.  So the red comments are Calinda Stringer's
7    comments?
8        A.  That's what she says up in her notes.  It
9    says:  "See my comments below in red."
10       Q.  Oh, well, then, yes, I suppose that is.  So
11   her first comment on page 1 is after the reference to
12   the -- it says, the statement of:  "What Happened/What
13   We Learned?"
14       Third bullet point is:  "In 2004 an address
15   change was received, signed by both co-trustees, but
16   it was not processed by the service center.  The
17   request was IGO, but was scanned into the incorrect
18   folder under Contract Changes."
19       Did I read that right?
20       A.  You did read that correctly.
21       Q.  And "IGO" means In Good Order?
22       A.  Correct.
23       Q.  And what does "In Good Order" mean in the
24   New York Life context?
25       A.  It means that in order to process whatever

1    was requested, we had all the necessary information.
2        Q.  Okay.  And in her comment on that --
3    Calinda's comment on that in red is:  "Has this item
4    been in the CC folder since 2004 with no action?  Has
5    then been referred to leadership?  If so, any
6    response?  Concerned that if scanned in the wrong
7    work-type that a review of an item was not conducted
8    for more than 15 years. "
9        Did I read that correctly?
10       A.  You did.
11       Q.  All right.  When she refers to the "CC
12   folder," that's the Contract Changes Folder?
13       A.  That's correct.
14       Q.  Do you share Calinda Stringer's concerns
15   about no review being taken for more than 15 years?
16       ATTORNEY RYAN:  Objection.  Form.
17   Argumentative.  Falls outside of the scope of the
18   topics for which this witness has been designated.
19       A.  I -- I believe that Ms. Stringer's frame of
20   reference for looking at this is with the Automated
21   Work Flow System that we have.  And I don't think she
22   recognizes this was before Automated Work Flow.  We
23   wouldn't have an Automated Work Flow item open since
24   2004 with no action.  But when we were just sending
25   things to file, documents to file afterwards,

## Page 110

1    that's -- which is where this was, there wouldn't be
2    any further action on it.  We'd never go back to
3    review it unless we were asked.
4         Q.  (By Attorney Jacobson) Now when was the
5    automatic [sic] Work Flow system adopted at New York
6    Life?
7         A.  I don't know.  And it migrated from nothing
8    to where it is today in various stages over the years.
9    Automated Work Flow arrived in the traditional service
10   world in 2006.  But we hadn't fully integrated into it
11   until many years later.
12        Q.  So it first started in 2006 and evolved over
13   time to the current situation?
14        A.  That's correct.
15        Q.  All right.  And when did Ms. Stringer,
16   formally Ms. Graham, arrive at New York Life working
17   in this office?
18        A.  I don't know when she started here.
19        Q.  When did you start?
20        A.  1988.
21        Q.  So you were there well before the Automated
22   Work Flow?
23        A.  Yes.  I was there before Document Management
24   System, yes.
25        Q.  Was Ms. Graham someone you worked with in

## Page 111

1    the office before those things showed up?
2         A.  Ms. Graham works in the Cleveland office.  I
3    really didn't have much interaction with her until the
4    last ten years or so.
5         Q.  Okay.  Her next comment on that bullet point
6    is: "Were there any touch points from client/agent
7    etc. between the address change request and the 2011
8    return mail?"
9             Did I read that correctly?
10        A.  Yes, you did.
11        Q.  What does "touch points" refer to?
12            ATTORNEY RYAN:  Objection.  Calls for
13   speculation.  Lack of foundation.
14        A.  I'm not sure what she meant by "touch
15   points."  I believe what she was saying:  Did they
16   contact us?  Or did we contact them with information
17   between those two dates?
18        Q.  (By Attorney Jacobson) Is "touch points" a
19   phrase that's used within New York Life to refer to
20   contacts with a customer or something like that?
21        A.  It's not one that I use.
22        Q.  Okay.  And you know what the answer is to
23   whether there were any touch points, right, or any
24   contacts between the client and the agent --
25            ATTORNEY RYAN:  Objection -- I'm sorry.  Go

## Page 112

1    ahead.
2             ATTORNEY JACOBSON:  I've got to -- let me
3    finish my question.
4             ATTORNEY RYAN:  Sorry.
5         Q.  (By Attorney Jacobson) Were they any contacts
6    between New York Life and the client or agent on the
7    issue of the address between the Address Change
8    Request and the 2011 return mail from reviewing the
9    file, correct?
10        A.  I know that they contacted us subsequent to
11   the Address Change Request to confirm the
12   owner/beneficiary change.  We sent that to the
13   attorney for the trust with the Huntleigh Woods
14   address on it, yes.
15        Q.  Okay.  Any other contacts in that time
16   period?
17        A.  Not that I can -- not that I can recall.
18        Q.  Not from your review of the files, right?
19   Is that correct?
20        A.  Yes.
21        Q.  Her third comment was:  "File indicates
22   foreclosure letters and such were archived due to
23   UMI?"
24            Is that accurate or inaccurate?
25        A.  That's inaccurate.  Everything but the

## Page 113

1    foreclosure letters would have been archived.
2         Q.  Foreclosure letters were actually mailed?
3         A.  They were.  Those were those two final
4    foreclosure letters that we looked at.
5         Q.  I've sent you what I have marked as Exhibit
6    25.
7             (Exhibit 25 was identified and marked.)
8         Q.  (By Attorney Jacobson) This is some more
9    emails.  A four-paged total document starting at New
10   York Life 414.  Do you have it, sir?
11        A.  I've got it.  Let me review it.  (Reviewing
12   document.)
13            ATTORNEY RYAN:  One second, Joe.  Let me get
14   there.
15            ATTORNEY JACOBSON:  Sure.  Got it.  Let him
16   review it.
17        A.  Okay.  I've reviewed it.
18        Q.  (By Attorney Jacobson) Okay.  So, this is, in
19   part, a follow-up to the last email we looked at where
20   someone answered Calinda's questions, correct?
21        A.  Yes.  It says the responses are in blue, but
22   this is a black-and-white copy.
23        Q.  Unfortunately, I didn't find one that had
24   the color.  But we can tell that what was red in a
25   lighter gray than what, I guess, was supposedly blue,

Page 114

1  which is a darker gray.  Do you see that?
2      A.  I can't really see the difference.  But, I
3  mean, she's asking a question, and he's responding.
4  We can go back and forth if need be.
5      Q.  All right.  We just looked at it, so maybe.
6  So, let's see.  Looking at the comment question thing.
7  In response to the question about whether it had been
8  in the CC folder since 2004 with no action?  And
9  hasn't been referred to leadership?  If so, what the
10  response would be.
11      There is a bullet point, which says:  "yes,
12  the item has been in the CC folder since 2004 about no
13  action.  It does not appear that this case was
14  previously referred to leadership; based on the age
15  and the fact that it is pre-AWF, I do not see a need
16  to loop in leadership at this point, but we can
17  certainly highlight this case in the next leadership
18  meeting and LIS quarterly review."
19      Did I read that correctly?
20      A.  Yes.
21      Q.  What is "LIS quarterly review?"
22      A.  Life Insurance Solutions, that's the service
23  area that directly handles this sort of thing.
24      Q.  Okay.  And it refers to "next leadership
25  meeting."  What is the "leadership meeting" in this

Page 115

1  context?
2      A.  I'm not really sure.  We have a lot of
3  different leadership meetings.  There's a quarterly
4  review that the Customer Advocacy Team holds with the
5  leaders of the different areas.  I'm not sure what
6  Chris meant by leadership meeting.
7      Q.  Based on your experience and understanding
8  as a corporate rep, why would the fact the age and
9  that the missed filing, I guess, was pre-AWF made
10  against involving leadership or looping in leadership
11  at this point?
12      ATTORNEY RYAN:  I'll object.  It falls
13  outside the scope of the topics for which this witness
14  has been designated.  Objection.  Form.
15      A.  It goes back to what I said earlier.  Chris
16  is clarifying that this was not an AWF.  If it had
17  been an AWF, it would have been unusual and referred
18  to leadership.  Because this was pre-AWF, we handled
19  the case, we filed the case.  We're not going to look
20  at that case again until an owner -- till the owner
21  calls us again.
22      Q.  (By Attorney Jacobson) Okay.  I think I
23  understand what you're saying.  So you're saying if it
24  was AWF making this kind of slip and leaving it open
25  for so long would be worrisome because AWF helps

Page 116

1  prompt you to make sure you don't do that?
2      ATTORNEY RYAN:  Objection.  Form.
3  Argumentative.  Outside the scope.
4      Q.  (By Attorney Jacobson) Is that correct, sir?
5      A.  Automated Work Flow, the cases stay open
6  until they're closed.  Document Management System,
7  they go there when they're closed.  We don't -- we
8  wouldn't -- it would be very unusual for us to have a
9  case that was open for 12 years in order to make a
10  work flow.  That would be unusual.
11      Q.  Okay.  It references under there one, two,
12  three, four, five -- the fifth circle says:  "The
13  insured called in November 2011 inquiring on the
14  status of the policy, as her husband, the previous
15  policyowner was now deceased.  We advised the policy
16  was active."
17      Do you see that?
18      A.  I do.
19      Q.  I have not seen anything else in the file
20  relate to a call from Jean Cameron Wiegand.  Did you
21  see anything in there when you were reviewing the
22  file?
23      A.  I remember there was a call from her.  I
24  didn't know if it was about this policy or another
25  policy.

Page 117

1      Q.  Okay.  Are there any notes somewhere in the
2  system that would reflect the content of the
3  conversation between the New York Life employee and
4  Jean Cameron Wiegand about this policy or any other
5  policy?
6      A.  There should be.  Chris wouldn't know what
7  happened in 2011 unless he saw it somewhere.
8      ATTORNEY JACOBSON:  Hey, Dan, that note, the
9  conversation with Jean, is not something that's in the
10  files that you produced.  I'd like to ask you if you
11  could revisit and find that and get back to us.
12      ATTORNEY RYAN:  Yeah, I'll doublecheck, Joe.
13  I think we made a special effort to provide
14  documentation relating to Policy 665, but I'll
15  doublecheck.
16      ATTORNEY JACOBSON:  Yeah.  It's a phone
17  call.  So, it may be found under another policy she
18  owned -- or that she was an insured of because there
19  were a lot of policies.
20      ATTORNEY RYAN:  I understand.  And I'll make
21  that distinction when we do the follow-up check.
22      ATTORNEY JACOBSON:  Thanks a lot.  I
23  appreciate it.
24      ATTORNEY RYAN:  You bet.
25      Q.  (By Attorney Jacobson) Then the next bullet

1    point says:  "The POA for the Insured called in
2    June 2016 inquiring on the status of the policy.  We
3    did not provide any information."
4         Do you see that?
5    A.  Yes.
6    Q.  Did I read that correctly?
7    A.  You did.
8    Q.  And "POA," does that stand for Power of
9    Attorney?
10   A.  That would be Power of Attorney, yes.
11   Q.  And that -- so someone else called on behalf
12   of the Insured about the Policy?
13   A.  And -- yes.  Go ahead.
14   Q.  And June 2016, which is when the notice went
15   out about the likelihood of expiration, right?
16   A.  June 2016 is when we sent the lapse notices
17   and the foreclosure notice, yes.
18   Q.  So someone called about the lapse notice?
19   A.  Yes.  That's likely what happened, yes.
20   Q.  And there --
21   A.  We don't know why they called, but the
22   timing lines up.
23   Q.  Well, there would be some sort of note,
24   wouldn't there be, about what they're communicating
25   about?

1    A.  I do remember we reviewed a document earlier
2    that said a third party had called.  It didn't say
3    what they asked about.
4    Q.  Okay.  All right.  You should have
5    Exhibit 26 there shortly.
6         (Exhibit 26 was identified and marked.)
7    A.  I'm looking at it.
8    Q.  (By Attorney Jacobson) And I misstated
9    previously.  This is a later copy in the series that
10   has the blue and the red.
11   A.  Yes. (reviewing document).  I've reviewed
12   it.
13   Q.  Okay.  Let's go to the thing from the middle
14   on down we've looked at already, basically.  So let's
15   look at the January 13, 2021, 6:35 p.m. email from
16   Calinda Stringer.
17   A.  Okay.
18   Q.  And she says -- this is to Lakeisha Dillard
19   with a copy to Chris Atkins.  It says: "Thanks.
20   Perhaps you can join the first 15 minutes of Chris'
21   1/1 meeting tomorrow at 10 so that we can further
22   discuss.  I'd like to understand the point of no
23   leadership review.  Understood prior to AWF but if the
24   work item was visible to us now, wouldn't anyone
25   reviewing workloads for CC see this item as well?  In

1    2011, did we miss an opportunity to update the address
2    while the policy was active?  Slightly concerned the
3    final foreclosure letters reached destination but no
4    action but we're surrendering as of the current date.
5    Do we have the right signatures now to even process
6    this as a surrender for it's current Cash Value?  Etc.
7    etc."
8         Did I read that correctly?
9    A.  Yes.
10   Q.  Thoughts, comments on this email from you,
11   sir?
12        ATTORNEY RYAN:  Objection.  Form.  Lack of
13   foundation.  Calls for speculation.
14   A.  She's asking a lot of questions that she
15   doesn't have the answer to.
16   Q.  (By Attorney Jacobson) All right.  Are these
17   the type of questions that you would be asking under
18   the circumstances?
19        ATTORNEY RYAN:  Same objection.
20   A.  I'm a little closer to the reinstatement
21   process than Ms. Stringer was.  I understand how the
22   Work Flow would work for this type of work
23   specifically and also why the letters were sent.  Some
24   letters were sent and some letters were archived.  I'm
25   not sure that she's got the same background as me for

1    this particular type of work.  That's why we have
2    business experts look at these.
3    Q.  (By Attorney Jacobson) Okay.  What about the
4    notion that anyone reviewing the workloads for
5    contract changes would have seen the item?
6        ATTORNEY RYAN:  Objection.  Form.
7    Foundation lack of -- form and foundation.
8    A.  She's asking the question.  The answer is
9    no.
10   Q.  (By Attorney Jacobson) Okay.  I've just sent
11   you another set of internal emails, which I've marked
12   as Exhibit 27, a two-page document starting at New
13   York Life 919.
14        (Exhibit 27 was identified and marked.)
15   A.  Okay.  I've got it.  I've reviewed it.
16   Q.  (By Attorney Jacobson) So, part of it is
17   emails we've seen before.  This is the new part, which
18   is, I guess, the top two messages.  It's simply about
19   tax ramifications from New York Life; is that correct?
20   A.  Yes.
21   Q.  All right.  And there wouldn't be any gain
22   in making that payment, is there?
23   A.  That's what Mr. Nalls is saying, there's no
24   gains and no tax implications.
25   Q.  No gains for the Insured?  Or no gains for

Page 122

1  New York Life?
2      A.  A gain on a policy is when it's worth more
3  than what was paid into it.  In this case, the
4  settlement offer is less than what was paid into it --
5      Q.  Okay.
6      A.  -- so there's no gain.
7      Q.  Understood.  So we're talking about whether
8  or not they have to send some sort of tax statement to
9  the owner of the policy?
10     A.  We would send a 1099 to the owner if we sent
11 out a check that had a gain in it.
12     Q.  Okay.  Gotcha.  You should have Exhibit 28
13 which is a one-page document that was marked as New
14 York Life 369.
15             (Exhibit 28 was identified and marked.)
16     Q   (By Attorney Jacobson) It appears to be some
17 kind of internal memo.  It's not dated, but it does
18 reference Eugenia Sprich's contact in November of
19 2020.
20     A.  I've got it.  I'm reviewing it.  (Reviewing
21 document)  I've reviewed it.
22     Q.  Okay.  Is this a type of form or report
23 that's generated by New York Life internally from time
24 to time when dealing with a situation?
25     A.  I've never seen anything produced like this

Page 123

1  in any other case.
2      Q.  Okay.
3      A.  That doesn't mean that it doesn't happen on
4  a Customer Advocacy Team, but it's not anything I'm
5  familiar with.
6      Q.  All right.  It has the Policy number and the
7  Insured.  The date of the Policy and a line called
8  "Risk Paid to date" which, if I am guessing correctly,
9  that's the date in which the Cash Value is no longer
10 sufficient to pay the insurance cost?
11     A.  That's correct.  When the May 13, 2016,
12 month-aversary process, there was sufficient value.
13 It moved the risk date to June 16.  On June 16, there
14 wasn't enough to move it forward, so that's where the
15 risk date ended.  After that, the coverage is under
16 the grace period not under the contract's risk.
17     Q.  And the "Status" is "A8 Expired."
18             What does that mean?
19     A.  "A8" is our internal just number -- it's a
20 code just saying that it expired.
21     Q.  Oh, okay.  So, in effect, it's repetitive.
22 "A8" means expired, and someone wrote the word
23 "expired" as well?
24     A.  Yes.  Depending on who is talking about
25 this, what level of savvy you have about our systems

Page 124

1  versus our contracts.  Both of those are terms you
2  might use.
3      Q.  All right.  Do you have any knowledge as to
4  who generated this one-page memo?
5      A.  I do not.
6      Q.  But it is part of New York Life's files?
7      A.  I don't recall seeing this before.
8      Q.  Look in the lower right-hand corner.
9      A.  It says New York Life number on it, so I
10 presume it was.
11     Q.  All right.  If it was in the files, would it
12 be part of the records, business records of New York
13 Life?
14     A.  I don't know where we would have got it
15 otherwise.
16     Q.  Okay.  There's a number of bullet points
17 here.  I mean getting a quick history, a very
18 high-level history of the policy, correct?
19     A.  Yeah.  There's a number of points that
20 they're listing here as things that happened and
21 things that are, yes.
22     Q.  Okay.  And so, it notes that the single
23 premium note was paid, that the insured was still
24 living, at that point; that ownership was changed to
25 the trust in 2003, that an address --.

Page 125

1      The fourth bullet point says:  "In 2004 an
2  address change was received, signed by both
3  co-trustees.  Upon further investigation this request
4  was In Good Order but was not processed due to our
5  error."
6              Do you see that?
7      A.  I do.
8      Q.  And that's consistent with your review of
9  the file as well, those facts?
10     A.  Yes.  I mean, when the attorney for the
11 trust submitted the letter asking for the duplicate
12 policy, attached was the form for duplicate policy and
13 an address change.  We overlooked the address change.
14     Q.  And then it refers to the return to mail.
15 And then it has two subpoints under that.  Second
16 subpoint says:  "The address on record is a valid
17 address as it is the residence of the insured, but
18 it's an invalid address for the trust/trustee,"
19 correct?
20     A.  That's what it says.
21     Q.  All right.
22     THE WITNESS:  I'm about due for another
23 bathroom break.
24     ATTORNEY JACOBSON:  Please.
25     THE WITNESS:  Do we want to work a lunch in

32  (Pages 122 to 125)

Page 126

1    here, or are we almost done?
2         ATTORNEY JACOBSON:  I'm happy to work in the
3    lunch.  Let me send the next document.  We can take a
4    break now and reconvene later, I guess.  I just sent
5    Exhibit 29 so you have it there.
6         How long would you like to take a break,
7    sir?
8         THE WITNESS:  What's normal for something
9    like this?
10        ATTORNEY RYAN:  If I can suggest, why don't
11   we take a 10-minute break.  If you want to cover one
12   more document, Joe, and then we can take a lunch
13   break.
14        ATTORNEY JACOBSON:  That sounds fine.
15        (Recess.)
16        COURT REPORTER:  We are back on the record.
17        (Exhibit 29 was identified and marked.)
18   Q  (By Attorney Jacobson) Mr. Elliott, I've sent
19   you just before the break Exhibit 29, which is a
20   reissue of the insurance policy issue.  And it's
21   stamped New York Life 921 through 971.  It's 50 pages.
22   But I will note that every other page is blank for
23   whatever reason.
24        ATTORNEY JACOBSON:  And so, Dan, I was
25   wondering if I had your consent later to modify this

Page 127

1    exhibit by deleting the alternative blank pages so
2    we'll have a more compact document?
3         ATTORNEY RYAN:  Yeah, I don't theoretically
4    have a problem with that.  I just don't like messing
5    with exhibits.
6         ATTORNEY JACOBSON:  Me neither.  That's how
7    you produced it.  I don't want to question about why
8    is it every other page numbered.
9         ATTORNEY RYAN:  Well, why don't we ask the
10   witness and see where that gets us.  We can reconvene
11   on this.  It's not a big deal.
12        ATTORNEY JACOBSON:  Okay.
13   Q  (By Attorney Jacobson) So, just out of
14   curiosity, Mr. Elliott.  Do you have any idea why
15   every other page of this document has a blank page?
16        A.  These policies print duplex.  It's possible
17   it was printed duplex but scanned simplex, and then
18   copied again, put it in duplex form.  I really don't
19   know.
20        Q.  Okay.  No important business purpose, right?
21        A.  No.
22        Q.  So, this is a reissue of Policy # 62791665
23   which is the Policy that we've been talking about,
24   correct?
25        A.  Yes.

Page 128

1         Q.  And if we move to page 43 of this document,
2    which is page New York Life 963.  We see an
3    "ENDORSEMENT", a reissue Endorsement?
4         A.  Right.
5         Q.  It says:  "This policy is issued in place of
6    a previously issued policy with the same policy number
7    or in place of part of a previously issued policy with
8    the same policy number," correct?
9         A.  Yes.
10        Q.  And date of reissuance of this one is
11   January 28, 2021?
12        A.  Yes.
13        Q.  Do you -- can you explain why your client
14   would have reissued this Policy in January of 2021?
15        A.  I don't know why this policy specifically
16   was reissued then.  This was subsequent to the
17   original complaint; maybe it was in order to have an
18   updated copy of it.  I'm not really sure.
19        Q.  Okay.  I do note if you go to the second
20   page of the Policy, which is New York Life 923 and
21   it's page 3 of this pdf.  It does show that the owner
22   of the policy, "The Herbert C. Wiegand Revocable
23   Trust."
24        Do you see that?
25        A.  Yes.

Page 129

1         Q.  And I believe this is the first Policy we've
2    seen where that actually appears in the Policy itself,
3    correct?
4         A.  Yes.
5         Q.  Is it possible that it was reissued so there
6    would be a copy of the Policy with the proper owner
7    disclosed?
8         ATTORNEY RYAN:  Objection.  Speculation.
9    Form.
10        A.  I don't know the reason why it was
11   reproduced.  But when we produced the policies --
12   certainly, when we produced this one, this is what was
13   on the record at the time.  So, it just reflects who
14   the owner was at the time.
15        Q.  (By Attorney Jacobson) So, this is what was
16   in the computer records of New York Life?
17        A.  Right.
18        Q.  And this is putting it down on paper?
19        A.  Yes.
20        Q.  Okay.  And if you move to page 39 of this
21   pdf, which was page 17 of the Policy stamped as New
22   York Life 959.
23        ATTORNEY RYAN:  One second.  Okay.
24        Q.  (By Attorney Jacobson) All right.  The pages
25   on the very left side of the document it says, in

Page 130

1    light print: "Customer copy all along," correct?
2        A.   Yes.
3        Q.   And this has a Section 8.15: "Will You Be
4    Updated Regarding The Status Of Your Policy?"
5        Do you see that?
6        A.   Yes.
7        Q.   And that's the same language in that
8    section -- the same section as I read to you on the
9    earlier 2004 version of the Policy, correct?
10       A.   I assume.  I don't think there's any reason
11   for it to have changed.  I mean, without comparing
12   word for word, I couldn't guarantee it, but yes,
13   this -- in every likelihood, this is the exact same
14   provision, yes.
15       Q.   Would it be the normal policy of New York
16   Life when it reissued a policy, for whatever reason,
17   to keep all the contractual terms unchanged?
18       A.   Yes.
19       Q.   And you have no reason to believe that New
20   York Life would have tried to change any of the
21   contractual terms when it reissued this Policy,
22   correct?
23       A.   That's correct.
24           (Exhibit 30 was identified and marked.)
25       Q   (By Attorney Jacobson) I've just sent you

Page 131

1    what I've marked as Exhibit 30, which is a February 2,
2    2021 letter from New York Life to Eugenia Sprich.  And
3    it's Bates stamped at the bottom beginning with New
4    York Life 789 and continuing through New York Life
5    881.  So kind of a long document.
6        A.   I see it.  I'm reviewing it.  (Reviewing
7    document.)  Okay.  I've got it, I've reviewed it.
8        Q   (By Attorney Jacobson) Okay.  This letter was
9    sent by Lakeisha Dillard, Senior Associate at New York
10   Life, correct?
11       A.   Yes.
12       Q.   And sending these types of correspondences
13   are part of her job; is that right?
14       A.   That's correct.
15       Q.   All right.  And so, when she's writing this,
16   she's writing for New York Life as its employee?
17       A.   That's correct.
18       Q.   So, the February 2, 2021, letter is
19   addressed to Ms. Sprich at her home address.  Refers
20   to the Insured and the Policy number that we've been
21   discussing all day, right?
22       A.   Yes.
23       Q.   And moving down to the fourth paragraph of
24   the letter, New York Life writes to Ms. Sprich saying:
25   "On January 21, 2004 we received a request signed by

Page 132

1    Edward Wiegand and Eugenia Sprich as Co-Trustees to
2    change the address to 165 N. Meramce..." Meramec is
3    misspelled.  "Avenue, 6th Floor, St. Louis, MO 63105.
4    Due to an oversight on our part, the address change
5    was not processed as requested.  We apologize for this
6    error."
7        Did I read that correctly?
8        A.   You did.
9        Q.   Then there's --
10       ATTORNEY RYAN:  Joe -- hey, Joe.  Sorry to
11   interrupt, but it just occurred to me we promised the
12   witness a lunch break after that last document.
13       ATTORNEY JACOBSON:  I'm almost done with
14   this one.  Can we take a break after this one?  Is
15   that okay?
16       ATTORNEY RYAN:  Sure.
17       Q   (By Attorney Jacobson) All right.  There are
18   then some additional paragraphs describing the Policy
19   and New York Life's decision-making process relating
20   to the contact by Ms. Sprich.  And the last paragraph
21   it says: "Ms. Sprich, as part of your request for
22   policy statements and notices, enclosed are copies of
23   the billing notices that APS from 2003 to 2016, lapse
24   letters, and expiration notice.  I trust this
25   information is helpful."

Page 133

1        And then it says do not hesitate to contact
2    her for additional information, correct?  Did I read
3    that correctly?
4        A.   Yes, you did.
5        Q.   And "APS" is annual policy statement?
6        A.   Annual Policy Summary.
7        Q.   Summary.  Okay.
8        ATTORNEY JACOBSON:  Let's take a break here.
9    We'll come back with this document after your lunch
10   break.
11       How long do you need to take, sir?
12       THE WITNESS:  Let's take a 30-minute break.
13       ATTORNEY JACOBSON:  Sounds good to me.  See
14   you back at 1:40 Central Time.
15          (Recess.)
16       COURT REPORTER:  We are back on the record.
17       ATTORNEY JACOBSON:  All right.
18       Q   (By Attorney Jacobson) Welcome back,
19   Mr. Elliott.  Before we left on a lunch break we were
20   looking at Exhibit 30, and I'd like to continue in
21   that exhibit.  If you could turn to the fifth page of
22   the exhibit.
23       A.   This is the 2003 premium notice?
24       Q.   Yes, sir.
25       A.   Okay.  I'm looking at it.

34  (Pages 130 to 133)

Page 134

1    Q. So, attached to the letter and the
2  acceptance and offer, release, a time, and there's a
3  series of these annual premium notices followed each
4  year by Annual Policy Summary and so on through, I
5  guess, through the termination year -- starting in
6  2003 through the termination year of the policy; is
7  that correct?
8    A. Yes.
9    Q. And if we look at this first one from
10 2003 it shows an amount due of $750,000.
11   A. That's the plan premium, yes.
12   Q. Yes. And it starts off by saying: "Your
13 insurance policy is a very valuable asset."
14     Do you see that?
15   A. I do.
16   Q. All right. Does that refresh your
17 recollection as to whether or not the insurance policy
18 is a valuable asset?
19   A. This says it is.
20   Q. All right. And is that the view of New York
21 Life?
22     ATTORNEY RYAN: Objection. Outside of the
23 scope of the topics for which he's been designated.
24   A. We produced the letter that says that.
25   Q  (By Attorney Jacobson) Okay. And New York

Page 135

1  Life wouldn't be wanting to lie to its customers,
2  right, in these letters?
3     ATTORNEY RYAN: Objection. Argumentative.
4  Form.
5    A. New York Life does not lie to its customers.
6    Q  (By Attorney Jacobson) Okay. So, in fact,
7  the policy is a very valuable asset, correct?
8    A. It says it's a valuable asset. We said it.
9    Q. All right. And New York Life agrees with
10 what it says, right? You're here for New York Life.
11   A. Yes.
12   Q. Okay. Thank you. All right.
13     If we turn to page 7 of the pdf, we have the
14 annual policy statement -- summary, which is page 1 of
15 5.
16     ATTORNEY RYAN: Bates number, please?
17     ATTORNEY JACOBSON: This is New York Life
18 795.
19     ATTORNEY RYAN: Thank you.
20   Q  (By Attorney Jacobson) Are you there, sir?
21   A. I am.
22   Q. Okay. And so, it has in the left-hand side,
23 it has "THE WIEGAND FAMILY, LLC." Because this was
24 before the change of ownership, right?
25   A. Yes.

Page 136

1    Q. At the Huntleigh Woods address. On the
2  right it has the agent as Clinton Vance and Robert
3  Barr, right?
4    A. Right.
5    Q. And the statement's prepared June 13, 2003?
6    A. Yes.
7    Q. And it's the annual summary which highlights
8  the financial activity of the policy during the prior
9  year, correct?
10   A. Yes.
11   Q. And also provides projections in the future,
12 correct?
13   A. Let me just check that. Yes.
14   Q. Okay. And it also gives a summary. It
15 gives the name of the Insured, the Policy number, the
16 type of plan, the Policy date, and the Planned Annual
17 Premium, correct?
18   A. Yes.
19   Q. And then below that it gives a life
20 insurance death benefit, which is 1,400,000, correct?
21   A. Correct.
22   Q. And the Cash Value, as of that date, which
23 was 812,000-and-change, correct?
24   A. Correct.
25   Q. And the Cash Surrender Value, which was

Page 137

1  $762,000-and-change?
2    A. Correct.
3    Q. Okay. Turn to the next page. And I'm just
4  going through this one in more detail because they're
5  all in the same form, correct?
6    A. Yes.
7    Q. Did the form change in any material way
8  during the years this Policy was in effect that you
9  know of?
10   A. Not that I could think of off the top of my
11 head. We're always refining our forms. It's possible
12 it changed in some way, but this looks to be the same
13 way that we're producing them today as well.
14   Q. Okay. So, the next one, again, has sort of
15 the information to send to you the Policy we're
16 talking about, like the Policy number, the Insured's
17 name, and all that, right?
18   A. Right.
19   Q. And under "Policy Cash Value," it shows the
20 Cash Value a year earlier, right? "Increased by",
21 "Interest Earned," "Decreased by," "Cost of Insurance
22 Charges." And then, "Fees and Other Charges."
23     Do you see that?
24   A. Yeah.
25   Q. That's an accurate description?

35 (Pages 134 to 137)

Page 138

1  A.  Yes.
2      Q.  And so, you get the "CASH VALUE," and then
3  "Less Surrender Charge," and then you have what the
4  "Cash Surrender Value" is.  And it shows that
5  calculation, right?
6      A.  Yes, it does.
7      Q.  Okay.  And this is all information that New
8  York Life provides routinely, annually to the owners
9  of this type of policy, correct?
10     A.  That's correct.
11     Q.  Because it's information that's of value,
12  importance to the policy owner, correct?
13         ATTORNEY RYAN:  Objection.  Calls for
14  speculation.  Form, foundation.
15     A.  Every policy owner has things at a
16  different -- they can find valuable or not.  I'm not
17  going to speak for all policyholders.
18     Q  (By Attorney Jacobson) No, I'm talking about
19  from New York Life's perspective.  New York Life
20  provides information to its policyholders because New
21  York Life believed information would be useful or
22  valuable to those policyholders, correct?
23         ATTORNEY RYAN:  Same objection.  Form.
24  Foundation.  Outside of the scope.
25     A.  I don't know that that's the -- that's

Page 139

1  necessarily the reason why.  It may be a
2  contractual -- a regulation from the state.  The
3  reason why we send them, I'm not clued in on the
4  reasons why we did this.
5      Q  (By Attorney Jacobson) Turn to next page,
6  page 3 of 5.  That's "TRANSACTION DETAILS," correct?
7      A.  Yes.
8      Q.  And it shows each month the "Cost Of
9  Insurance Charge" and "Fees and Other Charges" that
10  were applied, correct?
11     A.  Yes.
12     Q.  As well as the interest rate that was
13  credited?
14     A.  That's correct.
15     Q.  And the amount of interest earned?
16     A.  Yes.
17     Q.  And then, at the bottom of the table shows
18  the totals for that preceding 12 months.  How much for
19  total cost of insurance, the total fees, and the
20  totals, correct?
21     A.  Yes.
22     Q.  And for that year, the year ending in June
23  of 2003, the interest earned was significantly greater
24  than the charges of the insurance, correct?
25     A.  30,000 more, yes.

Page 140

1      Q.  Yeah.  So, the Cash Value increased by that
2  30,000?
3      A.  That's correct.
4      Q.  Then the next page, page 4, has a number of
5  things that's called "Conditions of Policy Coverage,"
6  right?
7      A.  Right.
8      Q.  And so it says:  "If you make no future
9  partial surrenders or loans your policy will continue
10  in force until:"
11         And then it has four different dates that it
12  relates to, right?
13     A.  Yes.
14     Q.  All right.  One is "Maturity," all right,
15  "assuming that you make all planned Annual premium
16  payments of $750,000."
17     A.  That's correct.
18     Q.  All right.  The next one is "Maturity,
19  assuming that you made all planned Annual premium
20  payments of $750,000.00 and the guaranteed interest
21  rate."  As opposed to the current interest rate?
22     A.  Right.
23     Q.  The third one says that the policy will
24  continue through "October 2017, assuming that you make
25  no further payments, and that the current interest

Page 141

1  rate is credited and the fees and charges" are used,
2  right?
3      A.  That's correct.
4      Q.  And then, also the fourth alternative is
5  that until December of 2010, assuming no further
6  payments, and that the guaranteed interest rate is
7  used rather than the current interest rate, correct?
8      A.  Correct.
9      Q.  And so, a person who gets this annual
10  summary can look at this page 4 of 5 and know that
11  unless they pay some premiums that the policy is
12  anticipated to expire in October of 2017, and then it
13  only guaranteed interest is paid, that's December of
14  2010.
15         ATTORNEY RYAN:  Objection.  Form.
16  Foundation.  Calls for speculation.
17     Q  (By Attorney Jacobson) Is that what someone
18  would see from reading this document?
19     A.  They -- they would see that if they made no
20  further payments and the current interest rate was
21  credited and the fees didn't change, that it would
22  continue until 2017.  Likewise, December 2010 if we
23  went to the contractual minimums or maximums.
24     Q.  Okay.  And that's information that New York
25  Life wants its insureds to know, correct?  Its owners

Page 142

1  of insurance policies?
2       ATTORNEY RYAN:  Same objection.  Form.
3  Foundation.
4       A.  We -- we put it on the form whether we want
5  them to know it, or we're required to tell them that,
6  I couldn't tell you.
7       Q   (By Attorney Jacobson) All right.  It's
8  valuable information, however, about your valuable
9  asset if you're the insured or the owner of the
10 policy.
11       ATTORNEY RYAN:  Same objection.  Sorry.
12       A.  If you're the policy owner, what's valuable
13 to you depends.
14       Q   (By Attorney Jacobson) So, you don't think
15 knowing when your policy might expire is something
16 that policy owners, as a general, would like to know
17 about their policy?
18       A.  I don't know what policy owners in general
19 are interested in.  Certainly, I could see a situation
20 where they might think this is useful.
21       Q.  All right.  And as we continue through this
22 document, we have a similar type of items for -- on
23 page 11 of this pdf, which is New York Life 799.
24 We've got the premium notice for June of 2004.
25 Similar, right?  If we go to the next page, we have

Page 143

1  the Annual Policy Statement Summary Sheet?
2       ATTORNEY RYAN:  Hold on.  Joe, Bates number,
3  please?
4       ATTORNEY JACOBSON:  This one is New York
5  Life 801.
6       ATTORNEY RYAN:  Thank you.
7       Q   (By Attorney Jacobson) All right.  Do you see
8  that page, sir?
9       A.  Yes.
10       Q.  All right.  It has, again, it has a Cash
11 Value, the Cash Surrender Value on page 1 of 5?
12       A.  Yes, it does.
13       Q.  And if you go to page -- for whatever
14 reason, page 3 of 5 is missing on this one.  But if
15 you go to -- page 2 of 5 is missing.  But if you go to
16 page 3 of 5, you can see what the change is in the
17 Cash Value, right?
18       A.  Yes.
19       Q.  And on page 4 of 5, once again, you get the
20 monthly transaction details showing the total
21 insurance charges and total insurance interest,
22 correct?
23       A.  Right.
24       Q.  And again, on page 5 of 5, it has how long
25 the Policy is going to last, right, on these four

Page 144

1  different scenarios?
2       A.  Yeah, based on the assumptions that
3  outlined, those scenarios, yes, that's what it's
4  showing.
5       Q.  And those dates change because things
6  change, right?
7       A.  In this case, the interest rates went down.
8       Q.  In this one, Item 4 moved from 2010 to
9  August of 2011 would be the expiry on the guaranteed
10 minimums?
11       A.  Yes.  Because we had a year that was above
12 guaranteed.  It was taking into -- the prior year
13 would have been at the guarantee, but it was actually
14 higher.  That's why this one moved forward.
15       Q.  Right.  And we'll continue through the same
16 types of forms.  Let me see which one I want to get to
17 to talk about.  Let's move, if we could, to page 53 of
18 this document, which is New York Life 841.
19       A.  Page which?
20       A.  Its page 53 of the pdf.
21       A.  Fifty-three, okay.
22       ATTORNEY RYAN:  Bates No. 851?
23       ATTORNEY JACOBSON:  841.
24       ATTORNEY RYAN:  841, thank you.
25       THE WITNESS:  Okay.  I'm here.

Page 145

1       Q   (By Attorney Jacobson) All right.  And this
2  is the June 3, 2011, premium notice, correct?
3       A.  Yes.
4       Q.  All right.  At this point, if you look at
5  the upper right-hand side, the agents are gone now,
6  and it's just customer relations, correct?
7       A.  That's correct.
8       Q.  And on the left-hand side there's no longer
9  the LLC, but it's the Revocable Trust.
10       A.  That's correct.
11       Q.  It shows, again, on page 1 of 5 on the
12 Annual Policy Statement it shows the Cash Value, death
13 benefits, and Cash Surrender Value, right?
14       A.  Yes.
15       Q.  And, at this point, in 2011, there's no
16 longer a surrender charge.  So the Cash Surrender
17 Value is equal to the Cash Value.
18       A.  That's correct.
19       Q.  And if we go to page 5 of 5, which is on
20 Bates stamped New York Life 846, we can see that the
21 Policy term under "guaranteed conditions" and "no
22 further payments" is now extended all the way to March
23 of 2015, right?
24       A.  That -- that's correct.
25       Q.  Now, if we turn to the next page, which is

1    page 59 of this document or New York Life stamped 847,
2    which is the June 2012 premium notice.
3         Are you there, sir?
4    **A.  I am.**
5         Q.  All right.  Now, this one, above the
6    address, it has "MAIL UNCLAIMED:  Premium Notice
7    archived but not mailed," right?
8    **A.  I see that.**
9         Q.  And that means, if I understand correctly,
10   that although this was printed out internally, it was
11   never actually mailed to the owner of the Policy?
12   **A.  We created it, but we did not mail it.**
13        Q.  Okay.  So, it wasn't mailed.  And it shows
14   an amount due of $750,000, correct?
15   **A.  That's the plan premium, yes.**
16        Q.  Okay.  And you go two pages down to the
17   first page of the Annual Policy Summary.  And this
18   also says:  "UNCLAIMED MAIL APS ARCHIVED BUT NOT
19   MAILED?"
20   **A.  I see that.**
21        Q.  All right.  So, the Annual Policy Summary
22   also was not mailed beginning with this June 2012
23   version of it, right?
24   **A.  Yes.**
25        Q.  It has the same sort of information with the

1    Cash Value and Cash Surrender Value now.  The same
2    809,000-and-change, right?
3    **A.  Yes, it does.**
4         Q.  Okay.  And we go to page 4 of 5.  And we can
5    see the series of transactions going on, right?
6    **A.  I can see that, yes.**
7         Q.  Okay.  And now we see that for that prior
8    12-month period, the cost of the insurance charges
9    totaled $76,272, right?
10   **A.  Yes.**
11        Q.  And the interest earned was $34,676 --
12   **A.  Yes.**
13        Q.  -- correct?
14        All right.  Which meant that the cost of
15   insurance now outweighed the interest earned, almost
16   doubled it, right?  Approximately doubled it.
17   **A.  Approximately doubled it.**
18        Q.  Okay.  And if this Annual Policy Summary was
19   in the hands of the trustees in or around June of
20   2012.  They could have looked at that and seen that
21   the Cash Value of the Policy looking at page 3 of 5,
22   which is Bates stamped New York Life 850, that the
23   Cash Value of the Policy had diminished in that prior
24   12 months from 850,000-and-change down to
25   809,000-and-change, correct?

1         ATTORNEY RYAN:  Objection.  Form.  Calls for
2    speculation.  Lack of foundation.
3    **A.  The figures are there on -- if they had one**
4    **against the other they could -- they could see the**
5    **difference.**
6         Q.  (By Attorney Jacobson)  Right.  If they had
7    this in hand, they could see that difference, correct?
8    **A.  Yes.**
9         Q.  And a purpose for mailing these statements,
10   these policy summaries to the customers, to the owners
11   of the Policy, is so that they can look at it and see
12   what's happening and make their decisions based on
13   whatever factors are important to them, correct?
14        ATTORNEY RYAN:  Objection.  Calls for
15   speculation.  Form.
16   **A.  Yeah.  Again, I don't know the purpose,**
17   **whether that's what it's for, whether it's a state**
18   **requirement.  I could tell you that we do send them.**
19        Q.  (By Attorney Jacobson)  All right.  Well, you
20   do send them except when you don't.  When the mail is
21   not delivered, right?
22        ATTORNEY RYAN:  Objection.  Argumentative.
23   **A.  We send them to addresses that we know are**
24   **good.**
25        Q.  (By Attorney Jacobson)  All right.  And if you

1    don't believe the address is good, then you send them
2    directly to archive?
3    **A.  We hold them and wait for the policy owner**
4    **to ask for them when they provide a better address.**
5    **We protect our policy owner's privacy.**
6         Q.  All right.  And then, we've got on page New
7    York Life 853.  We have the premium notice for June of
8    2013?
9         ATTORNEY RYAN:  Bates number?
10        ATTORNEY JACOBSON:  853.
11        ATTORNEY RYAN:  Thank you.
12   **A.  Right.  I see it.**
13        Q.  (By Attorney Jacobson)  Okay.  And again, it's
14   requesting payment of the $750,000.
15   **A.  That's the plan premium, yes.**
16        Q.  Yes.  And again, there is an annual summary,
17   which was "MAIL UNCLAIMED:  Premium Notice archived
18   but not mailed."  Dated the same day or dated 10 days
19   later.
20   **A.  Yeah.  We send the premium notice before the**
21   **anniversary.**
22        Q.  And they're always sent separately, correct,
23   if they're sent?
24   **A.  Yes.**
25        Q.  Same type of information.  And if one were

1  to go to page 3 of this document, which was New York
2  Life 857, one would see that the "NET CASH VALUE" has
3  dropped from 809,000 to 734,000-and-change, right?
4  **A. Again, this has the amount.  You would know**
5  **it dropped by -- comparing one against the other.**
6  **This doesn't tell that you it dropped.**
7  Q.  Well, it says "Decreased by," right?
8  "Increased by" earnings, "decreased by" cost of
9  insurance gives you the Cash Value on June 13th,
10 2012 --
11 **A. Right.**
12 Q.  -- as 809,000, and gives you the Cash Value
13 on June 12, 2013, at $734,509, correct?
14 **A. Okay.  Yeah, so if you -- I was thinking if**
15 **you compared line item from line item, but from the**
16 **top to the bottom, yes.**
17 Q.  No, no, I'm not saying look at the prior
18 year's statement.  I'm saying itself presents that
19 information, correct?
20 **A. Yes.**
21 Q.  All right.  So, each of the Annual Policy
22 Summaries, in fact, shows you what the Cash Value was
23 the year before and what the Cash Value is now?
24 **A. Well, to get very technical, it's actually**
25 **one day before the anniversary.  If you look at the**

1  dates there.
2  Q.  Okay.
3  **A. It's June 13 to June 12.  Next one starts**
4  **June 13 again.  It's just we do them one day before**
5  **the anniversary.**
6  Q.  Okay.  But my question was:  Each of these
7  annual policy statements -- summaries, excuse me,
8  presents to the owner what the Cash Value of the
9  Policy is now and what it was a year before?
10 **A. That's correct.**
11 Q.  And also presents a month-by-month on page 4
12 of 5 of the changes, correct?
13 **A. That's what it shows, yes.**
14 Q.  All right.  And again, on page 5 of 5, it
15 again shows you the term date under the four different
16 scenarios.
17 **A. That's correct.**
18 Q.  All right.  That gets us off of this
19 document.  So, the last exhibit we looked at
20 Exhibit 30, the letter from New York Life didn't
21 include all of the policy -- Annual Policy Summaries
22 and all of the statements.  So, there is another block
23 of documents, which I've just sent you, which is
24 Exhibit 31, which I believe covers all of the Annual
25 Policy Summaries for this Policy from initiation

1  through termination.
2  (Exhibit 31 was identified and marked.)
3  Q.  (By Attorney Jacobson)  It begins at New York
4  Life 470 and continues through New York Life 541.  And
5  I'd ask you to just look at this document and confirm
6  whether or not this is New York Life's records of the
7  Annual Policy Summaries for this insurance Policy for
8  the life of the Policy?
9  **A. Yeah, let me go through.**
10 Q.  Yeah.
11 **A. (Reviewing document).  I see 2002 in here**
12 **twice.  I don't see 2010.**
13 Q.  Okay.  Thank you for that information.
14 We'll have to get those from elsewhere, I guess.
15 Looking at -- going back to the beginning, the first
16 page, the 2001.  All right.
17 **A. I'm there.**
18 Q.  Okay.  It shows that the Policy owner is
19 Mrs. Jean Wiegand, on the left side.
20 **A. Yes.**
21 Q.  And it shows that the Agents are Clinton
22 Vance and Robert Barr, but not Robert Barr, Jr.,
23 right?
24 **A. Yes.**
25 Q.  When we turn to the -- scroll down six pages

1  to the 2001.  So, there's actually two that are
2  prepared 2001, right?  The first one, which is New
3  York Life 470, which has Mrs. Jean Wiegand as the
4  Policy owner.  Then, if you scroll down to page New
5  York Life 474, same date, June 13th, 2001, it shows
6  Herbert Wiegand as the Policy owner?
7  **A. Yeah, I didn't notice that.  They must have**
8  **been joint owners.  We would send one to each owner.**
9  Q.  Was the first one in error since the Policy
10 was never to be owned by Mrs. Wiegand and then
11 reissued one that was corrected?
12 **A. I don't know.  I don't know the answer to**
13 **that.**
14 Q.  Okay.  So, either a correction or a joint
15 issuance?
16 **A. That would be -- that would be why there**
17 **were two of each.**
18 Q.  Okay.  Then we go to the 2002 one, which is
19 on page, New York Life 478, and we have the Wiegand
20 Family LLC as the owner.  Right?
21 **A. Yes.**
22 Q.  And Mr. Robert Barr has been replaced by
23 Robert Barr, Jr.?
24 **A. Yes.**
25 Q.  We get to the 2002.  And we, again, have

Page 154

```
1    Jean Wiegand on page New York Life 482.
2        A.  Right.
3        Q.  And then we go to 2003 on page New York Life
4    486 we have Wiegand Family LLC.  Is there any
5    explanation that you're aware of in the files for why
6    we're having this back and forth here?
7        A.  Let me look here.  They're both for 2002,
8    right, dated January 13th, 2003.
9        Q.  Well, the one with her -- the second one
10   with her name on it is a 2002.  And the one
11   immediately following it for the family LLC is in
12   2003.
13       A.  So, 2002 has the LLC and Jean.  2003 has the
14   LLC.  2004 has the Trust.
15       Q.  Yeah, 2004 is the Trust.  I didn't see
16   anything in the various things that we looked at
17   before explaining these changes.  I was wondering if
18   you had any information on that.
19       A.  I didn't analyze the ownership history on
20   this as part of my work.
21       Q.  Okay.  You're saying 2010 is missing?
22       A.  I didn't see it in here it.  It may be out
23   of order.
24       Q.  Okay.  All right.  Now we saw earlier
25   Eugenia Sprichs contacts about the Policy.  And I'm
```

Page 155

```
1    going to show you now Exhibit 32.  It should be there
2    shortly there.
3             (Exhibit 32 was identified and marked.)
4        A.  Got it.
5        Q  (By Attorney Jacobson) All right.  And this
6    is just a cover email, which is then forwarded to
7    Ms. Dillard, who she then forwards to the IPS service
8    emails, the demand letter, right?
9        A.  Yes.  It's an email from you to Ms. Dillard.
10       Q.  All right.  And this was reflected in the
11   Work Reports we've looked at -- the Work Reports that
12   we looked at before, correct?
13       A.  We'd have to go back and doublecheck, but
14   this sounds -- this sounds familiar.
15       Q.  All right.  So, excluding any conversations
16   that anyone at New York Life might have had with any of
17   its lawyers, whether in-house or outside, what's the
18   normal process when one gets a demand letter from a
19   lawyer for a policy owner?
20       A.  From a policy owner.
21       Q.  From a lawyer for a policy owner.
22       A.  Okay.  I'm -- is a lawyer or a lawyer for?
23       Q.  Lawyer for.  I'm sorry if my sound is not
24   clear, I apologize.
25       A.  That's okay.  I just wanted to be sure.
```

Page 156

```
1        If we got a demand letter from a lawyer for
2    a policy owner, we would have referred that to our
3    Office of General Counsel.
4        Q.  Okay.  That's the general process?
5        A.  Yes.
6        Q.  Okay.  And that's the cover email.  I'm
7    going to show you the demand letter itself in a
8    second.
9             (Exhibit 33 was identified and marked.)
10           ATTORNEY JACOBSON:  Do you have it yet, sir?
11           THE WITNESS:  It just came through.
12           ATTORNEY JACOBSON:  It's a little bit
13   longer.
14           ATTORNEY RYAN:  One second.
15           THE WITNESS:  It's slow to open.
16           ATTORNEY RYAN:  Yep.
17       A.  I see it.  (Reviewing document.)
18           ATTORNEY RYAN:  Is there a question pending?
19           ATTORNEY JACOBSON:  No, I'm waiting for him
20   to open the document.
21           THE WITNESS:  I've opened it.  I'm reviewing
22   it.
23           ATTORNEY RYAN:  Take your time.
24           THE WITNESS:  It's 39 pages here.
25   (Reviewing document.)
```

Page 157

```
1        A.  Okay.  I've reviewed it.
2        Q  (By Attorney Jacobson) Okay.  So my first
3    question is:  New York Life received this demand
4    letter?
5        A.  Yes.
6        Q.  All right.  And, in fact, it entered in its
7    files as shown by the marks in the lower right-hand
8    corner, right?
9        A.  Yes.
10       Q.  And it received it on or about December 10,
11   2021, the date stated?
12       A.  Yeah, it's date December 10.  I don't know
13   what date we received it, but certainly no reason to
14   think it came at any other time.
15       Q.  Okay.  Does New York Life follow different
16   procedures in dealing with demand letters?  Again, I'm
17   not going to ask for anything dealing with legal
18   matters, conversations with lawyers either inside or
19   outside.  But simply on a business level, do you deal
20   with demands differently depending upon the dollar
21   amounts of the demands?
22           ATTORNEY RYAN:  Objection.  Outside of the
23   scope of the topics for which this witness has been
24   designated.  Form.  Foundation.  Calls for
25   speculation.
```

40  (Pages 154 to 157)

 1      A.  Demand letters are pretty rare, and I'd say
 2  that each one is handled differently based on the
 3  circumstances.
 4      Q.  (By Attorney Jacobson) Okay.  And you went
 5  through it, so you looked at the attachments in this.
 6  And these are all Exhibits we've looked at, documents
 7  we've looked at previously today, right?
 8      A.  They look familiar, yes.
 9          (Exhibit 34 was identified and marked.)
10      Q.  All right.  I've sent you a document I've
11  marked as Exhibit 34.  It was a New York Life document
12  NYL417.
13      A.  I've got it.
14      Q.  Could you explain what this document is?
15      A.  This is a Miscellaneous Loss Form.
16      Q.  What's it used for?
17      A.  When we're paying out extra-contractual
18  amounts, this explains why we're doing it.
19      Q.  Okay.  And it would normally be signed in
20  the lower box by someone for approval?
21      A.  Based on the amounts that are listed, the
22  department approver that's who would sign it.
23      Q.  All right.  So, if the amount of the
24  miscellaneous loss says under $150,000.  It's signed
25  by an Appointive Officer.  What's an "Appointive

 1  Officer?"
 2      A.  I'm an Appointive Officer.  Appointive
 3  Officers are Corporate Vice Presidents.  Executive
 4  Officers are Vice Presidents and above.
 5      Q.  I see, okay.  And this one was never signed
 6  because there was no agreement to accept that money,
 7  correct?
 8      A.  That's right.  We would -- we would sign it
 9  and submit it when we issued the check.  It was just
10  prepared in advance.
11          (Exhibit 36 was identified and marked.)
12      Q.  (By Attorney Jacobson) You should be getting
13  shortly Exhibit 36.
14      A.  Got it.  Reviewing it.  (Reviewing
15  document).  I've reviewed it.
16      Q.  Okay.  And this is sent by Lakeisha Dillard
17  to me in my capacity as the lawyer for the Trustees.
18      A.  Yes.
19      Q.  And was this sent by her within the scope of
20  her work and employment for New York Life?
21      A.  Yes.
22      Q.  And per her job, she's authorized to send
23  this kind of letter, correct?
24      A.  Yes.
25          (Exhibit 37 was identified and marked.)

 1      Q.  (By Attorney Jacobson) I just sent you what
 2  is marked as Exhibit 37.  It's 24 pages from New York
 3  Life's files.  First page is New York Life 888.  The
 4  last page is New York Life 911.
 5      A.  I see it.  I'm reviewing it.  (Reviewing
 6  document.)
 7      Q.  Sure.
 8      A.  Okay.  I've reviewed it.
 9      Q.  All right.  Can you tell me what these
10  documents are?  What these pages are?
11      A.  They're all different things.  Would you
12  like me to go through them page by page?
13      Q.  We will.  It seemed to me that this was a
14  log of contacts from people to New York Life.  And
15  sometimes it's memos about it, sometimes the actual
16  contact document.  So, pretty well, does New York Life
17  keep track of all these types of contacts from people
18  calling up regardless of who they are, why they're
19  calling?
20      A.  We don't normally put together anything that
21  looks like this.  I've not seen anything like this in
22  this format before.
23      Q.  Okay.  Well, let's look at the first page
24  then.  Is that a page that looks -- a familiar type of
25  document?

 1      A.  This is -- you may remember earlier, we had
 2  that thing with the little comments and the boxes
 3  around it.
 4      Q.  Yes, sir.
 5      A.  This is a different view of that sort of
 6  thing.
 7      Q.  I see.
 8      A.  These are AWF comments.  I believe I
 9  remember seeing something about "CKGREEN" when we went
10  through that.
11      Q.  Yeah.  Okay.  All right.  So, then the
12  second page going down, there's a blue line in there
13  saying: "3rd party called.  General questions about
14  premium cost with universal life policies."
15          And it looks like that's a June 28, 2016,
16  call; is that right?
17      A.  Yes.  At 9:00 in the morning, yes.
18      Q.  Okay.  Then, if we go to the next page.  We
19  have, it looks like, a fax from someone named "Robert
20  Hall."
21          Do you know what that's about?
22      A.  Robert Hall is saying he's the Power of
23  Attorney for Jean.
24      Q.  He lists this particular Policy and another
25  policy, correct?

Page 162

1    A. Yes.
2    Q. And New York Life didn't take any actions or
3    response to his contact, correct?
4         ATTORNEY RYAN:  Objection.  Form.
5    Foundation.  Outside of the scope.
6    Q (By Attorney Jacobson) Let me rephrase it.
7    Did New York Life take any actions in response to his
8    contact?
9         ATTORNEY RYAN:  Same objection.
10   A. Off the top of my head, I don't know.
11   Q (By Attorney Jacobson) Okay.  Then there is a
12   "DURABLE POWER OF ATTORNEY FOR FINANCIAL MATTERS OF
13   JEAN C. WALTERS."
14   A. Yes.
15   Q. It looks like we've got several pages of
16   those.  Let's go all the way through those.  And we
17   get to the next view from the work flow, which is on
18   page 17 of this exhibit marked as New York Life 904.
19   A. Yes.
20   Q. All right.  And that -- there in the blue
21   note says:  "Spoke w/Nancy Galloway.  Advised we can't
22   discuss 665 because she is not trustee.  She advised
23   Herbert is deceased.  I advised we need to review
24   trust to verify trustees and verify if there were
25   successors appointed for trustees if they were unable

Page 163

1    or unwilling to perform duties.  I did get info on 676
2    because caller owns this policy.  I advised COI and
3    how UL/TL policies work."
4         Did I read that correctly?
5    A. You did.
6    Q. All right.  And what does "COI" stand for?
7    A. Cost of Insurance.
8    Q. Okay.  That's right, you said that before.
9    And "676" is another policy, insurance policy on the
10   life of Jean Wiegand?
11   A. Yes.
12   Q. And then, the next page is the Trust
13   document or POA Trust document.  And then, we go to
14   the next page, page 19, of this document, which is New
15   York Life 906.  And there is the blue comment typed in
16   is:  "3rd party John calling to see if poa has been
17   updated.  Called pol admin spoke to Carla.  She
18   adv" -- I guess that's advised -- poa is in insd and
19   she is not a trustee."
20        Can you translate those fixed comments with
21   the abbreviations for everyone?
22   A. Sure.  John called.  He's a 3rd party.  He
23   was looking to see if the Power of Attorney had been
24   updated on our records.  "TUDEH" spoke with Carla, who
25   works in our Policy Administration Team.  That's the

Page 164

1    team that updates owners and beneficiaries and things
2    like that.  Carla advised "TUDEH" that the POA is on
3    the Insured, not in the Insured.  And that she is not
4    the trustee.
5    Q. All right.  What does POA is in insured, not
6    on the insured?  What does that mean?
7    A. It's a misspelling.  It should be on the
8    insured.
9    Q. Oh, okay.  So the Power of Attorney is the
10   Insured's Power of Attorney, not the Trustee's Power
11   of Attorney.
12   A. Correct.
13   Q. Okay.  And then, the next page, the blue
14   typed note says: "Advised CSR POA doc is for the
15   insured, but the owner of the policy is a trust."
16   A. If you go back to the prior comments, it
17   says Carla advised -- this is Carla.
18   Q. Okay.  Okay.  So, the customer service
19   representation -- someone advised the customer service
20   representation the Power of Attorney documents for the
21   Insured, but the policy is owned by the Trust?
22   A. Right.  Yeah.  This is the other side of the
23   internal conversation.
24   Q. All right.  So, it's the same thing, just
25   from the other person's point of view?

Page 165

1    A. Yeah.
2    Q. Okay.  Gotcha.  And then, the next page of
3    this is New York Life 908, page 21.  This is a letter
4    to Robert Hall from New York Life.
5    A. Yes.
6    Q. All right.  And it's basically informing him
7    of what they discussed internally in the prior pages,
8    which is, that, no, we can't record you as the
9    attorney because your Power of Attorney is for a
10   policy that she doesn't own?
11   A. That is correct.
12   Q. Okay.
13   A. Or I -- actually, she doesn't own the
14   policy.  She doesn't own any of the policies.
15   Q. She doesn't own any of the policies.
16   A. Right.
17   Q. And then the next page, which is New York
18   Life 909, there's a note there from November 16 of
19   2011.  It says:  "Pi calling to make sure still
20   current policy...  She received a letter from NYL re:
21   deceased ex husband... we could not find any of his
22   policies still current, all had claims since he died
23   in the 90s."
24        What does that mean?
25   A. It's a little disjointed.  I can't really

42  (Pages 162 to 165)

Page 166

1 tell you exactly what "LMATZKE" meant to say. But
2 from my reading this is that we got a call from the
3 power -- from the primary insured. She received a
4 letter from New York Life. Now the timing on this, I
5 mean, this is November of 2011. So, I believe that
6 corresponds with the 120-day Unclaimed Mail Letter.
7 The letter was about a deceased ex husband. That's --
8 we didn't send any letter about a deceased ex husband.
9 But it may have listed his name as the trust on it.
10 That may be where that confusion came from.
11     Q. Right.
12         ATTORNEY RYAN: Dont' -- I'd ask you not to
13 speculate, Mr. Elliott. Answer it as best you can.
14     A. Okay. And we could not find any of his
15 policies still current since he had died in the '90s.
16 That's what this says.
17     Q (By Attorney Jacobson) Okay. All right.
18 Then on the next page, page 23, 24, which is New York
19 Life 910. There's a note from November 17, 2020. And
20 this one says -- I'm going to read it, and then you
21 tell me if I got it right. Okay. Received call from
22 stepdaughter of insured/beneficiary Eugenia Sprich.
23 Phone number. The date of death. She asked about the
24 policy. We're talking about the policy number here.
25 Confirmed that the policy expired since August 15,

Page 167

1 2016 since she was a beneficiary. She asked if it
2 paid out. Advised there are no more remaining funds
3 to fund the policy, the Cost of Insurance. She wanted
4 to know who the PO was. Advised not able to release
5 information. Advised since she mentioned there is an
6 attorney, she could try to reach out to the firm. Who
7 was the owner so she could submit appropriate docs to
8 request the p-o-l, policy details. That's what it
9 says.
10     Q. Okay. So, that's sort of like it matches
11 what we've looked at earlier with the correspondence,
12 and the back and forth, and the notes in the Work Flow
13 System, correct?
14     A. This appears to be what precipitated the
15 letter from Ms. Sprich.
16     Q. Okay. So, she called in to find out about
17 this, and was told the Policy's expired. She asked
18 for more information, and they said we can't tell you
19 more information without her showing, that you have
20 got a right to ask.
21     A. That's what this says.
22     Q. Okay. Then we have another full message the
23 next day, November 11th and the -- it says -- the blue
24 text says, and I'll quote. "Received ROD call from
25 Eugenia Sprich requesting info on the policy says she

Page 168

1 is a trustee and needed to know if a signature from an
2 attorney confirming she is the trustee enough.
3 Advised will need paperwork from the trust showing
4 Title, Signature and Notary pages of the Trust,
5 including the pages showing the Trustees and Successor
6 Trustees. Confirmed fax number to send paperwork,"
7 and her phone number.
8     Q. Did I read that correctly?
9     A. Yes.
10    Q. I'm sending you a one-page document, which
11 is stamped New York Life 356.
12        (Exhibit 39 was identified and marked.)
13    Q (By Attorney Jacobson) And it's called
14 "Premium History."
15    A. I got it, yes.
16    Q. So, is this a standard document that New
17 York Life produces internally?
18    A. Yes.
19    Q. And does it track all of the premium
20 payments made on a policy?
21    A. Yes.
22    Q. Is it by policy?
23       Is it by policy owner?
24       How are these organized?
25    A. By policy.

Page 169

1     Q. Okay. And so, here we have just a single
2 policy premium amount of $750,000 paid on June 13,
3 2000?
4     A. It was due June 13. The policy data was
5 processed on June 28th.
6     Q. Okay. So, it was due on the 13th, and the
7 payment was processed on June 28th?
8     A. Correct.
9     Q. Okay. And then there's some abbreviations
10 below, blah, blah, blah, right?
11    A. (Nod of head.)
12    Q. We're getting near the end of my documents.
13 I just sent you a document that's marked as Exhibit
14 40.
15        (Exhibit 40 was identified and marked.)
16    Q (By Attorney Jacobson) It is yet another
17 reissue of the insurance Policy. It's stamped New
18 York Life 648. Let me enlarge that.
19    A. Yeah, 648.
20    Q. Okay. Running through 673.
21    A. I've got it.
22    Q. Now I'll direct your attention, if I could,
23 to the 22nd page of this Exhibit 40.
24    A. I'm there.
25    Q. Now here the endorsement says: "This policy

Page 170

1  is issued in place of a previously issued policy with
2  the same policy number which was lost, as shown in the
3  evidence filed with us."
4      Do you see that?
5  A.  Yes.
6  Q.  And this was issued on June 28, 2022.
7  A.  Yes.
8  Q.  Is it typical at New York Life to reissue
9  policies years after they've expired?
10  A.  Yes.
11  Q.  Okay.  It seemed unusual to me.
12  A.  Yeah.  We --
13      ATTORNEY RYAN:  There's no question pending,
14  Mr. Elliott.
15      ATTORNEY JACOBSON:  I was going to finish my
16  question.
17  Q.  (By Attorney Jacobson) What is the business
18  purpose of doing so?
19  A.  We would produce a policy if someone was to
20  ask for a copy if we needed to read one internally.
21  Q.  Okay.  And the reissued policy would be the
22  same in all respects other than the Endorsement of the
23  policy previously issued, correct?
24  A.  For things like ownership and beneficiary,
25  it will reflect what's on record at that time.

Page 171

1  Q.  But the terms of the policy itself won't
2  change?
3  A.  The terms of the policy don't change.
4  Q.  All right.  I had sent you previously, but I
5  will send you again, the Notice of Corporate Rep
6  Deposition because there's a few topics that we have
7  not touched upon yet.
8      ATTORNEY RYAN:  How are you doing on breaks,
9  Mr. Elliott?
10      THE WITNESS:  You know, I think it's about
11  time.  I think I need to use the restroom.  It's been
12  an hour.
13      ATTORNEY JACOBSON:  Whatever you need, you
14  just let me know.  We'll take a break.
15      (Recess.)
16      COURT REPORTER:  We are back on the record.
17  Q.  (By Attorney Jacobson) So you have in front
18  of you the Second Amended Notice of Rule 30(b) 6
19  Deposition.
20  A.  Yes.
21  Q.  All right.  And you had a chance to look at
22  this before your deposition, right, during
23  preparation?
24  A.  Yes.
25  Q.  These are topics that we have, in large

Page 172

1  part, covered already, but I want to go through it and
2  make sure we've covered what you have to say fully on
3  these.  Okay.  All right.  Turning to the second page
4  of this on Topic 3.  The letter from Ms. Dillard dated
5  February 2, 2021, which we've just talked about at
6  length.
7      Have we talked about everything that New
8  York Life has to say about the work that was done?
9      ATTORNEY RYAN:  I'll object to the form of
10  the question.  If you've got additional questions to
11  ask the witness on this particular topic, feel free to
12  do so.  But that is an unfair question to ask him if
13  he's got anything further to say.
14      ATTORNEY JACOBSON:  That's not unfair.
15      ATTORNEY RYAN:  Yes, it is.
16      ATTORNEY JACOBSON:  No, it isn't.
17  Q.  (By Attorney Jacobson) Do you have anything
18  else to say regarding the preparation of Ms. Dillard's
19  letter to Ms. Sprich?
20      Any other facts that we haven't talked about
21  yet?
22      ATTORNEY RYAN:  Same objection.
23  A.  No.
24  Q.  (By Attorney Jacobson) Okay.  With regard to
25  paragraph 4, the policies and procedures.  You gave a

Page 173

1  pretty detailed explanation of those procedures.  Is
2  there anything -- now that we're at the end of the
3  deposition, anything else that you would add to that?
4  A.  No.
5  Q.  Okay.  Does -- on No. 6, does New York Life
6  keep any recordings of the conversations with the
7  people who call in?
8  A.  We -- we do have phone recordings.  How long
9  we retained them has varied over the years.
10  Q.  All right.  Is there -- at this point in
11  time, how long do you typically retain those calls, do
12  you know?
13  A.  Recently, we've gone to retaining them for
14  the life of the policy, but that's a very recent
15  thing.
16  Q.  What was it, let's say, five years ago?  How
17  long did you keep those calls?
18  A.  I don't know the answer to that.
19  Q.  Okay.  Do you know whether New York Life has
20  any recordings of conversations with the lawyers for
21  the Trust regarding this Policy?
22  A.  I don't know the answer to that.
23  Q.  Okay.  You haven't seen any, though?
24  A.  I haven't seen any.
25  Q.  Okay.  Regarding paragraph No. 7 here, is

44  (Pages 170 to 173)

Page 174

1  that one invoice that we looked at that was returned,
2  the only letter that was returned by the US Postal
3  Service, or other mail carriers, New York Life on this
4  policy?
5  **A. Based on my research, that's the only thing**
6  **that I saw that was returned, yes.**
7  Q. Okay. Were any -- going to paragraph 8,
8  Topic 8. We looked at those various lapse letters.
9  Were the lapse letters sent to any address
10  other than the 9 Huntleigh Woods?
11  **A. I don't see any lapse letters going anywhere**
12  **else. That was our last known address. That's the**
13  **place we would have sent them.**
14  Q. Okay. On paragraph 9 with regard to that
15  $25,000. I think you've explained that the $25,000
16  Cash Value at the time of termination was used to pay
17  down part of the expense for continuing insurance for
18  July and August of that year; is that correct?
19  **A. That's correct. There wasn't enough to keep**
20  **the Policy in force under its regular terms. It was**
21  **kept in force under its grace period terms, and that's**
22  **what that money is used to cover.**
23  Q. Is that the standard policy and procedure of
24  New York Life in that situation?
25  **A. Yes.**

Page 175

1  Q. Are there any other policies or procedures
2  New York Life would follow with regard to Cash Value
3  in a policy that's insufficient to cover premiums?
4  **A. We -- we don't have any policies or**
5  **procedures other than what took place in this that I'm**
6  **aware of.**
7  Q. All right. Could you explain the nature of
8  the business relation -- this is paragraph 10 -- the
9  nature and the business relationship between New York
10  and NYLIAC?
11  **A. NYLIAC is a wholly-owned subsidiary of New**
12  **York Life. I don't know whether they have their own**
13  **employees. I work for New York Life insurance.**
14  Q. All right. Does New York Life appoint a
15  NYLIAC board?
16  **A. I don't know the answer to that.**
17  Q. All right. Topic 10 did ask whether NYLIAC
18  has any employees of its own. That was one of the
19  subjects of paragraph 10. But you're saying you don't
20  know. Did you investigate that issue?
21  **A. I spent a lot of time preparing for this**
22  **deposition. I made a good faith effort to cover**
23  **everything.**
24  Q. I'm not doubting you.
25  **A. I did not investigate whether we have NYLIAC**

Page 176

1  employees.
2  Q. All right.
3  ATTORNEY JACOBSON: Dan, I don't want to
4  waste his time. Would it be possible for you to just
5  check and send me a letter one way or the other as to
6  whether or not NYLIAC has any employees of its own
7  beyond simply the entity that owns and issues
8  policies?
9  ATTORNEY RYAN: I'll look into it, Joe.
10  ATTORNEY JACOBSON: I appreciate it.
11  ATTORNEY RYAN: It doesn't seem like a big
12  deal.
13  Q. (By Attorney Jacobson) To your knowledge, did
14  NYLIAC normally operate and communicate with its
15  policyholders through New York Life employees such as
16  yourself?
17  **A. Yes.**
18  Q. Okay.
19  ATTORNEY RYAN: Does that answer your
20  question now?
21  ATTORNEY JACOBSON: I think so.
22  Q. (By Attorney Jacobson) So, it was nothing odd
23  for a New York Life employee to be communicating with
24  policyholders who have a NYLIAC policy, correct?
25  **A. That's correct. All the service work on**

Page 177

1  these policies is handled by me or New York Life
2  employees.
3  Q. Yes.
4  ATTORNEY JACOBSON: Dan, you don't have to
5  look that up. That answers the question for me.
6  ATTORNEY RYAN: Yeah, typical.
7  Q. (By Attorney Jacobson) In the trust
8  address -- in the Change of Address Form for the
9  Trust, the street address of 165 North Meramec was
10  mistyped with the final "C" and "E" reversed in order.
11  Did that misspelling, in any way, impact New York Life
12  or NYLIAC's ability to make written communications to
13  the Trust?
14  ATTORNEY RYAN: Objection. Calls for
15  speculation. Form. Answer it as best you can.
16  **A. The misspelling wouldn't have been an issue.**
17  **We have a system which would go and correct addresses**
18  **if we have a misspelling like that. It was**
19  **overlooked. We overlooked the address change.**
20  Q. (By Attorney Jacobson) And you never
21  attempted to send anything to the Meramec address,
22  whether it was spelled correctly or incorrectly,
23  correct?
24  **A. We overlooked the address change.**
25  Q. My question was slightly different. You

Page 178

1 never attempted to send anything to the Meramec
2 address whether it was spelled correctly or not
3 correctly, correct?
4    **A.  Yes.**
5    Q.  Thank you.  I think we've already talked
6 about whether Clinton Vance or Mr. Barr were Agents of
7 New York Life.
8    Do you know whether Heidi Vance, his wife,
9 was also an Agent?
10   **A.  I don't believe she was.**
11   Q.  Okay.  As authorized Agents of New York Life
12 and NYLIAC, were they authorized when CU change in
13 ownerships and addresses for life insurance policies?
14   **A.  Yes.**
15   Q.  And were authorized to communicate with the
16 policy owners about the policies and the terms of the
17 policies?
18   ATTORNEY RYAN:  Objection.  Vague.
19 Ambiguous.  Object as to form.  Lack of foundation.
20   **A.  I know they're able to communicate some**
21 **things, like status of request.  This has been done,**
22 **and here's what you need to process a change.  I don't**
23 **know the full extent of what they're authorized to**
24 **communicate.**
25   Q.  (By Attorney Jacobson) Maybe more specific.

Page 179

1 Are they authorized to communicate with the policy
2 owners what the terms of the policy are?
3    ATTORNEY RYAN:  Same objection.  Form.
4 Foundation.
5    **A.  They deliver the policy contract.  The**
6 **contract does all the terms in it.  They could review**
7 **it with the customer, but the contract has the terms**
8 **of it.**
9    Q.  (By Attorney Jacobson) All right.
10 Paragraph 14, I asked you -- or I rather asked New
11 York Life to provide a witness who could testify to
12 whether Clinton Vance was an authorized agent of New
13 York Life and NYLIAC in July and August of 2002.
14   **A.  Are you asking me if he was?**
15   Q.  Yes.
16   **A.  Yes.**
17   Q.  Okay.  At that time, was he authorized to
18 communicate with the owner of the life insurance
19 policies about those policies?
20   ATTORNEY RYAN:  That's vague and ambiguous.
21   **A.  The same answer as before.  They were**
22 **able -- there were some things I know they were able**
23 **to communicate with because there were things that I**
24 **worked with in service.  I don't know the full extent**
25 **of what they're able to communicate with them about.**

Page 180

1    Q.  (By Attorney Jacobson) Okay.  That's all
2 right.  Do they have authorization to communicate with
3 the trust -- did they have authorization to
4 communicate with the trustee about the policy in July
5 or August of 2002?
6    ATTORNEY RYAN:  Objection.  Vague.
7 Ambiguous.  Calls for a legal conclusion.
8    **A.  The trustees weren't the owners in 2002,**
9 **were they?  Yes.**
10   Q.  (By Attorney Jacobson) Or I should say the
11 Trust owned it, didn't it?
12   ATTORNEY RYAN:  No.
13   **A.  Not until 2003.**
14   Q.  (By Attorney Jacobson) Okay.  All right.  The
15 first topic was the factual basis for each denial,
16 independent answers of each paragraph of the petition,
17 complaint.  I sent you, and-- let me send it to you
18 again so it's right at the top of your thing, the
19 answer that was filed.
20   (Answers identified but not marked as
21   an Exhibit.)
22   Do you have it there, sir?
23   **A.  I've got it.**
24   Q.  All right.  If you could turn to page 5 of
25 the answer, paragraph 15.

Page 181

1    **A.  I'm there.**
2    Q.  All right.  Paragraph 15 alleges:  "The
3 Policy had a Cash Value.  The Cash Value at any point
4 in time equaled the initial premium, plus any
5 additional premiums paid (net of premium expense
6 charges), increased by interest earned, less the
7 cost-of-insurance charges, less fees and other
8 charges."
9    Do you see that?
10   **A.  Yes.**
11   Q.  And the answer, the Defendants deny that
12 paragraph 15 fully and accurately describes that
13 portion of the Policy.  So, I'm asking you in what way
14 is paragraph 15 incomplete or inaccurate in its
15 description of Cash Value?
16   ATTORNEY RYAN:  I'll object insofar as you
17 didn't read the full answer to that particular
18 allegation, which includes Defendants admit that the
19 allegations in paragraph 15 purport to summarize a
20 portion of the policy.
21   ATTORNEY JACOBSON:  Right.
22   ATTORNEY RYAN:  And I also object on the
23 basis that the policy speaks for itself.
24   ATTORNEY JACOBSON:  Yeah, it denies that it
25 fully and accurately does so, and that's what I'm

46  (Pages 178 to 181)

Page 182

```
 1   focused on.
 2       Q.  (By Attorney Jacobson) New York Life and
 3   NYLIAC deny that paragraph 15 accurately describes
 4   that portion of the policy.  And so I'm asking you:
 5   In what respect it is incomplete or inaccurate so that
 6   I can understand the policy better.
 7           ATTORNEY RYAN:  Counsel, you spent several
 8   minutes, if not an hour going through the policy and
 9   how it works.  This witness was, I think, very helpful
10   in that regard in describing the workings of this
11   policy and the terms and conditions.  Answer the best
12   you can, though.
13       A.  Well, I'll give you one thing where it fails
14   to fully and accurately describe it.  It doesn't talk
15   anything about the surrender charges.  We spent a lot
16   of time reading the contract to describe when this is,
17   at any time, equal the initial premium.  But during
18   the first 10 years, that's not what it would have
19   equaled.
20       Q.  (By Attorney Jacobson) Right.  But that
21   surrender Cash Value is different than the Cash Value,
22   correct?  It's a separately defined term in the
23   Policy, right?
24       A.  The surrender Cash Value is different than
25   the Cash Value, yes.
```

Page 183

```
 1       Q.  All right.  And this paragraph is about the
 2   Cash Value, not surrender Cash Value, correct?
 3       A.  Yes.
 4       Q.  Okay.  So, setting aside what surrender Cash
 5   Value, additional work might be needed to better
 6   define that, is there anything in this paragraph that
 7   is not fully or accurately describing Cash Value?
 8       A.  I can't spot anything at this moment.  Let
 9   me go back and just adjust one thing.
10       Q.  Yes, sir.
11       A.  The Cash Value at any point in time equaled
12   the initial premium, net of premium expense charges.
13   Not just premium expense charges and the additional
14   premium's paid.
15       Q.  All right.  So there are premium expense
16   charges taken out of the initial premium as well?
17       A.  Every premium.
18       Q.  Okay.  Thank you.
19           Now you remember we, on a couple of
20   occasions, read Section 8.15 of the policy.
21       A.  Will you refresh me which one that is.
22       Q.  That is how -- about the report.  Each
23   policy year after the first year policy is in force
24   and the Insured is living, we will send a written
25   report to you in 30 days after the policy anniversary.
```

Page 184

```
 1   Remember that one?
 2       A.  I do remember that, yes.
 3       Q.  All right.  Does that provision accurately
 4   state the Insured's obligation to provide a written
 5   report each year concerning the policy?
 6           ATTORNEY RYAN:  Objection.  Calls for a
 7   legal conclusion.  Form.
 8       A.  Yeah, I don't know what our obligation is.
 9   That's what the contract says we will do.
10       Q.  (By Attorney Jacobson) Okay.  What the
11   contract said you did is what I mean by "obligation."
12   All right.  I'd like to direct you to page 31 of the
13   Answer Affirmative Defenses.
14       A.  Okay.
15       Q.  Which is where New York Life alleges certain
16   Affirmative Defenses.
17       A.  I'm going to ask you what you know about the
18   factual basis of these.
19           ATTORNEY RYAN:  One second, Joe.
20           ATTORNEY JACOBSON:  Sure thing.
21       A.  (Reviewing document).
22           ATTORNEY RYAN:  Okay.
23       Q.  (By Attorney Jacobson) Are you -- are you
24   familiar with the Affirmative Defenses, in this case,
25   in the Answer?
```

Page 185

```
 1       A.  I've read them.
 2       Q.  All right.  Are you familiar with them?  Do
 3   you understand them?
 4           ATTORNEY RYAN:  Objection.  Calls for a
 5   legal conclusion.
 6       Q.  (By Attorney Jacobson) Let me rephrase it.
 7   Do you believe you understand them?
 8       A.  I understand them as a layman.
 9       Q.  Yeah, that's what I was expecting.
10           Did you prepare to testify about any of them
11   as the representative of New York Life and NYLIAC?
12       A.  Yes.
13       Q.  All right.  What did you do to prepare to
14   answer these?
15       A.  We met with the attorneys.
16       Q.  Okay.
17       A.  Spent quite a bit of time preparing for
18   these.
19       Q.  Okay.  Looking at the Third Affirmative
20   Defense, which says:  "Any damage or loss, if any, was
21   the result of the negligence or the acts or omissions
22   of third parties over which Defendants exercise no
23   control, including Plaintiffs and the prior attorneys
24   for the trust."
25           Do you see that?
```

47  (Pages 182 to 185)

Page 186

1    A. I do.
2    Q. Can you tell me what facts New York Life
3  relies upon to make this Affirmative Defenses?
4        ATTORNEY RYAN: Objection. Calls for a
5  legal conclusion, and opinion testimony.
6    A. The attorney for the Trust received a letter
7  from us subsequent to the request for address change
8  that showed the prior address change, and they did not
9  let us know that we had overlooked that. The attorney
10 for the Trust submitted a request for duplicate
11 policy, that's all they asked for. They didn't ask us
12 to change the address.
13   Q. (By Attorney Jacobson) You mean the second
14 request for a duplicate policy?
15   A. That.
16   Q. I'm trying to make sure I understand.
17   A. Yeah. The one that had the cover letter
18 with the address change.
19   Q. Okay. Your Fourth Affirmative Defense is:
20 "Defendants allege that Plaintiffs' losses, injuries,
21 or damages (if there were any losses, injuries, or
22 damages) were proximately caused by Plaintiffs,
23 constituting an intervening or superseding cause, and
24 precluding liability of Defendants."
25       Can you tell me what facts New York Life and

Page 187

1  NYLIAC rely on for this Affirmative Defense?
2        ATTORNEY RYAN: Same objection. Calls for a
3  legal conclusion.
4    A. This is beyond my understanding as a layman.
5    Q. (By Attorney Jacobson) Okay. Your fifth
6  Affirmative Defense is: "Defendants did not knowingly
7  commit any wrongful act or omission relevant to this
8  action. Defendants exercised due care and diligence
9  with respect to all matters alleged in the Petition,
10 and no act or omission, if any, by Defendants was
11 cause of any harm alleged in the Petition."
12       Do you see that?
13   A. I do.
14   Q. Can you tell me what facts New York Life and
15 NYLIAC rely on to make this Affirmative Defense?
16       ATTORNEY RYAN: Same objection. Answer as
17 best you can.
18   A. We didn't knowingly commit any wrongful act.
19   Q. (By Attorney Jacobson) All right.
20   A. We didn't knowingly commit an omission.
21   Q. All right.
22   A. It was an oversight.
23   Q. So, each time you said "knowingly." Would
24 you agree that New York Life unknowingly,
25 unintentionally failed to process the address change

Page 188

1  that was submitted?
2    A. We received --
3        ATTORNEY RYAN: Same objection. Go ahead.
4    A. We received the request to change the
5  address, and we overlooked it. We didn't process it.
6    Q. (By Attorney Jacobson) All right. So, is
7  that a "yes" that unintentionally failed to process
8  it?
9        ATTORNEY RYAN: Objection. The question has
10 been asked and answered.
11       ATTORNEY JACOBSON: It wasn't answered.
12 That's why I asked it again.
13       ATTORNEY RYAN: Oh, it was.
14   A. We received an address change, we overlooked
15 it, did not process it.
16   Q. (By Attorney Jacobson) All right. On your
17 seventh -- excuse me -- the Sixth Affirmative Defense
18 says: "Plaintiffs have failed, neglected and/or
19 refused to take reasonable and/or necessary steps to
20 mitigate any damages allegedly incurred as a result of
21 Defendants' alleged conduct, if any, thus barring, or
22 at least reducing, any recovery in had action."
23       Can you tell me what facts New York Life and
24 NYLIAC rely upon in making this Sixth Affirmative
25 Defense?

Page 189

1        ATTORNEY RYAN: Objection. Calls for a
2  legal conclusion. And attorney-client privileged
3  communication as well as Work Product Doctrine.
4        Answer it as best you can.
5    A. The Trustees should have realized they
6  weren't receiving their statements, their bills. The
7  attorney for the Trustee should have received, should
8  have realized they weren't receiving the
9  correspondence. This is -- this is a life insurance
10 policy that they had been entrusted to take care of.
11 When they stopped receiving the paperwork, they -- I
12 think it would have been a reasonable step for them to
13 take to call us.
14   Q. (By Attorney Jacobson) Are you aware of any
15 term in the contract, the policy that would require
16 them to call you if they had not received the Annual
17 Policy Summaries from New York Life?
18   A. I'm not familiar with anything in the
19 contract that says it, but we didn't say they were
20 contractually obligated to. We said they failed to
21 take reasonable steps.
22   Q. So, you agree that New York Life is
23 contractually obligated to send the annual summary
24 statements, correct?
25       ATTORNEY RYAN: Objection. Calls for a

48  (Pages 186 to 189)

Page 190

1  legal conclusion.  Legal opinion.  Outside the scope.
2  Calls for attorney-client privileged communications
3  and Work Product Doctrine.
4        Answer as best as you can.
5     A.  The policy says we will send those
6  statements on an annual basis.
7     Q  (By Attorney Jacobson) On the Eighth
8  Affirmative Defense, New York Life and NYLIAC say:
9  "Plaintiffs, by their acts and conduct or the acts or
10  conduct of their agent(s), have waived any rights to
11  bring the Petition, and each and every claim for
12  relief contained therein."
13        Do you see that?
14     A.  I see that.
15     Q.  All right.  What are the facts that New York
16  Life and NYLIAC rely on in support of this 8th
17  Affirmative Defense?
18        ATTORNEY RYAN:  Objection.  Calls for a
19  legal conclusion.  Attorney-client privilege.  Work
20  Product Doctrine.
21     A.  Yeah, this outside my ability as a
22  layperson.  I don't understand all the legal -- all
23  the legal parts -- all the legal implications of this.
24     Q  (By Attorney Jacobson) Okay.  Look at the
25  Ninth Affirmative Defense, which says:  "The Petition,

Page 191

1  and each and every claim for relief contained therein,
2  is barred by the doctrine of estoppel."
3        Do you see that?
4     A.  I do.
5     Q.  All right.  Can you tell me what facts New
6  York Life and NYLIAC rely on for this Ninth
7  Affirmative Defense?
8        ATTORNEY RYAN:  Objection.  Legal
9  conclusion.  Attorney-client -- attorney-client
10  privileged communication, Work Product Doctrine.
11  Answer as best you can.
12     A.  Again, this is very specific legal terms
13  here.  It's not something that a layperson can -- can
14  explain.
15     Q.  (By Attorney Jacobson) All right.  You are a
16  layperson, but you're also here as the corporate
17  representative of both New York Life and NYLIAC,
18  right?
19        ATTORNEY RYAN:  Objection.  Argumentative.
20     Q.  (By Attorney Jacobson) It's step-by-step.  Is
21  that correct?  Right, sir?
22     A.  I am.
23     Q.  All right.  And you were given in advance a
24  Second Amended Notice of Rule 30(b) 6 Deposition
25  laying out the various topics that you'd be asked

Page 192

1  about, correct?
2     A.  Yes, I was.
3     Q.  And one of those was the second paragraph of
4  that was the factual basis for each Affirmative
5  Defense asserted in Defendant's answer to the petition
6  and the Complaint.  Correct?
7     A.  Yes.
8     Q.  All right.  Can you tell me what steps you
9  did other than talk to the lawyer?
10        Well, I'm not asking about what you said to
11  the lawyer.  But what steps you did to prepare
12  yourself to answer these issues that are beyond your
13  scope as a layman.
14        ATTORNEY RYAN:  Objection.  Asking for
15  attorney-client privileged communication.  Work
16  Product Doctrine.
17        You can answer as best you can.
18     A.  We reviewed these.
19     Q  (By Attorney Jacobson) You reviewed it with
20  someone, but you didn't come up with the understanding
21  of what facts might support these claims; is that
22  right?
23        ATTORNEY RYAN:  Same objection.
24  Attorney-client privileged communication.  Work
25  Product Doctrine.

Page 193

1     A.  I don't understand the legal terms well
2  enough to be able to explain.
3     Q.  (By Attorney Jacobson) Okay.  The Tenth
4  Affirmative Defense is:  "The Petition is barred by
5  the doctrine of unclean hands."
6        Do you see that?
7     A.  I do.
8     Q.  All right.  Can you tell me what facts New
9  York Life or NYLIAC rely on in making this Tenth
10  Affirmative Defense?
11        ATTORNEY RYAN:  Same objection.  Can I have
12  a continuing objection on all these questions,
13  Counselor?
14        ATTORNEY JACOBSON:  Absolutely.
15        ATTORNEY RYAN:  Thank you.
16        So with that, Mr. Elliott, go ahead and
17  answer these questions to the best of your ability.
18  I've got my objection on record as to all of these
19  questions on the Affirmative Defenses based upon
20  attorney-client privileged communication, Work Product
21  Doctrine, and calls for a legal conclusion.  Thank
22  you.  Go ahead.
23     A.  The Trustees have a duty to represent -- the
24  interest of the Trust, the attorney for the Trustees
25  likewise has a duty.  They failed to do their duty to

49  (Pages 190 to 193)

1 exercise reasonable steps to make sure that they were
2 getting information on this.
3     Q.  (By Attorney Jacobson)  Okay.  So that's the
4 basis of the unclean hand Affirmative Defense No. 10?
5     A.  To the best of my understanding of it, yes.
6     Q.  Okay.  The Eleventh Affirmative Defense
7 says: "Defendants allege that Plaintiffs' Petition is
8 barred by doctrine of laches."
9         Do you see that?
10    A.  Yes.
11    Q.  All right.  Do you know what "laches" refers
12 to?
13    A.  I do not know what "laches" are.
14    Q.  Do you know what the factual basis is for
15 New York Life and NYLIAC asserting this defense?
16    A.  I do not.
17    Q.  All right.  Twelfth Affirmative Defense
18 says: "Defendants allege that the Petition as a
19 whole, each and every claim for relief alleged
20 therein, and the damages alleged are fatally uncertain
21 and speculative as to the state of mind of Plaintiffs'
22 or what they may have done in the past."
23        Do you see that?
24    A.  I do.
25    Q.  Can you tell me what facts New York Life or

1 NYLIAC relied upon in asserting this Twelfth
2 Affirmative Defense?
3     A.  We have no idea what the Plaintiffs would
4 have done at any time.  There's not any way for us to
5 know.
6     Q.  Is there any way for the Plaintiffs to know,
7 in your opinion?
8     A.  That I don't -- I don't know what they would
9 know.
10    Q.  Okay.  The Thirteenth Affirmative Defense
11 says:  Any damages awarded to Plaintiffs and/or any
12 benefits due under the policy is subject to offset
13 with respect to unpaid premiums due and/or other
14 deductions for adjustments --
15        (Cell phone ringing.)
16        ATTORNEY JACOBSON:  Excuse me.  Let me start
17 to read again.  I thought I had my ringer off.
18    Q.  (By Attorney Jacobson) It begins:  "Any
19 damages awarded to Plaintiffs and/or any benefits due
20 under the policy is subject to offset with respect to
21 unpaid premiums due and/or other deductions or
22 adjustments in accordance of the terms of the policy."
23        Do you see that?
24    A.  Yes.
25    Q.  Can you tell me what facts New York Life and

1 NYLIAC rely upon in making this Thirteenth Affirmative
2 Defense?
3     A.  The insured lived past the age of maturity.
4 To get it, to make any kind of claim on this Policy
5 would either be a death benefit if she had died before
6 the age of maturity or the Cash Value after that date.
7 To be in force at that date, they would have had to
8 pay -- it would have been much -- it would have been a
9 lot of premium due to keep the Policy in force and not
10 to pay out a contractual claim on this.
11    Q.  All right.  Do you understand that the
12 Plaintiffs' claim is that if they had received the
13 annual statements, they would have surrendered the
14 Policy long before it expired?  Do you understand
15 that's the claim?
16        ATTORNEY RYAN:  Objection.  Mischaracterizes
17 the Complaint, and mischaracterizes the answers to
18 interrogatories as to Plaintiffs' damages theory in
19 this case.  And it calls for a legal conclusion as
20 well.
21        Answer it as best you can.
22    A.  I understand they're saying that if they had
23 known, they might have done something different.
24    Q.  (By Attorney Jacobson) Okay.  You have a
25 Fourteenth Affirmative Defense that says:  "Plaintiffs

1 are barred from obtaining the relief sought in the
2 Petition because Plaintiffs and/or their agent(s), by
3 their acts or words, consented to and/or ratified the
4 conduct in connection with the matters alleged in the
5 Petition, including consenting, approving and/or
6 ratifying the lapsing of the Policy."
7         Do you see that?
8     A.  I do.
9     Q.  Can you tell me what facts New York Life and
10 NYLIAC rely on in making this Fourteenth Affirmative
11 Defense?
12    A.  If I remember correctly, the acts were that
13 we notified the attorney for the Trust that we still
14 have the Huntleigh Woods address on record, and they
15 didn't take any action to fix it.
16    Q.  So, that's what it's tied to is that letter
17 to the lawyer?
18    A.  I believe that's what this was, yes.
19    Q.  Okay.  The Fifteenth Affirmative Defense
20 says: "Defendants are informed and believes and
21 thereon allege that the Defendants breached no
22 contract resulting in damages of relief Plaintiffs
23 claim, and the Petition also fails to establish that
24 Defendants committed a breach of the contract."
25        Do you see that?

Page 198

1    A.  Yes.
2    Q.  Can you tell me what facts, if any, New York
3  Life and NYLIAC rely upon in making this Fifteenth
4  Affirmative Defense?
5    A.  I don't understand the legal term of
6  "breached" well enough to explain.
7    Q.  Okay.  How about the Sixteenth Affirmative
8  Defense where it says:  "Defendants have performed all
9  obligations owed by it under the contract, which
10  accordingly bars any and all claims by Plaintiffs."
11    Do you have knowledge about what facts, if
12  any, New York Life and NYLIAC rely on in making this
13  Sixteenth Affirmative Defense?
14    A.  We accepted the premium that was paid.  We
15  kept the policy in force for as long as we were
16  supposed to.  We sent letters as long as we had a good
17  address.  Once the Post Office said that the address
18  was no good, to protect the privacy of the owner, we
19  stopped sending notices there.  The only notices that
20  we sent beyond the notices saying that it was mail
21  that was unclaimed, were the lapse notices and
22  foreclosure statement, which is contractually provided
23  for.
24    Q.  Okay.  Look at the Seventeenth Affirmative
25  Defense which says: "plaintiffs failed to give

Page 199

1  adequate notice of any alleged breach of contract and
2  any notice herein was not given in a reasonable time
3  after discovery of said alleged claim.  By reason of
4  said failure to notify, Plaintiffs are barred from a
5  right of recovery from Defendants."
6    Do you see that?
7    A.  Yes.
8    Q.  Can you tell me what New York Life and
9  NYLIAC rely on for this Seventeenth Affirmative
10  Defense?
11    A.  The breach of contract thing, again, that's
12  another -- that's another legal thing I don't know.  I
13  can't speak with any kind of certainty on.
14    Q.  All right.  Let me ask you a further
15  question on this thing.  Is New York Life and NYLIAC
16  saying that if Plaintiffs had discovered this problem
17  some time in the past long before they made the
18  request for information?
19    ATTORNEY RYAN:  Objection.  Mischaracterizes
20  his testimony.
21    Q  (By Attorney Jacobson) I'm asking him a
22  question.  Are you saying is that part of the argument
23  is that they, in fact, knew about these problems
24  months or years before the claim was made?
25    A.  They should have known because they weren't

Page 200

1  receiving the statements.
2    Q.  All right.  The question wasn't whether they
3  should know.
4    My question was:  Is New York Life and
5  NYLIAC alleging that the Plaintiffs knew, in fact,
6  knew about the problems months or years before they
7  made their claim to New York Life?
8    A.  Again, I'm not an attorney, but I believe
9  that's the case.
10    Q.  All right.  So New York Life is saying that
11  they knew about the problem long before they made a
12  claim?
13    ATTORNEY RYAN:  Objection.  Mischaracterizes
14  the facts.  There's been no evidence of a claim being
15  made under this Policy.
16    A.  And it says:  "Adequate notice."  It doesn't
17  say long before.
18    Q  (By Attorney Jacobson) All right.  Nineteenth
19  Affirmative Defense -- excuse me.  Eighteenth
20  Affirmative Defense.  It says:  "Defendants are not
21  liable under V.A.M.S. Section 375.420 (375.420 RSMo)
22  and 375.296 RSMo as any delay in resolving Plaintiffs'
23  claim was not unreasonable or vexatious."
24    That's referring to particular statutes,
25  blah, blah, blah.  Are you aware of any facts that New

Page 201

1  York Life or NYLIAC are relying on in support of this
2  Eighteenth Affirmative Defense?
3    A.  There were no claims while the Policy was in
4  force.  As soon as the owner reached out to us, we did
5  a full investigation provided the information that was
6  requested in a reasonable period of time.
7    Q.  Is that the facts then that you rely upon
8  for saying that there was no reasonable vexatious
9  delay?
10    A.  Yes.
11    Q.  And do you believe that Plaintiffs' claims
12  were resolved?
13    ATTORNEY RYAN:  Objection.  Foundation, and
14  form.
15    Q  (By Attorney Jacobson) Well, the Affirmative
16  Defense says, "resolving Plaintiffs' claim."  Right.
17  So, my question is:  Was Plaintiffs' claim resolved?
18    ATTORNEY RYAN:  Same objection.
19    A.  We responded whether, you know, with -- with
20  what we -- with what I just described.
21    Q  (By Attorney Jacobson) Is that -- I don't
22  think you answered the question, though.
23    Was the claim resolved?
24    A.  We made an offer.  It wasn't expected.
25    Q.  You consider that resolved?

51  (Pages 198 to 201)

1   **A.  Yes.**
2        ATTORNEY RYAN:  Objection.  Argumentative.
3        Q   (By Attorney Jacobson) The Nineteenth
4   Affirmative Defense is:  "Defendants' contractual
5   obligations arising from the subject Policy at issue
6   between are excused based upon the conduct of the
7   Plaintiffs and/or their agent(s) which has impeded,
8   interfered with and prevented Defendants from
9   completing the contract barring the Plaintiffs' claims
10  partially or in their entirety."
11       Do you see that?
12  **A.  Yes.**
13       Q.  Can you tell me what facts New York Life and
14  NYLIAC rely upon in making this Nineteenth Affirmative
15  Defense?
16  **A.  When we provided the attorney for the Trust,**
17  **the letter that said the Huntleigh Woods address, and**
18  **they didn't let us know we were impeded and interfered**
19  **with getting a better address on there, getting the**
20  **address change on there.**
21       Q.  Well, you already had the new address,
22  right?
23       ATTORNEY RYAN:  Objection.  Argumentative.
24  **A.  We had it.  We overlooked it.**
25       Q   (By Attorney Jacobson) Right.  But that --

1   you can't blame the Plaintiffs or their lawyer for you
2   overlooking that address, can you?
3        ATTORNEY RYAN:  Objection.  Argumentative.
4   Calls for a legal conclusion.  Form.
5   **A.  They submitted a request.  We provided them**
6   **information afterwards that showed that the request**
7   **had not been processed.  They could have come back and**
8   **asked us to process it.  Or, for all we know, they**
9   **were happy with the Huntleigh Woods address and that**
10  **may be why they didn't respond.  We don't know why**
11  **they didn't tell us.**
12       Q   (By Attorney Jacobson) The Twentieth
13  Affirmative Defense says:  "Plaintiffs' claims are
14  barred because Plaintiffs' suffered no damages as a
15  result of the allegations in the Petition and the
16  damage alleged are not the result of acts and/or
17  omissions of the Defendants."
18  **A.  Yes.**
19       Q.  Can you tell me what New York Life and
20  NYLIAC rely upon in making this Twentieth Affirmative
21  Defense?
22  **A.  The Policy was in force based on the**
23  **premiums that were paid.  It performed just as it was**
24  **supposed to.  If they -- if the insured had died at**
25  **any time, there would have been a death claim for the**

1   full amount.
2        Q.  Twenty-first Affirmative Defense, all right.
3   It says:  Plaintiffs' Count for Unjust Enrichment must
4   be dismissed as unjust enrichment is an equitable
5   remedy and strictly disallowed in breach of contract
6   claims wherein the breach is prefaced on a written
7   instrument."
8        Do you see that?
9   **A.  Yes.**
10       Q.  All right.  Do you have any facts that New
11  York Life or NYLIAC rely on for this, or is this just
12  one of these legal ones that you don't have any
13  knowledge about?
14  **A.  The premiums in the Policy provided a death**
15  **claim as the contract provided for.  It provided Cash**
16  **Values as the Cash Value provide for.  There was no**
17  **unjust enrichment.  Every dollar we received as a**
18  **premium payment provided a benefit.**
19       Q.  All right.  We've been here now for a number
20  of hours in this deposition, and you've answered a
21  number of questions.  I just want to give you a
22  chance -- sometimes when you -- at the end of the day,
23  you're like, oh, I might have wanted to say "X" or "Y"
24  in answering that question, and I forgot to say that,
25  and it pops into your mind.  I'm not saying that you

1   have anything that's in your mind that you would
2   supplement anything.  But if there's anything that you
3   would like to add on any of the prior answers, I'd
4   like to hear it.  If not, then we'll end the
5   deposition.
6   **A.  Yes, I do have one thing.  We talked about**
7   **agents/representatives.**
8        Q.  Yes.
9   **A.  And at the time I wasn't sure why I said**
10  **agents/representatives.  Some of our agents are also**
11  **registered reps, they're licensed by the SEC.  So,**
12  **they may be -- they may be registered representatives.**
13  **That's why it's called that.**
14       Q.  Registered representatives in the sense of
15  the securities industry?
16  **A.  Right.  That would be their designation with**
17  **their license.**
18       Q.  All right.  And neither Barr nor Vance were
19  security registered, correct?
20  **A.  That I don't know the answer to.**
21       Q.  You don't know them to have been, right?
22  **A.  Excuse me?**
23       Q.  You don't you -- from your review of the
24  file, they weren't serving as registered reps for New
25  York Life or any of these companies, correct?

Page 206

1    ATTORNEY RYAN: Objection. Outside the
2  scope of the topics for which this witness has been
3  designated.
4    **A. This is not a registered product. So, their**
5  **licensing had nothing to do with this contract.**
6    Q  (By Attorney Jacobson) So, if they were
7  licensed, it would be totally irrelevant to this deal
8  anyway if they're agents?
9    **A. Yeah. We put representatives on there just**
10 **because they could be either one. We use the same**
11 **things for our registered products as well.**
12   Q. Okay. I understand. So, there's a reason
13 why you have that, agent/representative. But there's
14 no dispute that those two gentlemen were agents at
15 that time?
16   **A. They were agents.**
17   Q. Okay. I have no further questions for you.
18 I appreciate your time here today.
19     Oh, I do have one more question. I apologize
20 for that.
21     One of the files that we received, it
22 indicated that you might have some expert opinions
23 that you would be offering at trial, incidental
24 expertise.
25     Are there any expert opinions you'd be

Page 207

1  offering that go beyond anything that we've talked
2  about so far today?
3    ATTORNEY RYAN: Not at this time. If we got
4  any, we'll disclose them, and we'll present him again
5  if necessary.
6    ATTORNEY JACOBSON: All right. I accept
7  that statement by your lawyer.
8    Your lawyer will tell you you have a right
9  to read or waive signature.
10   ATTORNEY RYAN: One second. I've got some
11 follow-up questions.
12   ATTORNEY JACOBSON: Oh, cool. All right.
13   ATTORNEY RYAN: Thank you.
14     [EXAMINATION]
15 QUESTIONS BY ATTORNEY RYAN:
16   Q. Mr. Elliott, I want to direct your attention
17 to the Twelfth Affirmative Defense here "(Uncertainty
18 of Damages)," which reads: "Defendants allege that
19 the Petition as a whole, each and every claim for
20 relief alleged therein, and the damages alleged are
21 fatally uncertain and speculative as to the state of
22 mind of the Plaintiffs' or what they may have done in
23 the past."
24     Did you read that Affirmative Defense in
25 advance of this deposition, sir?

Page 208

1    A. Yes.
2    Q. Okay. Is it your understanding that the
3  Plaintiffs, in this case, have claimed that had they
4  received the June 2012 annual statement from New York
5  Life, they would have exercised the cash surrender
6  benefit under this Policy?
7    **A. I believe that's what they're alleging, yes.**
8    Q. And what facts are you aware of that would
9  render that theory for damages by the Plaintiffs
10 speculative?
11   **A. We have no idea if that's what they would**
12 **really do.**
13   Q. What facts or considerations are you aware
14 of that might be considered in whether or not an owner
15 of a Policy such as this would exercise the Cash
16 Surrender Value at any point in time during the
17 effective period of time of the Policy?
18   **A. It really depends on what the objectives of**
19 **the owners are. Remember this is a life insurance**
20 **policy. Over and above the Cash Value, it has a**
21 **$1.4 million death benefit. In 2012, the insured was**
22 **90-plus years old. It -- it's many policy owners**
23 **would find keeping it in force for the death benefit**
24 **to be much more advantageous than cashing it in for**
25 **its value.**

Page 209

1    Q. Thank you. Mr. Elliott, I've got another
2  question.
3    And that is: One of the other Affirmative
4  Defense had to do with this legal concept known as
5  "laches." If I were to tell you that laches means a
6  delay in bringing a claim, what facts or events are
7  you aware of that would support a defense based upon a
8  delay in bringing this lawsuit against New York Life?
9    **A. There's annual statements that have been**
10 **generated on this. They haven't -- we haven't mailed**
11 **them since -- they haven't been -- they've been**
12 **returned since -- pardon me. We mailed them until**
13 **2010. The 2011 one was returned. The Trustees, the**
14 **attorney for the Trust, even if they had been received**
15 **at the Huntleigh Woods address, that's 12 years ago.**
16 **They should have told us that they weren't receiving**
17 **them.**
18   Q. Last question or last series of questions,
19 if I may, Mr. Elliott.
20     Mr. Jacobson went through several annual
21 statements relative to the Policy that's at issue in
22 this case. And pointing you to various points of
23 information in those annual statements, including the
24 Cash Value and the Cash Surrender Value.
25     Do you recall that?

## Page 210

1    **A.  Yes.**

2    Q.  To your knowledge, is there any other way

3 for an owner of a universal policy such as this to

4 obtain that same information from New York Life other

5 than through the annual statements?

6    **A.  They can contact us at any time.  They can**

7 **call us.  In fact --**

8    Q.  Other than --

9    **A.  It says that in the contract.  You can**

10 **contact us, we'll give you the Cash Value.**

11    Q.  Do you recall offhand what section of the

12 policy that information is contained?

13    **A.  I believe it's Section 5, the premium**

14 **section -- or the Cash Value section.**

15    Q.  So, in other words, an owner of a Policy is

16 not limited to the annual statements in order to get

17 the information that Mr. Jacobson was asking you

18 about, namely, the Cash Value and the Cash Surrender

19 Value, correct?

20    **A.  That is correct.**

21    Q.  And can an owner receive that information

22 online in addition -- or by email in addition to

23 calling New York Life?

24    **A.  They can create an online account to check**

25 **it, yes.**

## Page 211

1    Q.  Thank you.  No further questions.

2    ATTORNEY RYAN:  All right.  The witness will

3 read.

4    ATTORNEY JACOBSON:  I have a redirect.

5    [EXAMINATION]

6 QUESTIONS BY ATTORNEY JACOBSON:

7    Q.  From your review of the file, is there any

8 evidence that either of the Plaintiffs ever created an

9 online account with New York Life in order to access

10 its information?

11    **A.  I didn't look to see if they had.**

12    Q.  All right.  Did you see anything in the

13 files to indicate that New York Life ever informed

14 them, themselves, of this kind of capability?

15    **A.  I wasn't looking for that.**

16    Q.  Okay.  So you didn't see anything?

17    ATTORNEY RYAN:  Object to form.

18    **A.  It's not like it wasn't there, I wasn't**

19 **looking for it.**

20    Q  (By Attorney Jacobson) All right.  But you

21 did testify that as to the ability right now on your

22 cross-examination, correct?

23    **A.  Yes.**

24    Q.  All right.  And so, I assume that you knew

25 that was a topic that you were going to be asked

## Page 212

1 about, correct?

2    ATTORNEY RYAN:  Objection.  Calls for --

3 argumentative.  Calls for attorney-client

4 communications.

5    **A.  No, I didn't know I was going to be asked**

6 **about that.**

7    ATTORNEY JACOBSON:  All right.  Your lawyer

8 was telling you about reading it waiving.

9    ATTORNEY RYAN:  We'll read.

10    COURT REPORTER:  Mr. Ryan, did you need to

11 order a copy of the transcript?

12    ATTORNEY RYAN:  Yes, Etran and the exhibits

13 with the stickers.

14    ATTORNEY JACOBSON:  Etran.

15    COURT REPORTER:  Thank you.

16    (Whereupon signature was reserved, and

17    the deponent was excused.)

18    (The exhibits were retained by the

19    court reporter.)

## Page 213

1    COMES NOW THE WITNESS, JAMES ELLIOTT, and having read the foregoing transcript of the remote

2 deposition taken on the 12th day of May, 2023, acknowledges by signature hereto that it is a true and

3 accurate transcript of the testimony given on the date hereinabove mentioned.

4

5    _____

6    [JAMES ELLIOTT]

7    Subscribed to before me this _____ day

8 of _____, 2023.

9

10    _____

11    [Notary Public]

12

13 My commission expires: _____.

14

15

16

17 (JAMES ELLIOTT remote deposition)

18 EDWARD WIEGAND AND EUGENIA SPRICH, TRUSTEES OF THE HERBERT C. WIEGAND REVOCABLE TRUST vs. NEW YORK LIFE INSURANCE & ANNUITY CORPORATION AND NEW YORK LIFE

19 INSURANCE CO.,
Reporter:  Elizabeth A. Goodwin, RPR, MO-CCR, IL-CSR

20 Date Taken:  May 12, 2023.

21

22

23

24

25

```
 1         REPORTER CERTIFICATE
 2      I, Elizabeth A. Goodwin, RPR, MO-CCR,
      IL-CSR, do hereby certify that there came before me
 3    via ZOOM,
 4
 5         JAMES ELLIOTT,
 6    who was by me first duly sworn; that the witness was
      carefully examined, that said remote deposition was
 7    reported by myself, translated and proofread using
      computer-aided transcription, and the above transcript
 8    of proceedings is a true and accurate transcript of my
      notes as taken at the time of the remote deposition of
 9    this witness.
10         I further certify that I am neither attorney
      nor counsel for nor related nor employed by any of the
11    parties to the action in which this remote deposition
      is taken; further, that I am not a relative or
12    employee of any attorney or counsel employed by the
      parties hereto or financially interested in this
13    action.
14         Dated this 21st day of May, 2023.
15
16
      _____
17    ELIZABETH A. GOODWIN, RPR, MO-CCR, IL-CSR
18
19
20
21
22
23
24
25
```

PohlmanUSA Court Reporting
(877) 421-0099    PohlmanUSA.com

**A**

a.m
65:19
A8
123:17,19
123:22
abbrevia...
163:21
169:9
ability
60:20 79:12
177:12
190:21
193:17
211:21
able
20:16 56:24
58:5 63:20
65:23
71:10
83:25
91:18
105:14,17
167:4
178:20
179:22,22
179:25
193:2
absence
39:25
Absolutely
48:14 51:14
58:9 79:17
89:13
193:14
accept
75:20 159:6
207:6
acceptance
134:2
accepted
44:10,12
198:14
access
211:9
accident
94:16
account
30:23 31:2

51:18
210:24
211:9
accounts
31:10
accrued
36:21 80:7
accumulator
14:25 15:2
15:5,23
61:18
accurate
112:24
137:25
213:3
214:8
accurately
43:8 181:12
181:25
182:3,14
183:7
184:3
Accurint
54:3,7
62:18,19
acknowle...
64:2
acknowle...
213:2
acquire
42:23
act
71:12 187:7
187:10,18
action
72:2,2,7
109:4,24
110:2
114:8,13
120:4
187:8
188:22
197:15
214:11,13
actions
72:5 162:2
162:7
active
61:10 75:21

75:23 89:6
116:16
120:2
activity
136:8
acts
185:21
190:9,9
197:3,12
203:16
actual
70:11
160:15
add
52:25 173:3
205:3
added
60:11 62:2
73:11 74:4
74:5 82:25
adding
60:15,22,23
addition
38:12
210:22,22
additional
75:19,24
77:16,18
101:10
132:18
133:2
172:10
181:5
183:5,13
address
27:12,22
28:4 29:7
32:5,6,9
32:10,11
32:12,13
32:17,19
32:20,22
33:1 34:17
40:25
41:16,18
41:20 42:9
50:20,23
50:24 51:2
51:19 53:6
53:11,25

54:1,6,16
54:18,22
55:3,5,6,8
55:18
56:25 58:2
58:6,13,21
59:1,2
62:6,7,9
62:17
63:20
64:11,11
66:8,17
68:8,15
69:1,12,15
69:20 75:6
91:8,15
92:7,9,10
92:14
94:23 95:3
95:8,18,19
95:22,25
96:2 97:13
99:7
100:24
101:5
106:9
108:14
111:7
112:7,7,11
112:14
120:1
124:25
125:2,13
125:13,16
125:17,18
131:19
132:2,4
136:1
146:6
149:1,4
174:9,12
177:8,8,9
177:19,21
177:24
178:2
186:7,8,12
186:18
187:25
188:5,14
197:14

198:17,17
202:17,19
202:20,21
203:2,9
209:15
addressed
40:24 42:8
50:20
94:22
131:19
addressee
54:9,15
addresses
54:19 91:11
91:12
148:23
177:17
178:13
adequate
199:1
200:16
adjust
183:9
adjustments
195:14,22
admin
163:17
administ...
7:16
Administ...
163:25
administ...
106:12
admit
181:18
Adobe
33:17
adopted
110:5
adv
163:18
advance
159:10
191:23
207:25
Advanced
60:7
advantag...
208:24

advised
64:3 116:15
162:21,22
162:23
163:2,18
164:2,14
164:17,19
167:2,4,5
168:3
advises
96:3
advocacy
63:1,14,20
63:21
64:18
71:18
105:2,19
107:20
115:4
123:4
Affirmative
4:19 184:13
184:16,24
185:19
186:3,19
187:1,6,15
188:17,24
190:8,17
190:25
191:7
192:4
193:4,10
193:19
194:4,6,17
195:2,10
196:1,25
197:10,19
198:4,7,13
198:24
199:9
200:19,20
201:2,15
202:4,14
203:13,20
204:2
207:17,24
209:3
afternoon
5:18
age

7:14 19:25
46:7,10
66:25
67:24
70:21
75:12
114:14
115:8
196:3,6
agency
20:13 23:25
25:1
agent
3:14,16
20:16 22:3
22:4,8,11
22:12
41:22
42:12
47:17,18
47:24 48:1
48:3 49:13
50:1 59:15
111:24
112:6
136:2
178:9
179:12
agent's
21:14,15
23:23
agent(s)
190:10
197:2
202:7
agent/re...
206:13
agents
20:8,10,12
20:14
21:10,17
21:18,20
22:1,16,25
26:19 30:5
30:10
49:10,16
50:2 145:5
152:21
178:6,11
205:10

206:8,14
206:16
agents/
20:4
agents/r...
205:7,10
ago
173:16
209:15
agree
56:1 108:2
187:24
189:22
AGREED
7:1
agreement
7:9 159:6
agrees
135:9
ahead
21:3 112:1
118:13
188:3
193:16,22
alerting
59:2
alive
77:23
allegation
181:18
allegations
181:19
203:15
allege
186:20
194:7,18
197:21
207:18
alleged
187:9,11
188:21
194:19,20
197:4
199:1,3
203:16
207:20,20
allegedly
188:20
alleges

181:2
184:15
alleging
200:5 208:7
allowed
71:2 73:7
allows
79:1
alternative
54:14,19,20
55:17,19
127:1
141:4
ambiguous
178:19
179:20
180:7
Amended
4:18 10:5
10:11
23:11
171:18
191:24
Amendment
71:8
amount
14:22 18:12
19:21,24
36:21 46:8
46:25 48:2
52:4,8,11
65:23
67:18 75:2
75:4,17
76:6,9,15
76:15,20
77:3 79:14
82:19 83:3
83:4,5,11
83:18 85:8
85:10,15
85:19 87:8
87:10 97:1
97:5
100:20
105:15
134:10
139:15
146:14
150:4

158:23
169:2
204:1
amounts
157:21
158:18,21
analyze
154:19
and--
180:17
and/or
188:18,19
195:11,13
195:19,21
197:2,3,5
202:7
203:16
anniversary
36:19,20
76:14 86:9
149:21
150:25
151:5
183:25
annoying
94:9
annual
3:20 4:10
17:6 18:5
52:3 90:2
133:5,6
134:3,4
135:14
136:7,16
140:15,19
141:9
143:1
145:12
146:17,21
147:18
149:16
150:21
151:7,21
151:24
152:7
189:16,23
190:6
196:13
208:4
209:9,20

209:23
210:5,16
**annually**
37:6 51:18
51:18
138:8
**annuities**
31:11
**annuity**
1:21 2:8
4:10 5:9
5:14 8:4
13:2,17
15:2 38:1
213:18
**answer**
4:19 11:25
14:2 20:24
20:25 21:1
21:3,5,6
21:13
23:21
24:23 25:6
35:23 37:9
53:19
58:18
87:19
93:25
100:7
111:22
120:15
121:8
153:12
166:13
173:18,22
175:16
176:19
177:15
179:21
180:19,25
181:11,17
182:11
184:13,25
185:14
187:16
189:4
190:4
191:11
192:5,12
192:17

193:17
196:21
205:20
**answered**
50:4 113:20
188:10,11
201:22
204:20
**answering**
11:16,19
12:5
204:24
**answers**
177:5
180:16,20
196:17
205:3
**anticipated**
141:12
**anybody**
93:22
**anymore**
95:10,19
**anyway**
77:24 206:8
**apologize**
50:5 82:12
101:22
132:5
155:24
206:19
**appear**
50:14 57:23
114:13
**appears**
18:24 27:17
65:11
122:16
129:2
167:14
**applied**
77:9,24
78:8 82:18
83:9,15
84:16 85:1
139:10
**apply**
80:6 82:7
**appoint**

49:12
175:14
**appointed**
162:25
**Appointive**
158:25,25
159:2,2
**appreciate**
52:2 72:9
103:13
117:23
176:10
206:18
**approach**
24:18
**appropriate**
103:23
167:7
**approval**
74:13
158:20
**approved**
65:22 87:1
**approver**
158:22
**approving**
197:5
**approxim...**
76:24
147:16,17
**April**
3:14,16
35:21
47:22
**APS**
132:23
133:5
146:18
**archive**
101:13,14
101:15
149:2
**archived**
90:15,25
112:22
113:1
120:24
146:7,18
149:17

**archives**
91:3
**area**
8:23 9:1
24:4 88:25
114:23
**areas**
115:5
**argument**
199:22
**argument...**
45:8 56:3
97:16
109:17
116:3
135:3
148:22
191:19
202:2,23
203:3
212:3
**arising**
202:5
**arms**
15:14
**arrive**
10:24
110:16
**arrived**
31:2 110:9
**arrives**
11:2
**art**
44:5,8
**ASCAFFIDI**
65:4,20
66:2,21
67:8,22
**aside**
55:8,14
183:4
**asked**
9:16 22:4
35:24 50:3
65:5 110:3
119:3
166:23
167:1,17
179:10,10

186:11
188:10,12
191:25
203:8
211:25
212:5
**asking**
7:23 11:18
22:22
24:17 39:8
65:9,12
93:12
101:10
102:25
105:9,10
108:3,4
114:3
120:14,17
121:8
125:11
179:14
181:13
182:4
192:10,14
199:21
210:17
**asserted**
192:5
**asserting**
194:15
195:1
**asset**
43:6 45:9
56:2
134:13,18
135:7,8
142:9
**assets**
42:23
**assigned**
9:14 60:18
72:24
105:5
**assist**
49:18 63:19
**Associate**
131:9
**assume**
53:4 130:10
211:24

| | | | |
|---|---|---|---|
| **assuming** | 23:2,6 | 100:8,17 | 142:14 |
| 80:17 | 24:8,11,22 | 100:21 | 143:2,4,6 |
| 140:15,19 | 25:4,9,13 | 101:3 | 143:7 |
| 140:24 | 25:17,19 | 102:7 | 144:22,23 |
| 141:5 | 25:22,25 | 104:1,6,14 | 144:24 |
| **assumption** | 28:18 | 107:6 | 145:1 |
| 69:19 | 29:18,22 | 109:16 | 148:1,6,14 |
| **assumptions** | 29:25 | 110:4 | 148:19,22 |
| 144:2 | 31:12,17 | 111:12,18 | 148:25 |
| **asterisks** | 31:24 | 111:25 | 149:9,10 |
| 52:11 | 33:11,13 | 112:2,4,5 | 149:11,13 |
| **Atkins** | 33:14,19 | 112:13 | 152:3 |
| 107:13,19 | 34:2,4,21 | 113:8,13 | 155:5 |
| 119:19 | 34:24 35:1 | 113:15,18 | 156:10,12 |
| **attached** | 35:3,18,22 | 115:12,22 | 156:14,16 |
| 4:24 26:4 | 37:7,13 | 116:2,4 | 156:18,19 |
| 38:25 41:9 | 38:18 | 117:8,12 | 156:23 |
| 93:8 96:25 | 40:12 | 117:16,20 | 157:2,22 |
| 125:12 | 41:20,22 | 117:22,24 | 158:4 |
| 134:1 | 42:4 45:7 | 117:25 | 159:12 |
| **attaching** | 45:13,17 | 118:9,10 | 160:1 |
| 103:18 | 45:22 | 119:8 | 161:23 |
| **attachments** | 47:15 | 120:12,16 | 162:4,6,9 |
| 33:25 158:5 | 48:14,19 | 120:19 | 162:11,12 |
| **attempt** | 48:22 49:5 | 121:3,6,10 | 163:23 |
| 32:25 | 50:12 | 121:16 | 164:9,10 |
| **attempted** | 51:14 | 122:16 | 164:11,20 |
| 177:21 | 53:15,19 | 125:10,24 | 165:9,9 |
| 178:1 | 53:22 56:3 | 126:2,10 | 166:12,17 |
| **Attended** | 56:6,10 | 126:14,18 | 167:6 |
| 6:2,6 | 63:6,8,10 | 126:24 | 168:2,13 |
| **attention** | 63:11 | 127:3,6,9 | 169:16 |
| 30:18 48:6 | 74:23 | 127:12,13 | 170:13,15 |
| 169:22 | 78:10,14 | 129:8,15 | 170:17 |
| 207:16 | 78:17,19 | 129:23,24 | 171:8,13 |
| **attorney** | 81:8,10,13 | 130:25 | 171:17 |
| 3:2,2,3 | 81:14 | 131:8 | 172:9,14 |
| 7:20 8:10 | 87:17,19 | 132:10,13 | 172:15,16 |
| 8:12,14,16 | 88:4,6,8 | 132:16,17 | 172:17,22 |
| 8:19,20 | 88:12 | 133:8,13 | 172:24 |
| 10:15 11:1 | 89:13,18 | 133:17,18 | 176:3,9,10 |
| 11:4 13:1 | 89:20,23 | 134:22,25 | 176:11,13 |
| 13:4,8,11 | 92:20 94:4 | 135:3,6,16 | 176:19,21 |
| 15:11,17 | 94:11,13 | 135:17,19 | 176:22 |
| 15:21 | 94:15,17 | 135:20 | 177:4,6,7 |
| 18:21 | 94:19 | 138:13,18 | 177:14,20 |
| 20:18,20 | 96:14 | 138:23 | 178:18,25 |
| 21:11,15 | 97:15,19 | 139:5 | 179:3,9,20 |
| 22:18,22 | 97:21,24 | 141:15,17 | 180:1,6,10 |
| | 98:5 100:4 | 142:2,7,11 | 180:12,14 |
| | | | 181:16,21 |
| | | | 181:22,24 |
| | | | 182:2,7,20 |
| | | | 184:6,10 |
| | | | 184:19,20 |
| | | | 184:22,23 |
| | | | 185:4,6 |
| | | | 186:4,6,9 |
| | | | 186:13 |
| | | | 187:2,5,16 |
| | | | 187:19 |
| | | | 188:3,6,9 |
| | | | 188:11,13 |
| | | | 188:16 |
| | | | 189:1,7,14 |
| | | | 189:25 |
| | | | 190:7,18 |
| | | | 190:24 |
| | | | 191:8,15 |
| | | | 191:19,20 |
| | | | 192:14,19 |
| | | | 192:23 |
| | | | 193:3,11 |
| | | | 193:14,15 |
| | | | 193:24 |
| | | | 194:3 |
| | | | 195:16,18 |
| | | | 196:16,24 |
| | | | 197:13 |
| | | | 199:19,21 |
| | | | 200:8,13 |
| | | | 200:18 |
| | | | 201:13,15 |
| | | | 201:18,21 |
| | | | 202:2,3,16 |
| | | | 202:23,25 |
| | | | 203:3,12 |
| | | | 206:1,6 |
| | | | 207:3,6,10 |
| | | | 207:12,13 |
| | | | 207:15 |
| | | | 209:14 |
| | | | 211:2,4,6 |
| | | | 211:17,20 |
| | | | 212:2,7,9 |
| | | | 212:12,14 |
| | | | 214:10,12 |
| | | | **attorney...** |
| | | | 73:6 189:2 |
| | | | 190:2,19 |

191:9,9
192:15,24
193:20
212:3
**attorneys**
185:15,23
**audio**
8:24 15:9
15:12
**August**
3:5,6,24
13:1,10,16
28:22
29:13
62:13
77:17
93:10 97:2
98:1,20
144:9
166:25
174:18
179:13
180:5
**authorit...**
23:21
**authoriz...**
180:2,3
**authorized**
159:22
178:11,12
178:15,23
179:1,12
179:17
**Automated**
104:15
109:20,22
109:23
110:9,21
116:5
**automatic**
110:5
**available**
62:3
**Avenue**
6:3 132:3
**awarded**
195:11,19
**aware**
24:12 46:23

154:5
175:6
189:14
200:25
208:8,13
209:7
**AWF**
68:12,12,14
70:1
104:15,18
115:16,17
115:24,25
119:23
161:8

———————
**B**
**back**
15:20,21
20:2 22:4
33:18,20
38:14
41:15,20
48:17,19
53:16,17
53:21
64:11,20
65:10
67:14,22
69:7,13,25
73:12
86:18,19
87:5 88:11
88:14,20
89:16,19
103:9
105:6,19
107:9
110:2
114:4
115:15
117:11
126:16
133:9,14
133:16,18
152:15
154:6
155:13
164:16
167:12
171:16

183:9
203:7
**background**
8:21 120:25
**backwards**
85:17,18
**bad**
15:12
**balance**
77:24
**Barr**
3:14 20:6
42:13
47:23 49:6
136:3
152:22,22
153:22,23
178:6
205:18
**Barr's**
42:15 48:8
**barred**
191:2 193:4
194:8
197:1
199:4
203:14
**barring**
188:21
202:9
**bars**
198:10
**base**
14:22 75:24
**based**
16:14 46:8
76:15
83:21
85:13
114:14
115:7
144:2
148:12
158:2,21
174:5
193:19
202:6
203:22
209:7

**basic**
14:13
**basically**
16:6 39:1,4
119:14
165:6
**basis**
46:21
180:15
181:23
184:18
190:6
192:4
194:4,14
**Bates**
3:5,7,8,9
3:10,11,12
3:13,14,15
3:17,18,19
3:20,21,22
3:24,24
4:2,3,4,4
4:5,5,6,7
4:8,9,11
4:11,12,13
4:14,15,16
4:17 63:6
81:8,10,11
131:3
135:16
143:2
144:22
145:20
147:22
149:9
**BatesNYL...**
3:23
**bathroom**
125:23
**beginning**
61:4 83:10
86:14
104:3
131:3
146:22
152:15
**begins**
152:3
195:18
**behalf**

2:13 5:15
23:15,21
24:7 38:6
38:7
118:11
**Behlmann**
26:1
**believe**
9:12 17:1
32:24
39:12,15
42:17 51:7
65:14,16
65:16
69:18,25
82:10
106:8
109:19
111:15
129:1
130:19
149:1
151:24
161:8
166:5
178:10
185:7
197:18
200:8
201:11
208:7
210:13
**believed**
138:21
**believes**
197:20
**belonged**
102:3
**belongs**
56:24
**benefici...**
28:2 71:1
164:1
**beneficiary**
26:6 27:5
28:1 38:12
40:20 41:8
41:9 167:1
170:24
**benefit**

19:22,23
136:20
196:5
204:18
208:6,21
208:23
**benefits**
145:13
195:12,19
**best**
166:13
177:15
182:11
187:17
189:4
190:4
191:11
192:17
193:17
194:5
196:21
**bet**
117:24
**better**
54:6 56:25
58:6,21
91:14
149:4
182:6
183:5
202:19
**beyond**
54:23 92:15
176:7
187:4
192:12
198:20
207:1
**big**
76:13
127:11
176:11
**bill**
51:8,10,18
**billing**
51:6 69:7
132:23
**bills**
17:20,22
189:6

**bind**
20:16
**bit**
8:21 156:12
185:17
**black-an...**
113:22
**blah**
169:10,10
169:10
200:25,25
200:25
**blame**
203:1
**blank**
35:7 37:15
104:10
126:22
127:1,15
**block**
20:23 95:17
95:18
151:22
**blue**
113:21,25
119:10
161:12
162:20
163:15
164:13
167:23
**blurry**
8:24
**board**
175:15
**bottom**
19:6 61:7
61:23 63:4
104:24
131:3
139:17
150:16
**box**
70:17
158:20
**boxes**
62:2 161:2
**brain**
82:14

**breach**
197:24
199:1,11
204:5,6
**breached**
197:21
198:6
**break**
11:23,24
12:2 15:15
48:13
89:14
125:23
126:4,6,11
126:13,19
132:12,14
133:8,10
133:12,19
171:14
**breaks**
171:8
**Brennan**
98:21 99:11
**brief**
35:8
**bring**
88:11
190:11
**bringing**
209:6,8
**BTK00916...**
4:5
**builds**
16:16
**bullet**
108:14
111:5
114:11
117:25
124:16
125:1
**bunch**
73:17
**business**
21:17 63:16
63:19,22
64:5 72:21
74:18
121:2

124:12
127:20
157:19
170:17
175:8,9
**button**
13:9

---

**C**

**C**
1:12 5:5
6:1 35:13
41:3
128:22
162:13
177:10
213:18
**calculate**
79:13 87:7
**calculated**
80:11 84:13
**calculation**
67:3 138:5
**Calinda**
107:14,20
108:6
109:14
119:16
**Calinda's**
109:3
113:20
**call**
10:16 54:3
59:14,16
59:24
95:12
102:25
116:20,23
117:17
161:16
166:2,21
167:24
173:7
189:13,16
210:7
**called**
10:10 57:3
59:20 64:3
64:10
81:16

95:20,24
116:13
118:1,11
118:18,21
119:2
123:7
140:5
161:13
163:17,22
167:16
168:13
205:13
**caller**
163:2
**calling**
67:8 160:18
160:19
163:16
165:19
210:23
**calls**
20:18,19
21:11
22:18 24:8
24:23 37:7
78:10,11
87:17
97:16
111:12
115:21
120:13
138:13
141:16
148:1,14
157:24
173:11,17
177:14
180:7
184:6
185:4
186:4
187:2
189:1,25
190:2,18
193:21
196:19
203:4
212:2,3
**Cameron**
116:20

117:4
cancel
70:23 75:14
capability
211:14
capacity
159:17
care
69:9 187:8
189:10
carefully
214:6
Carla
163:17,24
164:2,17
164:17
carriers
174:3
case
1:17 5:7
7:23 8:8
9:14 12:9
12:13
20:23 22:2
53:11 54:5
56:20
60:18 72:5
72:6 73:14
74:22
76:16
84:18 85:9
105:10
107:11,25
114:13,17
115:19,19
115:20
116:9
122:3
123:1
144:7
184:24
196:19
200:9
208:3
209:22
cases
9:24 60:21
116:5
cash
16:13,16,18

16:19
17:15
18:10,11
18:13
19:19,19
19:24
36:20,20
45:14,19
46:9,21,24
70:23,25
71:3 75:16
76:17 77:2
77:4,6,8
77:24 78:6
78:8,16,21
79:2,20
80:2,3,4,4
80:5,5,10
80:16,17
80:20,21
82:25 86:1
86:2 87:15
98:10,16
98:19
106:24
120:6
123:9
136:22,25
137:19,20
138:2,4
140:1
143:10,11
143:17
145:12,13
145:16,17
147:1,1,21
147:23
150:2,9,12
150:22,23
151:8
174:16
175:2
181:3,3,15
182:21,21
182:24,25
183:2,2,4
183:7,11
196:6
204:15,16
208:5,15

208:20
209:24,24
210:10,14
210:18,18
cashing
208:24
catch
82:3
catchphrase
15:5
CATKINS
72:20
cause
186:23
187:11
caused
43:15
186:22
CC
109:4,11
114:8,12
119:25
CCR
2:21 5:19
ceased
47:23,25
ceases
3:15,16
47:17
Cell
195:15
center
49:18,21
72:25
108:16
centers
72:23
Central
6:3 133:14
certain
64:24
184:15
certainly
100:19
114:17
129:12
142:19
157:13
certainty

199:13
CERTIFICATE
214:1
Certified
7:5,6
certify
214:2,10
chain
4:4,4,5,5,6
105:1
chance
171:21
204:22
change
3:8 22:7
26:6 27:4
27:5,9,20
28:1 29:2
29:5 30:20
31:19 32:8
32:11,13
32:19
34:16
38:11 41:9
41:12
53:25 55:3
55:5 62:9
66:9,11,14
66:17 68:8
68:8,15
69:12,20
69:23
76:13 92:2
92:7 93:25
97:13
99:16,19
108:15
111:7
112:7,11
112:12
125:2,13
125:13
130:20
132:2,4
135:24
137:7
141:21
143:16
144:5,6
171:2,3

177:8,19
177:24
178:12,22
186:7,8,12
186:18
187:25
188:4,14
202:20
changed
21:8 29:7
29:14 32:6
32:17,21
35:20 36:2
46:13 54:1
75:6 76:11
76:12
90:11
124:24
130:11
137:12
changes
22:5 43:7
54:17,18
54:22 55:6
55:8,15
66:9,10
108:18
109:12
121:5
151:12
154:17
changing
32:10
charge
45:25 46:2
46:5,5,6,7
46:8,25
47:5 74:17
76:4,5
81:19,25
82:4,4,9,9
82:15,15
82:16,17
83:11,19
83:20,21
83:21
84:10,12
84:15,17
84:22,23
85:5,10,12

85:13,20
85:22,23
86:16
138:3
139:9
145:16
**charged**
71:3
**charges**
16:17,20
45:20,23
45:23,24
46:19
75:25 78:7
80:6,9,10
80:21 81:2
81:17
82:18,19
83:8
137:22,22
139:9,24
141:1
143:21
147:8
181:6,7,8
182:15
183:12,13
183:16
**Chat**
10:8,9,13
10:16,23
11:10 13:5
**check**
53:24 91:10
91:13,14
106:12
117:21
122:11
136:13
159:9
176:5
210:24
**checking**
91:23
**Chicago**
6:8
**choose**
86:5
**Chris**
107:19

108:4
115:6,15
117:6
119:19
**Chris'**
119:20
**Christopher**
107:13
**chronolo...**
61:21
**chronolo...**
25:14
**circle**
116:12
**circumst...**
120:18
158:3
**CKGREEN**
161:9
**CKGREEN01**
59:13
**claim**
190:11
191:1
194:19
196:4,10
196:12,15
197:23
199:3,24
200:7,12
200:14,23
201:16,17
201:23
203:25
204:15
207:19
209:6
**claimed**
208:3
**claims**
165:22
192:21
198:10
201:3,11
202:9
203:13
204:6
**clarifying**
115:16

**clear**
12:22 52:2
81:9
155:24
**Cleveland**
72:25 111:2
**CLGRAHAM**
74:12,19
86:24 87:1
87:20
107:20
**click**
13:9 29:19
104:7
**clicked**
104:8
**client**
60:10,14
60:22 61:1
87:5
111:24
112:6
128:13
**client's**
60:24
**client/a...**
111:6
**Cliff**
41:23 48:25
**climbing**
87:16
**Clinton**
20:5 30:1
42:13
136:2
152:21
178:6
179:12
**close**
33:24 34:18
64:24
71:21 72:5
**closed**
57:1 71:25
72:2,8
88:23 89:3
89:6 116:6
116:7
**closer**

100:14
120:20
**clued**
139:3
**co-trustees**
108:15
125:3
132:1
**code**
56:24
123:20
**coi**
67:9 163:2
163:6
**color**
90:8 113:24
**coloring**
90:10
**column**
84:16
**come**
9:13 20:2
34:23 92:2
101:10
104:5
133:9
192:20
203:7
**comes**
26:2 40:19
60:18
85:15 87:5
89:9 213:1
**coming**
41:25
**comment**
59:8 66:7
66:21 73:3
105:18
108:11
109:2,3
111:5
112:21
114:6
163:15
**comments**
56:22 62:4
68:13,19
68:20

73:10 88:2
107:21
108:6,7,9
120:10
161:2,8
163:20
164:16
**commission**
213:13
**commit**
187:7,18,20
**committed**
197:24
**common**
16:24
**communicate**
21:21,25
22:2
176:14
178:15,20
178:24
179:1,18
179:23,25
180:2,4
**communic...**
22:15,16,24
22:25
118:24
176:23
**communic...**
73:7 189:3
191:10
192:15,24
193:20
**communic...**
22:11
177:12
190:2
212:4
**compact**
127:2
**companies**
17:1 205:25
**company**
2:9 8:1 9:5
13:17,18
21:10,17
23:22 24:7
43:1,2

```
 99:25              concerning         confusion          92:12              78:24 79:6
compared           184:5              166:10             111:20,24          83:16
46:4 150:15        concerns           connection         112:5,15           98:11
comparing          64:4 109:14        197:4              154:25             101:9
130:11             conclusion         consent            160:14,17          106:1,1
 150:5             20:19 24:9         126:25             contained          108:18
comparison          24:23 37:8        consented          190:12             109:12
16:17               78:12             197:3               191:1             121:5
complainant         97:16             consenting          210:12            179:5,6,7
61:11               180:7             197:5              content            182:16
complaint           184:7             consider           107:7 117:2        184:9,11
12:5 61:10          185:5             201:25             context            189:15,19
 62:25              186:5             consider...        17:19 44:22        197:22,24
 64:14              187:3             208:13              102:16            198:9
 71:19,22           189:2             considered          108:24            199:1,11
 88:25 89:6         190:1,19          14:13 27:24         115:1             202:9
 105:4,17           191:9              55:9              continue           204:5,15
 107:10             193:21             208:14            16:21 66:5         206:5
 128:17             196:19            consistent          70:24 71:4        210:9
 180:17             203:4             125:8               71:19             contract's
 192:6             conditions         consists            75:15            123:16
 196:17            140:5              45:23               77:12            contracts
complain...         145:21            constitu...         133:20           105:8 124:1
104:20              182:11            186:23              140:9,24         contractual
complaints         conduct           constrained          141:22          130:17,21
64:15 71:18        188:21            11:12                142:21            139:2
complete            190:9,10         contact              144:15           141:23
27:20 73:13         197:4            4:15 54:14          continued          196:10
 87:9 95:14         202:6             54:20              63:12 77:14        202:4
completed          conducted          55:17              93:14            contract...
60:11 88:24        109:7              60:25              continues         62:16
completing         confident          74:23 91:9        16:20 44:25        189:20,23
202:9              22:14,21,24        91:9,25             71:22             198:22
component           24:14             93:18,21           152:4            control
104:15             confirm            95:10              continuing        84:1 185:23
comprehe...        112:11             99:17              86:23 91:2       conversa...
24:5                152:5             103:6,16           99:5 131:4        117:3,9
computer           confirma...        111:16,16          174:17            164:23
129:16             39:6               122:18             193:12           conversa...
computer...        Confirma...        132:20            contract          155:15
214:7              62:8               133:1              14:10,14          157:18
concept            confirmed          160:16             16:13,14          173:6,20
209:4              41:15              162:3,8             16:15            cool
conceptu...         105:13            210:6,10           18:14,15         207:12
108:2               166:25           contacted           20:13            Coordinator
concerned           168:6            112:10              21:14,16         64:17
86:8 98:17         confirming        contacting          23:25 37:2       copied
 109:6             29:6 106:16       27:16 55:19          45:11 66:9       127:18
 120:2              168:2            contacts             66:10 68:8       copies
                                                         69:23
```

25:20,21
26:15
30:10
50:13
132:22
**copy**
10:4 18:24
26:19,22
30:5 52:17
52:19,25
91:3
113:22
119:9,19
128:18
129:6
130:1
170:20
212:11
**corner**
12:16 42:6
56:12
90:14
124:8
157:8
**corporate**
2:7 5:12
7:25 9:2,3
9:14,24
10:5 23:5
64:14
73:13
98:23 99:3
115:8
159:3
171:5
191:16
**corporation**
1:21 2:8
4:10 5:9
5:14 8:4
13:3 15:2
38:2
213:18
**Corr**
60:10
**correct**
8:1,2,5
9:22 14:14
17:6,7,24
18:2,7

22:13,17
28:2 29:2
29:3,15
30:21 32:7
32:18,20
32:23,24
33:4 35:10
35:16,24
35:25 36:3
36:8 38:9
39:2,7,14
40:21,22
41:6,10,14
42:6,10
43:3 44:13
45:3,6,16
46:1 51:2
51:3,20,21
52:4 57:24
58:5 59:5
61:6 67:11
67:19
68:18 69:4
76:6 77:5
78:9,16,22
80:15,24
81:20 83:2
83:6 85:5
85:23 86:1
86:10,17
88:16 92:1
92:11,16
93:1,2,9
93:16,17
93:20
94:23
95:12 96:5
96:23,24
97:3,6,7
97:10 98:7
98:8
100:14
101:6,7,11
101:16
102:17,22
103:3,8,19
103:24
108:22
109:13
110:14

112:9,19
113:20
116:4
121:19
123:11
124:18
125:19
127:24
128:8
129:3
130:1,9,22
130:23
131:10,14
131:17
133:2
134:7
135:7
136:9,12
136:17,20
136:21,23
136:24
137:2,5
138:9,10
138:12,22
139:6,10
139:14,20
139:24
140:3,17
141:3,7,8
141:25
143:22
145:2,6,7
145:10,18
145:24
146:14
147:13,25
148:7,13
149:22
150:13,19
151:10,12
151:17
155:12
159:7,23
161:25
162:3
164:12
165:11
167:13
169:8
170:23

174:18,19
176:24,25
177:17,23
178:3
182:22
183:2
189:24
191:21
192:1,6
205:19,25
210:19,20
211:22
212:1
**corrected**
39:8 153:11
**correction**
153:14
**correctly**
36:14,24
37:22
42:23
58:24 61:5
77:21
83:23
108:20
109:9
111:9
114:19
118:6
120:8
123:8
132:7
133:3
146:9
163:4
168:8
177:22
178:2,3
197:12
**correspo...**
30:6 50:22
58:25
60:15,19
62:3 69:8
101:11
167:11
189:9
**correspo...**
131:12
**corresponds**

166:6
**corridor**
18:9,11,15
19:14
**cost**
17:16 46:2
46:10,13
46:14 67:9
67:15,16
71:2 75:22
75:24,25
76:7 77:25
123:10
137:21
139:8,19
147:8,14
150:8
161:14
163:7
167:3
**cost-of-...**
181:7
**Council**
42:18
**counsel**
7:2,2,9
73:15 74:1
87:4 156:3
182:7
214:10,12
**Counselor**
193:13
**Count**
204:3
**countero...**
74:24
**couple**
60:1 64:10
76:20
183:19
**couple-h...**
76:23
**court**
1:4 5:1 7:6
7:10,16
10:21
11:15
15:14,18
15:20

48:15,17
53:15,17
89:16
126:16
133:16
171:16
212:10,15
212:19
**cover**
3:11 16:19
17:16
26:15 44:3
76:19 77:6
77:13,25
126:11
155:6
156:6
174:22
175:3,22
186:17
**coverage**
16:20 20:17
44:4,25
77:14,16
77:17,19
93:6,14
98:18,20
123:15
140:5
**covered**
23:12 172:1
172:2
**covering**
94:7
**covers**
151:24
**create**
210:24
**created**
33:3 60:4
71:16
72:20,20
99:13,15
146:12
211:8
**credited**
71:4 139:13
141:1,21
**cross-ex...**
211:22

**CSR**
2:20 5:19
69:9,13
164:14
**CST**
5:17,17
**CTS**
64:13,13
73:12,13
**CU**
178:12
**Culbertson**
6:7
**cumulative**
84:14 85:8
**curiosity**
127:14
**current**
34:14 67:9
110:13
120:4,6
140:21,25
141:7,20
165:20,22
166:15
**customer**
8:23 9:1
14:9 22:14
27:17,17
27:21
43:11
47:20
49:16
55:20 63:1
63:14,20
63:21
64:18
69:10
71:18 91:9
92:12 99:6
105:2,19
107:10,10
107:19
111:20
115:4
123:4
130:1
145:6
164:18,19
179:7

**customer...**
92:7
**customers**
22:1,20,23
24:14 30:7
30:10
47:16 48:4
49:25
135:1,5
148:10

---

**D**

**damage**
185:20
203:16
**damages**
186:21,22
188:20
194:20
195:11,19
196:18
197:22
203:14
207:18,20
208:9
**Dan**
99:13 117:8
126:24
176:3
177:4
**Daniel**
6:6 96:8
**Danielle**
105:3
**darker**
114:1
**data**
80:9 169:4
**database**
64:15 91:11
91:13
**date**
25:14,15
29:13,16
44:24 68:2
68:3 80:11
80:13 86:3
86:5,8,9
93:12,13
102:2

120:4
123:7,8,9
123:13,15
128:10
136:16,22
151:15
153:5
157:11,12
157:13
166:23
196:6,7
213:3,20
**dated**
13:16 25:25
38:8,24
40:16 42:9
92:21 93:4
96:17
122:17
149:18,18
154:8
172:4
214:14
**dates**
35:9 111:17
140:11
144:5
151:1
**day**
5:18 88:22
131:21
149:18
150:25
151:4
167:23
204:22
213:2,7
214:14
**days**
36:18 59:4
64:5 96:3
101:24
149:18
183:25
**deal**
49:24
127:11
157:19
176:12
206:7

**dealing**
24:15 99:5
107:10
122:24
157:16,17
**Dear**
42:21
**death**
19:22,23
136:20
145:12
166:23
196:5
203:25
204:14
208:21,23
**deceased**
116:15
162:23
165:21
166:7,8
**December**
4:12,14
42:9 60:9
63:2,3
73:20,25
89:3 141:5
141:13,22
157:10,12
**decide**
21:1
**decision...**
132:19
**decisions**
148:12
**decreased**
137:21
150:7,8
**deduct**
83:18
**deducted**
45:23
**deductible**
45:20
**deduction**
46:21 83:22
**deductions**
17:17
195:14,21

```
Defendant's          186:3              45:19 99:16         description         88:13
192:5                193:19             123:24             137:25              94:13,15
Defendants           define            157:20             181:15              99:3 100:2
1:24 5:10            183:6             depends            designated          104:23
 5:13 6:9            defined            45:9 56:5          31:14 35:19         106:21
 7:3 181:11          55:12             142:13              109:18             115:3,5
181:18               182:22            208:18              115:14             138:16
185:22               definitely        deponent            134:23             140:11
186:20,24            57:17              212:17              157:24             144:1
187:6,8,10           definiti...        deposes            206:3              151:15
194:7,18             24:7              7:17                designation        157:15
197:20,21            delay             deposition          42:17              160:11
197:24               200:22            2:7 4:23            205:16             161:5
198:8                201:9              5:12 7:3           designed           177:25
199:5                209:6,8           10:5 11:14          20:22              182:21,24
200:20               deleting          11:23              destination        196:23
202:8                127:1             13:15 19:8          120:3              differen...
203:17               deliver           23:8,11            detail             16:3
207:18               179:5             24:3,18            137:4              differently
Defendants'          deliverable       35:4 171:6         detailed           157:20
188:21               3:17 95:10        171:19,22          61:14 173:1         158:2
202:4                delivered         173:3              detailing          diligence
defense              12:14 97:13       175:22             103:15             187:8
185:20               148:21            191:24             details            Dillard
186:19               demand            204:20             139:6              73:2 105:6
187:1,6,15           155:8,18          205:5              143:20             106:7
188:17,25            156:1,7           207:25             167:8              107:14
190:8,17             157:3,16          213:2,17           determine          119:18
190:25               158:1             214:6,8,11         97:17              131:9
191:7                DEMANDED          depositions        died              155:7,9
192:5                1:18 5:8          11:5               62:21              159:16
193:4,10             demands           depreciate         165:22             172:4
194:4,6,15           157:20,21         42:24              166:15             Dillard's
194:17               denial            describe           196:5              172:18
195:2,10             180:15            10:1 182:14        203:24             diminished
196:2,25             denies            182:16             differ             147:23
197:11,19            181:24            described          16:9 82:6          diminishing
198:4,8,13           deny              58:1 60:13         83:3               45:14
198:25               181:11            95:3               difference         direct
199:10               182:3             201:20             16:6 114:2         22:4 79:11
200:19,20            department        describes          148:5,7            169:22
201:2,16             65:22,25          101:4              different          184:12
202:4,15             66:23 67:2        181:12             12:14 15:8         207:16
203:13,21            67:2,5            182:3              15:24 16:4         directly
204:2                104:21            describing         16:10 31:9         21:25 22:6
207:17,24            158:22            103:16,17          31:10 59:8         49:19,24
209:4,7              departure         132:18             60:21              101:14
Defenses             48:25             182:10             64:19 82:5         114:23
4:19 184:13          depending         183:7              82:10,18           149:2
184:16,24                                                                    directory
```

101:23
disallowed
204:5
disclose
73:7 207:4
disclosed
37:5 129:7
Disclosure
8:13
discovered
199:16
discovery
199:3
discuss
119:22
162:22
discussed
90:21 165:7
discussing
131:21
disjointed
165:25
dismay
15:14
dismissed
204:4
dispute
206:14
distinction
117:21
distinguish
20:7
distingu...
15:6
distorted
15:10
DISTRICT
1:4,5 5:1,1
division
1:6 5:2
96:11
DMS
68:8,11
doc
164:14
docs
167:7
doctrine
189:3 190:3

190:20
191:2,10
192:16,25
193:5,21
194:8
document
10:10 11:7
11:9 12:21
12:23
13:15
19:13
25:23 26:8
26:9,12
28:9,21
30:4,15
31:22,25
32:1,6
34:7,10
37:14
38:21
40:10,13
42:2,5
47:13 49:3
51:2,4,7
51:15
52:18 53:9
56:8,15
57:2,19
59:7 63:3
68:9,19,21
69:20,21
70:12
72:16
73:11
74:11
79:18
89:21,24
90:4 92:20
92:23 94:9
96:20 98:1
98:4 101:1
101:18
102:8,13
103:10
104:2,12
107:4
110:23
113:9,12
116:6
119:1,11

121:12
122:13,21
126:3,12
127:2,15
128:1
129:25
131:5,7
132:12
133:9
141:18
142:22
144:18
146:1
150:1
151:19
152:5,11
156:17,20
156:25
158:10,11
158:14
159:15
160:6,16
160:25
163:13,13
163:14
168:10,16
169:13
184:21
document...
117:14
documents
4:3 12:9,12
12:12,15
12:18,20
23:9 24:25
25:15
28:13
31:16
33:21
39:23,25
50:14 57:3
57:22
68:16,22
70:11
73:18 74:4
74:5 103:1
103:17,18
104:16
109:25
151:23

158:6
160:10
164:20
169:12
doing
11:9 12:6
22:10
75:18
158:18
170:18
171:8
dollar
157:20
204:17
dollars
76:23
Dont'
166:12
doublecheck
117:12,15
155:13
doubled
147:16,16
147:17
doubting
175:24
draft
73:15
Drive
64:12
drop-down
84:7
dropped
150:3,5,6
dropping
83:10,12
dryan@hi...
6:8
Dryoff
3:10 81:11
DRYOFF00...
3:13
DRYOFF00...
3:12
DRYOFF00...
3:11
DRYOFF00556
3:8
DRYOFF124

81:12,15
due
16:12,18
52:4,8,11
66:16,17
75:5 76:7
76:9,15,18
77:7
105:22
112:22
125:4,22
132:4
134:10
146:14
169:4,6
187:8
195:12,13
195:19,21
196:9
duly
214:6
duplex
127:16,17
127:18
duplicate
32:9,14
33:3,5
34:16
66:10
69:22,24
73:19,21
125:11,12
186:10,14
DURABLE
162:12
duties
163:1
duty
193:23,25
193:25
Dyroff
26:2 40:17

E

E
3:19 6:1,1
177:10
earlier
44:15 53:3
75:1 77:4

87:24
90:21 95:3
96:7
102:16
115:15
119:1
130:9
137:20
154:24
161:1
167:11
**earliest**
61:5
**earned**
47:7 137:21
139:15,23
147:11,15
181:6
**earnings**
150:8
**EASTERN**
1:5,6 5:1,2
**edits**
87:11
**Edward**
1:10 5:4
71:9 132:1
213:17
**effect**
42:19 78:5
80:18
123:21
137:8
**effective**
62:11
208:17
**effort**
117:13
175:22
**eight**
14:15
**Eighteenth**
200:19
201:2
**Eighth**
190:7
**either**
153:14
157:18

196:5
206:10
211:8
**EJD**
18:14
**Eleventh**
194:6
**Elizabeth**
2:19 5:18
7:4 213:19
214:2,17
**Elliott**
2:11 5:15
7:10,13,21
8:20 48:22
100:5
126:18
127:14
133:19
166:13
170:14
171:9
193:16
207:16
209:1,19
213:1,5,17
214:5
**email**
4:4,4,5,5,6
4:11 55:18
73:24 74:2
86:23
87:23
88:22
104:15,23
105:1,3,4
105:21
107:8,13
107:18,24
113:19
119:15
120:10
155:6,9
156:6
210:22
**emailing**
73:18
**emails**
104:4 107:1
113:9

121:11,17
155:8
**employed**
13:22
214:10,12
**employee**
117:3
131:16
176:23
214:12
**employees**
13:24
175:13,18
176:1,6,15
177:2
**employment**
159:20
**empowers**
21:9
**enclosed**
51:6 132:22
**ended**
66:4 123:15
**endorsement**
37:16,18
128:3,3
169:25
170:22
**ends**
68:5
**Enforcement**
38:12
**enlarge**
79:22
169:18
**enrichment**
204:3,4,17
**entered**
157:6
**entire**
78:4
**entirety**
202:10
**entitled**
79:14
**entity**
176:7
**entries**
60:2,2 74:8

**entrusted**
189:10
**entry**
57:25 60:1
66:19
67:20 68:4
71:5 74:6
86:23,24
**envelope**
3:18 50:18
51:1 52:19
52:25
**envelopes**
51:22
**equal**
78:8 80:5
80:20
145:17
182:17
**equaled**
181:4
182:19
183:11
**equitable**
204:4
**error**
75:5 125:5
132:6
153:9
**escaping**
82:12
**especially**
43:7
**Esq**
6:2,6
**establish**
197:23
**estoppel**
191:2
**Etran**
212:12,14
**Eugenia**
1:10 5:4
61:1 64:3
64:12
65:12 71:8
102:19
122:18
131:2

132:1
154:25
166:22
167:25
213:17
**Eugenia's**
65:15
**event**
43:14
**events**
103:22
209:6
**eventually**
46:24
**evidence**
170:3
200:14
211:8
**evolved**
110:12
**ex**
165:21
166:7,8
**exact**
100:15
130:13
**exactly**
166:1
**EXAMINATION**
3:1 7:19
207:14
211:5
**examined**
5:15 7:14
214:6
**example**
55:1,17
76:18 86:9
92:8
**exception**
42:25
**excess**
85:14
**excluding**
155:15
**excuse**
151:7
188:17
195:16

```
200:19                  56:9,13              158:6               expiry              95:18 98:6
205:22                  61:22                212:12,18           144:9               98:16
excused                 72:14                expect              explain             101:8
202:6                   81:15                47:4                14:24 15:23         114:15
212:17                  86:19,21             expected            83:14               115:8
Executive               88:7 89:10           17:9,12             107:17              135:6
159:3                   89:22,24             39:23,24            128:13              150:22
exercise                92:18,19             201:24             158:14              157:6
185:22                  94:5,11,13           expecting           175:7               199:23
194:1                   94:16,18             185:9               191:14              200:5
208:15                  96:13,16             expects             193:2               210:7
exercised               97:25 98:3           22:1                198:6               factors
187:8 208:5             100:22,25            expense             explained           148:13
exhibit                 102:5,6,7            82:15,15,18         67:6 74:22          facts
3:5,6,6,7,8             102:15               82:24 83:3          79:5,21             36:22 37:4
3:9,10,11               103:8,9,11           174:17              87:24               125:9
3:12,13,14              103:14,25            181:5               174:15              172:20
3:16,17,18              104:2                183:12,13           explaining          186:2,25
3:19,20,21              107:1,3              183:15              75:20               187:14
3:22,23,24              113:5,7              experience          154:17              188:23
4:2,3,4,4               119:5,6              30:9 115:7          explains            190:15
4:5,5,6,6               121:12,14            expert              75:4 158:18         191:5
4:7,8,9,11              122:12,15            8:7 20:13           explanation         192:21
4:12,13,14              126:5,17             21:13               154:5 173:1         193:8
4:15,16,17              126:19               23:24 25:2          extended            194:25
4:18,20                 127:1                63:16,19            145:22              195:25
10:10,12                130:24               72:22 87:7          extent              197:9
10:22                   131:1                87:21               178:23              198:2,11
12:24,25                133:20,21            206:22,25           179:24              200:14,25
13:15                   133:22               expertise           extra               201:7
18:19,20                151:19,20            206:24              104:7               202:13
18:22 19:4              151:24               experts             extra-co...         204:10
19:5,6,7,9              152:2                63:22 121:2         75:10               208:8,13
20:3 25:8               155:1,3              expiration          105:22,25           209:6
25:23,24                156:9                118:15              106:3               factual
28:16,17                158:9,11             132:24              158:17              180:15
29:23,24                159:11,13            expire                                  184:18
29:25                   159:25               141:12           ┌─────────┐           192:4
31:18,21                160:2                142:15           │    F    │           194:14
33:9,10                 162:18               expired           └─────────┘          factually
34:4,19,19              168:12               65:8 101:9          face                45:5
34:22 35:4              169:13,15            123:17,20          17:25 18:12          failed
38:16,17                169:23               123:22,23          19:21,24            187:25
39:2 40:8               180:21               166:25             75:17               188:7,18
40:9 41:10              exhibits             167:17            facsimile            189:20
41:25 42:1             3:4 4:1,22            170:9              3:11 38:24           193:25
47:11,12               4:23 11:10            196:14             fact                 198:25
48:21,24               19:10                 expires           21:24 24:7           failing
50:10,11               25:10 56:7            213:13             28:13                97:12
51:9,12                127:5                                   32:21                fails
                                                               52:23 59:2
```

182:13
197:23
**failure**
76:3 199:4
**fair**
31:9 47:8,9
48:7
**faith**
175:22
**falls**
35:18
109:17
115:12
**familiar**
9:15,17
12:8,17
30:17
31:25 57:9
102:12
123:5
155:14
158:8
160:24
184:24
185:2
189:18
**family**
28:23 49:11
135:23
153:20
154:4,11
**far**
55:9 69:13
86:7 98:17
107:25
207:2
**fatally**
194:20
207:21
**fault**
97:12,18,23
**fax**
3:7 4:3
29:25
39:11
40:15
102:19
161:19
168:6

**February**
3:11 4:8
38:25
131:1,18
172:5
**fee**
46:3,3
**feel**
22:14,21,23
24:5,14
172:11
**fees**
75:24
137:22
139:9,19
141:1,21
181:7
**Feinberg**
43:21,23
**Fellow**
42:18
**Fifteenth**
197:19
198:3
**fifth**
116:12
133:21
187:5
**Fifty-three**
144:21
**figure**
84:3,5,22
**figures**
148:3
**file**
52:23 53:1
54:14,19
55:6,16,16
57:1 58:8
60:12
61:10 62:4
63:23
64:17,22
65:1 66:8
67:22
71:22
72:22
73:20 74:5
74:12

88:23,24
89:3,5,9
90:7 91:5
91:16,24
92:6 97:14
102:2
109:25,25
112:9,21
116:19,22
125:9
205:24
211:7
**filed**
9:18,21
115:19
170:3
180:19
**files**
26:12,16,22
26:25 27:1
28:10,14
30:16 31:8
32:3,4
39:20 40:3
40:4,6
42:5 43:18
50:13
68:10,10
68:10 89:8
97:12
102:21
112:18
117:10
124:6,11
154:5
157:7
160:3
206:21
211:13
**filing**
115:9
**final**
77:10 95:3
96:4 101:4
101:21
113:3
120:3
177:10
**financial**
26:2 30:1

40:16
136:8
162:12
**financially**
214:12
**find**
8:17 18:18
39:23,24
56:25 58:3
58:5 97:12
106:13
113:23
117:11
138:16
165:21
166:14
167:16
208:23
**finding**
58:21 91:8
**fine**
12:3 25:17
94:10
126:14
**finish**
21:3 112:3
170:15
**firm**
167:6
**first**
9:20 20:7
21:8 26:14
30:19
36:16 39:1
40:15
42:21 53:4
53:7 62:2
63:3 70:15
72:17
91:21 93:2
98:9,12,14
100:13
101:25
102:24
107:2,8,12
108:11
110:12
119:20
129:1
134:9

146:17
152:15
153:2,9
157:2
160:3,23
180:15
182:18
183:23
214:6
**five**
68:16
116:12
173:16
**fix**
197:15
**fixed**
16:12,15
45:24
163:20
**flip**
33:18
**Floor**
132:3
**flow**
56:19,23
57:5 68:12
68:14,17
68:25 72:4
104:15
107:21
109:21,22
109:23
110:5,9,22
116:5,10
120:22
162:17
167:12
**focused**
89:1 182:1
**folder**
56:21 66:10
68:8 69:14
69:16,17
69:20,22
69:24
108:18
109:4,12
109:12
114:8,12
**folders**

70:3,5,6,8
70:9,11
**follow**
53:20 54:12
58:16
91:22
157:15
175:2
**follow-up**
60:1 73:14
74:23 75:1
113:19
117:21
207:11
**followed**
73:25 91:20
134:3
**following**
58:24
154:11
**force**
17:11 36:17
65:10
67:14 86:6
86:7,11
93:7
140:10
174:20,21
183:23
196:7,9
198:15
201:4
203:22
208:23
**foreclosure**
62:13
112:22
113:1,2,4
118:17
120:3
198:22
**foregoing**
213:1
**forenoon**
5:17
**forgot**
204:24
**form**
3:8 4:13
20:19

22:18 23:2
24:23 26:4
27:5,9,11
27:17,23
27:24 29:4
31:19
32:12 45:7
45:17
47:15 55:4
56:4 57:12
59:19,21
62:7 78:10
87:10,18
92:7 97:13
97:15
100:17
109:16
115:14
116:2
120:12
121:6,7
122:22
125:12
127:18
129:9
135:4
137:5,7
138:14,23
141:15
142:2,4
148:1,15
157:24
158:15
162:4
172:9
177:8,15
178:19
179:3
184:7
201:14
203:4
211:17
**formally**
110:16
**format**
160:22
**formatted**
57:19
**formatting**
90:10

**forms**
137:11
144:16
**forth**
33:18,20
107:9
114:4
154:6
167:12
**forward**
101:8 103:2
123:14
144:14
**forwarded**
155:6
**forwarding**
50:20 53:11
**forwards**
155:7
**found**
117:17
**foundation**
45:18 87:18
111:13
120:13
121:7,7
138:14,24
141:16
142:3
148:2
157:24
162:5
178:19
179:4
201:13
**four**
12:14 60:2
62:2 68:16
116:12
140:11
143:25
151:15
**four-page**
61:4
**four-paged**
113:9
**Fourteenth**
196:25
197:10

**fourth**
125:1
131:23
141:4
186:19
**frame**
109:19
**Franklin**
6:7
**free**
172:11
**freely**
11:11
**frequency**
17:4
**frequently**
9:23 10:2
21:18
**fresh**
92:8
**front**
13:14
171:17
**fruitless**
55:21
**full**
70:17
167:22
178:23
179:24
181:17
201:5
204:1
**fully**
110:10
172:2
181:12,25
182:14
183:7
**function**
10:8
**fund**
167:3
**funds**
87:11 167:2
**further**
62:11 66:22
110:2
119:21

125:3
140:25
141:5,20
145:22
172:13
199:14
206:17
211:1
214:10,11
**future**
136:11
140:8

---
**G**

**gain**
121:21
122:2,6,11
**gains**
121:24,25
121:25
**Galloway**
162:21
**general**
46:13 52:24
73:15 74:1
87:4
142:16,18
156:3,4
161:13
**generally**
24:17 33:19
44:10,12
44:16,20
55:16 57:4
**generated**
39:21
104:18
122:23
124:4
209:10
**generates**
58:13
**gentlemen**
206:14
**geograph...**
100:2
**getting**
25:19 65:17
66:23
124:17

124:17
159:12
169:12
194:2
202:19,19
**give**
20:25,25
36:22 49:3
79:15
97:22
182:13
198:25
204:21
210:10
**given**
47:4 191:23
199:2
213:3
**gives**
47:20 49:20
81:25 85:3
95:11
136:14,15
136:19
150:9,12
**giving**
20:24 35:8
**glass**
84:4
**glossy-w...**
51:1
**go**
19:13 21:3
22:5 33:20
35:2 36:5
37:14
45:19 46:6
46:7,11
48:17,19
59:6 61:21
66:5 69:21
72:13,16
72:18 81:5
84:9 89:12
89:16,18
91:7 94:7
103:2,9
105:16,17
110:2
111:25

114:4
116:7
118:13
119:13
128:19
142:25
143:13,15
143:15
145:19
146:16
147:4
150:1
152:9
153:18
154:3
155:13
160:12
161:18
162:16
163:13
164:16
172:1
177:17
183:9
188:3
193:16,22
207:1
**goes**
8:15 22:7
29:12 46:8
72:15 91:5
94:6
115:15
**going**
7:23 8:16
11:4 21:1
23:12 25:4
25:9 30:15
33:18,19
34:18
36:13
42:20 46:9
61:24
63:18
72:10
74:22 78:8
83:16
86:18
88:21
89:20

92:14
106:12
115:19
137:4
138:17
143:25
147:5
152:15
155:1
156:7
157:17
161:12
166:20
170:15
174:7,11
182:8
184:17
211:25
212:5
**good**
7:21 27:21
27:24 40:5
66:15
68:11
95:22,25
108:21,23
125:4
133:13
148:24
149:1
175:22
198:16,18
**Goodwin**
2:19 5:19
7:4 213:19
214:2,17
**Gotcha**
122:12
165:2
**gotten**
92:13
**grace**
77:15,19
123:16
174:21
**Graham**
107:22
110:16,25
111:2
**gray**

113:25
114:1
**greater**
18:10,12
19:21,24
47:6
139:23
**Group**
26:2 30:1
40:16
**guarantee**
130:12
144:13
**guaranteed**
140:20
141:6,13
144:9,12
145:21
**guarantor**
62:20
**guarded**
95:5
**guess**
10:16 12:14
14:13 71:5
113:25
115:9
121:18
126:4
134:5
152:14
163:18
**guessing**
123:8

─────────

**H**

**halfway**
107:12
**Hall**
161:20,22
165:4
**hand**
7:11 37:15
148:7
194:4
**handle**
60:8 105:8
**handled**
60:19 63:1

115:18
158:2
177:1
**handles**
114:23
**handling**
69:3
**hands**
147:19
193:5
**Hang**
102:3
**happen**
63:12 95:20
123:3
**happened**
46:11 53:11
73:9 75:5
77:8 117:7
118:19
124:20
**Happened...**
108:12
**happening**
105:1
148:12
**happens**
58:7 76:13
**happy**
11:24 72:12
126:2
203:9
**hard**
100:3
**harm**
187:11
**he'll**
20:25
**head**
137:11
162:10
169:11
**headset**
15:10
**health**
43:7
**hear**
205:4
**Hebert**

41:3,5
Heidi
178:8
help
72:12
helpful
132:25
182:9
helps
115:25
Herbert
1:12 5:5
13:3 35:13
39:5 41:6
62:19
128:22
153:6
162:23
213:18
hereinabove
213:3
hereto
213:2
214:12
hesitate
133:1
hey
92:13 95:8
117:8
132:10
high-level
124:18
higher
85:12 87:8
87:14
144:14
highlight
114:17
highlights
136:7
Hinshaw
6:7
history
4:16 9:8
124:17,18
154:19
168:14
hit
84:4

hold
18:17 72:1
88:20
143:2
149:3
holding
61:8,11
71:15,16
71:19,21
71:25 72:6
87:23
holds
115:4
home
131:19
hopefully
25:6 34:24
hotline
95:11
hour
171:12
182:8
hours
5:16 204:20
housekee...
73:17
Huntleigh
28:24 32:22
40:24
41:16,18
41:19 42:9
50:23,24
51:19 53:5
94:22
100:24
112:13
136:1
174:10
197:14
202:17
203:9
209:15
husband
116:14
165:21
166:7,8
hypothet...
84:19

I
idea
97:23
100:11
127:14
195:3
208:11
identified
4:20,22
10:12
12:25
18:20
25:24
28:17
29:24
31:21
33:10
38:11 40:9
42:1 47:12
48:21
50:11
51:12 56:9
89:22
92:19
94:18
96:13 98:3
100:25
102:6
103:25
107:3
113:7
119:6
121:14
122:15
126:17
130:24
152:2
155:3
156:9
158:9
159:11,25
168:12
169:15
180:20
identity
91:17
IGO
108:17,21
IL
6:8

IL-CSR
2:19 213:19
214:2,17
Illinois
7:5
images
70:13
immediately
154:11
impact
177:11
impeded
202:7,18
implicat...
121:24
190:23
importance
138:12
important
42:25 52:12
127:20
148:13
impossible
11:20
in-house
49:14,22
155:17
inaccurate
112:24,25
181:14
182:5
incidental
206:23
include
27:12 91:23
95:5
151:21
included
51:8 57:15
58:18
includes
102:15
181:18
including
168:5
185:23
197:5
209:23
incomplete

27:18
181:14
182:5
incorrect
58:16 69:16
69:17
108:17
incorrectly
177:22
increase
46:15
increased
137:20
140:1
150:8
181:6
incurred
188:20
independent
180:16
INDEX
3:1,4
indicate
89:5 211:13
indicated
44:15 58:3
206:22
indicates
52:3 112:21
indicating
34:12
indicator
57:1 58:8
58:10,22
58:23
62:11
69:11
90:23
91:21
95:23
individual
39:5 91:18
99:5
104:22
individu...
91:25
individuals
92:15
industry

```
  16:24 44:6     initial         45:25 46:2      118:1,12        80:22
  44:12,21       18:3,4          46:4,5,6,6      121:25          82:10,11
  205:15           38:13 47:4    46:10,13        123:7           137:21
info               85:11 87:4    46:15 47:1      124:23          139:12,15
163:1              181:4         47:6 56:2       125:17          139:23
  167:25           182:17        67:10,15        131:20          140:20,21
info/status        183:12,16     67:16 71:3      136:15          140:25
61:15           initiated        71:4 75:22      142:9           141:6,7,13
information     103:22           75:24 76:1      164:3,3,5       141:20
14:13 40:20     initiation       76:4,5,7        164:6,8,15      143:21
  48:8 54:15    14:9 151:25      77:3,9,11       164:21          144:7
  54:20         injuries         78:1 80:12      166:3           147:11,15
  55:17         186:20,21        87:16           183:24          181:6
  60:23,24      inquiring        98:10,18        196:3           193:24
  61:17 64:7    116:13           114:22          203:24        interested
  64:8,9          118:2          123:10          208:21        142:19
  66:22         Inquiry          126:20        insured's        214:12
  91:24 95:6    59:22            134:13,17      18:25 35:5     interfered
  96:1          insd             136:20          57:10,17      202:8,18
  103:15        163:18           137:21          137:16       internal
  109:1         inside           139:9,19        164:10        3:19 4:6
  111:16        157:18           139:24          184:4          87:6
  118:3         insofar          142:1         insured/...      106:25
  132:25        78:11            143:21,21      166:22          121:11
  133:2           181:16         147:8,15      insureds         122:17
  137:15        instruction      150:9         21:21 49:13      123:19
  138:7,11      20:25            152:7           75:12          164:23
  138:20,21     instrument       163:7,9        141:25        internally
  141:24        204:7            167:3         integrated      23:20
  142:8         insuffic...      169:17        110:10           122:23
  146:25        77:24 175:3      174:17        intention       146:10
  149:25        insurance        175:13        22:23 23:3       165:7
  150:19        1:20,22 2:8      178:13          24:13          168:17
  152:13          2:9 3:13       179:18        intentions      170:20
  154:18          4:10,17        189:9         23:5           interrog...
  167:5,18        5:8,9,13       208:19        Inter-Vivos     196:18
  167:19          5:14 7:25      213:18,19     26:5           interrupt
  194:2           8:3 13:2     insured         interact        15:12
  199:18          13:17,23     14:17 18:7      21:18 23:23      132:11
  201:5           14:4,10        36:17 43:6    interacting    intervening
  203:6           15:3,6,9       45:25 46:7     49:25 50:2     186:23
  209:23          16:24          49:17         interaction    invalid
  210:4,12        17:16 18:1     56:21         111:3           125:18
  210:17,21       18:6 38:1      57:14         interacts      investigate
  211:10          43:1,2         70:24         21:9           24:6,19
informed          44:1,2,6       75:16 76:4    interest         175:20,25
197:20            44:20,23       76:14 80:3    36:21 45:21    investig...
  211:13          44:24          95:7           46:18,19      125:3 201:5
informing         45:10,11       116:13         47:7 80:7     invoice
59:12 165:6                      117:18
```

| | | | | |
|---|---|---|---|---|
| 3:18 52:3 | 142:22 | 98:5 100:8 | 159:12 | 7:13 213:1 |
| 174:1 | | 100:21 | 160:1 | 213:5,17 |
| **invoices** | **J** | 101:3 | 162:6,11 | 214:5 |
| 90:9 | **Jacobson** | 102:7 | 166:17 | **January** |
| **involved** | 3:2,3  6:2,3 | 104:1,6,14 | 168:13 | 3:9  4:7 |
| 9:21 12:4 | 7:20,22 | 107:6 | 169:16 | 35:21 38:9 |
| **involves** | 8:12,16,20 | 110:4 | 170:15,17 | 119:15 |
| 48:25 | 10:15,21 | 111:18 | 171:13,17 | 128:11,14 |
| **involving** | 11:1,4 | 112:2,5 | 172:14,16 | 131:25 |
| 9:24 115:10 | 13:1,4,8 | 113:8,15 | 172:17,24 | 154:8 |
| **IPS** | 13:11 | 113:18 | 176:3,10 | **Jean** |
| 104:20,21 | 15:11,17 | 115:22 | 176:13,21 | 18:25 57:11 |
| 155:7 | 15:21 | 116:4 | 176:22 | 57:23 |
| **irrelevant** | 18:21 | 117:8,16 | 177:4,7,20 | 67:25 |
| 206:7 | 20:20 | 117:22,25 | 178:25 | 116:20 |
| **Irrevoca...** | 21:15 | 119:8 | 179:9 | 117:4,9 |
| 26:6 | 22:22 23:6 | 120:16 | 180:1,10 | 152:19 |
| **issuance** | 24:11 25:4 | 121:3,10 | 180:14 | 153:3 |
| 34:13 | 25:13,19 | 121:16 | 181:21,24 | 154:1,13 |
| 153:15 | 25:22,25 | 122:16 | 182:2,20 | 161:23 |
| **issue** | 28:18 | 125:24 | 184:10,20 | 162:13 |
| 18:25 35:9 | 29:18,22 | 126:2,14 | 184:23 | 163:10 |
| 39:17 81:1 | 29:25 | 126:18,24 | 185:6 | **Joann** |
| 107:10 | 31:17,24 | 127:6,12 | 186:13 | 26:2 40:16 |
| 112:7 | 33:13,19 | 127:13 | 187:5,19 | **job** |
| 126:20 | 34:2,4,24 | 129:15,24 | 188:6,11 | 40:5 131:13 |
| 175:20 | 35:3,22 | 130:25 | 188:16 | 159:22 |
| 177:16 | 37:13 | 131:8 | 189:14 | **Joe** |
| 202:5 | 38:18 | 132:13,17 | 190:7,24 | 6:2 7:21 |
| 209:21 | 40:12 42:4 | 133:8,13 | 191:15,20 | 8:11 25:9 |
| **issued** | 45:13,22 | 133:17,18 | 192:19 | 33:12 63:7 |
| 37:19,19,21 | 47:15 | 134:25 | 193:3,14 | 94:14 |
| 38:14 | 48:14,19 | 135:6,17 | 194:3 | 113:13 |
| 128:5,6,7 | 48:22 49:5 | 135:20 | 195:16,18 | 117:12 |
| 159:9 | 50:12 | 138:18 | 196:24 | 126:12 |
| 170:1,1,6 | 51:14 | 139:5 | 199:21 | 132:10,10 |
| 170:23 | 53:22 56:6 | 141:17 | 200:18 | 143:2 |
| **issues** | 56:10 63:8 | 142:7,14 | 201:15,21 | 176:9 |
| 176:7 | 63:11 | 143:4,7 | 202:3,25 | 184:19 |
| 192:12 | 78:14,19 | 144:23 | 203:12 | **John** |
| **item** | 81:10,14 | 145:1 | 206:6 | 163:16,22 |
| 105:17 | 87:19 88:6 | 148:6,19 | 207:6,12 | **join** |
| 109:3,7,23 | 88:12 | 148:25 | 209:20 | 9:9 119:20 |
| 114:12 | 89:13,18 | 149:10,13 | 210:17 | **joint** |
| 119:24,25 | 89:20,23 | 152:3 | 211:4,6,20 | 153:8,14 |
| 121:5 | 92:20 94:4 | 155:5 | 212:7,14 | **jointly** |
| 144:8 | 94:11,15 | 156:10,12 | **Jacobson...** | 71:9 |
| 150:15,15 | 94:19 | 156:19 | 6:4 | **Jr** |
| **items** | 96:14 | 157:2 | **JAMES** | 42:13 47:23 |
| | 97:19,24 | 158:4 | 2:11 5:15 | 152:22 |

153:23
**July**
3:6,23 26:1
77:14
96:17
174:18
179:13
180:4
**June**
3:10,12,18
3:20,21,22
4:9 19:2
40:16
48:23,24
51:8,10
56:23
57:25 59:8
62:11,13
62:22
73:19 76:8
90:2 92:21
93:4 94:21
98:20
106:24
118:2,14
118:16
123:13,13
136:5
139:22
142:24
145:2
146:2,22
147:19
149:7
150:9,13
151:3,3,4
153:5
161:15
169:2,4,5
169:7
170:6
208:4
**June15**
62:10
**JURY**
1:18 5:8
**Justin**
105:7

———
**K**
———

**K**
6:6
**keep**
25:12,18
33:17 43:5
45:2 57:13
65:1 71:17
75:23
77:23 89:7
93:6
130:17
160:17
173:6,17
174:19
196:9
**keeping**
40:5 208:23
**keeps**
28:10
**kept**
91:3 174:21
198:15
**Kernersv...**
64:12
**kind**
25:11,11
57:5 73:6
90:10
93:21
115:24
122:17
131:5
159:23
196:4
199:13
211:14
**knew**
24:24
199:23
200:5,6,11
211:24
**know**
11:2,24
12:19 14:2
16:5 21:6
21:14 23:5
24:21
26:18,20
26:21,23
30:8,13,14

31:6 37:4
37:10,25
38:4 39:10
42:16,22
43:10,15
43:21
44:22 48:1
49:7 51:4
55:11,24
57:6 58:14
59:23 61:2
61:12 69:1
69:6 73:2
78:25
87:10
93:25 95:4
96:8
102:25
105:4
110:7,18
111:22
112:10
116:24
117:6
118:21
124:14
127:19
128:15
129:10
137:9
138:25
141:10,25
142:5,16
142:18
148:16,23
150:4
153:12,12
157:12
161:21
162:10
167:4
168:1
171:10,14
173:12,18
173:19,22
175:12,16
175:20
178:8,20
178:23
179:22,24

184:8,17
186:9
194:11,13
194:14
195:5,6,8
195:9
199:12
200:3
201:19
202:18
203:8,10
205:20,21
212:5
**knowing**
142:15
**knowingly**
187:6,18,20
187:23
**knowledge**
23:19 24:5
25:7 50:6
124:3
176:13
198:11
204:13
210:2
**known**
62:16
174:12
196:23
199:25
209:4

———
**L**
———
**L-U-T-C-F**
42:16
**label**
19:7
**laches**
194:8,11,13
209:5,5
**lack**
45:17 87:18
111:13
120:12
121:7
148:2
178:19
**laid**
23:11

**Lakeisha**
105:9,19
107:14
108:4
119:18
131:9
159:16
**Lakeisha's**
105:21
**language**
15:3 130:7
**lapse**
62:13 75:8
75:9 92:25
93:2,8
96:15,23
96:25
118:16,18
132:23
174:8,9,11
198:21
**lapsed**
75:6
**lapsing**
197:6
**large**
171:25
**law**
36:23 37:5
37:11
**lawful**
7:14
**lawsuit**
9:18,21
12:5 209:8
**lawyer**
7:22 20:24
26:3,15
40:17
55:18
74:17
155:19,21
155:22,22
155:23
156:1
159:17
192:9,11
197:17
203:1

207:7,8
212:7
**lawyers**
11:6 50:14
155:17
157:18
173:20
**laying**
191:25
**layman**
185:8 187:4
192:13
**layperson**
190:22
191:13,16
**LDILLARD**
64:1,21
65:4 68:7
69:18,25
71:6 74:11
86:21 87:2
**LDILLARD's**
65:12 73:3
**leaders**
115:5
**leadership**
109:5 114:9
114:14,16
114:17,24
114:25
115:3,6,10
115:10,18
119:23
**learned**
75:11
108:13
**leave**
81:1 105:18
**leaves**
48:3
**leaving**
115:24
**left**
35:7 37:15
49:6 84:7
129:25
133:19
152:19
**left-hand**

90:14
135:22
145:8
**legal**
20:19,19
21:12 24:9
24:23 37:8
78:12
97:16
157:17
180:7
184:7
185:5
186:5
187:3
189:2
190:1,1,19
190:22,23
190:23
191:8,12
193:1,21
196:19
198:5
199:12
203:4
204:12
209:4
**length**
172:6
**Leo**
71:9
**lesser**
84:13,17
85:7
**let's**
46:5 48:19
61:21
63:24
72:13 81:5
82:22
89:18
100:9
114:6
119:13,14
133:8,12
144:17
160:23
162:16
173:16
**letter**

3:5,6,6,9
3:12,14,16
3:21,22,23
3:24 4:2,8
4:12,14
13:2,16
14:3,6,8
14:12 20:4
25:25
26:15,16
26:19 27:6
28:23 29:4
29:9,12
30:21
34:17
39:16
40:23
42:21
43:11,15
43:17,19
47:16
48:24 49:6
49:19
50:15,19
52:24 53:5
55:13
58:13,17
61:9 71:15
71:17,20
71:21,25
72:1,6
87:24
88:20
90:15,24
91:1 93:3
93:16,22
94:21,25
95:2,8
96:4,9,15
98:1 99:12
99:15,15
100:23
101:4,21
101:25
103:15,21
125:11
131:2,8,18
131:24
134:1,24
151:20

155:8,18
156:1,7
157:4
159:23
165:3,20
166:4,6,7
166:8
167:15
172:4,19
174:2
176:5
186:6,17
197:16
202:17
**letters**
42:15 61:11
62:13 93:1
96:18 99:3
99:9,12,19
99:22
101:9
112:22
113:1,2,4
120:3,23
120:24,24
132:24
135:2
157:16
158:1
174:8,9,11
198:16
**letting**
58:13 61:12
95:4 105:4
**level**
61:19 98:25
99:24
100:16
123:25
157:19
**levels**
100:2
**liability**
186:24
**liable**
200:21
**license**
205:17
**licensed**
205:11

206:7
**licensing**
206:5
**lie**
135:1,5
**life**
1:20,22 2:8
2:8 4:9
5:8,9,13
5:14 7:25
8:3,22 9:8
9:11,24
10:3 12:10
12:13,16
13:2,17,23
14:1,10
15:6,8,24
15:25 16:1
16:5,8,9
16:10,11
16:11,12
16:13,15
16:25 17:2
17:25 18:6
20:7,11,16
21:7,8,16
21:25
22:17 23:1
23:15 24:3
24:13 25:2
26:16,18
27:11,16
28:10,14
29:5 30:6
31:3,10
32:11,25
37:1,6
38:1 39:10
39:13,21
39:21 40:6
40:23
41:13 42:5
42:18,25
43:2,18,25
44:2,11,11
44:16,19
44:23,23
45:10,11
45:25
46:22

47:16,17
47:19,24
47:25 48:3
48:9 49:1
49:8 50:7
50:16
51:17
52:18 53:6
53:9,12
54:13
55:15
56:11 57:4
57:13
61:18 63:8
65:24 66:1
66:1 67:4
67:7,7,14
69:2 70:17
72:14
79:13
80:15
86:22 87:7
87:21 88:7
89:25 91:6
92:21
94:22
96:16 97:9
97:11,20
97:25
98:10,18
100:23
102:9,9,20
102:21
103:17,22
104:3,17
105:8
107:1,2,9
108:24
110:6,16
111:19
112:6
113:10
114:22
117:3
121:13,19
122:1,14
122:23
124:9,13
126:21
128:2,20

129:16,22
130:16,20
131:2,4,4
131:10,16
131:24
134:21
135:1,5,9
135:10,17
136:19
138:8,19
138:21
141:25
142:23
143:5
144:18
145:20
146:1
147:22
149:7
150:2
151:20
152:4,4,8
153:3,5,19
154:1,3
155:16
157:3,15
158:11
159:20
160:3,4,14
160:16
161:14
162:2,7,18
163:10,15
165:3,4,18
166:4,19
168:11,17
169:18
170:8
172:8
173:5,14
173:19
174:3,24
175:2,12
175:13,14
176:15,23
177:1,11
178:7,11
178:13
179:11,13
179:18

182:2
184:15
185:11
186:2,25
187:14,24
188:23
189:9,17
189:22
190:8,16
191:6,17
193:9
194:15,25
195:25
197:9
198:3,12
199:8,15
200:4,7,10
201:1
202:13
203:19
204:11
205:25
208:5,19
209:8
210:4,23
211:9,13
213:18,18
**Life's**
20:15 22:16
22:23,25
24:20
26:22,24
29:15
30:16 32:3
49:12
50:13
52:23
98:17
124:6
132:19
138:19
152:6
160:3
**Life/Uni...**
67:4
**light**
130:1
**lighter**
113:25
**likelihood**

118:15
130:13
**likewise**
141:22
193:25
**limit**
86:4
**limited**
210:16
**line**
90:15
104:19
123:7
150:15,15
161:12
**lines**
118:22
**liquidate**
31:2
**liquidation**
30:22
**LIS**
114:18,21
**Lisa**
64:12
**listed**
20:14 32:12
33:1 39:5
57:10
158:21
166:9
**listing**
57:11
124:20
**lists**
28:1 35:12
161:24
**little**
8:21,24 9:7
11:7,8
29:18 72:5
84:6 94:4
94:9 104:7
120:20
156:12
161:2
165:25
**lived**
196:3

**living**
36:17 71:10
71:11 80:3
124:24
183:24
**LLC**
28:23
135:23
145:9
153:20
154:4,11
154:13,14
**LLP**
6:7
**LMATZKE**
166:1
**loan**
80:7,22,22
80:23 81:1
**loans**
140:9
**locate**
53:13 54:9
91:18
**log**
4:15 160:14
**logs**
103:7
**long**
43:24,25
86:11
102:8
115:25
126:6
131:5
133:11
143:24
173:8,11
173:17
196:14
198:15,16
199:17
200:11,17
**longer**
43:5 45:2
47:19
49:16 59:1
69:11 71:3
74:7 78:7

```
  123:9              63:15 65:8      looping          107:22            121:22
  145:8,16           72:21 79:8      115:10           mail              188:24
  156:13             90:12           lose             33:1 50:15        193:9
look                 101:22          65:1              54:10,11         196:1
 10:16,18            102:16          loss              56:25 58:4       197:10
  11:7,11            105:13          4:13 87:10        58:8,10,11       198:3,12
  18:15              113:4,19         105:12,16        58:12,14         202:14
  19:15              114:5            106:10,11        58:20,22         203:20
  23:10 30:2         119:14           158:15,24        58:23 59:2      Management
  31:20 34:9         147:20           185:20           62:10,10         68:9,21
  36:10 46:5         151:19          losses            69:9,10          69:21
  46:11,17           154:16          186:20,21         70:14            70:13
  53:25 54:3         155:11,12       lost              73:24            110:23
  54:13,16           158:5,6,7       34:13 170:2       90:15,21         116:6
  54:19,22           167:11          lot               90:23,24        Manager
  54:23,25           174:1,8         11:5 27:1         91:3,6,21        107:19
  55:15             looking           115:2            92:6,9,13       Mantz
  56:19              11:8 19:17       117:19,22        93:7 95:2        105:3
  69:13              19:18            120:14           95:5,9,17       manual
  72:16              27:10            175:21           95:18,22         67:2
  78:23              28:20 35:6       182:15           101:5           March
  79:11,15           36:6 40:10       196:9            111:8            145:22
  90:9 91:7          56:14           Louis             112:8           marching
  91:16              58:21 64:3      6:4 132:3         125:14           33:20
  92:14 97:4         68:13,17        Louise            146:6,12        mark
  115:19             81:15,24        71:8              146:18           76:14
  119:15             101:1           lower             148:20          marked
  121:2              105:20          10:17,18          149:17          4:20,23
  124:8              106:3            12:15 42:6       166:6            10:12
  134:9              107:17,18        56:12            174:3            12:23,25
  141:10             109:20           124:8            198:20          13:15
  145:4              114:6            157:7           mailed            18:20
  148:11             119:7            158:20           29:9 41:17      25:23,24
  150:17,25          133:20,25       LSHESTINA         88:22           28:17
  152:5              147:21          64:20             90:16,25        29:24
  154:7              152:15          Lucas             113:2           31:18,21
  158:8              163:23          105:7             146:7,11        33:8,10
  160:23             185:19          lunch             146:13,19       38:17 42:1
  171:21             211:15,19       125:25            146:22          47:11,12
  176:9             looks             126:3,12         149:18          48:21,23
  177:5              30:17 64:6       132:12           209:10,12       50:9,11
  190:24             64:10,10         133:9,19        mailing          56:7,9,11
  198:24             74:25                             95:23           56:13
  211:11             79:19 90:7      ____M____         101:15          88:24
looked               137:12          magnifying       148:9           89:22
 27:1 30:21          160:21,24       84:4            making            92:18,19
  34:19 35:4         161:15,19       magnitude        66:21 69:18      94:18
  39:2 51:7          162:15          100:12,13        70:8             96:13,16
  58:2 60:8         loop             maiden           105:22           97:25
  62:18              114:16                            115:24          100:22,25
```

102:4,6
103:25
104:2
107:1,3
113:5,7
119:6
121:11,14
122:13,15
126:17
130:24
131:1
152:2
155:3
156:9
158:9,11
159:11,25
160:2
162:18
168:12
169:13,15
180:20
**marks**
157:7
**Marylee**
26:1
**matches**
103:6
167:10
**material**
137:7
**materially**
76:22
**matter**
98:16 99:7
**matters**
157:18
162:12
187:9
197:4
**matured**
75:12
**maturity**
66:25 67:24
68:2 70:21
70:21 71:1
75:14
140:14,18
196:3,6
**maximum**
80:9 81:16

82:1
**maximums**
141:23
**mean**
12:11 17:8
17:19
20:12
32:17 44:1
44:7,9
60:14
63:17 65:6
67:12,21
69:17
71:15,24
73:21 79:4
84:11 88:3
95:18
99:10
101:14
104:20
105:24
106:5
108:23
114:3
123:3,18
124:17
125:10
130:11
164:6
165:24
166:5
184:11
186:13
**meaning**
44:10
**meanings**
44:12
**means**
17:20 42:16
44:2 57:6
60:7 61:16
63:18
67:25 68:1
68:1,15
73:22
78:20
83:15
87:25
90:19,25
108:21,25

123:22
146:9
209:5
**meant**
66:2 72:10
111:14
115:6
147:14
166:1
**mechanical**
37:24 38:5
38:7
**meeting**
10:13,24
13:5
114:18,25
114:25
115:6
119:21
**meetings**
115:3
**Melvin**
43:21
**memo**
4:6 122:17
124:4
**memos**
160:15
**mentioned**
55:21 58:3
62:18 77:4
93:1 96:6
97:5 167:5
213:3
**mentions**
20:5
**menu**
84:7
**Meramce**
132:2
**Meramec**
132:2 177:9
177:21
178:1
**merged**
73:20 88:20
**merging**
73:18
**message**

22:11 30:20
38:24
52:12
167:22
**messages**
30:9 121:18
**messing**
127:4
**met**
185:15
**methods**
55:20
**middle**
65:19
105:20
119:13
**migrated**
110:7
**Mike**
105:7,9,13
105:21
106:16
**million**
76:16
208:21
**mind**
194:21
204:25
205:1
207:22
**minimums**
141:23
144:10
**minus**
76:16 84:7
**minute**
31:20 74:9
**minutes**
119:20
182:8
**miscella...**
4:13 87:10
105:12,16
106:10,11
158:15,24
**mischara...**
196:16,17
199:19
200:13

**missed**
115:9
**missing**
143:14,15
154:21
**Missouri**
1:5 5:1 7:6
**misspelled**
132:3
**misspelling**
41:5 164:7
177:11,16
177:18
**misstated**
119:8
**mistyped**
177:10
**mitigate**
188:20
**MMURAWSKI**
63:15
**MO**
6:4 132:3
**MO-CCR**
2:19 213:19
214:2,17
**modify**
126:25
**moment**
26:7 42:24
49:3 79:15
82:12
93:23
102:11
183:8
**money**
16:16 159:6
174:22
**month**
16:17,18,20
16:21,22
17:15
46:12
55:10,13
76:10,11
76:12,15
76:22
77:12
96:18

139:8
month's
17:16,17
month-av...
123:12
month-by...
77:11
151:11
month-to...
46:21 99:19
99:21
monthly
16:17,19
45:20,22
45:24 46:3
46:6,14,18
46:18,20
46:25 47:5
47:7 75:24
76:4,5
87:16
143:20
months
49:5 76:19
76:20
77:16,20
77:24
139:18
147:24
199:24
200:6
morning
7:21 161:17
move
33:16 64:19
65:18 94:6
99:22
123:14
128:1
129:20
144:17
moved
68:10,11
72:21
123:13
144:8,14
moving
63:11 66:5
70:16
71:18

73:18
88:17
131:23
multiple
70:3,5,5,8
multiply
85:1,2

**N**

N
6:1 19:4,7
35:4 132:2
Nalls
105:7,9
106:16
121:23
name
7:21 14:17
18:25 28:4
35:9 42:15
56:20,21
57:10,14
57:14,17
57:23 67:8
92:15 95:7
102:2
104:21,23
107:22
136:15
137:17
154:10
166:9
named
62:20 71:1
161:19
nature
175:7,9
near
169:12
necessarily
55:11 139:1
necessary
17:14 27:20
109:1
188:19
207:5
need
11:23 25:20
26:7 33:25
65:9 87:9

89:14
104:7
105:11
114:4,15
133:11
162:23
168:3
171:11,13
178:22
212:10
needed
23:20 24:6
24:12,19
67:3 77:3
168:1
170:20
183:5
neglected
188:18
negligence
185:21
neither
49:10 127:6
205:18
214:10
net
150:2 181:5
183:12
never
31:2 32:21
72:9 80:23
110:2
122:25
146:11
153:10
159:5
177:20
178:1
new
1:20,21 2:7
2:8 4:9
5:8,9,13
5:14 7:25
8:3,21 9:8
9:11,24
10:3 12:9
12:13,16
13:2,16,23
13:25
16:25 20:7

20:11,15
20:16 21:7
21:8,16,25
22:15,16
22:23,24
22:25
23:15 24:2
24:13,20
25:2 26:16
26:18,22
26:24
27:11,16
27:22
28:10,14
29:4,10,14
30:6,16
31:2,10
32:2,10,25
34:14 37:1
38:1,8
39:10,13
39:17,20
39:21 40:6
40:23
41:13 42:5
47:16,17
47:19,23
47:25 48:3
48:8 49:1
49:8,12,13
50:7,12,16
51:17
52:17,23
53:6,9,12
54:13
55:15
56:11 57:4
57:13 58:2
63:8 64:9
69:2 70:16
71:16,20
72:14
79:13
80:15
86:21 88:7
89:24 91:6
92:8,21
94:21 96:2
96:16 97:9
97:11,20

97:25
98:17
100:22
102:8,9,20
102:21
103:16,22
104:3,17
106:25
107:2,9
108:24
110:5,16
111:19
112:6
113:9
117:3
121:12,17
121:19
122:1,13
122:23
124:6,9,12
126:21
128:2,20
129:16,21
130:15,19
131:2,3,4
131:9,16
131:24
132:19
134:20,25
135:5,9,10
135:17
138:7,19
138:19,20
141:24
142:23
143:4
144:18
145:20
146:1
147:22
149:6
150:1
151:20
152:3,4,6
153:2,4,19
154:1,3
155:16
157:3,15
158:11
159:20

160:2,3,4
160:14,16
162:2,7,18
163:14
165:3,4,17
166:4,18
168:11,16
169:17
170:8
172:7
173:5,19
174:3,24
175:2,9,11
175:13,14
176:15,23
177:1,11
178:7,11
179:10,12
182:2
184:15
185:11
186:2,25
187:14,24
188:23
189:17,22
190:8,15
191:5,17
193:8
194:15,25
195:25
197:9
198:2,12
199:8,15
200:4,7,10
200:25
202:13,21
203:19
204:10
205:24
208:4
209:8
210:4,23
211:9,13
213:18,18
**nine**
14:15
**Nineteenth**
200:18
202:3,14
**Ninth**

190:25
191:6
**Nod**
169:11
**normal**
58:25
106:14,17
106:18
126:8
130:15
155:18
**normally**
21:24 91:1
158:19
160:20
176:14
**North**
6:7 177:9
**Notary**
168:4
213:10
**notated**
56:22
**notation**
64:13,25
**notations**
64:23
**note**
61:5 86:20
88:17
117:8
118:23
124:23
126:22
128:19
162:21
164:14
165:18
166:19
**noted**
27:11 62:23
67:22
**notes**
61:4 63:13
108:8
117:1
124:22
167:12
214:8

**notice**
3:20 4:18
10:5,11
23:11 24:4
31:9 48:4
51:6,16
52:13,17
58:15 59:1
59:3 69:7
90:2 96:4
98:6
118:14,17
118:18
132:24
133:23
142:24
145:2
146:2,6
149:7,17
149:20
153:7
171:5,18
191:24
199:1,2
200:16
**notices**
62:12 67:23
75:8,9
118:16
132:22,23
134:3
198:19,19
198:20,21
**notifica...**
53:25
**notified**
197:13
**notify**
199:4
**noting**
68:7 90:23
**notion**
121:4
**notwiths...**
41:12
**November**
3:7 59:25
60:4,5
116:13
122:18

165:18
166:5,19
167:23
**number**
12:16 14:6
14:20
19:14 28:5
28:5 31:9
35:9 37:20
37:21
47:20
49:20
54:21 55:1
55:18
56:20,21
63:6 81:8
81:10,24
85:3,3,14
95:6,12
100:15
103:5
106:21
123:6,19
124:9,16
124:19
128:6,8
131:20
135:16
136:15
137:16
140:4
143:2
149:9
166:23,24
168:6,7
170:2
204:19,21
**numbered**
25:10,14,15
81:12
127:8
**numbers**
28:7,8
**NYL**
3:13,21 4:2
4:11,15
12:16
165:20
**NYL00029**
3:18 50:13

**NYL00326...**
4:12
**NYL00367...**
3:9
**NYL00369**
4:7
**NYL00414...**
4:5
**NYL00418...**
4:14
**NYL00429...**
3:20
**NYL00470...**
4:11
**NYL00615**
3:5
**NYL00616**
3:7
**NYL00648...**
4:17
**NYL00736**
3:19
**NYL00738...**
4:3
**NYL00784**
3:14
**NYL00785**
3:15
**NYL00786**
3:17
**NYL00789...**
4:9
**NYL00883...**
3:22
**NYL00885...**
3:24
**NYL00887**
3:25
**NYL00912...**
4:4
**NYL00914...**
4:4
**NYL00919...**
4:6
**NYL356**
4:16
**NYL417**
4:13 158:12
**NYL429**

56:12
**NYL888-911**
4:15
**NYL921-971**
4:8
**NYLIAC**
13:19,20,22
13:24
14:24 15:1
15:23
23:16 24:3
175:10,11
175:15,17
175:25
176:6,14
176:24
178:12
179:13
182:3
185:11
187:1,15
188:24
190:8,16
191:6,17
193:9
194:15
195:1
196:1
197:10
198:3,12
199:9,15
200:5
201:1
202:14
203:20
204:11
**NYLIAC's**
177:12

———————
O
———————
**oath**
7:16
**object**
60:10,22
63:1 71:16
71:20,21
71:25
72:19,20
72:21
78:11

87:24
88:10,11
88:13,15
115:12
172:9
178:19
181:16,22
211:17
**objection**
20:18 21:11
22:18 23:2
24:8,22
31:12
35:18 37:7
45:7,17
56:3 78:10
78:17
87:17,18
97:15,21
100:17
109:16
111:12,25
115:14
116:2
120:12,19
121:6
129:8
134:22
135:3
138:13,23
141:15
142:2,11
148:1,14
148:22
157:22
162:4,9
172:22
177:14
178:18
179:3
180:6
184:6
185:4
186:4
187:2,16
188:3,9
189:1,25
190:18
191:8,19
192:14,23

193:11,12
193:18
196:16
199:19
200:13
201:13,18
202:2,23
203:3
206:1
212:2
**objections**
20:21,22
**objectives**
208:18
**objects**
21:2
**obligated**
189:20,23
**obligation**
24:2 184:4
184:8,11
**obligations**
198:9 202:5
**obtain**
210:4
**obtaining**
197:1
**Obviously**
102:20
**occasion**
62:1
**occasions**
183:20
**occurred**
75:13
132:11
**October**
4:2 100:23
140:24
141:12
**odd**
176:22
**offer**
8:8 75:10
75:20 87:4
105:22,25
105:25
106:4,23
108:2

122:4
134:2
201:24
**offered**
74:25 75:1
**offering**
8:17 75:19
87:9
206:23
207:1
**offers**
17:1 106:23
**offhand**
210:11
**office**
50:19 58:14
73:15 74:1
74:16 87:3
90:22 95:4
95:9 99:25
110:17
111:1,2
156:3
198:17
**officer**
9:4,10,12
74:12,13
74:14,15
74:17,18
74:19 87:1
99:14,19
158:25
159:1,2
**Officers**
159:3,4
**offset**
195:12,20
**OGC**
73:15
**oh**
79:22,24
82:1,6
84:9
101:20
104:6
108:10
123:21
164:9
188:13
204:23

206:19
207:12
**OK**
65:23
**okay**
8:16,19
10:4,8
11:1,12,13
11:20,21
12:13
13:11,14
14:3,8
16:2 17:22
17:25
18:18,23
19:9,12,16
19:23 20:2
22:7,14
25:4 26:11
26:24 27:3
27:8,11,23
28:21,22
29:13,18
29:21 30:4
30:19 31:8
31:17
32:10,16
33:24 35:1
37:13
38:16,22
38:23,24
39:13
40:10,12
42:4,20,23
44:9 47:15
48:7,12
49:24 50:3
50:25
51:24
52:16
55:14,23
56:1 57:2
57:10,22
57:25
58:23 59:6
59:25 61:3
61:8,14,20
62:24
63:25 65:3
65:18

| | | | | |
|---|---|---|---|---|
| 66:19 | 122:22 | 179:17 | 211:9 | 108:21,23 |
| 67:12,20 | 123:2,21 | 180:1,14 | **open** | 108:25 |
| 68:4 69:5 | 124:16,22 | 183:4,18 | 10:8 11:10 | 116:9 |
| 70:15 71:5 | 127:12,20 | 184:10,14 | 13:10,12 | 125:4 |
| 71:14 72:9 | 128:19 | 184:22 | 33:16,17 | 128:17 |
| 72:19 73:1 | 129:20,23 | 185:16,19 | 65:1 89:8 | 154:23 |
| 73:16 74:3 | 131:7,8 | 186:19 | 94:5 | 177:10 |
| 74:6,11,16 | 132:15 | 187:5 | 109:23 | 210:10 |
| 74:21 77:2 | 133:7,25 | 190:24 | 115:24 | 211:9 |
| 78:3 79:15 | 134:25 | 193:3 | 116:5,9 | 212:11 |
| 79:22,25 | 135:6,12 | 194:3,6 | 156:15,20 | **organized** |
| 80:20 81:5 | 135:22 | 195:10 | **opened** | 168:24 |
| 81:7 82:3 | 136:14 | 196:24 | 105:5 | **oriented** |
| 82:6 83:7 | 137:3,14 | 197:19 | 156:21 | 72:18 |
| 84:9,11,21 | 138:7 | 198:7,24 | **opening** | **original** |
| 85:11,21 | 141:24 | 206:12,17 | 28:20 | 34:12 88:11 |
| 85:24 | 144:21,25 | 208:2 | **operate** | 128:17 |
| 86:14,18 | 146:13,16 | 211:16 | 176:14 | **outlined** |
| 87:11,13 | 147:4,7,18 | **old** | **operations** | 144:3 |
| 88:12,17 | 149:13 | 29:6,10,10 | 13:25 | **outlining** |
| 89:10 | 150:14 | 29:12 | **opinion** | 107:24 |
| 90:19 91:5 | 151:2,6 | 58:13 | 20:19 21:12 | **outside** |
| 92:23,25 | 152:13,18 | 65:21 67:7 | 186:5 | 31:12 35:18 |
| 93:15,24 | 153:14,18 | 67:8 68:10 | 190:1 | 91:11 |
| 94:1,2,17 | 154:21,24 | 104:21 | 195:7 | 106:16,18 |
| 94:21 96:3 | 155:22,25 | 208:22 | **opinions** | 109:17 |
| 96:14,22 | 156:4,6 | **older** | 8:7,17 | 115:13 |
| 98:4 101:3 | 157:1,2,15 | 43:5 46:14 | 206:22,25 | 116:3 |
| 101:17 | 158:4,19 | 76:14 | **opportunity** | 134:22 |
| 102:2,4,11 | 159:5,16 | **omission** | 105:23 | 138:24 |
| 102:13 | 160:8,23 | 187:7,10,20 | 106:4,6 | 155:17 |
| 104:9,12 | 161:11,18 | **omissions** | 120:1 | 157:19,22 |
| 104:14,24 | 162:11 | 185:21 | **opposed** | 162:5 |
| 105:20 | 163:8 | 203:17 | 102:3 | 190:1,21 |
| 106:10 | 164:9,13 | **once** | 140:21 | 206:1 |
| 107:6,12 | 164:18,18 | 73:23,24,24 | **opposite** | **outweighed** |
| 107:23 | 165:2,12 | 85:21 91:5 | 88:9 | 147:15 |
| 109:2 | 166:14,17 | 91:10 | **option** | **overlooked** |
| 111:5,22 | 166:21 | 143:19 | 61:19 70:23 | 32:14,16 |
| 112:15 | 167:10,16 | 198:17 | **options** | 125:13 |
| 113:17,18 | 167:22 | **one-page** | 75:14 | 177:19,19 |
| 114:24 | 169:1,6,9 | 122:13 | **order** | 177:24 |
| 115:22 | 169:20 | 124:4 | 25:10 27:21 | 186:9 |
| 116:11 | 170:11,21 | 168:10 | 54:8 60:19 | 188:5,14 |
| 117:1 | 172:3,24 | **ones** | 61:21 | 202:24 |
| 119:4,13 | 173:5,19 | 16:4 19:11 | 66:15 | **overlooking** |
| 119:17 | 173:23,25 | 33:25 53:3 | 68:11 91:9 | 203:2 |
| 121:3,10 | 174:7,14 | 204:12 | 100:9,12 | **oversight** |
| 121:15 | 176:18 | **online** | 100:13 | 66:16,18 |
| 122:5,12 | 178:11 | 210:22,24 | | 106:8 |

```
132:4                208:14               40:15,23             160:12,23            68:10 70:7
187:22               210:3,15             52:18 59:7           160:24               70:11
owed                 210:21               59:7,25              161:12,18            90:13
198:9                owner's              61:3,22              162:18               129:18
owned                57:14 79:12          63:3,7               163:12,14            papers
117:18               149:5                65:19 68:5           163:14               70:11
153:10               owner/be...          68:6 70:15           164:13               paperwork
164:21               112:12               70:16                165:2,3,17           31:1 168:3
180:11               owners               72:14,17             166:18,18            168:6
owner                21:21 57:18          79:18,19             169:23               189:11
17:9 22:5            79:4 138:8           80:10 81:3           172:3                paragraph
27:12 29:7           141:25               81:6,15              180:24               30:19,22
29:10,10             142:16,18            86:21 88:1           184:12               42:21 98:9
29:11,12             148:10               88:4,6               pages                98:14
32:7 34:14           153:8                97:4                 26:14 33:16          131:23
35:12,15             164:1                102:24               36:7 39:1            132:20
35:20,24             178:16               103:10,14            56:10,16             172:25
36:2,3,4             179:2                104:3                102:16               173:25
37:2,6               180:8                107:2,13             107:2                174:7,14
38:12 39:4           208:19,22            108:11               126:21               175:8,19
41:2 54:23           ownership            126:22               127:1                179:10
55:2,20              26:4 27:4,9          127:8,15             129:24               180:16,25
57:12                29:2,5,14            127:15               146:16               181:2,12
59:15 78:3           30:20                128:1,2,20           152:25               181:14,19
78:15,20             40:19 62:5           128:21               156:24               182:3
79:1 91:4            124:24               129:20,21            160:2,10             183:1,6
91:14                135:24               133:21               162:15               192:3
92:15                154:19               135:13,14            165:7                paragraphs
93:19                170:24               137:3                168:4,5              132:18
115:20,20            ownerships           139:5,6              paid                 pardon
122:9,10             178:13               140:4,4              18:3,4,4,6           209:12
128:21               owns                 141:10               18:12                parenthe...
129:6,14             163:2 176:7          142:23,25            45:20 47:5           62:15
138:12,15                                 143:8,11             48:6 70:25           part
142:9,12             ─────────────        143:13,14            82:16 83:4           7:15 26:11
146:11                     P              143:15,16            84:14,18             37:1,20
149:3                P                    143:19,24            85:6,7,8,9           41:10
151:8                6:1,1                144:17,19            85:11,14             58:19,20
152:18               p-o-l                144:20               85:16                63:23
153:4,6,8            167:8                145:11,19            122:3,4              77:25 97:8
153:20               P.C                  145:25               123:8                104:18
155:19,20            6:3                  146:1,17             124:23               113:19
155:21               p.m                  147:4,21             141:13               121:16,17
156:2                74:7 119:15          149:6                167:2                124:6,12
164:15               page                 150:1                169:2                128:7
167:7                4:20 19:15           151:11,14            181:5                131:13
168:23               27:8 35:5            152:16               183:14               132:4,21
179:18               35:7 36:5            153:4,19             198:14               154:20
198:18               36:8,8,10            154:1,3              203:23               172:1
201:4                37:14,14             160:3,4,12           paper                174:17
                     37:15,16
```

```
  199:22           123:10         percentage      138:19         plaintiffs
partial            141:11         18:10,11        petition       1:15  2:13
140:9              174:16         19:18,19        4:19 180:16    5:6,16  6:5
partially          196:8,10       83:14,18        187:9,11       7:2,15,22
202:10           payable          84:13,15        190:11,25      185:23
participate      75:17            85:1            192:5          186:22
12:6             paying         Percentages       193:4          188:18
particular       158:17          83:9            194:7,18        190:9
9:18 12:19       payment        perform          197:2,5,23      195:3,6,11
  15:5 25:10     82:22 106:2     163:1            203:15         195:19
  46:12 51:1     121:22        performed         207:19          196:25
  52:17          149:14          198:8          phone           197:2,22
  59:19          169:7            203:23         28:8 47:20      198:10,25
  63:22          204:18        period            54:20 55:1     199:4,16
  70:16        payments         64:24 66:4       55:17          200:5
  71:21         45:15 46:18      77:15,19        103:5          202:7
  74:16 99:4     52:12 71:2      112:16          117:16         203:1
  99:5 121:1     140:16,20       123:16          166:23         208:3,9
  161:24         140:25          147:8           168:7          211:8
  172:11         141:6,20        174:21          173:8         Plaintiffs'
  181:17         145:22          201:6           195:15        186:20
  200:24         168:20          208:17         photocopy       194:7,21
parties        pdf             periodic...       70:8           196:12,18
185:22          35:5 36:5       61:11 91:7      phrase          200:22
  214:11,12      79:19 81:6    permanent         111:19         201:11,16
parts            83:25 84:1     3:13 42:25     physically       201:17
190:23           128:21          43:2,25        38:4           202:9
party            129:21          44:2,19,23    Pi               203:13,14
59:14,14         135:13        permanently      165:19          204:3
  119:2          142:23         44:4,25        piece            207:22
  161:13         144:20          45:1           60:17,17       plan
  163:16,22    pending         person           61:25          14:22 17:4
passed          12:1,1          19:25 20:15     69:22 70:7      134:11
95:21            156:18          53:13 54:5     101:12          136:16
passing          170:13          54:21         pieces          146:15
70:24 75:15    people            56:23         60:21           149:15
path            11:6 16:16       59:19 60:6    place           planned
106:14           54:4 60:20      62:20 69:2     37:19,20        17:12,13,19
pause            63:21           69:9 72:23     53:12 91:1      18:5 45:15
94:5             64:19           91:19 96:8     91:2,21         52:8,9
pay              68:20 82:7      99:12,13       102:3           82:23
16:16 17:9       88:14           99:17,18       128:5,7         136:16
  17:13          91:12 99:8      105:19         170:1           140:15,19
  30:18          99:21,24        141:9          174:13         planning
  67:17 76:3     100:16        person's         175:5          8:17
  77:3,22        104:16         164:25         placed          please
  82:23          160:14,17     personal         19:7 90:22     7:11 26:9
  85:19          173:7          11:23          Plaintiff's      52:11 58:9
  86:15        per-thou...     perspective     4:19            81:9 89:12
                 46:14                                          102:25
```

105:7
125:24
135:16
143:3
**plus**
84:7 181:4
**PO**
167:4
**poa**
118:1,8
163:13,16
163:18
164:2,5,14
**POC**
59:22
**point**
11:22 18:6
23:20
35:16 47:5
57:15
59:24 65:9
70:10 78:7
78:21 91:7
98:17
101:8
108:14
111:5
114:11,16
115:11
118:1
119:22
124:24
125:1
145:4,15
164:25
173:10
181:3
183:11
208:16
**pointing**
24:16
209:22
**points**
111:6,11,15
111:18,23
124:16,19
209:22
**pol**
163:17
**policies**

9:25 15:7,9
15:24 16:5
17:2 20:14
21:22 25:1
27:16
31:10
69:24
117:19
127:16
129:11
142:1
161:14
163:3
165:14,15
165:22
166:15
170:9
172:25
175:1,4
176:8
177:1
178:13,16
178:17
179:19,19
**policy**
3:10 4:7,10
4:17 9:15
9:18,19
14:4,5,6
14:20,22
15:1,3,25
16:1,8,9
16:10,11
16:11,14
17:8,10,13
18:1,8,18
18:24 19:1
19:2 22:5
29:2,14
32:7,9,14
32:22 33:3
33:5 34:12
34:14,16
35:9,9,20
36:8,16,16
36:17,19
37:2,6,18
37:19,20
37:21,21
38:13,13

39:1,14,18
39:22
40:20,25
43:18 45:2
45:14
46:12,17
46:22,24
47:7 53:14
55:16 56:2
56:20
57:12 58:2
58:11,12
59:15
61:15,17
62:12 65:8
65:10 66:3
66:11,25
67:7,14,17
68:2 69:22
70:23 75:6
75:11,12
75:15,20
75:21,23
76:3,17
77:15,17
77:18,22
77:23 78:4
78:5,5,15
78:15,16
78:18,21
78:22,25
79:1,2,3,5
79:12,19
79:20 80:1
80:2,8,9
80:16,24
81:23,24
82:8,22
83:1,9,19
85:25 86:4
86:6,11,20
90:24 91:2
93:19 95:6
98:6 103:2
104:22
116:14,15
116:24,25
117:4,5,14
117:17
118:2,12

120:2
122:2,9
123:6,7
124:18
125:12,12
126:20
127:22,23
128:5,6,6
128:7,8,14
128:15,20
128:22
129:1,2,6
129:21
130:4,9,15
130:16,21
131:20
132:18,22
133:5,6
134:4,6,13
134:17
135:7,14
136:8,15
136:16
137:8,15
137:16,19
138:9,12
138:15
140:5,9,23
141:11
142:10,12
142:15,16
142:17,18
143:1,25
145:12,21
146:11,17
146:21
147:18,21
147:23
148:10,11
149:3,5
150:21
151:7,9,21
151:21,25
151:25
152:7,7,8
152:18
153:4,6,9
154:25
155:19,20
155:21

156:2
161:24,25
163:2,9,9
163:25
164:15,21
165:10,14
165:20
166:24,24
166:25
167:3,8,25
168:20,22
168:23,25
169:2,4,17
169:25
170:1,2,19
170:21,23
171:1,3
173:14,21
174:4,20
174:23
175:3
176:24
178:16
179:1,2,5
180:4
181:3,13
181:20,23
182:4,6,8
182:11,23
183:20,23
183:23,25
184:5
186:11,14
189:10,15
189:17
190:5
195:12,20
195:22
196:4,9,14
197:6
198:15
200:15
201:3
202:5
203:22
204:14
208:6,15
208:17,20
208:22
209:21

210:3,12
210:15
**Policy's**
87:14
167:17
**policyho...**
22:8
**policyho...**
138:17,20
138:22
176:15,24
**policyowner**
42:22
116:15
**pop**
82:14
**pops**
204:25
**portion**
53:18
181:13,20
182:4
**position**
75:19 97:17
97:22 99:8
99:10,14
**positions**
24:20
**possible**
54:2 87:13
105:10
127:16
129:5
137:11
176:4
**Post**
50:18 58:14
90:22 95:4
95:9
198:17
**Postal**
174:2
**power**
118:8,10
161:22
162:12
163:23
164:9,10
164:10,20

165:9
166:3
**practice**
52:24
**pre**
68:12
**pre-AWF**
114:15
115:9,18
**preceding**
139:18
**precipit...**
167:14
**precluding**
186:24
**prefaced**
204:6
**premium**
3:20 4:16
16:12,12
17:4,9,23
18:3,5
45:15 47:4
52:3,8,9
52:12
62:12 71:2
75:8,9
77:23
81:19,25
82:4,8,9,9
82:17,17
82:22,23
83:22
84:15,23
85:8,10,12
85:13,15
90:2 93:15
101:10
124:23
133:23
134:3,11
136:17
140:15,19
142:24
145:2
146:2,6,15
149:7,15
149:17,20
161:14
168:14,19

169:2
181:4,5
182:17
183:12,12
183:13,15
183:16,17
196:9
198:14
204:18
210:13
**premium's**
183:14
**premiums**
17:13,14,14
45:20 82:7
82:8,16
84:14
85:14
87:16
141:11
175:3
181:5
195:13,21
203:23
204:14
**preparation**
171:23
172:18
**prepare**
23:7 185:10
185:13
192:11
**prepared**
55:13 136:5
153:2
159:10
**preparing**
24:18
175:21
185:17
**present**
207:4
**presents**
150:18
151:8,11
**President**
9:4 37:25
43:22
98:23,24
**presidents**

9:2 99:4
100:10
159:3,4
**Press**
6:3
**pressed**
64:21
**presume**
124:10
**pretty**
40:5 158:1
160:16
173:1
**prevented**
202:8
**prevents**
58:11
**previous**
116:14
**previously**
34:20 37:19
37:20 97:5
102:16
114:14
119:9
128:6,7
158:7
170:1,23
171:4
**price**
77:9
**primary**
166:3
**print**
127:16
130:1
**printed**
57:16
127:17
146:10
**printing**
90:8
**prior**
19:8 68:5
71:5 73:14
88:1 96:18
119:23
136:8
144:12

147:7,23
150:17
164:16
165:7
185:23
186:8
205:3
**privacy**
95:5 149:5
198:18
**privilege**
190:19
**privileged**
189:2 190:2
191:10
192:15,24
193:20
**probably**
40:3 73:6
**problem**
102:1 127:4
199:16
200:11
**problems**
199:23
200:6
**procedure**
53:12,20,23
54:24
55:22,24
58:20
91:20,22
174:23
**procedures**
25:1 157:16
172:25
173:1
175:1,5
**proceed**
8:15
**proceedings**
214:8
**process**
49:15 53:12
54:12 57:7
58:18
64:19
66:16,17
90:20 95:1

97:8
105:10
106:11,14
106:17,18
108:25
120:5,21
123:12
132:19
155:18
156:4
178:22
187:25
188:5,7,15
203:8
processed
32:14 62:5
66:12
69:23,25
105:15
108:16
125:4
132:5
169:5,7
203:7
produce
40:4 90:25
170:19
produced
5:15 7:14
25:16
26:17 33:6
39:21 40:1
50:15
56:11,18
57:8 58:12
66:11 90:7
90:12
117:10
122:25
127:7
129:11,12
134:24
produces
168:17
producing
137:13
product
65:22 67:2
189:3
190:3,20

191:10
192:16,25
193:20
206:4
production
12:9,11
57:20
products
65:25 66:1
67:7
206:11
professi...
7:5 42:17
professor
78:20
projections
136:11
promised
132:11
prompt
116:1
prompted
43:13
prompts
43:10
proofread
214:7
proper
129:6
properly
97:13
protect
20:22 149:5
198:18
provide
32:9 77:19
78:22 79:2
93:14
98:20
117:13
118:3
149:4
179:11
184:4
204:16
provided
62:7 198:22
201:5
202:16

203:5
204:14,15
204:15,18
provides
14:12 44:4
77:16
103:5
136:11
138:8,20
providing
67:1
provision
78:18 79:6
130:14
184:3
provisions
78:23 80:8
proximately
186:22
Public
213:10
published
54:7
pull
79:10
purport
181:19
purpose
127:20
148:9,16
170:18
purposes
57:20
pursue
65:13
put
58:8,10,22
63:15
65:10
67:13 69:8
69:10 70:2
70:4,5,7
99:17
106:23
107:25
127:18
142:4
160:20
206:9

putting
58:15
129:18

_____

Q

quality
15:12
quarterly
114:18,21
115:3
question
11:17,18,25
21:3 22:4
24:1,4,17
33:15,22
44:19 50:4
50:4 53:16
55:14
107:8
112:3
114:3,6,7
121:8
127:7
151:6
156:18
157:3
170:13,16
172:10,12
176:20
177:5,25
188:9
199:15,22
200:2,4
201:17,22
204:24
206:19
209:2,18
questions
3:2,2,3
7:20,24
25:5 33:21
103:1
108:3,4
113:20
120:14,17
161:13
172:10
193:12,17
193:19
204:21

206:17
207:11,15
209:18
211:1,6
quick
8:18 124:17
quickly
46:9
quite
21:18 30:12
185:17
quote
65:21 66:23
67:1
167:24

_____

R

R
6:1
raise
7:11
ramifica...
121:19
random
79:5
rare
158:1
rate
45:21
139:12
140:21,21
141:1,6,7
141:20
rates
82:11,11
144:7
ratified
197:3
ratifying
197:6
reach
27:21 47:21
49:20
58:15 67:1
167:6
reached
65:4 66:25
120:3
201:4

reacts
21:9
read
26:7 36:13
  36:14,24
  37:22
  42:20,22
  43:8 53:16
  53:17 71:7
  74:9 79:25
  105:5
  108:19,20
  109:9
  111:9
  114:19
  118:6
  120:8
  130:8
  132:7
  133:2
  163:4
  166:20
  168:8
  170:20
  181:17
  183:20
  185:1
  195:17
  207:9,24
  211:3
  212:9
  213:1
reading
26:9 83:23
  141:18
  166:2
  182:16
  212:8
reads
207:18
ready
48:17 49:18
  65:17
  89:16
realized
66:3,24
  189:5,8
really
10:1 15:9
  16:3,5

23:3 30:13
44:7 45:9
99:7 100:1
100:3,6
106:13
111:3
114:2
115:2
127:18
128:18
165:25
208:12,18
reason
11:24 48:10
  64:23
  69:13 99:2
  126:23
  129:10
  130:10,16
  130:19
  139:1,3
  143:14
  157:13
  199:3
  206:12
reasonable
188:19
  189:12,21
  194:1
  199:2
  201:6,8
reasons
139:4
reasserts
47:19
recall
50:3 93:23
  112:17
  124:7
  209:25
  210:11
receive
54:10 62:9
  75:7,9
  78:6 79:14
  80:13
  82:10,10
  93:15,18
  93:21
  210:21

received
26:18 39:10
  53:24
  54:11
  59:14 62:5
  62:9 64:2
  69:7 73:12
  73:14
  80:11
  102:20
  108:15
  125:2
  131:25
  157:3,10
  157:13
  165:20
  166:3,21
  167:24
  186:6
  188:2,4,14
  189:7,16
  196:12
  204:17
  206:21
  208:4
  209:14
receives
28:10
receiving
56:7 189:6
  189:8,11
  200:1
  209:16
Recess
15:19 48:16
  89:15
  126:15
  133:15
  171:15
recognize
43:19
recognized
70:2
recognizes
109:22
recollec...
93:25
  134:17
recommen...
87:3

reconvene
126:4
  127:10
record
15:18,20,22
  20:22
  48:15,18
  48:20 53:7
  54:2 57:5
  57:18 60:4
  62:7 69:9
  69:11
  70:19 71:7
  71:19
  89:17,19
  125:16
  126:16
  129:13
  133:16
  165:8
  170:25
  171:16
  193:18
  197:14
recordings
173:6,8,20
records
29:15,16
  32:18
  41:14 53:1
  57:13,15
  64:17
  124:12,12
  129:16
  152:6
  163:24
recovery
188:22
  199:5
red
107:16
  108:3,6,9
  109:3
  113:24
  119:10
redacted
73:9
redirect
211:4
reducing

188:22
refer
13:18 52:11
  111:11,19
reference
108:11
  109:20
  122:18
references
30:12 41:8
  42:12
  116:11
referred
109:5 114:9
  114:14
  115:17
  156:2
referring
51:11,16
  106:22
  200:24
refers
109:11
  114:24
  125:14
  131:19
  194:11
refining
137:11
reflect
60:25 117:2
  170:25
reflected
41:13
  155:10
reflecting
29:1 66:16
reflects
64:16
  129:13
refresh
134:16
  183:21
refreshes
93:24
refused
188:19
regard
24:13 101:4

172:24
174:14
175:2
182:10
**regarding**
14:3 26:5
27:16
36:15
40:20,25
52:12
93:22
130:4
172:18
173:21,25
**regardless**
160:18
**Regina**
71:8
**Register**
66:13
**registered**
7:4 205:11
205:12,14
205:19,24
206:4,11
**regular**
58:12
174:20
**regulation**
36:23 37:5
37:11
139:2
**reinstate**
65:22 67:17
**reinstated**
67:23 75:12
105:14
**reinstat...**
65:5,7
66:22
70:20
120:20
**reissuance**
128:10
**reissue**
4:17 126:20
127:22
128:3
169:17

170:8
**reissued**
4:7 128:14
128:16
129:5
130:16,21
153:11
170:21
**relate**
116:20
**related**
214:10
**relates**
140:12
**relating**
96:15
117:14
132:19
**relation**
175:8
**relations**
145:6
**relation...**
3:15,16
14:9 25:1
46:17
47:17
175:9
**relative**
209:21
214:11
**release**
134:2 167:4
**relevant**
187:7
**relied**
195:1
**relief**
190:12
191:1
194:19
197:1,22
207:20
**relies**
186:3
**rely**
187:1,15
188:24
190:16

191:6
193:9
196:1
197:10
198:3,12
199:9
201:7
202:14
203:20
204:11
**relying**
201:1
**remaining**
98:10,19
167:2
**remedy**
204:5
**remember**
13:20 27:2
27:3,5,7
73:12
77:10
116:23
119:1
161:1,9
183:19
184:1,2
197:12
208:19
**remote**
2:7 5:12
7:3 213:1
213:17
214:6,8,11
**Remotely**
6:2,6
**remove**
95:17,22
**render**
208:9
**rendezvous**
88:2,9,14
88:19
**reopen**
34:1 89:9
**rep**
9:14,24
69:10
115:8

171:5
**repeat**
50:5
**repetitive**
123:21
**rephrase**
78:14 162:6
185:6
**replaced**
153:22
**replacement**
39:17,22
**report**
36:18,22
122:22
183:22,25
184:5
**reported**
214:7
**reporter**
7:5,6,7,10
7:16 10:21
11:15
15:14,18
15:20
48:15,17
53:16,17
89:16
126:16
133:16
171:16
212:10,15
212:19
213:19
214:1
**Reports**
155:11,11
**represent**
193:23
**represen...**
164:19,20
**represen...**
2:7 5:13
7:25 24:2
42:12
185:11
191:17
**represen...**
20:5,8

205:12,14
206:9
**represented**
6:5,9
**represen...**
49:16,17
**reproduced**
129:11
**reps**
205:11,24
**request**
3:19 26:6
27:20 28:1
31:19 32:8
32:13,15
34:15 41:9
57:8 60:11
60:15,19
61:13,17
62:9 65:15
66:15
68:11,16
69:15
70:16
72:13
73:19,21
73:22
80:12,13
91:4
108:17
111:7
112:8,11
125:3
131:25
132:21
167:8
178:21
186:7,10
186:14
188:4
199:18
203:5,6
**requested**
29:8 53:18
62:6 75:7
109:1
132:5
201:6
**requesting**
4:3 34:13

t>

```
74:24            103:23          return          31:23           156:25
103:19           203:10          3:17 52:19      38:23           159:14,14
149:14           responded       52:25           40:11 42:3      160:5,5
167:25           65:20           111:8           47:14 49:4      184:21
Requests         105:18          112:8           56:15           revisit
3:8 57:3         201:19          125:14          70:20           117:11
103:7            responding      returned        92:24           Revocable
require          7:15 114:3      3:18 50:19      96:21 98:4      1:13 5:5
24:9,10          response        51:5 52:24      101:2           39:6 41:3
27:22            64:4,5          53:6,8,9        102:13          128:22
106:2            88:21,22        58:14 59:3      104:12          145:9
189:15           88:23 89:7      62:10,17        107:5           213:18
required         89:8,9          69:8 90:22      108:1           right
36:23 37:5       103:2           95:4 174:1      113:17          7:11 8:6,14
37:11            108:5           174:2,6         119:1,11        9:3,7,13
62:16            109:6           209:12,13       121:15          9:17,20,23
67:13 72:1       114:7,10        returning       122:21          10:16,17
72:3,7,7         162:3,7         50:15,21        131:7           10:18
75:22            responses       reverse         157:1           11:14,22
88:21            113:21          52:13,16        159:15          12:2,4,8
142:5            responsible     61:20           160:8           12:21
requirement      69:2            reversed        192:18,19       13:20
67:13            rest            177:10          reviewing       14:12,17
148:18           64:6,8 90:8     review          28:21 30:4      14:18,24
requirem...      restating       26:12 31:8      31:22           15:4 16:8
65:5             75:19           31:15           34:10           16:23 17:3
research         restroom        46:20           38:20,20        17:18 18:1
23:20 174:5      89:12           51:13           40:10 42:2      18:17,18
researched       171:11          63:16,19        47:13 49:3      20:2,11,15
24:24            result          63:24           51:15 56:8      21:4,7,20
reserved         185:21          64:18 66:8      56:14           21:24
7:9 212:16       188:20          72:22           65:14           22:10 23:6
residence        203:15,16       97:12 98:2      74:11           23:10,14
125:17           resulting       105:9           79:18 90:4      24:16,17
resolution       197:22          109:7,15        90:4 92:23      25:8,22
75:18            results         110:3           96:20 98:4      26:14,21
resolved         58:24           112:18          101:1           27:15
201:12,17        resume          113:11,16       102:13          28:16 29:1
201:23,25        95:23           114:18,21       103:9           29:9 30:5
resolving        retain          115:4           104:12          31:1,24
200:22           173:11          119:23          107:4           32:2,5,21
201:16           retained        125:8           112:8           32:25 33:5
respect          173:9           162:23          113:11          33:8,21
182:5 187:9      212:18          179:6           116:21          34:7,15
195:13,20        retaining       205:23          119:11,25       35:5,8,12
respects         173:13          211:7           121:4           35:13,15
170:22           retired         reviewed        122:20,20       36:4,5,13
respond          43:24,25        23:9 26:10      131:6,6         36:14
22:12 65:17      96:10           28:21           152:11          37:16 38:8
                                 30:15           156:17,21       39:17 40:8
```

Pohlman USA Court Reporting

| | | | | |
|---|---|---|---|---|
| 40:15 | 102:24 | 151:14,18 | 202:22,25 | 43:12 |
| 43:10 44:5 | 103:15,21 | 152:16,23 | 204:2,10 | **routinely** |
| 44:11,15 | 108:19 | 153:2,20 | 204:19 | 138:8 |
| 45:1,5,13 | 109:11 | 154:2,8,24 | 205:16,18 | **routing** |
| 45:24 | 110:15 | 155:5,8,10 | 205:21 | 63:13 |
| 46:16,23 | 111:23 | 155:15 | 207:6,8,12 | **row** |
| 47:3,10 | 112:18 | 157:6,8 | 211:2,12 | 63:4 |
| 48:2 49:10 | 114:5 | 158:7,10 | 211:20,21 | **RPR** |
| 49:21 50:9 | 118:15 | 158:23 | 211:24 | 2:19 5:19 |
| 50:21,23 | 119:4 | 159:8 | 212:7 | 213:19 |
| 51:9,17 | 120:5,16 | 160:9 | **right-hand** | 214:2,17 |
| 52:1,10,22 | 121:21 | 161:11,16 | 12:15 36:10 | **RROBERSON** |
| 54:13,25 | 123:6 | 162:20 | 37:15 42:6 | 60:9,13 |
| 56:6,16 | 124:3,11 | 163:6,8 | 56:12 85:4 | 62:1,18 |
| 57:11,11 | 125:21 | 164:5,22 | 124:8 | 66:7 |
| 59:6,11,16 | 127:20 | 164:24 | 145:5 | **RSMo** |
| 59:18,20 | 128:4 | 165:6,16 | 157:7 | 200:21,22 |
| 60:20 61:3 | 129:17,24 | 166:11,17 | **rights** | **Rule** |
| 61:7 62:23 | 131:13,15 | 166:21 | 190:10 | 8:12 23:11 |
| 63:2,4,5 | 131:21 | 167:20 | **ringer** | 171:18 |
| 63:11 65:6 | 132:17 | 169:10 | 195:17 | 191:24 |
| 66:5 68:4 | 133:17 | 171:4,21 | **ringing** | **rules** |
| 70:10 72:2 | 134:16,20 | 171:22 | 195:15 | 24:9 37:12 |
| 72:3,4 | 135:2,9,10 | 172:3 | **risk** | **Run** |
| 73:5 74:10 | 135:12,24 | 173:10 | 46:9 76:16 | 64:12 |
| 75:3 76:2 | 136:2,3,4 | 175:7,14 | 123:8,13 | **Running** |
| 76:25 77:8 | 137:17,18 | 175:17 | 123:15,16 | 169:20 |
| 77:21 78:2 | 137:20 | 176:2 | **risks** | **Ryan** |
| 78:4,15,19 | 138:5 | 179:9 | 76:20 | 3:2 6:6 |
| 79:10 | 140:6,7,12 | 180:2,14 | **Robert** | 8:10,14,19 |
| 80:14,23 | 140:14,14 | 180:18,24 | 20:5 42:13 | 20:18 |
| 80:25 81:1 | 140:18,22 | 181:2,21 | 47:23 | 21:11 |
| 81:3,14 | 141:2 | 182:20,23 | 136:2 | 22:18 23:2 |
| 82:2 84:25 | 142:7,21 | 183:1,15 | 152:22,22 | 24:8,22 |
| 85:2 86:13 | 142:25 | 184:3,12 | 153:22,23 | 25:9,17 |
| 86:18 | 143:7,10 | 185:2,13 | 161:19,22 | 31:12 |
| 87:22 | 143:17,23 | 187:19,21 | 165:4 | 33:11,14 |
| 89:18,20 | 143:25 | 188:6,16 | **ROD** | 34:21 35:1 |
| 90:14 | 144:6,15 | 190:15 | 167:24 | 35:18 37:7 |
| 91:16,23 | 145:1,4,13 | 191:5,15 | **role** | 45:7,17 |
| 92:5,12,17 | 145:23 | 191:18,21 | 99:22 | 53:15,19 |
| 93:4,12 | 146:5,7,21 | 191:23 | **roles** | 56:3 63:6 |
| 94:12,25 | 146:23 | 192:8,22 | 60:11,16,23 | 63:10 |
| 95:11,13 | 147:2,5,9 | 193:8 | **roughly** | 78:10,17 |
| 95:16,24 | 147:14,16 | 194:11,17 | 99:24 | 81:8,13 |
| 96:6 97:11 | 148:6,19 | 196:11 | 107:12 | 87:17 88:4 |
| 97:19 98:5 | 148:21,25 | 199:5,14 | **route** | 88:8 94:13 |
| 98:9,19 | 149:6,12 | 200:2,10 | 105:7 | 94:17 |
| 99:2,18 | 150:3,7,11 | 200:18 | **routine** | 97:15,21 |
| 102:15,19 | 150:21 | 201:16 | | |

| | | | | |
|---|---|---|---|---|
| 100:4,17 | 190:18 | 131:24 | 165:19 | **search** |
| 109:16 | 191:8,19 | 134:12 | 166:16,20 | 54:2 69:13 |
| 111:12,25 | 192:14,23 | 150:17,18 | 167:9,21 | **searching** |
| 112:4 | 193:11,15 | 154:21 | 167:23,24 | 84:5 |
| 113:13 | 196:16 | 161:13,22 | 167:25 | **SEC** |
| 115:12 | 199:19 | 175:19 | 169:25 | 205:11 |
| 116:2 | 200:13 | 196:22 | 184:9 | **second** |
| 117:12,20 | 201:13,18 | 198:20 | 185:20 | 4:18 10:4 |
| 117:24 | 202:2,23 | 199:16,22 | 188:18 | 10:10 13:9 |
| 120:12,19 | 203:3 | 200:10 | 189:19 | 18:17 |
| 121:6 | 206:1 | 201:8 | 190:5,25 | 23:10 |
| 126:10 | 207:3,10 | 204:25 | 194:7,18 | 30:22 35:5 |
| 127:3,9 | 207:13,15 | **says** | 195:11 | 40:23 |
| 129:8,23 | 211:2,17 | 7:17 10:19 | 196:25 | 53:15 63:4 |
| 132:10,16 | 212:2,9,10 | 18:25 31:1 | 197:20 | 96:22 97:4 |
| 134:22 | 212:12 | 31:5 40:19 | 198:8,25 | 100:14 |
| 135:3,16 | | 41:4 45:1 | 200:16,20 | 102:4 |
| 135:19 | —— **S** —— | 45:4 49:19 | 201:16 | 103:14 |
| 138:13,23 | **S** | 52:8,10 | 203:13 | 113:13 |
| 141:15 | 6:1 | 59:22 | 204:3 | 125:15 |
| 142:2,11 | **Sandra** | 61:14 67:9 | 210:9 | 128:19 |
| 143:2,6 | 98:21 99:11 | 69:15 75:5 | **scanned** | 129:23 |
| 144:22,24 | **save** | 80:15 | 70:13 | 154:9 |
| 148:1,14 | 64:21 | 81:19 | 108:17 | 156:8,14 |
| 148:22 | **saves** | 84:12 88:1 | 109:6 | 161:12 |
| 149:9,11 | 64:24 | 95:14 | 127:17 | 171:18 |
| 156:14,16 | **savvy** | 96:25 98:9 | **scenarios** | 172:3 |
| 156:18,23 | 123:25 | 103:16 | 144:1,3 | 184:19 |
| 157:22 | **saw** | 105:21 | 151:16 | 186:13 |
| 162:4,9 | 27:2 28:13 | 108:8,9,12 | **scope** | 191:24 |
| 166:12 | 30:17 76:1 | 113:21 | 31:13 35:19 | 192:3 |
| 170:13 | 103:6,7 | 114:11 | 109:17 | 207:10 |
| 171:8 | 117:7 | 116:12 | 115:13 | **Secretary** |
| 172:9,15 | 154:24 | 118:1 | 116:3 | 38:1 |
| 172:22 | 174:6 | 119:18,19 | 134:23 | **section** |
| 176:9,11 | **saying** | 124:9 | 138:24 | 19:15,16,16 |
| 176:19 | 15:13 36:2 | 125:1,16 | 157:23 | 36:11 |
| 177:6,14 | 39:4 41:17 | 125:20 | 159:19 | 79:19,25 |
| 178:18 | 46:16 | 128:5 | 162:5 | 80:8 81:3 |
| 179:3,20 | 52:11 | 129:25 | 190:1 | 130:3,8,8 |
| 180:6,12 | 63:23 | 132:21 | 192:13 | 183:20 |
| 181:16,22 | 66:23 | 133:1 | 206:2 | 200:21 |
| 182:7 | 70:21 86:7 | 134:19,24 | **screen** | 210:11,13 |
| 184:6,19 | 87:2,23 | 135:8,10 | 11:6,11 | 210:14,14 |
| 184:22 | 92:5 95:8 | 140:8,23 | 13:12 34:2 | **securities** |
| 185:4 | 108:2 | 146:18 | 83:24 94:6 | 205:15 |
| 186:4 | 111:15 | 150:7 | 104:10 | **security** |
| 187:2,16 | 115:23,23 | 158:24 | **scroll** | 28:5,7 |
| 188:3,9,13 | 121:23 | 162:21 | 94:8 152:25 | 30:23 31:2 |
| 189:1,25 | 123:20 | 164:14,17 | 153:4 | 95:15,21 |

```
 205:19            134:14            129:2             95:19             106:7,25
see                137:23            147:20            96:14             107:24,25
8:15 10:9          141:18,19         160:21            104:1             108:5
10:10,17           142:19            173:23,24         109:24            112:12
10:19 13:4         143:7,16          sees              131:12            113:5
13:6,10            144:16            66:8 68:7         168:10            118:16
14:6 15:13         145:20            send              198:19            120:23,24
15:16 17:4         146:8,20          12:21 17:20       sends             121:10
19:3,4,13          147:5,6,7         17:22             48:3 58:25        122:10
25:5 26:24         148:4,7,11        25:20 29:5        59:1              126:4,18
27:13 28:7         149:12            30:12             104:16            130:25
28:8 30:2          150:2             34:19             105:9             131:9
30:9,11,12         152:11,12         36:18             Senior            149:22,23
30:24 31:4         154:15,22         47:18             43:21 131:9       151:23
36:11 41:8         156:17            51:18,18          sense             158:10
46:11,17           159:5             61:11             100:2             159:16,19
49:2,4             160:5             63:18 64:4        205:14            160:1
50:17              161:7             71:20 82:7        sent              169:13
52:14,20           163:16,23         87:12             13:6 14:8         171:4
53:24 54:1         170:4             88:21             18:21             174:9,13
54:9,14,19         174:11            89:21 95:3        25:23             180:17
54:25 55:4         181:9             97:1              28:16             198:16,20
55:4,16            185:25            101:14            29:22             sentence
59:9 62:1          187:12            122:8,10          31:17             98:12,13,14
62:19              190:13,14         126:3             38:16             separate
64:23              191:3             137:15            39:15 40:8        51:22,25
68:20,22           193:6             139:3             43:16             52:1 58:19
71:23              194:9,23          148:18,20         47:10,16          separately
77:11              195:23            148:23            48:23 50:9        149:22
79:23 87:8         197:7,25          149:1,20          50:22 51:5        182:22
87:11,22           199:6             153:8             51:22 53:5        separation
89:10              202:11            159:22            59:1,3            48:8 49:8
90:17 91:7         204:8             166:8             62:8,12,14        50:7
91:17 92:3         211:11,12         168:6             62:16             sequence
94:7 98:12         211:16            171:5             63:25 64:6        25:11
98:21              seeing            176:5             64:17,20          103:22
99:20              27:3,6,7          177:21            73:14 74:1        series
104:19             70:12             178:1             74:12 84:1        7:23 10:17
108:9              124:7             180:17            86:24             28:2 119:9
114:1,2,6          161:9             183:24            88:22 89:7        134:3
114:15             seen              189:23            89:23 92:7        147:5
116:17,21          12:12,18          190:5             92:17 93:3        209:18
118:4              26:11 32:1        Sender            94:12,16          serve
119:25             32:2,4            3:17              95:8 96:4         9:23 71:10
125:6              34:7,9,10         sending           97:24             service
127:10             40:13             11:9 12:23        100:21            3:8 8:23
128:2,24           43:17,20          43:11             101:11,24         9:1 23:24
130:5              116:19            58:11 70:9        102:4             24:25
131:6              121:5,17          92:9 93:16        104:11            31:19
133:13             122:25            94:15 95:9        105:3             49:18,21
```

64:15
69:10
72:23,25
74:20 75:5
88:24 89:1
98:24
99:14,19
100:3,10
105:22
106:4,5
108:16
110:9
114:22
155:7
164:18,19
174:3
176:25
179:24
**Services**
104:22
**serving**
205:24
**set**
25:15,21
56:10 57:2
60:8 61:4
73:9 100:1
121:11
**sets**
45:23
**setting**
55:8,14
183:4
**settlement**
122:4
**Seventeenth**
198:24
199:9
**seventh**
188:17
**share**
11:6 109:14
**Sheet**
3:12 143:1
**short**
70:8 77:3
**shorthand**
7:4,5 13:18
65:24 72:5

87:6
**shortly**
119:5 155:2
159:13
**show**
10:23 11:12
33:8 36:19
51:9
128:21
155:1
156:7
**showed**
111:1 186:8
203:6
**showing**
34:14 50:18
90:6
143:20
144:4
167:19
168:3,5
**shown**
42:5 80:9
84:15
157:7
170:2
**shows**
41:2 56:19
134:10
137:19
138:4
139:8,17
145:11,12
146:13
150:22
151:13,15
152:18,21
153:5
**sic**
110:5
**side**
35:7,8
36:10 51:2
52:13,16
129:25
135:22
145:5,8
152:19
164:22
**sign**

158:22
159:8
**signature**
7:8 37:24
37:25 38:5
38:7 168:1
168:4
207:9
212:16
213:2
**signatures**
120:5
**signed**
38:4 43:22
80:12 96:9
98:21 99:3
99:16
108:15
125:2
131:25
158:19,24
159:5
**signific...**
47:6 139:23
**signing**
99:12,19
**similar**
48:24 58:17
59:3
142:22,25
**simplex**
127:17
**simply**
22:10
121:18
157:19
176:7
**single**
88:15
124:22
169:1
**sir**
15:11 19:17
36:24
38:19 43:8
45:6 94:19
113:10
116:4
120:11
126:7

133:11,24
135:20
143:8
146:3
156:10
161:4
180:22
183:10
191:21
207:25
**situation**
110:13
122:24
142:19
174:24
**six**
152:25
**Sixteenth**
198:7,13
**Sixth**
188:17,24
**skill**
60:8
**slightly**
47:22 120:2
177:25
**slip**
115:24
**slow**
156:15
**small**
46:4 83:24
**smaller**
76:21 85:11
85:19,20
**Social**
28:5,7
**Solutions**
114:22
**soon**
48:1 201:4
**sorry**
15:11 28:6
29:19
35:22 82:1
94:4,12
101:20
104:8
111:25

112:4
132:10
142:11
155:23
**sort**
44:10 57:8
103:21
107:8
114:23
118:23
122:8
137:14
146:25
161:5
167:10
**sought**
197:1
**sound**
155:23
**sounds**
126:14
133:13
155:14,14
**South**
6:3
**space**
34:2
**Spawn**
71:15 87:23
**speak**
24:7 138:17
199:13
**speaks**
181:23
**special**
43:14
117:13
**specialty**
16:25
**specific**
24:16 43:19
44:3,24
68:2 107:7
178:25
191:12
**specific...**
33:23
120:23
128:15

```
speculate          132:1,20         83:11 102:8      37:18 93:6       119:16
100:4              132:21           103:10           status           120:21
166:13             166:22           104:24           36:15 61:14      Stringer's
speculation        167:15,25        113:9            61:18            108:1,6
22:19 78:11        172:19           121:12           63:15            109:14,19
87:18              213:17           134:5            90:24 91:6       stuff
100:18             Sprich's         starts           92:6             29:19 72:10
111:13             122:18           60:1 68:5        116:14           107:16
120:13             Sprichs          134:12           118:2            subject
129:8              154:25           151:3            123:17           80:7 104:19
138:14             St               state            130:4            195:12,20
141:16             6:4 132:3        36:23 37:5       178:21           202:5
148:2,15           stages           37:11,11         statutes         subjects
157:25             110:8            37:11            200:24           175:19
177:15             stale            139:2            stay             submit
speculative        92:4             148:17           116:5            159:9 167:7
194:21             stamp            184:4            step             submits
207:21             42:6 102:8       194:21           13:9 64:18       27:17
208:10             stamped          207:21           74:13            submitted
spell              12:15 50:13      stated           189:12           33:7 125:11
100:3              51:6 72:15       157:11           step-by-...      186:10
spelled            89:24            statement        191:20           188:1
177:22             92:21            26:4,5 93:8      stepdaug...       203:5
178:2              96:16            97:1             166:22           subpoint
spent              126:21           108:12           steps            125:16
175:21             129:21           122:8            32:11 39:13      subpoints
182:7,15           131:3            133:5            54:8,12          125:15
185:17             145:20           135:14           188:19           Subscribed
split              146:1            143:1            189:21           213:7
60:9,14,20         147:22           145:12           192:8,11         subsequent
60:21              168:11           150:18           194:1            112:10
62:25 88:9         169:17           198:22           stickers         128:16
88:13              stand            207:7            212:13           186:7
Splitting          87:4 118:8       208:4            STIPULATED       subsidiary
60:17              163:6            statement's      7:1              175:11
spoke              standard         136:5            stopped          Successor
162:21             29:4 168:16      statements       189:11           168:5
163:17,24          174:23           107:15           198:19           successors
spot               stands           132:22           street           162:25
183:8              59:23            148:9            6:7 177:9         suffered
Sprenger           stare            151:7,22         strictly         203:14
96:8 99:13         104:10           189:6,24         69:19 204:5      sufficient
Sprich             start            190:6            strike           77:6 123:10
1:11 4:3           92:9 103:11      196:13           27:6             123:12
5:4 61:1           110:19           200:1            Stringer         suggest
71:8               195:16           209:9,21         107:14,20        40:1 47:3
102:20             started          209:23           107:21           74:24
131:2,19           110:12,18        210:5,16         108:1            126:10
131:24             starting         states           110:15           suggests
                                    1:4 5:1
```

40:2
**Suite**
6:3,7
**summaries**
62:12
148:10
150:22
151:7,21
151:25
152:7
189:17
**summarize**
181:19
**summary**
4:10 14:15
35:8 51:19
108:5
133:6,7
134:4
135:14
136:7,14
141:10
143:1
146:17,21
147:18
149:16
189:23
**superseding**
186:23
**supplement**
205:2
**support**
60:10,15,22
190:16
192:21
201:1
209:7
**supports**
87:3
**suppose**
108:10
**supposed**
198:16
203:24
**supposedly**
113:25
**surcharge**
82:1
**sure**

10:1 12:11
12:18 15:9
16:3 18:13
18:17 20:9
23:3 30:3
36:14
39:19 44:7
57:6,18
60:5 76:2
81:10
84:21
106:7
111:14
113:15
115:2,5
116:1
120:25
128:18
132:16
155:25
160:7
163:22
165:19
172:2
184:20
186:16
194:1
205:9
**surrender**
36:20 70:23
78:6,7,18
78:20,20
79:1,5,12
79:20 80:1
80:2,4,4,5
80:6,9,10
80:13,16
80:16,20
80:21 81:2
81:17,19
81:25 82:4
82:4,8,9
82:16,17
82:19 83:8
83:11,19
83:20,21
83:21
84:10,12
84:14,17
84:22,23

85:5,10,12
85:13,19
85:22,23
85:25 86:3
86:5,9,10
86:12,16
105:11,15
106:15,19
120:6
136:25
138:3,4
143:11
145:13,16
145:16
147:1
182:15,21
182:24
183:2,4
208:5,16
209:24
210:18
**surrendered**
83:16,19
196:13
**surrende...**
120:4
**surrenders**
140:9
**switched**
86:19
**sworn**
5:15 7:14
214:6
**system**
56:19,23
60:24
64:14,24
68:9,12,14
68:17,21
68:25
69:21
70:13 72:4
73:13
104:16,17
104:23
106:13
109:21
110:5,24
116:6
117:2

167:13
177:17
**systems**
123:25

———————

**T**

**T80KK2I**
60:6
**table**
18:16 61:6
61:21
71:24 80:8
81:2,16,16
82:20 83:8
83:15 85:2
85:4
139:17
**tables**
16:14
**tabular**
16:15
**take**
11:23 12:2
15:15
19:15 26:7
31:19
32:11
39:13
48:13
49:14 54:8
74:9 78:16
84:23
89:13 91:2
102:11
126:3,6,11
126:12
132:14
133:8,11
133:12
156:23
162:2,7
171:14
188:19
189:10,13
189:21
197:15
**taken**
2:13 7:3
82:24
83:20

109:15
183:16
213:2,20
214:8,11
**takes**
29:18
**talk**
144:17
182:14
192:9
**talked**
19:14 43:23
70:18
106:20
172:5,7,20
178:5
205:6
207:1
**talking**
11:19 12:19
12:22
40:21 55:8
76:22 79:3
103:11
107:7
122:7
123:24
127:23
137:16
138:18
166:24
**talks**
17:3 20:4
**target**
66:1 67:4,7
**tax**
121:19,24
122:8
**team**
63:1,14,20
70:20
71:18
105:3,19
107:20
115:4
123:4
163:25
164:1
**technical**
150:24

| | | | | |
|---|---|---|---|---|
| **telephone** 28:5 59:16 | 57:4 145:21 | 178:5 183:18 | 95:19 109:25 | 196:1 **thought** |

telephone
28:5 59:16
tell
8:21 9:7
 22:4,20
 33:22
 53:22
 56:16 58:7
 59:11 60:3
 61:15,23
 63:12 74:8
 79:4 82:6
 90:19
 100:20
 104:25
 113:24
 142:5,6
 148:18
 150:6
 160:9
 166:1,21
 167:18
 186:2,25
 187:14
 188:23
 191:5
 192:8
 193:8
 194:25
 195:25
 197:9
 198:2
 199:8
 202:13
 203:11,19
 207:8
 209:5
telling
59:13,18
 66:20 68:6
 212:8
tells
83:17
ten
111:4
Tenth
193:3,9
term
44:3,5,7,11
 44:16,20

57:4
145:21
151:15
182:22
189:15
198:5
terminate
78:5
terminated
46:24 76:3
98:7
termination
134:5,6
152:1
174:16
terms
78:22 79:2
 79:3 124:1
 130:17,21
 171:1,3
 174:20,21
 178:16
 179:2,6,7
 182:11
 191:12
 193:1
 195:22
test
77:11
testify
23:15
 179:11
 185:10
 211:21
testimony
96:7 186:5
 199:20
 213:3
text
167:24
thank
25:18 33:14
 63:10
 81:13 88:8
 103:13
 135:12,19
 143:6
 144:24
 149:11
 152:13

178:5
183:18
193:15,21
207:13
209:1
211:1
212:15
thanked
64:7
thanking
87:2
Thanks
117:22
119:19
theoreti...
127:3
theory
196:18
 208:9
thereon
197:21
thing
43:12 57:8
 60:13
 63:14 94:8
 100:10
 101:22,23
 104:7
 105:5
 114:6,23
 119:13
 161:2,6
 164:24
 173:15
 174:5
 180:18
 182:13
 183:9
 184:20
 199:11,12
 199:15
 205:6
things
14:16 24:20
 30:10 32:8
 69:21
 70:12
 71:17
 73:17,18
 73:19 82:5

95:19
109:25
111:1
124:20,21
138:15
140:5
144:5
154:16
160:11
164:1
170:24
178:21
179:22,23
206:11
think
10:21 18:9
 18:18 20:3
 47:9 61:2
 61:4 66:2
 66:24 70:1
 82:13
 85:17
 97:11,20
 104:10
 109:21
 115:22
 117:13
 130:10
 137:10
 142:14,20
 157:14
 171:10,11
 174:15
 176:21
 178:5
 182:9
 189:12
 201:22
thinking
150:14
third
27:8 59:14
 59:14
 108:14
 112:21
 119:2
 140:23
 185:19,22
Thirteenth
195:10

196:1
thought
195:17
thoughts
65:13,16
 120:10
thousand
46:10
three
39:1 100:9
 100:19
 116:12
throwing
15:14
THRUSTEES
5:4
tie
75:13
tied
197:16
till
115:20
time
11:19 20:10
 20:12,21
 20:21 21:7
 26:3 29:19
 35:16,17
 39:18,22
 40:1,4
 46:19 48:3
 53:4 54:11
 58:2 64:9
 64:25 66:3
 66:4,6,24
 70:10,22
 70:25
 75:16,19
 75:23 76:3
 76:5 77:2
 78:4,7
 80:2 86:10
 86:12,23
 90:11 99:8
 99:23,23
 100:10
 110:13
 112:15
 122:23,24
 129:13,14

133:14
134:2
156:23
157:14
170:25
171:11
173:11
174:16
175:21
176:4
179:17
181:4
182:16,17
183:11
185:17
187:23
195:4
199:2,17
201:6
203:25
205:9
206:15,18
207:3
208:16,17
210:6
214:8
**times**
11:5 18:11
 18:13
 19:19
 51:25 52:1
 67:14 70:1
 84:14,18
 85:8,10
**timing**
48:6 118:22
 166:4
**Title**
168:4
**TL**
65:24 87:6
**today**
7:23 11:5
 14:4 23:8
 23:12
 33:18
 57:21
 110:8
 137:13
 158:7

206:18
207:2
**told**
167:17
 209:16
**toll-free**
95:11
**tomorrow**
119:21
**top**
19:5 71:23
 121:18
 137:10
 150:16
 162:10
 180:18
**topic**
23:19 24:4
 24:21
 35:19
 172:4,11
 174:8
 175:17
 180:15
 211:25
**topics**
23:12,16
 31:13
 109:18
 115:13
 134:23
 157:23
 171:6,25
 191:25
 206:2
**total**
97:1 113:9
 139:19,19
 143:20,21
**totaled**
147:9
**totally**
206:7
**totals**
139:18,20
**touch**
111:6,11,14
 111:18,23
**touched**

171:7
**TR**
66:11,13
**track**
25:12,18
 65:1
 160:17
 168:19
**Tracking**
64:14 73:13
**tracks**
64:15
**traditional**
110:9
**Training**
42:18
**tranches**
12:14,20
**transaction**
66:13 139:6
 143:20
**transact...**
147:5
**transcribed**
7:7
**transcript**
4:24 53:18
 212:11
 213:1,3
 214:7,8
**transcri...**
214:7
**transfer**
26:4 62:4
**transferred**
72:22
**translate**
163:20
**translated**
214:7
**transmittal**
34:17
**trial**
1:18 5:8
 206:23
**tried**
130:20
**trouble**
83:24

**true**
87:10 213:2
 214:8
**trust**
1:13 5:5
 26:3,5
 32:7 36:4
 39:6 40:17
 40:24 41:3
 41:21,22
 42:8 50:22
 54:5 57:23
 62:7,20
 71:7 91:13
 94:22
 100:24
 112:13
 124:25
 125:11
 128:23
 132:24
 145:9
 154:14,15
 162:24
 163:12,13
 164:15,21
 166:9
 168:3,4
 173:21
 177:7,9,13
 180:3,11
 185:24
 186:6,10
 193:24
 197:13
 202:16
 209:14
 213:18
**trust/tr...**
125:18
**trustee**
60:11,23
 61:1 71:13
 91:17,18
 91:24
 162:22
 163:19
 164:4
 168:1,2
 180:4

189:7
**Trustee's**
164:10
**trustees**
1:11 60:16
 71:9 74:23
 75:7,8
 147:19
 159:17
 162:24,25
 168:5,6
 180:8
 189:5
 193:23,24
 209:13
 213:17
**trustees'**
60:23
**Trusts**
91:12
**try**
13:20 53:13
 54:9 82:21
 103:23
 167:6
**trying**
18:9 25:11
 25:18 84:3
 84:5
 100:11
 106:13
 107:14
 186:16
**TUDEH**
163:24
 164:2
**turn**
27:8 35:5
 133:21
 135:13
 137:3
 139:5
 145:25
 152:25
 180:24
**turning**
84:4 172:3
**Twelfth**
194:17
 195:1

207:17
**Twentieth**
203:12,20
**Twenty-f...**
204:2
**twice**
67:17
152:12
**two**
26:14 32:8
36:7 45:23
49:5 67:14
70:9 77:16
77:20,23
82:5,18
84:14,18
85:3,8,10
88:13
107:2
111:17
113:3
116:11
121:18
125:15
146:16
153:1,17
206:14
**two-page**
104:2
121:12
**tying**
103:13
**type**
9:15,25
15:1,2
17:13 28:9
43:17
59:23 61:8
63:22
74:14,15
93:18
120:17,22
121:1
122:22
136:16
138:9
142:22
149:25
160:24
**typed**

163:15
164:14
**types**
15:8 131:12
144:16
160:17
**typewriting**
7:8
**typical**
14:8 48:2
49:15 97:8
170:8
177:6
**typically**
30:5,8 90:9
173:11
**typo**
41:5,12

─── **U** ───

**UL/TL**
163:3
**ULA-L**
61:15,19
**ultimately**
83:12
**UMI**
112:23
**unable**
162:25
**uncertain**
194:20
207:21
**Uncertainty**
207:17
**unchanged**
130:17
**unclaimed**
56:25 58:4
58:8,10,20
58:22,23
62:10 69:9
69:10
90:15,22
91:6,21
92:6 95:2
95:22
146:6,18
149:17

166:6
198:21
**unclean**
193:5 194:4
**Undated**
4:6
**undelive...**
50:19 53:10
62:17
101:5
**underlined**
43:3
**understand**
7:24 8:7
15:13
20:12 23:4
23:14,18
23:23 24:1
24:11,12
24:19
35:23 37:1
52:22 55:7
58:24 61:5
72:10
77:21
79:11
80:14
82:21 83:7
84:21 89:2
105:1
107:15
115:23
117:20
119:22
120:21
146:9
182:6
185:3,7,8
186:16
190:22
193:1
196:11,14
196:22
198:5
206:12
**understa...**
55:12 115:7
187:4
192:20
194:5

208:2
**understood**
44:17,20
67:20
119:23
122:7
**Underwri...**
42:18
**unfair**
172:12,14
**Unfortun...**
113:23
**unintent...**
187:25
188:7
**UNITED**
1:4 5:1
**universal**
14:10 15:3
15:6,8
16:1,5,8
16:10,15
17:1 37:6
43:18
44:16,23
61:18
65:24 66:1
67:6,14
87:7,21
105:8
161:14
210:3
**unjust**
204:3,4,17
**unknowingly**
187:24
**unpaid**
36:21 80:7
195:13,21
**unplanned**
17:14
**unreason...**
200:23
**unusual**
115:17
116:8,10
170:11
**unwilling**
163:1

**update**
64:13 106:9
120:1
**updated**
29:16 36:15
69:1,6
71:6 73:12
99:9,23
104:23
128:18
130:4
163:17,24
**updates**
164:1
**updating**
70:19 87:12
**upload**
10:24 11:1
**uploaded**
10:22,23
**upper**
84:6 90:14
145:5
**upward**
63:12
**use**
21:20 54:3
111:21
124:2
171:11
206:10
**useful**
138:21
142:20
**usual**
106:12

─── **V** ───

**V.A.M.S**
200:21
**vague**
178:18
179:20
180:6
**valid**
125:16
**valuable**
34:3 43:6
45:3,12

| | | | | |
|---|---|---|---|---|
| 56:2 | 175:2 | 16:4 | 125:25 | 91:14 |
| 134:13,18 | 181:3,3,15 | **versus** | 126:11 | 103:23 |
| 135:7,8 | 182:21,21 | 124:1 | 127:7 | 104:25 |
| 138:16,22 | 182:24,25 | **vexatious** | 142:4 | 106:17 |
| 142:8,8,12 | 183:2,2,5 | 200:23 | 144:16 | 137:7,12 |
| **value** | 183:7,11 | 201:8 | 172:1 | 137:13 |
| 16:13,16,18 | 196:6 | **vice** | 176:3 | 145:22 |
| 16:19 | 204:16 | 9:2,3 43:21 | 204:21 | 162:16 |
| 17:15,25 | 208:16,20 | 98:23,23 | 207:16 | 176:5 |
| 18:7,7,10 | 208:25 | 99:3 | **wanted** | 177:11 |
| 18:11,13 | 209:24,24 | 100:10 | 72:24 | 181:13 |
| 19:19,19 | 210:10,14 | 159:3,4 | 155:25 | 195:4,6 |
| 19:24 | 210:18,19 | **video** | 167:3 | 210:2 |
| 36:20,20 | **Values** | 11:5 | 204:23 | **we'll** |
| 42:24 45:9 | 46:21 | **view** | **wanting** | 8:14 20:2 |
| 45:14,19 | 204:16 | 134:20 | 135:1 | 25:4,5 |
| 46:9,24 | **Vance** | 161:5 | **wants** | 72:18 81:1 |
| 70:24,25 | 3:16 20:5 | 162:17 | 20:24 | 89:8 127:2 |
| 71:3 75:15 | 26:1 30:1 | 164:25 | 141:25 | 133:9 |
| 75:16 | 30:1 40:16 | **visible** | **warning** | 144:15 |
| 76:17 77:2 | 41:23 | 119:24 | 96:22 | 152:14 |
| 77:4,6 | 42:13 | **visual** | **warnings** | 171:14 |
| 78:6,8 | 48:25 | 84:2 | 96:15 | 205:4 |
| 79:21 80:2 | 136:2 | **vs** | **wasn't** | 207:4,4 |
| 80:3,4,5,5 | 152:22 | 1:17 5:7 | 52:1 55:23 | 210:10 |
| 80:10,16 | 178:6,8 | 213:18 | 62:6 69:6 | 212:9 |
| 80:17,18 | 179:12 | | 70:7 77:22 | **we're** |
| 80:20,21 | 205:18 | _____ | 105:17 | 11:19 14:4 |
| 82:25 86:1 | **Vance's** | **W** | 123:14 | 15:21 |
| 86:2 87:7 | 49:7 50:6 | **w/Nancy** | 146:13 | 19:18 |
| 87:14,15 | **varied** | 162:21 | 174:19 | 24:21 29:6 |
| 98:10,16 | 46:19 173:9 | **wait** | 188:11 | 61:12 |
| 98:19 | **various** | 11:16,18 | 200:2 | 63:18,23 |
| 106:24 | 25:5 104:16 | 21:2 34:21 | 201:24 | 68:13,17 |
| 120:6 | 107:15 | 88:4 149:3 | 205:9 | 70:12,15 |
| 123:9,12 | 110:8 | **waiting** | 211:15,18 | 75:18,18 |
| 136:22,25 | 154:16 | 89:8 156:19 | 211:18 | 79:3 81:9 |
| 137:19,20 | 174:8 | **waive** | **waste** | 81:14 85:9 |
| 138:2,4,11 | 191:25 | 207:9 | 176:4 | 87:11 |
| 140:1 | 209:22 | **waived** | **way** | 88:21 89:8 |
| 143:11,11 | **vendor** | 190:10 | 12:4 13:18 | 100:1 |
| 143:17 | 54:3 91:11 | **waiving** | 13:21 21:9 | 106:3 |
| 145:12,13 | **verifica...** | 212:8 | 55:19 | 107:17,18 |
| 145:17,17 | 95:15,21 | **WALTERS** | 59:18 | 115:19 |
| 147:1,1,21 | **verify** | 162:13 | 61:23 | 120:4 |
| 147:23 | 162:24,24 | **want** | 63:14 | 122:7 |
| 150:2,9,12 | **version** | 18:15 67:17 | 65:21 | 137:11,13 |
| 150:22,23 | 130:9 | 79:4 85:25 | 68:23 70:2 | 137:15 |
| 151:8 | 146:23 | 87:5 | 70:4,7,16 | 142:5 |
| 174:16 | **versions** | 104:10 | 88:18 91:8 | 154:6 |

| | | | | |
|---|---|---|---|---|
| 158:17,18 | 209:16 | 156:11,15 | 63:23 | 68:21 |
| 166:24 | wholly-o... | 156:21,24 | 68:12,14 | 88:14 |
| 169:12 | 175:11 | 157:23 | 68:16,25 | 104:25 |
| 173:2 | Wiegand | 171:10 | 71:20,21 | 110:16 |
| we've | 1:10,12 | 172:11 | 71:25 72:4 | workings |
| 15:8 16:4 | 3:19 5:4,5 | 179:11 | 72:13,19 | 182:10 |
| 22:5 29:7 | 13:3 18:25 | 182:9 | 72:20,21 | workloads |
| 40:20 | 28:23 31:9 | 206:2 | 72:24 | 119:25 |
| 41:15 | 35:13 39:5 | 211:2 | 87:24 | 121:4 |
| 48:23 | 41:3 49:11 | 213:1 | 88:10,11 | works |
| 53:24 | 57:11,23 | 214:6,9 | 88:13 | 111:2 |
| 57:16 | 71:9 | wondering | 103:7 | 163:25 |
| 60:20 | 116:20 | 126:25 | 104:15 | 182:9 |
| 100:2 | 117:4 | 154:17 | 107:21 | world |
| 102:16 | 128:22 | Woods | 109:21,22 | 110:10 |
| 119:14 | 132:1 | 28:24 32:22 | 109:23 | worrisome |
| 121:17 | 135:23 | 40:24 | 110:5,9,22 | 115:25 |
| 127:23 | 152:19 | 41:16,18 | 116:5,10 | worth |
| 129:1 | 153:3,6,10 | 41:19 | 119:24 | 122:2 |
| 131:20 | 153:19 | 51:19 53:5 | 120:22,22 | wouldn't |
| 142:24 | 154:1,4 | 94:23 | 120:22 | 27:20 54:6 |
| 149:6 | 163:10 | 100:24 | 121:1 | 55:25 |
| 155:11 | 213:17,18 | 112:13 | 125:25 | 69:12 |
| 158:6,7 | wife | 136:1 | 126:2 | 87:20 |
| 162:15 | 178:8 | 174:10 | 154:20 | 105:14 |
| 167:11 | willing | 197:14 | 155:11,11 | 109:23 |
| 172:2,5 | 71:10,10,11 | 202:17 | 159:20 | 110:1 |
| 173:13 | window | 203:9 | 162:17 | 116:8 |
| 178:5 | 10:16 11:8 | 209:15 | 163:3 | 117:6 |
| 204:19 | witness | word | 167:12 | 118:24 |
| 207:1 | 7:8,9 10:13 | 82:11,13 | 172:8 | 119:24 |
| Weigand | 10:18,22 | 123:22 | 175:13 | 121:21 |
| 71:8 | 11:3 13:6 | 130:12,12 | 176:25 | 135:1 |
| Welcome | 15:15 | words | 183:5 | 177:16 |
| 133:18 | 29:21 | 18:9 44:9 | 189:3 | writes |
| went | 31:13 | 84:5 197:3 | 190:3,19 | 131:24 |
| 67:22 71:6 | 33:15,24 | 210:15 | 191:10 | writing |
| 73:11 92:6 | 34:23 | work | 192:15,24 | 53:13 77:25 |
| 105:6 | 48:13 | 3:19 8:23 | 193:20 | 87:11 |
| 118:14 | 89:11 | 9:1 13:23 | work-type | 131:15,16 |
| 141:23 | 94:10 | 21:16 | 109:7 | written |
| 144:7 | 104:5,9 | 49:13 | worked | 36:18 64:4 |
| 158:4 | 109:18 | 56:19,23 | 9:19 62:1 | 177:12 |
| 161:9 | 115:13 | 57:3,5,8 | 63:14 | 183:24 |
| 209:20 | 125:22,25 | 57:15,20 | 110:25 | 184:4 |
| weren't | 126:8 | 58:1 59:22 | 179:24 | 204:6 |
| 180:8 189:6 | 127:10 | 60:10,10 | working | wrong |
| 189:8 | 132:12 | 60:15,17 | 49:11 61:12 | 80:15 97:20 |
| 199:25 | 133:12 | 60:18,22 | 61:22 | 101:22 |
| 205:24 | 144:25 | 61:8,25 | 64:21 | |

102:1
109:6
**wrongful**
187:7,18
**wrote**
123:22

---

**X**

**X**
204:23
**x2**
67:12

---

**Y**

**Y**
204:23
**yeah**
19:10 22:20
24:24 28:9
34:2 35:14
65:20 67:6
78:13
79:24 84:3
88:19
100:6
101:24
103:13
105:2
117:12,16
124:19
127:3
137:24
140:1
144:2
148:16
149:20
150:14
152:9,10
153:7
154:15
157:12
161:11
164:22
165:1
169:19
170:12
177:6
181:24
184:8
185:9

186:17
190:21
206:9
**year**
17:10,10,23
36:16
45:16 46:7
46:12
51:19
55:10
76:10,14
77:1 81:21
81:22,23
82:24 83:9
83:12,17
83:17,17
83:20
84:10,19
85:21,21
85:24
86:14,14
91:10
134:4,5,6
136:9
137:20
139:22,22
144:11,12
150:23
151:9
174:18
183:23,23
184:5
**year's**
150:18
**years**
21:10 97:14
109:8,15
110:8,11
111:4
116:9
137:8
170:9
173:9,16
182:18
199:24
200:6
208:22
209:15
**yellow-b...**
19:10

**Yep**
156:16
**York**
1:20,22 2:7
2:8 4:9
5:8,9,13
5:14 7:25
8:3,22 9:8
9:11,24
10:3 12:9
12:13,16
13:2,16,23
13:25
16:25 20:7
20:11,15
20:16 21:7
21:8,16,25
22:15,16
22:23,25
23:1,15
24:2,13,20
25:2 26:16
26:18,22
26:24
27:11,16
28:10,14
29:5,15
30:6,16
31:3,10
32:2,11,25
37:1 38:1
38:8 39:10
39:13,20
39:21 40:6
40:23
41:13 42:5
47:16,17
47:19,24
47:25 48:3
48:8 49:1
49:8,12
50:7,12,16
51:17
52:18,23
53:6,9,12
54:13
55:15
56:11 57:4
57:13 63:8
69:2 70:17

72:14
79:13
80:15
86:21 88:7
89:24 91:6
92:21
94:22
96:16 97:9
97:11,20
97:25
98:17
100:22
102:9,9,20
102:21
103:17,22
104:3,17
107:1,2,9
108:24
110:5,16
111:19
112:6
113:10
117:3
121:13,19
122:1,14
122:23
124:6,9,12
126:21
128:2,20
129:16,22
130:15,20
131:2,4,4
131:9,16
131:24
132:19
134:20,25
135:5,9,10
135:17
138:8,19
138:19,21
141:24
142:23
143:4
144:18
145:20
146:1
147:22
149:7
150:1
151:20

152:3,4,6
153:3,5,19
154:1,3
155:16
157:3,15
158:11
159:20
160:2,3,4
160:14,16
162:2,7,18
163:15
165:3,4,17
166:4,18
168:11,17
169:18
170:8
172:8
173:5,19
174:3,24
175:2,9,12
175:13,14
176:15,23
177:1,11
178:7,11
179:11,13
182:2
184:15
185:11
186:2,25
187:14,24
188:23
189:17,22
190:8,15
191:6,17
193:9
194:15,25
195:25
197:9
198:2,12
199:8,15
200:4,7,10
201:1
202:13
203:19
204:11
205:25
208:4
209:8
210:4,23
211:9,13

213:18,18

**Z**

**zoom**
5:18 10:9
  10:22 19:1
83:25
214:3

**0**

**0**
83:12
**0-0-0**
7:12
**0%**
83:10
**00001-2**
4:11
**00464-466**
3:21
**00502-504**
3:10
**00788**
4:2
**084.004310**
2:20 5:19
  7:6

**1**

**1**
3:5 12:24
  12:25
  13:15 25:8
  83:9,17
  108:11
  135:14
  143:11
  145:11
**1-34**
4:23
**1,400,000**
18:1 136:20
**1.3**
19:15,16,17
**1.4**
76:16
  208:21
**1.4-million**
45:10

**1/1**
119:21
**1:40**
133:14
**10**
3:13 4:12
  41:25 42:1
  64:5 81:21
  81:22,23
  86:14
  119:21
  149:18
  157:10,12
  175:8,17
  175:19
  182:18
  194:4
**10-minute**
126:11
**10%**
83:20 84:11
  84:19
**10:56**
74:5
**100**
67:25 68:2
  75:13
  100:15
**100%**
106:7
**100,00**
76:19
**100,000**
18:6
**1001**
64:12
**101**
4:3
**102**
4:4
**105%**
19:21,24
**106**
4:4
**1099**
122:10
**11**
3:5,14
  47:11,12

48:24 83:9
  83:12
  85:21,22
  85:24
  86:15
  142:23
**11:22**
65:19
**11:39**
74:4
**11:51**
66:19
**112**
4:5
**118**
4:5
**11th**
51:10
  167:23
**12**
2:14 3:9,16
  5:16 48:21
  48:23
  116:9
  139:18
  147:24
  150:13
  151:3
  209:15
  213:20
**12-month**
147:8
**12,475**
84:10,19
**12/13/2011**
72:19
**12/14**
73:4,11
**12/21**
74:4,6
  86:20
**12/27**
88:23
**12/30/20**
71:6
**12:09**
74:7
**120**
4:6 59:3

96:3
  101:24
**120-day**
166:6
**120-days**
58:16
**121**
4:6
**124,000**
85:7
**125**
4:7
**129**
4:8
**12th**
213:2
**13**
3:10,17,21
  3:23 4:9
  36:5,10
  50:10,11
  92:21 93:4
  96:17
  119:15
  123:11
  136:5
  151:3,4
  169:2,4
**13th**
19:2 150:9
  153:5
  154:8
  169:6
**14**
3:18 51:9
  51:12
  179:10
**15**
3:19,24
  56:7,9,13
  61:22
  72:14 76:8
  77:14
  86:19,21
  89:10 98:1
  98:20,20
  103:8,9,11
  109:8,15
  119:20

166:25
  180:25
  181:2,12
  181:14,19
  182:3
**150,000**
158:24
**151**
4:9 6:7
**154**
4:11
**155**
4:12
**157**
4:13
**158**
4:14,15
**15th**
93:10 97:2
**16**
3:20 36:8
  37:14,14
  89:22,24
  123:13,13
  165:18
**165**
132:2 177:9
**167**
4:16
**168**
4:17
**16th**
62:22 73:20
**17**
3:10,11,21
  36:8 38:25
  92:18,19
  94:3,12,16
  129:21
  162:18
  166:19
**179**
4:20
**18**
3:7,22 42:9
  77:17
  94:11,16
  94:18
**19**

```
3:6,23              29:13              111:7             4:7,8,12,14       40:16
29:13               124:25             112:8              89:3             107:1,3
59:25               132:23             116:13             119:15           160:2
96:13,16            133:23             117:7              128:11,14        166:18
163:14              134:6,10           120:1              131:2,18        25
1988                136:5              144:9              157:11           4:5 113:6,7
9:11 110:20         139:23             145:2,15           172:5          25,000
19th                154:3,8,12         165:19           2022               75:2 77:18
28:22               154:13             166:5              170:6            87:15
1st                 180:13             209:13           2023               93:13
35:21             2004              2012                 2:14 5:16         106:20
_____             3:9,11,12          146:2,22           213:2,7,20       174:15,15
      2             35:21 38:9         147:20             214:14         25,095
2                   38:25              150:10           206                77:4
3:6 4:8             40:16 66:9         208:4,21           3:2            2500
 25:23,24           69:12,16         2013               21                 6:7
 59:7 131:1         108:14             149:8              4:2,2 60:9     26
 131:18             109:4,24           150:13             73:25            4:5 8:12
 143:15             114:8,12         2015                 100:22,23        119:5,6
 172:5              125:1              145:23             100:25         27
2.1                 130:9            2016                 131:25           3:6 4:6,14
 80:10 81:3         131:25            3:20,21,23          165:3            121:12,14
 81:5               142:24            3:24 59:8         210              27th
20                  154:14,15         62:13              3:3               89:3
 3:24 60:4,5      2006                75:21 76:8        21st             28
 60:9 97:25         42:9 110:10        87:8,15           214:14           3:7 4:6,7
 98:3               110:12            90:3 92:22        22                 59:8
20-               2008                93:4,11            3:6 4:3           122:12,15
 35:21              62:5              96:17 97:2          26:1 63:2        128:11
200               2009               98:1                102:5,6,7        161:15
 100:16             3:14,16           101:17             102:15           170:6
2000                47:22             105:11             103:14         28th
 3:5,10 13:2        48:24             106:19,24        222                169:5,7
 13:16 19:2       2010                118:2,14          6:3             29
 38:14              62:22 141:5        118:16          22nd               3:5 4:7
 169:3              141:14,22         123:11            169:23            13:1,10,16
2001                144:8             132:23          23                  35:21 38:9
 4:9 152:16         152:12            161:15            3:22 4:4          126:5,17
 153:1,2,5          154:21            167:1             56:23             126:19
2002                209:13          2017                57:25
 152:11           2011               140:24             62:11           _____
 153:18,25          3:18,22 4:2       141:12,22         94:21                 3
 154:7,10           9:12 51:8       2020                103:25          3
 154:13             56:23             59:25 70:22       104:2             3:6,18,20
 179:13             57:25             75:13,22          166:18            28:16,17
 180:5,8            62:10,11          87:8,14         23-page             128:21
2003                69:7 94:21        101:18            102:8             139:6
 3:6,6,7            100:23            122:19          24                  143:14,16
 26:1 28:23         101:19,20         166:19            3:6,12 4:4        145:2
                    101:21          2021                                 147:21
                                                                         150:1
```

**150:1**
172:4
**30**
3:8 4:8
36:18
130:24
131:1
133:20
151:20
183:25
**30-minute**
133:12
**30(b)**
23:11
171:18
191:24
**30,000**
139:25
140:2
**300**
100:11,16
**31**
4:9 151:24
152:2
184:12
**32**
3:9 4:11
155:1,3
**33**
4:12 156:9
**34**
4:13 158:9
158:11
**34,676**
147:11
**35**
4:22
**356**
168:11
**36**
4:14,23
159:11,13
**369**
122:14
**37**
3:11 4:15
4:23
159:25
160:2

**375.296**
200:22
**375.420**
200:21,21
**38**
4:22
**38,000**
76:18,21,24
77:7,12,13
87:16
**38,800**
76:22
**38,842**
75:25 76:5
**39**
3:12 4:16
4:24
129:20
156:24
168:12
**39,000**
76:24
**3rd**
161:13
163:16,22

_____
**4**
_____
**4**
3:7 19:15
29:23,24
29:25 81:6
81:15
140:4
141:10
143:19
144:8
147:4
151:11
172:25
**4:22-CV-...**
1:17 5:7
**40**
4:17,24
169:14,15
169:23
**40%**
83:10
**400**
100:16

**41**
3:13 4:18
4:24 10:10
10:12
**414**
113:10
**43**
128:1
**432**
70:17
**434**
63:9
**436**
72:15 88:7
**437**
86:22
**439**
56:12
**46**
3:14
**464**
89:25
**47**
3:16
**470**
152:4 153:3
**474**
153:5
**478**
153:19
**482**
154:1
**486**
154:4
**49**
3:17
**49,900**
83:11

_____
**5**
_____
**5**
3:8 31:18
31:21
83:17
135:15
139:6
141:10
143:11,14
143:15,16

143:19,24
143:24
145:11,19
145:19
147:4,21
151:12,14
151:14
180:24
210:13
**5.5**
79:23,24,25
**5:45**
5:17
**50**
3:18 126:21
**53**
144:17,20
**541**
152:4
**55**
3:19
**550**
6:3
**59**
146:1

_____
**6**
_____
**6**
3:2,9 23:11
33:9,10
34:4 46:3
46:4 63:3
171:18
173:5
191:24
**6,237.5**
81:20
**6,237.50**
81:23
**6:35**
119:15
**60606**
6:8
**62,000**
84:18 85:6
**62,375**
83:5 84:24
**62731**
19:1

**62731665**
3:10
**62791665**
14:5 127:22
**63105**
6:4 132:3
**648**
169:18,19
**665**
19:1 117:14
162:22
**673**
169:20
**676**
163:1,9
**6th**
132:3

_____
**7**
_____
**7**
3:10,14,16
18:19,20
18:22 19:5
19:6,9
20:3 34:19
34:19,22
39:2 47:22
61:22 79:7
81:15
103:10
135:13
173:25
**72,027.28**
97:5
**72,027.31**
93:7
**734,000-...**
150:3
**734,509**
150:13
**736**
52:18
**737**
52:18
**738**
102:9
**75**
19:25
**750,000**

```
17:6,9,22
18:4,5
45:15 47:4
52:3 82:23
82:25 85:9
134:10
140:16
146:14
149:14
169:2
750,000.00
140:20
76,272
147:9
760
102:9
762,000-...
137:1
787
94:22
788
100:23
789
131:4
795
135:18
799
142:23
_____
    8
8
3:11 38:16
 38:17
 72:14 88:6
 174:7,8
8.15
36:11,14
 130:3
 183:20
8.5
79:20
80-year-old
19:20 45:12
801
143:5
809,000
150:3,12
809,000-...
147:2,25
```

```
81-year-old
19:20
812,000-...
136:23
831
2:21 5:19
 7:7
841
144:18,23
 144:24
846
145:20
847
146:1
850
147:22
850,000-...
147:24
851
144:22
853
149:7,10
857
150:2
88
3:20
881
131:5
883
92:21
885
96:17
887
98:1
888
160:3
8th
190:16
_____
    9
9
3:12 4:18
 28:23
 32:22 40:8
 40:9,24
 48:24 53:5
 79:18,19
 83:17,20
 84:10,20
```

```
86:21
 174:10,14
9:00
161:17
9:30
5:16
90
19:25 20:1
90-plus
208:22
90-year-old
45:11
904
162:18
906
163:15
908
165:3
909
165:18
90s
165:23
 166:15
91
3:21
910
166:19
911
160:4
912
104:3
914
107:2
919
121:13
921
126:21
923
128:20
93
3:22
95
3:23
959
129:22
963
128:2
97
3:24
```

```
971
126:21
99
4:2
```