

# PohlmanUSA®
## Court Reporting and Litigation Services

---

Eugenia Sprich

April 7, 2023

---

Edward Wiegand, et al.

vs.

New York Life Insurance & Annuity Corporation, et al.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


EDWARD WIEGAND AND EUGENIA      )
SPRICH, TRUSTEES OF THE HERBERT )
C. WIEGAND REVOCABLE TRUST,     )
INDIVIDUALLY AND ON BEHALF OF   )
ALL OTHER SIMILARLY SITUATED,   )
                                )
Plaintiff,                      )
                                )
                                )
vs.                             )Case No. 4:22 CV 188 RWS
                                )
                                )
NEW YORK LIFE INSURANCE &       )
ANNUITY CORPORATION, ET AL.,    )
                                )
Defendants.                     )




VIDEOCONFERENCE DEPOSITION OF EUGENIA SPRICH

Taken on behalf of Defendants

April 7, 2023




JULIE HUNDELT, RPR, CCR, CSR
Missouri CCR No. 829
Illinois CSR No. 084-004789

Page 2

INDEX OF EXAMINATION

WITNESS:  EUGENIA SPRICH
Examination By Mr. Ryan ......................6


INDEX OF EXHIBITS

Exhibit No. 1 .....................................35
  Document:  First Amendment to the
  Amended and Restated Herbert C.
  Wiegand Revocable Trust
Exhibit No. 2 .....................................52
  Document:  Assets of Herbert C.
  Wiegand
Exhibit No. 3 .....................................67
  7/22/2003 Letter from Joann Dyroff
  to Marylee Behlmann at Vance
  Financial Group
Exhibit No. 4 .....................................81
  Policy on Jean Wiegand, Policy No.
  62791665, Date of 6/1/2000

Exhibit No. 5 ...................................108
  2/17/2004 Fax Cover Sheet from Joann
  Dryoff to Vance Financial Group Re:
  New York Life Insurance Policy
  62691665

Exhibit No. 6 ...................................109
  Itemized Document from Herbert C.
  Wiegand Revocable Trust Checking
  Account
Exhibit No. 7 ...................................111
  New York Life Customer Advocacy
  Department
Exhibit No. 8 ...................................115
  7/30/2002 Document:  Fax Cover Sheet
  Vance Financial Group from Marylee
  Behlmann to McCarter and Greenley
  Re: Jean Wiegand Policy No. 62791665

Page 3

INDEX
(continued)

Exhibit No. 9 ...................................118
  Document on New York Life Letterhead
  Titled, "Policy Delivery Receipt for
  Insured Jean Wiegand, Policy No.
  62791665"
Exhibit No. 10 .................................121
  Group Exhibit, Series of Annual
  Policy Summaries from New York Life
  and Annuity Corporation from 2003
  through 2009
Exhibit No. 11 .................................135
  Group Exhibit, Series of Annual
  Policy Summaries from New York Life
  and Annuity Corporation from 2001
  through 2002
Exhibit No. 12 .................................141
  1/12/2004 Letter from Joann Dyroff
  to Eugenia Sprich and Edward Wiegand
Exhibit No. 13 .................................147
  Series of Annual Policy Summaries
  from New York Life and Annuity
  Corporation from June 2009 through
  June 2014
Exhibit No. 14 .................................150
  6/23/2004 Letter from Jennifer
  Williams, Customer Service Rep at
  New York Life to The Herbert C.
  Wiegand Revocable Trust Dated
  4/15/1997


(All exhibits were retained by counsel for Defendants,
  Daniel K. Ryan.)

Page 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

EDWARD WIEGAND AND EUGENIA    )
SPRICH, TRUSTEES OF THE HERBERT)
C. WIEGAND REVOCABLE TRUST,  )
INDIVIDUALLY AND ON BEHALF OF )
ALL OTHER SIMILARLY SITUATED,  )
                                         )
Plaintiff,                        )
                                         )
                                         )
vs.                             )Case No. 4:22 CV 188 RWS
                                         )
NEW YORK LIFE INSURANCE &    )
ANNUITY CORPORATION, ET AL.,  )
                                         )
Defendants.            )

VIDEOCONFERENCE DEPOSITION OF EUGENIA SPRICH,
produced, sworn, and examined on behalf of the
Defendants, April 7, 2023, between the hours of
10:00 a.m. CST and 3:30 p.m. CST on that day, via Zoom,
before Julie Hundelt, a Registered Professional
Reporter, Certified Shorthand Reporter, and Certified
Court Reporter, within and for the State of Missouri.

Page 5

A P P E A R A N C E S

APPEARING FOR THE PLAINTIFF:
Joe Jacobson
Jacobson Press, PC
222 S. Central Ave., Suite 550
Clayton, MO 63105
(314) 899-9790
Jacobson@ArchCityLawyers.com
APPEARING FOR THE DEFENDANTS:
Daniel K. Ryan
Hinshaw & Culbertson LLP
151 North Franklin Street, Suite 2500
Chicago, IL  60606
(312) 704-3248
dryan@hinshawlaw.com
ALSO PRESENT:
Edward Wiegand

Page 6

1     IT IS STIPULATED AND AGREED by and between
2  counsel for the Plaintiffs and counsel for the
3  Defendants that the deposition of EUGENIA SPRICH may be
4  taken in shorthand by Julie Hundelt, Registered
5  Professional Reporter, Certified Court Reporter, and
6  Certified Shorthand Reporter, and afterwards
7  transcribed into typewriting, and the signature of the
8  witness is reserved by agreement of counsel and the
9  witness.
10     PROCEEDINGS:  10:00 a.m. CST
11          * * * * *
12          EUGENIA SPRICH,
13  of lawful age, being produced, sworn, and examined on
14  the part of the Defendants, and after responding "I do"
15  to the oath administered by the court reporter, deposes
16  and says:
17          EXAMINATION
18  QUESTIONS BY MR. RYAN:
19     Q   All right.  We've done it.  Technology is in
20  place here.
21     Would you please state your full name and
22  spell it for the record?
23     A   It's Eugenia W. Sprich.  It's E-U-G-E-N-I-A,
24  middle initial W like William, Sprich, S-P-R-I-C-H.
25     Q   All right.  And we've got Ed, is it Wiegand

Page 7

1  with us here today?  Am I pronouncing that correctly?
2     MR. WIEGAND:  Exactly.
3     Q   (By Mr. Ryan)  Thank you.  And of course,
4  we've got your attorney Joe Jacobson on this Zoom
5  video -- not videotaped.  Zoom deposition.
6     Just by way of introduction, my name is Dan
7  Ryan.  I represent New York Life Insurance Company in
8  the case that you have filed there in St. Louis,
9  Missouri.  I'm going to be asking you some questions
10  regarding the lawsuit, the allegations, the facts, and
11  events leading up to that lawsuit here today.
12     This is not a marathon session.  If at any
13  time you want to take a break, don't hesitate to ask.
14  I'm more than happy to accommodate you.  Similarly, if
15  you don't understand a question, ask me to repeat it
16  or rephrase it.  And I am entitled to your, your best
17  recollection as the events in question.
18     But in any event, let's proceed.  How would
19  you like to be called, Ms. Sprich?  Would you
20  prefer --
21     A   Gina.
22     Q   Gina?
23     A   Yeah.  G-I-N-A.
24     Q   Okay.  Very good.  I'll call you Gina.  And
25  again, I'm going to be asking you some questions.  And

Page 8

1  I'll wait -- I'll try to be patient and wait for your
2  answers.
3     You'll notice that we have Julie Oglesby
4  there with us.  She's a court reporter, and she is
5  taking everything down that you and I say verbatim.
6  Her job gets really difficult if you and I talk over
7  one another.
8     I think that's kind of human nature.  We
9  tend to do it in everyday conversation, but I would
10  ask you to, if you would please, try to be
11  disciplined, wait until I finish my question before
12  you begin to answer.  That way two of us are not
13  speaking at the same time, and we make Julie's job a
14  whole lot easier that way.  Fair enough?
15     A   Fair enough.
16     Q   All right.  Is there -- are you on any
17  medication that would in any way impair your ability
18  to concentrate or your memory?
19     A   No.
20     Q   Okay.  All right.  Well, then, let's get
21  started.
22     Gina, where are you located right now?
23     A   I'm in Kernersville, North Carolina.
24     Q   I'm sorry.  Where in North Carolina?
25     A   Kernersville.

Page 9

1     Q   How do you spell that?
2     A   K-E-R-N-E-R-S-V-I-L-L-E.
3     Q   Okay.  And, and just to -- you know, since
4  the pandemic we lawyers have been doing a lot of these
5  depositions by Zoom.
6     A   Uh-huh.
7     Q   And so it's kind of a newer thing for guys
8  like Joe and I.  So it's a little bit different.
9  Typically in the past we've done them face-to-face.
10  We're all in the same conference room and so forth.
11     Do you have any devices there with you Gina
12  that would allow you to communicate with anyone
13  outside of the room?
14     A   No.
15     Q   All right.  And is there anyone in the room
16  there with you?
17     A   No.
18     Q   All right.  And do you have any notes or
19  documents there with you?
20     A   I just got some papers if I need to go grab
21  something.  But that's all.  It's some papers that you
22  already have anyway.
23     Q   What are those papers, ma'am?
24     A   The one is the, most of it is what I got
25  back from Leticia when I initially sent information to

Page 10

1 her so we could get copies of the statements and the
2 contract and all that.  I think it was back in
3 February or March.
4     Q    Okay.  So these are documents that you
5 received from New York Life?
6     A    Right.  Right.
7     Q    And Leticia at New York Life?
8     A    Yes.  Yes.
9     Q    You say you got copies of the statements,
10 are those the annual reports?
11     A    Yeah.  The annual statements or one of
12 them --
13     Q    And do you also have the insurance policy
14 that is at issue in this case?
15     A    Yes.  I have a copy of that.
16     Q    All right.  What else do you have there with
17 you?
18     A    I think that's about it.  That's basically
19 all she had, that she sent me.  I found out who to
20 talk to, what to send, and the death certificate of my
21 father, and asked for the statements and everything.
22     Q    Okay.  Did you say you have, also have the
23 death certificate of your father?
24     A    I don't know if I have it here.  I know I
25 had it from my dad.

Page 11

1     Q    All right.  Okay.
2     A    But I did not see it in here when I was
3 going through it.  I probably just sent it to her.
4     Q    All right.  Fair enough.  When did you
5 receive those documents from Leticia at New York Life?
6     A    I saw it -- okay.  Her letter is dated
7 February 2nd, so it would be a little after that date.
8     Q    February 2nd of what year?
9     A    I'm sorry, 2021.  I'm sorry, 2021.
10     Q    Okay.  All right.  All right, Gina, I'm
11 going to be asking you some questions as I indicated.
12 You are under oath, the same as if were you in a court
13 of law.  I'd ask you to be as truthful as you possibly
14 can be here today.
15         What is your date of birth Gina?
16     A    2/18/1952.
17     Q    And how long have you lived in
18 North Carolina?
19     A    Since September of 2007.
20     Q    All right.  And where did you live prior to
21 that?
22     A    I lived in Tennessee.  Sharps Chapel,
23 Tennessee.
24     Q    And what period of time did you live in
25 Tennessee?

Page 12

1     A    We were there for five years, I think from
2 2002 to 2007.
3     Q    And was that, did you move there after your
4 father passed away?
5     A    To Tennessee, yes.
6     Q    Okay.  And prior to living in Tennessee,
7 where did you live?
8     A    I lived in Dahlonega, Georgia, for about a
9 year, a little over a year.
10     Q    So we're back to approximately 2000, 2001?
11     A    Right.
12     Q    And where prior to Georgia?
13     A    I moved to Cincinnati, Ohio.  Actually in
14 two -- excuse me.  1977 till I moved to Georgia.
15     Q    Okay.  And are you married, Gina.
16     A    I'm divorced.
17     Q    How long have you been divorced?
18     A    Since 1982.
19     Q    And what is the name of your ex-husband?
20     A    William Daniel Sprich.
21     Q    Do you have any children?
22     A    No.
23     Q    How long were you married to William Daniel
24 Sprich?
25     A    We were married five years.

Page 13

1     Q    Did you have any marriages prior to
2 Mr. Sprich?
3     A    No.
4     Q    When was the last time you lived in St.
5 Louis, Missouri?
6     A    When I got married in 1977.  I left in May
7 of '77.
8     Q    Okay.  Did you grow up in St. Louis?
9     A    Yes.
10     Q    Were you born in St. Louis?
11     A    No.  I was born in Germany.  I was adopted
12 in Germany.
13     Q    What period of time did you live in
14 St. Louis, Gina?
15     A    From the time I was 3 1/2 until I was 25.
16     Q    How did you meet Mr. William Daniel Sprich?
17     A    Through one of his friends that I had
18 casually dated.  One of his classmates right after
19 high school.
20     Q    Did Mr. Sprich grow up in the St. Louis
21 area?
22     A    Yes, he did.
23     Q    What prompted the move to Cincinnati, Ohio?
24     A    Bill had graduated from medical school.  And
25 he was doing his internship at the University of

Page 14

1  Cincinnati, the medical school up there.  The
2  hospital.
3      Q   What kind of doctor -- is he still alive?
4      A   Yes.  He's in Belleville, Illinois.
5      Q   Belleville?
6      A   Yeah.
7      Q   Right outside of St. Louis there?
8      A   Yeah.  Right.  Yeah.
9      Q   And what kind of medicine does he practice?
10     A   He's a neurosurgeon.
11     Q   Okay.  Where did you attend high school?
12     A   Well, Horton Watkins High School or Ladue
13  High School.
14     Q   Did you say Ladue High School?
15     A   Yeah.  They call it Ladue High School.  I
16  think it was -- the proper name, I think it was Horton
17  Watkins, like Horton.
18     Q   Okay.  Did your ex-husband go to school
19  there as well?
20     A   No.  He went to Country Day.  Boys private
21  school.  Prep school.
22     Q   Uh-huh.  And did you go onto college?
23     A   Yes.
24     Q   Where did you attend college?
25     A   My first year I went to University of

Page 15

1  Denver.  And --
2      Q   DU?
3      A   I'm sorry, what?
4      Q   DU.
5      A   Yes.  Yes.  I did.  And then I moved back to
6  St. Louis obviously to be with my ex because I met him
7  right after high school.  Went to Washington
8  University.  Graduated a year early.
9      Q   Congratulations.  Good school.
10     A   Thank you.  Yeah.  Very good.
11     Q   And when did you graduate from Wash U?
12     A   1973.
13     Q   And what was your degree in?
14     A   Education and psychology.
15     Q   Did you obtain any advanced degrees after
16  Wash U, Gina?
17     A   No.
18     Q   Did you attend any schooling beyond Wash U?
19     A   No.
20     Q   After you graduated from Wash U, did you
21  work?
22     A   Yes.  I worked in a bank in St. Louis.
23     Q   What bank was that?
24     A   It was part of the Bank of St. Louis.  But
25  that one was Commercial Bank of St. Louis County.

Page 16

1      Q   Okay.
2      A   I don't know if it's St. Louis -- I know
3  that bank there is not physically there.  I don't know
4  if Bank of St. Louis is still there.
5      Q   And how long did you work for Bank of
6  St. Louis, Gina?
7      A   I worked for --
8          (The court reporter asked for
9          clarification.)
10         THE WITNESS:  About four years there.
11     Q   (By Mr. Ryan) And what were -- what
12  positions did you hold at Bank of St. Louis?
13     A   Well, of course I started on the ground
14  floor and worked my way up to supervising that whole
15  back office.
16     Q   Okay.  What back office is that?
17     A   It's part of the handling deposits, sending
18  money, exchanging money in different currencies.
19  Safety deposit box.  Balancing out the tellers.
20     Q   Okay.  So what was your title when you left
21  Bank of St. Louis?
22     A   I didn't really have a title.  I was, just I
23  was supervisor of back office.  I don't know if you
24  call that a title or not, but that's what I was.
25     Q   Okay.  Fair enough, fair enough.

Page 17

1          Did you have any employment after Bank of
2  St. Louis?
3      A   Yes.  When I moved to Cincinnati, I got a
4  job at Bartlett & Company.
5      Q   And what type of company is Bartlett &
6  Company?
7      A   It's an investment advisory firm.
8      Q   Are they still in existence?
9      A   Yes, they are.
10     Q   How long did you work for Bartlett &
11  Company?
12     A   I -- almost, I think it was 19 years, almost
13  20.
14     Q   And what positions did you hold at Bartlett
15  & Company?
16     A   Well, I moved a lot.  I started on the
17  ground floor again.  Then I worked up to the assistant
18  to the chief financial officer.
19     Q   Do you have any accounting background, Gina?
20     A   No, not real accounting background, no.
21  What I needed to know, I learned at work.
22     Q   Good for you.
23     A   In the roles I worked in, yeah.
24     Q   Good for you.  And were you performing any
25  sales duties while at Bartlett?

Page 18

1      A   No.
2      Q   Did you obtain any certifications relative
3   to any of the products that Bartlett & Company was
4   selling --
5      A   No.
6      Q   -- to its customers?
7      A   No.
8      Q   No securities --
9      A   No.
10     Q   -- certifications or anything like that?
11     A   No. No.
12     Q   What sort of products did Bartlett & Company
13  sell?
14     A   Stocks, bonds.  That was mostly it.  Yeah,
15  stocks and bonds and treasury notes.  They didn't get
16  into gold or coins or insurance at all.  Or they did
17  real estate, commercial real estate.  They put in
18  somebody that knew what to do with that and they went
19  with that for a while.
20     Q   But during the 19 or 20 years that you were
21  with Bartlett & Company, did Bartlett sell any type of
22  insurance products?
23     A   No.  None.
24     Q   No life insurance?
25     A   Nope.  I don't -- there was talk that some

Page 19

1   of the clients wanted it, but they didn't want to do
2   it.  They didn't want to be bothered with it.
3      Q   How about annuities, any annuities --
4      A   No.
5      Q   -- sold by Bartlett?
6      A   No.
7      Q   Now, remember when I first started -- and
8   I'm guilty of it as well.  All right.  Gina.  I
9   noticed that you and I already are starting to talk
10  over one another.
11     A   I'm sorry.
12     Q   I can tell Julie is already starting to get
13  a headache.  So we got to make her job a little
14  easier.  You and I can both try harder.  I'm going to
15  be the first to confess during the course of this
16  deposition today, I'm going to do the same thing.
17     So let's just both work on it, okay?
18     A   Okay.
19     Q   Have you ever purchased any life insurance
20  yourself?
21     A   No.
22     Q   Did your ex-husband, Bill, ever purchase any
23  life insurance while you were married to him?
24     A   No.
25     Q   Have you ever had any sort of formal or

Page 20

1   informal training or education relative to insurance
2   policies?
3      A   No.
4      Q   Do you have insurance on your -- well,
5   strike that.
6      Do you know if you are an insured under any
7   insurance policy today?
8      A   No, I'm not.
9      Q   Have you ever been --
10     A   No.
11     Q   There we go.  All right.  It takes, it takes
12  a little getting used to.  I'm the first to admit it.
13  Okay?
14     To your knowledge, have you ever been an
15  insured under any life insurance policy, Gina?
16     A   My bank has one for accidental death or
17  dismemberment for a thousand dollars.  But you know
18  you can buy more into it, but I never did anything
19  with it.
20     Q   Okay.  All right.  You were with Bartlett &
21  Company for 19 or 20 years, did you have employment
22  after Bartlett?
23     A   Yes.
24     Q   With whom?
25     A   They sold out to Legg Mason I think it was.

Page 21

1   So the work they do -- I think it was Baltimore.  That
2   work was going to go out there.  And whoever were
3   affected down in Cincinnati were let go.  So I was let
4   go.
5      So I went -- I can't think of the name of it
6   now.  Another investment advisory firm who dealt
7   mostly with people who were retiring from Proctor &
8   Gamble.  Cincinnati was Proctor & Gamble's hometown,
9   home base.  I worked there for about a year for
10  compliance.  I did a lot of compliance.  I was hired
11  for compliance, but when I caught the president doing
12  something, he slammed the door in my face and fired
13  me.
14     Q   Oh, boy.  When you say -- by the way, Legg
15  is L-E-G-G, then Mason is M-A-S-O-N?
16     A   Yeah.  I don't know if that's what they're
17  called now or not.  I don't know.
18     Q   Yeah.  They tend to get bought out, don't
19  they?
20     A   Yeah.
21     Q   Then you went to work for some other
22  securities, investment advisory firm that focused on
23  Proctor & Gamble employees or retirees?
24     A   Yeah.  It was retirement -- Retirement
25  Capital Advisors.

6  (Pages 18 to 21)

Page 22

1    Q   Based out of Cincinnati?
2    A   Yes.
3    Q   And you said you were involved in
4  compliance.  Can you explain what that entailed,
5  please?
6    A   Number one, that we had all the proper
7  paperwork from our clients depending on the accounts
8  that they're setting up, whether it be an estate
9  account, a corporate account, individual account,
10  trust account.  Make sure we got all the paperwork.
11  And make sure there weren't any illegal transactions
12  going on among the employees or the principals of the
13  firm.
14    Q   Okay.  So to make sure all that paperwork is
15  completed and in order relative to the investments
16  that customers purchased?
17    A   Right.
18    Q   Okay.  And you were there at Retirement
19  Capital Advisors for approximately a year before they
20  let you go?
21    A   Yeah.
22    Q   And where did -- did you work after?
23    A   Yes.  I went to Kohn & Co. Cohen.
24  K-O-H-E-N [sic] I think it is, and Company.
25    Q   And where were they located?

Page 23

1    A   In Cincinnati.
2    Q   Did you became a Bengals fan when you were
3  out there?
4    A   No.  Everybody else was though.
5    Q   What did you do for Kohn~&~Company?
6    A   Mostly answering and doing books.  He dealt
7  mostly in mutual funds.  He had his own accounting
8  system program, so we weren't tied into any big
9  houses.  We had to do all our funding through somebody
10  that was part of the New York Stock Exchange, Midwest
11  Stock Exchange, that kind of thing.
12        So we were the ones that were putting in
13  the entries and the buys and sells into the accounts
14  that we had on our computer.
15        And I, I got fired there, too.  When I was
16  working there, I saw nobody was checking, nobody was
17  balancing anything.  And people's accounts were
18  getting double entried.  And the way a lot of these
19  investment advisers do when they deal with people with
20  money, they, they -- the fee they get is a percentage
21  of the amount that they manage.
22        So I had made the bill already and gave it
23  to him ,and I said, "I just found this.  I re-did it
24  all.  Don't you want me to go back and change the
25  billing?"  He said, "No."  I got fired the next day

Page 24

1  because he thought I was so trouble because I didn't
2  like that.
3    Q   I'm sorry to hear that.
4    A   Yeah.
5    Q   So what kind of products did Kohn & Company
6  sell?  Were those stocks, bonds, securities?
7    A   Stocks and bonds, yeah.
8    Q   Any insurance products?
9    A   Mutual funds.
10    Q   All right.  Any insurance products?
11    A   No.
12    Q   After you left Kohn~&~Company, did you work
13  after that?
14    A   Yep.
15    Q   Where did you go to work?
16    A   I worked -- it was called Resonate.  It was
17  another advisory firm.
18    Q   And where were they located?
19    A   It was also in Cincinnati.
20    Q   How long did you work for them?
21    A   About a year and a half I think.
22    Q   And what sort of products did Resonate sell?
23    A   Well, they did stocks and bonds.  However,
24  they started out in insurance together.  And then they
25  got into the stocks and bonds afterward.  So the

Page 25

1  insurance policies, annuities had started off being
2  their bread and butter, and that's what they really,
3  really liked to do.
4        I left that job because they weren't -- when
5  I went to discuss this, when they were trying to get
6  people into products, they were looking at the line
7  for themselves, which ones were going to give them the
8  better payout at the end.
9    Q   Okay.
10    A   I didn't like that either, and I left.
11    Q   How long were you with Resonate?
12    A   About a year and a half.  But I worked in
13  the securities side.  I did not work on the insurance
14  side at all.
15    Q   You never worked on, on any of the insurance
16  products?
17    A   No.  I don't know nothing about them.
18    Q   Okay.  And what was your position with
19  Resonate?
20    A   Didn't really have a title.
21    Q   All right.
22    A   It was back office.  Back office.
23    Q   By the way, what year are we talking about
24  now, Gina?
25    A   2000 or 2001.  2000 I think.

7  (Pages 22 to 25)

Page 26

1    Q   Okay.  And I'm going to ask the question,
2  I'm going to guess you worked after Resonate.  Who did
3  you work for?
4    **A   Well, then I moved on to Georgia to live**
5  **with my sister.  I had enough of Cincinnati.  I moved**
6  **down there.  And I did work -- actually, something**
7  **really different.  She was up in the mountains,**
8  **Dahlonega Mountains and the National Forest.  And**
9  **there was a 4-H camp down there.  So I went down to**
10  **work in the kitchen for a year doing something**
11  **different.**
12    Q   Okay.  And how long did you live in Georgia
13  again?
14    **A   Just a little over a year.  Like 13, 14**
15  **months.**
16    Q   Okay.  And then you moved to Tennessee?
17    **A   Yes.**
18    Q   And did you work in Tennessee?
19    **A   No.  I did not.**
20    Q   When -- when were you in Tennessee again,
21  Gina?
22    **A   2002 to 2007.**
23    Q   And that was about the time your father
24  passed away?
25    **A   Yeah.**

Page 27

1    Q   I mean 2002 is when your father passed away;
2  right?
3    **A   One or two.  Yeah.  I forget which.**
4    Q   July, July of '02 sound right?
5    **A   That's -- yeah.**
6    Q   And you lived in Tennessee for the next five
7  years until 2007?
8    **A   Uh-huh.  Correct.**
9    Q   And where did you -- did you work at all in
10  Tennessee?  Oh, you said no.
11    **A   Did not work in Tennessee.**
12    Q   No work in Tennessee?
13    **A   No.**
14    Q   And that brings us up to North Carolina
15  where you moved in 2007; right?
16    **A   Correct.**
17    Q   And have you worked at all since 2007?
18    **A   Yes.  My sister and I opened a dog grooming**
19  **salon.**
20    Q   What's the name of it?
21    **A   Well, it doesn't exist anymore.  It was our**
22  **company --**
23      (The court reporter asked for
24      clarification.)
25      THE WITNESS:  Laundromuttz.

Page 28

1  L-A-U-N-D-R-O-M-U-T-T-Z.
2      MR. RYAN:  Love that.  Great name.
3      THE WITNESS:  Yeah.  A lot of people liked
4  it.
5    Q   (By Mr. Ryan)  And so that was open for about
6  a year?
7    **A   No.  We had that for six years.**
8    Q   Okay.  And when did you shut that down?
9    **A   2008 -- '19 I think it was.  My sister got**
10  **sick.**
11    Q   Which sister is that?
12    **A   Susan.**
13    Q   Is Susan still alive?
14    **A   Yes.  But she's had a very bad stroke a**
15  **little over a year ago.**
16    Q   Sorry to hear that.
17    **A   Yeah.**
18    Q   Okay.  And have you worked since you had
19  your own business?
20    **A   No.**
21    Q   How old are you now Gina?
22    **A   Seventy-one.**
23    Q   Gina, what -- other than the documents that
24  you got there with you, what, if any, documents did
25  you review in preparation for today's deposition?

Page 29

1    **A   Well, I actually just looked over the**
2  **deposition for Joann to mostly get a feel for what**
3  **kind of -- you know, what you guys are looking for.**
4      **The ones that I -- I didn't really go over a**
5  **lot in preparation for this.  I'm the one that got the**
6  **ball rolling to get this going when we found out that**
7  **Jean Walters had passed on because we didn't have any**
8  **documentation at all.**
9    Q   Okay.  So you reviewed -- when you say
10  "reviewed the deposition of Joann," you mean Gina
11  Joann Dryoff, D-R-Y-O-F-F?
12    **A   Dyroff.**
13    Q   Oh, I was mispronouncing it, sorry.
14    **A   Yeah.  It's Dyroff.  It's spelled wrong on**
15  **your deposition.**
16    Q   Oh, is it?
17    **A   Yeah.**
18    Q   Sorry about that.
19    **A   That's all right.**
20    Q   So the proper pronunciation is Dyroff?
21    **A   Dyroff.  Yes.**
22    Q   And who --
23      (The court reporter asked for
24      clarification.)
25      MR. JACOBSON:  D-Y-R-O-F-F.

8  (Pages 26 to 29)

Page 30

1    Q   (By Mr. Ryan) And who is Joann Dyroff?
2    A   She's an attorney.
3    Q   In St. Louis?
4    A   Yes.
5    Q   And is she your attorney?
6    A   She became our attorney.
7    Q   When?
8    A   When we were trying to finish up my dad's
9    estate and we were not happy with the attorney and
10   adviser that my father had had and we wanted to switch
11   attorneys again, set it up with somebody else.
12   Q   Okay.  And the, the attorneys that you
13   weren't happy with, was that McCarter and, what is it,
14   Greenley?  Do I have that right?
15   A   Yes.  Greenley, yes.
16   Q   And so the attorneys at the law firm of
17   McCarter and Greenley, were they -- who were they
18   hired by?
19   A   My dad was paying them.  I don't know who
20   recommended them or what.  I don't know how they got
21   together, I have no idea.
22   Q   Okay.  Is it your understanding that they
23   provided legal services to your father when he was
24   still alive?
25   A   Yes.  And investment.

Page 31

1    Q   And investment?
2    A   Well, yeah.
3    Q   What do you mean by that?
4    A   Well, well, he got -- he sold all their
5    stocks and took that money and put them in an
6    insurance policy.  I don't know what else he put them
7    in.  I don't know exactly what all the conversations
8    were.  We were not privy to it.
9    Q   Fair enough.  Who at that law firm provided
10   legal services to your dad?
11   A   At the firm, McCarter.
12   Q   Okay.  And when you referenced earlier that
13   he became our attorney, who is "our?"  Who are you
14   including in that?
15   A   For the family.
16   Q   Okay.  Is that the family trust?
17   A   Yeah.
18   Q   All right.
19   A   Because Eddie and I got involved in that,
20   and the other kids were not at that time because we
21   were the trustees.  That's what I mean by "our."
22   Eddie and I did the communications with the attorneys.
23   Q   When you say "Eddie," you're referring to
24   your brother?
25   A   Yeah.  Ed.

Page 32

1    Q   Ed -- Ed Wiegand?
2    A   Yes.
3    Q   Who is with us here today in this
4    deposition?
5    A   Correct.
6    Q   And the two of you have filed the lawsuit
7    that we're here on today on behalf of the trust, the
8    Wiegand Trust?
9    A   Yes.
10   Q   The two of you are the trustees?
11   A   Correct.
12   Q   Other than -- are the two of you also
13   beneficiaries under that trust?
14   A   Yes.
15   Q   Who else are beneficiaries under that trust?
16   A   Two sisters and two brothers -- two sisters
17   and two more brothers.
18   Q   All right.  Would you please identify those
19   two sisters?
20   A   Susan Lennard.  It's L-E-N-N-A-R-D.
21   Q   And where does she live?
22   A   She's here in North Carolina.
23   Q   Oh, she's the one who had the stroke
24   recently?
25   A   Yes.

Page 33

1    Q   Okay.  And then who is your other sister?
2    A   Antoinette Hines, H-I-N-E-S.  She's in
3    Colorado.
4    Q   What part of Colorado?
5    A   Boulder.
6    Q   And the two brothers other than Eddie, other
7    than Ed?
8    A   Mark.  I knew I was missing one.  There's
9    three brothers.  Mark Wiegand.
10   Q   Where does he live?
11   A   Boulder.
12   Q   The other brothers?
13   A   Jim, James.
14   Q   Where does Jim live?
15   A   He was in Loveland, Colorado.  He has passed
16   on.
17   Q   When did he pass away?
18   A   A little over a year ago.
19   Q   Okay.  And is the third brother Ed?
20   A   Yeah.  Well, Ed, but there's also another
21   one.  I knew I was missing one.  Herbert, who lives in
22   St. Louis.  Same name as my dad.  Herbert Wiegand.
23   Q   Okay.  So at least at one time, a total of
24   seven of you?
25   A   Correct.

9  (Pages 30 to 33)

Page 34

1    Q   Are they all adopted?

2    A   No.  Just Susan and I.

3    Q   Was the trust originally set up -- I'm going

4  to -- hold on one second.  Let me -- was the trust

5  originally set up in 1997 to your knowledge, Gina?

6    A   I really don't know the date.

7    Q   Okay.  What is your understanding as to who

8  set up that trust?

9    A   I -- to my best of knowledge, and I can't

10  write in stone, is that McCarter helped my dad with

11  that.

12    Q   What I'm going to do is I'm going to

13  screen -- so again, we're talking new technology here,

14  Gina.  So bear with me, but I'm going to show you a

15  document.  I'm going to put it up on the screen.  And

16  I'll scroll through various pages of it.  And

17  throughout the course of today's deposition, that's

18  how we're going to introduce what we lawyers call

19  exhibits.  Okay?

20    A   Uh-huh.

21    Q   And since we're not together in person, I'm

22  going to do that by way of putting that document on

23  the screen.  Okay?

24    A   Okay.

25    Q   So bear with me while I try to accomplish

Page 35

1  that.  It was mislabeled.  So I'm scrolling through a

2  bunch of documents trying to find it.  One second.

3  I'll tell you what, Joe, do you mind if we take just a

4  quick break.  I want to --

5    MR. JACOBSON:  No, get yourself together.

6  That's fine.

7    MR. RYAN:  Let's take a five-minute break.

8  Resume at about, let's call it 11:00 o'clock Central

9  Time.  That would be noon your time, Gina.

10    THE WITNESS:  Yeah.

11    MR. RYAN:  All right.

12    (A break was taken off the record.)

13    Q   (By Mr. Ryan) Can you see, is there a

14  document shown on your screen there, Gina?

15    A   Now I do, yes.

16    Q   Okay.  I'll show you what will be marked as

17  Exhibit 1 for identification.

18    And it's a several-page document, the first

19  page of which is titled "First Amendment to the

20  Amended and Restated Herbert C. Wiegand Revocable

21  Trust."

22    MR. RYAN:  Miss Court Reporter, we'll call

23  this Exhibit 1.

24    THE COURT REPORTER:  Okay.

25    (Exhibit No. 1, Document:  First

Page 36

1    Amendment to the Amended and Restated

2    Herbert C. Wiegand Revocable Trust, was

3    marked for identification.)

4    Q   (By Mr. Ryan) Now, I'm going to scroll

5  through it, but I'll note for your edification, Gina,

6  that the first page references, "Whereas on April 15,

7  1997, Herbert C. Wiegand as grantor and the same

8  Herbert C. Wiegand as trustee entered into the Herbert

9  C. Wiegand Revocable Trust."

10    Do you see that?

11    A   Yes.

12    Q   Is that the trust for which you and your

13  brother Ed have filed this lawsuit on behalf of?

14    A   Yes.  I believe so.

15    Q   Okay.  So you and Ed are the sole trustees

16  of the Herbert C. Wiegand Revocable Trust?

17    A   Yes, we are.

18    Q   All right.  How is it that -- did your dad

19  choose you and your brother to be the trustees of this

20  trust, Gina?

21    A   Yes.

22    Q   Out of all the seven kids -- because I come

23  from a family of eight kids.  Out of all the seven

24  kids, why did he choose you two, do you know?

25    A   He wanted one daughter and one son, and one

Page 37

1  son he didn't trust.

2    Q   Okay.  Have you been the trustees -- how

3  long have you and Ed been the trustees of this trust?

4    A   I guess since he set it up that way.

5    Q   I -- okay.  That's -- but at least as long

6  a -- well, let me ask you this.

7    Were you and Ed the trustees prior to when

8  your dad got remarried to Jean Walters?

9    A   When did he get married?  Do you have the

10  date on there?  The day he got married?

11    Q   I was going to ask you.  But I'm going to

12  give it a shot for you.

13    A   I don't remember.  It was like three years.

14  It wasn't real long.

15    Q   Yeah.  Right.  And we'll get into that in a

16  moment.

17    But my understanding, and I'm not suggesting

18  that this is right, but that the two of them got

19  married in August of 1999.  Does that sound about

20  right?

21    A   That sounds about right, yeah.

22    Q   And this, this trust, this Herbert C.

23  Wiegand Revocable Trust existed prior to his marriage

24  to Jean Walters in '99; right?

25    A   It appears so, yes.

10  (Pages 34 to 37)

Page 38

1    Q   To your knowledge, were you and Ed the
2  trustees prior to when your dad got married to Jean
3  Walters in August of 1999?
4    A   I don't remember.  I don't remember talking
5  about it or doing anything with it.  I think it was
6  something that was set up through McCarter.
7    Q   McCarter the lawyer?
8    A   Yes.  I can't think of his first name.
9    Q   Okay.  Now I'm going to scroll through this
10 document.  By the way, this document is Bates
11 numbered.  It's Dryoff -- now I understand it's
12 Dyroff?
13   A   Yeah.
14   Q   But it's -- I'm going to go by what it's
15 been -- you know, these numbers here in the lower
16 right-hand corners, we lawyers call them Bates
17 numbers, okay?
18      MR. JACOBSON:  Dan, this is Joe Jacobson.
19 Is it possible to expand your image so we can see the
20 whole page?  Because all we can see are eight or nine
21 lines at a time.
22      MR. RYAN:  Yeah.  Let me do that for you,
23 Joe.
24      MR. JACOBSON:  Thank you.
25      MR. RYAN:  You're assuming I'm

Page 39

1  technologically advanced.  But let's see what I can do
2  here.
3       (A break was taken off the record.)
4    Q   (By Mr. Ryan)  In any event, Gina, I'm going
5  to scroll through Exhibit 1, which begins with Dyroff
6  149 through Dyroff 192.  Okay?
7    A   Okay.
8    Q   The first page I showed you was actually the
9  first amendment to the trust.  But if we scroll
10 down -- by the way, on Dyroff 151, you see a
11 signature.  Is that your father's signature?
12   A   Yes.
13   A   From December 5 of 2001?
14   A   That's his signature, yes.
15   Q   All right.  And then if we scroll down
16 further, we've got Amendment To and Restatement of the
17 Herbert C. Wiegand Revocable Trust, with a reference
18 to the law firm of McCarter and Greenley.  Do you see
19 that?
20   A   Right, yep.
21   Q   Then it has a table of contents that goes
22 from Pages 2 through 34.  That appears to be the
23 restated trust.
24      And if I go to, for example, the page marked
25 as -- Page 2, Dyroff 160.  At the top, there's a

Page 40

1  reference to a bunch of names up there.  Are these you
2  and your siblings that you identified earlier today?
3    A   Yes.
4    Q   Okay.  Who is Jean Cameron Wiegand?
5    A   That is his second wife.
6    Q   Which leads me to my next question, and I
7  don't mean to be in any way disrespectful.  But how
8  many wives did your father have?
9    A   I had a jeweler ask me that with my mother's
10 jewelry, the diamonds.  But anyway, he just had two.
11 Just my mother and Jean Walters.
12   Q   Okay.  Jean Walters, is that -- prior to
13 marrying your father, was that her previous married
14 name?
15   A   Yes.
16   Q   And is her maiden name Cameron or was her
17 maiden name Cameron?
18   A   I think her maiden name was Cameron.  I
19 won't swear to it.
20   Q   Okay.  That's fine.
21      And what was your mother's maiden name?
22   A   Buder.  B-U-D-E-R.
23   Q   All right.  And can you give me her full
24 name, please?
25   A   Who, my mother?

Page 41

1    Q   Yes.
2    A   She was Antonia Buder Wiegand.
3    Q   Buder is spelled how?
4    A   B-U-D-E-R.
5    Q   Was she a German citizen?
6    A   No.
7    Q   How did they meet?
8    A   My mother was from St. Louis.
9    Q   Is that right?
10   A   Uh-huh.
11   Q   I'm not sure how relevant this is.  But how
12 did it come to be that -- were you born in Germany?
13   A   Yes.  On the east side.
14   Q   And how, how did it come to be that you were
15 adopted by your parents?
16   A   I'll tell you a quick story.  They had four
17 boys.  My mother wanted a girl.  My, my mother's --
18 Tony -- Antonia Buder's mother had relatives over in
19 Germany that she kept up with.  And she had talked to
20 one of the relatives that was a judge.  And his son
21 was a lawyer.  So they got information on two little
22 German girls that needed a home.  So they went over to
23 pick one of us and brought both of us back.  And then
24 my mother had a surprise baby, which is Antoinette
25 after that.

11  (Pages 38 to 41)

Page  42

1    Q   Huh.  That's a cool story.
2    A   Yeah.
3    Q   So you and your sister were both adopted
4  from Germany?
5    A   Yes, but we're not biologically related.
6    Q   And which sister is that?
7    A   Susan.
8    Q   All right.  And so, I note that this, this
9  document -- and I'm going to scroll up -- actually,
10  let's see.  Amendment Two and Restatement of the
11  Herbert C. Wiegand Revocable Trust.  And, and I'm
12  going to scroll down here now, Gina, to the signature
13  page.  And this is dated -- well, that's Exhibit A.
14  But if we go to Page 32, which is Dyroff 190.
15    A   Uh-huh.
16    Q   We'll see that there appears to be your
17  father's signature, with a notary dated May 23, 2001.
18    A   Okay.
19    Q   Right?
20    A   Yes.
21    Q   And does that, does that also appear to be
22  your father's signature?
23    A   Yes.
24    Q   And am I correct in stating that this
25  document was executed by your father after he married

Page  43

1  Jean Cameron?
2    A   Looks like it, yes.
3    Q   Okay.  So -- and did the two of them marry
4  in August of 1999?
5    A   I think that was the date.  I don't remember
6  the date.
7    Q   All right.  Your mother's name -- did you
8  say Antonia?
9    A   Antonia.
10    Q   Antonia.  And how long were your father and
11  Antonia married?
12    A   For over 50 years.
13    Q   Did she pass away, or did they got divorced?
14    A   She passed away.  She died in her sleep.
15    Q   When did she pass away?
16    A   I think it was only three years before they
17  got married.  Before Jean got married to my dad.  I
18  think it was.
19    Q   How did -- did your father -- when I refer
20  to Jean, can we have an understanding that I'm
21  referring to Jean Cameron?
22    A   Yes.
23    Q   All right?
24    A   Yes.
25    Q   And then how long had -- did your -- strike

Page  44

1  that.
2        Did your father Herbert know Jean Cameron
3  before your mom passed away?
4    A   He had known her by sight.  Many years ago
5  when he went to Washington University and she was
6  there.  She had a twin.
7    Q   Okay.
8    A   But he'd admit, he was, he was intimidated
9  by them because he thought they were so pretty and he
10  never asked her out for a date.  Because he ended up,
11  she ended up being a member of the church that my
12  parents went to and supposedly that's how they met and
13  got to talking later in life.
14    Q   Okay.  But at least as of, as of this date,
15  May 23, 2001, you and your brother Ed were the
16  trustees of this Herbert C. Wiegand Revocable Trust;
17  is that fair to say?
18    A   Yes.
19    Q   All right.  What assets were in this trust
20  in or about 2001?
21    A   I, I honest to God can't tell you what was
22  in it.  I know my parents had stocks and bonds at the
23  bank.  And a safety deposit box.  I don't know if they
24  had them, you know, at the security firms or not.  The
25  only thing I could offer to you is that he got all

Page  45

1  those in physical form and Mr. McCarter had him sell
2  all those to put them in different vehicles.
3    Q   Okay.
4    A   But I was not privy to that information at
5  the time.
6    Q   Did your father die with a will?
7    A   Yes.
8    Q   And who were the executors of his estate?
9    A   I think it was Eddie and I handled all that.
10    Q   Okay.
11    A   We were the ones doing that.
12    Q   Did -- did your father's estate go through
13  probate?
14    A   I'm sure it did.  We paid taxes and stuff on
15  it.  Ed handled most of that part of it.
16    Q   Okay.
17    A   If I remember correctly.
18    Q   Ed is going to have the privilege of being
19  deposed as well.  I'm sure he's looking forward to it.
20        But what is Ed's background work-wise,
21  employment-wise?
22    A   You'd have to ask him.  He, he's done
23  several things and I couldn't tell you a lot about any
24  of them because we ended up at all different states.
25  And that's, you know, didn't stay super, super close

12  (Pages 42 to 45)

Page 46

1  on a daily basis.
2      Q   Okay.  And again, I'm just asking for your
3  understanding, Gina.  But what, what's your
4  understanding as to what your role is and has been as
5  a trustee of the Herbert C. Wiegand Revocable Trust?
6      A   Was to divvy up assets, money, whatever my
7  dad had equally.  And make sure the terms were met.
8      Q   Okay.  So I'm trying to get a sense of this.
9  And since I wasn't there, I'm going to ask you to walk
10  me through it.
11          So, so your dad passes away in July of 2002.
12  The estate then goes into probate for a couple of
13  years.  And my records indicate through November of
14  2004.  So about two years.
15          During that period of time while your
16  father's estate was in probate, were various assets
17  distributed to you and your siblings?
18      A   Yeah.  Some have.  I mean they -- we had to
19  sell the house and deal with some other things to try
20  to close everything up.  But yeah, we did get some.
21      Q   Okay.  Did all of the assets get distributed
22  in or about 2004?  Or did some assets remain that
23  you -- that were in the trust that you and your
24  brother Ed continued to oversee?
25      A   No.  I think every, everything was

Page 47

1  distributed.  I don't know exactly when the house
2  sold, but it was about a year or two later.
3      Q   Which house is that?
4      A   Well, we got -- he had a lake house in the
5  Lake of the Ozarks.  And then the residency in Ladue.
6  He kept his house even though he lived with his wife.
7      Q   Yeah.  I was going to get to that.
8          So the house that your, that he had in
9  Ladue, what street was that on?
10      A   Overhills Drive.
11      Q   And what sort of a house was that?
12      A   What do you mean?  It's a brick ranch house.
13  A big brick ranch.
14      Q   Okay.  And what was the house at Lake of the
15  Ozarks, what street was that on?
16      A   I don't remember.  I barely remember how to
17  get there.  I honest to God don't remember the name of
18  it.  Wisteria I think was the name, something
19  Wisteria.  Something to do with a flower or tree or
20  bush.
21      Q   Okay.  So after he passed away, did you and
22  Ed arrange to have both the Lake of the Ozarks house
23  and the Overhills house in Ladue sold?
24      A   Yes.
25      Q   And then the proceeds were distributed

Page 48

1  amongst the seven kids?
2      A   Yes.
3      Q   Did his will provide for all of the assets
4  of his estate to be divided equally amongst his seven
5  kids?
6      A   Yes.
7      Q   After he got married to Jean Cameron
8  Walters -- I think you mentioned he kept the Overhills
9  house?
10      A   Yes.
11      Q   But lived in Jean's house?
12      A   Yes.
13      Q   Was Jean's house on Huntleigh Woods Road?
14      A   Yes.
15      Q   Okay.  Okay.  And while -- and did he, did
16  he -- after they got married, did he move over to the
17  Huntleigh Woods address?
18      A   Yes.  But he didn't take all his
19  possessions.  He kept them there at the house.
20      Q   I understand.  Okay.  So was that 9
21  Huntleigh Woods Road in St. Louis?
22      A   Yeah.  I believe that's the address.
23      Q   All right.  So approximately what period of
24  time did your dad live at 9 Huntleigh Woods Road in
25  St. Louis?

Page 49

1      A   From the time he got married till the time
2  he passed.
3      Q   Okay.
4      A   I think that's all --
5      Q   So that would have been from, from
6  approximately August of 1999 until July 16 of 2022?
7      A   Correct.
8      Q   So about, about three years?
9      A   Yeah.  Yeah.  I remember it being three.
10      Q   And while he lived at Huntleigh Woods Road,
11  was there anyone living in the, his house on Overhills
12  Road in Ladue?
13      A   No.  Nobody was living there.
14      Q   It was vacant?
15      A   Yeah.  But the electric and everything was
16  still on.
17      Q   Okay.  Did you visit him at 9 Huntleigh
18  Woods Road in St. Louis?
19      A   Yes.  Yes.
20      Q   On how many occasions?
21      A   Susan and I went down there to see him
22  before he got married.  And that's when he introduced
23  us to Jean.  And of course, came back for the wedding.
24  And then we came back for another time to visit him
25  before he passed.

13  (Pages 46 to 49)

Page 50

1    Q   So about -- you were at the 9 Huntleigh
2    Woods Road house approximately three times?
3        A   Yes.
4        Q   When he lived at the Huntleigh Woods Road in
5    St. Louis, did anyone else live there other than your
6    dad and Jean Cameron Walters?
7        A   She had a daughter living -- she had a pool
8    and a pool house.  And the pool house was kind of
9    converted into an apartment if you will.  And she, the
10   one daughter got married and she and her husband were
11   staying there.  So I think his -- her daughter was
12   with her constantly living there.  It was her
13   residence.  She was not in the main house.
14       Q   Okay.  Is that Nancy?
15       A   Yes.  Nancy.
16       Q   And her married name is Galloway?
17       A   It could be.
18       Q   Have you ever met Nancy?
19       A   Yes.
20       Q   How many times?
21       A   Probably two or three.
22       Q   Did Nancy and her husband live in the pool
23   house/apartment at 9 Huntleigh Woods Road the entire
24   time --
25       A   Yes.

Page 51

1        Q   -- that your father was living there?
2        A   I think so, yes.  But he, he passed away a
3    couple years later.  He didn't live long after they
4    got married.  I don't know why.
5        Q   Oh, Nancy's husband passed away?
6        A   Yeah.
7        Q   When you sold the house on Overhills Road in
8    Ladue, how much was it sold for?
9        A   Oh, gosh.  I don't remember.  Eddie will
10   have that.  Eddie did the wheeling and dealing on the
11   numbers with that.
12       Q   Do you recall approximately how much, how
13   much the total estate, the total value of your
14   father's estate at the time he passed away?
15       A   Total value?
16       Q   Yeah.  All of the assets combined?
17       A   I don't know if I saw one with a total on
18   it.  I really don't know.  I don't want to second
19   guess and be totally wrong.
20       Q   Well, how much did you receive out of your
21   father's estate?
22       A   I think it was close to 700.
23       Q   700,000?
24       A   Yes.
25       Q   All right.  Let's see.  If you haven't

Page 52

1    noticed, I'm trying to find another document.
2        A   I'm just happy to see somebody else stumble
3    over it instead of me.
4        Q   Yeah.  I don't have any pride on this stuff
5    so, you know, so if I fumble through it, it is what it
6    is.
7        A   I hear you.
8        Q   I think I finally got it.  Okay.  Okay.  I'm
9    going to show you now -- I'm going to shrink it.  Can
10   you see that?
11       A   Yes.
12       Q   I'll show you what we will mark as
13   Exhibit 2.
14           (Exhibit No. 2, Document:  Assets of
15           Herbert C. Wiegand, was marked for
16           identification.)
17       Q   (By Mr. Ryan) It's a document entitled
18   "Assets of Herbert C. Wiegand."  Date of death,
19   July 16, 2002.  There's a social security number on
20   there.
21           MR. RYAN:  Joe, I'll have this redacted
22   before we attach to any dep transcript.
23           MR. JACOBSON:  What's the -- what exhibit
24   was that in the Dyroff deposition so I can pull it up
25   here?

Page 53

1            MR. RYAN:  I don't know since Jim took that
2    dep.  Let's see, maybe I got it.
3            MR. JACOBSON:  Are there Bates numbers on it
4    anywhere?
5            MR. RYAN:  You know, the one I got doesn't
6    have Bates numbers on it.  I apologize.
7            MR. JACOBSON:  I'll look at my list.  I'm
8    sure I can find it.  I know I've seen that before.
9        Q   (By Mr. Ryan) All right.  Gina, I'm showing
10   you what will be marked as Exhibit 2.  It's a
11   document, as I indicated, titled "Assets of Herbert C.
12   Wiegand."  And I'm scrolling through it.
13           Does this appear to be a true and accurate
14   copy of the list of your father's assets at the
15   time --
16       A   I think so.  I think so, yes.
17       Q   See, Julie is getting heartburn.  Wait until
18   I finish my question.
19       A   Sorry.
20       Q   Okay.  Does this appear to be a true and
21   accurate listing of your father's estates --
22       A   Yes.
23       Q   I'm sorry.  Let me start again because I
24   messed up my question.
25           All right.  I'm going to withdraw that last

14  (Pages 50 to 53)

1  question.
2      Gina, does this document appear to accurately
3  reflect all of the assets that were in your father's
4  estate at the time he passed away?
5      **A   I think it is, yes.**
6      Q   Okay.  And we've got the Overhills Drive
7  property that you mentioned; right?
8      **A   Yes.**
9      Q   There appears to be two Overhills Drive
10 properties.  Can you explain that?
11     **A   Where it says "to be probated" and then the**
12 **one below it?**
13     Q   Yeah.  Yeah.
14     **A   No.**
15     Q   Was there, was there like a, was there like
16 a vacant lot next to the Overhills Drive property?
17     **A   No.**
18     Q   Was there like a pool house or some sort of
19 additional dwelling next to it?
20     **A   No.  I know that, I know at one point, which**
21 **I didn't know for a long time, that the neighbors next**
22 **door wanted a little piece of their land and they sold**
23 **it to him.  But that was eons ago.**
24     Q   Okay.
25     **A   And that may be -- yeah.  It was a little**

1  **strip or something they wanted.**
2      Q   Then we got 904.165 units of the Wiegand
3  Family, LLC.  What's that a reference to?
4      **A   I don't know.**
5      Q   Is that the Lake of the Ozarks property?
6      **A   I don't, I don't know what they mean by**
7  **units.**
8      Q   Okay.  We've got some life insurance
9  policies here.  Appear to be a total of eight of them.
10 Do you see that?
11     **A   Yes.**
12     Q   And were all of -- were those -- I'm going
13 to turn to the next page because there's some
14 additional policies.
15     But were those issued -- to your knowledge,
16 were those eight policies issued by New York Life?
17     **A   Those I don't know.  I know over the years**
18 **since he became a doctor, he was buying smaller**
19 **policies in New York Life.  Periodically, he'd buy**
20 **small policies with New York Life.**
21     Q   Okay.  Are you aware of any company that
22 your father purchased life insurance policies from
23 other than New York Life?
24     **A   No.  If he did, I don't know about them.**
25     Q   Okay.  And then there are two annuities

1  listed there as well.  Do you see that right above the
2  life insurance policies?
3      **A   Yes.**
4      Q   To your knowledge, were those annuities
5  issued by New York Life?
6      **A   That I don't know.**
7      Q   Then there is a New York Life money market
8  account.  Do you see that?
9      **A   Yeah.**
10     Q   I'm going to turn to the next page where
11 there appear to be three more life insurance policies.
12 The first one at the top is a life insurance policy on
13 Jean's life purchased by Dr. Wiegand in satisfaction
14 of prenuptial obligations.  Dr. W paid single premium
15 $325,000.  And off to the right, it says -- well,
16 there's an amount of $600,000, and it's titled "Jean
17 created an ILIT for this policy for her children's
18 benefit."
19     Is that a reference to Jean creating a trust
20 for this policy for her children's benefit?
21     **A   I have no idea what she did.**
22     Q   Okay.  Let's dig into this a little bit.
23     **A   What does ILIT mean?**
24     Q   I'm not sure.  Maybe Ed knows.  We'll ask
25 him when he's deposed.

1      **A   Okay.**
2      Q   It might be a trust.  Okay.  In any event,
3  Jean Cameron, your father's second wife, was she
4  married prior to being married to your father?
5      **A   Yes.**
6      Q   And was she married to a, a gentleman named
7  Mr. Walters?
8      **A   Yes.  Doctor, he was a doctor too.**
9      Q   Okay.  So -- did Mr. Walters die or did she
10 divorce?
11     **A   They divorced.**
12     Q   And how many years prior to your, to Jean
13 marrying your father did Jean divorce from
14 Mr. Walters?
15     **A   I would say it was at least -- oh, goodness.**
16 **Wait a minute.  At least 45, 50 years.  Forty-five.**
17     Q   Okay.  But had she gone under name of Jean
18 Walters up until the time she married your father?
19     **A   Yes.**
20     Q   And did -- after she married your father,
21 did she change her name from Jean Walters to Jean
22 Wiegand?
23     **A   I don't think so.**
24     Q   And why do you say that?
25     **A   Because the obituary does not have the**

15  (Pages 54 to 57)

1  **Wiegand name in it at all.**
2      Q   Was there any talk about Jean changing her
3  name to Wiegand after she married your father?
4      **A   Not that I know of.  I'm not aware of any**
5  **discussion.  I wasn't involved in any discussion.  I**
6  **just assumed she would.**
7      Q   Okay.
8      **A   I have no idea.**
9      Q   Are you familiar with the policy that we're
10  discussing right now, this $600,000 face amount, life
11  insurance policy for the benefit of Jean's children?
12      **A   I knew she had a policy for the benefit of**
13  **her children, yes.**
14      Q   Okay.  And were you aware that your father
15  paid a single premium for this policy of $325,000?
16      **A   I was told by the insurance agent, yes.**
17      Q   Which insurance agent?
18      **A   Clinton Vance with New York Life.**
19      Q   Okay.  Since you just introduced a new name,
20  who is Clinton Vance?
21      **A   He's a New York Life insurance sales rep.  I**
22  **guess that's what you call them.  Agent.**
23      Q   Broker, is he an insurance broker?
24      **A   I think so, yeah.**
25      Q   Is it your understanding that Mr. Vance sold

1  various insurance products, including life insurance
2  and annuities, to your father while he was still
3  alive?
4      **A   Yes.**
5      Q   Including the policy that's at issue in this
6  lawsuit?
7      **A   Yes.**
8      Q   Did you have any discussions with your
9  father about whether to purchase the life insurance
10  policy that's at issue in this case?
11      **A   No.  He, he and Mr. McCarter, and I don't**
12  **know if Jean was involved or not, they did all of that**
13  **before we were involved in anything.**
14      **And at that point, it was none of our**
15  **business how he was setting it up.  He didn't want to**
16  **discuss.  He wouldn't talk to anybody about it.**
17      Q   Fair enough.  So is it fair to say that
18  you've never had any discussions with your father
19  regarding the life insurance policy that's at issue in
20  this lawsuit?
21      **A   No.  Never have.**
22      Q   So I think we had a double negative.  It
23  might be my fault, my question.
24      So just to be clear, you and your father
25  never had any discussions regarding the life insurance

1  policy at issue in this case?
2      **A   No.  I was not aware that it even existed**
3  **until he died.**
4      Q   Okay.  Are you aware of what, if anything,
5  happened to this policy that's listed on Exhibit 2
6  with a single premium of $325,000 in a, and an amount
7  of $600,000, what happened to that policy?
8      **A   I have no idea, but we weren't listed on it.**
9  **We probably didn't get any information on it.**
10      Q   Okay.  The next policy on here -- by the
11  way, how long was Mr. Vance your, your father's
12  insurance broker?
13      **A   I think my dad started working with**
14  **Mr. McCarter shortly after my mother passed away,**
15  **which was the end of '96 or the beginning of '97.**
16  **Because I know my one brother talked -- not Ed, but**
17  **another brother said, "Dad, you need to get your ducks**
18  **in a row.  You need to start planning."  I don't know**
19  **how he got up with McCarter, but McCarter I guess they**
20  **had been associates or friends with Clinton Vance.**
21      Q   Okay.
22      **A   My dad, I told you my dad used New York**
23  **Life.  And the guy that he had been buying policies**
24  **from got older, passed it down to his son.  Who I**
25  **think passed it down to Clinton.  I think that's how**

1  the connection goes.  But I won't swear on it.
2      Q   Okay.  Have you ever had any, have you ever
3  met Clinton Vance?
4      **A   Yes.**
5      Q   On how many occasions?
6      **A   Two.**
7      Q   When were those occasions?
8      **A   One was at 9 Huntleigh Woods one time when I**
9  **was there.  And the other time was at the visitation.**
10      Q   And so the meeting with him at 9 Huntleigh
11  Woods in St. Louis, that was while your dad was still
12  alive?
13      **A   Yes.**
14      Q   And what was that, some sort of a social
15  event?
16      **A   No, they needed him to sign papers while we**
17  **were there.  And they brought them over.**
18      Q   Did you have to sign papers at that time?
19      **A   No.  They were still finishing up my dad's**
20  **stuff.**
21      Q   Okay.
22      **A   They needed his signature.**
23      Q   I see.  And you just happened to be there?
24      **A   Yes.**
25      Q   Were those any documents related to the

Page 62

1    insurance policy at issue in this lawsuit?
2       A   I have no idea.
3       Q   Okay.
4       A   I didn't see it, and it wasn't offered.
5       Q   And at any time, did you discuss with
6    Mr. Vance the life insurance policy that's at issue in
7    this lawsuit?
8       A   I only found out about it the day of the
9    viewing.
10      Q   Okay.  And how did you find out about it?
11      A   I was speaking to people in the viewing
12   room.  And a guy tapped on my shoulder and it was
13   Mr. Clinton Vance and he asked me to follow him.  We
14   went into a little office, and he told me about that.
15   That's the first I heard of it.
16      Q   So at the viewing, that was at the wake
17   after your father's death?
18      A   Yeah.  The viewing, yeah, before the
19   funeral.
20      Q   Okay.  And what, if anything -- was there
21   anyone in the room other than you and Mr. Vance?
22      A   No.
23      Q   What, if anything -- what did Mr. Vance tell
24   you about the policy that's at issue in this lawsuit?
25      A   He told me that my dad had this other

Page 63

1    policy, and it's on Jean's life.  And he has paid all
2    the premiums and all the taxes on it.  All you have to
3    do is sit back and wait for her to die.  Then it gets
4    split among the kids.  That's exactly, pretty much
5    exactly what he said to me.
6       Q   Anything else?
7       A   No.
8       Q   All right.  The next policy listed in
9    Exhibit 2 is a life policy 62772095 on Dr. Wiegand's
10   life.  Death benefit is $400,000.  CV on 9/8/01.
11   73,385.  ANN premiums are $35,000.
12      Do you see that?
13      A   Yes.
14      Q   Was that a term life insurance policy to
15   your knowledge?
16      A   I don't know.
17      Q   It reflects an amount of $400,000.  To your
18   knowledge, was this policy in effect at the time of
19   your father's death?
20      A   It would appear to be by the date, value
21   date.
22      Q   Okay.  And was it, was it a policy issued by
23   New York Life?
24      A   I don't know that.
25      Q   To your knowledge, was this policy -- did

Page 64

1    the estate of your father receive death benefits under
2    this policy in the amount of $400,000?
3       A   That I don't know.
4       Q   All right.
5       A   Was this a list made up by Mr. McCarter, do
6    you know?
7       Q   I don't honestly know, Gina.  That's why I'm
8    asking you about it.
9       This last policy, life insurance policy
10   62775588 on Dr. Wiegand's life, single premium,
11   3,035,000.  CV on 12/7/01.  $3,032,345.
12   Then it reflects an amount of $7,367,214.
13   Says "owned by Dr. Wiegand's ILIT dated 12/14/98."  Who
14   issued this policy, if you know?
15      A   I have no idea.  I have no idea.  These are
16   all after my mother died.  Like I said, I don't know
17   when he got connected with McCarter, and I told you he
18   got all his physical stocks and got him so --
19   everything changed.  So I don't -- because they always
20   had physical stock.  So a lot of this stuff was
21   orchestrated through Mr. McCarter.
22      Q   By the way, did you and Ed decide to
23   terminate the legal services of Mr. McCarter?
24      A   Yes.
25      Q   And was that after your father passed away?

Page 65

1       A   Yes.
2       Q   And why did you terminate the services of
3    Mr. McCarter?
4       A   He -- he wasn't cooperating.  He wasn't -- I
5    don't know how to put it.  He was trying to get us to
6    invest policies and stuff through him.  And we didn't
7    want to do it.  He wanted to do a presentation.  He
8    sent us a bill for it.  We knew that his secretary had
9    stolen money from my dad and he caught them at it.  We
10   were not just, we were not pleased with his ethics at
11   all or the way he was handling things.  So we did not
12   want him to finish up.
13      Q   All right.  The, the policy that is at issue
14   in this lawsuit, do you see it referenced anywhere in
15   this document this, Exhibit 2?
16      MR. JACOBSON:  I don't understand your
17   question.  Could you please repeat it?
18      MR. RYAN:  Miss Court Reporter, would you
19   repeat it?
20      (The requested portion of testimony was
21      read back by the court reporter.)
22      Q   (By Mr. Ryan) You may answer, Gina.
23      A   I don't know.  I don't know the answer.  You
24   got a policy number on it, it's -- wouldn't you have
25   that on record in New York?

                                      17  (Pages  62  to  65)

1    Q   Well, I'm just asking about this document,
2   Gina.  We'll get to the policy at issue.
3    A   Could you repeat the question, then?
4    Q   Sure.  The life insurance policy that is at
5   issue in this lawsuit, do you see it referenced
6   anywhere on this document, this Exhibit 2?
7    A   Not that I can identify.
8    Q   Okay.  After you and your brother terminated
9   the services of Mr. McCarter, who, if anyone, did you
10   hire to assist you in handling the affairs, the
11   probate, of your father's estate?
12    A   We started out with Tom Blumenthal I think
13   is his name.  I think he's a litigator.
14    Q   Okay.  How did you happen upon him?
15    A   I think somebody had highly recommended him.
16    Q   All right.  And did Ms. Dyroff work in
17   Mr. Blumenthal's office?
18    A   Yes.
19    Q   What was your understanding as to the type
20   of law that Ms. Dyroff specializes in?
21    A   Well, we asked for somebody to help us
22   finish settling the estate.  They said she was good at
23   it.  And we went with her because she was with -- she
24   met with us with Tom Blumenthal at the time.
25    Q   Okay.  Did she handle the probate of your

1   father's estate?
2    A   I think so.  I'm not a hundred percent sure.
3    Q   Okay.  After you had the conversation with
4   Clinton Vance at the viewing of your father's body at
5   the time of his funeral, did you have any subsequent
6   conversations or communications with Mr. Vance
7   regarding the life insurance policy at issue in this
8   case?
9    A   Only to get the record changed on your end,
10   New York Life's end, with the new trustees and the
11   change of address.
12    Q   Did you have those communications with
13   Mr. Vance?
14    A   No.  We had -- Joann Dyroff had written a
15   letter that we signed, Eddie and I signed, that she
16   sent to Vance, who forwarded it to New York.
17    Q   Okay.  All right.  Do you see the document
18   that I've got up, Gina?
19    A   I see it highlighted, yes.
20    Q   Okay.  I'm sorry.  I just want to make sure
21   that you can see the -- I'm going to have this marked
22   as Exhibit 3.  It's a letter dated July 22, 2003.
23        (Exhibit No. 3, 7/22/2003 Letter from
24        Joann Dyroff to Marylee Behlmann at
25        Vance Financial Group, was marked for

1   identification.)
2    Q   (By Mr. Ryan) It appears to be going to
3   Marylee Behlmann at Vance Financial Group from Joann
4   Dyroff with a copy to you and your brother Ed Wiegand.
5   Do you see that?
6    A   Yes.
7        MR. JACOBSON:  I cannot see the letter.
8        MR. RYAN:  Sorry about that.  Let me -- bear
9   with me.  Thank you.
10    Q   (By Mr. Ryan) There we go.  You see it now
11   everybody?
12    A   Yes.
13    Q   Okay.  Showing you what's been marked as
14   Exhibit 3 for identification.  It's a letter dated
15   July 22, 2003, from Joann Dyroff to Marylee Behlmann
16   at Vance Financial Group.  Do you recognize this
17   letter?
18    A   Yes.
19    Q   Did you receive a copy of it on or about the
20   date it bears?
21    A   Yes.
22    Q   Did you direct Ms. Dyroff to send this
23   letter to the Vance Financial Group?
24    A   Yes.
25    Q   Is the Vance Financial Group the same as --

1   is that Mr. Clinton Vance's company?
2    A   Yes.
3    Q   And that's the company that sold your father
4   various insurance policies, including the one that's
5   at issue in this lawsuit?
6    A   Yes.
7    Q   In the first paragraph, it states, "We are
8   enclosing documents necessary to transfer the
9   ownership of a life insurance policy now owned by the
10   Wiegand Family, LLC, Policy No. 62791665 on the life
11   of Jean Wiegand from the Wiegand Family, LLC, to the
12   Herbert C. Wiegand Revocable Trust, dated April 15,
13   1997."  Do you see that?
14    A   Yes.
15    Q   So was this letter about the transfer of
16   ownership of the policy that's at issue in this
17   lawsuit?
18    A   I believe so.
19    Q   The same, the same policy that you and
20   Mr. Vance discussed at the, the funeral of your
21   father?
22    A   I believe so.  I don't know about the policy
23   number, I -- but it appears to be.
24    Q   Okay.  I'm -- I'm -- Gina, it says the
25   policy was owned by the Wiegand Family, LLC, and there

Page 70

1  is a request to transfer it to the Herbert C. Wiegand
2  Revocable Trust, dated April 15, 1997.
3        If you know, why was the policy owned by
4  this Wiegand Family, LLC?
5        A  You'd have to ask Mr. McCarter that because
6  I don't know.  He's not -- I don't know why.  He's --
7  this is all his handywork.
8        Q  Okay.
9        A  I'm serious.  My dad doesn't -- didn't
10  understand a lot of this stuff.  This was McCarter's
11  handywork.  I can't tell you how he did things.
12        Q  All right.  But there was a Wiegand Family
13  Limited Liability Company at one time?
14        A  Obviously so.  We didn't know about it.
15        Q  Well, were you and Ed, your brother, the
16  administrators for that LLC?
17        A  The first Wiegand, LLC, my dad was.  And
18  then it was changed to the other title where Ed and I
19  were the trustees.
20        Q  Okay.  So also attached to this letter is a
21  reference to the same Policy No. 62791665, with
22  there -- it's on a transfer of ownership form to go to
23  the Herbert C. Wiegand Revocable Trust, dated
24  April 15, 1997.
25        Is that your signature on that document,

Page 71

1  ma'am?
2        A  Yes.
3        Q  And do you recognize your brother's
4  signature as well?
5        A  Yes.  Yes.
6        Q  Okay.  It says -- there's -- you signed that
7  document in two different areas.  Fair to say?
8        A  Yes.
9        Q  Once as administrative -- hard to read.
10        MR. JACOBSON:  Authorized signature.
11  Authorized signature.
12        MR. RYAN:  Oh.  Authorized.  Well, come on
13  now, Joe.
14        MR. JACOBSON:  You're talking -- oh,
15  additional signature.  Additional signature.
16        MR. RYAN:  No.  Okay.  So --
17        MR. JACOBSON:  Where are we talking about?
18  There are several things here.
19        MR. RYAN:  Well, yeah, give me some time
20  here, Joe.
21        MR. JACOBSON:  Okay.
22        Q  (By Mr. Ryan) Gina, there are two signatures
23  on this page, on this form; right?
24        A  Yeah.
25        Q  You signed this form in two different areas;

Page 72

1  correct?
2        A  Correct.
3        Q  Okay.  Once is, it says -- you signed it
4  underneath, Wiegand Family, LLC, and then there's some
5  language.  Can you read it, administrative?
6        A  It says administrate -- something.  I don't
7  know what it is.
8        Q  Okay.  And then down below, you signed it as
9  co-trustee.  Is that co-trustee for the trust?
10        A  I think so, yes.
11        Q  Okay.  So you're signing it once on behalf
12  of the Wiegand Family, LLC, and then a second time as
13  co-trustee of the Herbert C. Wiegand Revocable Trust;
14  fair to say?
15        A  I would -- I assume so, yes.
16        Q  All right.  And then the next page
17  references you and your brother as co-trustees of the
18  Revocable Trust; right?
19        A  Right.
20        Q  And then you signed it again along with Ms.
21  Dyroff as your, as the witness; right?
22        A  Yes.
23        Q  And then if we go further down in that
24  document, Exhibit 3, we've got the beneficiaries;
25  right?

Page 73

1        A  Correct.
2        Q  That would be all, all seven children of
3  your father?
4        A  Yes.
5        Q  At the time you signed this document in or
6  about May 27, 2003, did you or Ms. Dyroff have the
7  policy that is the subject of, of this transfer of
8  ownership?
9        MR. JACOBSON:  Object to the form of the
10  question.
11        I'm not sure what you mean by "had the
12  policy."  You mean had a copy of the policy?
13        MR. RYAN:  I'm not sure, Joe.
14        Q  (By Mr. Ryan) The copy -- did you have a
15  copy of the policy?
16        A  I don't think I did.
17        Q  Okay.  When was the first time --
18        A  Oh, this is, this is the one where, where --
19  no.  I did not get a copy of that.
20        Q  Okay.
21        A  Of the policy itself.
22        Q  When was the first time you were provided
23  with a copy of the life insurance policy that is the
24  subject of this lawsuit?
25        A  Only after I found out Jean Walters passed

19  (Pages 70 to 73)

Page 74

1  away.
2     Q   And when approximately was that?
3     A   That was last -- over a year ago I think it
4  was.
5     Q   So approximately what year?
6     A   2000 -- what is it -- '21 or '22.  '21 I
7  think.
8     Q   Prior to 2021, did anyone explain to you how
9  this policy, namely the policy that's at issue in this
10 lawsuit, operated?
11    A   No.  Had no idea.
12    Q   Up until the time you got a copy of the
13 policy in 2021 or 2022, was it your understanding that
14 nothing needed to be done relative to this policy
15 other than to wait until Jean Cameron Walters passed
16 away?
17    A   That is correct.  From Clinton Vance.
18    Q   Based on what Mr. Vance told you?
19    A   Yes.  That the policies were all paid up and
20 the taxes were all paid up.
21    Q   And that you didn't need to do anything
22 except wait until --
23    A   Correct.
24    Q   -- Jean Cameron --
25    A   Passed away.

Page 75

1     Q   -- Walters passed away?
2     A   Yes.
3     Q   All right.  Is it your understanding that
4  Ms. Dyroff also requested a copy of the policy that's
5  at issue in this lawsuit?
6     A   Yes.
7     Q   And that request was made of New York Life?
8     A   Say that again.  Oh, for Herbert -- yes.
9     Q   Okay.
10    A   No, I think -- gosh.
11    Q   Fair enough.  Is it your understanding that
12 Ms. Dyroff in or about 2003, after your father passed
13 away, requested a copy of the policy from New York
14 Life?
15    A   I -- I don't know if she did, requested it
16 from Clinton Vance or from New York Life direct.  I
17 don't know.
18    Q   Okay.  But she did request a copy of the
19 policy; right?
20    A   Yes.  Yes.  I think she requested it from
21 Vance and that was forwarded to New York Life.
22    Q   All right.  And is it your understanding
23 that Ms. Dyroff did receive a copy of the policy in or
24 about 2003?
25    A   I don't think I ever knew.

Page 76

1     Q   Not you.  Ms. Dyroff?
2     A   No, I don't know if I knew if she received
3  it or not.
4     Q   Okay.
5     A   I don't recollect.
6     Q   Do you have a memory as to whether Ms.
7  Dyroff also, in addition to transferring ownership of
8  the property from the Wiegand, LLC, to the Wiegand
9  Revocable Trust, requested that New York Life change
10 the address for notices to be sent by New York Life?
11    A   Yes, I believe she did.
12    Q   And did you have a discussion about that
13 with your brother about whether or not notices
14 relative to this policy at issue here should go to
15 Dyroff as opposed to you and your brother?
16    A   Say that again.
17    Q   Yeah.  So, so is it -- I think I got this
18 right, Gina.
19        But is it your understanding that in or
20 about 2003, there was a request made on New York Life
21 to have all notices and statements regarding the
22 policy at issue in this lawsuit go to Ms. Dyroff?
23    A   Instead of us?
24    Q   Yeah.
25    A   I --

Page 77

1     Q   Or instead -- or instead of your father or
2  anybody else.
3        Was there a decision made in 2003 to have
4  all statements and anything regarding this
5  life insurance policy be sent to Ms. Dyroff?
6     A   I don't recall.
7     Q   Okay.  Do you have any memory of talking to
8  your brother Ed about having notices and statements,
9  reports having to do with this life insurance policy
10 at issue in this lawsuit be sent to Ms. Dyroff?
11    A   I -- I don't recall doing that.  But -- one
12 way or the other, I don't.
13    Q   Okay.  Did you attend the wedding of your
14 father and Jean Cameron Walters?
15    A   Yes.
16    Q   Where was that at?
17    A   Ladue Chapel.
18    Q   All right.  And did your siblings also
19 attend that wedding?
20    A   Yes, they did.
21    Q   And was there a reception?
22    A   Yes.
23    Q   Did Jean Cameron Walters' kids also attend
24 the wedding?
25    A   Yes.

Page 78

1    Q   And following that wedding up until the day
2  your dad died, did you have occasion to visit with
3  Jean Cameron Walters?
4    A   From the day that he died -- is that -- I'm
5  sorry?
6    Q   Yeah. I'm sorry. No, no. No. Sorry about
7  that. Let me be clear. Believe it or not, sometimes
8  lawyers ask poor questions.
9    A   No problem.
10   Q   After, after your dad married Jean Cameron
11 Walters and before your dad passed away, did you have
12 occasions to visit with Jean Cameron Walters?
13   A   I don't think so. I don't remember.
14   Q   Okay. How did you feel about your father
15 marrying Jean Cameron Walters?
16   A   How did I feel about it?
17   Q   Yeah.
18   A   Oh, personally it wasn't my business. It
19 was his business.
20   Q   Okay. Did you -- did you get along with
21 her?
22   A   I got along fine with her.
23   Q   Okay.
24   A   We weren't close. I mean I didn't know her
25 well. We weren't close.

Page 79

1    Q   Fair enough.
2        Before your dad passed, did you see her at
3  any holidays or vacations or anything of the like?
4    A   No.
5    Q   All right. After your dad passed away, did
6  you ever see Jean Cameron Walters again?
7    A   No.
8    Q   After your dad passed away, did you ever in
9  any way communicate with Jean Cameron Walters?
10   A   No.
11   Q   After your dad passed away, did you ever
12 communicate with any of Jean Cameron Walters'
13 children?
14   A   No.
15       MR. RYAN:  Hey Joe, what do you think about
16 taking a lunch break?
17       MR. JACOBSON:  How much more do you have?
18       MR. RYAN:  A lot. I'm not trying to be
19 facetious. I know how lawyers always do that. I got
20 to tell you I'm going to go, I'm going to go the
21 better part of the day.
22       MR. JACOBSON:  It seems pretty excessive for
23 just such a small number of facts. You got the right
24 to do your deposition I guess. So do you want to take
25 a lunch break?

Page 80

1        MR. RYAN:  I don't have any interest in
2  belaboring points, Joe. I'm trying to, I'm trying to
3  be productive and efficient. I really am.
4        MR. JACOBSON:  I haven't objected, I mean.
5        MR. RYAN:  I know, I know.
6        MR. JACOBSON:  Whether or not she went to
7  the reception of her father's second marriage seems to
8  be kind of remote from anything in the case. It's
9  your deposition. If you want to take, do you want to
10 take a half hour?
11       MR. RYAN:  Yeah. Let's do a half hour. You
12 know. I --
13       MR. JACOBSON:  Around 12:40 or so?
14       MR. RYAN:  Let's do 12:40 -- let's do 12:45
15 and we'll return at that time.
16       (A break was taken off the record.)
17   Q   (By Mr. Ryan) Gina, I now want to share with
18 you another document. Bear with me. Can you see the
19 document I got up here?
20   A   I do now, yes.
21       MR. JACOBSON:  Does it have a number to it
22 or something so I can try to find it on my system?
23 Which one is this?
24       MR. RYAN:  This is the policy.
25       MR. JACOBSON:  Thanks.

Page 81

1        MR. RYAN:  Miss Court Reporter, we'll mark
2  this as Exhibit 4.
3        (Exhibit No. 4, Policy on Jean Wiegand,
4          Policy No. 62791665, Date of 6/1/2000,
5          was marked for identification.)
6    Q   (By Mr. Ryan) I'm showing you what has been
7  marked as Exhibit 4, Gina. It is a Policy No.
8  62791665. Insured, Jean Wiegand. Policy date of
9  June 1, 2000.
10       Do you see that document?
11   A   Me, yes. I can see it.
12   Q   Okay. Is this, is this the, a copy of the
13 policy that's at issue in this lawsuit, ma'am?
14   A   I don't know. You're going pretty fast on
15 that.
16   Q   Oh, okay. I'm sorry. My apologies. I'll
17 start at the top and scroll down slower.
18   A   Yeah. It does look like it.
19   Q   Okay. Okay. Do you know how -- is it your
20 understanding now that Jean Cameron Walters was the,
21 the insured on this policy?
22   A   It was on her life, yes.
23   Q   Okay. And the trust that you and your
24 brother are co-trustees on, were the -- the trust was
25 the beneficiary of this policy; correct?

21  (Pages 78 to 81)

Page 82

1      A   Correct.
2      Q   And you and your brother were co-trustees,
3  and always have been co-trustees, of this Herbert C.
4  Wiegand Revocable Trust?
5      A   Yes.
6      Q   Is it also your understanding that your
7  father purchased this policy at a time when his wife,
8  Jean Cameron Walters Wiegand, was 80 years old?
9      A   It says here -- I don't really know how old
10  she is or was.  Very possible she was 80.
11      Q   Okay.  And the first time you saw this
12  policy was in or about 2020 -- year 2021?
13      A   Correct.
14      MR. JACOBSON:  Objection.
15      That's not what she testified to earlier.
16  Can you state it again?
17      MR. RYAN:  No speaking objections, Joe.  You
18  know the rules.
19      MR. JACOBSON:  I know the rules.  Correct.
20      MR. RYAN:  Yeah, right.  No speaking
21  objections, please.
22      MR. JACOBSON:  That's not the rule.  The
23  rule is make an objection.
24      My question was, I couldn't hear the date.
25  Could you please ask the date again?  I don't know if

Page 83

1  it was clear.
2      MR. RYAN:  All right.
3      MR. JACOBSON:  The rule --
4      Q   (By Mr. Ryan) Did you -- at any time, Gina,
5  did you ask to see a copy of the policy prior to the
6  year 2020?
7      A   I don't think so.  I don't recall.
8      Q   At any time prior to 2020, did you have a
9  conversation about this policy with your brother Ed
10  Wiegand?
11      A   For details, no.
12      Q   Generally?
13      A   No.  I went on the basis of what Clinton
14  Vance had told me.
15      Q   And that was you -- and what was that?
16      A   That premiums are paid, taxes are paid.  All
17  we have to do is sit back and wait.
18      Q   Wait for what?
19      A   For Jean to pass away.  That we didn't have
20  to do anything.
21      Q   Okay.  And where did this conversation take
22  place?
23      A   At the visitation of my father.
24      Q   At his funeral?
25      A   Yes.  Before the funeral.

Page 84

1      Q   Okay.  And what day was that?
2      A   I don't remember the date.
3      Q   And were you the only one in the room
4  talking to Mr. Vance at the time?
5      A   At the time, yes.
6      Q   And did you take any notes during that
7  conversation?
8      A   Well, no.  I just had myself and my purse.
9  I didn't have anything else.  I wasn't expecting to
10  get something like that.
11      Q   Okay.  And after you had that conversation
12  with Mr. Vance, did you relay or describe that
13  conversation to anyone else?
14      A   I don't recall.  That was a long time ago.
15      Q   All right.  After you -- was that the last
16  conversation you ever had with Clinton Vance regarding
17  this policy?
18      A   Yes.
19      Q   Was that the last time you had any written
20  or verbal communications with Clinton Vance regarding
21  the life insurance policy?
22      A   That's it, yes.
23      Q   Do you know if anyone else had any
24  conversations with Clinton Vance regarding this life
25  insurance policy?

Page 85

1      A   I'm sure he told everybody because everybody
2  knew about it.
3      Q   Well, okay.  You say that, but who -- were
4  you, were you present when Mr. Vance discussed this
5  policy with anyone other than yourself?
6      A   No.  He told me separately.  I'm guessing he
7  told everybody else separately.  I don't know when he
8  did it.
9      Q   All right.  Do you know if your brother Ed
10  had any conversations with Clinton Vance regarding
11  this policy?
12      A   I don't know.
13      Q   Now after your dad's funeral, I think you
14  testified that you did not have any further
15  communications with Jean Cameron Walters Wiegand;
16  right?
17      A   Correct.
18      Q   Nor did you have any communications with any
19  of Jean's children after your dad's funeral; right?
20      A   That is correct.
21      Q   Did Jean Cameron Walters Wiegand's children
22  attend your dad's funeral or the visitation?
23      A   I know the funeral they did.  Probably the
24  visitation too.  I don't remember.
25      Q   You mentioned your dad's estate went through

22  (Pages 82 to 85)

Page 86

1  the probate court.  Did I get that correct?
2      **A   I think that is correct.**
3      Q   And Ms. Dyroff oversaw the probate action of
4  your father's estate; correct?
5      **A   I believe so.**
6      Q   And there came a point in time in which the
7  assets of your dad's estate were distributed amongst
8  you and your six siblings; is that right?
9      **A   Yes.**
10     Q   And that's when you recall receiving
11  approximately $700,000 from your father's estate?
12     **A   Yes.**
13     Q   Have there been any distributions from your
14  father's estate since that time?
15     **A   I, I don't recall.  I don't think so.  But I**
16  **do not recall.**
17     Q   Okay.  Was that in or about year 2004?
18     **A   No.  I don't recall when it was.**
19     Q   Okay.  But you were one of the executors;
20  right, of his estate?
21     **A   Right.**
22     Q   And so -- and was your brother Ed also a
23  co-executor of the estate?
24     **A   Yes.**
25     Q   Were there any other executors of the

Page 87

1  estate?
2      **A   No.**
3      Q   When there's a final distribution from the
4  estate -- well, strike that.
5          Other than you and your siblings, were there
6  any other beneficiaries or recipients of your fathers
7  estate?
8      **A   Are you talking about the policy that he had**
9  **for his, her girls?**
10     Q   No.  No.  No.  That's fine to seek a
11  clarification.
12         Let me try to be clear.
13         So under his will, did all of his assets go
14  to his seven children?
15     **A   Yes.  As far as I know they did, yes.**
16     Q   So when there was a final distribution of
17  the assets of your father's estate, those assets were
18  divided amongst seven Wiegand children; right?
19     **A   Yes.**
20     Q   And that was after the estate of your father
21  had been probated through the St. Louis Court?
22     **A   I don't recall exactly on dates.**
23     Q   Okay.  Fair enough.  But it was at some time
24  within say three or four years after your father
25  passed away that his probate was, was fully disbursed

Page 88

1  and distributed to the seven kids?
2      **A   I think it was.**
3      Q   And when that distribution occurred, did
4  each, each Wiegand child get a check?
5      **A   Yes.**
6      Q   And when those distributions occurred, what,
7  if any, assets were left in your father's estate?
8      **A   I don't know exactly what you're asking.**
9  **Are you talking about physical possessions, monetary**
10  **possessions?**
11     Q   Yeah.  So the assets of the estate are
12  distributed through the probate court.  Each of the
13  seven Wiegand kids gets a check.  Was there anything
14  left of your father's estate at that point in time?
15     **A   No.**
16     Q   After the assets of your father's estate
17  were distributed, were there -- was there any reason
18  for you to have interactions with Ms. Dyroff or any
19  other attorney?
20     **A   No.  Only the change in this policy --**
21     Q   Okay.  So between say 2004 through 2020, did
22  you have any communications with Ms. Dyroff regarding
23  your father's estate or this policy.
24     **A   Not that I recall.**
25     Q   So did you -- what, if anything, did you do

Page 89

1  between the day your dad died and the date that Jean
2  Cameron Walters Wiegand died to determine whether or
3  not she passed away?
4      **A   What did I do?  I didn't do anything.**
5      Q   Okay.  So how did you learn about the death
6  or passing of Jean Cameron Walters Wiegand?
7      **A   A relative saw the obituary that didn't have**
8  **our name on it, but she recognized who it was.  She**
9  **called a friend of mine, who called me.**
10     Q   Okay.  Who was the relative?
11     **A   My one brother's wife.**
12     Q   Who is that?
13     **A   Herb.**
14     Q   And what's his wife's name?
15     **A   Gerda.**
16     Q   So your brother, your brother's wife saw the
17  obituary.  Do I have that right?
18     **A   Yes.**
19     Q   For Jean Cameron Walters Wiegand?
20     **A   No.  Jean Cameron Walters.**
21     Q   Okay.
22     **A   Wiegand wasn't there.**
23     Q   That's right.  To your knowledge, she never
24  changed her name to Wiegand; right?
25     **A   Correct.**

23  (Pages 86 to 89)

Page 90

1    Q   Okay.  So we'll just call her Jean Cameron
2  Walters.  Fair enough?
3    A   Fair enough.
4    Q   Okay.  So who saw the obituary for jean
5  Cameron Walters?
6    A   Gerda.
7    Q   Gerda, who is married to your brother Herb?
8    A   Correct.
9    Q   And does she, does she at the time live in
10  the St. Louis area?
11   A   Yes.
12   Q   And she told who and who then told you?
13   A   A family friend.  She called a family friend
14  who is also from Germany.  Gerda is from Germany.  And
15  she told her, and I'm real close to that woman, and
16  she called me.
17   Q   Who is the family friend that Gerda told
18  about the obituary?
19   A   Her name is Mary Frank.
20   Q   Spelled F-R-A-N-K?
21   A   Correct.
22   Q   And then Mary Frank told who?
23   A   Me.
24   Q   And when was that?
25   A   I don't remember the date.  It was shortly

Page 91

1  after she died.
2    Q   Okay.
3    A   A couple days after the obituary came out I
4  think.
5    Q   All right.  And what did Mary Frank tell you
6  about the obituary?
7    A   That Gerda had called her and saw her death
8  notice in the newspaper.
9    Q   Anything else?
10   A   No.  Just that she was surprised that it
11  didn't have Wiegand in it, but that's it.
12   Q   And then what did you say to her?
13   A   What did I say to her?
14   Q   Yeah.  What did you say to Mary Frank in
15  response?
16   A   Like, "Oh, really."
17       That was news to me.  I was glad to know
18  about it, but I was surprised she didn't use our name.
19  I don't know what else I could have said.
20   Q   So were you surprised that she never changed
21  her name to Wiegand?
22   A   That didn't surprise me so much as her not
23  mentioning that she was remarried, that she's leaving
24  other people behind.
25   Q   I see.  So in the obituary, there was no

Page 92

1  reference to your father?
2    A   None.
3    Q   And no reference to your father's seven
4  children?
5    A   Correct.
6    Q   By the way, what, if anything, did Jean
7  Cameron Walters get from your father's estate?
8    A   I don't -- I don't recall what she got from
9  the estate.
10   Q   Was she -- to your knowledge, was Jean
11  Cameron Walters an heir of your father's estate?
12   A   I do not know how all that was set up
13  through McCarter.  I do not know how that was set up.
14   Q   Well, you were a co-executor of his estate,
15  were you not?
16   A   Yes.  But I didn't handle the paperwork or
17  the checkbook.
18   Q   Prior to getting this call from Mary Frank
19  about the obituary of Jean Cameron Walters, did you do
20  anything over the years to see whether or not Jean
21  Cameron Walters was alive or dead?
22   A   Did I do anything?
23   Q   Yeah.
24   A   No.  I didn't do anything.  I didn't have to
25  do anything.  I knew people that had seen her, so I

Page 93

1  knew she was alive for the most part until the end.
2    Q   How did you know that?
3    A   Because she goes to a lot of fancy parties,
4  and I know the catering people that had the parties or
5  the people that had the parties.  They mentioned they
6  saw her and talked to her.
7    Q   Okay.  When you say "fancy parties," what do
8  you mean by that?
9    A   Dinner parties at people's homes.  Big
10  parties.
11   Q   Was Jean Cameron Walters wealthy to your
12  knowledge?
13   A   I don't know what she had.  She had a nice
14  house.  I don't know what she had.  I don't know.
15   Q   The house you're mentioning is the one at
16  9 --
17   A   Huntleigh.
18   Q   Huntleigh Woods in St. Louis?
19   A   Correct.
20   Q   So after you learned that Jean Cameron
21  Walters had passed away, what did you do next?
22   A   I tried to figure out how to get ahold of
23  New York Life.
24   Q   Why did you feel a need to get ahold of New
25  York Life?

24  (Pages 90 to 93)

Page 94

1      A   Because of what Clinton Vance told me about
2  the policy.
3      Q   And then you called?  Or how did you contact
4  New York Life?
5      A   Well, I called several times, and they
6  wouldn't give me any information.
7      Q   Why not?
8      A   Because I -- my name was not on it they
9  said.
10     Q   And, and did they ask for information or
11 documentation before they could discuss the policy
12 with you?
13     A   Eventually, yes.  Otherwise, they kept
14 cutting me off to be honest.
15     Q   And what information were they asking for in
16 order to --
17     A   Prove I --
18     Q   Hold on a second.
19     A   My apologies.
20     Q   What information or documentation did New
21 York Life ask of you in order for them to be able to
22 discuss the policy with you?
23     A   To prove that I was on the policy and a
24 death certificate.
25     Q   So trust documents?

Page 95

1      A   Documents to prove I'm on the account, that
2  they can talk to me.  Whatever they --
3      Q   Okay.
4      A   They --
5      Q   Did you eventually provide them with
6  documentation so as to be able to talk to, get
7  information on the policy?
8      A   Absolutely.  Absolutely.
9      Q   What documentation did you provide New York
10 Life?
11     A   A copy of the trust, the death certificate,
12 and I think the letters from Joann requesting that
13 information be changed to us.
14         That's what I sent, and they finally
15 responded.
16     Q   Okay.  So they wanted proof of ownership and
17 the proof of the fact that Jean had passed away?
18     A   Correct.
19     Q   When you gave them that documentation, did
20 they provide you with information regarding the
21 policy?
22     A   Yes.  They sent me a letter.  I think you
23 have a copy of it from Leticia or whatever her name
24 was.
25     Q   Okay.  And what, what documentation

Page 96

1  accompanied that letter from Leticia at New York Life?
2      A   A copy of the policy and the statements.
3      Q   And those are the documents you got there
4  with you today?
5      A   Yes.
6      Q   And when you reference the statement, are
7  you -- are you talking about the -- what kind of
8  statements are you referencing?  We'll get to it.
9      A   The statements that they should have been
10 sending all those years.  I just copied and sent them.
11     Q   Okay.  When was this conversation with,
12 with -- was this a conversation with Leticia that you
13 had?
14     A   Originally -- yeah.  Finally I got ahold of
15 her, and that's where I sent it, the information.  And
16 she sent a letter back.
17     Q   Okay.  So once you provided the death
18 certificate and the trust documents for the Herbert C.
19 Wiegand Revocable Trust, New York Life then sent you a
20 copy of the policy and the annual statements?
21     A   Correct.
22     Q   All right.  And how long did that take after
23 you sent the -- after you sent the trust documents and
24 the death certificate, how long did it take before you
25 got the policy and the annual statements?

Page 97

1      A   It was a couple weeks.  I don't remember how
2  long.  I'd have to look at it.
3      Q   Okay.  During this time, were you discussing
4  with your brother Ed Wiegand anything about this
5  policy?
6      A   What do you mean discussing?  We didn't know
7  the terms of the policy in between.
8      Q   Yeah, I know.  But -- you're in the process
9  of trying to get more information regarding the
10 policy; right?
11     A   Yeah.
12     Q   Did you, did you, did you discuss anything
13 having to do with this policy with your brother Ed,
14 the co-trustee?
15     A   Yes.
16     Q   During this, during this period of time?
17     A   Yes, I told him I was looking into it
18 because I talked to him.  He didn't have anything that
19 referred to it.
20     Q   Okay.
21     A   About the terms of it.
22     Q   Did you reach out to Ms. Joann Dyroff
23 regarding this policy after you learned that Jean
24 Cameron Walters had passed away?
25     A   Yes, I did.

Page 98

1    Q    And what did she tell you?
2    A    She went and got her files. There's -- and
3  sent me copies that showed that Eddie and I had signed
4  the documents to have the name and address changed.
5  She said --
6    Q    Did she provide -- did Dyroff provide you
7  with a copy of the policy?
8    A    No, not the policy.
9    Q    Did you ask her for a copy of the policy?
10   A    I don't -- I don't think she thought she had
11 it.
12   Q    Have you seen the documents that she's
13 produced in response to our subpoena in this case?
14   A    Yes.
15   Q    Did you see that she had a copy of the
16 policy in her file?
17   A    I did not know -- she didn't, she did not
18 know that she had it when I spoke it her.
19   Q    Okay. Did you ask her to check to see if
20 she had a copy of the policy?
21   A    I think I asked her if she had it, and I, I
22 don't remember the exact conversation.
23   Q    Okay. Let me ask you this, at any time
24 after your father's funeral and up until the time you
25 learned that Jean Cameron Walters had passed away, did

Page 99

1  you have any conversations with Joann Dyroff or anyone
2  at her office regarding the life insurance policy
3  that's at issue in this lawsuit?
4    A    Could you repeat it, please?
5         MR. RYAN:  Miss Court Reporter, would you
6  repeat it, please.
7              (The requested portion of testimony was
8              read back by the court reporter.)
9         THE WITNESS:  From the time after my father
10 died, we just, we had those letters -- Eddie and I
11 signed those letters that she had sent on to Vance
12 that was forwarded to New York.  But other than that,
13 no.
14   Q    (By Mr. Ryan) All right.  So aside, except
15 for the documents transferring ownership of this
16 policy from the LLC to the Herbert C. Wiegand Trust,
17 you had no conversations with Joann Dyroff or her
18 office regarding this policy up until the time you
19 learned of the death of Jean Cameron Walters; is that
20 correct?
21   A    Correct.  Correct.
22   Q    During that same time period, did you or
23 your brother ask anyone, whether it be Ms. Dyroff's
24 office or New York Life, did you -- during those years
25 did you ask anyone for documents or information or

Page 100

1  reports or statements regarding the policy that's at
2  issue in this case?
3    A    I did not.  I don't know if anybody else
4  did, but I didn't because of the way it was presented
5  to me by Clinton Vance -- there was nothing to be done
6  but wait, everything was taken care of.
7    Q    Did you or your brother ever ask Joann
8  Dyroff or anyone else to analyze the policy that's at
9  issue in this case to see whether or not anything
10 further needed to be done on this policy after your
11 dad passed away?
12   A    No.  When I was told everything was paid up
13 and all we had to do was sit and wait, I didn't see
14 there was any reason to ask anybody anything.  We
15 weren't -- we didn't have to do anything.  And I
16 assumed everything was going to be paid -- that
17 everything was okay.
18   Q    Other than the policy, the life insurance
19 policy that's at issue in this case, are you aware of
20 any other assets that are contained in the Herbert C.
21 Wiegand Revocable Trust?
22   A    I'm confused what you're asking.
23   Q    Sure.  I'll, I'll -- I need to stop sharing
24 here.
25         Other than possibly this life insurance

Page 101

1  policy that's at issue, are you aware of whether the
2  Herbert C. Wiegand Revocable Trust has any remaining
3  assets in it?
4    A    No.  Only maybe a small balance in the
5  checking account to finish up the estate when they got
6  that money.
7    Q    Who -- is there a checking account that's
8  still open for this trust?
9    A    A very small one, just to -- because when we
10 need attorneys to work with it, then we had money to
11 pay.
12   Q    And where is that account, that banking
13 account held?
14   A    I don't know where it's held.  It's -- Eddie
15 has the checkbook.
16   Q    Has there been any activity relative to the
17 Herbert C. Wiegand Revocable Trust since --
18   A    No.
19   Q    -- your father's estate was probated?
20   A    I don't think so.  I don't know.
21   Q    You and your brother Ed Wiegand, who's on
22 this, who's on this video, the Zoom call, being
23 co-trustees of your father's Revocable Trust, did you
24 and he have an understanding as to who, call it the
25 division of labor, who was to do what, whose

26  (Pages 98 to 101)

Page 102

1  responsibility is this?  Did you divide up the tasks
2  or the responsibilities relative to that Revocable
3  Trust?
4      **A   Well, yes.  Informally we did.**
5      Q   Okay.  And what was that division of labor,
6  Gina?
7      **A   He took care of the checkbook.  We both**
8  **talked to the attorney.  I don't know what -- he**
9  **finished all, he did all the paperwork with selling**
10  **the, the house, houses.  And took care of some of the**
11  **other physical assets that my father had that was**
12  **either distributed or sold.**
13      **I don't know exactly what you're looking**
14  **for.**
15      Q   Sure.  Did you have any responsibilities
16  that were yours and yours alone as opposed to Ed
17  relative to the Revocable Trust?
18      **A   Not really.**
19      Q   All right.  And after -- can you think of
20  any, anything that you or your brother Ed did relative
21  to the Herbert C. Wiegand Revocable Trust after the
22  assets of your father's estate were distributed
23  relative to this trust?
24      **A   I'm sorry.  I lost you on that.  What was**
25  **the first part of the question?**

Page 103

1      Q   Sure.  Can you think of anything that you or
2  your brother Ed did as co-trustees of the Herbert C.
3  Wiegand Revocable Trust after the estate of your
4  father had been probated and the checks were
5  distributed to you and your siblings for that estate?
6      **A   Not that I recall.**
7      Q   Can you think of any services that Ms.
8  Dyroff or her law firm performed for the trust after
9  your father's estate was probated and the assets of
10  that estate were distributed to you and your siblings?
11      **A   Only the letter to Clinton Vance on the**
12  **change of the account and the address which he**
13  **forwarded to New York Life as I remember.**
14      Q   Was it your understanding that prior to the
15  request that the address on the life insurance policy
16  be changed, that documents from New York Life were
17  being sent to 9 Huntleigh Woods Road in St. Louis?
18      **A   Did I know?**
19      Q   Yeah.
20      **A   No.  I did not.  I didn't know anything was**
21  **being sent.**
22      Q   Okay.  So, okay.  So there came a point in
23  time where Ms. Dyroff at the direction of you and your
24  brother made a request to change the, the address on
25  the life insurance policy at issue over to the address

Page 104

1  for Ms. Dyroff; right?
2      **A   Well, I don't remember what the letter said.**
3      Q   All right.  Let me see if I can -- I'll get
4  to that in a moment, Gina.  Let me switch gears a
5  little bit here.
6      How many -- how many written or verbal
7  communications have you had with New York Life
8  regarding the life insurance policy at issue in this
9  lawsuit?
10      **A   How many times?**
11      Q   Yes.  Written or verbal?
12      **A   Verbal.  I called them a couple times and I**
13  **finally got the information that she sent to me.**
14      Q   Okay.
15      **A   And I don't think I had any further**
16  **conversation with her.**
17      Q   Okay.  And the conversations you had with
18  New York Life, were those in an attempt to get a copy
19  of the policy and the annual reports?
20      **A   Yeah.  I wanted a copy of the policy when I**
21  **was --**
22      Q   And that's what we already discussed, they
23  wanted a proof of ownership of the trust as well as a
24  death certificate; right?
25      **A   Right.  Correct.**

Page 105

1      Q   And then once you provided that, you
2  received copies of the policy and the reports; right?
3      **A   Correct.**
4      Q   Okay.  Have you described for me then all
5  communications that you've had with New York Life
6  regarding this life insurance policy here today in
7  this case?
8      **A   That's all I have.**
9      Q   Okay.  And I just want to make sure I, I
10  inquire everything.  You've now told me all about your
11  communications that you had with New York Life
12  regarding this policy; right?
13      **A   That's it.  Yes.**
14      Q   Okay.  Did there come a point in time where
15  one of your brothers threatened to sue you and your
16  brother Ed?
17      **A   Yes.**
18      Q   What's that about?  Explain it to me, if you
19  would, please.
20      **A   What I understand is my oldest brother who**
21  **really thought he needed, was supposed to get more,**
22  **more money than everything else.  And he --**
23      Q   Okay.  Did he hire an attorney?
24      **A   Yes, he did.**
25      Q   And who represented you and your brother at

27  (Pages 102 to 105)

Page 106

1  trust in that dispute?
2      A   I think it was Joann -- it might have been
3  Tom Blumenthal that did that.
4      Q   Okay.  Joann Dyroff or her partner?
5      A   Yeah.  Yeah.
6      Q   Okay.  And that never went to litigation;
7  right?  The suit never actually got filed?
8      A   No.  We did it through arbitration.
9      Q   Okay.  And that dispute got settled?
10     A   Yes.
11     Q   Was it settled by additional payments of
12 moneys to your brother?
13     A   Oh, yeah.
14     Q   Which brother is that?
15     A   The oldest, Jim.  James.
16     Q   Have you reported back, have you or Ed
17 reported back to your other siblings about the life
18 insurance policy that's at issue in this lawsuit?
19     A   Yes.
20     Q   And what have you told them?
21     A   That we were looking into it.  And basically
22 what happened.  And we're looking into it.
23     Q   Did you tell them about this lawsuit?
24     A   Yes.  Just that we're -- we found one.
25     Q   All right.

Page 107

1      A   Not nothing in particular.
2      Q   Did any of your siblings ask you whether any
3  additional steps should have been taken to monitor
4  this policy?
5      A   No.  No.  They were told the same I was
6  told, we didn't have to do anything.
7      Q   Okay.  Do you know if Ms. Dyroff reviewed
8  the terms and conditions of the life insurance policy
9  at issue to determine whether what, if anything,
10 needed to be done on the policy after 2004?
11         MR. JACOBSON:  I'm going to object to the
12 form the question because it's too open as far as
13 date.  Can you give a date period in which you're
14 asking about?
15         MR. RYAN:  Miss Court Reporter, would you
16 read back the question, please.
17         (The requested portion of testimony was
18         read back by the court reporter.)
19         MR. JACOBSON:  Same objection.
20     Q   (By Mr. Ryan) Let me rephrase.  Let me
21 rephrase.
22         At any time prior to the year 2020, do you
23 know whether or not Ms. Dyroff ever reviewed the life
24 insurance policy at issue in this case to determine
25 whether anything needed to be done on that policy

Page 108

1  after 2004 and up to 2020?
2      A   Not that I recall.
3      Q   Well, after 2003, was it your understanding
4  that any notices or reports or anything from New York
5  Life would be sent to Ms. Dyroff?
6      A   I'd have to look at that letter.  I don't
7  remember.
8      Q   Which letter is that?
9      A   The one you're saying that's going to --
10 request that was going to her office.
11     Q   We're going to get to that letter in a
12 moment, but I want to share with you a couple other
13 documents first.
14         I'm showing you what I think will be marked
15 as Exhibit 5 for identification.  It's a fax cover
16 sheet dated February 17, 2004.  Appears to be from
17 Joann Dyroff to Vance Financial Group.  Stated in
18 part, "Heidi, I'm enclosing several pages from the
19 replacement New York Life Insurance Policy 62691665 on
20 the life of Jean Cameron Wiegand which we received.
21 As we discussed, the owner is now listed as Herbert C.
22 Wiegand rather than his Revocable Trust.  We would
23 appreciate your help in having this corrected as per
24 the documents we previously re-sent to New York Life."
25         (Exhibit No. 5, 2/17/2004 Fax Cover

Page 109

1          Sheet from Joann Dryoff to Vance
2          Financial Group Re: New York Life
3          Insurance Policy 62691665, was marked
4          for identification.)
5      Q   (By Mr. Ryan) Are you familiar with this
6  document, Gina?
7      A   I think I knew about it.  I don't think I
8  saw it.
9      Q   Okay.  What's your understanding as to what
10 Ms. Dyroff was doing relative to this communication,
11 this fax communication?
12     A   To make changes on the account, it's
13 ownership.
14     Q   Okay.  Was that ownership ever changed from
15 the LLC to the trust?
16     A   I think it was, but it didn't list other
17 names on it on the face page, cover page.
18         (Exhibit No. 6, Itemized Document from
19         Herbert C. Wiegand Revocable Trust
20         Checking Account, was marked for
21         identification.)
22     Q   (By Mr. Ryan) Now showing you what will be
23 marked as Exhibit 6 for identification.  It's an
24 itemized document.
25         Do you know what this document -- can you see

28  (Pages 106 to 109)

1    it?  did I -- am I sharing it with you, Gina?

2    **A   Yeah, I can see it.  It's kind of small, but**

3    **I can see it.**

4    Q    Let me see if I can blow it up for you.  Do

5    you see it better now?

6    **A   Yes.**

7    Q    So at the top there's some legal expenses

8    for McCarter and Greenley.

9    Is this from the trust checking account?

10   **A   I, I don't recall.**

11   Q    Okay.  And where did the account statements

12   for this checking account go?  Did they go to you or

13   your brother Ed?

14   **A   Eddie has the, Eddie the checkbook.  Eddie**

15   **wrote the checks.**

16   Q    Okay.  Are you aware of any payments going

17   to Joann Dyroff's firm after 2004 for services

18   relative to the Herbert C. Wiegand Revocable Trust?

19   **A   Not that I recall.**

20   Q    Would that suggest to you that Ms. Dyroff

21   and her firm didn't provide any legal services for the

22   trust after 2004?

23   **A   I, I don't recall.  We didn't end the**

24   **relationship because we knew we had this thing coming**

25   **up, so we wanted to keep it open in case we needed it.**

1    Q    Okay.

2    **A   It wasn't for her to be, you know, checking**

3    **her files.**

4    Q    Okay.  But to your knowledge, you didn't

5    request any legal services from Ms. Dyroff relative to

6    the Herbert C. Wiegand Revocable Trust between 2004

7    and 2020; correct?

8    **A   Not to my recollection.**

9    Q    Showing you what has been marked or will be

10   marked as Exhibit 6, if I'm not mistaken.  Seven --

11   MR. RYAN:  Miss Court Reporter, what are we

12   on?

13   THE COURT REPORTER:  Six was the itemized

14   document.  You're on seven.

15   Q    (By Mr. Ryan) Okay.  Gina, showing you what

16   will be marked as Exhibit 7.  It's a letter going to

17   New York Life Customer Advocacy Department.  It

18   appears to be from you as trustee.  Do you recognize

19   that document?

20   **A   Yes.**

21   **(Exhibit No. 7, New York Life Customer**

22   **Advocacy Department, was marked for**

23   **identification.)**

24   Q    (By Mr. Ryan) Okay.  Can you tell me what

25   this is?

1    **A   Well -- I keep bouncing.**

2    **That I had sent the things that they had**

3    **requested in order to get the information on the**

4    **account.**

5    Q    Okay.  And did you write this letter?

6    **A   Yes, I did.**

7    Q    Did anyone assist you in writing this

8    letter?

9    **A   No, they didn't.**

10   Q    Okay.  And, and by this point in time, you

11   had received from New York Life a copy of the policy

12   as well as the annual statements?

13   **A   By that time, no.  I hadn't got -- I didn't**

14   **get it until like February the following year.**

15   Q    Okay.  So it says in the first line, "I am

16   now aware that the above mentioned policy has quote

17   expired as of 2016."

18   **A   Right.**

19   Q    How --

20   **A   That was when I finally got told, the very**

21   **last phone call I had with Leticia, whatever her name**

22   **is, she had told me that.**

23   Q    Okay.

24   **A   About the letter.  And that's when I told**

25   **her, you know, I needed to get information on it.  I**

1    gave her basically the story.  She told me to put that

2    in a letter and send in the paperwork, which I did.

3    But she had told me that on the phone in our last

4    conversation prior to sending that letter.

5    Because I couldn't figure out, they told me

6    that the account didn't exist anymore.  I didn't know

7    what she meant.

8    Q    All right.  The letter goes on to say,

9    "However, when I called New York Life to get

10   information, they did not want to give me any

11   information, other than the policy had expired in 2016

12   due to the lack of payments.  I just found out the

13   notices were mailed to the wrong address and not to

14   the trustees."

15   How did you know that?

16   **A   Because they told me, they, when they --**

17   **when they looked at these statements that I guess had**

18   **been returned by mail, they told me it was going to 9**

19   **Huntleigh.**

20   Q    And that's the same address --

21   **A   It was Jean Walters' address.**

22   Q    Okay.  And that's where she was living up

23   until the day she died?

24   **A   Yes.  She died at home, yes.**

25   Q    That was at 9 Huntleigh Road in St. Louis?

Page 114

1      A   Correct.  That's how I found that out.
2      Q   Okay.  And that was the address that New
3  York Life had prior to -- when your dad was still
4  alive?
5      A   Yes.  He lived there.
6      Q   No.  But up until the day your dad died, is
7  it your understanding that the address that New York
8  Life had for the life insurance policy in question was
9  9 Huntleigh Woods Road in St. Louis where your father
10  was living?
11      A   I don't know that because my dad never
12  changed his address on a lot of things, and he was
13  still getting mail at the house he was not living in,
14  so I can't attest to that.
15      Q   Okay.  At any time prior to 2020, did you
16  contact Jean Cameron Walters or her daughters to see
17  whether or not they were receiving mail from New York
18  Life regarding the life insurance policy at issue in
19  this lawsuit?
20      A   No.  Because I didn't know we were going to
21  be receiving anything.
22      Q   Okay.  You say, "The attached New York Life
23  transfer form we sent to you in 2003 should have
24  triggered the address change as to the trustees in
25  your system."

Page 115

1          What was the address change that you believe
2  was sent to New York Life in 2003?
3      A   One of our addresses, Eddie's or mine, if I
4  remember.
5      Q   Have you ever seen a change of address form
6  which --
7      A   A form?  Not a form.
8      Q   Have you ever seen any sort of a request
9  from anyone to New York Life asking that the address
10  on the life insurance policy at issue in this case be
11  changed to either your address or your brother Ed
12  Wiegand's address?
13      A   I don't recall.
14      Q   Showing you now what will be marked as
15  Exhibit 8 for identification.  It's a document titled,
16  "Fax Cover Sheet, Vance Financial Group," dated July
17  30, 2002, from Marylee Behlmann to McCarter and
18  Greenley regarding Jean Wiegand Policy No. 62791665.
19          Have you ever seen this document before?
20      A   I don't recall that.
21          (Exhibit No. 8, 7/30/2002 Document:
22          Fax Cover Sheet Vance Financial Group
23          from Marylee Behlmann to McCarter and
24          Greenley Re: Jean Wiegand Policy No.
25          62791665, was marked for

Page 116

1  identification.)
2      Q   (By Mr. Ryan)  Attached to that fax -- by the
3  way, at this time, was the law firm of McCarter and
4  Greenley still the law firm of your father?
5      A   I don't recall the dates on that.  It was
6  too long ago.
7      Q   How did your father pass away, Gina?  What
8  was the cause of death?
9      A   Alzheimer's.
10      Q   Alzheimer's?
11      A   Yeah.
12      Q   So he had been ill for some time before he
13  passed away?
14      A   Yes.
15      Q   How long had he been ill?
16      A   It started a couple years before he actually
17  got married.
18      Q   And then it got worse, progressively worse I
19  would imagine?
20      A   Yes.
21      Q   Did there come a point in time where it
22  became apparent that he may not last too long?
23      A   Yes.
24      Q   And when was that?  And I'll remind you that
25  the date of death was July 16, 2002.  How many months

Page 117

1  apart?
2      A   A week and a half prior to that he
3  collapsed, and they called 911.
4      Q   Okay.  Attached to this fax are some
5  illustrations.  Do you see this, these?
6      A   Yeah, but I can't see what it says here.
7      Q   Sorry?
8      A   I can't read that fast.
9      Q   Tell me when to stop.
10      A   What is your question?
11      Q   Are you familiar with these, these
12  illustrations?
13      A   No.  I don't remember seeing that at all.
14      Q   Okay.  Do you have any reason to believe
15  that your father never received a copy of the life
16  insurance policy and these illustrations prior to his
17  death?
18      A   I have no idea.
19          MR. JACOBSON:  Object to the form of the
20  question.  Calls for speculation.
21          But she answered before the objection.
22          THE WITNESS:  Yeah.
23      Q   (By Mr. Ryan) I'm scrolling through the
24  document.  There are different illustrations that
25  relate to the life insurance policy at issue in this

30  (Pages 114 to 117)

Page 118

```
 1   case.
 2           Had you seen any of these illustrations
 3   prior to today?
 4       A  Yes.
 5       Q  When is the first time you saw these
 6   illustrations?
 7       A  When I got the information from Leticia.
 8       Q  From New York Life?
 9       A  Correct.
10       Q  That was in or about 20 -- what?
11       A  2021.
12       Q  2021?
13       A  Yes.
14       Q  Okay.
15       A  Or '22, whatever it was, yeah.
16       Q  Now I'm showing you what will be marked as
17   Exhibit 9 for identification.  It's a document on New
18   York Life letterhead with -- titled, "Policy Delivery
19   Receipt for Insured Jean Wiegand, Policy No.
20   62791665," the policy at issue in this case.  And it's
21   got an address of 9 Huntleigh Woods, St. Louis,
22   Missouri, 63131, with a face amount of $1.4 million.
23           (Exhibit No. 9, Document on New York
24           Life Letterhead Titled, "Policy
25           Delivery Receipt for Insured Jean
```

Page 119

```
 1           Wiegand, Policy No. 62791665", was
 2           marked for identification.)
 3       THE WITNESS:  What date?
 4       Q  (By Mr. Ryan)  Sure.  One second.  Trying to
 5   find it.  It looks to be --
 6       A  June?
 7       Q  Well, there's a fax -- well, first of all,
 8   there's, there's a Bates number, ED Wiegand NYL00009
 9   through 0010.  And I'll just turn to the last page.
10   It looks to be dated June 28, 2000.
11           Do you recognize that signature on the last
12   page to be that of your father?
13       A  Yes.
14       Q  And you would agree that this is an
15   acknowledgment that he got a copy of the policy at
16   issue in this case along with an illustration for the
17   policy?
18       A  It appears to be that way.
19       Q  Okay.  And the, the address associated with
20   this policy was 9 Huntleigh Woods, St. Louis,
21   Missouri, 63131; right?
22       A  Right.
23       Q  And that's where your dad and Jean Cameron
24   Walters lived while they were married up until the
25   date of your father's death; right?
```

Page 120

```
 1       A  Correct.
 2           (There was simultaneous speaking.)
 3       THE WITNESS:  Sorry, what?
 4       Q  (By Mr. Ryan) Sorry.  I didn't mean to
 5   interrupt.  Go ahead.
 6       A  If they got it, it was never passed on to
 7   us.  We didn't know anything about it.
 8       Q  Okay.  Do you have any reason to believe
 9   that between the day your father passed away and for
10   the several years after his death, that annual
11   statements regarding this policy were being sent to 9
12   Huntleigh Woods, St. Louis, Missouri?
13       A  I am not familiar with insurance policies.
14   I don't know how they're handled, so I was -- I didn't
15   know -- I didn't think I expected anything.
16       Q  Okay.
17       A  All I'm familiar with policies is when the
18   premiums are paid, the policy gets paid out at the
19   right time.  If they don't have it fully paid up, then
20   you only get the value of what is paid up to be.
21           That's all I know when it comes to
22   insurance.  I don't deal with any insurance, except
23   for house and car.
24       Q  Okay.
25       MR. JACOBSON:  Dan, this is Joe Jacobson.
```

Page 121

```
 1       MR. RYAN:  Hi, Joe.
 2       MR. JACOBSON:  The document you've just
 3   shown I've not seen it before.  I think it would be
 4   part of your Rule 26 Disclosures, but I have not seen
 5   that.  If you have other documents that are marked, I
 6   usually have them in advance of you taking a corporate
 7   representative.
 8       MR. RYAN:  Yeah, I'll talk to Jim about
 9   that, but my understanding was that it had been
10   produced.  I'll certainly make sure you get a copy,
11   Joe.
12       MR. JACOBSON:  Thank you.
13       Q  (By Mr. Ryan) Now showing you what will be
14   marked as Group Exhibit 10 for identification.
15           It is a document -- a group document several
16   pages in length.  And I will represent to you, Gina,
17   that this is a series of annual policy summaries
18   issued by New York Life and Annuity Corporation with
19   various dates starting with year 2003 and -- I'm
20   sorry.  Starting with year -- let's see, make sure I
21   get this right.
22           Yeah, starting with year 2003 going up into
23   and including year 2009.
24           (Exhibit No. 10, Group Exhibit, Series
25           of Annual Policy Summaries from New
```

31  (Pages 118 to 121)

Page 122

1    York Life and Annuity Corporation from
2    2003 through 2009, was marked for
3    identification.)
4        Q   (By Mr. Ryan) So from 2003 to 2009 --
5        MR. JACOBSON:  Hey, Dan, can we take a
6    five-minute break?
7        MR. RYAN:  Yeah, can I finish my question?
8        MR. JACOBSON:  Sure.  I didn't hear the
9    question.  I thought you were describing documents.
10       MR. RYAN:  No, no.  I just want to get
11   through a few questions on this, and then we can take
12   a break.  All right, Joe?
13       MR. JACOBSON:  All right.
14       Q   (By Mr. Ryan) I think you testified earlier,
15   Gina, that after you had provided New York Life with
16   the death certificate and the trust documents, that
17   they provided you with the policy and certain annual
18   statements.  Did I have that right?
19   **A   Say that again.**
20       Q   I think you testified earlier that after the
21   death of Jean Cameron Walters, you provided New York
22   Life with a copy of the death certificate for Jean
23   Cameron Walters, as well as trust documents relative
24   to the Herbert C. Wiegand Revocable Trust; right?
25   **A   Correct.**

Page 123

1        Q   And then they sent, New York Life sent you a
2    copy of the policy as well as some annual statements;
3    right?
4    **A   Correct.**
5        Q   Are these annual statements that I have here
6    marked as Group Exhibit 10 copies of the, of the
7    annual statements that they sent to you at that time?
8    **A   I'd have to look in my, my paperwork to do**
9    **so.**
10       Q   All right.  You've got that there; right?
11   **A   Yes.**
12       Q   Go ahead and look at that.
13   **A   That's an annual notice?**
14       Q   Well, I'm just going to point you to the
15   first page of this which is, says "Annual Policy
16   Summary."  Yeah.  And can you see it up on my screen?
17   **A   Yeah.  Yeah.  I just --**
18       Q   All right.
19   **A   I'm not seeing that.  Oh, okay.  It is stuck**
20   **in here.**
21       Q   Okay.
22   **A   Yeah.**
23       Q   So I'm just trying to clarify what was sent
24   to you back in 2021, 2022.
25   **A   Yes.  Yes.**

Page 124

1        Q   Okay.  Are these, are these annual policy
2    summaries that I've got here marked as Exhibit 10 what
3    were sent to you back in 2021, 2022, from New York
4    Life after you gave them the death certificate of Jean
5    and the trust documents?
6    **A   If you go page by page, I couldn't tell.**
7        Q   Yeah.  Sure.  Sure.
8    **A   It appears to be.**
9        Q   This is 2003.  Then we got 2004.  You see
10   the date prepared in the upper right-hand corner.
11       (There was simultaneous speaking.)
12       THE WITNESS:  -- annual premium notice --
13   was it annual?  I don't know.  It looks -- let's see.
14   2010 there.  2016.  It looks like it only goes up to
15   2016.  That looks like when they put us in the dead
16   file.
17       Q   (By Mr. Ryan) In what file?
18   **A   I call it the dead file, when they say your**
19   **account had been closed.**
20       Q   Okay.  The policy had lapsed?
21   **A   Yes.  Thank you.  That's the word I was**
22   **looking for.**
23       MR. RYAN:  All right.  Why don't we take a
24   quick break and give Joe the break he's asking for.
25       MR. JACOBSON:  Be done in five minutes or

Page 125

1    so.
2        MR. RYAN:  You bet.
3        (A break was taken off the record.)
4        Q   (By Mr. Ryan) Okay.  Back on the record.
5    Gina, I'm again showing you what's been marked as
6    Exhibit 10 for identification.
7        Have you been able to confirm that these
8    documents were included in the batch of documents sent
9    to you by New York Life in or about --
10   **A   Yes.**
11       Q   -- 2021?  Yes?
12   **A   Yes.**
13       Q   Okay.  When you received these documents,
14   did you understand them?
15   **A   Not right away.**
16       Q   Okay.  Did someone assist you in helping you
17   to understand what they were and what they meant?
18   **A   Well, a couple of it is kind of -- went**
19   **through and talked to people and looked on the**
20   **internet to see what kind of policy it was and what**
21   **some of the stuff means.**
22       Q   Okay.  I don't want to get into any
23   conversations you might have had with your attorney
24   Joe Jacobson.  Okay?
25   **A   Right.**

32  (Pages 122 to 125)

Page 126

1      Q   But what did you -- so this is the first
2  time you tried to understand what this, what these
3  annual policy summaries meant?
4      **A   Right.**
5      Q   Or -- all right.  And who did you talk to
6  about them?
7      **A   Just some acquaintances that are familiar**
8  **with trusts.  And we --**
9      Q   Who --
10     **A   -- found out this was kind of an oddball**
11 **trust.**
12     Q   Meaning oddball policy you mean?
13     **A   Policy, yes.  I'm sorry.  Thank you.**
14     Q   Okay.  What do you mean by "oddball policy?"
15     **A   Well, because of the -- that without making**
16 **premiums, that the whole thing will shut down to**
17 **nothing, taking out all the service fees and all that.**
18     **Like I said, we -- we thought everything was**
19 **a done deal, and we didn't have to do anything.  We**
20 **didn't know that we had to, that we would be requested**
21 **to send any money in.  That it was all paid for.**
22     Q   Okay.
23     **A   It was some modified policy.**
24     Q   Okay.
25     **A   I'm not real familiar with insurance**

Page 127

1  policies.
2      Q   All right.  And in order to understand the
3  statements, did you have to go back to the policy
4  itself?
5      **A   Yes.**
6      Q   Read that?
7      **A   Yes.**
8      Q   Okay.  And who, who did you confer with in
9  order to understand these annual statements as well as
10 the policy?
11     **A   I know I had talked to Joann a couple times.**
12 **She kind of helped me understand it.**
13     Q   Okay.  And what did Joann say to you
14 regarding the policy and the statements?
15     MR. JACOBSON:  I'm going to object.  I'm
16 going to object as to attorney-client communication.
17     THE WITNESS:  Yes.  Thank you.
18     MR. RYAN:  Well, Joe, I, I hear your
19 objection.  But the, the communications that we're
20 talking about here are at the heart of this
21 litigation.  And I think there's an exception --
22     Our position is that there's an exception to
23 the privilege given the nature of this dispute and the
24 communications between Dyroff and, and this witness,
25 so I believe I'm entitled to inquire about them.

Page 128

1      I'm not intending -- I don't have any belief
2  that I'm going to convince you of that here today.
3  I'm just, I'm just stating my position for the record,
4  okay, and we'll take it up with the judge.
5      That's not -- I'm not trying to be
6  threatening or anything.  I just want you to
7  understand that that's our position, and we may need
8  to come back depending on the Court's ruling.  Okay?
9      MR. JACOBSON:  I'll let you know my position
10 which is that you say it's the heart of the situation,
11 and communications between their clients and lawyers
12 are often at the heart of the situation.
13     The privilege is there.  The relationship
14 was never terminated.  And Ms. Dyroff at her
15 deposition refused to answer these questions as well
16 under attorney-client privilege.
17     MR. RYAN:  I understand.  Hey, listen, we
18 can have mutual respect on this.  Okay?  I'm not
19 trying to pick a fight here.  I just thought I'd get
20 my position on the record, as I think Jim Brodzik did
21 during Dyroff's deposition.  Okay.
22     So I'm going to ask some follow-up questions
23 without getting into the substance of her
24 communications with Joann Dyroff just to get a sense
25 of who, what, when, that sort of thing.  Okay?

Page 129

1      Q   (By Mr. Ryan) Back on the record -- well, I
2  guess we've been on the record.
3      Gina, you indicated that you had some
4  communications with Ms. Dyroff after you received the
5  policy and the annual statements from New York Life;
6  is that correct?
7      **A   Correct.**
8      Q   How many such communications did you have
9  with her on that subject?
10     **A   Of this policy?**
11     Q   Yeah.  And the statements.
12     **A   Not a whole lot.**
13     Q   Well, can you estimate for me how many, how
14 many -- were they over the phone, were they by email,
15 or were they in person?  What kind of --
16     **A   They were mostly over the phone.**
17     Q   Do you recall how many times you had
18 communications with her, with Ms. Dyroff, after you
19 received the policy and the annual statements from New
20 York Life?
21     **A   I may have talked to her once or twice**
22 **afterwards, after I knew what I needed to do.**
23     Q   Did Ms. -- to your knowledge, did Ms. Dyroff
24 have any communications with New York Life?
25     MR. JACOBSON:  I'm going to object to that

1  question because that would call for communication
2  from Ms. Dyroff to her about her communication with
3  New York Life, so that is covered by attorney-client
4  privilege.
5      Q   (By Mr. Ryan) Okay.  Well, here's my
6  question before I was interrupted.
7          To your knowledge --
8      MR. JACOBSON:  I'm allowed to raise an
9  objection as to privilege.
10         I want to mention, Dan, I've been extremely
11  patient throughout your deposition in areas that
12  relate to nothing about this case.  Every time I make
13  an objection, you've got a snippy comment.  I don't
14  find it professional.  I don't find it pleasant.
15         So if you'd allow me to make my depositions
16  [sic] and be professional about it, I'll do the same.
17     (There was simultaneous speaking.)
18     MR. JACOBSON:  Objection as to
19  attorney-client privilege.
20     MR. RYAN:  Understood.  All I was saying,
21  Joe, is that I wasn't done with my question, if you
22  could allow me to ask my question before you insert
23  your objection.  That's all I'm asking for is that
24  professional courtesy.
25     Q   (By Mr. Ryan) So here is my question, and

1  I'll allow you to insert your objection.
2          To your knowledge, did Ms. Dyroff have any
3  communications with New York Life after you received
4  the policy and annual statements from New York Life in
5  or about 2021?
6      MR. JACOBSON:  Again, this is objected to as
7  to attorney-client privilege.
8      MR. RYAN:  And you're instructing her not to
9  answer?
10     MR. JACOBSON:  Well, yes, of course.
11     MR. RYAN:  Okay.  Just being clear.
12     Q   (By Mr. Ryan) Up until you received these
13  annual statements from New York Life in or about 2021,
14  Gina, had you ever seen these statements before?
15     A   No.
16     Q   Had you received any statement similar to
17  what we have before us in Exhibit 10?
18     A   No.
19     Q   Do you know whether or not your father
20  received annual statements such as these in the years
21  prior to his death for the policy at issue in this
22  case?
23     A   If they went to the address shown on the
24  statement, then he probably did.
25     Q   Did you ever have any communications with

1  your father written, verbal, face-to-face, or
2  otherwise, involving how the life insurance policy at
3  issue in this case worked?
4      A   No.  And I'm not sure he did either.
5      Q   Okay.  But did you have -- let me be broader
6  so we can move on.
7          Prior to his death, did you have any
8  communications whatsoever, written or verbal, with
9  your father regarding the life insurance policy at
10  issue in this case ending with Policy No. 665?
11     A   No.
12     Q   Prior to your father's death, did you even
13  know this policy existed?
14     A   I know a policy existed.  I didn't know any
15  more than that.  And what Clinton Vance said.  That's
16  all I know.
17     Q   And the only policy -- the only
18  communication you had with Clinton Vance regarding
19  this policy was the conversation you referenced
20  earlier at the time of the funeral?
21     A   Yeah.
22     Q   Is that right?
23     A   That is, yes.
24     Q   Was your expectation -- was it your
25  expectation that Joann Dyroff would monitor this life

1  insurance policy from year 2004 on into the future?
2      A   Did I know?  I don't recall.  I don't think
3  so.
4      Q   After your father's death, what was your
5  expectation as to who would be responsible for
6  monitoring this life insurance policy on behalf of the
7  trust?
8      A   I had no expectation because I did not
9  understand this whole thing.
10     Q   Okay.
11     A   When everything -- while we were told --
12  when I was told all, everything was done, all we had
13  to do was sit and wait, I didn't expect to have to do
14  anything, so I did not probably even think about it.
15     Q   I just want to be clear, Gina.
16         After your father passed away and you became
17  aware of this policy, you didn't have any expectations
18  as to whether anybody would be in charge of monitoring
19  this life insurance policy on behalf of the trust; is
20  that fair to say?
21     A   Say that again.
22     MR. RYAN:  Will you repeat the question,
23  Miss Court Reporter.
24         (The requested portion of testimony was
25         read back by the court reporter.)

Page 134

1    THE WITNESS:  That is probably fair to say
2  because everything was supposed to have been done.  I
3  don't think the representation that Vance had was
4  proper from New York Life.  He should have explained
5  it a little more.  And he didn't represent this policy
6  correctly or accurately or thoroughly.
7      Q    (By Mr. Ryan) And Mr. Vance is now deceased?
8      A    Yes.
9      Q    Do you know of any evidence that would
10  support your recollection of that conversation other
11  than your memory?
12      A    No.  I was by myself with him.  He called me
13  in.
14      Q    Did you -- after the conversation with
15  Mr. Vance, did you describe that conversation with
16  anyone else?
17      A    I'm sure I did.  I don't remember when or
18  who, but everyone seemed to know about it in the same
19  respect that I did.
20      Q    I'm gonna screen share that Exhibit 10
21  again, the annual statements from 2003 to 2009.
22      Do you see that the addressee of this
23  statement is to the Wiegand Family, LLC, at 9
24  Huntleigh Woods, St. Louis, Missouri?
25      A    Yes.

Page 135

1      Q    I'll represent to you that all of the
2  statements comprised in Exhibit 10 had that same
3  address.
4      As you sit here today, do you have any
5  reason to believe that these annual statements were
6  not sent to 9 Huntleigh wood, St. Louis, Missouri,
7  address?
8      A    I would have no idea.
9      MR. RYAN:  All right.  Showing you what has
10  been -- excuse me.  Showing you what will be marked as
11  Exhibit 11.
12      (Exhibit No. 11, Group Exhibit, Series
13      of Annual Policy Summaries from New
14      York Life and Annuity Corporation from
15      2001 through 2002, was marked for
16      identification.)
17      Q    (By Mr. Ryan) These are annual policy
18  summary, summaries that are similar to what we were
19  looking at before.  I'll just scroll through them,
20  Gina, and represent to you that these are from the
21  time period of 2001 to 2002.
22      Same questions, were these annual reports,
23  summaries sent to you at the same time New York Life
24  sent you the policy and other annual statements back in
25  2021 at your request?

Page 136

1      A    Are these the same ones that they sent me?
2      A    Yeah.  I showed you years 2003 to 2009.  Now
3  I'm showing you 2001 and 2002.
4      Were these included in the statements that
5  were sent --
6      A    I think it was, but let me just --
7      Q    Okay.  Feel free.
8      A    No.  It only goes up to 2016.
9      Q    Okay.  But what's the first report you
10  received, what's the earliest one?  Did you have
11  these?
12      A    Yeah --
13      Q    From 2001 an 2002?
14      A    First annual I have is June 13, 2003.
15      Q    Okay.  All right.  Okay.
16      A    Why is Jean Walters on there as the owner,
17  not the insured?
18      Q    Question for another day, Gina.
19      Who else did you confer with -- let me set a
20  time frame if I may.
21      So 2021, you've now provided the death
22  certificate and trust documents to New York Life.  They
23  then sent you the policy and certain annual summaries;
24  right?
25      A    Correct.

Page 137

1      Q    And you mentioned, we've covered Dyroff, I
2  don't want to get into your communications with Ms.
3  Dyroff.  Did you discuss these documents with anyone
4  else?
5      A    Only to try to understand what this document
6  was as far as insurance.
7      Q    Yeah.  Who, who else other than Dyroff?
8      A    I don't know.  I just -- a couple people
9  that I knew knew a little bit about insurance.
10      Q    Yeah.  Who was that?
11      A    I don't remember to be perfectly honest with
12  you.
13      Q    You don't remember who or what they said?
14      A    Well, that it was a modified endowment fund.
15  It was modified.  It was not to -- that a normal
16  insurance policy that I would think of as an insurance
17  policy.
18      Q    And they --
19      A    And then I looked a lot of it up on the
20  internet as to what all that meant.
21      Q    Okay.  And, and so you were trying to
22  understand what the policy terms, what type of policy
23  it was and how it operated; is that fair to say?
24      A    That's fair to say, yes.
25      Q    Okay.  Did you ever come to any conclusion

35  (Pages 134 to 137)

Page 138

1   as to how it, how the policy worked?
2       A   Well, yeah.  We need to make more
3   contributions to it, or it dwindles down to zero.  I
4   didn't know anything about that.  It was paid up.
5       Q   Okay.  At any time prior to 2021, did you
6   or, to your knowledge, your brother Ed Wiegand ever
7   undertake any sort of analysis to decide whether or
8   not to exercise a cash value election under this
9   policy?
10      A   I don't know why we would, given the
11  information we had.
12      Q   So is the answer no?
13      A   I guess the answer is no.
14      Q   During your communications with the folks at
15  New York Life regarding this policy, were, were the
16  New York Life folks professional in your view and
17  opinion?
18      A   They weren't very nice.
19      Q   Why is that?
20      A   Well, because they kept telling me, we can't
21  talk to you, we can't talk to you, you're not on the
22  policy.
23      Q   Okay.  And they kept asking you for -- until
24  you provided them with the trust documents; right?
25      A   Right.  I asked them to look at the records,

Page 139

1   and they didn't go back and look at their records.
2   They said that they had it.  She admitted in --
3       Q   Is it fair to say --
4           (There was simultaneous speaking.)
5       Q   (By Mr. Ryan) I'm sorry.  Gina, is it fair
6   to say that what the folks at New York Life were
7   telling you was that until they could establish proof
8   that you were the owner of the policy, they couldn't
9   talk to you about it?
10      A   They couldn't give me any information on it,
11  then finally got the one that it had closed out or
12  discontinued in 2016.
13      Q   Okay.  But that was after you provided them
14  with the trust documents --
15      A   No.  That was when I kept calling, I kept
16  calling, they got tired of hearing from me.
17          I wanted to know where -- I didn't even have
18  a policy number to write to them.
19      Q   Okay.  But did you ultimately provide them
20  with trust documents?
21      A   Yes.
22      Q   To show that you and your brother were
23  co-trustees as owners of this policy?
24      A   Yes.
25      Q   After you provided that documentation, they

Page 140

1   provided you with more information regarding the
2   policy.  Fair to say?
3       A   Yes.  Yes.
4       Q   When was the first time you became aware of
5   the fact that the policy in question in this lawsuit
6   called for New York Life sending annual summaries such
7   as the ones we've been looking at in Exhibits 10 and
8   11?  When did you become aware of that?
9       A   Not until I, I couldn't get any information
10  on it.
11      Q   So in 2021, is that the first time you
12  became aware?
13      A   Yeah.  I didn't know anything about it.
14      Q   What do you believe New York Life did wrong
15  relative to this life insurance policy, Gina?
16      A   They didn't make a bigger effort when they
17  had the information on Ed's and my addresses.  We are
18  the trustees, and they didn't send it to us.
19          Plus, they did have records of that -- that
20  law firm that Joann Dyroff is with, and they could
21  have communicated with them.  They didn't make an
22  effort.
23      Q   So they didn't make the address change; is
24  that your --
25      A   Yes.  Yes.

Page 141

1       Q   Anything else?
2       A   No.  That was my biggest thing.  They didn't
3   make an effort to try to locate somebody, with a
4   policy that size.
5           MR. RYAN:  Okay.  Let's take a five-minute
6   break.  Let's take a 10-minute break, Joe.
7           MR. JACOBSON:  Okay.
8           MR. RYAN:  Thank you.  We'll come back at
9   2:40 Central.
10          MR. JACOBSON:  2:40 sounds good.
11          (A break was taken off the record.)
12      Q   (By Mr. Ryan) Gina, I'm now showing you
13  what's been marked as Exhibit 12 for identification.
14  It's a letter from Dyroff with a copy to you and your
15  brother Ed dated January 12, 2004.
16          (Exhibit No. 12, 1/12/2004 Letter from
17          Joann Dyroff to Eugenia Sprich and
18          Edward Wiegand, was marked for
19          identification.)
20      Q   (By Mr. Ryan) Did you receive this letter on
21  or about the date it bears?
22      A   Wait a minute.
23      Q   Yeah.
24      A   I think so, yes.
25      Q   Okay.  And attached to this letter is a New

36  (Pages 138 to 141)

Page 142

1  York Life form, service form change request. And in
2  it, would you agree there is a request that Policy 665
3  be changed by the owner to the Herbert C. Wiegand
4  Revocable Trust, dated April 15, 1997?
5      **A  Yes.**
6      Q    And it also states an address of 165 North
7  Mirror --
8      **A  Meramec. It's spelled wrong.**
9      Q    Okay.  You believe it's supposed to be
10 Meramec?
11     **A  Meramec, yes.**
12     Q    How do you spell Meramec?
13     **A  M-E-R-A-M-A-C I think.**
14     Q    Okay.  And what's that address for?
15     **A  That is Joann Dyroff's office address.**
16     Q    Okay.  And so it was your understanding back
17 in January of 2004 that Ms. Dyroff was requesting that
18 the address on this policy that's at issue be changed
19 to her office on Meramec?
20     **A  It looks like it, but apparently she didn't**
21 **receive anything either.**
22     Q    Okay.  But did you, did you understand at
23 the time that there was a request to New York Life
24 that all communications regarding this policy would go
25 to 165 North -- well, Meramec is misspelled -- in

Page 143

1  St. Louis as opposed to your address or your brother's
2  address?
3      **A  I don't recall.  I may not have paid that**
4  **much attention to it.  I don't recall that.**
5      Q    And the phone number there, (314) 727-2266,
6  whose phone number is that?
7      **A  I don't know.  Might be the attorney's**
8  **office.**
9      Q    Joann Dyroff?
10     **A  Dyroff.**
11     Q    Dyroff.  You signed this document, did you
12 not?
13     **A  Yep.**
14     Q    Did you read it before you signed it?
15     **A  I can't -- I can't tell you if I read it**
16 **word for word.**
17     Q    Did you understand at the time that from the
18 standpoint of New York Life records, there's a request
19 that all phone and mailing communications go to Ms.
20 Dyroff relative to this policy?
21     **A  No.  I didn't realize that, but New York**
22 **Life still didn't do it.**
23     Q    Okay.  But I -- was that the request that
24 you signed off on, that all --
25     **A  I signed it.**

Page 144

1      Q    Okay.  And at the time you signed it, was
2  the expectation that New York Life would communicate
3  with Ms. Dyroff's office regarding this policy from
4  that point forward?
5      **A  I don't recall.**
6      Q    Let me just -- one second.  I'm going back
7  to an exhibit we already discussed, Gina, and I quite
8  honestly don't remember what exhibit number it is.
9           But it's the letter dated July 22, 2003,
10 which is after your father passed away.  It appears to
11 be from Joann Dyroff with a copy to you and your
12 brother Ed; right?
13     **A  Correct.**
14     Q    And did you receive this letter on or about
15 the date it bears?
16     **A  Yes.  I think I just ran across it in my**
17 **file.**
18     Q    Okay.  So it's to Marylee Behlmann at Vance
19 Financial Group.  Is that where Clinton Vance was
20 employed?
21     **A  That was his firm.**
22     Q    Okay.  And that's -- that's a different --
23 that firm is different than New York Life; is it not?
24     **A  Correct.  He was an agent for New York Life.**
25     Q    Okay.  That was your understanding, that

Page 145

1  Clinton Vance was an agent of New York Life?
2      **A  Correct.**
3      Q    Okay.  Not an employee of New York Life;
4  correct?
5      **A  I don't know that.**
6      Q    Did you personally ever buy any insurance or
7  other products from Vance Financial Group?
8      **A  I've never dealt with him.**
9      Q    So is the answer no?
10     **A  No.  The answer is no.**
11     Q    Okay.  And I may have asked you this, if I
12 did, I apologize.  But prior to learning of the death
13 of Jean Cameron Walters in or about 2021, had you ever
14 asked anybody to see a copy of the life insurance
15 policy that's at issue in this lawsuit?
16     **A  No.  Didn't see a reason to.**
17     Q    All right.  Prior to the death of Jean
18 Cameron Walters in or about 2021, were you aware that
19 this policy that's at issue in the lawsuit had what's
20 known as a No-Lapse Guarantee?
21     **A  No.  I didn't know anything about the**
22 **policy.**
23     Q    Okay.  Nor did you know prior to the death
24 of Jean Cameron Walters that the policy had a cash
25 surrender value?

37 (Pages 142 to 145)

Page 146

```
 1        A   Say that again.  I don't know what you're
 2   asking me.
 3        Q   Sure.  Sure.  And I may have botched that
 4   one.  Let me start over.
 5            Prior to the death of Jean Cameron Walters,
 6   did you have any understanding as to whether or not
 7   the policy that's at issue in this case had a cash
 8   surrender value?
 9        A   No.  I knew nothing about the policy until I
10   got a copy of it.
11        Q   All right.  As you sit here today, do you
12   know what a cash surrender is?
13        A   Not much.  Not very well.
14        Q   Well, what do you understand about it?
15        A   That I think there's like, I don't know a
16   termination fee or something where money is taken out
17   so you don't get the full value.  I don't know.  I
18   didn't realize it dwindled down to zero.  I had no
19   idea.
20        Q   Had you gotten -- strike that.
21            MR. RYAN:  What exhibit are we on?
22            THE COURT REPORTER:  You're on 13.
23            MR. RYAN:  All right.  Thank you.
24            THE COURT REPORTER:  You're welcome.
25        Q   (By Mr. Ryan) Showing you what has been,
```

Page 147

```
 1   marked as Exhibit 13.  Do you see the, the document
 2   that I have screen shared with you, Gina?
 3        A   Yes.
 4            (Exhibit No. 13, Series of Annual
 5            Policy Summaries from New York Life and
 6            Annuity Corporation from June 2009
 7            through June 2014, was marked for
 8            identification.)
 9        Q   (By Mr. Ryan) These are similar to the other
10   annual policy summaries that we were looking at
11   before, but with a, a different time period.
12            Earliest one here appears to be 20 --
13   June 13, 2009, going to June of 2010, going to June of
14   2011, going to June of 2012.  Let's see if there's a
15   later one here so we capture all the dates.  Yeah.  We
16   got one of June of 2013, June of 2014.  Okay.
17            And just similar questions to the others,
18   fair to say, Gina, that you had not seen these
19   statements prior to 2021?
20        A   That is correct.
21        Q   And you've now had -- you've been provided
22   with copies of these, right, since this litigation?
23        A   Yes.
24        Q   And have you had a chance to review them?
25        A   Tooth and nail, no.  But what are you
```

Page 148

```
 1   asking?
 2        Q   Do you understand them?
 3        A   I understand better now than I used to
 4   understand, yes.
 5        Q   Okay.  Had you received these statements on
 6   or about the date they bear, what, if any, actions
 7   would you have taken in response to them?
 8        A   Well, because they were requesting for
 9   premiums to be paid, we would have probably cashed it
10   out.
11        Q   Okay.
12        A   In paying the premiums, you had to get
13   everybody to pay upfront, and everybody was not going
14   to do it.
15        Q   And when would you have cashed out?
16        A   I don't know.
17        Q   And why would you have --
18            (There was simultaneous speaking.)
19            THE WITNESS:  -- we see the amount dwindled,
20   we would have checked into it.
21            MR. RYAN:  Okay.
22            THE WITNESS:  See how fast it was going down
23   and why and the reason behind it.  Then we would have
24   made a decision.
25        Q   (By Mr. Ryan) Okay.  But no such decision
```

Page 149

```
 1   was ever made; right?
 2        A   Because I didn't know anything about -- we
 3   didn't know anything about it.
 4        Q   Okay.  And why would you have cashed out?
 5        A   If they wanted premiums and you were going
 6   to take funds out of it for management fees or
 7   whatever you did, we would not have been smart to keep
 8   it.  Like I said, the kids would not have paid the
 9   premiums.
10        Q   Okay.
11        A   Some might.  But it wouldn't be fair for
12   them to pay somebody else's portion of it and then not
13   get the benefit of it.
14        Q   Is it your understanding this policy would
15   have paid out a death benefit if Jean Cameron Walters
16   had passed away prior to 2016?
17        A   What was the beginning of that question
18   again?
19            MR. RYAN:  Will you repeat my question, Miss
20   Court Reporter, please.
21            (The requested portion of testimony was
22            read back by the court reporter.)
23            THE WITNESS:  Yes.  I'm sure they would
24   have.
25        Q   (By Mr. Ryan) What would that death benefit
```

38  (Pages 146 to 149)

Page 150

1  have been?
2      A   On that -- I don't know.  Of -- I don't
3  know.  I'm saying if we saw the statements coming in
4  and the amounts are going down, we found out why
5  they're going down and what we needed to do to
6  preserve whatever we had there and acted on it.  But
7  we didn't do that because we didn't know.
8      Q   And when was the first time you made that,
9  was that type of analysis?  Was that after you
10  received these statements in 2020?
11     A   Of course.  I wouldn't have known otherwise.
12     Q   Bear with me.  All right.  Showing you what
13  has been marked as Exhibit 14 for identification.
14  It's a letter dated June 23, 2004.  It's from Jennifer
15  Williams, customer service representative at New York
16  Life, to the Herbert C. Wiegand Revocable Trust, dated
17  April 15, 1997.
18             (Exhibit No. 14, 6/23/2004 Letter from
19             Jennifer Williams, Customer Service Rep
20             at New York Life to The Herbert C.
21             Wiegand Revocable Trust Dated
22             4/15/1997, was marked for
23             identification.)
24     Q   (By Mr. Ryan) Have you seen this document
25  before?

Page 151

1      A   No.
2      Q   I see a copy to Clinton Vance and a copy to
3  Robert Barr.  Who is Robert Barr?
4      A   He also sold New York Life.
5      Q   Was he with Mr. Vance's office?
6      A   I don't know for sure.  I know my father
7  dealt with Mr. Bar's father years and years and years
8  ago.  I think his father retired, and his son took his
9  place.  The policies my dad got from Mr. Barr Senior
10  was with New York Life, so I think it got passed on.
11         And I don't know how McCarter and Vance got
12  together.  I don't know what that relationship is.
13     Q   Did you take any steps to monitor the health
14  condition of Jean Cameron Walters during the period
15  after your father died up until the day that she died?
16     A   Her health condition?
17     Q   Yeah.
18     A   I didn't communicate with her.  How would I
19  know the condition?
20     Q   All right.  So the answer is no?
21     A   The answer is no.
22     Q   All right.
23         MR. JACOBSON:  Can I interrupt for one
24  second?  This document that you have up there, the
25  Dear Policy Holder one that's on the screen, that's

Page 152

1  another document that unless it comes from a different
2  source, it's not from your files.  You guys haven't
3  produced this one to us.
4         Is this the copy from Ms. Dyroff's files?
5         MR. RYAN:  Yeah.  It's from Dyroff.
6         MR. JACOBSON:  Okay.
7         MR. RYAN:  It's Bates numbered Dyroff 84.
8         MR. JACOBSON:  The Bates number wasn't on
9  the screen earlier.
10         MR. RYAN:  So you got it, Joe?
11         MR. JACOBSON:  Yeah.
12     Q   (By Mr. Ryan) Do you know why -- do you have
13  any reason to know why Ms. Dyroff would have this
14  document?
15     A   Well, when we -- we had asked for McCarter
16  to send his files to Joann so we could get the estate
17  settled and closed out.  We asked him to send what he
18  had on file, and that's what I'm guessing happened.
19     Q   So is that, is that to say -- your
20  understanding is that Ms. -- your attorney, Ms.
21  Dyroff, requested documents from Vance relative to
22  this policy?
23     A   Yes.  When we released McCarter, yes.
24     Q   Okay.  But you'd agree that this letter
25  reflects that the owner of the policy at issue is, has

Page 153

1  now been changed to Herbert C. Wiegand Revocable
2  Trust, dated April 15, 1997; right?
3      A   I, I see that, yes.
4      Q   So the -- yeah.  So the request to change
5  the owner from the LLC to the Wiegand Revocable Trust
6  had been accomplished at least as of June 23, 2004;
7  right?
8      A   Right.
9      Q   Okay.  But it still reflects an address of 9
10  Huntleigh Woods, St. Louis, Missouri, where your
11  father lived prior to his death; right?
12     A   Correct.
13     Q   Do you know if after June 23, 2004, Ms.
14  Dyroff in any way communicated with New York Life to
15  make sure that the address for this policy would be
16  changed to Ms. Dyroff's office of her law firm?
17     A   Did I know that she would do that?
18     Q   Do you know, do you know whether she did do
19  that?
20         Let me start again.
21     A   Only from the form that you showed me.
22     Q   I know, but -- I know but, well --
23     A   Did we discuss it?  I don't know what you're
24  asking.
25     Q   The, the -- the letter and form that you and

Page 154

1  I were going over before for the change of address --
2  I mean we can go back to it, but it's, it is dated
3  prior to this.
4          And so my question is whether or not you
5  know -- strike that.
6          Gina, do you know whether Joann Dyroff after
7  June 23, 2004, the date of this letter, made contact
8  or attempted to make contact with New York Life to
9  change the address for this policy from 9 Huntleigh
10 Woods, St. Louis, Missouri, to Ms. Dyroff's law firm?
11 **A   I don't know.  I can't really answer that.**
12     Q   All right.  Did Clinton Vance ever tell you
13 that he was employed by New York Life?
14 **A   No.  I just -- all I knew is that he sold**
15 **it.**
16     Q   Okay.
17 **A   I don't know who gave him his paycheck.**
18     Q   All right.  You never had any -- is it fair
19 to say you never had any discussions with Mr. Vance or
20 anyone in his office regarding whether or not he was
21 employed by or acted as an agent for New York Life?
22 **A   I never -- I assumed he was an agent.**
23 **That's what I was told by McCarter.  That's it.  It**
24 **says here he's an agent.**
25         MR. RYAN:  All right, Joe.  Let me look over

Page 155

1  my notes and see if we can wrap this up.  Instead of
2  ten minutes, I'm going to take 15.  I'm going to try
3  to eliminate a lot of the questions I don't think are
4  necessary anymore.  Okay?  So let's come back at 3:35.
5  Is that okay with everybody?
6         THE WITNESS:  Yep.
7         MR. RYAN:  Joe?
8         MR. JACOBSON:  Sure.
9         MR. RYAN:  Okay.
10        (A break was taken off the record.)
11        MR. RYAN:  Subject to the Court's ruling
12 relative to the attorney-client privilege and those
13 lines of questioning, I'm recessing the deposition.
14        So thank you, Gina.  Appreciate your time
15 and effort.  And Ed, we'll see you soon.
16        MR. JACOBSON:  I would like my copy of the
17 deposition in PTX file, and we would like to read and
18 sign.
19        MR. RYAN:  I'll just take a condensed and an
20 electronic version.
21        (The witness will read and sign the
22 transcript.)
23        (The deposition concluded at 3:30 p.m.
24 CST.)
25

Page 156

1              REPORTER CERTIFICATE
2          I, Julie Hundelt, a Registered Professional
3  Reporter, Certified Court Reporter, and Certified
   Shorthand Reporter within and for the State of
4  Missouri, do hereby certify that there came before me
   on April 7, 2023, via Zoom,
5              EUGENIA SPRICH
6  who was by me first duly sworn; that the witness
   was carefully examined; that said examination was
7  reported by myself, translated and proofread using
   computer-aided transcription; and the above transcript
8  of proceedings is a true and accurate transcript of my
   notes as taken at the time of the examination of this
9  witness.
10        I further certify that I am neither attorney
   nor counsel for nor related nor employed by any of the
11 parties to the action in which this examination is
   taken; further, that I am not a relative or employee of
12 any attorney or counsel employed by the parties hereto
   or financially interested in this action.
13
14        Dated this 13th day of April, 2023.
15
16
17
18
          Julie Hundelt, RPR, CCR, CSR
19
20
21
22
23
24
25

Page 157

1
2          CORRECTION SHEET
           OF WITNESS EUGENIA SPRICH
3
   PAGE ____ OF ____
4
   In Re:  WIEGAND, ET AL. VS. NEW YORK LIFE INSURANCE & ANNUITY
5  CORP., ET AL
6  Upon reading the deposition, and before subscribing
   thereto, EUGENIA SPRICH, has indicated the
7  following changes should be made:
8  Page ____ Line ____ should read:
9  _____
10        Reason assigned for change: _____
11 Page ____ Line ____ should read:
12 _____
13        Reason assigned for change: _____
14 Page ____ Line ____ should read:
15 _____
16        Reason assigned for change: _____
17 Page ____ Line ____ should read:
18 _____
19        Reason assigned for change: _____
20 Page ____ Line ____ should read:
21 _____
22        Reason assigned for change: _____
23
           _____
24              EUGENIA SPRICH
25

40  (Pages 154 to 157)

Page 158

1
2      I, EUGENIA SPRICH, do hereby certify:
3
4          That I have read the foregoing deposition;
5      That I have made such changes in form and/or
6      Substance to the deposition as might be
7      Necessary to render the same true and correct;
8
9          That having made such changes thereon, I
10     Hereby subscribe my name to the deposition.
11
12         I declare under penalty of perjury that
13     The foregoing is true and correct.
14
15     Executed the _____ day of _____
16     20___, at _____.
17
18     _____.
19
20             Notary Public
21      My Commission Expires: _____.
22
23     Signature: _____
24             EUGENIA SPRICH
25

PohlmanUSA Court Reporting
(877) 421-0099     PohlmanUSA.com

**A**

**a.m**
4:16  6:10
**ability**
8:17
**able**
94:21  95:6
125:7
**Absolutely**
95:8,8
**accidental**
20:16
**accommodate**
7:14
**accompanied**
96:1
**accomplish**
34:25
**accompli...**
153:6
**account**
2:20  22:9,9
22:9,10
56:8  95:1
101:5,7,12
101:13
103:12
109:12,20
110:9,11
110:12
112:4
113:6
124:19
**accounting**
17:19,20
23:7
**accounts**
22:7  23:13
23:17
**accurate**
53:13,21
156:8
**accurately**
54:2  134:6
**acknowle...**
119:15
**acquaint...**
126:7
**acted**

150:6
154:21
**action**
86:3  156:11
156:12
**actions**
148:6
**activity**
101:16
**addition**
76:7
**additional**
54:19  55:14
71:15,15
106:11
107:3
**address**
48:17,22
67:11
76:10  98:4
103:12,15
103:24,25
113:13,20
113:21
114:2,7,12
114:24
115:1,5,9
115:11,12
118:21
119:19
131:23
135:3,7
140:23
142:6,14
142:15,18
143:1,2
153:9,15
154:1,9
**addressee**
134:22
**addresses**
115:3
140:17
**administ...**
6:15
**administ...**
72:6
**administ...**
71:9  72:5

**administ...**
70:16
**admit**
20:12  44:8
**admitted**
139:2
**adopted**
13:11  34:1
41:15  42:3
**advance**
121:6
**advanced**
15:15  39:1
**adviser**
30:10
**advisers**
23:19
**Advisors**
21:25  22:19
**advisory**
17:7  21:6
21:22
24:17
**Advocacy**
2:21  111:17
111:22
**affairs**
66:10
**afterward**
24:25
**age**
6:13
**agent**
58:16,17,22
144:24
145:1
154:21,22
154:24
**ago**
28:15  33:18
44:4  54:23
74:3  84:14
116:6
151:8
**agree**
119:14
142:2
152:24
**AGREED**

6:1
**agreement**
6:8
**ahead**
120:5
123:12
**ahold**
93:22,24
96:14
**AL**
1:10  4:10
157:4,5
**alive**
14:3  28:13
30:24  59:3
61:12
92:21  93:1
114:4
**allegations**
7:10
**allow**
9:12  130:15
130:22
131:1
**allowed**
130:8
**Alzheimer's**
116:9,10
**Amended**
2:7  35:20
36:1
**amendment**
2:7  35:19
36:1  39:9
39:16
42:10
**amount**
23:21  56:16
58:10  60:6
63:17  64:2
64:12
118:22
148:19
**amounts**
150:4
**analysis**
138:7  150:9
**analyze**
100:8

**and/or**
158:5
**ANN**
63:11
**annual**
3:5,8,13
10:10,11
96:20,25
104:19
112:12
120:10
121:17,25
122:17
123:2,5,7
123:13,15
124:1,12
124:13
126:3
127:9
129:5,19
131:4,13
131:20
134:21
135:5,13
135:17,22
135:24
136:14,23
140:6
147:4,10
**annuities**
19:3,3  25:1
55:25  56:4
59:2
**Annuity**
1:10  3:6,9
3:14  4:10
121:18
122:1
135:14
147:6
157:4
**answer**
8:12  65:22
65:23
128:15
131:9
138:12,13
145:9,10
151:20,21
154:11

answered
117:21
answering
23:6
answers
8:2
Antoinette
33:2 41:24
Antonia
41:2,18
  43:8,9,10
  43:11
anybody
59:16 77:2
  100:3,14
  133:18
  145:14
anymore
27:21 113:6
  155:4
anyway
9:22 40:10
apart
117:1
apartment
50:9
apologies
81:16 94:19
apologize
53:6 145:12
apparent
116:22
apparently
142:20
appear
42:21 53:13
  53:20 54:2
  55:9 56:11
  63:20
APPEARING
5:2,6
appears
37:25 39:22
  42:16 54:9
  68:2 69:23
  108:16
  111:18
  119:18
  124:8

144:10
147:12
appreciate
108:23
155:14
approxim...
12:10 22:19
  48:23 49:6
  50:2 51:12
  74:2,5
  86:11
April
1:17 4:15
  36:6 69:12
  70:2,24
  142:4
  150:17
  153:2
  156:4,14
arbitration
106:8
area
13:21 90:10
areas
71:7,25
  130:11
arrange
47:22
aside
99:14
asked
10:21 16:8
  27:23
  29:23
  44:10
  62:13
  66:21
  98:21
  138:25
  145:11,14
  152:15,17
asking
7:9,25
  11:11 46:2
  64:8 66:1
  88:8 94:15
  100:22
  107:14
  115:9
  124:24

130:23
138:23
146:2
148:1
153:24
assets
2:9 44:19
  46:6,16,21
  46:22 48:3
  51:16
  52:14,18
  53:11,14
  54:3 86:7
  87:13,17
  87:17 88:7
  88:11,16
  100:20
  101:3
  102:11,22
  103:9
assigned
157:10,13
  157:16,19
  157:22
assist
66:10 112:7
  125:16
assistant
17:17
associated
119:19
associates
60:20
assume
72:15
assumed
58:6 100:16
  154:22
assuming
38:25
attach
52:22
attached
70:20
  114:22
  116:2
  117:4
  141:25
attempt

104:18
attempted
154:8
attend
14:11,24
  15:18
  77:13,19
  77:23
  85:22
attention
143:4
attest
114:14
attorney
7:4 30:2,5
  30:6,9
  31:13
  88:19
  102:8
  105:23
  125:23
  152:20
  156:10,12
attorney's
143:7
attorney...
127:16
  128:16
  130:3,19
  131:7
  155:12
attorneys
30:11,12,16
  31:22
  101:10
August
37:19 38:3
  43:4 49:6
Authorized
71:10,11,12
Ave
5:3
aware
55:21 58:4
  58:14 60:2
  60:4
  100:19
  101:1
  110:16

112:16
133:17
140:4,8,12
145:18

------

**B**

B
2:5
B-U-D-E-R
40:22 41:4
baby
41:24
back
9:25 10:2
  12:10 15:5
  16:15,16
  16:23
  23:24
  25:22,22
  41:23
  49:23,24
  63:3 65:21
  83:17
  96:16 99:8
  106:16,17
  107:16,18
  123:24
  124:3
  125:4
  127:3
  128:8
  129:1
  133:25
  135:24
  139:1
  141:8
  142:16
  144:6
  149:22
  154:2
  155:4
background
17:19,20
  45:20
bad
28:14
balance
101:4
balancing
16:19 23:17

```
ball                141:21         Bengals        13:10,11       72:17
29:6                144:15         23:2           41:12          76:13,15
Baltimore           beginning      best           botched        77:8 81:24
21:1                60:15          7:16 34:9      146:3          82:2 83:9
bank                149:17         bet            bothered       85:9 86:22
15:22,23,24        begins          125:2          19:2           89:16 90:7
  15:25 16:3        39:5           better         bought         97:4,13
  16:4,5,12        behalf          25:8 79:21     21:18          99:23
  16:21 17:1        1:5,16 4:5     110:5          Boulder        100:7
  20:16             4:14 32:7      148:3          33:5,11        101:21
  44:23             36:13          beyond         bouncing       102:20
banking             72:11          15:18          112:1          103:2,24
101:12              133:6,19       big            box            105:16,20
Bar's              Behlmann        23:8 47:13     16:19 44:23    105:25
151:7               2:12,24        93:9           boy            106:12,14
barely              67:24 68:3     bigger         21:14          110:13
47:16               68:15          140:16         boys           115:11
Barr                115:17,23      biggest        14:20 41:17    138:6
151:3,3,9           144:18         141:2          bread          139:22
Bartlett           belaboring      bill           25:2           141:15
17:4,5,10           80:2           13:24 19:22    break          144:12
  17:14,25         belief          23:22 65:8     7:13 35:4,7   brother's
  18:3,12,21        128:1          billing        35:12 39:3     71:3 89:11
  18:21 19:5       believe         23:25          79:16,25       89:16
  20:20,22          36:14 48:22    biologic...    80:16          143:1
base                69:18,22       42:5           122:6,12      brothers
21:9                76:11 78:7     birth          124:24,24      32:16,17
Based               86:5 115:1     11:15          125:3          33:6,9,12
22:1 74:18          117:14         bit            141:6,6,11     105:15
basically           120:8          9:8 56:22      155:10        brought
10:18               127:25         104:5          brick          41:23 61:17
  106:21            135:5          137:9          47:12,13      Buder
  113:1             140:14         blow           brings         40:22 41:2
basis               142:9          110:4          27:14          41:3
46:1 83:13         Belleville      Blumenthal     broader       Buder's
batch               14:4,5         66:12,24       132:5          41:18
125:8              benefici...     106:3          Brodzik       bunch
Bates               32:13,15       Blumenth...    128:20         35:2 40:1
38:10,16            72:24 87:6     66:17          broker        bush
53:3,6             beneficiary     body           58:23,23       47:20
119:8               81:25          67:4           60:12         business
152:7,8            benefit         bonds          brother        28:19 59:15
bear                56:18,20       18:14,15       31:24 33:19    78:18,19
34:14,25            58:11,12       24:6,7,23      36:13,19      butter
68:8 80:18          63:10          24:25          44:15          25:2
148:6               149:13,15      44:22          46:24         buy
150:12              149:25         books          60:16,17       20:18 55:19
bears              benefits        23:6           66:8 68:4      145:6
68:20               64:1           born           70:15         buying
```

```
   55:18              24:16 89:9      car              141:9            115:11
   60:23              89:9 90:13      120:23           certain          142:3,18
buys                  90:16 91:7      care             122:17           153:1,16
   23:13              94:3,5          100:6 102:7      136:23        changes
                      104:12          102:10        certainly          109:12
        C             113:9        carefully          121:10           157:7
C                     117:3           156:6        certificate         158:5,9
1:4 2:7,9             134:12       Carolina          10:20,23       changing
   2:19 3:17          140:6          8:23,24           94:24            58:2
   4:5 5:1         calling            11:18            95:11        Chapel
   35:20 36:2         139:15,16       27:14            96:18,24         11:22 77:17
   36:7,8,9        Calls              32:22            104:24       charge
   36:16              117:20       case               122:16,22        133:18
   37:22           Cameron          1:8 4:8 7:8       124:4        check
   39:17              40:4,16,17      10:14            136:22          88:4,13
   42:11              40:18 43:1      59:10 60:1       156:1            98:19
   44:16 46:5         43:21 44:2      67:8 80:8     certific...     checkbook
   52:15,18           48:7 50:6       98:13           18:2,10          92:17
   53:11              57:3 74:15      100:2,9,19   Certified          101:15
   69:12 70:1         74:24           105:7           4:18,18 6:5      102:7
   70:23              77:14,23        107:24          6:6 156:2        110:14
   72:13 82:3         78:3,10,12      110:25          156:2        checked
   96:18              78:15 79:6      115:10       certify            148:20
   99:16              79:9,12         118:1,20        156:3,10     checking
   100:20             81:20 82:8      119:16           158:2         2:19 23:16
   101:2,17           85:15,21        130:12       chance             101:5,7
   102:21             89:2,6,19       131:22          147:24          109:20
   103:2              89:20 90:1      132:3,10     change             110:9,12
   108:21             90:5 92:7       146:7           23:24 57:21      111:2
   109:19             92:11,19     cash               67:11 76:9    checks
   110:18             92:21          138:8            88:20           103:4
   111:6              93:11,20        145:24          103:12,24       110:15
   122:24             97:24           146:7,12        114:24       Chicago
   142:3              98:25        cashed             115:1,5         5:8
   150:16,20          99:19          148:9,15         140:23       chief
   153:1              108:20          149:4           142:1          17:18
call                  114:16       casually           153:4        child
   7:24 14:15         119:23          13:18           154:1,9        88:4
   16:24              122:21,23    catering           157:10,13    children
   34:18 35:8         145:13,18      93:4             157:16,19      12:21 58:11
   35:22              145:24       caught             157:22         58:13 73:2
   38:16              146:5          21:11 65:9    changed           79:13
   58:22 90:1         149:15       cause             64:19 67:9      85:19,21
   92:18              151:14         116:8           70:18           87:14,18
   101:22,24       camp            CCR               89:24           92:4
   112:21             26:9          1:19,20          91:20        children's
   124:18          Capital           156:18          95:13 98:4     56:17,20
   130:1              21:25 22:19  Central           103:16       choose
called             capture          5:3 35:8         109:14         36:19,24
   7:19 21:17         147:15                          114:12
```

44:11
Cincinnati
12:13 13:23
14:1 17:3
21:3,8
22:1 23:1
24:19 26:5
citizen
41:5
clarific...
16:9 27:24
29:24
87:11
clarify
123:23
classmates
13:18
Clayton
5:4
clear
59:24 78:7
83:1 87:12
131:11
133:15
clients
19:1 22:7
128:11
Clinton
58:18,20
60:20,25
61:3 62:13
67:4 69:1
74:17
75:16
83:13
84:16,20
84:24
85:10 94:1
100:5
103:11
132:15,18
144:19
145:1
151:2
154:12
close
45:25 46:20
51:22
78:24,25
90:15

closed
124:19
139:11
152:17
co-executor
86:23 92:14
co-trustee
72:9,9,13
97:14
co-trustees
72:17 81:24
82:2,3
101:23
103:2
139:23
Cohen
22:23
coins
18:16
collapsed
117:3
college
14:22,24
Colorado
33:3,4,15
combined
51:16
come
36:22 41:12
41:14
71:12
105:14
116:21
128:8
137:25
141:8
155:4
comes
120:21
152:1
coming
110:24
150:3
comment
130:13
commercial
15:25 18:17
Commission
158:21

communicate
9:12 79:9
79:12
144:2
151:18
communic...
140:21
153:14
communic...
109:10,11
127:16
130:1,2
132:18
communic...
31:22 67:6
67:12
84:20
85:15,18
88:22
104:7
105:5,11
127:19,24
128:11,24
129:4,8,18
129:24
131:3,25
132:8
137:2
138:14
142:24
143:19
company
7:7 17:4,5
17:6,11,15
18:3,12,21
20:21
22:24 24:5
27:22
55:21 69:1
69:3 70:13
completed
22:15
compliance
21:10,10,11
22:4
comprised
135:2
computer
23:14
computer...

156:7
concentrate
8:18
concluded
155:23
conclusion
137:25
condensed
155:19
condition
151:14,16
151:19
conditions
107:8
confer
127:8
136:19
conference
9:10
confess
19:15
confirm
125:7
confused
100:22
Congratu...
15:9
connected
64:17
connection
61:1
constantly
50:12
contact
94:3 114:16
154:7,8
contained
100:20
contents
39:21
continued
3:1 46:24
contract
10:2
contribu...
138:3
conversa...
8:9 67:3
83:9,21

84:7,11,13
84:16
96:11,12
98:22
104:16
113:4
132:19
134:10,14
134:15
conversa...
31:7 67:6
84:24
85:10 99:1
99:17
104:17
125:23
converted
50:9
convince
128:2
cool
42:1
cooperating
65:4
copied
96:10
copies
10:1,9 98:3
105:2
123:6
147:22
copy
10:15 53:14
68:4,19
73:12,14
73:15,19
73:23
74:12 75:4
75:13,18
75:23
81:12 83:5
95:11,23
96:2,20
98:7,9,15
98:20
104:18,20
112:11
117:15
119:15
121:10

121:10
122:22
123:2
141:14
144:11
145:14
146:10
151:2,2
152:4
155:16
**corner**
124:10
**corners**
38:16
**CORP**
157:5
**corporate**
22:9 121:6
**Corporation**
1:10 3:6,9
3:14 4:10
121:18
122:1
135:14
147:6
**correct**
27:8,16
32:5,11
33:25
42:24 49:7
72:1,2
73:1 74:17
74:23
81:25 82:1
82:13,19
85:17,20
86:1,2,4
89:25 90:8
90:21 92:5
93:19
95:18
96:21
99:20,21
99:21
104:25
105:3
111:7
114:1
118:9
120:1

122:25
123:4
129:6,7
136:25
144:13,24
145:2,4
147:20
153:12
158:7,13
**corrected**
108:23
**CORRECTION**
157:2
**correctly**
7:1 45:17
134:6
**counsel**
3:21 6:2,2
6:8 156:10
156:12
**Country**
14:20
**County**
15:25
**couple**
46:12 51:3
91:3 97:1
104:12
108:12
116:16
125:18
127:11
137:8
**course**
7:3 16:13
19:15
34:17
49:23
131:10
150:11
**court**
1:1 4:1,19
6:5,15 8:4
11:12 16:8
27:23
29:23
35:22,24
65:18,21
81:1 86:1
87:21

88:12 99:5
99:8
107:15,18
111:11,13
133:23,25
146:22,24
149:20,22
156:2
**Court's**
128:8
155:11
**courtesy**
130:24
**cover**
2:16,23
108:15,25
109:17
115:16,22
**covered**
130:3 137:1
**created**
56:17
**creating**
56:19
**CSR**
1:19,20
156:18
**CST**
4:16,16
6:10
155:24
**Culbertson**
5:7
**currencies**
16:18
**customer**
2:21 3:17
111:17,21
150:15,19
**customers**
18:6 22:16
**cutting**
94:14
**CV**
1:8 4:8
63:10
64:11

_____
D
_____

**D**
2:1,5 3:1
**D-R-Y-O-F-F**
29:11
**D-Y-R-O-F-F**
29:25
**dad**
10:25 30:19
31:10
33:22
34:10
36:18 37:8
38:2 43:17
46:7,11
48:24 50:6
60:13,17
60:22,22
61:11
62:25 65:9
70:9,17
78:2,10,11
79:2,5,8
79:11 89:1
100:11
114:3,6,11
119:23
151:9
**dad's**
30:8 61:19
85:13,19
85:22,25
86:7
**Dahlonega**
12:8 26:8
**daily**
46:1
**Dan**
7:6 38:18
120:25
122:5
130:10
**Daniel**
3:21 5:6
12:20,23
13:16
**date**
2:14 11:7
11:15 34:6
37:10 43:5
43:6 44:10

44:14
52:18
63:20,21
68:20 81:4
81:8 82:24
82:25 84:2
89:1 90:25
107:13,13
116:25
119:3,25
124:10
141:21
144:15
148:6
154:7
**dated**
3:18 11:6
13:18
42:13,17
64:13
67:22
68:14
69:12 70:2
70:23
108:16
115:16
119:10
141:15
142:4
144:9
150:14,16
150:21
153:2
154:2
156:14
**dates**
87:22 116:5
121:19
147:15
**daughter**
36:25 50:7
50:10,11
**daughters**
114:16
**day**
4:16 14:20
23:25
37:10 62:8
78:1,4
79:21 84:1

```
 89:1                146:5              79:24 80:9        8:6               88:12,17
 113:23              149:15,25          128:15,21        dig               102:12,22
 114:6               153:11             130:11           56:22             103:5,10
 120:9               deceased           155:13,17        Dinner            distribu...
 136:18              134:7              155:23           93:9              87:3,16
 151:15              December           157:6            direct            88:3
 156:14              39:13              158:4,6,10       68:22 75:16       distribu...
 158:15              decide             depositions      direction         86:13 88:6
days                 64:22 138:7        9:5 130:15       103:23            DISTRICT
91:3                 decision           deposits         disbursed         1:1,1 4:1,1
dead                 77:3 148:24        16:17            87:25             divide
92:21                148:25             describe         disciplined       102:1
 124:15,18           declare            84:12            8:11              divided
deal                 158:12             134:15           Disclosures       48:4 87:18
23:19 46:19          Defendants         described        121:4             division
 120:22              1:11,16            105:4            disconti...        1:2 4:2
 126:19               3:21 4:11         describing       139:12             101:25
dealing               4:15 5:6          122:9           discuss            102:5
51:10                 6:3,14            details          25:5 59:16        divorce
dealt                degree             83:11            62:5 94:11        57:10,13
21:6 23:6            15:13              determine         94:22            divorced
 145:8               degrees            89:2 107:9        97:12            12:16,17
 151:7               15:15               107:24          137:3             43:13
Dear                 Delivery           devices          153:23            57:11
151:25               3:3 118:18         9:11            discussed          divvy
death                118:25             diamonds         69:20 85:4        46:6
10:20,23             Denver             40:10            104:22            doctor
 20:16               15:1               die              108:21           14:3 55:18
 52:18               dep                45:6 57:9        144:7             57:8,8
 62:17               52:22 53:2         63:3            discussing        document
 63:10,19            Department         died             58:10 97:3       2:7,9,19,23
 64:1 89:5           2:22 111:17        43:14 60:3       97:6              3:2 34:15
 91:7 94:24          111:22             64:16 78:2      discussion         34:22
 95:11               depending          78:4 89:1        58:5,5            35:14,18
 96:17,24            22:7 128:8         89:2 91:1        76:12             35:25
 99:19               deposed            99:10           discussions        38:10,10
 104:24              45:19 56:25        113:23,24        59:8,18,25        42:9,25
 116:8,25            deposes            114:6            154:19            52:1,14,17
 117:17              6:15               151:15,15       dismembe...        53:11 54:2
 119:25              deposit            different        20:17             65:15 66:1
 120:10              16:19 44:23        9:8 16:18       dispute            66:6 67:17
 122:16,21           deposition         26:7,11         106:1,9           70:25 71:7
 122:22              1:15 4:13          45:2,24         127:23            72:24 73:5
 124:4                6:3 7:5           71:7,25         disrespe...        80:18,19
 131:21               19:16            117:24           40:7              81:10
 132:7,12            28:25 29:2        144:22,23       distributed        109:6,18
 133:4               29:10,15          147:11          46:17,21          109:24,25
 136:21              32:4 34:17        152:1            47:1,25           111:14,19
 145:12,17           52:24             difficult        86:7 88:1         115:15,19
 145:23
```

| | | | | |
|---|---|---|---|---|
| 115:21 | double | 77:10 86:3 | 122:14,20 | 67:15 98:3 |
| 117:24 | 23:18 59:22 | 88:18,22 | 132:20 | 99:10 |
| 118:17,23 | **Dr** | 97:22 98:6 | 152:9 | 101:14 |
| 121:2,15 | 56:13,14 | 99:1,17 | **earliest** | 110:14,14 |
| 121:15 | 63:9 64:10 | 100:8 | 136:10 | 110:14 |
| 137:5 | 64:13 | 103:8,23 | 147:12 | **Eddie's** |
| 143:11 | **Drive** | 104:1 | **early** | 115:3 |
| 147:1 | 47:10 54:6 | 106:4 | 15:8 | **edification** |
| 150:24 | 54:9,16 | 107:7,23 | **easier** | 36:5 |
| 151:24 | **dryan@hi...** | 108:5,17 | 8:14 19:14 | **education** |
| 152:1,14 | 5:9 | 109:10 | **east** | 15:14 20:1 |
| **document...** | **Dryoff** | 110:20 | 41:13 | **Edward** |
| 29:8 94:11 | 2:16 3:11 | 111:5 | **EASTERN** | 1:3 3:12 |
| 94:20 95:6 | 29:11 | 127:24 | 1:1,2 4:1,2 | 4:4 5:10 |
| 95:9,19,25 | 38:11 | 128:14,24 | **Ed** | 141:18 |
| 139:25 | 109:1 | 129:4,18 | 6:25 31:25 | **effect** |
| **documents** | 141:17 | 129:23 | 32:1,1 | 63:18 |
| 9:19 10:4 | **DU** | 130:2 | 33:7,19,20 | **efficient** |
| 11:5 28:23 | 15:2,4 | 131:2 | 36:13,15 | 80:3 |
| 28:24 35:2 | **ducks** | 132:25 | 37:3,7 | **effort** |
| 61:25 69:8 | 60:17 | 137:1,3,7 | 38:1 44:15 | 140:16,22 |
| 94:25 95:1 | **due** | 140:20 | 45:15,18 | 141:3 |
| 96:3,18,23 | 113:12 | 141:14 | 46:24 | 155:15 |
| 98:4,12 | **duly** | 142:17 | 47:22 | **eight** |
| 99:15,25 | 156:6 | 143:9,10 | 56:24 | 36:23 38:20 |
| 103:16 | **duties** | 143:11,20 | 60:16 | 55:9,16 |
| 108:13,24 | 17:25 | 144:11 | 64:22 68:4 | **either** |
| 121:5 | **dwelling** | 152:5,7,13 | 70:15,18 | 25:10 |
| 122:9,16 | 54:19 | 152:21 | 77:8 83:9 | 102:12 |
| 122:23 | **dwindled** | 153:14 | 85:9 86:22 | 115:11 |
| 124:5 | 146:18 | 154:6 | 97:4,13 | 132:4 |
| 125:8,8,13 | 148:19 | **Dyroff's** | 101:21 | 142:21 |
| 136:22 | **dwindles** | 99:23 | 102:16,20 | **election** |
| 137:3 | 138:3 | 110:17 | 103:2 | 138:8 |
| 138:24 | **Dyroff** | 128:21 | 105:16 | **electric** |
| 139:14,20 | 2:11 29:12 | 142:15 | 106:16 | 49:15 |
| 152:21 | 29:14,20 | 144:3 | 110:13 | **electronic** |
| **dog** | 29:21 30:1 | 152:4 | 115:11 | 155:20 |
| 27:18 | 38:12 39:5 | 153:16 | 119:8 | **eliminate** |
| **doing** | 39:6,10,25 | 154:10 | 138:6 | 155:3 |
| 9:4 13:25 | 42:14 | | 141:15 | **else's** |
| 21:11 23:6 | 52:24 | | 144:12 | 149:12 |
| 26:10 38:5 | 66:16,20 | **E** | 155:15 | **email** |
| 45:11 | 67:14,24 | **E** | **Ed's** | 129:14 |
| 77:11 | 68:4,15,22 | 2:1,1,5,5 | 45:20 | **employed** |
| 109:10 | 72:21 73:6 | 3:1 5:1,1 | 140:17 | 144:20 |
| **dollars** | 75:4,12,24 | **E-U-G-E-...** | **Eddie** | 154:13,21 |
| 20:17 | 76:1,7,15 | 6:23 | 31:19,22,23 | 156:10,12 |
| **door** | 76:22 77:5 | **earlier** | 33:6 45:9 | **employee** |
| 21:12 54:22 | | 31:12 40:2 | 51:9,10 | |
| | | 82:15 | | |

145:3
156:11
**employees**
21:23 22:12
**employment**
17:1 20:21
**employme...**
45:21
**enclosing**
69:8 108:18
**ended**
44:10,11
45:24
**endowment**
137:14
**entailed**
22:4
**entered**
36:8
**entire**
50:23
**entitled**
7:16 52:17
127:25
**entried**
23:18
**entries**
23:13
**eons**
54:23
**equally**
46:7 48:4
**establish**
139:7
**estate**
18:17,17
22:8 30:9
45:8,12
46:12,16
48:4 51:13
51:14,21
54:4 64:1
66:11,22
67:1 85:25
86:4,7,11
86:14,20
86:23 87:1
87:4,7,17
87:20 88:7

88:11,14
88:16,23
92:7,9,11
92:14
101:5,19
102:22
103:3,5,9
103:10
152:16
**estates**
53:21
**estimate**
129:13
**ET**
1:10 4:10
157:4,5
**ethics**
65:10
**Eugenia**
1:3,15 2:2
3:12 4:4
4:13 6:3
6:12,23
141:17
156:5
157:2,6,24
158:2,24
**event**
7:18 39:4
57:2 61:15
**events**
7:11,17
**eventually**
94:13 95:5
**everybody**
23:4 68:11
85:1,1,7
148:13,13
155:5
**everyday**
8:9
**evidence**
134:9
**ex**
15:6
**ex-husband**
12:19 14:18
19:22
**exact**

98:22
**exactly**
7:2 31:7
47:1 63:4
63:5 87:22
88:8
102:13
**examination**
2:3 6:17
156:6,8,11
**examined**
4:14 6:13
156:6
**example**
39:24
**exception**
127:21,22
**excessive**
79:22
**Exchange**
23:10,11
**exchanging**
16:18
**excuse**
12:14
135:10
**executed**
42:25
158:15
**executors**
45:8 86:19
86:25
**exercise**
138:8
**exhibit**
2:6,9,11,13
2:15,18,21
2:23 3:2,5
3:5,8,8,11
3:13,16
35:17,23
35:25 39:5
42:13
52:13,14
52:23
53:10 60:5
63:9 65:15
66:6 67:22
67:23

68:14
72:24 81:2
81:3,7
108:15,25
109:18,23
111:10,16
111:21
115:15,21
118:17,23
121:14,24
121:24
123:6
124:2
125:6
131:17
134:20
135:2,11
135:12,12
141:13,16
144:7,8
146:21
147:1,4
150:13,18
**exhibits**
3:21 34:19
140:7
**exist**
27:21 113:6
**existed**
37:23 60:2
132:13,14
**existence**
17:8
**expand**
38:19
**expect**
133:13
**expectation**
132:24,25
133:5,8
144:2
**expectat...**
133:17
**expected**
120:15
**expecting**
84:9
**expenses**
110:7

**expired**
112:17
113:11
**Expires**
158:21
**explain**
22:4 54:10
74:8
105:18
**explained**
134:4
**extremely**
130:10

---

**F**

**F**
2:1,5
**F-R-A-N-K**
90:20
**face**
21:12 58:10
109:17
118:22
**face-to-...**
9:9 132:1
**facetious**
79:19
**fact**
95:17 140:5
**facts**
7:10 79:23
**fair**
8:14,15
11:4 16:25
16:25 31:9
44:17
59:17,17
71:7 72:14
75:11 79:1
87:23 90:2
90:3
133:20
134:1
137:23,24
139:3,5
140:2
147:18
149:11
154:18

154:18
**familiar**
58:9 109:5
117:11
120:13,17
126:7,25
**family**
31:15,16
36:23 55:3
69:10,11
69:25 70:4
70:12 72:4
72:12
90:13,13
90:17
134:23
**fan**
23:2
**fancy**
93:3,7
**far**
87:15
107:12
137:6
**fast**
81:14 117:8
148:22
**father**
10:21,23
12:4 26:23
27:1 30:10
30:23 40:8
40:13
42:25
43:10,19
44:2 45:6
51:1 55:22
57:4,13,18
57:20 58:3
58:14 59:2
59:9,18,24
64:1,25
69:3,21
73:3 75:12
77:1,14
78:14 82:7
83:23
87:20,24
92:1 99:9
102:11

103:4
114:9
116:4,7
117:15
119:12
120:9
131:19
132:1,9
133:16
144:10
151:6,7,8
151:15
153:11
**father's**
39:11 42:17
42:22
45:12
46:16
51:14,21
53:14,21
54:3 57:3
60:11
62:17
63:19
66:11 67:1
67:4 80:7
86:4,11,14
87:17 88:7
88:14,16
88:23 92:3
92:7,11
98:24
101:19,23
102:22
103:9
119:25
132:12
133:4
**fathers**
87:6
**fault**
59:23
**fax**
2:16,23
108:15,25
109:11
115:16,22
116:2
117:4
119:7

**February**
10:3 11:7,8
108:16
112:14
**fee**
23:20
146:16
**feel**
29:2 78:14
78:16
93:24
136:7
**fees**
126:17
149:6
**fight**
128:19
**figure**
93:22 113:5
**file**
98:16
124:16,17
124:18
144:17
152:18
155:17
**filed**
7:8 32:6
36:13
106:7
**files**
98:2 111:3
152:2,4,16
**final**
87:3,16
**finally**
52:8 95:14
96:14
104:13
112:20
139:11
**financial**
2:12,16,24
17:18
67:25 68:3
68:16,23
68:25
108:17
109:2

115:16,22
144:19
145:7
**financially**
156:12
**find**
35:2 52:1
53:8 62:10
80:22
119:5
130:14,14
**fine**
35:6 40:20
78:22
87:10
**finish**
8:11 30:8
53:18
65:12
66:22
101:5
122:7
**finished**
102:9
**finishing**
61:19
**fired**
21:12 23:15
23:25
**firm**
17:7 21:6
21:22
22:13
24:17
30:16 31:9
31:11
39:18
103:8
110:17,21
116:3,4
140:20
144:21,23
153:16
154:10
**firms**
44:24
**first**
2:7 14:25
19:7,15
20:12

35:18,19
35:25 36:6
38:8 39:8
39:9 56:12
62:15 69:7
70:17
73:17,22
82:11
102:25
108:13
112:15
118:5
119:7
123:15
126:1
136:9,14
140:4,11
150:8
156:6
**five**
12:1,25
27:6
124:25
**five-minute**
35:7 122:6
141:5
**floor**
16:14 17:17
**flower**
47:19
**focused**
21:22
**folks**
138:14,16
139:6
**follow**
62:13
**follow-up**
128:22
**following**
78:1 112:14
157:7
**foregoing**
158:4,13
**Forest**
26:8
**forget**
27:3
**form**

```
45:1 70:22          full                26:4,12           125:5            123:12
71:23,25            6:21 40:23          Gerda             129:3            124:6
73:9                146:17              89:15 90:6        131:14           127:3
107:12              fully               90:7,14,17        133:15           139:1
114:23              87:25               91:7              135:20           142:24
115:5,7,7           120:19              German            136:18           143:19
117:19              fumble              41:5,22           139:5            154:2
142:1,1             52:5                Germany           140:15           God
153:21,25           fund                13:11,12          141:12           44:21 47:17
158:5               137:14              41:12,19          144:7            goes
formal              funding             42:4 90:14        147:2,18         39:21 46:12
19:25               23:9                90:14             154:6            61:1 93:3
forth               funds               getting           155:14           113:8
9:10                23:7 24:9           20:12 23:18       girl             124:14
Forty-five          149:6               53:17             41:17            136:8
57:16               funeral             92:18             girls            going
forward             62:19 67:5          114:13            41:22 87:9       7:9,25 11:3
45:19 144:4         69:20               128:23            give             11:11
forwarded           83:24,25            Gina              25:7 37:12       19:14,16
67:16 75:21         85:13,19            7:21,22,24        40:23            21:2 22:12
99:12               85:22,23            8:22 9:11         71:19 94:6       25:7 26:1
103:13              98:24               11:10,15          107:13           26:2 29:6
found               132:20              12:15             113:10           34:3,12,12
10:19 23:23         further             13:14             124:24           34:14,15
29:6 62:8           39:16 72:23         15:16 16:6        139:10           34:18,22
73:25               85:14               17:19 19:8        given            36:4 37:11
106:24              100:10              20:15             127:23           37:11 38:9
113:12              104:15              25:24             138:10           38:14 39:4
114:1               156:10,11           26:21             glad             42:9,12
126:10              future              28:21,23          91:17            45:18 46:9
150:4               133:1               29:10 34:5        go               47:7 52:9
four                                    34:14 35:9        9:20 14:18       52:9 53:25
16:10 41:16    ─────────────────       35:14 36:5        14:22            55:12
87:24                    G              36:20 39:4        20:11 21:2       56:10
frame               G-I-N-A             42:12 46:3        21:3,4           67:21 68:2
136:20              7:23                53:9 54:2         22:20            79:20,20
Frank               Galloway           64:7 65:22        23:24            81:14
90:19,22            50:16               66:2 67:18        24:15 29:4       100:16
91:5,14             Gamble              69:24             38:14            107:11
92:18               21:8,23            71:22             39:24            108:9,10
Franklin            Gamble's            76:18             42:14            108:11
5:7                 21:8                80:17 81:7        45:12            110:16
free                gears               83:4 102:6        68:10            111:16
136:7               104:4               104:4             70:22            113:18
friend              Generally           109:6             72:23            114:20
89:9 90:13          83:12               110:1             76:14,22         121:22
90:13,17            gentleman           111:15            79:20,20         123:14
friends             57:6                116:7             87:13            127:15,16
13:17 60:20         Georgia             121:16            110:12,12        128:2,22
                    12:8,12,14          122:15            120:5            129:25
```

144:6
147:13,13
147:14
148:13,22
149:5
150:4,5
154:1
155:2,2
**gold**
18:16
**gonna**
134:20
**good**
7:24 15:9
15:10
17:22,24
66:22
141:10
**goodness**
57:15
**gosh**
51:9 75:10
**gotten**
146:20
**grab**
9:20
**graduate**
15:11
**graduated**
13:24 15:8
15:20
**grantor**
36:7
**Great**
28:2
**Greenley**
2:24 30:14
30:15,17
39:18
110:8
115:18,24
116:4
**grooming**
27:18
**ground**
16:13 17:17
**group**
2:12,16,24
3:5,8

67:25 68:3
68:16,23
68:25
108:17
109:2
115:16,22
121:14,15
121:24
123:6
135:12
144:19
145:7
**grow**
13:8,20
**Guarantee**
145:20
**guess**
26:2 37:4
51:19
58:22
60:19
79:24
113:17
129:2
138:13
**guessing**
85:6 152:18
**guilty**
19:8
**guy**
60:23 62:12
**guys**
9:7 29:3
152:2

---

**H**

**H**
2:5
**H-I-N-E-S**
33:2
**half**
24:21 25:12
80:10,11
117:2
**handle**
66:25 92:16
**handled**
45:9,15
120:14

**handling**
16:17 65:11
66:10
**handywork**
70:7,11
**happen**
66:14
**happened**
60:5,7
61:23
106:22
152:18
**happy**
7:14 30:9
30:13 52:2
**hard**
71:9
**harder**
19:14
**headache**
19:13
**health**
151:13,16
**hear**
24:3 28:16
52:7 82:24
122:8
127:18
**heard**
62:15
**hearing**
139:16
**heart**
127:20
128:10,12
**heartburn**
53:17
**Heidi**
108:18
**heir**
92:11
**held**
101:13,14
**help**
66:21
108:23
**helped**
34:10
127:12

**helping**
125:16
**Herb**
89:13 90:7
**Herbert**
1:4 2:7,9
2:19 3:17
4:4 33:21
33:22
35:20 36:2
36:7,8,8
36:16
37:22
39:17
42:11 44:2
44:16 46:5
52:15,18
53:11
69:12 70:1
70:23
72:13 75:8
82:3 96:18
99:16
100:20
101:2,17
102:21
103:2
108:21
109:19
110:18
111:6
122:24
142:3
150:16,20
153:1
**hereto**
156:12
**hesitate**
7:13
**Hey**
79:15 122:5
128:17
**Hi**
121:1
**high**
13:19 14:11
14:12,13
14:14,15
15:7
**highlighted**

67:19
**highly**
66:15
**Hines**
33:2
**Hinshaw**
5:7
**hire**
66:10
105:23
**hired**
21:10 30:18
**hold**
16:12 17:14
34:4 94:18
**Holder**
151:25
**holidays**
79:3
**home**
21:9 41:22
113:24
**homes**
93:9
**hometown**
21:8
**honest**
44:21 47:17
94:14
137:11
**honestly**
64:7 144:8
**Horton**
14:12,16,17
**hospital**
14:2
**hour**
80:10,11
**hours**
4:15
**house**
46:19 47:1
47:3,4,6,8
47:11,12
47:14,22
47:23 48:9
48:11,13
48:19
49:11 50:2

50:8,8,13
51:7 54:18
93:14,15
102:10
114:13
120:23
**house/ap...**
50:23
**houses**
23:9 102:10
**Huh**
42:1
**human**
8:8
**Hundelt**
1:19 4:17
  6:4 156:2
  156:18
**hundred**
67:2
**Huntleigh**
48:13,17,21
  48:24
  49:10,17
  50:1,4,23
  61:8,10
  93:17,18
  103:17
  113:19,25
  114:9
  118:21
  119:20
  120:12
  134:24
  135:6
  153:10
  154:9
**husband**
50:10,22
  51:5

─────────
            **I**
─────────
**idea**
30:21 56:21
58:8 60:8
62:2 64:15
64:15
74:11
117:18
135:8

146:19
**identifi...**
35:17 36:3
  52:16 68:1
  68:14 81:5
  108:15
  109:4,21
  109:23
  111:23
  115:15
  116:1
  118:17
  119:2
  121:14
  122:3
  125:6
  135:16
  141:13,19
  147:8
  150:13,23
**identified**
40:2
**identify**
32:18 66:7
**IL**
5:8
**ILIT**
56:17,23
  64:13
**ill**
116:12,15
**illegal**
22:11
**Illinois**
1:20 14:4
**illustra...**
119:16
**illustra...**
117:5,12,16
  117:24
  118:2,6
**image**
38:19
**imagine**
116:19
**impair**
8:17
**included**
125:8 136:4

**including**
31:14 59:1
  59:5 69:4
  121:23
**indicate**
46:13
**indicated**
11:11 53:11
  129:3
  157:6
**individual**
22:9
**INDIVIDU...**
1:5 4:5
**informal**
20:1
**Informally**
102:4
**information**
9:25 41:21
  45:4 60:9
  94:6,10,15
  94:20 95:7
  95:13,20
  96:15 97:9
  99:25
  104:13
  112:3,25
  113:10,11
  118:7
  138:11
  139:10
  140:1,9,17
**initial**
6:24
**initially**
9:25
**inquire**
105:10
  127:25
**insert**
130:22
  131:1
**instructing**
131:8
**insurance**
1:9 2:17
  4:10 7:7
  10:13

18:16,22
18:24
19:19,23
20:1,4,7
20:15 24:8
24:10,24
25:1,13,15
31:6 55:8
55:22 56:2
56:11,12
58:11,16
58:17,21
58:23 59:1
59:1,9,19
59:25
60:12 62:1
62:6 63:14
64:9 66:4
67:7 69:4
69:9 73:23
77:5,9
84:21,25
99:2
100:18,25
103:15,25
104:8
105:6
106:18
107:8,24
108:19
109:3
114:8,18
115:10
117:16,25
120:13,22
120:22
126:25
132:2,9
133:1,6,19
137:6,9,16
137:16
140:15
145:6,14
157:4
**insured**
3:3 20:6,15
  81:8,21
  118:19,25
  136:17
**intending**

128:1
**interact...**
88:18
**interest**
80:1
**interested**
156:12
**internet**
125:20
  137:20
**internship**
13:25
**interrupt**
120:5
  151:23
**interrupted**
130:6
**intimidated**
44:8
**introduce**
34:18
**introduced**
49:22 58:19
**introduc...**
7:6
**invest**
65:6
**investment**
17:7 21:6
  21:22
  23:19
  30:25 31:1
**investments**
22:15
**involved**
22:3 31:19
  58:5 59:12
  59:13
**involving**
132:2
**issue**
10:14 59:5
  59:10,19
  60:1 62:1
  62:6,24
  65:13 66:2
  66:5 67:7
  69:5,16
  74:9 75:5

76:14,22
77:10
81:13 99:3
100:2,9,19
101:1
103:25
104:8
106:18
107:9,24
114:18
115:10
117:25
118:20
119:16
131:21
132:3,10
142:18
145:15,19
146:7
152:25
**issued**
55:15,16
56:5 63:22
64:14
121:18
**itemized**
2:19 109:18
109:24
111:13

**J**
**Jacobson**
5:2,3 7:4
29:25 35:5
38:18,18
38:24
52:23 53:3
53:7 65:16
68:7 71:10
71:14,17
71:21 73:9
79:17,22
80:4,6,13
80:21,25
82:14,19
82:22 83:3
107:11,19
117:19
120:25,25
121:2,12

122:5,8,13
124:25
125:24
127:15
128:9
129:25
130:8,18
131:6,10
141:7,10
151:23
152:6,8,11
155:8,16
**Jacobson...**
5:5
**James**
33:13
106:15
**January**
141:15
142:17
**jean**
2:14,25 3:3
29:7 37:8
37:24 38:2
40:4,11,12
43:1,17,20
43:21 44:2
48:7 49:23
50:6 56:16
56:19 57:3
57:12,13
57:17,21
57:21 58:2
59:12
69:11
73:25
74:15,24
77:14,23
78:3,10,12
78:15 79:6
79:9,12
81:3,8,20
82:8 83:19
85:15,21
89:1,6,19
89:20 90:1
90:4 92:6
92:10,19
92:20
93:11,20

95:17
97:23
98:25
99:19
108:20
113:21
114:16
115:18,24
118:19,25
119:23
122:21,22
124:4
136:16
145:13,17
145:24
146:5
149:15
151:14
**Jean's**
48:11,13
56:13
58:11 63:1
85:19
**Jennifer**
3:16 150:14
150:19
**jeweler**
40:9
**jewelry**
40:10
**Jim**
33:13,14
53:1
106:15
121:8
128:20
**Joann**
2:11,16
3:11 29:2
29:10,11
30:1 67:14
67:24 68:3
68:15
95:12
97:22 99:1
99:17
100:7
106:2,4
108:17
109:1

110:17
127:11,13
128:24
132:25
140:20
141:17
142:15
143:9
144:11
152:16
154:6
**job**
8:6,13 17:4
19:13 25:4
**Joe**
5:2 7:4 9:8
35:3 38:18
38:23
52:21
71:13,20
73:13
79:15 80:2
82:17
120:25
121:1,11
122:12
124:24
125:24
127:18
130:21
141:6
152:10
154:25
155:7
**judge**
41:20 128:4
**Julie**
1:19 4:17
6:4 8:3
19:12
53:17
156:2,18
**Julie's**
8:13
**July**
27:4,4
46:11 49:6
52:19
67:22
68:15

115:16
116:25
144:9
**June**
3:14,15
81:9 119:6
119:10
136:14
147:6,7,13
147:13,13
147:14,16
147:16
150:14
153:6,13
154:7

**K**
**K**
3:21 5:6
**K-E-R-N-...**
9:2
**K-O-H-E-N**
22:24
**keep**
110:25
112:1
149:7
**kept**
41:19 47:6
48:8,19
94:13
138:20,23
139:15,15
**Kernersv...**
8:23,25
**kids**
31:20 36:22
36:23,24
48:1,5
63:4 77:23
88:1,13
149:8
**kind**
8:8 9:7
14:3,9
23:11 24:5
29:3 50:8
80:8 96:7
110:2
125:18,20

126:10
127:12
129:15
**kitchen**
26:10
**knew**
18:18 33:8
33:21
58:12 65:8
75:25 76:2
85:2 92:25
93:1 109:7
110:24
129:22
137:9,9
146:9
154:14
**know**
9:3 10:24
10:24 16:2
16:2,3,23
17:21 20:6
20:17
21:16,17
25:17 29:3
30:19,20
31:6,7
34:6 36:24
38:15 44:2
44:22,23
44:24
45:25 47:1
51:4,17,18
52:5 53:1
53:5,8
54:20,20
54:21 55:4
55:6,17,17
55:24 56:6
58:4 59:12
60:16,18
63:16,24
64:3,6,7
64:14,16
65:5,23,23
69:22 70:3
70:6,6,14
72:7 75:15
75:17 76:2
78:24

79:19 80:5
80:5,12
81:14,19
82:9,18,19
82:25
84:23 85:7
85:9,12,23
87:15 88:8
91:17,19
92:12,13
93:2,4,13
93:14,14
97:6,8
98:17,18
100:3
101:14,20
102:8,13
103:18,20
107:7,23
109:25
111:2
112:25
113:6,15
114:11,20
120:7,14
120:15,21
124:13
126:20
127:11
128:9
131:19
132:13,14
132:14,16
133:2
134:9,18
137:8
138:4,10
139:17
140:13
143:7
145:5,21
145:23
146:1,12
146:15,17
148:16
149:2,3
150:2,3,7
151:6,6,11
151:12,19
152:12,13

153:13,17
153:18,18
153:22,22
153:23
154:5,6,11
154:17
**knowledge**
20:14 34:5
34:9 38:1
55:15 56:4
63:15,18
63:25
89:23
92:10
93:12
111:4
129:23
130:7
131:2
138:6
**known**
44:4 145:20
150:11
**knows**
56:24
**Kohn**
22:23 24:5
**Kohn~&~C...**
23:5 24:12

_____
**L**
**L-A-U-N-...**
28:1
**L-E-G-G**
21:15
**L-E-N-N-...**
32:20
**labor**
101:25
102:5
**lack**
113:12
**Ladue**
14:12,14,15
47:5,9,23
49:12 51:8
77:17
**lake**
47:4,5,14

47:22 55:5
**land**
54:22
**language**
72:5
**lapsed**
124:20
**Laundrom...**
27:25
**law**
11:13 30:16
31:9 39:18
66:20
103:8
116:3,4
140:20
153:16
154:10
**lawful**
6:13
**lawsuit**
7:10,11
32:6 36:13
59:6,20
62:1,7,24
65:14 66:5
69:5,17
73:24
74:10 75:5
76:22
77:10
81:13 99:3
104:9
106:18,23
114:19
140:5
145:15,19
**lawyer**
38:7 41:21
**lawyers**
9:4 34:18
38:16 78:8
79:19
128:11
**leading**
7:11
**leads**
40:6
**learn**

89:5
**learned**
17:21 93:20
97:23
98:25
99:19
**learning**
145:12
**leaving**
91:23
**left**
13:6 16:20
24:12 25:4
25:10 88:7
88:14
**legal**
30:23 31:10
64:23
110:7,21
111:5
**Legg**
20:25 21:14
**length**
121:16
**Lennard**
32:20
**let's**
7:18 8:20
19:17 35:7
35:8 39:1
42:10
51:25 53:2
56:22
80:11,14
80:14
121:20
124:13
141:5,6
147:14
155:4
**Leticia**
9:25 10:7
11:5 95:23
96:1,12
112:21
118:7
**letter**
2:11 3:11
3:16 11:6

67:15,22
67:23 68:7
68:14,17
68:23
69:15
70:20
95:22 96:1
96:16
103:11
104:2
108:6,8,11
111:16
112:5,8,24
113:2,4,8
141:14,16
141:20,25
144:9,14
150:14,18
152:24
153:25
154:7
**letterhead**
3:2 118:18
118:24
**letters**
95:12 99:10
99:11
**Liability**
70:13
**life**
1:9 2:17,21
3:2,6,9,14
3:17 4:10
7:7 10:5,7
11:5 18:24
19:19,23
20:15
44:13 55:8
55:16,19
55:20,22
55:23 56:2
56:5,7,11
56:12,13
58:10,18
58:21 59:1
59:9,19,25
60:23 62:6
63:1,9,10
63:14,23
64:9,10

66:4 67:7
69:9,10
73:23 75:7
75:14,16
75:21 76:9
76:10,20
77:5,9
81:22
84:21,24
93:23,25
94:4,21
95:10 96:1
96:19 99:2
99:24
100:18,25
103:13,15
103:16,25
104:7,8,18
105:5,6,11
106:17
107:8,23
108:5,19
108:20,24
109:2
111:17,21
112:11
113:9
114:3,8,8
114:18,18
114:22
115:2,9,10
117:15,25
118:8,18
118:24
121:18
122:1,15
122:22
123:1
124:4
125:9
129:5,20
129:24
130:3
131:3,4,13
132:2,9,25
133:6,19
134:4
135:14,23
136:22
138:15,16

139:6
140:6,14
140:15
142:1,23
143:18,22
144:2,23
144:24
145:1,3,14
147:5
150:16,20
151:4,10
153:14
154:8,13
154:21
157:4
**Life's**
67:10
**liked**
25:3 28:3
**Limited**
70:13
**line**
25:6 112:15
157:8,11
157:14,17
157:20
**lines**
38:21
155:13
**list**
53:7,14
64:5
109:16
**listed**
56:1 60:5,8
63:8
108:21
**listen**
128:17
**listing**
53:21
**litigation**
106:6
127:21
147:22
**litigator**
66:13
**little**
9:8 11:7

12:9 19:13
20:12
26:14
28:15
33:18
41:21
54:22,25
56:22
62:14
104:5
134:5
137:9
**live**
11:20,24
12:7 13:13
26:4,12
32:21
33:10,14
48:24 50:5
50:22 51:3
90:9
**lived**
11:17,22
12:8 13:4
27:6 47:6
48:11
49:10 50:4
114:5
119:24
153:11
**lives**
33:21
**living**
12:6 49:11
49:13 50:7
50:12 51:1
113:22
114:10,13
**LLC**
55:3 69:10
69:11,25
70:4,16,17
72:4,12
76:8 99:16
109:15
134:23
153:5
**LLP**
5:7
**locate**

141:3
**located**
8:22 22:25
24:18
**long**
11:17 12:17
12:23 16:5
17:10
24:20
25:11
26:12 37:3
37:5,14
43:10,25
51:3 54:21
60:11
84:14
96:22,24
97:2 116:6
116:15,22
**look**
53:7 81:18
97:2 108:6
123:8,12
138:25
139:1
154:25
**looked**
29:1 113:17
125:19
137:19
**looking**
25:6 29:3
45:19
97:17
102:13
106:21,22
124:22
135:19
140:7
147:10
**looks**
43:2 119:5
119:10
124:13,14
124:15
142:20
**lost**
102:24
**lot**
8:14 9:4

17:16
21:10
23:18  28:3
29:5  45:23
54:16
64:20
70:10
79:18  93:3
114:12
129:12
137:19
155:3
**Louis**
7:8  13:5,8
13:10,14
13:20  14:7
15:6,22,24
15:25  16:2
16:4,6,12
16:21  17:2
30:3  33:22
41:8  48:21
48:25
49:18  50:5
61:11
87:21
90:10
93:18
103:17
113:25
114:9
118:21
119:20
120:12
134:24
135:6
143:1
153:10
154:10
**Love**
28:2
**Loveland**
33:15
**lower**
38:15
**lunch**
79:16,25

**M**

**M**

2:1
**M-A-S-O-N**
21:15
**M-E-R-A-...**
142:13
**ma'am**
9:23  71:1
81:13
**maiden**
40:16,17,18
40:21
**mail**
113:18
114:13,17
**mailed**
113:13
**mailing**
143:19
**main**
50:13
**making**
126:15
**manage**
23:21
**management**
149:6
**marathon**
7:12
**March**
10:3
**mark**
33:8,9
52:12  81:1
**marked**
35:16  36:3
39:24
52:15
53:10
67:21,25
68:13  81:5
81:7
108:14
109:3,20
109:23
111:9,10
111:16,22
115:14,25
118:16
119:2

121:5,14
122:2
123:6
124:2
125:5
135:10,15
141:13,18
147:1,7
150:13,22
**market**
56:7
**marriage**
37:23  80:7
**marriages**
13:1
**married**
12:15,23,25
13:6  19:23
37:9,10,19
38:2  40:13
42:25
43:11,17
43:17  48:7
48:16  49:1
49:22
50:10,16
51:4  57:4
57:4,6,18
57:20  58:3
78:10  90:7
116:17
119:24
**marry**
43:3
**marrying**
40:13  57:13
78:15
**Mary**
90:19,22
91:5,14
92:18
**Marylee**
2:12,24
67:24  68:3
68:15
115:17,23
144:18
**Mason**
20:25  21:15
**McCarter**

2:24  30:13
30:17
31:11
34:10  38:6
38:7  39:18
45:1  59:11
60:14,19
60:19  64:5
64:17,21
64:23  65:3
66:9  70:5
92:13
110:8
115:17,23
116:3
151:11
152:15,23
154:23
**McCarter's**
70:10
**mean**
27:1  29:10
31:3,21
40:7  46:18
47:12  55:6
56:23
73:11,12
78:24  80:4
93:8  97:6
120:4
126:12,14
154:2
**Meaning**
126:12
**means**
125:21
**meant**
113:7
125:17
126:3
137:20
**medical**
13:24  14:1
**medication**
8:17
**medicine**
14:9
**meet**
13:16  41:7
**meeting**

61:10
**member**
44:11
**memory**
8:18  76:6
77:7
134:11
**mention**
130:10
**mentioned**
48:8  54:7
85:25  93:5
112:16
137:1
**mentioning**
91:23  93:15
**Meramec**
142:8,10,11
142:12,19
142:25
**messed**
53:24
**met**
15:6  44:12
46:7  50:18
61:3  66:24
**middle**
6:24
**Midwest**
23:10
**million**
118:22
**mind**
35:3
**mine**
89:9  115:3
**minute**
57:16
141:22
**minutes**
124:25
155:2
**Mirror**
142:7
**mislabeled**
35:1
**misprono...**
29:13
**missing**

33:8,21
**Missouri**
1:1,20 4:1
4:19 7:9
13:5
118:22
119:21
120:12
134:24
135:6
153:10
154:10
156:3
**misspelled**
142:25
**mistaken**
111:10
**MO**
5:4
**modified**
126:23
137:14,15
**mom**
44:3
**moment**
37:16 104:4
108:12
**monetary**
88:9
**money**
16:18,18
23:20 31:5
46:6 56:7
65:9 101:6
101:10
105:22
126:21
146:16
**moneys**
106:12
**monitor**
107:3
132:25
151:13
**monitoring**
133:6,18
**months**
26:15
116:25

**mother**
40:11,25
41:8,17,18
41:24
60:14
64:16
**mother's**
40:9,21
41:17 43:7
**mountains**
26:7,8
**move**
12:3 13:23
48:16
132:6
**moved**
12:13,14
15:5 17:3
17:16 26:4
26:5,16
27:15
**mutual**
23:7 24:9
128:18

---

**N**

**N**
2:1,1,1,5
3:1 5:1
**nail**
147:25
**name**
6:21 7:6
12:19
14:16 21:5
27:20 28:2
33:22 38:8
40:14,16
40:17,18
40:21,24
43:7 47:17
47:18
50:16
57:17,21
58:1,3,19
66:13 89:8
89:14,24
90:19
91:18,21
94:8 95:23

98:4
112:21
158:10
**named**
57:6
**names**
40:1 109:17
**Nancy**
50:14,15,18
50:22
**Nancy's**
51:5
**National**
26:8
**nature**
8:8 127:23
**necessary**
69:8 155:4
158:7
**need**
9:20 60:17
60:18
74:21
93:24
100:23
101:10
128:7
138:2
**needed**
17:21 41:22
61:16,22
74:14
100:10
105:21
107:10,25
110:25
112:25
129:22
150:5
**negative**
59:22
**neighbors**
54:21
**neither**
156:10
**neurosur...**
14:10
**never**
20:18 25:15

44:10
59:18,21
59:25
89:23
91:20
106:6,7
114:11
117:15
120:6
128:14
145:8
154:18,19
154:22
**new**
1:9 2:17,21
3:2,6,9,14
3:17 4:10
7:7 10:5,7
11:5 23:10
34:13
55:16,19
55:20,23
56:5,7
58:18,19
58:21
60:22
63:23
65:25
67:10,10
67:16 75:7
75:13,16
75:21 76:9
76:10,20
93:23,24
94:4,20
95:9 96:1
96:19
99:12,24
103:13,16
104:7,18
105:5,11
108:4,19
108:24
109:2
111:17,21
112:11
113:9
114:2,7,17
114:22
115:2,9

118:8,17
118:23
121:18,25
122:15,21
123:1
124:3
125:9
129:5,19
129:24
130:3
131:3,4,13
134:4
135:13,23
136:22
138:15,16
139:6
140:6,14
141:25
142:23
143:18,21
144:2,23
144:24
145:1,3
147:5
150:15,20
151:4,10
153:14
154:8,13
154:21
157:4
**newer**
9:7
**news**
91:17
**newspaper**
91:8
**nice**
93:13
138:18
**nine**
38:20
**No-Lapse**
145:20
**noon**
35:9
**Nope**
18:25
**normal**
137:15
**North**

5:7 8:23
8:24 11:18
27:14
32:22
142:6,25
**notary**
42:17
158:20
**note**
36:5 42:8
**notes**
9:18 18:15
84:6 155:1
156:8
**notice**
8:3 91:8
123:13
124:12
**noticed**
19:9 52:1
**notices**
76:10,13,21
77:4,8
108:4
113:13
**November**
46:13
**number**
22:6 52:19
65:24
69:23
79:23
80:21
119:8
139:18
143:5,6
144:8
152:8
**numbered**
38:11 152:7
**numbers**
38:15,17
51:11 53:3
53:6
**NYL00009**
119:8

―――――――
O
―――――――
O

2:1,1,5
**o'clock**
35:8
**oath**
6:15 11:12
**obituary**
57:25 89:7
89:17 90:4
90:18 91:3
91:6,25
92:19
**object**
73:9 107:11
117:19
127:15,16
129:25
**objected**
80:4 131:6
**objection**
82:14,23
107:19
117:21
127:19
130:9,13
130:18,23
131:1
**objections**
82:17,21
**obligations**
56:14
**obtain**
15:15 18:2
**obviously**
15:6 70:14
**occasion**
78:2
**occasions**
49:20 61:5
61:7 78:12
**occurred**
88:3,6
**oddball**
126:10,12
126:14
**offer**
44:25
**offered**
62:4
**office**

16:15,16,23
25:22,22
62:14
66:17 99:2
99:18,24
108:10
142:15,19
143:8
144:3
151:5
153:16
154:20
**officer**
17:18
**Oglesby**
8:3
**oh**
21:14 27:10
29:13,16
32:23 51:5
51:9 57:15
71:12,14
73:18 75:8
78:18
81:16
91:16
106:13
123:19
**Ohio**
12:13 13:23
**okay**
7:24 8:20
9:3 10:4
10:22 11:1
11:6,10
12:6,15
13:8 14:11
14:18 16:1
16:16,20
16:25
19:17,18
20:13,20
22:14,18
25:9,18
26:1,12,16
28:8,18
29:9 30:12
30:22
31:12,16
33:1,19,23

34:7,19,23
34:24
35:16,24
36:15 37:2
37:5 38:9
38:17 39:6
39:7 40:4
40:12,20
42:18 43:3
44:7,14
45:3,10,16
46:2,8,21
47:14,21
48:15,15
48:20 49:3
49:17
50:14 52:8
52:8 53:20
54:6,24
55:8,21,25
56:22 57:1
57:2,9,17
58:7,14,19
60:4,10,21
61:2,21
62:3,10,20
63:22 66:8
66:14,25
67:3,17,20
68:13
69:24 70:8
70:20 71:6
71:16,21
72:3,8,11
73:17,20
75:9,18
76:4 77:7
77:13
78:14,20
78:23
81:12,16
81:19,19
81:23
82:11
83:21 84:1
84:11 85:3
86:17,19
87:23
88:21 89:5
89:10,21

90:1,4
91:2 93:7
95:3,16,25
96:11,17
97:3,20
98:19,23
100:17
102:5
103:22,22
104:14,17
105:4,9,14
105:23
106:4,6,9
107:7
109:9,14
110:11,16
111:1,4,15
111:24
112:5,10
112:15,23
113:22
114:2,15
114:22
117:4,14
118:14
119:19
120:8,16
120:24
123:19,21
124:1,20
125:4,13
125:16,22
125:24
126:14,22
126:24
127:8,13
128:4,8,18
128:21,25
130:5
131:11
132:5
133:10
136:7,9,15
136:15
137:21,25
138:5,23
139:13,19
141:5,7,25
142:9,14
142:16,22

143:23
144:1,18
144:22,25
145:3,11
145:23
147:16
148:5,11
148:21,25
149:4,10
152:6,24
153:9
154:16
155:4,5,9
**old**
28:21 82:8
82:9
**older**
60:24
**oldest**
105:20
106:15
**once**
71:9 72:3
72:11
96:17
105:1
129:21
**ones**
23:12 25:7
29:4 45:11
136:1
140:7
**open**
28:5 101:8
107:12
110:25
**opened**
27:18
**operated**
74:10
137:23
**opinion**
138:17
**opposed**
76:15
102:1
143:1
**orchestr...**
64:21

**order**
22:15 94:16
94:21
112:3
127:2,9
**originally**
34:3,5
96:14
**outside**
9:13 14:7
**Overhills**
47:10,23
48:8 49:11
51:7 54:6
54:9,16
**oversaw**
86:3
**oversee**
46:24
**owned**
64:13 69:9
69:25 70:3
**owner**
108:21
136:16
139:8
142:3
152:25
153:5
**owners**
139:23
**ownership**
69:9,16
70:22 73:8
76:7 95:16
99:15
104:23
109:13,14
**Ozarks**
47:5,15,22
55:5

_____
**P**

**P**
5:1,1
**p.m**
4:16 155:23
**page**
35:19 36:6

38:20 39:8
39:24,25
42:13,14
55:13
56:10
71:23
72:16
109:17,17
119:9,12
123:15
124:6,6
157:3,8,11
157:14,17
157:20
**pages**
34:16 39:22
108:18
121:16
**paid**
45:14 56:14
58:15 63:1
74:19,20
83:16,16
100:12,16
120:18,18
120:19,20
126:21
138:4
143:3
148:9
149:8,15
**pandemic**
9:4
**papers**
9:20,21,23
61:16,18
**paperwork**
22:7,10,14
92:16
102:9
113:2
123:8
**paragraph**
69:7
**parents**
41:15 44:12
44:22
**part**
6:14 15:24
16:17

23:10 33:4
45:15
79:21 93:1
102:25
108:18
121:4
**particular**
107:1
**parties**
93:3,4,5,7
93:9,10
156:11,12
**partner**
106:4
**pass**
33:17 43:13
43:15
83:19
116:7
**passed**
12:4 26:24
27:1 29:7
33:15
43:14 44:3
47:21 49:2
49:25 51:2
51:5,14
54:4 60:14
60:24,25
64:25
73:25
74:15,25
75:1,12
78:11 79:2
79:5,8,11
87:25 89:3
93:21
95:17
97:24
98:25
100:11
116:13
120:6,9
133:16
144:10
149:16
151:10
**passes**
46:11
**passing**

89:6
**patient**
8:1 130:11
**pay**
101:11
148:13
149:12
**paycheck**
154:17
**paying**
30:19
148:12
**payments**
106:11
110:16
113:12
**payout**
25:8
**PC**
5:3
**penalty**
158:12
**people**
21:7 23:19
25:6 28:3
62:11
91:24
92:25 93:4
93:5
125:19
137:8
**people's**
23:17 93:9
**percent**
67:2
**percentage**
23:20
**perfectly**
137:11
**performed**
103:8
**performing**
17:24
**period**
11:24 13:13
46:15
48:23
97:16
99:22

107:13
135:21
147:11
151:14
Periodic...
55:19
perjury
158:12
person
34:21
129:15
personally
78:18 145:6
phone
112:21
113:3
129:14,16
143:5,6,19
physical
45:1 64:18
64:20 88:9
102:11
physically
16:3
pick
41:23
128:19
piece
54:22
place
6:20 83:22
151:9
Plaintiff
1:6 4:7 5:2
Plaintiffs
6:2
planning
60:18
pleasant
130:14
please
6:21 8:10
22:5 32:18
40:24
65:17
82:21,25
99:4,6
105:19
107:16

149:20
pleased
65:10
Plus
140:19
point
54:20 59:14
86:6 88:14
103:22
105:14
112:10
116:21
123:14
144:4
points
80:2
policies
20:2 25:1
55:9,14,16
55:19,20
55:22 56:2
56:11
60:23 65:6
69:4 74:19
120:13,17
127:1
151:9
policy
2:14,14,17
2:25 3:3,3
3:6,9,13
10:13 20:7
20:15 31:6
56:12,17
56:20 58:9
58:11,12
58:15 59:5
59:10,19
60:1,5,7
60:10 62:1
62:6,24
63:1,8,9
63:14,18
63:22,25
64:2,9,9
64:14
65:13,24
66:2,4
67:7 69:9
69:10,16

69:19,22
69:25 70:3
70:21 73:7
73:12,12
73:15,21
73:23 74:9
74:9,13,14
75:4,13,19
75:23
76:14,22
77:5,9
80:24 81:3
81:4,7,8
81:13,21
81:25 82:7
82:12 83:5
83:9 84:17
84:21,25
85:5,11
87:8 88:20
88:23 94:2
94:11,22
94:23 95:7
95:21 96:2
96:20,25
97:5,7,10
97:13,23
98:7,8,9
98:16,20
99:2,16,18
100:1,8,10
100:18,19
101:1
103:15,25
104:8,19
104:20
105:2,6,12
106:18
107:4,8,10
107:24,25
108:19
109:3
112:11,16
113:11
114:8,18
115:10,18
115:24
117:16,25
118:18,19
118:20,24

119:1,15
119:17,20
120:11,18
121:17,25
122:17
123:2,15
124:1,20
125:20
126:3,12
126:13,14
126:23
127:3,10
127:14
129:5,10
129:19
131:4,21
132:2,9,10
132:13,14
132:17,19
133:1,6,17
133:19
134:5
135:13,17
135:24
136:23
137:16,17
137:22,22
138:1,9,15
138:22
139:8,18
139:23
140:2,5,15
141:4
142:2,18
142:24
143:20
144:3
145:15,19
145:22,24
146:7,9
147:5,10
149:14
151:25
152:22,25
153:15
154:9
pool
50:7,8,8,22
54:18
poor

78:8
portion
65:20 99:7
107:17
133:24
149:12,21
position
25:18
127:22
128:3,7,9
128:20
positions
16:12 17:14
possessions
48:19 88:9
88:10
possible
38:19 82:10
possibly
11:13
100:25
practice
14:9
prefer
7:20
premium
56:14 58:15
60:6 64:10
124:12
premiums
63:2,11
83:16
120:18
126:16
148:9,12
149:5,9
prenuptial
56:14
Prep
14:21
preparation
28:25 29:5
prepared
124:10
present
5:10 85:4
presenta...
65:7
presented

100:4
preserve
150:6
president
21:11
Press
5:3
pretty
44:9 63:4
79:22
81:14
previous
40:13
previously
108:24
pride
52:4
principals
22:12
prior
11:20 12:6
12:12 13:1
37:7,23
38:2 40:12
57:4,12
74:8 83:5
83:8 92:18
103:14
107:22
113:4
114:3,15
117:2,16
118:3
131:21
132:7,12
138:5
145:12,17
145:23
146:5
147:19
149:16
153:11
154:3
private
14:20
privilege
45:18
127:23
128:13,16

130:4,9,19
131:7
155:12
privy
31:8 45:4
probably
11:3 50:21
60:9 85:23
131:24
133:14
134:1
148:9
probate
45:13 46:12
46:16
66:11,25
86:1,3
87:25
88:12
probated
54:11 87:21
101:19
103:4,9
problem
78:9
proceed
7:18
proceedings
6:10 156:8
proceeds
47:25
process
97:8
Proctor
21:7,8,23
produced
4:14 6:13
98:13
121:10
152:3
productive
80:3
products
18:3,12,22
24:5,8,10
24:22 25:6
25:16 59:1
145:7
professi...

4:17 6:5
130:14,16
130:24
138:16
156:2
program
23:8
progress...
116:18
prompted
13:23
pronouncing
7:1
pronunci...
29:20
proof
95:16,17
104:23
139:7
proofread
156:7
proper
14:16 22:6
29:20
134:4
properties
54:10
property
54:7,16
55:5 76:8
prove
94:17,23
95:1
provide
48:3 95:5,9
95:20 98:6
98:6
110:21
139:19
provided
30:23 31:9
73:22
96:17
105:1
122:15,17
122:21
136:21
138:24
139:13,25

140:1
147:21
psychology
15:14
PTX
155:17
Public
158:20
pull
52:24
purchase
19:22 59:9
purchased
19:19 22:16
55:22
56:13 82:7
purse
84:8
put
18:17 31:5
31:6 34:15
45:2 65:5
113:1
124:15
putting
23:12 34:22

Q
question
7:15,17
8:11 26:1
40:6 53:18
53:24 54:1
59:23
65:17 66:3
73:10
82:24
102:25
107:12,16
114:8
117:10,20
122:7,9
130:1,6,21
130:22,25
133:22
136:18
140:5
149:17,19
154:4
questioning

155:13
questions
6:18 7:9,25
11:11 78:8
122:11
128:15,22
135:22
147:17
155:3
quick
35:4 41:16
124:24
quite
144:7
quote
112:16

R
R
5:1
raise
130:8
ran
144:16
ranch
47:12,13
re-did
23:23
re-sent
108:24
reach
97:22
read
65:21 71:9
72:5 99:8
107:16,18
117:8
127:6
133:25
143:14,15
149:22
155:17,21
157:8,11
157:14,17
157:20
158:4
reading
157:6
real

17:20
18:17,17
37:14
90:15
126:25
**realize**
143:21
146:18
**really**
8:6 16:22
25:2,3,20
26:7 29:4
34:6 51:18
80:3 82:9
91:16
102:18
105:21
154:11
**reason**
88:17
100:14
117:14
120:8
135:5
145:16
148:23
152:13
157:10,13
157:16,19
157:22
**recall**
51:12 77:6
77:11 83:7
84:14
86:10,15
86:16,18
87:22
88:24 92:8
103:6
108:2
110:10,19
110:23
115:13,20
116:5
129:17
133:2
143:3,4
144:5
**Receipt**
3:3 118:19

118:25
**receive**
11:5 51:20
64:1 68:19
75:23
141:20
142:21
144:14
**received**
10:5 76:2
105:2
108:20
112:11
117:15
125:13
129:4,19
131:3,12
131:16,20
136:10
148:5
150:10
**receiving**
86:10
114:17,21
**reception**
77:21 80:7
**recessing**
155:13
**recipients**
87:6
**recognize**
68:16 71:3
111:18
119:11
**recognized**
89:8
**recollect**
76:5
**recollec...**
7:17 111:8
134:10
**recommended**
30:20 66:15
**record**
6:22 35:12
39:3 65:25
67:9 80:16
125:3,4
128:3,20

129:1,2
141:11
155:10
**records**
46:13
138:25
139:1
140:19
143:18
**redacted**
52:21
**refer**
43:19
**reference**
39:17 40:1
55:3 56:19
70:21 92:1
92:3 96:6
**referenced**
31:12 65:14
66:5
132:19
**references**
36:6 72:17
**referencing**
96:8
**referred**
97:19
**referring**
31:23 43:21
**reflect**
54:3
**reflects**
63:17 64:12
152:25
153:9
**refused**
128:15
**regarding**
7:10 59:19
59:25 67:7
76:21 77:4
84:16,20
84:24
85:10
88:22
95:20 97:9
97:23 99:2
99:18

100:1
104:8
105:6,12
114:18
115:18
120:11
127:14
132:9,18
138:15
140:1
142:24
144:3
154:20
**Registered**
4:17 6:4
156:2
**relate**
117:25
130:12
**related**
42:5 61:25
156:10
**relation...**
110:24
128:13
151:12
**relative**
18:2 20:1
22:15
74:14
76:14 89:7
89:10
101:16
102:2,17
102:20,23
109:10
110:18
111:5
122:23
140:15
143:20
152:21
155:12
156:11
**relatives**
41:18,20
**relay**
84:12
**released**
152:23

**relevant**
41:11
**remain**
46:22
**remaining**
101:2
**remarried**
37:8 91:23
**remember**
19:7 37:13
38:4,4
43:5 45:17
47:16,16
47:17 49:9
51:9 78:13
84:2 85:24
90:25 97:1
98:22
103:13
104:2
108:7
115:4
117:13
134:17
137:11,13
144:8
**remind**
116:24
**remote**
80:8
**render**
158:7
**rep**
3:17 58:21
150:19
**repeat**
7:15 65:17
65:19 66:3
99:4,6
133:22
149:19
**rephrase**
7:16 107:20
107:21
**replacement**
108:19
**report**
136:9
**reported**

106:16,17
156:7
**reporter**
4:18,18,19
6:5,5,6,15
8:4 16:8
27:23
29:23
35:22,24
65:18,21
81:1 99:5
99:8
107:15,18
111:11,13
133:23,25
146:22,24
149:20,22
156:1,2,2
156:3
**reports**
10:10 77:9
100:1
104:19
105:2
108:4
135:22
**represent**
7:7 121:16
134:5
135:1,20
**represen...**
134:3
**represen...**
121:7
150:15
**represented**
105:25
**request**
70:1 75:7
75:18
76:20
103:15,24
108:10
111:5
115:8
135:25
142:1,2,23
143:18,23
153:4
**requested**

65:20 75:4
75:13,15
75:20 76:9
99:7
107:17
112:3
126:20
133:24
149:21
152:21
**requesting**
95:12
142:17
148:8
**reserved**
6:8
**residence**
50:13
**residency**
47:5
**Resonate**
24:16,22
25:11,19
26:2
**respect**
128:18
134:19
**responded**
95:15
**responding**
6:14
**response**
91:15 98:13
148:7
**responsi...**
102:2,15
**responsi...**
102:1
**responsible**
133:5
**restated**
2:7 35:20
36:1 39:23
**Restatement**
39:16 42:10
**Resume**
35:8
**retained**
3:21

**retired**
151:8
**retirees**
21:23
**retirement**
21:24,24
22:18
**retiring**
21:7
**return**
80:15
**returned**
113:18
**review**
28:25
147:24
**reviewed**
29:9,10
107:7,23
**Revocable**
1:4 2:8,19
3:18 4:5
35:20 36:2
36:9,16
37:23
39:17
42:11
44:16 46:5
69:12 70:2
70:23
72:13,18
76:9 82:4
96:19
100:21
101:2,17
101:23
102:2,17
102:21
103:3
108:22
109:19
110:18
111:6
122:24
142:4
150:16,21
153:1,5
**right**
6:19,25
8:16,20,22

9:15,18
10:6,6,16
11:1,4,10
11:10,20
12:11
13:18 14:7
14:8 15:7
19:8 20:11
20:20
22:17
24:10
25:21 27:2
27:4,15
29:19
30:14
31:18
32:18
35:11
36:18
37:15,18
37:20,21
37:24
39:15,20
40:23 41:9
42:8,19
43:7,23
44:19
48:23
51:25 53:9
53:25 54:7
56:1,15
58:10 63:8
64:4 65:13
66:16
67:17
70:12
71:23
72:16,18
72:19,21
72:25 75:3
75:19,22
76:18
77:18 79:5
79:23
82:20 83:2
84:15 85:9
85:16,19
86:8,20,21
87:18
89:17,23

89:24 91:5
96:22
97:10
99:14
102:19
104:1,3,24
104:25
105:2,12
106:7,25
112:18
113:8
119:21,22
119:25
120:19
121:21
122:12,13
122:18,24
123:3,10
123:10,18
124:23
125:15,25
126:4,5
127:2
132:22
135:9
136:15,24
138:24,25
144:12
145:17
146:11,23
147:22
149:1
150:12
151:20,22
153:2,7,8
153:11
154:12,18
154:25
**right-hand**
38:16
124:10
**Road**
48:13,21,24
49:10,12
49:18 50:2
50:4,23
51:7
103:17
113:25
114:9

Robert
151:3,3
role
46:4
roles
17:23
rolling
29:6
room
9:10,13,15
62:12,21
84:3
row
60:18
RPR
1:19 156:18
rule
82:22,23
83:3 121:4
rules
82:18,19
ruling
128:8
155:11
RWS
1:8 4:8
Ryan
2:3 3:21
5:6 6:18
7:3,7
16:11 28:2
28:5 30:1
35:7,11,13
35:22 36:4
38:22,25
39:4 52:17
52:21 53:1
53:5,9
65:18,22
68:2,8,10
71:12,16
71:19,22
73:13,14
79:15,18
80:1,5,11
80:14,17
80:24 81:1
81:6 82:17
82:20 83:2

83:4 99:5
99:14
107:15,20
109:5,22
111:11,15
111:24
116:2
117:23
119:4
120:4
121:1,8,13
122:4,7,10
122:14
124:17,23
125:2,4
127:18
128:17
129:1
130:5,20
130:25
131:8,11
131:12
133:22
134:7
135:9,17
139:5
141:5,8,12
141:20
146:21,23
146:25
147:9
148:21,25
149:19,25
150:24
152:5,7,10
152:12
154:25
155:7,9,11
155:19

**S**

S
2:5 5:1,3
S-P-R-I-C-H
6:24
safety
16:19 44:23
sales
17:25 58:21
salon

27:19
satisfac...
56:13
saw
11:6 23:16
51:17
82:11 89:7
89:16 90:4
91:7 93:6
109:8
118:5
150:3
saying
108:9
130:20
150:3
says
6:16 54:11
56:15
64:13
69:24 71:6
72:3,6
82:9
112:15
117:6
123:15
154:24
school
13:19,24
14:1,11,12
14:13,14
14:15,18
14:21,21
15:7,9
schooling
15:18
screen
34:13,15,23
35:14
123:16
134:20
147:2
151:25
152:9
scroll
34:16 36:4
38:9 39:5
39:9,15
42:9,12
81:17

135:19
scrolling
35:1 53:12
117:23
second
34:4 35:2
40:5 51:18
57:3 72:12
80:7 94:18
119:4
144:6
151:24
secretary
65:8
securities
18:8 21:22
24:6 25:13
security
44:24 52:19
see
11:2 35:13
36:10
38:19,20
39:1,10,18
42:10,16
49:21
51:25 52:2
52:10 53:2
53:17
55:10 56:1
56:8 61:23
62:4 63:12
65:14 66:5
67:17,19
67:21 68:5
68:7,10
69:13 79:2
79:6 80:18
81:10,11
83:5 91:25
92:20
98:15,19
100:9,13
104:3
109:25
110:2,3,4
110:5
114:16
117:5,6
121:20

123:16
124:9,13
125:20
134:22
145:14,16
147:1,14
148:19,22
151:2
153:3
155:1,15
seeing
117:13
123:19
seek
87:10
seen
53:8 92:25
98:12
115:5,8,19
118:2
121:3,4
131:14
147:18
150:24
sell
18:13,21
24:6,22
45:1 46:19
selling
18:4 102:9
sells
23:13
send
10:20 68:22
113:2
126:21
140:18
152:16,17
sending
16:17 96:10
113:4
140:6
Senior
151:9
sense
46:8 128:24
sent
9:25 10:19
11:3 65:8

67:16
76:10 77:5
77:10
95:14,22
96:10,15
96:16,19
96:23,23
98:3 99:11
103:17,21
104:13
108:5
112:2
114:23
115:2
120:11
123:1,1,7
123:23
124:3
125:8
135:6,23
135:24
136:1,5,23
**separately**
85:6,7
**September**
11:19
**series**
3:5,8,13
121:17,24
135:12
147:4
**serious**
70:9
**service**
3:17 126:17
142:1
150:15,19
**services**
30:23 31:10
64:23 65:2
66:9 103:7
110:17,21
111:5
**session**
7:12
**set**
30:11 34:3
34:5,8
37:4 38:6
92:12,13

136:19
**setting**
22:8 59:15
**settled**
106:9,11
152:17
**settling**
66:22
**seven**
33:24 36:22
36:23 48:1
48:4 73:2
87:14,18
88:1,13
92:3
111:10,14
**Seventy-one**
28:22
**several-...**
35:18
**share**
80:17
108:12
134:20
**shared**
147:2
**sharing**
100:23
110:1
**Sharps**
11:22
**sheet**
2:16,23
108:16
109:1
115:16,22
157:2
**shorthand**
4:18 6:4,6
156:3
**shortly**
60:14 90:25
**shot**
37:12
**shoulder**
62:12
**show**
34:14 35:16
52:9,12

139:22
**showed**
39:8 98:3
136:2
153:21
**showing**
53:9 68:13
81:6
108:14
109:22
111:9,15
115:14
118:16
121:13
125:5
135:9,10
136:3
141:12
146:25
150:12
**shown**
35:14 121:3
131:23
**shrink**
52:9
**shut**
28:8 126:16
**siblings**
40:2 46:17
77:18 86:8
87:5 103:5
103:10
106:17
107:2
**sic**
22:24
130:16
**sick**
28:10
**side**
25:13,14
41:13
**sight**
44:4
**sign**
61:16,18
155:18,21
**signature**
6:7 39:11

39:11,14
42:12,17
42:22
61:22
70:25 71:4
71:10,11
71:15,15
119:11
158:23
**signatures**
71:22
**signed**
67:15,15
71:6,25
72:3,8,20
73:5 98:3
99:11
143:11,14
143:24,25
144:1
**signing**
72:11
**similar**
131:16
135:18
147:9,17
**Similarly**
1:5 4:6
7:14
**simultan...**
120:2
124:11
130:17
139:4
148:18
**single**
56:14 58:15
60:6 64:10
**sister**
26:5 27:18
28:9,11
33:1 42:3
42:6
**sisters**
32:16,16,19
**sit**
63:3 83:17
100:13
133:13
135:4

146:11
**SITUATED**
1:5 4:6
**situation**
128:10,12
**six**
28:7 86:8
111:13
**size**
141:4
**slammed**
21:12
**sleep**
43:14
**slower**
81:17
**small**
55:20 79:23
101:4,9
110:2
**smaller**
55:18
**smart**
149:7
**snippy**
130:13
**social**
52:19 61:14
**sold**
19:5 20:25
31:4 47:2
47:23 51:7
51:8 54:22
58:25 69:3
102:12
151:4
154:14
**sole**
36:15
**somebody**
18:18 23:9
30:11 52:2
66:15,21
141:3
149:12
**son**
36:25 37:1
41:20
60:24

151:8
**soon**
155:15
**sorry**
8:24 11:9,9
15:3 19:11
24:3 28:16
29:13,18
53:19,23
67:20 68:8
78:5,6,6
81:16
102:24
117:7
120:3,4
121:20
126:13
139:5
**sort**
18:12 19:25
24:22
47:11
54:18
61:14
115:8
128:25
138:7
**sound**
27:4 37:19
**sounds**
37:21
141:10
**source**
152:2
**speaking**
8:13 62:11
82:17,20
120:2
124:11
130:17
139:4
148:18
**specializes**
66:20
**speculation**
117:20
**spell**
6:22 9:1
142:12

**spelled**
29:14 41:3
90:20
142:8
**split**
63:4
**spoke**
98:18
**Sprich**
1:4,15 2:2
3:12 4:4
4:13 6:3
6:12,23,24
7:19 12:20
12:24 13:2
13:16,20
141:17
156:5
157:2,6,24
158:2,24
**St**
7:8 13:4,8
13:10,14
13:20 14:7
15:6,22,24
15:25 16:2
16:4,6,12
16:21 17:2
30:3 33:22
41:8 48:21
48:25
49:18 50:5
61:11
87:21
90:10
93:18
103:17
113:25
114:9
118:21
119:20
120:12
134:24
135:6
143:1
153:10
154:10
**standpoint**
143:18
**start**

53:23 60:18
81:17
146:4
153:20
**started**
8:21 16:13
17:16 19:7
24:24 25:1
60:13
66:12
116:16
**starting**
19:9,12
121:19,20
121:22
**state**
4:19 6:21
82:16
156:3
**Stated**
108:17
**statement**
96:6 131:16
131:24
134:23
**statements**
10:1,9,11
10:21
76:21 77:4
77:8 96:2
96:8,9,20
96:25
100:1
110:11
112:12
113:17
120:11
122:18
123:2,5,7
127:3,9,14
129:5,11
129:19
131:4,13
131:14,20
134:21
135:2,5,24
136:4
147:19
148:5
150:3,10

**states**
1:1 4:1
45:24 69:7
142:6
**stating**
42:24 128:3
**stay**
45:25
**staying**
50:11
**steps**
107:3
151:13
**STIPULATED**
6:1
**stock**
23:10,11
64:20
**stocks**
18:14,15
24:6,7,23
24:25 31:5
44:22
64:18
**stolen**
65:9
**stone**
34:10
**stop**
100:23
117:9
**story**
41:16 42:1
113:1
**street**
5:7 47:9,15
**strike**
20:5 43:25
87:4
146:20
154:5
**strip**
55:1
**stroke**
28:14 32:23
**stuck**
123:19
**stuff**
45:14 52:4

61:20
64:20 65:6
70:10
125:21
**stumble**
52:2
**subject**
73:7,24
129:9
155:11
**subpoena**
98:13
**subscribe**
158:10
**subscribing**
157:6
**subsequent**
67:5
**substance**
128:23
158:6
**sue**
105:15
**suggest**
110:20
**suggesting**
37:17
**suit**
106:7
**Suite**
5:3,7
**summaries**
3:6,9,13
121:17,25
124:2
126:3
135:13,18
135:23
136:23
140:6
147:5,10
**summary**
123:16
135:18
**super**
45:25,25
**supervising**
16:14
**supervisor**

16:23
**support**
134:10
**supposed**
105:21
 134:2
 142:9
**supposedly**
44:12
**sure**
22:10,11,14
 41:11
 45:14,19
 46:7 53:8
 56:24 66:4
 67:2,20
 73:11,13
 85:1
 100:23
 102:15
 103:1
 105:9
 119:4
 121:10,20
 122:8
 124:7,7
 132:4
 134:17
 146:3,3
 149:23
 151:6
 153:15
 155:8
**surprise**
41:24 91:22
**surprised**
91:10,18,20
**surrender**
145:25
 146:8,12
**Susan**
28:12,13
 32:20 34:2
 42:7 49:21
**swear**
40:19 61:1
**switch**
30:10 104:4
**sworn**

4:14 6:13
 156:6
**system**
23:8 80:22
 114:25

————————
        **T**
————————
**T**
2:1,5
**table**
39:21
**take**
7:13 35:3,7
 48:18
 79:24 80:9
 80:10
 83:21 84:6
 96:22,24
 122:5,11
 124:23
 128:4
 141:5,6
 149:6
 151:13
 155:2,19
**taken**
1:16 6:4
 35:12 39:3
 80:16
 100:6
 107:3
 125:3
 141:11
 146:16
 148:7
 155:10
 156:8,11
**takes**
20:11,11
**talk**
8:6 10:20
 18:25 19:9
 58:2 59:16
 95:2,6
 121:8
 126:5
 138:21,21
 139:9
**talked**
41:19 60:16

93:6 97:18
 102:8
 125:19
 127:11
 129:21
**talking**
25:23 34:13
 38:4 44:13
 71:14,17
 77:7 84:4
 87:8 88:9
 96:7
 127:20
**tapped**
62:12
**tasks**
102:1
**taxes**
45:14 63:2
 74:20
 83:16
**technolo...**
39:1
**technology**
6:19 34:13
**tell**
19:12 35:3
 41:16
 44:21
 45:23
 62:23
 70:11
 79:20 91:5
 98:1
 106:23
 111:24
 117:9
 124:6
 143:15
 154:12
**tellers**
16:19
**telling**
138:20
 139:7
**ten**
155:2
**tend**
8:9 21:18

**Tennessee**
11:22,23,25
 12:5,6
 26:16,18
 26:20 27:6
 27:10,11
 27:12
**term**
63:14
**terminate**
64:23 65:2
**terminated**
66:8 128:14
**termination**
146:16
**terms**
46:7 97:7
 97:21
 107:8
 137:22
**testified**
82:15 85:14
 122:14,20
**testimony**
65:20 99:7
 107:17
 133:24
 149:21
**thank**
7:3 15:10
 38:24 68:9
 121:12
 124:21
 126:13
 127:17
 141:8
 146:23
 155:14
**Thanks**
80:25
**thereon**
158:9
**thereto**
157:6
**thing**
9:7 19:16
 23:11
 44:25
 110:24

126:16
 128:25
 133:9
 141:2
**things**
45:23 46:19
 65:11
 70:11
 71:18
 112:2
 114:12
**think**
8:8 10:2,18
 12:1 14:16
 14:16
 17:12
 20:25 21:1
 21:5 22:24
 24:21
 25:25 28:9
 38:5,8
 40:18 43:5
 43:16,18
 45:9 46:25
 47:18 48:8
 49:4 50:11
 51:2,22
 52:8 53:16
 53:16 54:5
 57:23
 58:24
 59:22
 60:13,25
 60:25
 66:12,13
 66:15 67:2
 72:10
 73:16 74:3
 74:7 75:10
 75:20,25
 76:17
 78:13
 79:15 83:7
 85:13 86:2
 86:15 88:2
 91:4 95:12
 95:22
 98:10,21
 101:20
 102:19

| | | | | |
|---|---|---|---|---|
| 103:1,7 | 11:24 13:4 | 143:17 | 106:20 | 47:19 |
| 104:15 | 13:13,15 | 144:1 | 107:5,6 | **tried** |
| 106:2 | 26:23 | 147:11 | 112:20,22 | 93:22 126:2 |
| 108:14 | 31:20 | 150:8 | 112:24 | **triggered** |
| 109:7,7,16 | 33:23 35:9 | 155:14 | 113:1,3,5 | 114:24 |
| 120:15 | 35:9 38:21 | 156:8 | 113:16,18 | **trouble** |
| 121:3 | 45:5 46:15 | **times** | 133:11,12 | 24:1 |
| 122:14,20 | 48:24 49:1 | 50:2,20 | 154:23 | **true** |
| 127:21 | 49:1,24 | 94:5 | **Tom** | 53:13,20 |
| 128:20 | 50:24 | 104:10,12 | 66:12,24 | 156:8 |
| 133:2,14 | 51:14 | 127:11 | 106:3 | 158:7,13 |
| 134:3 | 53:15 54:4 | 129:17 | **Tony** | **trust** |
| 136:6 | 54:21 | **tired** | 41:18 | 1:4 2:8,19 |
| 137:16 | 57:18 61:8 | 139:16 | **Tooth** | 3:18 4:5 |
| 141:24 | 61:9,18 | **title** | 147:25 | 22:10 |
| 142:13 | 62:5 63:18 | 16:20,22,24 | **top** | 31:16 32:7 |
| 144:16 | 66:24 67:5 | 25:20 | 39:25 56:12 | 32:8,13,15 |
| 146:15 | 70:13 | 70:18 | 81:17 | 34:3,4,8 |
| 151:8,10 | 71:19 | **titled** | 110:7 | 35:21 36:2 |
| 155:3 | 72:12 73:5 | 3:3 35:19 | **total** | 36:9,12,16 |
| **third** | 73:17,22 | 53:11 | 33:23 51:13 | 36:20 37:1 |
| 33:19 | 74:12 | 56:16 | 51:13,15 | 37:3,22,23 |
| **thoroughly** | 80:15 82:7 | 115:15 | 51:17 55:9 | 39:9,17,23 |
| 134:6 | 82:11 83:4 | 118:18,24 | **totally** | 42:11 |
| **thought** | 83:8 84:4 | **today** | 51:19 | 44:16,19 |
| 24:1 44:9 | 84:5,14,19 | 7:1,11 | **training** | 46:5,23 |
| 98:10 | 86:6,14 | 11:14 | 20:1 | 56:19 57:2 |
| 105:21 | 87:23 | 19:16 20:7 | **transact...** | 69:12 70:2 |
| 122:9 | 88:14 90:9 | 32:3,7 | 22:11 | 70:23 72:9 |
| 126:18 | 97:3,16 | 40:2 96:4 | **transcribed** | 72:13,18 |
| 128:19 | 98:23,24 | 105:6 | 6:7 | 76:9 81:23 |
| **thousand** | 99:9,18,22 | 118:3 | **transcript** | 81:24 82:4 |
| 20:17 | 103:23 | 128:2 | 52:22 | 94:25 |
| **threatened** | 105:14 | 135:4 | 155:22 | 95:11 |
| 105:15 | 107:22 | 146:11 | 156:7,8 | 96:18,19 |
| **threatening** | 112:10,13 | **today's** | **transcri...** | 96:23 |
| 128:6 | 114:15 | 28:25 34:17 | 156:7 | 99:16 |
| **three** | 116:3,12 | **told** | **transfer** | 100:21 |
| 33:9 37:13 | 116:21 | 58:16 60:22 | 69:8,15 | 101:2,8,17 |
| 43:16 49:8 | 118:5 | 62:14,25 | 70:1,22 | 101:23 |
| 49:9 50:2 | 120:19 | 64:17 | 73:7 | 102:3,17 |
| 50:21 | 123:7 | 74:18 | 114:23 | 102:21,23 |
| 56:11 | 126:2 | 83:14 85:1 | **transfer...** | 103:3,8 |
| 87:24 | 130:12 | 85:6,7 | 76:7 99:15 | 104:23 |
| **tied** | 132:20 | 90:12,12 | **translated** | 106:1 |
| 23:8 | 135:21,23 | 90:15,17 | 156:7 | 108:22 |
| **till** | 136:20 | 90:22 94:1 | **treasury** | 109:15,19 |
| 12:14 49:1 | 138:5 | 97:17 | 18:15 | 110:9,18 |
| **time** | 140:4,11 | 100:12 | **tree** | 110:22 |
| 7:13 8:13 | 142:23 | 105:10 | | 111:6 |

122:16,23
122:24
124:5
126:11
133:7,19
136:22
138:24
139:14,20
142:4
150:16,21
153:2,5
**trustee**
36:8 46:5
111:18
**trustees**
1:4 4:4
31:21
32:10
36:15,19
37:2,3,7
38:2 44:16
67:10
70:19
113:14
114:24
140:18
**trusts**
126:8
**truthful**
11:13
**try**
8:1,10
19:14
34:25
46:19
80:22
87:12
137:5
141:3
155:2
**trying**
25:5 30:8
35:2 46:8
52:1 65:5
79:18 80:2
80:2 97:9
119:4
123:23
128:5,19
137:21

**turn**
55:13 56:10
119:9
**twice**
129:21
**twin**
44:6
**two**
8:12 12:14
27:3 32:6
32:10,12
32:16,16
32:16,17
32:19 33:6
36:24
37:18
40:10
41:21
42:10 43:3
46:14 47:2
50:21 54:9
55:25 61:6
71:7,22,25
**type**
17:5 18:21
66:19
137:22
150:9
**typewriting**
6:7
**Typically**
9:9

___ U ___

**U**
15:11,16,18
15:20
**Uh-huh**
9:6 14:22
27:8 34:20
41:10
42:15
**ultimately**
139:19
**underneath**
72:4
**understand**
7:15 38:11
48:20

65:16
70:10
105:20
125:14,17
126:2
127:2,9,12
128:7,17
133:9
137:5,22
142:22
143:17
146:14
148:2,3,4
**understa...**
30:22 34:7
37:17
43:20 46:3
46:4 58:25
66:19
74:13 75:3
75:11,22
76:19
81:20 82:6
101:24
103:14
108:3
109:9
114:7
121:9
142:16
144:25
146:6
149:14
152:20
**Understood**
130:20
**undertake**
138:7
**UNITED**
1:1 4:1
**units**
55:2,7
**University**
13:25 14:25
15:8 44:5
**upfront**
148:13
**upper**
124:10
**use**

91:18
**usually**
121:6

___ V ___

**vacant**
49:14 54:16
**vacations**
79:3
**value**
51:13,15
63:20
120:20
138:8
145:25
146:8,17
**Vance**
2:12,16,24
58:18,20
58:25
60:11,20
61:3 62:6
62:13,21
62:23 67:4
67:6,13,16
67:25 68:3
68:16,23
68:25
69:20
74:17,18
75:16,21
83:14 84:4
84:12,16
84:20,24
85:4,10
94:1 99:11
100:5
103:11
108:17
109:1
115:16,22
132:15,18
134:3,7,15
144:18,19
145:1,7
151:2,11
152:21
154:12,19
**Vance's**
69:1 151:5

**various**
34:16 46:16
59:1 69:4
121:19
**vehicles**
45:2
**verbal**
84:20 104:6
104:11,12
132:1,8
**verbatim**
8:5
**version**
155:20
**video**
7:5 101:22
**VIDEOCON...**
1:15 4:13
**videotaped**
7:5
**view**
138:16
**viewing**
62:9,11,16
62:18 67:4
**visit**
49:17,24
78:2,12
**visitation**
61:9 83:23
85:22,24
**vs**
1:8 4:8
157:4

___ W ___

**W**
6:23,24
56:14
**wait**
8:1,1,11
53:17
57:16 63:3
74:15,22
83:17,18
100:6,13
133:13
141:22
**wake**

62:16
**walk**
46:9
**Walters**
29:7 37:8
37:24 38:3
40:11,12
48:8 50:6
57:7,9,14
57:18,21
73:25
74:15 75:1
77:14 78:3
78:11,12
78:15 79:6
79:9 81:20
82:8 85:15
85:21 89:2
89:6,19,20
90:2,5
92:7,11,19
92:21
93:11,21
97:24
98:25
99:19
114:16
119:24
122:21,23
136:16
145:13,18
145:24
146:5
149:15
151:14
**Walters'**
77:23 79:12
113:21
**want**
7:13 19:1,2
23:24 35:4
51:18
59:15 65:7
65:12
67:20
79:24 80:9
80:9,17
105:9
108:12
113:10

122:10
125:22
128:6
130:10
133:15
137:2
**wanted**
19:1 30:10
36:25
41:17
54:22 55:1
65:7 95:16
104:20,23
110:25
139:17
149:5
**Wash**
15:11,16,18
15:20
**Washington**
15:7 44:5
**wasn't**
37:14 46:9
58:5 62:4
65:4,4
78:18 84:9
89:22
111:2
130:21
152:8
**Watkins**
14:12,17
**way**
7:6 8:12,14
8:17 16:14
21:14
23:18
25:23
34:22 37:4
38:10
39:10 40:7
60:11
64:22
65:11
77:12 79:9
92:6 100:4
116:3
119:18
153:14
**we'll**

35:22 37:15
42:16
56:24 66:2
80:15 81:1
90:1 96:8
128:4
141:8
155:15
**we're**
9:10 12:10
32:7 34:13
34:18,21
42:5 58:9
106:22,24
108:11
127:19
**we've**
6:19,25 7:4
9:9 39:16
54:6 55:8
72:24
129:2
137:1
140:7
**wealthy**
93:11
**wedding**
49:23 77:13
77:19,24
78:1
**week**
117:2
**weeks**
97:1
**welcome**
146:24
**went**
14:20,25
15:7 18:18
21:5,21
22:23 25:5
26:9 41:22
44:5,12
49:21
62:14
66:23 80:6
83:13
85:25 98:2
106:6
125:18

131:23
**weren't**
22:11 23:8
25:4 30:13
60:8 78:24
78:25
100:15
138:18
**whatsoever**
132:8
**wheeling**
51:10
**Wiegand**
1:3,4 2:8
2:10,14,19
2:25 3:3
3:12,18
4:4,5 5:10
6:25 7:2
32:1,8
33:9,22
35:20 36:2
36:7,8,9
36:16
37:23
39:17 40:4
41:2 42:11
44:16 46:5
52:15,18
53:12 55:2
56:13
57:22 58:1
58:3 68:4
69:10,11
69:11,12
69:25 70:1
70:4,12,17
70:23 72:4
72:12,13
76:8,8
81:3,8
82:4,8
83:10
85:15
87:18 88:4
88:13 89:2
89:6,19,22
89:24
91:11,21
96:19 97:4

99:16
100:21
101:2,17
101:21
102:21
103:3
108:20,22
109:19
110:18
111:6
115:18,24
118:19
119:1,8
122:24
134:23
138:6
141:18
142:3
150:16,21
153:1,5
157:4
**Wiegand's**
63:9 64:10
64:13
85:21
115:12
**wife**
40:5 47:6
57:3 82:7
89:11,16
**wife's**
89:14
**William**
6:24 12:20
12:23
13:16
**Williams**
3:17 150:15
150:19
**Wisteria**
47:18,19
**withdraw**
53:25
**witness**
2:2 6:8,9
16:10
27:25 28:3
35:10
72:21 99:9
117:22

| | | | | |
|---|---|---|---|---|
| 119:3 | 15:22 16:7 | 21:16,18 | 141:23 | 3:17 4:10 |
| 120:3 | 16:14 | 21:20,24 | 147:15 | 7:7 10:5,7 |
| 124:12 | 17:17,23 | 22:21 24:4 | 151:17 | 11:5 23:10 |
| 127:17,24 | 21:9 24:16 | 24:7 26:25 | 152:5,11 | 55:16,19 |
| 134:1 | 25:12,15 | 27:3,5 | 153:4 | 55:20,23 |
| 148:19,22 | 26:2 27:17 | 28:3,17 | **year** | 56:5,7 |
| 149:23 | 28:18 | 29:14,17 | 11:8 12:9,9 | 58:18,21 |
| 155:6,21 | 132:3 | 31:2,17,25 | 14:25 15:8 | 60:22 |
| 156:6,9 | 138:1 | 33:20 | 21:9 22:19 | 63:23 |
| 157:2 | **working** | 35:10 | 24:21 | 65:25 |
| **wives** | 23:16 60:13 | 37:15,21 | 25:12,23 | 67:10,16 |
| 40:8 | **worse** | 38:13,22 | 26:10,14 | 75:7,13,16 |
| **woman** | 116:18,18 | 42:2 46:18 | 28:6,15 | 75:21 76:9 |
| 90:15 | **wouldn't** | 46:20 47:7 | 33:18 47:2 | 76:10,20 |
| **wood** | 59:16 65:24 | 48:22 49:9 | 74:3,5 | 93:23,25 |
| 135:6 | 94:6 | 49:9,15 | 82:12 83:6 | 94:4,21 |
| **Woods** | 149:11 | 51:6,16 | 86:17 | 95:9 96:1 |
| 48:13,17,21 | 150:11 | 52:4 54:13 | 107:22 | 96:19 |
| 48:24 | **wrap** | 54:13,25 | 112:14 | 99:12,24 |
| 49:10,18 | 155:1 | 56:9 58:24 | 121:19,20 | 103:13,16 |
| 50:2,4,23 | **write** | 62:18,18 | 121:22,23 | 104:7,18 |
| 61:8,11 | 34:10 112:5 | 71:19,24 | 133:1 | 105:5,11 |
| 93:18 | 139:18 | 76:17,24 | **years** | 108:4,19 |
| 103:17 | **writing** | 78:6,17 | 12:1,25 | 108:24 |
| 114:9 | 112:7 | 80:11 | 16:10 | 109:2 |
| 118:21 | **written** | 81:18 | 17:12 | 111:17,21 |
| 119:20 | 67:14 84:19 | 82:20 | 18:20 | 112:11 |
| 120:12 | 104:6,11 | 88:11 | 20:21 27:7 | 113:9 |
| 134:24 | 132:1,8 | 91:14 | 28:7 37:13 | 114:3,7,17 |
| 153:10 | **wrong** | 92:23 | 43:12,16 | 114:22 |
| 154:10 | 29:14 51:19 | 96:14 97:8 | 44:4 46:13 | 115:2,9 |
| **word** | 113:13 | 97:11 | 46:14 49:8 | 118:8,18 |
| 124:21 | 140:14 | 103:19 | 51:3 55:17 | 118:23 |
| 143:16,16 | 142:8 | 104:20 | 57:12,16 | 121:18 |
| **work** | **wrote** | 106:5,5,13 | 82:8 87:24 | 122:1,15 |
| 15:21 16:5 | 110:15 | 110:2 | 92:20 | 122:21 |
| 17:10,21 | | 116:11 | 96:10 | 123:1 |
| 19:17 21:1 | **X** | 117:6,22 | 99:24 | 124:3 |
| 21:2,21 | **X** | 118:15 | 116:16 | 125:9 |
| 22:22 | 2:1,1,5,5 | 121:8,22 | 120:10 | 129:5,20 |
| 24:12,15 | 3:1 | 122:7 | 131:20 | 129:24 |
| 24:20 | | 123:16,17 | 136:2 | 130:3 |
| 25:13 26:3 | **Y** | 123:17,22 | 151:7,7,7 | 131:3,4,13 |
| 26:6,10,18 | **yeah** | 124:7 | **yep** | 134:4 |
| 27:9,11,12 | 7:23 10:11 | 129:11 | 24:14 39:20 | 135:14,23 |
| 66:16 | 14:6,8,8 | 132:21 | 143:13 | 136:22 |
| 101:10 | 14:15 | 136:2,12 | 155:6 | 138:15,16 |
| **work-wise** | 15:10 | 137:7,10 | **York** | 139:6 |
| 45:20 | 17:23 | 138:2 | 1:9 2:17,21 | 140:6,14 |
| **worked** | 18:14 | 140:13 | 3:2,6,9,14 | 142:1,23 |

```
143:18,21        10-minute       149             2               122:2,4
144:2,23         141:6           39:6            2:9 39:22        124:9
144:24           10:00           15              39:25            134:21
145:1,3          4:16 6:10       36:6 69:12      52:13,14         136:2,14
147:5            108              70:2,24        53:10 60:5       144:9
150:15,20        2:15             142:4          63:9 65:15      2004
151:4,10         109              150:17         66:6             46:14,22
153:14           2:18             153:2          2/17/2004        86:17
154:8,13         11               155:2          2:16 108:25      88:21
154:21           3:8 135:11      150             2/18/1952        107:10
157:4             135:12          3:16           11:16            108:1,16
                  140:8          151             2:40             110:17,22
      Z          11:00            5:7 39:10       141:9,10        111:6
zero              35:8           16              20               124:9
138:3            111              49:6 52:19      17:13 18:20     133:1
146:18            2:21            116:25          20:21           141:15
Zoom             115             160              118:10          142:17
4:16 7:4,5        2:23            39:25           147:12          150:14
9:5 101:22       118             165              158:16          153:6,13
156:4             3:2             142:6,25       2000             154:7
                 12              17               12:10 25:25    2007
      0           3:11 141:13     108:16          25:25 74:6      11:19 12:2
0010              141:15,16      188              81:9            26:22 27:7
119:9            12/14/98         1:8 4:8         119:10          27:15,17
02                64:13          19              2001            2008
27:4             12/7/01          17:12 18:20     3:9 12:10       28:9
084-004789        64:11           20:21 28:9      25:25          2009
1:20             12:40           190              39:13           3:7,14
                  80:13,14        42:14           42:17           121:23
      1          12:45           192              44:15,20        122:2,4
1                 80:14           39:6            135:15,21       134:21
2:6 35:17        121             1973             136:3,13       136:2
 35:23,25         3:5             15:12          2002             147:6,13
 39:5 81:9       13              1977             3:10 12:2      2010
1.4               3:13 26:14      12:14 13:6      26:22 27:1     124:14
118:22            136:14         1982             46:11          147:13
1/12/2004         146:22          12:18          52:19          2011
3:11 141:16       147:1,4,13     1997             115:17        147:14
1/2              135             34:5 36:7        116:25         2012
13:15             3:8            69:13 70:2       135:15,21      147:14
10               13th            70:24           136:3,13       2013
3:5 121:14       156:14          142:4          2003            147:16
121:24           14              150:17          3:6 67:22      2014
123:6             3:16 26:14      153:2           68:15 73:6     3:15 147:7
124:2             150:13,18     1999             75:12,24        147:16
125:6            141             37:19 38:3       76:20 77:3    2016
131:17            3:11            43:4 49:6       108:3          112:17
134:20           147                             114:23         113:11
135:2             3:13                 2         115:2          124:14,15
140:7                                            121:19,22      136:8
```

139:12
149:16
**2020**
82:12 83:6
  83:8 88:21
107:22
108:1
111:7
114:15
150:10
**2021**
11:9,9 74:8
  74:13
  82:12
  118:11,12
  123:24
  124:3
  125:11
  131:5,13
  135:25
  136:21
  138:5
  140:11
  145:13,18
  147:19
**2022**
49:6 74:13
  123:24
  124:3
**2023**
1:17 4:15
  156:4,14
**21**
74:6,6
**22**
67:22 68:15
  74:6
  118:15
  144:9
**222**
5:3
**23**
42:17 44:15
  150:14
  153:6,13
  154:7
**25**
13:15
**2500**
5:7

**26**
121:4
**27**
73:6
**28**
119:10
**2nd**
11:7,8

___

**3**

**3**
2:11 13:15
  67:22,23
  68:14
  72:24
**3,032,345**
64:11
**3,035,000**
64:11
**3:30**
4:16 155:23
**3:35**
155:4
**30**
115:17
**312**
5:8
**314**
5:4 143:5
**32**
42:14
**325,000**
56:15 58:15
  60:6
**34**
39:22
**35**
2:6
**35,000**
63:11

___

**4**

**4**
2:13 81:2,3
  81:7
**4-H**
26:9
**4/15/1997**
3:18 150:22

**4:22**
1:8 4:8
**400,000**
63:10,17
  64:2
**45**
57:16

___

**5**

**5**
2:15 39:13
  108:15,25
**50**
43:12 57:16
**52**
2:9
**550**
5:3

___

**6**

**6**
2:3,18
  109:18,23
  111:10
**6/1/2000**
2:14 81:4
**6/23/2004**
3:16 150:18
**600,000**
56:16 58:10
  60:7
**60606**
5:8
**62691665**
2:17 108:19
  109:3
**62772095**
63:9
**62775588**
64:10
**62791665**
2:14,25 3:4
  69:10
  70:21 81:4
  81:8
  115:18,25
  118:20
  119:1
**63105**

**5:4**
**63131**
118:22
  119:21
**665**
132:10
  142:2
**67**
2:11

___

**7**

**7**
1:17 2:21
  4:15
  111:16,21
  156:4
**7,367,214**
64:12
**7/22/2003**
2:11 67:23
**7/30/2002**
2:23 115:21
**700**
51:22
**700,000**
51:23 86:11
**704-3248**
5:8
**727-2266**
143:5
**73,385**
63:11
**77**
13:7

___

**8**

**8**
2:23 115:15
  115:21
**80**
82:8,10
**81**
2:13
**829**
1:20
**84**
152:7
**899-9790**
5:4

___

**9**

**9**
3:2 48:20
  48:24
  49:17 50:1
  50:23 61:8
  61:10
  93:16
  103:17
  113:18,25
  114:9
  118:17,21
  118:23
  119:20
  120:11
  134:23
  135:6
  153:9
  154:9
**9/8/01**
63:10
**904.165**
55:2
**911**
117:3
**96**
60:15
**97**
60:15
**99**
37:24