

**PohlmanUSA**®

## Court Reporting and Litigation Services

---

Joann Dyroff

February 24, 2023

---

Edward Wiegand, et al.

vs.

New York Life Insurance & Annuity Corporation, et al.

```
            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF MISSOURI
                 EASTERN DIVISION


EDWARD WIEGAND and EUGENIA      )
SPRICH, TRUSTEES OF THE         )
HERBERT C. WIEGAND REVOCABLE    )
TRUST, individually and on      )
behalf of all other similarly   )
situated,                       )
                                )
        Plaintiff,              )No. 4:22 CV 188 RWS
                                )
vs.                             )
                                )
NEW YORK LIFE INSURANCE &       )
ANNUITY CORPORATION, et al.,    )
                                )
        Defendants.             )
```

        The deposition of JOANN DYROFF, taken before

Mary M. Rocco, Certified Court Reporter and

Registered Professional Reporter, taken pursuant

to the provisions of the Missouri Code of Civil

Procedure and the Rules of the Supreme Court

thereof pertaining to the taking of depositions

for the purpose of discovery, commencing at 12:00

p.m., on February 24th, 2023, at 165 North

Meramec, Suite 110, St. Louis, Missouri 63105.

Page 2

```
 1   APPEARANCES:
 2   JACOBSON PRESS, P.C.
     BY:  JOSEPH JACOBSON, ESQUIRE
 3   222 South Central Avenue, Suite 550
     Clayton, Missouri 63105
 4   Phone:  314.899.9789
     E-mail:  jacobson@archcitylawyers.com
 5
          On behalf of the Plaintiffs;
 6
 7   PAULE, CAMAZINE & BLUMENTHAL, P.C.
     BY:  DAVID M. SLABY, ESQUIRE
 8   165 North Meramec Avenue, Suite 110
     St. Louis, Missouri 63105-3772
 9   Phone:  314.244.3650
     E-mail:  dslaby@pcblawfirm.com
10
          On behalf of Joann Dyroff;
11
12   HINSHAW & CULBERTSON, LLP
13   BY:  JAMES M. BRODZIK, ESQUIRE
     521 West Main Street, Suite 300
14   Belleville, Illinois 62220
     Phone:  618.277.2400
15   E-mail:  jbrodzik@hinshawlaw.com
16        On behalf of Defendants.
17
18               * * * * *
19
20
21
22
23
24
25
```

Page 3

```
 1          I N D E X
 2
     WITNESS                    PAGE
 3
     JOANN DYROFF
 4      Examination by Mr. Brodzik      4
        Examination by Mr. Jacobson    79
 5      Examination by Mr. Brodzik     85
 6
 7        E X H I B I T S
 8   EXHIBIT              PAGE
 9   Exhibit A  Petition              5
     Exhibit B  Subpoena             17
     Exhibit C  Privilege Log        18
10   Exhibit D  DRYOFF00149 to DRYOFF00192   23
     Exhibit E  DRYOFF00199 to DRYOFF00228   25
11   Exhibit F  DRYOFF00066 to DRYOFF00074   28
     Exhibit G  DRYOFF00898                  35
12   Exhibit H  DRYOFF00198                  37
     Exhibit I  DRYOFF00920 to DRYOFF00921   38
13   Exhibit J  DRYOFF00098 to DRYOFF00117   46
     Exhibit K  DRYOFF00799 to DRYOFF00812   50
14   Exhibit L  DRYOFF00556                  53
     Exhibit M  DRYOFF00502 to DRYOFF00504   54
15   Exhibit N  DRYOFF00121 to DRYOFF00147   58
     Exhibit O  DRYOFF00092 to DRYOFF00095   59
16   Exhibit P  DRYOFF00083 to DRYOFF00084   64
     Exhibit Q  DRYOFF00271                  67
17
        CERTIFIED QUESTIONS
18
19   PAGE   LINE      PAGE   LINE
20    19    17         20     5
      33    12         33    19
21    35    10         35    16
      61    25         62     5
22    63    13         63    18
      71     8         71    16
23    75    23         76    15
24
25              - - -
```

Page 4

```
 1           (Witness sworn.)
 2   WHEREUPON:
 3           JOANN DYROFF, called as a witness
 4   herein, having been first duly sworn, was examined
 5   and testified via videoconference as follows:
 6               - - -
 7           EXAMINATION
 8   BY MR. BRODZIK:
 9       Q.   Good afternoon.  My name is James
10   Brodzik.  I represent New York Life Insurance and
11   Annuity Corporation and New York Life Insurance
12   Company.
13           A few ground rules.  I almost feel
14   like I don't even have to state these to you.  But
15   no shaking heads.  "Yes" or "No" answers.  Allow
16   me to finish my questions.  Whenever you need a
17   break, let me know.  I just ask that you finish
18   any pending questions or answer any pending
19   questions before we do so.  Can you state your
20   name for the record, please?
21       A.   Joann N. Dyroff.
22       Q.   And your date of birth?
23       A.   6-30, 1945.
24       Q.   And your address?
25       A.   15 Woodoaks Trail, St. Louis,
```

Page 5

```
 1   Missouri 63124.
 2       Q.   How long have you lived there?
 3       A.   39 years.
 4       Q.   You haven't taken any medication
 5   prior to the deposition today that would impact
 6   your ability to testify, have you?
 7       A.   No.
 8       Q.   We're here today about a lawsuit
 9   filed by Edward Wiegand and Eugenia Sprich,
10   Trustees of the Herbert C. Wiegand Revocable Trust
11   versus New York Life Insurance and Annuity
12   Corporation and New York Life Insurance Company.
13           MR. BRODZIK:  I'm going to mark this
14   as Exhibit A.  It's a copy of the petition.
15           (Whereupon, Exhibit A is marked for
16   identification.)
17   BY MR. BRODZIK:
18       Q.   Take a chance to review it.  Have
19   you seen that document before?
20       A.   Yes.
21       Q.   Okay.  What is your understanding of
22   the factual allegations of the claims that have
23   been brought against New York Life and the New
24   York Life entities in this suit?
25       A.   My understanding is that the
```

2  (Pages 2 to 5)

Page 6

1 allegation is that New York Life failed to give
2 appropriate notice to the plaintiffs of the annual
3 notice and the diminution value and the expiration
4 on a timely basis that caused damage.  I read the
5 petitions from months ago, so I haven't reviewed
6 them recently.
7     Q.    You are a licensed attorney;
8 correct?
9     A.    Yes.
10     Q.    What type of practice do you do?
11     A.    It's a mix.  A lot of estate
12 planning, probate and trust administration, some
13 tax, some real estate.  I do a lot of qualified
14 domestic relations orders for the divorce arm of
15 our firm.  We don't do divorce practice.  I do a
16 fair amount of nonprofit work.
17     Q.    Do you consider yourself to be a
18 specialist in any particular area, or do you have
19 any specialties?
20     A.    I don't think of it as a specialty.
21 I would just say that I spend more of my time
22 doing some things more than others.
23     Q.    What do you spend more of your time
24 doing than others?
25     A.    Probably estate planning and probate

Page 7

1 and trust administration.
2     Q.    Do you do any litigation?
3     A.    No.
4     Q.    Have you ever done any litigation?
5     A.    No.
6     Q.    Where did you go to undergrad?
7     A.    University of Missouri.
8     Q.    What did you study?
9     A.    I have studied history.
10     Q.    So did I.  What year did you
11 graduate?
12     A.    I graduated in 1967.
13     Q.    Did you get -- outside from a JD,
14 did you get any higher-education degree?
15     A.    I have a masters in history.
16     Q.    Where did you get that?
17     A.    Mizzou.
18     Q.    Where did you go to law school?
19     A.    I started at University of Missouri
20 and then transferred to my last two years at
21 University of Minnesota.
22     Q.    Golden Gophers?
23     A.    You got it.
24     Q.    What year did you graduate?
25     A.    I graduated in 1973.

Page 8

1     Q.    Are you a member of any professional
2 organization?
3     A.    I'm a member of the Bar Association
4 of Metropolitan St. Louis, some other assorted
5 ones like that.
6     Q.    Sure.  Have you ever been sued for
7 malpractice?
8     A.    Yes.
9     Q.    How many times?
10     A.    Once.
11     Q.    Do you recall when that occured?
12     A.    That was, I think, 1993.
13     Q.    Could you tell me the allegations
14 that were -- or describe the allegations that were
15 brought against you in that suit?
16     A.    I was sued as a partner in a law
17 firm.  That law firm had a partner who allegedly
18 caused damage in a divorce case by not following
19 through with some kind of matter.  I don't
20 remember all the details, but I was sued because I
21 was a partner in that firm.
22     Q.    What was the outcome of that suit?
23     A.    There was a judgment and a remitter.
24 The judge reduced the amount of the judgment, and
25 I believe that it was paid by insurance.

Page 9

1     Q.    Have you ever had any action taken
2 against your law license?
3     A.    No.
4     Q.    Have you written for any
5 publications?
6     A.    I write for a publication that is a
7 specific publication having to do with general
8 counsel for a client.
9     Q.    Okay.
10     A.    And I may have written an article to
11 a bar journal a time or two.
12     Q.    So you served as general counsel for
13 a corporation?
14     A.    Yes.
15     Q.    Could you tell me the name of that
16 corporation?
17     A.    I assume I can.  It's Missouri
18 Housing Authorities Property and Casualty.
19     Q.    Have you ever done any expert work?
20     A.    No.
21     Q.    After you graduated law school, can
22 you tell me where you first worked?
23     A.    I worked at a firm, Maslon, Kaplan,
24 Edelman, Borman, Brand and McNalty in Minneapolis.
25     Q.    How long did you work there from, or

3  (Pages 6 to 9)

Page 10

1    the --
2        A.    I worked about five years there.
3        Q.    So after you graduated law School,
4    you took the Minnesota Bar, I'm assuming?
5        A.    (Nodding.)
6        Q.    At some point, you moved back to
7    Missouri?
8        A.    Yes.
9        Q.    Okay.  Did you have to take the
10   Missouri Bar, or did you get some sort of
11   reciprocity from years of practice?
12       A.    It was a little more complicated.  I
13   moved to Texas in between.  I had to take the
14   Texas Bar.  Then when I moved to Missouri, I got
15   reciprocity from Texas.
16       Q.    When did you move back to the
17   beautiful State of Missouri?
18       A.    1981.
19       Q.    Where did you work when you moved
20   back?
21       A.    I initially did not work for a
22   period of time because I had a child, and then I
23   started back with the firm of -- I don't remember
24   what it was called then.  Love, Lacks and Paule.
25       Q.    How long did you cease working as an

Page 11

1    attorney when you moved back to St. Louis?
2        A.    About eight or nine months.
3        Q.    Did you keep your license active
4    during that time?
5        A.    Yes.
6        Q.    How long did you work with that
7    firm?
8        A.    Until it dissolved in 1993, the end
9    of 1993, and a new firm was formed.  So until the
10   end of 1993.
11       Q.    Did that malpractice suit have any
12   impact or have any bearing on the closure of that
13   prior firm?
14       A.    Yes.
15       Q.    Following the closure of that firm,
16   where did you go?
17       A.    Paule, Camazine and Blumenthal.
18       Q.    So you have been here since 1990 --
19       A.    1994.
20       Q.    What is your current title for --
21   can I call it PCB?
22       A.    (Nodding.)
23       Q.    What is your current title for PCB?
24       A.    Principal partner.  We call
25   ourselves partners, but we are principals.

Page 12

1        Q.    Did you come into the firm as a
2    principal?
3        A.    Yes.
4        Q.    Do you have much experience, or do
5    you have any experience in advising clients on
6    life insurance policies?
7        A.    I mean, not much.
8        Q.    And you worked in a lot of trust and
9    estate work, as you said?
10       A.    Yes.
11       Q.    Is it common that a life insurance
12   policy would be included in a trust or estate
13   plan?
14       A.    Somewhat.  Not always.  Less now
15   because of changes in the estate tax law.
16       Q.    Have you had clients in the past
17   reach out to you for advice on life insurance
18   policies?
19       A.    Yes.
20       Q.    And when that happens, do you
21   typically answer their questions?  Or do you find
22   them a third party attorney or someone else in
23   your office to better help them?
24       A.    I typically discuss it with somebody
25   else appropriate in our office.

Page 13

1        Q.    The deposition that we're in today,
2    how long did you prepare for this deposition?
3        A.    I may have spent 45 minutes or an
4    hour just generally reviewing the files because
5    it's been so long.
6        Q.    When you state "the files," what are
7    you encompassing in that statement?
8        A.    The ones that were provided to
9    review.
10       Q.    You did that for about 45 minutes?
11       A.    Yes.
12       Q.    Did you discuss this deposition with
13   anybody outside of your attorney?
14       A.    No.
15       Q.    Have you ever discussed this case
16   with Edward Wiegand?
17       A.    I believe that would fall under
18   confidentiality rules.
19       Q.    Is Edward Wiegand your client?
20       A.    He was through the duration of this
21   time, the Trust administration.
22       Q.    How long did the Trust
23   administration occur?
24       A.    I can't remember exactly the year.
25   When Mr. Wiegand died, the senior officer, it

4  (Pages 10 to 13)

Page 14

1  **probably ended about the time we finally finished**
2  **up the estate tax return issues, major issues, you**
3  **know. 2006, 2007, something like that.**
4      Q.    So your representation of Edward
5  Wiegand ceased in 2007?
6      **A.    On this matter, yes.**
7      Q.    Right. So in regards to this
8  current lawsuit that's been filed in 2022, have
9  you spoken with Edward Wiegand about the suit?
10     MR. JACOBSON: I'm going to object
11 on the grounds it does call for attorney-client
12 communication. If you look at the file, there is
13 no termination of representation. And you have to
14 ask the client whether they believe they were
15 still being represented by Ms. Dyroff, which I
16 think they do believe that.
17 BY MR. BRODZIK:
18     Q.    Do you believe you are still
19 representing Mr. Wiegand?
20     MR. SLABY: I think this calls for a
21 legal conclusion. Ms. Dyroff wants to be very
22 careful regarding any statements that her client
23 made or has made related to this matter. And if
24 there is some agreement between the parties
25 regarding that this does not fall within

Page 15

1  privilege, then that's one thing, but she doesn't
2  want to divulge any confidential information that
3  may be required by the rules of professional
4  responsibility.
5      Q.    Have you spoken with Eugenia Sprich
6  in regards to this deposition?
7      **A.    I believe that the same issues of**
8  **confidentiality would apply here.**
9      Q.    So you have, but you believe that
10 the conversations were confidential?
11     **A.    I believe that whether or not I**
12 **conversed with them would be a confidential issue.**
13     Q.    Did you ever personally represent
14 Dr. Herbert Wiegand?
15     **A.    No.**
16     Q.    Was Dr. Wiegand deceased when your
17 representation of, I guess -- okay, well, here's a
18 question -- when this case first came in to your
19 office, who did you represent in the underlying
20 Trust matter?
21     THE WITNESS: Can I answer that it's
22 confidential?
23     MR. SLABY: Who we represented, I
24 don't think is confidential.
25     THE WITNESS: I represented Ed

Page 16

1  Wiegand and Eugenia Sprich as Trustees of the
2  Trust.
3  BY MR. BRODZIK:
4      Q.    Did you represent the trust as well?
5      **A.    I think the general position is I**
6  **represent the trustees.**
7      Q.    Was there -- did the Trust have an
8  attorney or some attorney representing the
9  interest of the Trust?
10     **A.    It would be my understanding that by**
11 **representing the Trustees of the Trust and their**
12 **duties as Trustees, that that is, in a sense,**
13 **representation of the Trust. But again, that**
14 **calls for a legal conclusion that I am not**
15 **prepared to draw right now.**
16     Q.    Were you familiar with Dr. Wiegand
17 prior to representing Edward and Eugenia as
18 Trustees of this Trust?
19     **A.    No.**
20     Q.    Okay. When did Edward and Eugenia
21 first become clients of PCB?
22     **A.    I don't recall the date the client,**
23 **the Trust, the administration was opened.**
24     Q.    Do you recall a general time period
25 in which Edward and Eugenia came to PCB asking for

Page 17

1  representation?
2      **A.    My thought is 2002, 2003. I don't**
3  **recall the date. I knew it was after his death.**
4      Q.    Did you know Edward socially or know
5  of him prior to him coming in to PCB for
6  representation?
7      **A.    No.**
8      Q.    Did you know Eugenia prior to?
9      **A.    No.**
10     MR. BRODZIK: I'm going to -- I'm
11 going to mark this as Exhibit B. It's the
12 subpoena that we issued to you.
13     (Whereupon, Exhibit B is marked for
14 identification.)
15 BY MR. BRODZIK:
16     Q.    Have you seen that document before?
17     **A.    Yes.**
18     Q.    And there is a rider attached to the
19 subpoena, asking you to produce a number of
20 documents in regards to your firm's handling of
21 this Trust or these individuals.
22     **A.    Yes.**
23     Q.    Have you read the rider in the past?
24     **A.    Yes.**
25     Q.    And you did produce a number of

Page 18

1    documents, both electronically, and you also
2    allowed the firm of Jacobson and I to come in and
3    view your file in person?
4        A.    Yes.
5        Q.    And there were a number of documents
6    that you copied for us out of the file and
7    produced supplementary to us?
8        A.    Yes.
9        MR. SLABY:  Just for the record,
10   there was a privilege log provided that --
11       MR. BRODZIK:  And I'm going to mark
12   this as Exhibit C.
13       (Whereupon, Exhibit C is marked for
14   identification.)
15   BY MR. BRODZIK:
16       Q.    This was a privilege log that was
17   provided to us in conjunction with us getting an
18   original production and then coming in the office
19   to review the file?
20       A.    (Nodding.)
21       Q.    Okay.  Based on the privilege log
22   that you have issued, is it your understanding
23   that none of the documents that you have produced
24   to us or that you have copied and then given to us
25   you are claiming privilege to?

Page 19

1        A.    Yes.
2        Q.    So the background of this suit, or
3    the allegations in the pending petition, all
4    essentially resolve around a life insurance policy
5    that was taken out by Dr. Wiegand on his then
6    wife, Jean Cameron Wiegand's life.  Are you
7    familiar with that policy?
8        A.    Somewhat.
9        Q.    For the record, it is called a
10   Universal Life Accumulator Policy, Number
11   62791665.  Have you ever read this policy?
12       A.    I have read parts of it.
13       Q.    What parts of the policy do you
14   recall having read?
15       A.    Primarily, the first several pages
16   of the policy.
17       Q.    Is there a reason why you would read
18   the first several pages of the policy and not the
19   entirety of it?
20       A.    As I recall, the policy was -- it's
21   a very substantial number of pages.  It's not a
22   short document, and you know --
23       Q.    So you didn't feel like it was
24   necessary to read the entirety of it, or --
25       A.    My conversations with the clients

Page 20

1    about my involvement with this policy are
2    privileged.  And this is starting to touch on
3    that, so I can't go any further.
4        MR. BRODZIK:  Can you certify that
5    question, please?
6        (Whereupon, the pending question is
7    certified at the request of Mr. Brodzik.)
8    BY MR. BRODZIK:
9        Q.    Did you assist in procuring this
10   policy?
11       A.    No.
12       Q.    Do you know who procured the policy?
13       A.    There was -- I believe it was an
14   insurance broker that the Wiegands worked with.  I
15   can't recall the name of the company.  And I think
16   it's defunct.  I'm fairly sure it's defunct,
17   because I understood that the broker had died
18   somewhere along the line.
19       Q.    Understood.  Are you familiar with
20   life accumulator life insurance policies?
21       A.    Not enough to talk about them.
22       Q.    So you don't know the difference
23   between -- or you can't describe the difference
24   between a life accumulator policy and a standard
25   term life insurance policy?

Page 21

1        A.    I can't explain the difference.  I
2    know that there is a difference between a term
3    policy and most other kinds of whole life or term
4    life or accumulative policies.
5        Q.    Do you recall what the life benefit
6    on Ms. Jean Wiegand was on this particular policy?
7        A.    Not precisely.
8        Q.    Do you recall what the initial
9    up-front premium was on this policy?
10       A.    I can't accurately recall.  I have a
11   vague impression.
12       Q.    What is your vague impression?
13       A.    About $700,000.
14       Q.    Are you aware that this particular
15   life insurance policy, this accumulator policy,
16   had a cash value?
17       A.    Yes.
18       Q.    Okay.  Are you aware that over time
19   the cash value of a policy or this particular
20   policy would diminish without the supplementation
21   of yearly premium?
22       A.    That, once again, gets into a matter
23   of discussion with the clients.  And --
24       Q.    Well, I'm asking for your personal
25   understanding of the policy, nothing you have

6  (Pages 18 to 21)

Page 22

1   spoken with the clients about.
2        MR. JACOBSON:  I'm going to object
3   to the form of the question.  Since we're talking
4   about a period of time that spans over 20 years or
5   so, I think we need to have the understanding of
6   what point in time.  Otherwise, we have --
7   BY MR. BRODZIK:
8        Q.   Okay.  In 2003, did you understand
9   that term about the policy?
10       A.   Understand what term about the
11  policy?
12       Q.   That the policy had a cash value
13  that would dissipate over time unless additional
14  premium was added to the policy?
15       A.   No.
16       Q.   Have you ever spoken with Jean
17  Cameron Wiegand?
18       A.   No.
19       Q.   And you didn't represent Jean
20  Cameron Wiegand?
21       A.   No.
22       Q.   Have you ever spoken with Jean
23  Cameron Wiegand's children, outside of the
24  children of Herbert Wiegand, her own children that
25  were outside of that marriage?

Page 23

1        A.   No.
2        MR. BRODZIK:  I'm going to mark this
3   as Exhibit D.
4        (Whereupon, Exhibit D is marked for
5   identification.)
6   BY MR. BRODZIK:
7        Q.   This is a document that was included
8   in the legal file that Mr. Jacobson and I had an
9   opportunity to kind of review.  In fact, all of
10  these documents were -- I'm going to hand it to
11  you.  Have you seen that document before?  Or do
12  you know what that document is?
13       MR. JACOBSON:  When you say "legal
14  file," are you talking about the documents she
15  produced in her copy here?
16       MR. BRODZIK:  Yes.
17       MR. JACOBSON:  Okay.
18       THE WITNESS:  Yes, I have seen this
19  before.
20  BY MR. BRODZIK:
21       Q.   Can you read for me what the
22  document is titled?
23       A.   The First Amendment to the Amended
24  and Restated Herbert C. Wiegand Revocable Trust.
25       Q.   Did you help prepare that document?

Page 24

1        A.   No.
2        Q.   Do you know who prepared that
3   document?
4        A.   No.
5        Q.   Do you have -- this is the First
6   Amended and Restated Trust.  If you look at -- my
7   office, in Bates marking these documents, listed
8   them as "Dyroff" and not Dyroff, which I am just
9   noticing.  But if you look at 153, it is the
10  Amendment to and the Restatement of the Herbert C.
11  Wiegand Revocable Trust.  That original amendment,
12  you did not prepare that?
13       A.   I did not.
14       Q.   Do you know who did?
15       A.   It says McCarter and Greenley, LLC.
16       Q.   Do you know who McCarter and
17  Greenley, LLC, is?
18       A.   No.  Another law firm.
19       Q.   Do you know the law firm?
20       A.   It's a law firm.
21       Q.   Do you know if they are still in
22  practice?
23       A.   I don't know.
24       Q.   Do you know if -- well, strike that.
25  Let me move on there.  Do you have a copy of the

Page 25

1   entirety of the Trust, the original Trust, prior
2   to the amendments?  Are you aware?
3        A.   I don't know.
4        Q.   And it's your -- okay.  When you
5   were paid legal fees in your representation, were
6   you paid directly from the children, or were you
7   paid from the proceeds of the Trust?
8        A.   I believe it would have been the
9   Trust.
10       Q.   So you were paid directly out of the
11  Trust?
12       A.   Yes.
13       MR. BRODZIK:  I'm going to mark the
14  next page as Exhibit E, or number of pages.  This
15  was also taken from the file that Mr. Jacobson and
16  I had an opportunity to come and review, Dyroff
17  199.
18       (Whereupon, Exhibit E is marked for
19  identification.)
20  BY MR. BRODZIK:
21       Q.   Can you tell me who prepared this
22  memorandum?
23       A.   I'm trying to remember who that
24  would have been.
25       Q.   And if you don't recall --

7  (Pages 22 to 25)

Page 26

1      A.    I'm sorry, I do not.
2      Q.    The date of this memorandum is
3   February 4, 2002.  Do you believe that you
4   represented the Wiegands by February 4, 2002, or
5   do you believe that this may have been a
6   memorandum from their prior counsel?
7      A.    It may have been from a prior
8   counsel.  I'm sorry, I do not remember when he
9   died, and I didn't represent him until after.  And
10  his name is not familiar.
11     Q.    If you look at Page 200, it's a
12  Policy Delivery Receipt on Jean Wiegand, signed by
13  the policy owners, the policy owner, the Herbert
14  Wiegand, LLC, signed by the agent.
15           Do you recall at a certain point
16  needing to change the policy owner from the LLC to
17  some other entity?
18     A.    Yes.
19     Q.    Do you recall what entity that you
20  needed to change, or that you changed the policy
21  to?
22     A.    It was changed to the Trust.
23     Q.    Do you recall when that occured?
24     A.    Sometime after his death.
25     Q.    And if you look at Page 201, it

Page 27

1   lists the owner of the Trust as Herbert Wiegand,
2   and the address of the Trust as 9 Huntleigh Woods,
3   St. Louis, Missouri 63131.  Are you familiar with
4   the 9 Huntleigh Woods address?
5      A.    I believe that was their home.
6      Q.    Do you know if Jean Wiegand lived at
7   the 9 Huntleigh Woods address?
8      A.    I do not know that.
9      Q.    In your assistance with these
10  individuals on the, I guess, maintenance of the
11  Trust, for lack of a better word, did you ever
12  sell the -- or liquidate the 9 Huntleigh Woods
13  property?
14     A.    His personal residence -- if that
15  was his personal residence, and I can't say that
16  for certain at this point, because I don't recall
17  what was sold as part of the Trust administration.
18     Q.    And you believe that that 9
19  Huntleigh Woods house was sold as part of the
20  administration?
21     A.    That was his address, yes.  That was
22  his residence.
23     Q.    And with this document being
24  included in the file with the copy of the original
25  policy receipt, it is not your belief that your

Page 28

1   firm did not have a copy of the insurance policy,
2   was it?
3           MR. JACOBSON:  I'm going to object
4   to the form of the question.
5           THE WITNESS:  I'm a little confused.
6   BY MR. BRODZIK:
7      Q.    Sure.  If you look on after 201,
8   202, through 228, can you describe for me what
9   those documents are?
10     A.    It looks like they are provisions as
11  part of the policy.
12     Q.    Have you seen this document before?
13     A.    I believe so.  It's been a long
14  time.
15     Q.    Is it your contention or belief that
16  your firm, or you, did not have a copy of the life
17  insurance policy?
18     A.    No.
19           MR. BRODZIK:  The next document that
20  I am going to provide was also -- what was that
21  last one?  I'm going to mark this as Exhibit F.
22  This was also taken from the file that we
23  reviewed.
24           (Whereupon, Exhibit F is marked for
25  identification.)

Page 29

1   BY MR. BRODZIK:
2      Q.    Could you tell me who that is from
3   and to whom it is sent?
4      A.    It's from MaryLee Behlmann.
5      Q.    Do you know who that is?
6      A.    I believe that this is someone who
7   was like an assistant in the office of Vance
8   Financial Group, which I believe was the group
9   that helped arrange for the policy.
10     Q.    Is that the group that you were
11  discussing earlier that has since closed and the
12  principal passed away?
13     A.    That's my understanding.
14     Q.    The fax was sent to Charles
15  McCarter.  Do you know who Charles McCarter is?
16     A.    He's an attorney with McCarter and
17  Greenley.
18     Q.    Is it your understanding that
19  McCarter and Greenley represented the Trust or the
20  children prior to your representation of the
21  children of the Trust?
22     A.    I did not recall that.  That may be
23  the case.
24     Q.    If you look at the document itself,
25  it is Dyroff 67 to 74.  Have you ever seen this

8  (Pages 26 to 29)

Page 30

1  document before?
2      A.   I cannot -- I have no recollection.
3      Q.   Of ever seeing this?
4      A.   That doesn't mean I didn't see it.
5  It just means I didn't see it -- it's just been so
6  long.
7      Q.   Right.  But you are not -- you have
8  no allegation that this document was not contained
9  in your legal file, do you?
10     A.   No.
11     Q.   Okay.  On Page 67, it states that
12 the cash value of the policy at the time this
13 document was prepared on May 7, 2002, was
14 $778,636.04.  What is your understanding of what
15 that figure means?
16     A.   A description of the cash value.
17     Q.   And below that, the net amount at
18 risk, $618,646.40.  Can you describe for me what
19 the net amount at risk means?
20     A.   No.
21     Q.   The surrender cost basis of
22 $750,000, do you -- can you describe for me what
23 the surrender cost basis means?
24     A.   My understanding would normally be
25 that that is the amount that you would receive to

Page 31

1  surrender the policy.
2      Q.   On the bottom part of the page, just
3  above where it says, 7702 Indicator GL, it shows a
4  Guideline Annual Premium of $168,477.95.  Are you
5  able to provide for me your understanding of what
6  that Annual Guideline Premium means?
7      A.   No.
8      Q.   If you look at Page 73, there is a
9  yearly breakdown of the insurance.  Essentially,
10 on the far left, the Premium Payment Mode shows an
11 annual of zero, including no new premium.  Do you
12 see under "Guaranteed Charges" that the cash value
13 of the policy depreciates over a 10-year period of
14 time?
15     A.   Yes, I see that.
16     Q.   You had not -- or correct me if I'm
17 wrong, but your prior testimony is you have dealt
18 with these types of policies in the past?
19          MR. SLABY:  Object to form.
20 BY MR. BRODZIK:
21     Q.   Had you dealt with these types of
22 policies in the past?
23          MR. SLABY:  Object to form.  What
24 does deal with the policy mean?  I'm sorry.
25 BY MR. BRODZIK:

Page 32

1      Q.   Have you represented clients who had
2  taken out these types of life accumulator policies
3  in the past?
4      A.   In 2002, had I represented people in
5  the past who had done this?
6      Q.   Yes.
7      A.   No.
8      Q.   How about in 2005, had you
9  represented people that had taken out policies
10 like this in the past?
11     A.   It's a little hard to remember.  I
12 can't give you an -- I cannot answer that, because
13 I can't recall exactly.
14     Q.   In 2022, outside of this particular
15 policy, have you represented clients that had
16 taken out life accumulator policies like this in
17 the past?
18     A.   I'm having trouble with the life
19 accumulator policy concept, the term, because
20 there are many different kinds of life insurance
21 policies.  So I can't say precisely that I
22 represented somebody that had exactly this kind of
23 policy.
24     Q.   Had you represented individuals as
25 of today's date that took out life insurance

Page 33

1  policies that had a death benefit and a
2  diminishing cash value but for the inclusion of an
3  additional premium?
4      A.   Yes.
5      Q.   Okay.  And you've provided legal
6  guidance in regards to the handling and
7  maintenance of these types of policies?
8      A.   On a very limited basis.
9      Q.   Okay.  And what basis would that be?
10     A.   To consult with their insurance
11 agent primarily.
12     Q.   Do you recall if you ever provided
13 this accumulative life insurance illustration
14 document to Edward or Eugenia?
15     A.   I believe that that calls for
16 confidentiality issues in terms of my discussions
17 with them.
18          MR. BRODZIK:  I'll certify that
19 question.
20          (Whereupon, the pending question is
21 certified at the request of Mr. Brodzik.)
22 BY MR. BRODZIK:
23     Q.   In your history of dealing with
24 accumulator policies with diminishing cash values,
25 has it been your recommendation in the past to

9  (Pages 30 to 33)

Page 34

1  cash out policies prior to deaths occurring?
2  MR. SLABY: Object to form.
3  MR. JACOBSON: I've got a lot of
4  problems with that question.
5  BY MR. BRODZIK:
6  Q.   Well, I'm not asking for your
7  particular guidance to any one individual client.
8  I'm asking you if in your practice over the past
9  40 years in dealing with policies that have
10  diminishing cash values, if you have ever
11  recommended to clients to exercise their cash-out
12  option and take the cash?
13  **A.   I may have from time to time just**
14  **discussed options under policies with individuals.**
15  Q.   Is it your understanding, as an
16  attorney and who gives advice on taking cash
17  value, or taking the cash value of a policy and
18  cashing it in, in your opinion, when should a cash
19  value be taken, and when should a client wait and
20  take their chances on the death benefit?
21  MR. SLABY: Object to form.
22  MR. JACOBSON: Yes, it calls for
23  speculation.  That is unrelated to this case.  I
24  think you are kind of looking for an expert
25  opinion in an area in which she is claiming she

Page 35

1  can't proceed.
2  BY MR. BRODZIK:
3  Q.   So you have no opinion on when a
4  cash value should be exercised or when a client
5  should wait for a death benefit?
6  **A.   If I'm dealing with a client on that**
7  **question, as I said, I would refer them back to**
8  **their insurance agent or to someone in our office**
9  **to help review.**
10  Q.   Do you recall ever directing Edward
11  or Eugenia to speak with their insurance agent
12  about this policy?
13  **A.   I believe that is covered by**
14  **confidentiality.**
15  MR. BRODZIK: I would like to
16  certify that question as well.
17  (Whereupon, the pending question is
18  certified at the request of Mr. Brodzik.)
19  (Whereupon, Exhibit G is marked for
20  identification.)
21  BY MR. BRODZIK:
22  Q.   This is a letter, dated October 23,
23  2002, to McCarter and Greenley, signed by Edward
24  and Eugenia Sprich, apparently requesting that
25  their representation be -- or McCarter and

Page 36

1  Greenley terminate their representation.
2  Do you recall if Edward and Eugenia
3  had spoken with you about taking over their
4  representation prior to sending this letter?
5  **A.   I just don't recall.**
6  Q.   You are CC'd on this letter.
7  **A.   Yes.**
8  Q.   Did you prepare this letter on their
9  behalf?
10  **A.   I don't know.**
11  **A.   The letter --**
12  **A.   Excuse me, no.**
13  Q.   The letter states, "Please have our
14  complete file on or before November 7th, 2002."
15  Do you recall if McCarter and Greenley sent you
16  their complete file?
17  **A.   I don't know.**
18  Q.   However, some of the exhibits that
19  we have gone through have McCarter and Greenley
20  faxes that they have received, so it would be safe
21  to assume that you received at least some portion
22  of their file; correct?
23  **A.   It would be safe to assume it, yes.**
24  Q.   You don't recall when at least that
25  partial file was turned over to you?

Page 37

1  **A.   No.**
2  MR. BRODZIK: The next one I'm going
3  to mark as H.
4  (Whereupon, Exhibit H is marked for
5  identification.)
6  BY MR. BRODZIK:
7  Q.   That appears to be another document
8  from McCarter and Greenley, based off of the "To"
9  and "From."  Would you agree?
10  **A.   Yes, it appears to be that.**
11  Q.   Can you tell me the date of --
12  **A.   April 24, 2003.**
13  MR. SLABY: Let him finish his
14  question before you answer.
15  THE WITNESS: I'm sorry.
16  BY MR. BRODZIK:
17  Q.   -- the date on the letter?  Do you
18  have any understanding of why McCarter would still
19  be performing work on behalf of the Wiegands,
20  what, some six or seven months after sending the
21  letter asking that PCB take over the handling of
22  the Trust?
23  **A.   No, I have no recollection.**
24  Q.   Okay.  Do you believe that by April
25  23, 2003, that PCB was representing Edward and

10  (Pages 34 to 37)

1  Eugenia?
2      A.    I don't recall the dates of when we
3  started to represent.
4      Q.    That letter discusses or states that
5  the policy was issued with errors. Are you aware
6  of any errors in the policy when it was issued?
7      A.    I don't recall.
8      Q.    Okay.
9          MR. BRODZIK: The next exhibit.
10         (Whereupon, Exhibit I is marked for
11  identification.)
12  BY MR. BRODZIK:
13     Q.    This is a letter from Thomas
14  Blumenthal, written to Barbara Blee Maille, dated
15  June 17th, 2003, in regards to a potential
16  settlement with a James Wiegand. Can you tell me
17  who Barbara Blee Maille is?
18     A.    Barbara Blee Maille, she's an
19  attorney.
20     Q.    Did she represent James Wiegand?
21     A.    That's my recollection.
22     Q.    Who is Thomas Blumenthal?
23     A.    My partner.
24     Q.    Did Thomas Blumenthal ever perform
25  work on behalf of the Wiegands or the Trust?

1      A.    Yes.
2      Q.    Can you tell me what the extent of
3  his work on this file was?
4      A.    There was potential litigation by
5  James, one of his sons, and he was involved in
6  that because he is a litigator.
7      Q.    Can you tell me if you recall what
8  the potential litigation stemmed from between
9  James Wiegand and --
10     A.    It is a little vague, but there was
11  -- I think it was primarily over tangible personal
12  property and a large gun collection.
13     Q.    Do you recall what happened to the
14  gun collection?
15     A.    No.
16     Q.    Do you recall how many guns were in
17  the collection?
18     A.    No.
19     Q.    Do you recall if any litigation
20  ended up being filed in regards to the dispute
21  between James and the trustees?
22     A.    No. My recollection is there was a
23  settlement.
24     Q.    If you look at this June 17, 2003
25  letter, the top of the second paragraph, written

1  by Tom, says, "In reference to this letter, let us
2  first emphasize that we do not represent Ed and
3  Gina in this matter. We represent the Trust." I
4  was under the belief that you only represented Ed
5  and Gina and not the Trust. Is there is mistake
6  in this letter, or --
7      A.    No. I believe what he is saying is
8  that we don't represent them individually. We
9  represent them as Trustees of the Trust.
10     Q.    Okay. So your take on, We represent
11  the Trust, is that you don't actually represent
12  the Trust; you represent the Trustees?
13         MR. SLABY: I'm going to object to
14  form.
15         THE WITNESS: The next sentence
16  says, "We must take direction from the Trustees of
17  the Trust."
18  BY MR. BRODZIK:
19     Q.    Is it still your belief that you did
20  not represent the Trust, though, as it states in
21  this letter?
22     A.    I think that's a legal conclusion
23  one way or the other. Do you represent the Trust?
24  Do you represent the Trustees? I think it's hard
25  to differentiate that.

1      Q.    And you're a lawyer; correct?
2      A.    Yes.
3      Q.    And you have been practicing for 45
4  years in trust and estates?
5      A.    Yes.
6      Q.    So based off of your extensive
7  knowledge on trust and estate law, is it your
8  belief that you represent the Trust, or that you
9  represent the children as Trustees of the Trust?
10     A.    Not the children as Trustees of the
11  Trust. I represent the Trustees acting as such,
12  not the children, because they are not children in
13  that fiduciary capacity. They are Trustees.
14     Q.    Please describe what you mean by --
15  well, can you repeat the question? I'm confused
16  by that answer.
17         MR. JACOBSON: May I interject here?
18  If you file a lawsuit on behalf of a trust, if you
19  file it in the name of "Trust So-and-So" sues, it
20  will be dismissed because a trust is not an entity
21  that has the power to sue. So it has to be filed
22  "So-and-So, Trustee of Such-and-Such Trust." Same
23  with deeds. A trustee's deeds written by the
24  trustee, saying, "On behalf of Such-and-Such
25  Trust, I convey this property to you."

Page 42

1        If you have a deed that is just in
2    the name of the trust and not in the name of the
3    trustee, it would be in effect of the conveyed
4    interest.  So yes, the trust exists.  The trust
5    acts only through its trustees.  But the
6    representation is all through trustees.  The
7    trustees are the persons that run the trust, that
8    do everything.  The trust itself doesn't have a
9    separate legal existence, aside from -- for
10    purposes of conveyance lawsuits and so on, other
11    than by actions taken by the trustees.
12        Would you agree with that, Joann?
13    Is that a correct description?
14        THE WITNESS:  Absolutely.  Well
15    said.
16    BY MR. BRODZIK:
17        Q.    So is it your understanding that a
18    trust does not have the right to sue?
19        **A.    Yes.**
20        Q.    Is it your understanding that
21    trustees can only bring suit for the -- I guess
22    for the interest of the trust on behalf of the
23    trust?
24        **A.    I defer to the litigator.**
25        MR. JACOBSON:  Just as this case is

Page 43

1    brought by Ed and Eugenia and as Trustees of the
2    Wiegand Trust, that's the proper method.  That's
3    how we sue.  We didn't make it up.  The English
4    guys made it up 500 years ago, so we're stuck with
5    it.
6        MR. BRODZIK:  Well, that's your
7    understanding of how it should be properly
8    captioned.
9        MR. JACOBSON:  That is true.
10    BY MR. BRODZIK:
11        Q.    I'm asking for your understanding
12    of --
13        **A.    My understanding is the same.  But**
14    **since I don't do litigation, I don't get in to**
15    **that.  But what Joe says is correct.**
16        Q.    Do you know Mr. Jacobson outside of
17    this suit?
18        **A.    No.  I wrote him a letter last week**
19    **on another matter.**
20        Q.    How long have you known Mr.
21    Jacobson?
22        **A.    About a week.**
23        MR. JACOBSON:  She may not recall,
24    but we actually met a number of years ago, because
25    we represented David Lacks in that litigation that

Page 44

1    she was -- she was deposed in that litigation, and
2    that was in 1993.
3        THE WITNESS:  1993.
4        MR. JACOBSON:  So I was involved in
5    her deposition in 1993, in connection with the
6    malpractice action against her then partner.  She
7    was just a kid.
8        THE WITNESS:  I had suppressed it.
9    BY MR. BRODZIK:
10        Q.    How many times do you think you have
11    been deposed over the years?
12        **A.    Three, counting today.**
13        Q.    The letter goes on to state that,
14    "We consider our first and foremost obligation is
15    to fulfill the dictates of the Trust and maintain
16    a fiduciary responsibility of the Trustees in
17    administrating the Trust."
18        Have you had instances in the past
19    where the trustees have not acted in the best
20    interest of the Trust, in your extensive history
21    of trust and estate planning?
22        MR. SLABY:  Object to the form.
23        MR. JACOBSON:  I object to the form.
24    Are you talking about with represent to this
25    Trust?  Are you talking about all Trusts?

Page 45

1        MR. BRODZIK:  Generally speaking.
2        THE WITNESS:  I recall one instance
3    of that in the past.
4    BY MR. BRODZIK:
5        Q.    When you come across an instance
6    where a trustee is not acting in the best interest
7    of the Trust, how do you rectify an issue like
8    that?
9        **A.    I believe I had to withdraw as**
10    **counsel.**
11        Q.    Withdraw as counsel from --
12        **A.    The representation of.**
13        Q.    Of the Trust?
14        **A.    Of the Trustee of the Trust, yes.**
15        Q.    Withdraw as representation of the
16    Trust or the Trustee?
17        **A.    Both.**
18        Q.    Both?
19        **A.    Well, when you withdraw from the**
20    **representation of the Trust, you are withdrawing**
21    **from the representation of the Trustees.**
22        Q.    In your extensive knowledge on the
23    subject of trust and estate planning, do you
24    believe there could be a conflict of interest
25    between representing a Trust and the Trustees of a

12  (Pages 42 to 45)

Page 46

1    Trust?
2        **A.    In the situation that you just**
3    **outlined, where the Trustee is acting not in the**
4    **best interest of the Trust, that is correct.  That**
5    **is creating a conflict between that Trustee and**
6    **the Trust and its fiduciary duty to the Trust.  So**
7    **there can be a conflict of interest in that sense.**
8        Q.    And if there was a conflict of
9    interest, do you have a duty to withdraw then?
10       **A.    I believe so.**
11       **(Whereupon, Exhibit J is marked for**
12   **identification.)**
13   BY MR. BRODZIK:
14       Q.    This is a July 22, 2003, letter to
15   MaryLee from you, requesting that the life
16   insurance policy be changed from the Wiegand
17   Family, LLC, to the Herbert C. Wiegand Revocable
18   Trust, Statement of Irrevocability, a Change of
19   Beneficiary Request.
20           And you further state that, In
21   addition, the policy cannot be located, and we
22   request a new policy.
23           I'll let you review that.  Can you
24   let me know if you drafted that letter?
25       **A.    Yes.**

Page 47

1        Q.    If you look at, I believe -- what
2    the is the Bates on the page I just gave you?
3        **A.    98.**
4        Q.    If you look at 100, there is a
5    Transfer of Ownership/Designation.  Did you
6    Prepare This Transfer of Ownership/Designation?
7        **A.    I do not believe so.**
8        Q.    Do you know who did prepare the
9    Transfer of Ownership/Designation?
10       **A.    No.**
11       Q.    And you recall that when the policy
12   was first taken out, the address on the policy was
13   9 Huntleigh Woods in St. Louis, Missouri?
14           MR. SLABY:  Object to form.
15           THE WITNESS:  I don't recall.
16   BY MR. BRODZIK:
17       Q.    Well, we can go back and look at the
18   policy, but --
19       **A.    I don't recall independently.**
20       Q.    But based off of your review of the
21   policy --
22       **A.    Yes.**
23       Q.    -- the address on the policy was 9
24   Huntleigh Woods?
25       **A.    (Nodding.)**

Page 48

1        Q.    On this Transfer of Ownership under,
2    Address of the new owner of the Herbert C. Wiegand
3    Revocable Trust, no address is included.  Do you
4    agree with me?
5        **A.    I can see that there is no address**
6    **listed.**
7        Q.    Do you know why no address was
8    listed for the Herbert C. Wiegand Revocable Trust?
9        **A.    No.**
10       Q.    And you never directed that an
11   address should be included there?
12           MR. JACOBSON:  Object to the form.
13   You mean in connection with this letter, or do you
14   mean at any point in time?
15   BY MR. BRODZIK:
16       Q.    I'm talking about with the transfer
17   of ownership.
18       **A.    Can you repeat the question, please?**
19       Q.    Yes.  Did you believe that an
20   address should have been included on this Transfer
21   of Ownership for the Trust?
22       **A.    I don't recall.**
23       Q.    Do you know if you -- or can you
24   recall if you reviewed this document prior to you
25   mailing it to New York Life?

Page 49

1        **A.    I don't recall.**
2        Q.    Is it in your normal course of
3    business to review Transfer of Ownership documents
4    before you personally mail them out to insurance
5    companies?
6        **A.    It would be, yes, in my normal**
7    **course.**
8        Q.    In that letter, you state that you
9    do not have a copy the policy, is that correct?
10       **A.    That is what the letter says, yes.**
11       Q.    And based on the exhibits that we've
12   gone through previously, there was, in fact, a
13   copy of the policy located in your legal file, is
14   that correct?
15           MR. SLABY:  I'm going to object to
16   form as far as if we're talking about the same
17   policy, or --
18           MR. JACOBSON:  I'm going to object
19   to form, as we don't have any evidence of when
20   that policy entered her file relative to the date
21   of this letter.
22   BY MR. BRODZIK:
23       Q.    Okay.  But you do believe that at
24   some point, that file made its way -- or that
25   policy made its way into your legal file; correct?

13  (Pages 46 to 49)

Page 50

1    A.   Yes.
2         (Whereupon, Exhibit K is marked for
3    identification.)
4    BY MR. BRODZIK:
5    Q.   I'm going to hand you an October
6    2003 letter from Danna McKitrick, Barbara Blee
7    Maille --
8    A.   Maille.
9    Q.   -- to you in regards to the dispute
10   between James Wiegand and Ed and Gina, including a
11   proposed petition for breach of fiduciary duty,
12   and for the removal of Ed and Gina as Trustees for
13   the Trust.
14        Do you recall receiving this letter
15   from Ms. Maille?
16   A.   I don't recall.
17   Q.   Right.  But it was included in your
18   legal file; correct?
19   A.   I assume that's where you got it.
20   Q.   Yes.  Do you recall when James
21   settled with Ed and Gina?
22   A.   No.
23   Q.   Is it your understanding that James
24   did at some point end up settling with Ed and
25   Gina?

Page 51

1    A.   That is my recollection, not strong.
2    Q.   Do you recall the terms of that
3    settlement?
4    A.   No.
5    Q.   Do you recall if, during the
6    negotiation of that settlement, if it was
7    discussed that Ed and Gina should be removed as
8    Trustees of the Trust?
9    A.   I don't remember any of those
10   details at that point.
11   Q.   I believe you stated earlier that
12   Tom Blumenthal was representing the Trust in
13   regards to this lawsuit.  However, this
14   correspondence is directed to you.
15        Did you also have some part in
16   defending the Trust in relation to this lawsuit or
17   potential lawsuit?
18   A.   Tom and I worked together on this,
19   so I would have turned this over to him.  I knew
20   Barbara well as well, and she knew I was working
21   with the Trust.  So for some reason, she addressed
22   this letter me.
23   Q.   You don't recall when that
24   settlement occured between --
25   A.   No.

Page 52

1    Q.   The petition that is attached to
2    this letter names Edward Wiegand, individually and
3    in his capacity as a trustee, Mark Wiegand,
4    individually, and Eugenia, individually and in her
5    capacity as a trustee.
6         Would it be in your -- with your
7    knowledge of trust and estate law, would it be a
8    conflict of interest to represent an individual
9    being sued for breach of fiduciary duty both
10   individually and as a trustee?
11   MR. SLABY:  Object to form.
12   BY MR. BRODZIK:
13   Q.   You can answer if you understand the
14   question.
15   A.   Could you ask the question again,
16   please?
17   MR. BRODZIK:  Can you repeat back
18   the question, please?
19        (Whereupon, the pending question is
20   read by the court reporter.)
21        THE WITNESS:  It could get to be a
22   conflict of interest if it got far enough.
23   BY MR. BRODZIK:
24   Q.   Do you recall if this settlement
25   that was entered into between James and Edward and

Page 53

1    Eugenia was entered into individually and on
2    behalf of the Trust?
3    A.   I don't remember.
4    Q.   General speaking, would it be your
5    advice to have a settlement like that -- strike
6    that.
7         (Whereupon, Exhibit L is marked for
8    identification.)
9    BY MR. BRODZIK:
10   Q.   Exhibit L is a fax from Vance
11   Financial to you, confirming that the New York
12   Life policy, the ownership was changed to the
13   Revocable Trust on August 19, 2003.  Do you recall
14   that?
15   A.   Do I read it as a fax?
16   Q.   Yes.  Do you recall that the
17   ownership of the policy was, in fact, changed to
18   the Trust?
19   A.   Yes, it was, eventually.
20   Q.   And you said say "eventually."  Is
21   it your testimony that on November 18, 2003, the
22   ownership had not been changed yet to the Trust?
23   A.   No.
24        MR. JACOBSON:  Because of the double
25   negatives, I don't know whether your answer was

14 (Pages 50 to 53)

Page 54

1  that, "No, it was changed," or "No, it wasn't
2  changed."
3        MR. SLABY:  If you know.
4        THE WITNESS:  I don't know.  I
5  assume from this.
6  BY MR. BRODZIK:
7     Q.   That it was?
8     A.   Yes.
9         (Whereupon, Exhibit M is marked for
10  identification.)
11  BY MR. BRODZIK:
12     Q.   On M, it is a July 12, 2004, letter
13  to Heidi Vance from you.  "We are enclosing the
14  completed Service Form - Change Request for the
15  life insurance policy owned by the Herbert C.
16  Wiegand Revocable Trust, insuring the life of Jean
17  C. Wiegand.  As indicated in the document, the
18  original policy has been lost, and we are
19  requesting the issuance of a new policy, showing
20  the current owner of the Herbert C. Wiegand
21  Irrevocable Trust."
22        And if you'd look to the next
23  page -- well, first off, 502, do you recall having
24  written that letter?
25     A.   I don't recall.

Page 55

1     Q.   On the following page, it is the
2  Service Form - Change Request that was attached to
3  this letter in your legal file.  Listed is --
4  well, do you recall if you filled out this Service
5  Form - Change Request?
6     A.   I don't recall.
7     Q.   The prior Change Request was all
8  written in hand.  This one is written, it looks
9  like, with a typewriter or some sort of computer
10  program.
11        Is it the standard course in your
12  business that when you are filling out forms such
13  as this, that your office type out Change Requests
14  rather than write them out by hand?
15        MR. SLABY:  Object to form.
16        THE WITNESS:  I don't know that we
17  have a standard practice.  I think it varies.
18  BY MR. BRODZIK:
19     Q.   Do you believe or recall if you or
20  your office was the individual that typed out the
21  instructions on the Service Form - Change Request
22  on this document?
23     A.   I don't recall.
24     Q.   The instructions -- well, strike
25  that.

Page 56

1        Do you have any recollection as to
2  why the top half of the Service Form - Change
3  Request is written with pen handwriting, and the
4  second half of the form was typed?
5     A.   I don't recall the -- because this
6  is a form that came from the agent, the top part,
7  probably written by the agent and sent to us.
8     Q.   And the letter prior that was in
9  accordance with this document says, "We are
10  enclosing the completed Service Form."
11        If you believe that the top half was
12  done by the agent, is it your belief then that the
13  remainder of the document was completed by you?
14     A.   I don't know for sure.  I can't
15  recall.
16     Q.   But it's your understanding that
17  either you or Edward or Eugenia would have
18  completed this Service Form, the Change Request?
19        MR. SLABY:  Object to form.
20        THE WITNESS:  I can't recall.
21  BY MR. BRODZIK:
22     Q.   Right.
23     A.   2002 or 2003 or whatever, or 2004.
24     Q.   And the purpose of this Service Form
25  was to provide an address for the Herbert C.

Page 57

1  Wiegand Revocable Trust; correct?
2     A.   It appears to be the case.
3     Q.   And the address listed as the owner
4  or the address for the Herbert C. Wiegand
5  Revocable Trust is 165 North Meramce Avenue?
6        MR. JACOBSON:  Meramec.
7  BY MR. BRODZIK:
8     Q.   The document states Meramce,
9  M-E-R-A-M-C-E, Avenue, Sixth Floor, St. Louis,
10  Missouri 63105.  Can you tell me where 165 North
11  Meramce Avenue is?
12     A.   I would assume that that is right
13  here, but with a small typo.
14     Q.   So you do admit that there is a typo
15  in this address?
16     A.   Yes.
17     Q.   And under phone number listed as the
18  home phone number of the Herbert C. Wiegand
19  Revocable Trust, the number 314-727-2266 is
20  listed.  Is that your office number?
21     A.   Yes.
22     Q.   Do you know why that is listed as
23  the home address of the Trust?
24     A.   I don't recall why that decision was
25  made.

15  (Pages 54 to 57)

Page 58

1    Q.    Just so you are aware or you now are
2   aware that the address that you instructed, or
3   that this document instructs New York Life to
4   provide notices, address, policy information is an
5   incorrect or a nonexistent address; correct?
6        MR. SLABY:  Object to form.
7        THE WITNESS:  There is a typo in the
8   address that may or may not have any effect in
9   terms of delivering information.
10  BY MR. BRODZIK:
11       Q.    Do you recall if you ever made an
12  attempt to correct the typographical error of this
13  address?
14       A.    I don't recall.
15       Q.    And if you look at Page 504, the
16  document appears to have been reviewed and signed
17  by Edward Wiegand and Eugenia Sprich.  Do you
18  agree?
19       A.    It appears to be.
20       (Whereupon, Exhibit N is marked for
21  identification.)
22  BY MR. BRODZIK:
23       Q.    Following that, I'm going to hand
24  you a copy of the policy that was included in your
25  legal file.  And if you would look at -- getting

Page 59

1   to Page 140, it appears that it was sent in a fax
2   on February 4, 2004.  Take a look, and you can
3   confirm that for me.
4        A.    It appears to be a copy of the
5   policy.
6        Q.    So your understanding, based off the
7   policy and the faxed date of same, at some point
8   around February 4, 2004, your firm would have a
9   complete copy of the policy at issue in this
10  lawsuit?
11       A.    Yes.
12       (Whereupon, Exhibit O is marked for
13  identification.)
14  BY MR. BRODZIK:
15       Q.    Exhibit O is a letter sent, or a fax
16  sent from you to Heidi Vance on February 17, 2004,
17  enclosing pages of the replacement policy, which
18  you admit you had received, and asking for
19  confirmation that the change of name had taken
20  place, is that correct?
21       A.    Yes, it appears be.
22       Q.    So you reviewed the policy in depth
23  enough to look and see who the named beneficiary
24  of the policy was; correct?
25       A.    Yes.

Page 60

1        Q.    And in the pages that you sent over,
2   it lists a guarantee no-lapse date of 6-13, 2005,
3   is that correct?
4        A.    I don't --
5        Q.    You can review the pages of the
6   document.
7        MR. SLABY:  Are you asking for what
8   it states on the form?
9        MR. BRODZIK:  Yes.  It states the
10  date of the guaranteed no-lapse date on the
11  policy.
12       THE WITNESS:  Yes.
13  BY MR. BRODZIK:
14       Q.    What is your understanding of what
15  the term "Guaranteed no-lapse date" of a policy
16  means?
17       MR. SLABY:  Object to form.
18       THE WITNESS:  Beyond the words
19  itself, I can't give you an explanation.
20  BY MR. BRODZIK:
21       Q.    Do you know what the "No-lapse" date
22  means, generally speaking?
23       A.    I can tell you what the words might
24  mean in English, but not what it means to the
25  insurance companies.

Page 61

1        Q.    What do those words mean in English?
2        A.    That it is not going to lapse in
3   that period of time or until that date?
4        Q.    Or until that date?
5        A.    Yes.
6        Q.    And that date is only a year and
7   change out from the date that you sent that
8   letter; correct?
9        A.    It appears.
10       Q.    So would it be in your normal course
11  of business, if you see a policy that has the
12  potential to lapse in a year, that you would
13  inform your clients of that fact?
14       MR. SLABY:  Object to form.  No
15  foundation.  Calls for a conclusion.
16       THE WITNESS:  Could you ask that
17  question again?
18       MR. BRODZIK:  Could you read it
19  back, please?
20       (Whereupon, the pending question is
21  read by the court reporter.)
22       MR. SLABY:  Same objections.
23       THE WITNESS:  Yes, generally.
24  BY MR. BRODZIK:
25       Q.    Do you recall if you did that in

Page 62

1  this instance?
2       **A.   I believe that is covered under**
3  **confidentiality.**
4            MR. BRODZIK: Can you certify that
5  question, please?
6            (Whereupon, the pending question is
7  certified at the request of Mr. Brodzik.)
8  BY MR. BRODZIK:
9       Q.    In the pages that you sent back to
10 the insurance agent, is it true that it states
11 that the policy requires a monthly premium of
12 $7,818.50?
13      **A.   I'm sorry, I don't have that in**
14 **front of me.**
15           MR. JACOBSON: I was looking it
16 over --
17           MR. SLABY: The document speaks for
18 itself. If you're just asking her to confirm what
19 it says on it, that's fine.
20           THE WITNESS: It says somewhere in
21 here.
22           MR. SLABY: Where is it? Don't
23 assume anything.
24           THE WITNESS: I assume it says what
25 you --

Page 63

1            MR. SLABY: What are you asking,
2  Jim? I'm sorry.
3  BY MR. BRODZIK:
4       Q.    Well, you can look through the
5  dates. What is the required monthly premium as
6  stated on the policy pages that you forwarded to
7  Vance Financial Group?
8            MR. SLABY: Calls for a conclusion.
9  Lack of foundation.
10           THE WITNESS: Yes, it says premium
11 levels $7,000 and some change.
12 BY MR. BRODZIK:
13      Q.    Do you ever recall discussing that
14 fact with Edward and Eugenia?
15      **A.   I believe that is covered by**
16 **confidentiality.**
17           MR. BRODZIK: Certify that question
18 as well, please.
19           (Whereupon, the pending question is
20 certified at the request of Mr. Brodzik.)
21 BY MR. BRODZIK:
22      Q.    Do you recall if the Trust -- strike
23 that. If payments are being made for, say, life
24 insurance or fees on a brokerage account, whatever
25 it may be, are those fees being paid by the Trust

Page 64

1  itself or by the Trustees of the Trust?
2       **A.   They are generally being paid by the**
3  **Trustees out of the Trust, so you can make your**
4  **conclusion as to whether it is being paid by the**
5  **Trustees or the Trust, I think is a fine point.**
6       Q.    Typically speaking, what would be
7  the -- say if it's a check, what would be the
8  entity as listed on the check? Would it be the
9  Trust itself or the Trustees?
10      **A.   Sometimes it might be one, sometimes**
11 **the other. Under Missouri law, it is permitted to**
12 **list the Trust on the account. But typically,**
13 **only the Trustees can sign on behalf of the Trust.**
14      Q.    From your own experience, practicing
15 in this area of the law for 45 years, if you
16 receive a payment for fees, and the check states
17 solely from the Trust, or solely from the
18 Trustees, could that cause any sort of potential
19 conflict of interest in your eyes?
20      **A.   No.**
21           **MR. SLABY: Object to form.**
22           **(Whereupon, Exhibit P is marked for**
23 **identification.)**
24 BY MR. BRODZIK:
25      Q.    And then following your request for

Page 65

1  a verification of the policy beneficiary
2  designation has been changed, on June 24, 2004, a
3  fax came to you from Clinton Vance, stating, Here
4  comes the policy ownership and beneficiary
5  information regarding policy 62791665.
6            And there is a letter from New York
7  Life, stating that the owner is the Herbert C.
8  Wiegand Revocable Trust.
9            Have you seen that document before,
10 or do you recall receiving that document?
11      **A.   I don't recall seeing that document.**
12      Q.    But you don't deny that it was in
13 your legal; file?
14      **A.   Correct.**
15      Q.    Is there a reason why you don't
16 think you would have reviewed this document, or
17 you just don't remember reviewing it?
18           MR. SLABY: Object to form.
19           THE WITNESS: I didn't say I didn't
20 -- I don't recall. It's been too long to say that
21 I can look at this document and say I remember
22 seeing it.
23 BY MR. BRODZIK:
24      Q.    If you look at the document, which
25 is dated June 23, 2004, it states the owner was

17 (Pages 62 to 65)

Page 66

1  Herbert C. Wiegand Revocable Trust; correct?
2      A.    Yes.
3      Q.    Okay.  And at the top, it states the
4  address of the Herbert C. Wiegand Revocable Trust
5  as 9 Huntleigh Woods, St. Louis, Missouri.  Do you
6  agree with that?
7      A.    Yes, it does.
8      Q.    And that is seven months after this
9  Service Form - Change Request was sent, directing
10  that the address of the Trust be changed to 165
11  North Meramce Avenue, is that correct?
12      A.    It is some period of time.  I
13  haven't measured the month.
14      Q.    After receiving this letter on June
15  23, 2004, stating that -- or providing an address
16  of 9 Huntleigh Woods, what action did you take to
17  attempt and rectify the current discrepancy and
18  address between 9 Huntleigh Woods and 165 North
19  Meramce?
20      A.    I don't recall.
21      Q.    Do you recall if you ever attempted
22  to contact New York Life again and request an
23  update of address?
24      A.    I don't recall.
25      Q.    If I were to tell you that I did not

Page 67

1  see any documents in your file memorializing an
2  attempt to reach out to New York Life, would you
3  have any reason to disagree with that?
4      MR. SLABY:  Object to form.
5      THE WITNESS:  I can't disagree with
6  what you saw one way or the other.
7  BY MR. BRODZIK:
8      Q.    And after this letter on June 23,
9  2004, the file essentially is devoid of any new
10  material in regards to this policy.  Do you recall
11  if you took any more -- strike that.
12      Do you recall performing any
13  additional legal work for Edward and Eugenia
14  and/or the Trust after June 23, 2004?
15      A.    In the overall Trust administration,
16  yes.
17      Q.    In regards specifically to this
18  policy?
19      MR. SLABY:  Object to form.
20      THE WITNESS:  I can't recall that.
21      (Whereupon, Exhibit Q is marked for
22  identification.)
23  BY MR. BRODZIK:
24      Q.    On 12-8, 2004, there was an itemized
25  list of legal expenses included in your file, and

Page 68

1  that itemized list shows that the PCB firm had to
2  date, or as of the date, 12-8, 2004, had billed
3  the Wiegands or the Trust $103,000 in legal fees.
4  Do you see that?
5      A.    Yes.
6      Q.    Was that the last bill that was sent
7  from PCB to -- well, strike that.
8      Was any legal work performed on
9  behalf of Edward and Eugenia Sprich or the
10  Wiegands following December 2004?
11      A.    Yes.
12      Q.    Do you recall if any invoices or
13  bills went out to the children or the Trust after
14  December 2004?
15      MR. SLABY:  Object to form.
16      THE WITNESS:  There would have been
17  bills going to the Trust.
18  BY MR. BRODZIK:
19      Q.    Do you have any knowledge or
20  understanding as to why no documentation was
21  included in the legal file post 2004?
22      MR. SLABY:  Object to form.
23      THE WITNESS:  I said that I reviewed
24  the file briefly, but it was my recollection that
25  we were still corresponding.  And I provided

Page 69

1  documents corresponding with the IRS subsequent to
2  that date, so there were documents in the file
3  subsequent to 2004.
4  BY MR. BRODZIK:
5      Q.    Do you recall when the last document
6  in the file date-wise would have been?
7      A.    No.  I do not believe -- I know we
8  had not settled with the IRS before 2004.
9      Q.    You don't recall when you settled
10  with the IRS?
11      A.    2006 comes to mind, but I could be
12  off by a year.
13      Q.    Following 2006 or 2007, or whenever
14  you think you may have settled with the IRS, did
15  you perform any other legal work on behalf of
16  Edward and Eugenia or the Trust?
17      A.    Not on behalf of the Trust, some
18  other matters for Edward and Eugenia.
19      Q.    That are not in any way related to
20  the Trust?
21      A.    Right.
22      Q.    Do you recall the last time you
23  performed legal work for Edward and Eugenia in
24  regards to the Trust?  Would it have been wrapping
25  things up with the IRS in 2005 or 2006?

18  (Pages 66 to 69)

1          MR. SLABY:  Or 2007.
2     BY MR. BRODZIK:
3          Q.    Or 2007?
4          A.    Or 2007.  Yes, somewhere in there.
5     I don't recall.
6          Q.    Is the Trust still open?
7          A.    That is a question that I am not
8     sure I can answer.  I don't have enough
9     information.
10         Q.    And you never received a yearly
11    notice from New York Life in regards to yearly
12    cash value of the policy?
13         A.    No.
14         Q.    Did you ever reach out to New York
15    Life as a representative of the Trustees or the
16    Trust to request another yearly policy cash value
17    notification?
18         A.    No.
19         Q.    Did you ever reach out to the
20    individuals living at 9 Huntleigh Woods to request
21    any notices?
22         MR. SLABY:  Object to form.
23         THE WITNESS:  No.
24    BY MR. BRODZIK:
25         Q.    Did you ever inform --

1          A.    Let me change -- I don't know.  I
2     can't remember.
3          Q.    If you would have, would that have
4     been noted in your legal file?
5          MR. SLABY:  Object to form.
6          THE WITNESS:  I don't know.
7     BY MR. BRODZIK:
8          Q.    Did you inform Edward and Eugenia
9     that the last correspondence you received from New
10    York Life in regards to the change in ownership
11    listed 9 Huntleigh Woods as the address for the
12    Trust?
13         A.    I believe that would fall under
14    confidentiality in terms of what I informed them.
15         MR. BRODZIK:  Certify that question,
16    please.
17         (Whereupon, the pending question is
18    certified at the request of Mr. Brodzik.)
19    BY MR. BRODZIK:
20         Q.    Did you ever make another attempt to
21    correct 165 North Meramce Avenue as your intended
22    address for the Trust?
23         A.    I don't recall.
24         Q.    Do you know when this insurance
25    policy lapsed?

1          MR. SLABY:  Object to form.
2          THE WITNESS:  No.
3     BY MR. BRODZIK:
4          Q.    Are you aware of when the Wiegand
5     children reached out to New York Life in regards
6     to their request for information about the policy?
7          A.    Would you rephrase that, please?  Or
8     I'm not sure I understand the question.
9          Q.    Are you aware that at some point in
10    time, the Wiegand children, Edward or Eugenia, or
11    both, reached out to New York Life for an update
12    as to the current standing of the policy?
13         A.    I'm aware that they did reach out,
14    yes.
15         Q.    Do you know when they reached out?
16         A.    Not precisely.
17         Q.    And you never reached out?
18         A.    I did not.
19         Q.    Did you review --
20         A.    There was additional correspondence
21    with New York Life, where we provided beneficiary
22    information to New York Life from our office for
23    -- after the termination of the Trust interest in
24    the policy.
25         Basically, we provided beneficiary

1     designations for each of the children of the
2     Trust, or the decedent, so that upon payment of
3     the policy they would know where to make the
4     payment.  And those addresses and the detailed
5     information was provided to New York Life.  I
6     can't tell you exactly when, but it would have
7     been somewhere in that --
8          Q.    Do you think that that may have
9     actually be included in some of the documents?
10         A.    I thought it was.
11         Q.    It was, right.  So the documentation
12    would have been provided to New York Life prior to
13    this April --
14         A.    No, I believe it was afterwards.
15         Q.    So you believe it was afterwards?
16         A.    Yes.  I don't recall exactly when it
17    was, but we provided beneficiary designation so
18    that New York Life had all the names and addresses
19    of all the beneficiaries for the eventual payout
20    of the policy.
21         Q.    Looking at Exhibit J, dated July 22,
22    2003, is this the beneficiary designation material
23    that you believe you are referencing?
24         A.    Yes.
25         Q.    So that was in July 2003, that that

19  (Pages 70 to 73)

1  information was sent to New York Life; correct?
2    **A.   Yes.  And that had all the names and**
3  **addresses of all the parties, including the**
4  **Trustees.**
5    Q.   When you provided this change of
6  beneficiary request, is that your understanding or
7  belief that at that point that somehow removes
8  your duty to contact New York Life in regards to
9  the upkeep or the current status of the policy?
10   MR. SLABY:  Object to form.  There
11  has been no established legal duty or anything
12  like that.  So lack of foundation.  Calls for a
13  conclusion.
14  BY MR. BRODZIK:
15   Q.   As the representative of Edward and
16  Eugenia as Trustees, did you have -- as an
17  attorney, did you have a legal duty to make sure
18  that their policy was in effect, and that they had
19  notice of the terms and conditions of the policy?
20   MR. SLABY:  Object to form.  Calls
21  for a legal conclusion.  Lack of foundation.
22   THE WITNESS:  My discussions with
23  them are covered by confidentiality.
24  BY MR. BRODZIK:
25   Q.   And I'm not asking for any

1  discussions that you've had with them.  I'm asking
2  you as an attorney of 45 years, who handles
3  estates and trusts, do you have a legal duty to
4  keep your clients informed as to the pertinent
5  provisions of life insurance policies?
6    MR. SLABY:  Object to form.  Lack of
7  foundation, vague and ambiguous, calls for a legal
8  conclusion.
9    THE WITNESS:  Does that mean I don't
10  answer?
11   MR. SLABY:  If you have an answer,
12  you can have answer.  I'm not telling you not to.
13  Do you understand the question?
14   THE WITNESS:  I believe that in any
15  given case, that may be governed by discussions
16  between the attorney and the client.  And in this
17  case, I believe that is covered by
18  confidentiality.
19  BY MR. BRODZIK:
20   Q.   I'm not asking you specifically
21  about this case.
22   **A.   I understand that.**
23   Q.   I'm asking you, generally speaking,
24  with your 45 years of experience, whether or not
25  the representative for the Trustees of the Trust,

1  counsel for the Trustees of the Trust has a duty
2  to inform the Trustees of the pertinent
3  information in life insurance policies that are
4  included in the Trust?
5    MR. SLABY:  Same objection as
6  previously made.  There has been no established
7  duty.  Lack of foundation, calls for a legal
8  conclusion, vague and ambiguous.
9    THE WITNESS:  I believe that, based
10  upon the objections raised by my attorney, that it
11  is not appropriate to answer that question.
12   MR. BRODZIK:  Why don't you certify
13  that question as well.
14   (Whereupon, the pending question is
15  certified at the request of Mr. Brodzik.)
16  BY MR. BRODZIK:
17   Q.   Have you ever spoken with Mark
18  Wiegand?
19   **A.   I don't recall.**
20   Q.   Have you spoken to Teal Wiegand?
21   **A.   Who?**
22   Q.   Teal Wiegand?
23   **A.   I don't recall.**
24   Q.   Had you ever spoken to Christina
25  Wiegand?

1    **A.   I don't recall.**
2    Q.   Patrick Wiegand?
3    **A.   I don't recall.**
4    Q.   Have you ever spoken with Stephanie
5  Wiegand?
6    **A.   I do not recall.**
7    Q.   Have you ever spoken to Miriam
8  Wiegand?
9    **A.   I don't recall.**
10   Q.   Have you ever spoken to Herbert C.
11  Wiegand, Junior?
12   **A.   Yes.**
13   Q.   And you didn't represent Herbert C.
14  Wiegand, Junior, did you?
15   **A.   As a beneficiary of the Trust, I**
16  **believe.  I believe he was a beneficiary of the**
17  **Trust.  As a beneficiary of the Trust, I may have**
18  **talked to him in connection with representation of**
19  **the Trustees of the Trust in carrying out the**
20  **Trust administration.**
21   Q.   What did you speak with Herbert C.
22  Wiegand about?
23   **A.   Is that covered by confidentiality?**
24   MR. SLABY:  Probably not.
25   THE WITNESS:  My recollection is

20  (Pages 74 to 77)

Page 78

1  that it had to do with a vehicle that he was
2  receiving from the Trust.
3  BY MR. BRODZIK:
4      Q.   Did you discuss the life insurance
5  policy on Jean Cameron Wiegand with him?
6      A.   No.
7      Q.   Have you ever spoken with Susan B.
8  Lennard?
9      A.   Yes.
10     Q.   What did you speak with Susan B.
11 Leonard about?
12     A.   I think assets passing from the
13 Trust, she may have asked me about.  I don't
14 recall specifically.
15     Q.   Do you recall ever speaking to Susan
16 B. Leonard about the life insurance policy at
17 issue in this case?
18     A.   No.
19     Q.   Did you ever speak with Antoinette
20 Hines?
21     A.   I don't recall.
22     Q.   Have you ever spoken with Emmet
23 Hines?
24     A.   I don't recall.
25     Q.   Douglas Hines?

Page 79

1      A.   I don't recall.
2      Q.   Jackie Hines?
3      A.   No.
4      MR. BRODZIK:  I believe those are
5  all the questions that I have at this time.
6          EXAMINATION
7  BY MR. JACOBSON:
8      Q.   Hello, Ms. Dyroff.  We meet again
9  after 30 years.
10     First, I'll direct your attention to
11 Deposition Exhibit J, which was a letter from you,
12 dated July 22, 2003, to the Vance Financial Group.
13     And if I understand correctly, the
14 Vance Financial Group was the New York Life agents
15 with whom the Trust was dealing?
16     A.   Yes.
17     Q.   And in your July 22, 2003 letter,
18 you state, quote, In addition, as we discussed,
19 the current policy cannot be located, and we
20 request a new policy, naming the Herbert C.
21 Wiegand Revocable Trust as owner, be issued and
22 delivered to our office, closed quote.
23     Did I read that correctly?
24     A.   Yes.
25     Q.   And would you have written that if,

Page 80

1  in fact, you knew and saw a policy -- insurance
2  policy in your file?
3      A.   It seems unlikely.
4      Q.   Yes.  And it seems, from the
5  correspondence, you didn't get a copy of the
6  policy right away when you wrote this July 22,
7  2003 letter, is that correct?
8      A.   I don't recall.
9      Q.   It's not a letter, July 13 of 2004,
10 which is Deposition Exhibit M.
11     A.   I'm sorry, which was what?
12     Q.   Exhibit M.  And it's from you to
13 Heidi Vance at Vance Financial Group, January 12,
14 2004, which was six months later.  And it states,
15 quote, As indicated in the document, the original
16 policy has been lost, and we are requesting the
17 issuance of a new policy, showing current owner as
18 the Herbert C. Wiegand Irrevocable Trust.
19     Did I read that correctly in the
20 first paragraph of your letter?
21     A.   Yes.
22     Q.   All right.  So from your request in
23 July 2003, to your second request in July of
24 2004, did you not receive a copy of the insurance?
25     A.   I don't recall.  Based upon the

Page 81

1  letters, it appears not.
2      Q.   At that time, you would have been
3  aware of whether you received something in the
4  last six months or so?
5      MR. BRODZIK:  Objection.  Calls for
6  speculation.
7      THE WITNESS:  Yes.
8  BY MR. JACOBSON:
9      Q.   And if you had received such a
10 thing, would you have asked for another copy,
11 saying it was still lost?
12     MR. BRODZIK:  Objection.  Calls for
13 speculation.
14     THE WITNESS:  No.
15 BY MR. JACOBSON:
16     Q.   Now, the address placed on this
17 Service Form - Change Request, the second page of
18 Exhibit M, has the misspelling.  It says 165 North
19 Meramec, but Meramec is spelled M-E-R-A-M-C-E,
20 instead of M-E-R-A-M-E-C; correct?
21     A.   I see that there is a difference.  I
22 didn't quite follow your letters, yes.
23     Q.   The last two letters are switched?
24     A.   Right.
25     Q.   And it says, the Sixth Floor.  We're

21  (Pages 78 to 81)

Page 82

1  currently on the first floor.
2      A.   At that point, we were using the
3  sixth floor.  But now mail comes in on the first
4  floor.
5      Q.   Do you still receive mail sometimes
6  addressed to the sixth floor?
7      A.   Sometimes, yes.
8      Q.   Do you still receive mail that is
9  sometimes addressed to a misspelled street name?
10      A.   Absolutely.
11      Q.   So with this January 12, 2004
12  letter, you are asking that the policy be noted as
13  owned by the Herbert C. Wiegand Irrevocable Trust;
14  right?
15      A.   Yes.
16      Q.   That didn't happen right away, did
17  it?  They didn't change the ownership right away,
18  did they?
19      A.   I can't remember that.
20          MR. BRODZIK:  Objection.  Vague.
21  BY MR. JACOBSON:
22      Q.   I'm going to direct your attention
23  next to Deposition Exhibit O, which is a facsimile
24  from you to Heidi Vance, February 17 of 2004, in
25  which you attach a couple of pages that have been

Page 83

1  issued for a change in policy.
2          And as we looked at it previously,
3  on the third page of this exhibit, it shows the
4  name of the owner as Herbert C. Wiegand, is that
5  correct?
6      A.   Somewhere in here.
7      Q.   About a third of the way down?
8      A.   Yes.
9      Q.   So it shows -- this document that
10  was generated by New York Life, supposedly showing
11  the changes in the policy, has the owner's name
12  wrong; correct?
13      A.   Correct.
14      Q.   So on February 17th of 2004, you
15  wrote to their agent to, again, ask them to issue
16  it in a correct name, is that correct?
17      A.   Yes.
18      Q.   And finally, we have here as part of
19  Exhibit P, a New York Life letter, dated June 23,
20  2004, addressed to the policyholder, which is here
21  listed as Herbert C. Wiegand Revocable Trust, but
22  at the address of 9 Huntleigh Woods; correct?
23      A.   Correct.
24      Q.   So that would be the wrong address,
25  based upon the information that you provided

Page 84

1  previously?
2      A.   Yes.
3      Q.   So would it be fair to say that in
4  the course of these year and a half to two years
5  of correspondence, it took that long to get a
6  change of policy from New York Life, and even in
7  the end, they still had the address wrong?
8      A.   Yes.
9      Q.   If you -- for some of your clients,
10  do you receive notices, mail, and so on addressed
11  to you at your law office for the benefit of your
12  clients?
13      A.   Yes.
14      Q.   What is your practice when you
15  receive such correspondence?
16      A.   We send it on immediately to the
17  client.
18      Q.   And if you received the annual
19  policy statements and notices from New York Life
20  here, what would you have done with them?
21      A.   Sent them on to the client.
22      Q.   But you didn't have the opportunity
23  to do that?
24      A.   That's right.
25          MR. JACOBSON:  I have no further

Page 85

1  questions.  I would like copies of these exhibits.
2          EXAMINATION
3  BY MR. BRODZIK:
4      Q.   Just one quick follow-up.
5          In regards to -- I think it is
6  Exhibit P, the June 23, 2004 letter, you just
7  stated that the address on the Trust was
8  incorrect.  Is that your testimony?
9      A.   The address listed by New York Life?
10      Q.   Yes.
11      A.   It appears to be incorrect.
12      Q.   Following this letter, what
13  affirmative step did you take to see that that
14  address should be changed to an address that
15  suited your needs and your clients?
16      A.   I'm sorry, I don't recall.
17      Q.   You don't recall if you ever did, or
18  you didn't do anything?
19      A.   I don't recall the steps I would
20  have taken.
21      Q.   And typically, if you would have
22  sent out a letter, just as all these other letters
23  were included in your file, that would have been
24  reflected in your file?
25      A.   Typically.

22  (Pages 82 to 85)



Page 86

```
1              MR. BRODZIK:  All right.
2              MR. JACOBSON:  That's the end of my
3   questions.
4              As your lawyer will tell you, you
5   have the right to read, review, correct the
6   transcript if you wish.
7              MR. SLABY:  Yes.  Read and sign,
8   please.
9                    ---
10             (Signature reserved.)
11                   ---
12             (Whereupon, at 2:05 p.m.,
13  proceedings are concluded.)
14                   ---
15
16
17
18
19
20
21
22
23
24
25
```

Page 87

```
1      C E R T I F I C A T E
2
3          I, Mary M. Rocco, being a
4   Certified Court Reporter and Registered
5   Professional Reporter, do hereby certify that the
6   aforegoing oral testimony of JOANN DYROFF was
7   taken stenographically by me on Friday, February
8   24th, 2023, after the said witness was duly sworn
9   or affirmed prior to the commencement of her
10  testimony; and that this deposition transcript is
11  a true and correct transcript of the same, fully
12  transcribed under my direction, to the best of my
13  ability and skill.
14          I further certify that I am not a
15  relative, employee or attorney of any of the
16  parties in this action; that I am not a relative
17  or employee of any attorney interested in the
18  event of this action.
19
20
21          _____
22          MARY M. ROCCO, RPR, CCR
            Certified Court Reporter
23          #MO CCR NO. 1064
24
25
```

Page 88

```
1          UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF MISSOURI
2               EASTERN DIVISION
3
   EDWARD WIEGAND and EUGENIA   )
4  SPRICH, TRUSTEES OF THE      )
   HERBERT C. WIEGAND REVOCABLE )
5  TRUST, individually and on   )
   behalf of all other similarly )
6  situated,                    )
                                )
7      Plaintiff,     )No. 4:22 CV 188 RWS
                                )
8  vs.                          )
                                )
9  NEW YORK LIFE INSURANCE &    )
   ANNUITY CORPORATION, et al., )
10                              )
      Defendants.        )
11
12         I, JOANN DYROFF, hereby acknowledge that
13  I have read the foregoing transcript of the
    testimony given by me at my deposition on Friday,
    February 24th, 2023, and that said transcript
14  constitutes a true and correct record of the
    testimony given by me at said deposition except as
15  I have so indicated on the errata sheets provided
    herein.
16
17         _____
               JOANN DYROFF
18
19  No corrections (Please initial)_____
20  Number of errata sheets submitted_____(pgs.)
21
22  SUBSCRIBED AND SWORN to
    Before me this _____ day
23  Of _____, 2023.
24         _____
               NOTARY PUBLIC
25
```

23  (Pages 86 to 88)

**A**

ability
5:6 87:13
able
31:5
Absolutely
42:14 82:10
account
63:24 64:12
accumula...
21:4 33:13
accumulator
19:10 20:20
  20:24
  21:15 32:2
  32:16,19
  33:24
accurately
21:10
acknowledge
88:12
acted
44:19
acting
41:11 45:6
  46:3
action
9:1 44:6
  66:16
  87:16,18
actions
42:11
active
11:3
acts
42:5
added
22:14
addition
46:21 79:18
additional
22:13 33:3
  67:13
  72:20
address
4:24 27:2,4
  27:7,21
  47:12,23
  48:2,3,5,7

48:11,20
56:25 57:3
57:4,15,23
58:2,4,5,8
58:13 66:4
66:10,15
66:18,23
71:11,22
81:16
83:22,24
84:7 85:7
85:9,14,14
addressed
51:21 82:6
82:9 83:20
84:10
addresses
73:4,18
74:3
administ...
44:17
administ...
6:12 7:1
13:21,23
16:23
27:17,20
67:15
77:20
admit
57:14 59:18
advice
12:17 34:16
53:5
advising
12:5
affirmative
85:13
affirmed
87:9
aforegoing
87:6
afternoon
4:9
agent
26:14 33:11
  35:8,11
  56:6,7,12
  62:10
  83:15

agents
79:14
ago
6:5 43:4,24
agree
37:9 42:12
  48:4 58:18
  66:6
agreement
14:24
al
1:9 88:9
allegation
6:1 30:8
allegations
5:22 8:13
  8:14 19:3
allegedly
8:17
Allow
4:15
allowed
18:2
ambiguous
75:7 76:8
Amended
23:23 24:6
amendment
23:23 24:10
  24:11
amendments
25:2
amount
6:16 8:24
  30:17,19
  30:25
and/or
67:14
annual
6:2 31:4,6
  31:11
  84:18
Annuity
1:9 4:11
  5:11 88:9
answer
4:18 12:21
  15:21
  32:12

37:14
41:16
52:13
53:25 70:8
75:10,11
75:12
76:11
answers
4:15
Antoinette
78:19
anybody
13:13
apparently
35:24
APPEARANCES
2:1
appears
37:7,10
  57:2 58:16
  58:19 59:1
  59:4,21
  61:9 81:1
  85:11
apply
15:8
appropriate
6:2 12:25
  76:11
April
37:12,24
  73:13
area
6:18 34:25
  64:15
arm
6:14
arrange
29:9
article
9:10
aside
42:9
asked
78:13 81:10
asking
16:25 17:19
  21:24 34:6
  34:8 37:21

43:11
59:18 60:7
62:18 63:1
74:25 75:1
75:20,23
82:12
assets
78:12
assist
20:9
assistance
27:9
assistant
29:7
Association
8:3
assorted
8:4
assume
9:17 36:21
  36:23
  50:19 54:5
  57:12
  62:23,24
assuming
10:4
attach
82:25
attached
17:18 52:1
  55:2
attempt
58:12 66:17
  67:2 71:20
attempted
66:21
attention
79:10 82:22
attorney
6:7 11:1
  12:22
  13:13 16:8
  16:8 29:16
  34:16
  38:19
  74:17 75:2
  75:16
  76:10
  87:15,17

attorney...
14:11
August
53:13
Authorities
9:18
Avenue
2:3,8 57:5
57:9,11
66:11
71:21
aware
21:14,18
25:2 38:5
58:1,2
72:4,9,13
81:3

**B**

B
3:6,9 17:11
17:13 78:7
78:10,16
back
10:6,16,20
10:23 11:1
35:7 47:17
52:17
61:19 62:9
background
19:2
bar
8:3 9:11
10:4,10,14
Barbara
38:14,17,18
50:6 51:20
based
18:21 37:8
41:6 47:20
49:11 59:6
76:9 80:25
83:25
Basically
72:25
basis
6:4 30:21
30:23 33:8
33:9

Bates
24:7 47:2
bearing
11:12
beautiful
10:17
behalf
1:5 2:5,10
2:16 36:9
37:19
38:25
41:18,24
42:22 53:2
64:13 68:9
69:15,17
88:5
Behlmann
29:4
belief
27:25 28:15
40:4,19
41:8 56:12
74:7
believe
8:25 13:17
14:14,16
14:18 15:7
15:9,11
20:13 25:8
26:3,5
27:5,18
28:13 29:6
29:8 33:15
35:13
37:24 40:7
45:9,24
46:10 47:1
47:7 48:19
49:23
51:11
55:19
56:11 62:2
63:15 69:7
71:13
73:14,15
73:23
75:14,17
76:9 77:16
77:16 79:4
Belleville

2:14
benefici...
73:19
beneficiary
46:19 59:23
65:1,4
72:21,25
73:17,22
74:6 77:15
77:16,17
benefit
21:5 33:1
34:20 35:5
84:11
best
44:19 45:6
46:4 87:12
better
12:23 27:11
Beyond
60:18
bill
68:6
billed
68:2
bills
68:13,17
birth
4:22
Blee
38:14,17,18
50:6
Blumenthal
2:7 11:17
38:14,22
38:24
51:12
Borman
9:24
bottom
31:2
Brand
9:24
breach
50:11 52:9
break
4:17
breakdown
31:9

briefly
68:24
bring
42:21
Brodzik
2:13 3:4,5
4:8,10
5:13,17
14:17 16:3
17:10,15
18:11,15
20:4,7,8
22:7 23:2
23:6,16,20
25:13,20
28:6,19
29:1 31:20
31:25
33:18,21
33:22 34:5
35:2,15,18
35:21 37:2
37:6,16
38:9,12
40:18
42:16 43:6
43:10 44:9
45:1,4
46:13
47:16
48:15
49:22 50:4
52:12,17
52:23 53:9
54:6,11
55:18
56:21 57:7
58:10,22
59:14 60:9
60:13,20
61:18,24
62:4,7,8
63:3,12,17
63:20,21
64:24
65:23 67:7
67:23
68:18 69:4
70:2,24
71:7,15,18

71:19 72:3
74:14,24
75:19
76:12,15
76:16 78:3
79:4 81:5
81:12
82:20 85:3
86:1
broker
20:14,17
brokerage
63:24
brought
5:23 8:15
43:1
business
49:3 55:12
61:11

**C**

C
1:4 3:9
5:10 18:12
18:13
23:24
24:10
46:17 48:2
48:8 54:15
54:17,20
56:25 57:4
57:18 65:7
66:1,4
77:10,13
77:21
79:20
80:18
82:13 83:4
83:21 87:1
87:1 88:4
call
11:21,24
14:11
called
4:3 10:24
19:9
calls
14:20 16:14
33:15
34:22

61:15 63:8
74:12,20
75:7 76:7
81:5,12
**Camazine**
2:7 11:17
**Cameron**
19:6 22:17
22:20,23
78:5
**capacity**
41:13 52:3
52:5
**captioned**
43:8
**careful**
14:22
**carrying**
77:19
**case**
8:18 13:15
15:18
29:23
34:23
42:25 57:2
75:15,17
75:21
78:17
**cash**
21:16,19
22:12
30:12,16
31:12 33:2
33:24 34:1
34:10,12
34:16,17
34:18 35:4
70:12,16
**cash-out**
34:11
**cashing**
34:18
**Casualty**
9:18
**cause**
64:18
**caused**
6:4 8:18
**CC'd**

36:6
**CCR**
87:22,23
**cease**
10:25
**ceased**
14:5
**Central**
2:3
**certain**
26:15 27:16
**certified**
1:14 3:18
20:7 33:21
35:18 62:7
63:20
71:18
76:15 87:4
87:22
**certify**
20:4 33:18
35:16 62:4
63:17
71:15
76:12 87:5
87:14
**chance**
5:18
**chances**
34:20
**change**
26:16,20
46:18
54:14 55:2
55:5,7,13
55:21 56:2
56:18
59:19 61:7
63:11 66:9
71:1,10
74:5 81:17
82:17 83:1
84:6
**changed**
26:20,22
46:16
53:12,17
53:22 54:1
54:2 65:2

66:10
85:14
**changes**
12:15 83:11
**Charges**
31:12
**Charles**
29:14,15
**check**
64:7,8,16
**child**
10:22
**children**
22:23,24,24
25:6 29:20
29:21 41:9
41:10,12
41:12
68:13 72:5
72:10 73:1
**Christina**
76:24
**Civil**
1:16
**claiming**
18:25 34:25
**claims**
5:22
**Clayton**
2:3
**client**
9:8 13:19
14:14,22
16:22 34:7
34:19 35:4
35:6 75:16
84:17,21
**clients**
12:5,16
16:21
19:25
21:23 22:1
32:1,15
34:11
61:13 75:4
84:9,12
85:15
**Clinton**
65:3

**closed**
29:11 79:22
**closure**
11:12,15
**Code**
1:16
**collection**
39:12,14,17
**come**
12:1 18:2
25:16 45:5
**comes**
65:4 69:11
82:3
**coming**
17:5 18:18
**commence...**
87:9
**commencing**
1:19
**common**
12:11
**communic...**
14:12
**companies**
49:5 60:25
**company**
4:12 5:12
20:15
**complete**
36:14,16
59:9
**completed**
54:14 56:10
56:13,18
**complicated**
10:12
**computer**
55:9
**concept**
32:19
**concluded**
86:13
**conclusion**
14:21 16:14
40:22
61:15 63:8
64:4 74:13
74:21 75:8

76:8
**conditions**
74:19
**confiden...**
15:2,10,12
15:22,24
**confiden...**
13:18 15:8
33:16
35:14 62:3
63:16
71:14
74:23
75:18
77:23
**confirm**
59:3 62:18
**confirma...**
59:19
**confirming**
53:11
**conflict**
45:24 46:5
46:7,8
52:8,22
64:19
**confused**
28:5 41:15
**conjunction**
18:17
**connection**
44:5 48:13
77:18
**consider**
6:17 44:14
**constitutes**
88:14
**consult**
33:10
**contact**
66:22 74:8
**contained**
30:8
**contention**
28:15
**conversa...**
15:10 19:25
**conversed**
15:12

convey
41:25
conveyance
42:10
conveyed
42:3
copied
18:6,24
copies
85:1
copy
5:14 23:15
24:25
27:24 28:1
28:16 49:9
49:13
58:24 59:4
59:9 80:5
80:24
81:10
corporation
1:9 4:11
5:12 9:13
9:16 88:9
correct
6:8 31:16
36:22 41:1
42:13
43:15 46:4
49:9,14,25
50:18 57:1
58:5,12
59:20,24
60:3 61:8
65:14 66:1
66:11
71:21 74:1
80:7 81:20
83:5,12,13
83:16,16
83:22,23
86:5 87:11
88:14
corrections
88:19
correctly
79:13,23
80:19
correspo...

51:14 71:9
72:20 80:5
84:5,15
correspo...
68:25 69:1
cost
30:21,23
counsel
9:8,12 26:6
26:8 45:10
45:11 76:1
counting
44:12
couple
82:25
course
49:2,7
55:11
61:10 84:4
court
1:1,14,17
52:20
61:21 87:4
87:22 88:1
covered
35:13 62:2
63:15
74:23
75:17
77:23
creating
46:5
CULBERTSON
2:12
current
11:20,23
14:8 54:20
66:17
72:12 74:9
79:19
80:17
currently
82:1
CV
1:7 88:7
_____
          D
_____
D
3:1,10 23:3

23:4
damage
6:4 8:18
Danna
50:6
date
4:22 16:22
17:3 26:2
32:25
37:11,17
49:20 59:7
60:2,10,10
60:15,21
61:3,4,6,7
68:2,2
69:2
date-wise
69:6
dated
35:22 38:14
65:25
73:21
79:12
83:19
dates
38:2 63:5
David
2:7 43:25
day
88:22
deal
31:24
dealing
33:23 34:9
35:6 79:15
dealt
31:17,21
death
17:3 26:24
33:1 34:20
35:5
deaths
34:1
deceased
15:16
decedent
73:2
December
68:10,14

decision
57:24
deed
42:1
deeds
41:23,23
Defendants
1:10 2:16
88:10
defending
51:16
defer
42:24
defunct
20:16,16
degree
7:14
delivered
79:22
delivering
58:9
Delivery
26:12
deny
65:12
deposed
44:1,11
deposition
1:13 5:5
13:1,2,12
15:6 44:5
79:11
80:10
82:23
87:10
88:13,14
depositions
1:18
depreciates
31:13
depth
59:22
describe
8:14 20:23
28:8 30:18
30:22
41:14
description
30:16 42:13

designation
65:2 73:17
73:22
designat...
73:1
detailed
73:4
details
8:20 51:10
devoid
67:9
dictates
44:15
died
13:25 20:17
26:9
difference
20:22,23
21:1,2
81:21
different
32:20
differen...
40:25
diminish
21:20
diminishing
33:2,24
34:10
diminution
6:3
direct
79:10 82:22
directed
48:10 51:14
directing
35:10 66:9
direction
40:16 87:12
directly
25:6,10
disagree
67:3,5
discovery
1:19
discrepancy
66:17
discuss
12:24 13:12

78:4
**discussed**
13:15 34:14
51:7 79:18
**discusses**
38:4
**discussing**
29:11 63:13
**discussion**
21:23
**discussions**
33:16 74:22
75:1,15
**dismissed**
41:20
**dispute**
39:20 50:9
**dissipate**
22:13
**dissolved**
11:8
**DISTRICT**
1:1,1 88:1
88:1
**DIVISION**
1:2 88:2
**divorce**
6:14,15
8:18
**divulge**
15:2
**document**
5:19 17:16
19:22 23:7
23:11,12
23:22,25
24:3 27:23
28:12,19
29:24 30:1
30:8,13
33:14 37:7
48:24
54:17
55:22 56:9
56:13 57:8
58:3,16
60:6 62:17
65:9,10,11
65:16,21

65:24 69:5
80:15 83:9
**document...**
68:20 73:11
**documents**
17:20 18:1
18:5,23
23:10,14
24:7 28:9
49:3 67:1
69:1,2
73:9
**doing**
6:22,24
**domestic**
6:14
**double**
53:24
**Douglas**
78:25
**Dr**
15:14,16
16:16 19:5
**drafted**
46:24
**draw**
16:15
**Dryoff**
24:8
**DRYOFF00066**
3:11
**DRYOFF00074**
3:11
**DRYOFF00083**
3:16
**DRYOFF00084**
3:16
**DRYOFF00092**
3:15
**DRYOFF00095**
3:15
**DRYOFF00098**
3:13
**DRYOFF00117**
3:13
**DRYOFF00121**
3:15
**DRYOFF00147**
3:15

**DRYOFF00149**
3:10
**DRYOFF00192**
3:10
**DRYOFF00198**
3:12
**DRYOFF00199**
3:10
**DRYOFF00228**
3:10
**DRYOFF00271**
3:16
**DRYOFF00502**
3:14
**DRYOFF00504**
3:14
**DRYOFF00556**
3:14
**DRYOFF00799**
3:13
**DRYOFF00812**
3:13
**DRYOFF00898**
3:11
**DRYOFF00920**
3:12
**DRYOFF00921**
3:12
**dslaby@p...**
2:9
**duly**
4:4 87:8
**duration**
13:20
**duties**
16:12
**duty**
46:6,9
50:11 52:9
74:8,11,17
75:3 76:1
76:7
**Dyroff**
1:13 2:10
3:3 4:3,21
14:15,21
24:8 25:16
29:25 79:8
87:6 88:12

88:17

---

**E**

**E**
3:1,6,10
25:14,18
87:1,1
**E-mail**
2:4,9,15
**earlier**
29:11 51:11
**EASTERN**
1:1,2 88:1
88:2
**Ed**
15:25 40:2
40:4 43:1
50:10,12
50:21,24
51:7
**Edelman**
9:24
**Edward**
1:3 5:9
13:16,19
14:4,9
16:17,20
16:25 17:4
33:14
35:10,23
36:2 37:25
52:2,25
56:17
58:17
63:14
67:13 68:9
69:16,18
69:23 71:8
72:10
74:15 88:3
**effect**
42:3 58:8
74:18
**eight**
11:2
**either**
56:17
**electron...**
18:1

**Emmet**
78:22
**emphasize**
40:2
**employee**
87:15,17
**enclosing**
54:13 56:10
59:17
**encompas...**
13:7
**ended**
14:1 39:20
**English**
43:3 60:24
61:1
**entered**
49:20 52:25
53:1
**entirety**
19:19,24
25:1
**entities**
5:24
**entity**
26:17,19
41:20 64:8
**errata**
88:15,20
**error**
58:12
**errors**
38:5,6
**ESQUIRE**
2:2,7,13
**essentially**
19:4 31:9
67:9
**established**
74:11 76:6
**estate**
6:11,13,25
12:9,12,15
14:2 41:7
44:21
45:23 52:7
**estates**
41:4 75:3
**et**

```
  1:9 88:9          17:11,13        F                 64:16 68:3      finish
Eugenia             18:12,13        3:11 28:21        fiduciary        4:16,17
1:3 5:9             23:3,4          28:24 87:1        41:13 44:16      37:13
  15:5 16:1         25:14,18        facsimile           46:6 50:11    finished
  16:17,20          28:21,24        82:23               52:9          14:1
  16:25 17:8        35:19 37:4      fact              figure          firm
  33:14             38:9,10         23:9 49:12        30:15            6:15 8:17
  35:11,24          46:11 50:2        53:17           file              8:17,21
  36:2 38:1         53:7,10           61:13           14:12 18:3        9:23 10:23
  43:1 52:4         54:9 58:20        63:14 80:1        18:6,19         11:7,9,13
  53:1 56:17        59:12,15       factual             23:8,14         11:15 12:1
  58:17             64:22          5:22                25:15           18:2 24:18
  63:14             67:21          failed              27:24           24:19,20
  67:13 68:9        73:21          6:1                 28:22 30:9      28:1,16
  69:16,18          79:11          fair                36:14,16        59:8 68:1
  69:23 71:8        80:10,12        6:16 84:3          36:22,25       firm's
  72:10             81:18          fairly              39:3 41:18     17:20
  74:16 88:3        82:23 83:3     20:16               41:19          first
event               83:19 85:6     fall                49:13,20        4:4 9:22
87:18             exhibits         13:17 14:25         49:24,25        15:18
eventual          36:18 49:11        71:13            50:18 55:3       16:21
73:19               85:1           familiar            58:25           19:15,18
eventually        existence        16:16 19:7         65:13 67:1       23:23 24:5
53:19,20          42:9               20:19            67:9,25          40:2 44:14
evidence          exists             26:10 27:3       68:21,24         47:12
49:19             42:4             Family             69:2,6           54:23
exactly           expenses         46:17             71:4 80:2        79:10
13:24 32:13       67:25            far                85:23,24         80:20 82:1
  32:22 73:6      experience       31:10 49:16       filed             82:3
  73:16           12:4,5             52:22            5:9 14:8        five
Examination         64:14          fax                39:20           10:2
3:4,4,5 4:7         75:24          29:14 53:10         41:21          floor
  79:6 85:2       expert             53:15 59:1      files            57:9 81:25
examined          9:19 34:24         59:15 65:3      13:4,6            82:1,3,4,6
4:4               expiration       faxed             filled          follow
Excuse            6:3              59:7              55:4             81:22
36:12             explain          faxes            filling          follow-up
exercise          21:1             36:20            55:12            85:4
34:11             explanation      February         finally          following
exercised         60:19            1:20 26:3,4       14:1 83:18       8:18 11:15
35:4              extensive          59:2,8,16      Financial          55:1 58:23
exhibit           41:6 44:20        82:24            29:8 53:11        64:25
3:7,8,9,9           45:22            83:14 87:7        63:7 79:12      68:10
  3:10,10,11      extent             88:13            79:14           69:13
  3:11,12,12      39:2             feel              80:13            85:12
  3:13,13,14      eyes             4:13 19:23        find             follows
  3:14,15,15      64:19            fees              12:21            4:5
  3:16,16       _____        25:5 63:24       fine             foregoing
  5:14,15               F           63:25            62:19 64:5       88:12
```

foremost
44:14
form
22:3 28:4
  31:19,23
  34:2,21
  40:14
  44:22,23
  47:14
  48:12
  49:16,19
  52:11
  54:14 55:2
  55:5,15,21
  56:2,4,6
  56:10,18
  56:19,24
  58:6 60:8
  60:17
  61:14
  64:21
  65:18 66:9
  67:4,19
  68:15,22
  70:22 71:5
  72:1 74:10
  74:20 75:6
  81:17
formed
11:9
forms
55:12
forwarded
63:6
foundation
61:15 63:9
  74:12,21
  75:7 76:7
Friday
87:7 88:13
front
62:14
fulfill
44:15
fully
87:11
further
20:3 46:20
  84:25

87:14
_____
**G**
G
3:11 35:19
general
9:7,12 16:5
  16:24 53:4
generally
13:4 45:1
  60:22
  61:23 64:2
  75:23
generated
83:10
getting
18:17 58:25
Gina
40:3,5
  50:10,12
  50:21,25
  51:7
give
6:1 32:12
  60:19
given
18:24 75:15
  88:13,14
gives
34:16
GL
31:3
go
7:6,18
  11:16 20:3
  47:17
goes
44:13
going
5:13 14:10
  17:10,11
  18:11 22:2
  23:2,10
  25:13 28:3
  28:20,21
  37:2 40:13
  49:15,18
  50:5 58:23
  61:2 68:17

82:22
Golden
7:22
Good
4:9
Gophers
7:22
governed
75:15
graduate
7:11,24
graduated
7:12,25
  9:21 10:3
Greenley
24:15,17
  29:17,19
  35:23 36:1
  36:15,19
  37:8
ground
4:13
grounds
14:11
group
29:8,8,10
  63:7 79:12
  79:14
  80:13
guarantee
60:2
guaranteed
31:12 60:10
  60:15
guess
15:17 27:10
  42:21
guidance
33:6 34:7
Guideline
31:4,6
gun
39:12,14
guns
39:16
guys
43:4
_____
**H**

**H**
3:6,12 37:3
  37:4
half
56:2,4,11
  84:4
hand
23:10 50:5
  55:8,14
  58:23
handles
75:2
handling
17:20 33:6
  37:21
handwriting
56:3
happen
82:16
happened
39:13
happens
12:20
hard
32:11 40:24
heads
4:15
Heidi
54:13 59:16
  80:13
  82:24
Hello
79:8
help
12:23 23:25
  35:9
helped
29:9
Herbert
1:4 5:10
  15:14
  22:24
  23:24
  24:10
  26:13 27:1
  46:17 48:2
  48:8 54:15
  54:20
  56:25 57:4

57:18 65:7
66:1,4
77:10,13
77:21
79:20
80:18
82:13 83:4
83:21 88:4
higher-e...
7:14
Hines
78:20,23,25
  79:2
HINSHAW
2:12
history
7:9,15
  33:23
  44:20
home
27:5 57:18
  57:23
hour
13:4
house
27:19
Housing
9:18
Huntleigh
27:2,4,7,12
  27:19
  47:13,24
  66:5,16,18
  70:20
  71:11
  83:22
_____
**I**
identifi...
5:16 17:14
  18:14 23:5
  25:19
  28:25
  35:20 37:5
  38:11
  46:12 50:3
  53:8 54:10
  58:21
  59:13
  64:23

67:22
Illinois
2:14
illustra...
33:13
immediately
84:16
impact
5:5 11:12
impression
21:11,12
included
12:12 23:7
27:24 48:3
48:11,20
50:17
58:24
67:25
68:21 73:9
76:4 85:23
including
31:11 50:10
74:3
inclusion
33:2
incorrect
58:5 85:8
85:11
independ...
47:19
indicated
54:17 80:15
88:15
Indicator
31:3
individual
34:7 52:8
55:20
individu...
1:5 40:8
52:2,4,4
52:10 53:1
88:5
individuals
17:21 27:10
32:24
34:14
70:20
inform

61:13 70:25
71:8 76:2
information
15:2 58:4,9
65:5 70:9
72:6,22
73:5 74:1
76:3 83:25
informed
71:14 75:4
initial
21:8 88:19
initially
10:21
instance
45:2,5 62:1
instances
44:18
instructed
58:2
instruct...
55:21,24
instructs
58:3
insurance
1:9 4:10,11
5:11,12
8:25 12:6
12:11,17
19:4 20:14
20:20,25
21:15 28:1
28:17 31:9
32:20,25
33:10,13
35:8,11
46:16 49:4
54:15
60:25
62:10
63:24
71:24 75:5
76:3 78:4
78:16 80:1
80:24 88:9
insuring
54:16
intended
71:21

interest
16:9 42:4
42:22
44:20 45:6
45:24 46:4
46:7,9
52:8,22
64:19
72:23
interested
87:17
interject
41:17
invoices
68:12
involved
39:5 44:4
involvement
20:1
Irrevoca...
46:18
Irrevocable
54:21 80:18
82:13
IRS
69:1,8,10
69:14,25
issuance
54:19 80:17
issue
15:12 45:7
59:9 78:17
83:15
issued
17:12 18:22
38:5,6
79:21 83:1
issues
14:2,2 15:7
33:16
itemized
67:24 68:1

___
J
___
J
3:13 46:11
73:21
79:11
Jackie

79:2
Jacobson
2:2,2 3:4
14:10 18:2
22:2 23:8
23:13,17
25:15 28:3
34:3,22
41:17
42:25 43:9
43:16,21
43:23 44:4
44:23
48:12
49:18
53:24 57:6
62:15 79:7
81:8,15
82:21
84:25 86:2
jacobson...
2:4
James
2:13 4:9
38:16,20
39:5,9,21
50:10,20
50:23
52:25
January
80:13 82:11
jbrodzik...
2:15
JD
7:13
Jean
19:6 21:6
22:16,19
22:22
26:12 27:6
54:16 78:5
Jim
63:2
Joann
1:13 2:10
3:3 4:3,21
42:12 87:6
88:12,17
Joe
43:15

JOSEPH
2:2
journal
9:11
judge
8:24
judgment
8:23,24
July
46:14 54:12
73:21,25
79:12,17
80:6,9,23
80:23
June
38:15 39:24
65:2,25
66:14 67:8
67:14
83:19 85:6
Junior
77:11,14

___
K
___
K
3:13 50:2
Kaplan
9:23
keep
11:3 75:4
kid
44:7
kind
8:19 23:9
32:22
34:24
kinds
21:3 32:20
knew
17:3 51:19
51:20 80:1
know
4:17 14:3
17:4,4,8
19:22
20:12,22
21:2 23:12
24:2,14,16
24:19,21

24:23,24
25:3 27:6
27:8 29:5
29:15
36:10,17
43:16
46:24 47:8
48:7,23
53:25 54:3
54:4 55:16
56:14
57:22
60:21 69:7
71:1,6,24
72:15 73:3
**knowledge**
41:7 45:22
52:7 68:19
**known**
43:20

---

### L

**L**
3:14 53:7
53:10
**lack**
27:11 63:9
74:12,21
75:6 76:7
**Lacks**
10:24 43:25
**lapse**
61:2,12
**lapsed**
71:25
**large**
39:12
**law**
7:18 8:16
8:17 9:2
9:21 10:3
12:15
24:18,19
24:20 41:7
52:7 64:11
64:15
84:11
**lawsuit**
5:8 14:8
41:18

51:13,16
51:17
59:10
**lawsuits**
42:10
**lawyer**
41:1 86:4
**left**
31:10
**legal**
14:21 16:14
23:8,13
25:5 30:9
33:5 40:22
42:9 49:13
49:25
50:18 55:3
58:25
65:13
67:13,25
68:3,8,21
69:15,23
71:4 74:11
74:17,21
75:3,7
76:7
**Lennard**
78:8
**Leonard**
78:11,16
**letter**
35:22 36:4
36:6,8,11
36:13
37:17,21
38:4,13
39:25 40:1
40:6,21
43:18
44:13
46:14,24
48:13 49:8
49:10,21
50:6,14
51:22 52:2
54:12,24
55:3 56:8
59:15 61:8
65:6 66:14
67:8 79:11

79:17 80:7
80:9,20
82:12
83:19 85:6
85:12,22
**letters**
81:1,22,23
85:22
**levels**
63:11
**license**
9:2 11:3
**licensed**
6:7
**life**
1:9 4:10,11
5:11,12,23
5:24 6:1
12:6,11,17
19:4,6,10
20:20,20
20:24,25
21:3,4,5
21:15
28:16 32:2
32:16,18
32:20,25
33:13
46:15
48:25
53:12
54:15,16
58:3 63:23
65:7 66:22
67:2 70:11
70:15
71:10 72:5
72:11,21
72:22 73:5
73:12,18
74:1,8
75:5 76:3
78:4,16
79:14
83:10,19
84:6,19
85:9 88:9
**limited**
33:8
**line**

3:19,19
20:18
**liquidate**
27:12
**list**
64:12 67:25
68:1
**listed**
24:7 48:6,8
55:3 57:3
57:17,20
57:22 64:8
71:11
83:21 85:9
**lists**
27:1 60:2
**litigation**
7:2,4 39:4
39:8,19
43:14,25
44:1
**litigator**
39:6 42:24
**little**
10:12 28:5
32:11
39:10
**lived**
5:2 27:6
**living**
70:20
**LLC**
24:15,17
26:14,16
46:17
**LLP**
2:12
**located**
46:21 49:13
79:19
**log**
3:9 18:10
18:16,21
**long**
5:2 9:25
10:25 11:6
13:2,5,22
28:13 30:6
43:20

65:20 84:5
**look**
14:12 24:6
24:9 26:11
26:25 28:7
29:24 31:8
39:24 47:1
47:4,17
54:22
58:15,25
59:2,23
63:4 65:21
65:24
**looked**
83:2
**looking**
34:24 62:15
73:21
**looks**
28:10 55:8
**lost**
54:18 80:16
81:11
**lot**
6:11,13
12:8 34:3
**Louis**
1:21 2:8
4:25 8:4
11:1 27:3
47:13 57:9
66:5
**Love**
10:24

---

### M

**M**
1:14 2:7,13
3:14 54:9
54:12
80:10,12
81:18 87:3
87:22
**M-E-R-A-...**
57:9 81:19
**M-E-R-A-...**
81:20
**mail**
49:4 82:3,5

82:8 84:10
mailing
48:25
Maille
38:14,17,18
50:7,8,15
Main
2:13
maintain
44:15
maintenance
27:10 33:7
major
14:2
malpractice
8:7 11:11
44:6
mark
5:13 17:11
18:11 23:2
25:13
28:21 37:3
52:3 76:17
marked
5:15 17:13
18:13 23:4
25:18
28:24
35:19 37:4
38:10
46:11 50:2
53:7 54:9
58:20
59:12
64:22
67:21
marking
24:7
marriage
22:25
Mary
1:14 87:3
87:22
MaryLee
29:4 46:15
Maslon
9:23
masters
7:15

material
67:10 73:22
matter
8:19 14:6
14:23
15:20
21:22 40:3
43:19
matters
69:18
McCarter
24:15,16
29:15,15
29:16,19
35:23,25
36:15,19
37:8,18
McKitrick
50:6
McNalty
9:24
mean
12:7 30:4
31:24
41:14
48:13,14
60:24 61:1
75:9
means
30:5,15,19
30:23 31:6
60:16,22
60:24
measured
66:13
medication
5:4
meet
79:8
member
8:1,3
memorandum
25:22 26:2
26:6
memorial...
67:1
Meramce
57:5,8,11
66:11,19

71:21
Meramec
1:21 2:8
57:6 81:19
81:19
met
43:24
method
43:2
Metropol...
8:4
mind
69:11
Minneapolis
9:24
Minnesota
7:21 10:4
minutes
13:3,10
Miriam
77:7
Missouri
1:1,16,21
2:3,8 5:1
7:7,19
9:17 10:7
10:10,14
10:17 27:3
47:13
57:10
64:11 66:5
88:1
misspelled
82:9
misspelling
81:18
mistake
40:5
mix
6:11
Mizzou
7:17
MO
87:23
Mode
31:10
month
66:13
monthly

62:11 63:5
months
6:5 11:2
37:20 66:8
80:14 81:4
move
10:16 24:25
moved
10:6,13,14
10:19 11:2
_____
**N**
N
3:1,15 4:21
58:20
name
4:9,20 9:15
20:15
26:10
41:19 42:2
42:2 59:19
82:9 83:4
83:11,16
named
59:23
names
52:2 73:18
74:2
naming
79:20
necessary
19:24
need
4:16 22:5
needed
26:20
needing
26:16
needs
85:15
negatives
53:25
negotiation
51:6
net
30:17,19
never
48:10 70:10
72:17

new
1:9 4:10,11
5:11,12,23
5:23 6:1
11:9 31:11
46:22 48:2
48:25
53:11
54:19 58:3
65:6 66:22
67:2,9
70:11,14
71:9 72:5
72:11,21
72:22 73:5
73:12,18
74:1,8
79:14,20
80:17
83:10,19
84:6,19
85:9 88:9
nine
11:2
no-lapse
60:2,10,15
60:21
Nodding
10:5 11:22
18:20
47:25
nonexistent
58:5
nonprofit
6:16
normal
49:2,6
61:10
normally
30:24
North
1:20 2:8
57:5,10
66:11,18
71:21
81:18
NOTARY
88:24
noted

notice
6:2,3 70:11
74:19
notices
58:4 70:21
84:10,19
noticing
24:9
notifica...
70:17
November
36:14 53:21
number
17:19,25
18:5 19:10
19:21
25:14
43:24
57:17,18
57:19,20
88:20

**O**

O
3:15 59:12
59:15
82:23
object
14:10 22:2
28:3 31:19
31:23 34:2
34:21
40:13
44:22,23
47:14
48:12
49:15,18
52:11
55:15
56:19 58:6
60:17
61:14
64:21
65:18 67:4
67:19
68:15,22
70:22 71:5
72:1 74:10
74:20 75:6

objection
76:5 81:5
81:12
82:20
objections
61:22 76:10
obligation
44:14
occur
13:23
occured
8:11 26:23
51:24
occurring
34:1
October
35:22 50:5
office
12:23,25
15:19
18:18 24:7
29:7 35:8
55:13,20
57:20
72:22
79:22
84:11
officer
13:25
okay
5:21 9:9
10:9 15:17
16:20
18:21
21:18 22:8
23:17 25:4
30:11 33:5
33:9 37:24
38:8 40:10
49:23 66:3
once
8:10 21:22
ones
8:5 13:8
open
70:6
opened
16:23
opinion

34:18,25
35:3
opportunity
23:9 25:16
84:22
option
34:12
options
34:14
oral
87:6
orders
6:14
organiza...
8:2
original
18:18 24:11
25:1 27:24
54:18
80:15
outcome
8:22
outlined
46:3
outside
7:13 13:13
22:23,25
32:14
43:16
overall
67:15
owned
54:15 82:13
owner
26:13,16
27:1 48:2
54:20 57:3
65:7,25
79:21
80:17 83:4
owner's
83:11
owners
26:13
ownership
48:1,17,21
49:3 53:12
53:17,22
65:4 71:10

82:17
Ownershi...
47:5,6,9

**P**

P
3:16 64:22
83:19 85:6
P.C
2:2,7
p.m
1:20 86:12
page
3:2,7,19,19
25:14
26:11,25
30:11 31:2
31:8 47:2
54:23 55:1
58:15 59:1
81:17 83:3
pages
19:15,18,21
25:14
59:17 60:1
60:5 62:9
63:6 82:25
paid
8:25 25:5,6
25:7,10
63:25 64:2
64:4
paragraph
39:25 80:20
part
27:17,19
28:11 31:2
51:15 56:6
83:18
partial
36:25
particular
6:18 21:6
21:14,19
32:14 34:7
parties
14:24 74:3
87:16
partner

8:16,17,21
11:24
38:23 44:6
partners
11:25
parts
19:12,13
party
12:22
passed
29:12
passing
78:12
Patrick
77:2
Paule
2:7 10:24
11:17
payment
31:10 64:16
73:2,4
payments
63:23
payout
73:19
PCB
11:21,23
16:21,25
17:5 37:21
37:25 68:1
68:7
pen
56:3
pending
4:18,18
19:3 20:6
33:20
35:17
52:19
61:20 62:6
63:19
71:17
76:14
people
32:4,9
perform
38:24 69:15
performed
68:8 69:23

```
     68:8 69:23        4:20 20:5          34:17              24:22 34:8        privileged
performing            36:13          35:12 38:5         55:17              20:2
37:19 67:12           41:14          38:6 46:16         84:14              probably
period                48:18          46:21,22      practicing             6:25 14:1
10:22 16:24           52:16,18       47:11,12      41:3 64:14              56:7 77:24
  22:4 31:13          61:19 62:5     47:18,21      precisely              probate
  61:3 66:12          63:18          47:23 49:9    21:7 32:21             6:12,25
permitted             71:16 72:7     49:13,17        72:16                problems
64:11                 86:8 88:19     49:20,25      premium                34:4
person           point                53:12,17     21:9,21               Procedure
18:3             10:6 22:6           54:15,18        22:14 31:4           1:17
personal              26:15          54:19 58:4      31:6,10,11          proceed
21:24 27:14           27:16          58:24 59:5      33:3 62:11           35:1
  27:15               48:14          59:7,9,17       63:5,10             proceedings
  39:11               49:24          59:22,24      prepare                86:13
personally            50:24          60:11,15      13:2 23:25            proceeds
15:13 49:4            51:10 59:7      61:11          24:12 36:8           25:7
persons               64:5 72:9      62:11 63:6      47:6,8             procured
42:7                  74:7 82:2      65:1,4,5     prepared               20:12
pertaining       policies            67:10,18     16:15 24:2            procuring
1:18             12:6,18             70:12,16        25:21               20:9
pertinent             20:20 21:4     71:25 72:6      30:13              produce
75:4 76:2             31:18,22       72:12,24     PRESS                  17:19,25
petition              32:2,9,16      73:3,20      2:2                   produced
3:8 5:14              32:21 33:1     74:9,18,19   previously             18:7,23
  19:3 50:11          33:7,24        78:5,16      49:12 76:6             23:15
  52:1                34:1,9,14      79:19,20       83:2 84:1           production
petitions             75:5 76:3      80:1,2,6     primarily             18:18
6:5              policy               80:16,17     19:15 33:11          professi...
pgs              12:12 19:4          82:12 83:1      39:11               1:15 8:1
88:20                 19:7,10,11     83:11 84:6   principal              15:3 87:5
phone                 19:13,16       84:19        11:24 12:2           program
2:4,9,14             19:18,20    policyho...        29:12                55:10
  57:17,18           20:1,10,12  83:20           principals             proper
place                 20:24,25   portion         11:25                  43:2
59:20                 21:3,6,9   36:21           prior                  properly
placed                21:15,15   position        5:5 11:13             43:7
81:16                 21:19,20   16:5              16:17 17:5           property
Plaintiff             21:25 22:9 post              17:8 25:1            9:18 27:13
1:7 88:7             22:11,12    68:21             26:6,7                39:12
plaintiffs            22:14      potential         29:20                41:25
2:5 6:2              26:12,13    38:15 39:4        31:17 34:1          proposed
plan                  26:13,16     39:8 51:17      36:4 48:24           50:11
12:13                 26:20        61:12          55:7 56:8           provide
planning              27:25 28:1   64:18          73:12 87:9          28:20 31:5
6:12,25              28:11,17    power           privilege             56:25 58:4
  44:21               29:9 30:12 41:21          3:9 15:1             provided
  45:23               31:1,13,24 practice        18:10,16            13:8 18:10
  45:23               32:15,19   6:10,15          18:21,25             18:17 33:5
please                32:23        10:11
```

| | | | | |
|---|---|---|---|---|
| 18:17 33:5 | 12:21 79:5 | 32:13 | 36:20,21 | **Registered** |
| 33:12 | 85:1 86:3 | 33:12 | 59:18 | 1:15 87:4 |
| 68:25 | **quick** | 35:10 36:2 | 70:10 71:9 | **related** |
| 72:21,25 | 85:4 | 36:5,15,24 | 81:3,9 | 14:23 69:19 |
| 73:5,12,17 | **quite** | 38:2,7 | 84:18 | **relation** |
| 74:5 83:25 | 81:22 | 39:7,13,16 | **receiving** | 51:16 |
| 88:15 | **quote** | 39:19 | 50:14 65:10 | **relations** |
| **providing** | 79:18,22 | 43:23 45:2 | 66:14 78:2 | 6:14 |
| 66:15 | 80:15 | 47:11,15 | **reciprocity** | **relative** |
| **provisions** | | 47:19 | 10:11,15 | 49:20 87:15 |
| 1:16 28:10 | ———— R ———— | 48:22,24 | **recollec...** | 87:16 |
| 75:5 | **R** | 49:1 50:14 | 30:2 37:23 | **remainder** |
| **PUBLIC** | 87:1 | 50:16,20 | 38:21 | 56:13 |
| 88:24 | **raised** | 51:2,5,23 | 39:22 51:1 | **remember** |
| **publication** | 76:10 | 52:24 | 56:1 68:24 | 8:20 10:23 |
| 9:6,7 | **reach** | 53:13,16 | 77:25 | 13:24 |
| **publicat...** | 12:17 67:2 | 54:23,25 | **recommen...** | 25:23 26:8 |
| 9:5 | 70:14,19 | 55:4,6,19 | 33:25 | 32:11 51:9 |
| **purpose** | 72:13 | 55:23 56:5 | **recommended** | 53:3 65:17 |
| 1:19 56:24 | **reached** | 56:15,20 | 34:11 | 65:21 71:2 |
| **purposes** | 72:5,11,15 | 57:24 | **record** | 82:19 |
| 42:10 | 72:17 | 58:11,14 | 4:20 18:9 | **remitter** |
| **pursuant** | **read** | 61:25 | 19:9 88:14 | 8:23 |
| 1:15 | 6:4 17:23 | 63:13,22 | **rectify** | **removal** |
| | 19:11,12 | 65:10,11 | 45:7 66:17 | 50:12 |
| ———— Q ———— | 19:14,17 | 65:20 | **reduced** | **removed** |
| **qualified** | 19:24 | 66:20,21 | 8:24 | 51:7 |
| 6:13 | 23:21 | 66:24 | **refer** | **removes** |
| **question** | 52:20 | 67:10,12 | 35:7 | 74:7 |
| 15:18 20:5 | 53:15 | 67:20 | **reference** | **repeat** |
| 20:6 22:3 | 61:18,21 | 68:12 69:5 | 40:1 | 41:15 48:18 |
| 28:4 33:19 | 79:23 | 69:9,22 | **referencing** | 52:17 |
| 33:20 34:4 | 80:19 86:5 | 70:5 71:23 | 73:23 | **rephrase** |
| 35:7,16,17 | 86:7 88:12 | 73:16 | **reflected** | 72:7 |
| 37:14 | **real** | 76:19,23 | 85:24 | **replacement** |
| 41:15 | 6:13 | 77:1,3,6,9 | **regarding** | 59:17 |
| 48:18 | **reason** | 78:14,15 | 14:22,25 | **reporter** |
| 52:14,15 | 19:17 51:21 | 78:21,24 | 65:5 | 1:14,15 |
| 52:18,19 | 65:15 67:3 | 79:1 80:8 | **regards** | 52:20 |
| 61:17,20 | **recall** | 80:25 | 14:7 15:6 | 61:21 87:4 |
| 62:5,6 | 8:11 16:22 | 85:16,17 | 17:20 33:6 | 87:5,22 |
| 63:17,19 | 16:24 17:3 | 85:19 | 38:15 | **represent** |
| 70:7 71:15 | 19:14,20 | **receipt** | 39:20 50:9 | 4:10 15:13 |
| 71:17 72:8 | 20:15 21:5 | 26:12 27:25 | 51:13 | 15:19 16:4 |
| 75:13 | 21:8,10 | **receive** | 67:10,17 | 16:6 22:19 |
| 76:11,13 | 25:25 | 30:25 64:16 | 69:24 | 26:9 38:3 |
| 76:14 | 26:15,19 | 80:24 82:5 | 70:11 | 38:20 40:2 |
| **questions** | 26:23 | 82:8 84:10 | 71:10 72:5 | 40:3,8,9 |
| 3:18 4:16 | 27:16 | 84:15 | 74:8 85:5 | 40:10,11 |
| 4:18,19 | 29:22 | **received** | | |

40:12,20
40:23,24
41:8,9,11
44:24 52:8
77:13
**represen...**
14:4,13
15:17
16:13 17:1
17:6 25:5
29:20
35:25 36:1
36:4 42:6
45:12,15
45:20,21
77:18
**represen...**
70:15 74:15
75:25
**represented**
14:15 15:23
15:25 26:4
29:19 32:1
32:4,9,15
32:22,24
40:4 43:25
**represen...**
14:19 16:8
16:11,17
37:25
45:25
51:12
**request**
20:7 33:21
35:18
46:19,22
54:14 55:2
55:5,7,21
56:3,18
62:7 63:20
64:25 66:9
66:22
70:16,20
71:18 72:6
74:6 76:15
79:20
80:22,23
81:17
**requesting**
35:24 46:15

54:19
80:16
**Requests**
55:13
**required**
15:3 63:5
**requires**
62:11
**reserved**
86:10
**residence**
27:14,15,22
**resolve**
19:4
**responsi...**
15:4 44:16
**Restated**
23:24 24:6
**Restatement**
24:10
**return**
14:2
**review**
5:18 13:9
18:19 23:9
25:16 35:9
46:23
47:20 49:3
60:5 72:19
86:5
**reviewed**
6:5 28:23
48:24
58:16
59:22
65:16
68:23
**reviewing**
13:4 65:17
**Revocable**
1:4 5:10
23:24
24:11
46:17 48:3
48:8 53:13
54:16 57:1
57:5,19
65:8 66:1
66:4 79:21

83:21 88:4
**rider**
17:18,23
**right**
14:7 16:15
30:7 42:18
50:17
56:22
57:12
69:21
73:11 80:6
80:22
81:24
82:14,16
82:17
84:24 86:1
86:5
**risk**
30:18,19
**Rocco**
1:14 87:3
87:22
**RPR**
87:22
**rules**
1:17 4:13
13:18 15:3
**run**
42:7
**RWS**
1:7 88:7

_____
**S**
_____
**S**
3:6
**safe**
36:20,23
**saw**
67:6 80:1
**saying**
40:7 41:24
81:11
**says**
24:15 31:3
40:1,16
43:15
49:10 56:9
62:19,20
62:24

63:10
81:18,25
**school**
7:18 9:21
10:3
**second**
39:25 56:4
80:23
81:17
**see**
30:4,5
31:12,15
48:5 59:23
61:11 67:1
68:4 81:21
85:13
**seeing**
30:3 65:11
65:22
**seen**
5:19 17:16
23:11,18
28:12
29:25 65:9
**sell**
27:12
**send**
84:16
**sending**
36:4 37:20
**senior**
13:25
**sense**
16:12 46:7
**sent**
29:3,14
36:15 56:7
59:1,15,16
60:1 61:7
62:9 66:9
68:6 74:1
84:21
85:22
**sentence**
40:15
**separate**
42:9
**served**
9:12

**Service**
54:14 55:2
55:4,21
56:2,10,18
56:24 66:9
81:17
**settled**
50:21 69:8
69:9,14
**settlement**
38:16 39:23
51:3,6,24
52:24 53:5
**settling**
50:24
**seven**
37:20 66:8
**shaking**
4:15
**sheets**
88:15,20
**short**
19:22
**showing**
54:19 80:17
83:10
**shows**
31:3,10
68:1 83:3
83:9
**sign**
64:13 86:7
**Signature**
86:10
**signed**
26:12,14
35:23
58:16
**similarly**
1:5 88:5
**situated**
1:6 88:6
**situation**
46:2
**six**
37:20 80:14
81:4
**sixth**
57:9 81:25

82:3,6
**skill**
87:13
**SLABY**
2:7 14:20
15:23 18:9
31:19,23
34:2,21
37:13
40:13
44:22
47:14
49:15
52:11 54:3
55:15
56:19 58:6
60:7,17
61:14,22
62:17,22
63:1,8
64:21
65:18 67:4
67:19
68:15,22
70:1,22
71:5 72:1
74:10,20
75:6,11
76:5 77:24
86:7
**small**
57:13
**So-and-So**
41:19,22
**socially**
17:4
**sold**
27:17,19
**solely**
64:17,17
**somebody**
12:24 32:22
**Somewhat**
12:14 19:8
**sons**
39:5
**sorry**
26:1,8
31:24

37:15
62:13 63:2
80:11
85:16
**sort**
10:10 55:9
64:18
**South**
2:3
**spans**
22:4
**speak**
35:11 77:21
78:10,19
**speaking**
45:1 53:4
60:22 64:6
75:23
78:15
**speaks**
62:17
**specialist**
6:18
**specialties**
6:19
**specialty**
6:20
**specific**
9:7
**specific...**
67:17 75:20
78:14
**speculation**
34:23 81:6
81:13
**spelled**
81:19
**spend**
6:21,23
**spent**
13:3
**spoken**
14:9 15:5
22:1,16,22
36:3 76:17
76:20,24
77:4,7,10
78:7,22
**Sprich**

1:4 5:9
15:5 16:1
35:24
58:17 68:9
88:4
**St**
1:21 2:8
4:25 8:4
11:1 27:3
47:13 57:9
66:5
**standard**
20:24 55:11
55:17
**standing**
72:12
**started**
7:19 10:23
38:3
**starting**
20:2
**state**
4:14,19
10:17 13:6
44:13
46:20 49:8
79:18
**stated**
51:11 63:6
85:7
**statement**
13:7 46:18
**statements**
14:22 84:19
**states**
1:1 30:11
36:13 38:4
40:20 57:8
60:8,9
62:10
64:16
65:25 66:3
80:14 88:1
**stating**
65:3,7
66:15
**status**
74:9
**stemmed**

39:8
**stenogra...**
87:7
**step**
85:13
**Stephanie**
77:4
**steps**
85:19
**street**
2:13 82:9
**strike**
24:24 53:5
55:24
63:22
67:11 68:7
**strong**
51:1
**stuck**
43:4
**studied**
7:9
**study**
7:8
**subject**
45:23
**submitted**
88:20
**subpoena**
3:9 17:12
17:19
**SUBSCRIBED**
88:22
**subsequent**
69:1,3
**substantial**
19:21
**Such-and...**
41:22,24
**sue**
41:21 42:18
43:3
**sued**
8:6,16,20
52:9
**sues**
41:19
**suit**
5:24 8:15

8:22 11:11
14:9 19:2
42:21
43:17
**Suite**
1:21 2:3,8
2:13
**suited**
85:15
**suppleme...**
18:7
**suppleme...**
21:20
**supposedly**
83:10
**suppressed**
44:8
**Supreme**
1:17
**sure**
8:6 20:16
28:7 56:14
70:8 72:8
74:17
**surrender**
30:21,23
31:1
**Susan**
78:7,10,15
**switched**
81:23
**sworn**
4:1,4 87:8
88:22

---

**T**

**T**
3:6 87:1,1
**take**
5:18 10:9
10:13
34:12,20
37:21
40:10,16
59:2 66:16
85:13
**taken**
1:13,15 5:4
9:1 19:5

25:15
28:22 32:2
32:9,16
34:19
42:11
47:12
59:19
85:20 87:7
**talk**
20:21
**talked**
77:18
**talking**
22:3 23:14
44:24,25
48:16
49:16
**tangible**
39:11
**tax**
6:13 12:15
14:2
**Teal**
76:20,22
**tell**
8:13 9:15
9:22 25:21
29:2 37:11
38:16 39:2
39:7 57:10
60:23
66:25 73:6
86:4
**telling**
75:12
**term**
20:25 21:2
21:3 22:9
22:10
32:19
60:15
**terminate**
36:1
**termination**
14:13 72:23
**terms**
33:16 51:2
58:9 71:14
74:19

**testified**
4:5
**testify**
5:6
**testimony**
31:17 53:21
85:8 87:6
87:10
88:13,14
**Texas**
10:13,14,15
**thereof**
1:18
**thing**
15:1 81:10
**things**
6:22 69:25
**think**
6:20 8:12
14:16,20
15:24 16:5
20:15 22:5
34:24
39:11
40:22,24
44:10
55:17 64:5
65:16
69:14 73:8
78:12 85:5
**third**
12:22 83:3
83:7
**Thomas**
38:13,22,24
**thought**
17:2 73:10
**Three**
44:12
**time**
6:21,23
9:11 10:22
11:4 13:21
14:1 16:24
21:18 22:4
22:6,13
28:14
30:12
31:14

34:13,13
48:14 61:3
66:12
69:22
72:10 79:5
81:2
**timely**
6:4
**times**
8:9 44:10
**title**
11:20,23
**titled**
23:22
**today**
5:5,8 13:1
44:12
**today's**
32:25
**Tom**
40:1 51:12
51:18
**top**
39:25 56:2
56:6,11
66:3
**touch**
20:2
**Trail**
4:25
**transcribed**
87:12
**transcript**
86:6 87:10
87:11
88:12,13
**transfer**
47:5,6,9
48:1,16,20
49:3
**transferred**
7:20
**trouble**
32:18
**true**
43:9 62:10
87:11
88:14
**trust**

1:5 5:10
6:12 7:1
12:8,12
13:21,22
15:20 16:2
16:4,7,9
16:11,13
16:18,23
17:21
23:24 24:6
24:11 25:1
25:1,7,9
25:11
26:22 27:1
27:2,11,17
29:19,21
37:22
38:25 40:3
40:5,9,11
40:12,17
40:20,23
41:4,7,8,9
41:11,18
41:19,20
41:22,25
42:2,4,4,7
42:8,18,22
42:23 43:2
44:15,17
44:20,21
44:25 45:7
45:13,14
45:16,20
45:23,25
46:1,4,6,6
46:18 48:3
48:8,21
50:13 51:8
51:12,16
51:21 52:7
53:2,13,18
53:22
54:16,21
57:1,5,19
57:23
63:22,25
64:1,3,5,9
64:12,13
64:17 65:8
66:1,4,10

67:14,15
68:3,13,17
69:16,17
69:20,24
70:6,16
71:12,22
72:23 73:2
75:25 76:1
76:4 77:15
77:17,17
77:19,20
78:2,13
79:15,21
80:18
82:13
83:21 85:7
88:5
**trustee**
41:22,24
42:3 45:6
45:14,16
46:3,5
52:3,5,10
**trustee's**
41:23
**trustees**
1:4 5:10
16:1,6,11
16:12,18
39:21 40:9
40:12,16
40:24 41:9
41:10,11
41:13 42:5
42:6,7,11
42:21 43:1
44:16,19
45:21,25
50:12 51:8
64:1,3,5,9
64:13,18
70:15 74:4
74:16
75:25 76:1
76:2 77:19
88:4
**trusts**
44:25 75:3
**trying**
25:23

turned
36:25 51:19
two
7:20 9:11
  81:23 84:4
type
6:10 55:13
typed
55:20 56:4
types
31:18,21
  32:2 33:7
typewriter
55:9
typically
12:21,24
  64:6,12
  85:21,25
typo
57:13,14
  58:7
typograp...
58:12

_____
**U**
undergrad
7:6
underlying
15:19
understand
22:8,10
  52:13 72:8
  75:13,22
  79:13
understa...
5:21,25
  16:10
  18:22
  21:25 22:5
  29:13,18
  30:14,24
  31:5 34:15
  37:18
  42:17,20
  43:7,11,13
  50:23
  56:16 59:6
  60:14
  68:20 74:6

understood
20:17,19
UNITED
1:1 88:1
Universal
19:10
University
7:7,19,21
unrelated
34:23
up-front
21:9
update
66:23 72:11
upkeep
74:9

_____
**V**
vague
21:11,12
  39:10 75:7
  76:8 82:20
value
6:3 21:16
  21:19
  22:12
  30:12,16
  31:12 33:2
  34:17,17
  34:19 35:4
  70:12,16
values
33:24 34:10
Vance
29:7 53:10
  54:13
  59:16 63:7
  65:3 79:12
  79:14
  80:13,13
  82:24
varies
55:17
vehicle
78:1
verifica...
65:1
versus
5:11

videocon...
4:5
view
18:3
vs
1:8 88:8

_____
**W**
wait
34:19 35:5
want
15:2
wants
14:21
wasn't
54:1
way
40:23 49:24
  49:25 67:6
  69:19 83:7
we're
5:8 13:1
  22:3 43:4
  49:16
  81:25
we've
49:11
week
43:18,22
went
68:13
West
2:13
Wiegand
1:3,4 5:9
  5:10 13:16
  13:19,25
  14:5,9,19
  15:14,16
  16:1,16
  19:5 21:6
  22:17,20
  22:24
  23:24
  24:11
  26:12,14
  27:1,6
  38:16,20
  39:9 43:2

46:16,17
48:2,8
50:10 52:2
52:3 54:16
54:17,20
57:1,4,18
58:17 65:8
66:1,4
72:4,10
76:18,20
76:22,25
77:2,5,8
77:11,14
77:22 78:5
79:21
80:18
82:13 83:4
83:21 88:3
88:4
Wiegand's
19:6 22:23
Wiegands
20:14 26:4
  37:19
  38:25 68:3
  68:10
wife
19:6
wish
86:6
withdraw
45:9,11,15
  45:19 46:9
withdrawing
45:20
witness
3:2 4:1,3
  15:21,25
  23:18 28:5
  37:15
  40:15
  42:14 44:3
  44:8 45:2
  47:15
  52:21 54:4
  55:16
  56:20 58:7
  60:12,18
  61:16,23
  62:20,24

63:10
65:19 67:5
67:20
68:16,23
70:23 71:6
72:2 74:22
75:9,14
76:9 77:25
81:7,14
87:8
Woodoaks
4:25
Woods
27:2,4,7,12
  27:19
  47:13,24
  66:5,16,18
  70:20
  71:11
  83:22
word
27:11
words
60:18,23
  61:1
work
6:16 9:19
  9:25 10:19
  10:21 11:6
  12:9 37:19
  38:25 39:3
  67:13 68:8
  69:15,23
worked
9:22,23
  10:2 12:8
  20:14
  51:18
working
10:25 51:20
wrapping
69:24
write
9:6 55:14
written
9:4,10
  38:14
  39:25
  41:23
  54:24 55:8

55:8 56:3
56:7 79:25
**wrong**
31:17 83:12
83:24 84:7
**wrote**
43:18 80:6
83:15

___

**X**

**X**
3:1,6

___

**Y**

**year**
7:10,24
13:24 61:6
61:12
69:12 84:4
**yearly**
21:21 31:9
70:10,11
70:16
**years**
5:3 7:20
10:2,11
22:4 34:9
41:4 43:4
43:24
44:11
64:15 75:2
75:24 79:9
84:4
**York**
1:9 4:10,11
5:11,12,23
5:24 6:1
48:25
53:11 58:3
65:6 66:22
67:2 70:11
70:14
71:10 72:5
72:11,21
72:22 73:5
73:12,18
74:1,8
79:14
83:10,19
84:6,19

85:9 88:9

___

**Z**

**zero**
31:11

___

**0**

___

**1**

**10**
3:21
**10-year**
31:13
**100**
47:4
**103,000**
68:3
**1064**
87:23
**110**
1:21 2:8
**12**
3:20 54:12
80:13
82:11
**12-8**
67:24 68:2
**12:00**
1:19
**13**
3:22 80:9
**140**
59:1
**15**
3:23 4:25
**153**
24:9
**16**
3:21,22
**165**
1:20 2:8
57:5,10
66:10,18
71:21
81:18
**168,477.95**
31:4
**17**
3:9,20

39:24
59:16
82:24
**17th**
38:15 83:14
**18**
3:9,22
53:21
**188**
1:7 88:7
**19**
3:20,20
53:13
**1945**
4:23
**1967**
7:12
**1973**
7:25
**1981**
10:18
**199**
25:17
**1990**
11:18
**1993**
8:12 11:8,9
11:10 44:2
44:3,5
**1994**
11:19

___

**2**

**2:05**
86:12
**20**
3:20 22:4
**200**
26:11
**2002**
17:2 26:3,4
30:13 32:4
35:23
36:14
56:23
**2003**
17:2 22:8
37:12,25
38:15

39:24
46:14 50:6
53:13,21
56:23
73:22,25
79:12,17
80:7,23
**2004**
54:12 56:23
59:2,8,16
65:2,25
66:15 67:9
67:14,24
68:2,10,14
68:21 69:3
69:8 80:9
80:14,24
82:11,24
83:14,20
85:6
**2005**
32:8 60:2
69:25
**2006**
14:3 69:11
69:13,25
**2007**
14:3,5
69:13 70:1
70:3,4
**201**
26:25 28:7
**202**
28:8
**2022**
14:8 32:14
**2023**
1:20 87:8
88:13,23
**22**
46:14 73:21
79:12,17
80:6
**222**
2:3
**228**
28:8
**23**
3:10,23

35:22
37:25
65:25
66:15 67:8
67:14
83:19 85:6
**24**
37:12 65:2
**24th**
1:20 87:8
88:13
**25**
3:10,21
**28**
3:11

___

**3**

**30**
79:9
**300**
2:13
**314-727-...**
57:19
**314.244....**
2:9
**314.899....**
2:4
**33**
3:20,20
**35**
3:11,21,21
**37**
3:12
**38**
3:12
**39**
5:3

___

**4**

**4**
3:4 26:3,4
59:2,8
**4:22**
1:7 88:7
**40**
34:9
**45**
13:3,10
41:3 64:15

75:2,24
**46**
3:13

---
**5**

**5**
3:8,20,21
**50**
3:13
**500**
43:4
**502**
54:23
**504**
58:15
**521**
2:13
**53**
3:14
**54**
3:14
**550**
2:3
**58**
3:15
**59**
3:15

---
**6**

**6-13**
60:2
**6-30**
4:23
**61**
3:21
**618,646.40**
30:18
**618.277....**
2:14
**62**
3:21
**62220**
2:14
**62791665**
19:11 65:5
**63**
3:22,22
**63105**
1:21 2:3

57:10
**63105-3772**
2:8
**63124**
5:1
**63131**
27:3
**64**
3:16
**67**
3:16 29:25
30:11

---
**7**

**7**
30:13
**7,000**
63:11
**7,818.50**
62:12
**700,000**
21:13
**71**
3:22,22
**73**
31:8
**74**
29:25
**75**
3:23
**750,000**
30:22
**76**
3:23
**7702**
31:3
**778,636.04**
30:14
**79**
3:4
**7th**
36:14

---
**8**

**8**
3:22
**85**
3:5

---
**9**

**9**
27:2,4,7,12
27:18
47:13,23
66:5,16,18
70:20
71:11
83:22
**98**
47:3